**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**

| | |
|---|---|
| LOU ANN LANDEL and ALVIN L. LEWIS JR.,<br>on behalf of themselves and all others<br>similarly situated,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>OLIN CORPORATION, OLIN PENSION AND<br>CEOP ADMINISTRATIVE COMMITTEE,<br>and JOHN/JANE DOES 1-10,<br><br>　　　　　Defendants. | )<br>)<br>) Civil Action No.: 4:25-cv-00096-JAR<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR**
**MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT**

COME NOW Defendants Olin Corporation ("Olin") and Olin Pension and CEOP

Administrative Committee ("Committee") (collectively, "Defendants"), and for their

Memorandum in Support of their Motion to Dismiss Plaintiffs' Amended Complaint, pursuant to

Fed. R. Civ. P. Rule 12(b)(6), state as follows:

i

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................ 1

STATEMENT OF FACTS .......................................................................................... 4

I.    ERISA's Statutory Framework ........................................................................ 4

II.    Olin and the Plan........................................................................................... 5

III.    Plaintiffs' Claims ........................................................................................... 6

STANDARD OF REVIEW ........................................................................................ 8

ARGUMENT .............................................................................................................. 8

I.    The Plan's Limitations Period Bars Plaintiffs' Claims.................................. 8

II.    Count I Fails to State a Claim for Violation of 29 U.S.C. § 1055. ................ 10

    A.    ERISA § 1055(d) and (e) Require that the SLA and QJSA be the "Actuarial Equivalent" Under the Assumptions Used in the Plan Document. ........................................................................................ 12

    B.    The Court Cannot Impose onto ERISA Additional Requirements That Congress Intentionally Omitted. ............................................. 14

    C.    The Regulations Cited by Plaintiffs Prove that Actuarial Equivalence Does Not Require that the Actuarial Assumptions be Reasonable or Updated. ............ 17

    D.    Using the Plan's Assumptions to Calculate Plaintiffs' Benefits Furthers ERISA's Goals of Transparency, Consistency, and Predictability....................... 20

    E.    Plaintiffs' Contrary Case Law is Not Persuasive................................. 22

III.    Count II Fails to State a Claim for Breach of Fiduciary Duty. ....................... 24

    A.    Count II Must be Dismissed Because Defendants Complied with ERISA § 1055............................................................................... 24

    B.    Plaintiffs Fail to State a Claim for Breach of Fiduciary Duty Against Defendant Olin Because Setting Plan Design is Not a Fiduciary Function.......... 25

    C.    The Committee Did Not Breach a Fiduciary Duty in Following the Plan Terms. ............................................................................ 27

    D.    Defendants Did Not Engage in a Prohibited Transaction under ERISA. ............. 28

    E.    Plaintiffs Cannot State a Claim Under 29 U.S.C. § 1132(a)(2). ........................... 30

CONCLUSION.......................................................................................................... 30

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Adams v. U.S. Bancorp*,
635 F. Supp. 3d 742 (D. Minn. 2022) ................................................................. 23

*Anderson v. Resol. Tr. Corp.*,
66 F.3d 956 (8th Cir. 1995) ........................................................................... 25, 27

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........................................................................................... 8

*Ausler v. Aetna Life Ins. Co*,
No. 4:18-CV-00315 JAR, 2019 WL 1015004 (E.D. Mo. Mar. 4, 2019) ................. 9

*Beck v. PACE Int'l Union*,
551 U.S. 96 (2007) ............................................................................................ 26

*Belknap v. Partners Healthcare Sys., Inc.*,
588 F. Supp. 3d 161 (D. Mass. 2022) ................... 11, 12, 14, 16, 19, 20, 21, 22, 24

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ....................................................................................... 8, 26

*Bennett v. Federated Mut. Ins. Co.*,
141 F.3d 837 (8th Cir. 1998) ............................................................................. 10

*Cement & Concrete Workers Dist. Council Pension Fund v. Ulico Cas. Co.*,
387 F. Supp. 2d 175 (E.D.N.Y. 2005) ................................................................ 28

*Chesnut v. Montgomery*,
307 F.3d 698 (8th Cir. 2002) ............................................................................. 15

*Conkright v. Frommert*,
559 U.S. 506 (2010) ................................................................................. 4, 20, 21

*Covic v. FedEx Corp.*,
--- F. Supp. 3d ---, 2024 WL 5509315 (W.D. Tenn. Sept. 8, 2024) ............. 12, 13, 24

*Crouch v. Bussen Quarries, Inc.*,
124 F. Supp. 3d 947 (E.D. Mo. 2015) ................................................................ 27

*Cunningham v. Cornell Univ.*,
145 S. Ct. 1020 (2025) ...................................................................................... 17

*David v. Alphin*,
704 F.3d 327 (4th Cir. 2013) ............................................................................. 29

*Drummond v. Southern Co. Servs., Inc.*,
Case No. 2:23-cv-00174, 2024 WL 4005945 (N.D. Ga. July 30, 2024) .... 12, 13, 14, 16, 18, 24

*Duffy v. Anheuser-Busch Companies, LLC*,
449 F. Supp. 3d 882 (E.D. Mo. 2020) ........................................................... 23, 24

*Elkharwily v. Mayo Holding Co.*,
955 F. Supp. 2d 988 (D. Minn. 2013) ................................................................ 26

*Great-West Life & Annuity Ins. Co. v. Knudson*,
534 U.S. 204 (2002) .......................................................................................... 16

*Heimeshoff v. Hartford Life & Accident Ins. Co.*,
571 U.S. 99 (2013) ........................................................................... 2, 4, 8, 9, 21

*Hughes Aircraft Co. v. Jacobson*,
525 U.S. 432 (1999) ..................................................................................... 26, 27

*Jenisio v. Ozark Airlines, Inc. Retirement Plan*,
   187 F.3d 970 (8th Cir. 1999) .................................................................................. 8

*Kennedy v. Plan Adm'r for DuPont Sav. & Inv. Plan*,
   555 U.S. 285 (2009) ............................................................................................... 21

*Larsen v. Cigna Corp. Short-Term Disability Plan*,
   Case No. 05-4189, 2006 WL 1367368 (D.S.D. May 18, 2006) ............................. 30

*Lockheed Corp. v. Spink*,
   517 U.S. 882 (1996) ..................................................................................... 4, 20, 29

*Massachusetts Mut. Life Ins. Co. v. Russell*,
   473 U.S. 134 (1985) ............................................................................................... 30

*Mertens v. Hewitt Assocs.*,
   508 U.S. 248 (1993) ............................................................................................... 15

*Munro-Kienstra v. Carpenters' Health & Welfare Trust Fund of St. Louis*,
   790 F.3d 799 (8th Cir. 2015) ............................................................................... 8, 9

*Paul v. RBC Cap. Mkts. LLC*,
   Case No. 16-cv-5616, 2018 WL 3630290 (W.D. Wash. July 31, 2018) ................ 28

*Pegram v. Herdrich*,
   530 U.S. 211 (2000) ............................................................................................... 25

*Reichert v. Bakery, Confectionary, Tobacco Workers & Grain Millers Pension Comm.*,
   Case No. 2:23-cv-12343, 2024 WL 5410419 (E.D. Mich. Apr. 17, 2024) ........ 12, 24, 25

*Russello v. United States*,
   464 U.S. 16 (1983) ................................................................................................. 15

*Schultz v. Windstream Commc'ns, Inc.*,
   600 F.3d 948 (8th Cir. 2010) ................................................................................ 27

*Sec'y of Lab. v. Macy's, Inc.*,
   Case No. 17-cv-541, 2022 WL 407238 (S.D. Ohio Feb. 10, 2022) ....................... 28

*Shafer v. Zimmerman Transfer, Inc.*,
   Case No. 1:20-cv-00023, 2020 WL 7260034 (D. Iowa Dec. 19, 2020) ................. 26

*Shaw v. Delta Air Lines, Inc.*,
   463 U.S. 85 (1983) ................................................................................................... 4

*Stark v. Healthy Alliance Life Ins. Co.*,
   Case No. 4:10–CV–1141, 2010 WL 4320339 (E.D. Mo. Oct. 22, 2010) ................ 30

*Stephens v. U.S. Airways Group, Inc.*,
   644 F.3d 437 (D.C. Cir. 2011) .............................................................................. 12

*Thorne v. U.S. Bancorp*,
   Case No. 18-3405, 2021 WL 1977126 (D. Minn. May 18, 2021) .......................... 22

*Trs. of the Graphic Commc'ns Int'l Union Upper Midwest Loc. 1M Health & Welfare Plan v. Bjorkedal,*
   516 F.3d 719 (8th Cir. 2008) ........................................................................... 29, 30

*Union Pac. R.R. Co. v. Beckham*,
   138 F.3d 325 (8th Cir. 1998) ............................................................................. 9, 10

*Urlaub v. CITGO Petroleum Corp.*,
   Case No. 21 C 4133, 2022 WL 523129 (N.D. Ill. Feb. 22, 2022) ......................... 23

*Usenko v. MEMC LLC*,
   926 F.3d 468 (8th Cir. 2019) .................................................................................. 8

*Wright v. Oregon Metallurgical Corp.,*
  360 F.3d 1090 (9th Cir. 2004) ............................................................................ 29
*Zean v. Fairview Health Servs.,*
  858 F.3d 520 (8th Cir. 2017) ................................................................................ 5

**Statutes**

26 U.S.C. § 401(a)(25)............................................................................. 2, 5, 14, 17
26 U.S.C. § 417(e) ............................................................................................. 19, 23
26 U.S.C. § 417(e)(3)(B) ......................................................................................... 14
26 U.S.C. § 430(h)(1) .............................................................................................. 19
26 U.S.C. § 430(h)(3) ......................................................................................... 14, 19
26 U.S.C. § 410(a) ................................................................................................... 18
26 U.S.C. § 411 ....................................................................................................... 18
26 U.S.C. § 412....................................................................................................... 18
29 U.S.C. § 1001 ....................................................................................................... 1
29 U.S.C. § 1002(16)(A).......................................................................................... 25
29 U.S.C. § 1002(16)(B)(i) ...................................................................................... 25
29 U.S.C. § 1002(21)(A)........................................................................................... 26
29 U.S.C. § 1024(b)(4) .............................................................................................. 9
29 U.S.C. § 1054..................................................................................................... 11
29 U.S.C. § 1054(c)(3)........................................................................................ 16, 23
29 U.S.C. § 1054(g)(1) ............................................................................................ 22
29 U.S.C. § 1055 .............................................................................................. *passim*
29 U.S.C. § 1055(a)(1)............................................................................................... 5
29 U.S.C. § 1055(a)(2)........................................................................................... 1, 5
29 U.S.C. § 1055(d) ......................................................................................... *passim*
29 U.S.C. § 1055(d)(1) .............................................................................................. 5
29 U.S.C. § 1055(e) ......................................................................................... *passim*
29 U.S.C. § 1055(e)(1)(a) ...................................................................................... 1, 5
29 U.S.C. § 1055(g) ...................................................................................... 11, 15, 19
29 U.S.C. § 1055(g)(3)(A)....................................................................................... 15
29 U.S.C. § 1055(g)(3)(B) .................................................................................. 14, 15
29 U.S.C. § 1083(h) ................................................................................................. 16
29 U.S.C. § 1083(h)(3) ............................................................................................ 14
29 U.S.C. § 1084(c)(3)............................................................................................. 16
29 U.S.C. § 1085(c)(3)(A) ....................................................................................... 16
29 U.S.C. § 1085a(c)(3) ........................................................................................... 16
29 U.S.C. § 1102(a)(1)............................................................................................... 4
29 U.S.C. § 1102(a)(2).............................................................................................. 25
29 U.S.C. § 1102(b)(4) .................................................................................... 5, 16, 21
29 U.S.C. § 1104(a)(1)(D) ....................................................................................... 28
29 U.S.C. § 1106...................................................................................................4, 29
29 U.S.C. § 1106(a)(1)........................................................................................ 28, 29
29 U.S.C. § 1106(a)(1)(D) ....................................................................................... 28
29 U.S.C. § 1106(b)(1) ............................................................................................ 29
29 U.S.C. § 1109...................................................................................................... 30

29 U.S.C. § 1109(a) ........................................................................................................ 30
29 U.S.C. § 1132(a)(2) .................................................................................................... 30
29 U.S.C. § 1202(c) ........................................................................................................ 18
29 U.S.C. § 1393(a)(1) .................................................................................................... 16
PL 98–397, Aug. 23, 1984, 98 Stat 1426 ........................................................................ 15
PL 103–465, Dec. 8, 1994, 108 Stat 4809 ...................................................................... 15

**Rules**

Rev. Rul. 79-90 ............................................................................................................... 17

**Regulations**

26 C.F.R. § 1.401(a)(4)-12 ..................................................................................... 12, 18, 24
26 C.F.R. § 1.401(a)-11(b)(2) ......................................................................................... 18
26 C.F.R. § 1.401(a)-14(c)(2) .......................................................................................... 18
26 C.F.R. § 1.401-1(b)(1)(i) ............................................................................................ 17
26 C.F.R. § 1.411(a)(13)-1(b)(3) ..................................................................................... 19
26 C.F.R. § 1.411(d)-3 ..................................................................................................... 22
26 C.F.R. § 1.411(d)-3(g)(1) ........................................................................................... 18
26 C.F.R. § 1.417(a)(3)-1(c)(2)(iv)(A)-(B) ..................................................................... 19
26 C.F.R. § 1.417(f)(ii)(2)(A)-(B) ................................................................................... 19

**Other Authorities**

Am. Acad. of Actuaries, *Final Report of Joint Comm. on Pension Terminology*,
    7 J. AM. ACAD. ACTUARIES 223, 236 (1981) .................................................... 13
American Academy of Actuaries, Actuarial Standards Board, Actuarial Standards of Practice 27,
    available at: https://www.actuarialstandardsboard.org/asops/adopted-asop-no-27-selection-of-
    assumptions-for-measuring-pension-obligations/ .................................................... 20
American Academy of Actuaries, Actuarial Standards Board, Actuarial Standards of Practice 35,
    available at: https://www.actuarialstandardsboard.org/asops/asop-no-35-documentation-and-
    disclosure-in-property-and-casualty-insurance-ratemaking-loss-reserving-and-valuations-
    repealed/ .................................................................................................................. 20
American Society of Actuaries, Glossary .................................................................... 13
Quarterly Mortality Monitoring Report for the U.S. Population, by the Society of Actuaries
    Research Institute, April 2025, available at https://www.soa.org/resources/research-
    reports/2025/qmmr-us-population/ .............................................................................. 2
Soc'y of Actuaries, Report on Actuarial Terminology for Pension Plans, 28 TRANSACTIONS
    SOC'Y ACTUARIES 327, 329 (1976) .......................................................... 12-13

## INTRODUCTION

Plaintiffs receive monthly annuity payments under the Olin Corporation Employees Pension Plan (the "Plan"). Plaintiffs acknowledge that they received the benefits provided by the Plan – but they assert that the Court should ignore the terms of the Plan and re-calculate their benefits using different "actuarial assumptions" because, they allege, the mortality tables and interest rates in the Plan are "outdated." Am. Compl. ¶ 5. Plaintiffs bring this lawsuit under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq. ("ERISA"), seeking to represent a class of Plan participants and beneficiaries whose benefit payments they allege would have been higher if they had been calculated with the Treasury Department's mortality tables and interest rate. Plaintiffs' claims must fail because ERISA entitles them to the annuity payments set forth in the Plan, and it does not require these assumptions to be rewritten or revised.

Plaintiffs' theory turns on the term "actuarial equivalence." A participant can receive benefits payable as an annuity for the participant's life ( "single life annuity" or "SLA"). A married participant may elect to have the benefit paid as an annuity payment for his or her life followed by the life of the surviving spouse ("joint and survivor annuity," or "JSA"). ERISA requires that a Qualified JSA ("QJSA") be "the actuarial equivalent" of the SLA. 29 U.S.C. § 1055(d). This actuarial equivalence accounts for the assumption that a JSA (paid over the lifetime of the employee plus spouse) will likely be paid over a longer period of time than an SLA (paid over just the employee's lifetime). If a participant dies *before* annuity payments begin, the surviving spouse receives a "qualified preretirement survivor annuity" ("QPSA"), with annuity payments for the spouse's life. 29 U.S.C. § 1055(a)(2). The QPSA must be no less than what the spouse would have received under a QJSA "(or the actuarial equivalent thereof)." *Id.* § 1055(e)(1)(A).

The term "actuarial equivalent" means that the benefit streams of the SLA and

1

QJSA/QPRA will have the same present value under a given set of assumptions. Am. Compl. ¶ 30. The assumptions underlying this calculation are (1) mortality tables and (2) interest rates. *Id.* ¶ 11. Plaintiffs' theory is that mortality rates have generally improved over time – though this is not a given, as the COVID-19 pandemic has shown[1] – so, they allege, the Plan must continuously update its actuarial assumptions to incorporate more recent data. Plaintiffs' theory is unsupported by the plain language of ERISA or by any implementing regulation.

ERISA deliberately leaves the content of actuarial assumptions used for annuity payments up to the plan sponsor. The only requirement for these actuarial assumptions is in the Internal Revenue Code, which requires that the "actuarial assumptions . . . are specified in the plan[.]" 26 U.S.C. § 401(a)(25). As the Supreme Court has repeatedly recognized, ERISA's "focus on the written terms of the plan is the linchpin of a system that is not so complex that administrative costs, or litigation expenses, unduly discourage employers from offering ERISA plans in the first place." *Heimeshoff v. Hartford Life & Accident Ins. Co.,* 571 U.S. 99, 108 (2013) (citation and quotation omitted). ERISA does not require plans to update the actuarial assumptions used to calculate annuity benefits, for good reason. Requiring a plan's actuarial assumptions to change every time new mortality data becomes available or interest rates change would lead to unpredictability in the amount of a plan's payments, which may not always work in a participant's favor.

Indeed, interest rates can change daily. Plaintiffs cite to IRS Effective Rates varying from 2.33% to 5.40% from 2018-2024 (though historically interest rates have swung much higher). Am. Compl. ¶ 64. Plaintiffs allege that the Plan uses a 5% interest rate – and they admit that this interest

---

[1] The Society of Actuaries published a report stating that the pandemic led to a roughly 20% increase in national age-standard death rates, and that in July 2024 the national death rate remained .8% greater than the 2019 level. *See* Quarterly Mortality Monitoring Report for the U.S. Population, by the Society of Actuaries Research Institute, April 2025, available at https://www.soa.org/resources/research-reports/2025/qmmr-us-population/.

rate is not "inherently unreasonable." Am. Compl., ¶¶ 61-62. What is unreasonable is Plaintiffs' suggestion that their benefits must change every time the interest rate changes. Of course, interest rates change in both directions, and Plaintiffs' theory that interest rates must be "current" could result in a decrease in benefits for some plan participants – which itself could run afoul of ERISA.

Notably, Plaintiffs do *not* argue that the actuarial assumptions set forth in Olin's Plan were not reasonable when they were adopted. Rather, they allege they became "unreasonable" because they are now "outdated." Am. Comp. ¶ 85. To support their argument that the Court should rewrite the terms of the Plan, Plaintiffs cite *other* sections of ERISA and *inapplicable* Treasury regulations. But the fact that Congress required that actuarial assumptions be "reasonable" or based upon the Treasury assumptions in *other* sections of ERISA proves that Congress does not understand these requirements are inherent to actuarial assumptions and Congress did not intend to impose these requirements in § 1055(d)-(e) when annuities are paid pursuant to the plan's terms.

To be clear, Olin maintains that the Plan's actuarial assumptions are reasonable, but that issue is not before the Court on this motion to dismiss. Rather, the issue on this motion to dismiss is: Does Plaintiffs' allegation that the Plan's actuarial assumptions are not reasonable (accepted as true on a motion to dismiss) state a claim upon which relief can be granted? The answer is no, because ERISA requires only that the annuity forms be "actuarially equivalent" under the actuarial assumptions set forth in the Plan. Plaintiffs' allegation that the assumptions set forth in the Plan are not reasonable does not give rise to a claim under ERISA, as a matter of law.

Plaintiffs' Amended Complaint fails to state a claim and should be dismissed. Plaintiffs' claims are untimely because the Plan provides that all claims must be brought within two years, and Plaintiffs waited five years to bring this lawsuit. On the merits, Count I, alleging that Defendants breached § 1055(d) and (e) by using "outdated" actuarial assumptions, should be

3

dismissed because ERISA requires that annuities be paid using the actuarial equivalence factors in the Plan, and ERISA does not allow a claim that these assumptions are not "reasonable." If the Court dismisses Count I, then Count II, alleging breach of fiduciary duty based upon use of these assumptions, necessarily fails as well. Additionally, Count II should be dismissed because: (1) Olin is not a fiduciary when setting the terms of the Plan; (2) the Committee does not breach a fiduciary duty by paying benefits in accordance with the Plan terms; and (3) Plaintiffs' allegation that Olin should have paid more in benefits is not a "prohibited transaction" under ERISA § 1106.

### STATEMENT OF FACTS

### I.     ERISA's Statutory Framework

ERISA is a "careful balancing" between the interests of employee and employer. *Conkright v. Frommert*, 559 U.S. 506, 517 (2010) (quotation omitted). Though "designed to promote the interests of employees and their beneficiaries in employee benefit plans," *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90 (1983), it neither "requires employers to establish employee benefits plans" nor "mandate[s] what kind of benefits employers must provide if they choose to have such a plan." *Lockheed Corp. v. Spink*, 517 U.S. 882, 887 (1996). An employer that offers benefits must memorialize those benefits in a written plan. 29 U.S.C. § 1102(a)(1). Once a plan is established, its "administrator's duty is to see that the plan is 'maintained pursuant to [that] written instrument.'" *Heimeshoff*, 571 U.S. at 108 (quoting 29 U.S.C. § 1102(a)(1)).

A participant's benefit under the Plan, or Retirement Allowance, is determined by multiplying a participant's years of service by a Normal Retirement Rate.  For single participants, the Retirement Allowance is paid as a "single life annuity" ("**SLA**"), which is a monthly benefit for the participant's life, unless the participant elects a different form. Am. Compl. ¶ 6. For married participants, the default form of payment to participants who die after their retirement benefits commence is a "qualified joint and survivor annuity" ("**QJSA**"), which provides monthly benefits

4

to the retiree for life and then pays the surviving spouse a defined percentage (50% to 100%) for the remainder of the spouse's life. 29 U.S.C. § 1055(a)(1), (d)(1); Am. Compl. ¶ 7. Because QJSAs are calculated based on two lifetimes, the Retirement Allowance must be adjusted so that the QJSA is the "actuarial equivalent" of the SLA. 29 U.S.C. § 1055(d)(1); *Id.* ¶ 11.

If a participant dies *before* his or her annuity starting date, ERISA requires that the plan pay the surviving spouse a "qualified preretirement survivor annuity" ("**QPSA**"), pursuant to which the surviving spouse receives annuity payments for his or her life. 29 U.S.C. §§ 1055(a)(2), (e); Am. Compl. ¶ 8. Payments under the QPSA must be not less than the amount the survivor would have received under a QJSA "(or the actuarial equivalent thereof)." *Id.* § 1055(e)(1)(a).

The specific assumptions used to calculate actuarial equivalence must be set out in the plan. 26 U.S.C. § 401(a)(25); 29 U.S.C. § 1102(b)(4). ERISA does not dictate the amount of benefit a plan must provide or the factors that must be used to calculate actuarial equivalence.

## II.    Olin and the Plan

Defendant Olin was founded in 1892 and is headquartered in Clayton, Missouri. Am. Compl. ¶ 26. In 1967, Olin established the Plan to offer pension benefits to its employees. *Id.* ¶ 54 (copy of the current Plan document attached as **Exhibit 1**).[2] The Plan has been amended several times since 1967. Plan, Preamble, pp. 1-3. As Olin acquired or merged with other companies, the

---

[2]  The Plan's August 1, 2020 restatement provides that benefits payable to participants who retired, died or whose employment terminated prior to that date are based on the document in effect when their employment ended, but "the administration of benefits shall be determined under the applicable terms of this Plan." Aug. 1, 2020 Plan (**Exhibit 1**), at p. 2-3. The Plan document dated December 31, 2014, in effect in 2019 when Mr. Landel died and his employment ended, is attached as **Exhibit 2.** The relevant cited provisions of Exhibits 1 and 2 are identical, and the documents are referred to herein collectively as the "Plan." Plaintiff Lewis alleges that he began collecting benefits on April 20, 2020, but he does not allege when his employment terminated. Am. Comp. ¶¶ 25, 84. The Court may consider the Plan document on a motion to dismiss. *Zean v. Fairview Health Servs.*, 858 F.3d 520, 526 (8th Cir. 2017). The Complaint describes and cites to the Plan. Am. Compl. ¶¶ 54-60.

substantive provisions of those companies' existing pension plans were added to the Plan, with their specific terms set forth in the Plan as Appendix J-1 through J-42. Plan, Appendix J.

In Section 4 (Retirement Benefits), the Plan provides that the default form of payment of retirement benefits for married participants who die after their benefits commence is a 50% QJSA, "[e]xcept as otherwise provided in Appendix J." Plan, § 4.1(c).[3] The Plan provides that the QJSA "shall be the Actuarial Equivalent (based on the applicable Actuarially Equivalent factors) of a [SLA]." *Id.* The Plan defines Actuarial Equivalent for purposes of annuities as using an interest rate of 9½% and the 1983 GAM Table, "except where the Plan or Appendix J expressly provides that other factors will be used." Plan, §1.1. Appendix J contains more than thirty different sub-appendices that define benefits for employees from different predecessor companies, some of which contain their own definition of "actuarial equivalent."

In Section 5 (Death Benefits), the Plan provides that if a vested participant dies *before* his or her benefits commence, his or her surviving spouse will receive a QPSA. *Id.* § 5.1. The default QPSA payment is in the form of a 50% QJSA, "[e]xcept as otherwise provided in Appendix J." *Id.* Certain of the sub-appendices in Appendix J contain different formulas to determine the QPSA.

## III.    Plaintiffs' Claims

Plaintiff Lou Ann Landel is a Plan beneficiary. Her husband Jerold Landel worked for Olin until he passed away in January 2019. Am. Compl. ¶ 24. Plaintiff Landel began receiving benefits under the Plan in November 2019. *Id.* She alleges that she receives "a Death Benefit [QPSA] under the Plan that was determined using the Plan's formulas for determining a 50% JSA." *Id.*

---

[3]  A 50% JSA means that after the participant's death, the surviving spouse will receive for their lifetime a monthly benefit that is 50% of the payment the participant received. A participant may select an optional JSA with a percentage of 25%, 75%, or 100%. Plan, § 4.2. When a participant (such as Mr. Lewis) selects a different percentage, his surviving spouse receives that percent of the participant's monthly benefit amount, but the monthly benefit amount is adjusted accordingly.

Plaintiff Lewis is a participant in the Plan who elected the optional form of 100% JSA for his pension benefit. Am. Compl. ¶ 25. He began receiving benefits on April 30, 2020. *Id.*

Plaintiffs allege that Plan benefits are calculated using formulas that "appear to be based" on UP-84 or 71GAM mortality table and a 5% interest rate. Am. Compl. ¶ 15, 60. Plaintiffs do not allege any factual basis for this assertion or identify the Plan provisions upon which they rely. The Plan defines Actuarial Equivalent as an interest rate of 9½% and the 1983 GAM Table, except where "Appendix J expressly provides that other factors will be used." Plan, §1.1. Plaintiffs' benefit calculations would each have been determined using the actuarial assumptions in the specific sub-appendix within Appendix J applicable to Mr. Landel's or Mr. Lewis' facility – but Plaintiffs do not allege facts identifying the applicable facility or specifying which sub-appendix applies to their claims (perhaps because the different assumptions in each sub-appendix applicable to each beneficiary or participant undermines their ability to represent a class).

Plaintiffs do not allege that Defendants failed to follow the Plan terms when calculating their pension benefits. Rather, they allege that Defendants violated ERISA *by following the Plan*. The crux of Plaintiffs' claims is that the Plan's interest rate and mortality assumptions are "unreasonable" because they are "outdated," and that using the Plan's assumptions to calculate QJSA and QPSA benefits caused their benefits to be less than the "actuarial equivalent" of an SLA, which they allege violates 29 U.S.C. §§ 1055(d) and (e). Am. Compl. ¶¶ 15-16, 102-104.

Plaintiffs allege that had Defendant calculated their annuity benefits using the assumptions set by the Treasury, and not the assumptions in the Plan, their monthly benefits would be greater. Am. Compl., ¶¶ 65, 83-84. Plaintiffs seek to represent a class of participants and beneficiaries receiving a JSA or QPSA who "are receiving a benefit where the actuarial present value of their annuity" was less than it would be "using the applicable Treasury Assumptions." *Id.* ¶ 88.

7

**STANDARD OF REVIEW**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Usenko v. MEMC LLC*, 926 F.3d 468, 472 (8th Cir. 2019) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "'Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.' Rather, well-pleaded factual allegations must 'plausibly give rise to an entitlement to relief.'" *Id.* (quoting *Iqbal*, 556 U.S. at 678, 679). The "district court may consider documents on a motion to dismiss where, as here, the plaintiffs' claims are based solely on the interpretation of the documents and the parties do not dispute the actual contents of the documents." *Jenisio v. Ozark Airlines, Inc. Retirement Plan*, 187 F.3d 970, 972 n. 3 (8th Cir. 1999) (considering ERISA plan document on motion to dismiss).

**ARGUMENT**

**I.      The Plan's Limitations Period Bars Plaintiffs' Claims.**

First, the Plan's two-year limitations period bars Plaintiffs' claims. "The principle that contractual limitations provisions ordinarily should be enforced as written is especially appropriate when enforcing an ERISA plan," and "[a]bsent a controlling statute to the contrary, a participant and a plan may agree by contract to a particular limitations period, even one that starts to run before the cause of action accrues, as long as the period is reasonable." *Heimeshoff,* 571 U.S. at 105-06, 108. "If the parties 'have adopted a limitations period by contract,'" the Court will apply it to ERISA claims. *Munro-Kienstra v. Carpenters' Health & Welfare Trust Fund of St. Louis*, 790 F.3d 799, 802 (8th Cir. 2015) (citing *Heimeshoff*, 571 U.S. at 116).

The Plan contains a two-year limitations period for all claims relating to the Plan, stating:

> A general time limitation shall apply to all lawsuits involving all types of Plan issues. ***An individual must commence any such lawsuit involving Plan claims no later than two years*** after the individual first receives information that constitutes

> a clear repudiation of the rights the individual is seeking to assert (i.e., the underlying event or issue that should have triggered the individual's awareness that his or her rights under the Plan may have been violated).

Plan, § 10.1(e) (emphasis added).

This two-year limitation period is reasonable and should be enforced. *See Munro-Kienstra*, 790 F.3d at 804 (holding ERISA claim was time-barred under two-year contractual limitations period); *Ausler v. Aetna Life Ins. Co*, No. 4:18-CV-00315 JAR, 2019 WL 1015004, at *1 (E.D. Mo. Mar. 4, 2019) (dismissing claim, holding 180-day limit to bring ERISA claim was reasonable).

The only remaining question is when Plaintiffs' claims accrued. *See Heimeshoff*, 571 U.S. at 107 (parties can "agree not only to the length of a limitations period but also to its commencement"). The Plan provides that a claim accrues when "the individual first receives information that constitutes a clear repudiation of the rights the individual is seeking to assert (i.e., the underlying event or issue that should have triggered the individual's awareness that his or her rights under the Plan may have been violated)." Plan § 10.1(e). This language mirrors the "discovery rule" applicable to ERISA claims, in which "plaintiff's cause of action accrues when he discovers, or with due diligence should have discovered, the injury that is the basis of the litigation." *Union Pac. R.R. Co. v. Beckham*, 138 F.3d 325, 330 (8th Cir. 1998).

Plaintiffs Landel and Lewis received their first benefit payments on November 1, 2019 and April 30, 2020, respectively. Am. Compl., ¶¶ 24-25, 83-84. Their claims accrued on these dates at the latest, because these payments should have triggered their awareness that their rights may have been violated. Plaintiffs were entitled to copies of the Plan. 29 U.S.C. § 1024(b)(4). Had they read the Plan they would have seen that it defines "Actuarial Equivalent" based upon the 1983 GAM Table and 9½% interest, or as provided in Appendix J. Plan §1.1. Plaintiffs make the conclusory allegation that "because Defendants used fixed actuarial factors to calculate optional forms of

9

benefits under the Plan, it would have been impossible for Plaintiffs or any other Class Member to independently discern that their benefits were determined using outdated and unreasonable mortality rates." Am. Compl. ¶ 105. But the Plan makes clear that it uses "fixed" actuarial factors, including the 1983 Table that Plaintiffs claim is outdated. *See* Exhibits 1-2. Plaintiffs could and should have discovered that the actuarial factors were "fixed" and not updated by simply reviewing the Plan at the time their benefits commenced. *See Beckham*, 138 F.3d at 331 (claim for plan's failure to credit service earned before merger accrued at time of merger, when employees were given documents showing pre-merger credit would not be applied); *Bennett v. Federated Mut. Ins. Co.*, 141 F.3d 837, 839 (8th Cir. 1998) (plaintiff's claim that his plan credit was forfeited upon his resignation accrued when he resigned, and not when he made a demand six years later, where plaintiff had a copy of the plan which included forfeiture clause and had been told it applied).

Plaintiffs waited until 2025 to file suit – five years after they began receiving payments. Plaintiffs' claims are barred by the Plan's two-year limitations period and should be dismissed.

## II.   Count I Fails to State a Claim for Violation of 29 U.S.C. § 1055.

Count I fails to state a claim under 29 U.S.C. § 1055 because Plaintiffs' claim depends entirely on asking this Court to read into ERISA requirements that simply are not there. Plaintiffs assert that Defendants violated the requirement in §1055(d) and (e) that QJSA and QPSA annuities must be the "actuarial equivalent" of the SLA when Defendants applied the actuarial factors in the Plan. Plaintiffs' theory asks the Court to make the leap to find that an SLA and JSA cannot be actuarially equivalent unless the assumptions (i.e., mortality tables and interest rate) used to compare the two income streams are both "current" and "reasonable," as defined by Plaintiffs. This theory requires the Court to impose additional requirements that Congress declined to impose.

First, "actuarial equivalence" means only that the "present value" of the expected lifetime benefits under the SLA and JSA income streams "are equal under a given set of assumptions."

10

Am. Compl. ¶ 30. *See infra* pp. 12-13. There is nothing in the definition of "actuarial equivalence" that speaks to the *substance* of the assumptions used to calculate present value – only that the same "given" assumptions be used for both the SLA and JSA payment streams. When it comes to *what* assumptions are applied to both streams, ERISA leaves those assumptions up to the employer to define in the plan. *See infra*, pp. 14, 16-17.  Congress did <u>not</u> require employers to continually update their plans every time mortality data or interest rates change – and any requirement to do so would undermine the predictability Congress intended benefit payments to have and, in some instances, could *reduce* the amount of the payment, which itself risks running afoul of ERISA.

Second, Congress did not require in ERISA that the actuarial assumptions underlying annuity payments be reasonable or current, and the statute makes clear this was deliberate. Congress required in *other* sections of ERISA that the actuarial assumptions for *other* types of payments be "reasonable." *See infra*, pp. 16-19. The fact that Congress legislated that certain actuarial assumptions be reasonable proves that reasonableness is not inherent in the meaning of "actuarial equivalence" and is not independently required where Congress did not so provide. And specifically, within 29 U.S.C. § 1055, Congress expressly required that plans use current actuarial tables and interest rates propounded by the Treasury to calculate lump sum benefits in § 1055(g), but did not require their use for annuities in § 1055(d) or (e). This alone defeats Plaintiffs' claim that they were entitled to benefits calculated using current Treasury assumptions.

In *Belknap v. Partners Healthcare Sys., Inc.*, 588 F. Supp. 3d 161 (D. Mass. 2022), the court rejected arguments like Plaintiffs' and concluded that "[i]f Congress had intended . . . to require actuarial equivalence to be calculated using reasonable actuarial assumptions . . . it knew how to do so," and it was "not for th[e] Court to impose a reasonableness standard that Congress chose to omit." *Id.* at 177. Although *Belknap* involved 29 U.S.C. § 1054 and was at the summary

11

judgment stage, courts have applied *Belknap*'s reasoning to § 1055 and dismissed claims that are nearly identical to Plaintiffs' for failing to state a claim. *Drummond v. Southern Co. Servs., Inc.*, Case No. 2:23-cv-00174, 2024 WL 4005945, at *5-6 (N.D. Ga. July 30, 2024); *Reichert v. Bakery, Confectionary, Tobacco Workers & Grain Millers Pension Comm.*, Case No. 2:23-cv-12343, 2024 WL 5410419, at *2 (E.D. Mich. Apr. 17, 2024); *Covic v. FedEx Corp.*,--- F. Supp. 3d ---, 2024 WL 5509315 (W.D. Tenn. Sept. 8, 2024). This Court should do the same.

Whether ERISA § 1055(d) or (e) requires plans to use current or "reasonable" actuarial assumptions when calculating annuity benefits is a question of statutory interpretation, which "is a matter of law for the court to decide." *Belknap*, 588 F. Supp. 3d at 169. The Court should follow the recent trend and dismiss Count I for failure to state a claim under § 1055(d) or (e).

**A. ERISA § 1055(d) and (e) Require that the SLA and QJSA be the "Actuarial Equivalent" Under the Assumptions Used in the Plan Document.**

ERISA § 1055(d) and (e) require that QJSA and QPSA annuity payments be the "actuarial equivalent" of an SLA. "ERISA does not define the term 'actuarial equivalent,' nor does it require . . . the use of any specific actuarial assumptions to calculate JSA benefits." *Drummond*, 2024 WL 4005945, at *5. While "ERISA does not further define actuarial equivalence, [the court] assume[s] Congress intended that term of art to have its established meaning." *Stephens v. U.S. Airways Group, Inc.*, 644 F.3d 437, 440 (D.C. Cir. 2011).

"Two modes of payment are actuarially equivalent when their present values are equal ***under a given set of actuarial assumptions***." *Id.* (emphasis added); *see also* Compl. ¶ 29. Though not binding here, Department of Treasury regulations define "Actuarial equivalent" to mean "the actuarial present value of the two amounts or benefits (calculated ***using the same actuarial assumptions***) at that time is the same." 26 C.F.R. § 1.401(a)(4)-12 (emphasis added). The preeminent industry groups for actuaries similarly define "actuarial equivalence." *See* Soc'y of

12

Actuaries, Report on Actuarial Terminology for Pension Plans, 28 TRANSACTIONS SOC'Y ACTUARIES 327, 329 (1976) ("actuarial equivalence is "where two or more items have an equal actuarial present value under a selected set of actuarial assumptions"); Am. Acad. of Actuaries, *Final Report of Joint Comm. on Pension Terminology*, 7 J. AM. ACAD. ACTUARIES 223, 236 (1981) (defining "Actuarially Equivalent": "Of equal Actuarial Present Value, determined as of a given date with each value based on the same set of Actuarial Assumptions").[4]

All authorities agree that to be actuarially equivalent, benefits must have the same present value ***using the same assumptions***. The term "actuarial equivalence" does not speak to what those assumptions must be, and does not inherently require that the assumptions be current, or "reasonable." *See Covic*, 2024 WL 5509315, at *3 ("Section 1055(d), however, does not require a specific set of assumptions, reasonable or not, for actuarial equivalence for QJSAs."); *Drummond*, 2024 WL 4005945, at *6 ("the Court remains unpersuaded that the plain, established meaning of 'actuarial equivalent' requires that the benefits calculations be conducted using reasonable actuarial assumptions").[5] The fact that Congress modified "actuarial assumptions" with the word "reasonable" in *other* sections for *other* purposes (*see infra* pp. 16-19), proves that Congress did not believe that reasonableness is *implicit* in the meaning of "actuarial assumptions." If it were

---

[4]   Notably, these societies published these definitions shortly after ERISA was enacted. The Glossary published by the American Society of Actuaries ("SOA") which Plaintiffs cite in the Amended Complaint, does not define "actuarial equivalent," but does define "present value," which Plaintiffs allege is the concept "[a]t the heart of actuarial equivalence calculations." Am. Compl. ¶¶ 29-30 & n. 3. The SOA defines the "Present Value Of The Cash Flow": "The estimate of the current monetary value of a future cash flow given by a present value model ***under a particular set of assumptions*** about future economic or other conditions is called the present value of the cash flow ***relative to those assumptions***."  SOA Glossary (emphasis added).

[5]   Plaintiffs cite an appellate amicus brief filed in *Drummond* as purported authority that actuarial equivalent requires reasonable actuarial assumptions. Am. Compl. ¶¶ 29, 46. It is disingenuous for Plaintiffs to cite this brief as authority without even mentioning that the district court in *Drummond* held that the term "actuarial equivalent" does not contain a reasonableness requirement.

13

implicit, adding the word "reasonable" would be superfluous.

The reason that neither Congress nor the Treasury has legislated the assumptions that must underlie actuarial equivalence for annuity calculations is simple: Congress has already required that these assumptions be specified in the plan. For qualified pension plans, Congress requires:

> **Requirement that actuarial assumptions be specified** – A defined benefit plan shall not be treated as providing definitely determinable benefits unless, whenever the amount of any benefit is to be determined on the basis of actuarial assumptions, such assumptions are specified in the plan in a way which precludes employer discretion.

26 U.S.C. § 401(a)(25).

As required, the Plan defines "Actuarial Equivalent." Plan, §1.1; *see also supra* at p. 6. Thus, "the only relevant place where 'actuarial equivalence' is defined is the Plan itself," and "Plaintiffs do not allege that the Plan's terms were not followed." *Drummond*, 2024 WL 4005945, at *6 (quoting *Belknap*, 588 F. Supp. 3d at 175). Plaintiffs thus fail to state a claim.

### B. The Court Cannot Impose onto ERISA Additional Requirements That Congress Intentionally Omitted.

Under basic principles of statutory construction, the Court cannot read into the statute additional requirements that Congress did not see fit to include. The stark contrast between the subsections *within § 1055* proves that Congress deliberately chose not to dictate the actuarial assumptions plans must use for annuity benefits. In 29 U.S.C. § 1055(d) and (e), Congress prescribed unqualified "actuarial equivalent" standards for QJSAs and QPSAs. By contrast, just a few paragraphs later, for lump sum distribution of benefits, Congress specifically required plans to calculate present value using the mortality tables and interest rates set by the Treasury,[6] which

---

[6] The statutes that govern employer contributions to ensure plans are adequately funded provide that the Secretary of the Treasury "shall by regulation prescribe mortality tables to be used in determining any present value or making any computation *under this section,"* revised at least every ten years. 29 U.S.C. § 1083(h)(3) (ERISA); 26 U.S.C. § 430(h)(3) (Tax Code) (same). To determine lump sum benefits, Congress has required the use of the Treasury's current mortality tables, in both ERISA, 29 U.S.C. § 1055(g)(3)(B), and the Tax Code, 26 U.S.C. § 417(e)(3)(B).

apply only "[f]or purposes of paragraphs (1) and (2)" of subsection (g). 29 U.S.C. § 1055(g)(3)(A) and (B). Thus, ***within § 1055, Congress treated the calculation of current lump sum payments differently than the calculation of different forms of annuities***.[7] Indeed, the Treasury mortality tables and interest rates that Congress *expressly* required in § 1055(g) are the exact assumptions that Plaintiffs want to read into § 1055(d) and (e). Am. Compl. ¶¶ 74, 80-84 (alleging that Plaintiffs were injured because they would have received greater benefits under the Treasury assumptions).[8] The fact that Congress mandated use of the Treasury assumptions for certain purposes within this same section – but not when calculating annuity payments – dooms Plaintiffs' claims.

It is well-established that "[w]here Congress includes particular language in one section of a statute but omits it in another section . . . it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (quotation omitted). "[T]he presumption is much stronger when, as here, the comparison is between two subsections of the same section of a statute." *Chesnut v. Montgomery*, 307 F.3d 698, 702 (8th Cir. 2002) (rejecting argument that a subsection of ERISA *implicitly* required written notice, because a separate subsection *explicitly* required written notice). These canons apply with even more force for ERISA, as ERISA's "carefully crafted and detailed" enforcement scheme is "strong evidence that Congress did *not* intend to authorize other remedies that it simply forgot to incorporate expressly." *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 254 (1993) (quotation omitted).

---

[7] Congress added the provisions for calculating lump sum payments to § 1055 in 1984, ten years after ERISA's enactment. PL 98–397, Aug. 23, 1984, 98 Stat 1426. In 1994, Congress amended § 1055(g) to specify that the "applicable interest rate" and "applicable mortality table" for lump sum payments are those prescribed by the Treasury – *without* amending the provisions in § 1055(d) or (e) governing "actuarial equivalence" for annuity payments. PL 103–465, Dec. 8, 1994, 108 Stat 4809. Congress further amended these specific provisions of § 1055(g) in 2006, 2012, and 2014.

[8] Plaintiffs even define their proposed class to include members whose benefits are less than if calculated "using the applicable Treasury Assumptions." Am. Compl. ¶ 88.

15

The Supreme Court is "especially 'reluctant to tamper with [the] enforcement scheme' embodied in [ERISA] by extending remedies not specifically authorized by its text." *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 209 (2002) (quotation omitted).

Other ERISA sections prove that, when Congress intended to require the use of "reasonable" actuarial assumptions, it said so. *Belknap*, 588 F. Supp. 3d at 171. Congress mandated the use of "reasonable" actuarial assumptions in ERISA:

- to determine **plan funding** obligations. 29 U.S.C. §§ 1083(h), 1084(c)(3), 1085(c)(3)(A), 1085a(c)(3).

- to calculate **withdrawal liability**. 29 U.S.C. § 1393(a)(1).

"None of those statutory provisions apply here, but their existence clearly shows that if Congress had meant to include a reasonableness requirement in § 1054(c)(3), it could have done so." *Belknap*, 588 F. Supp. 3d at 171. "Considering ERISA's careful and detailed drafting, generally courts must assume that any such omission from the text of ERISA is deliberate." *Drummond*, 2024 WL 4005945, at *5 (quotation omitted).

An understanding of how the payment of annuity benefits is substantively different than those provisions for which Congress mandated a "reasonableness" requirement makes clear that Congress's differential treatment was not fortuitous. First, each of the sections in which Congress mandated the assumptions to be used pertain to a plan meeting its *current* statutory obligations and one-time payments, *e.g.*, plan funding, withdrawal liability, and lump sum benefits. The payment of annuitants' *future* income streams over their lifetime is qualitatively different, making it unreasonable for the Court to assume that Congress intended to treat these concepts the same.

Second, Congress did not legislate how annuity benefits are to be determined because ERISA requires this to be set by the employer and stated in the plan, which "specif[ies] the basis on which payments are made to and from the plan." 29 U.S.C. § 1102(b)(4). The plan must define

16

participants' rights to defined benefits, which are not subject to fluctuation based upon changing mortality tables or interest rates. On the other hand, plan funding and withdrawal liability do not relate to benefit amounts for individual participants, but rather protect the plan as a whole, and the assumptions underlying these obligations are not required to be defined or set forth in the plan. As such, Congress legislated these assumptions and constrained them by the word "reasonable."

Third, as set forth above, the Internal Revenue Code requires that "actuarial assumptions" for defined benefits be "specified in the plan in a way which precludes employer discretion." 26 U.S.C. § 401(a)(25). *See supra*, p. 14. This is necessary to satisfy the Treasury requirement for tax qualification of a defined benefit plan that benefits must be "definitely determinable." 26 C.F.R. § 1.401-1(b)(1)(i). Stating the actuarial assumptions in the plan precludes any discretion to alter the amount of the benefit. Rev. Rul. 79-90. Plaintiffs' suggestion that employers or administrators must update assumptions to make them "reasonable" would require the exercise of discretion, in contravention of these requirements pertaining to defined plan benefits.

Ultimately, as the Supreme Court very recently reiterated, "the Court must read [ERISA] the way Congress wrote it" and plaintiff's "concerns … cannot overcome the statutory text and structure" or the "balance" set by Congress. *Cunningham v. Cornell Univ.*, 145 S. Ct. 1020, 1031 (2025) (citation and quotation omitted). Plaintiffs' entreaties that a plan's terms should be "reasonable" simply do not state an actionable claim under ERISA § 1055.

### C. The Regulations Cited by Plaintiffs Prove that Actuarial Equivalence Does Not Require that the Actuarial Assumptions be Reasonable or Updated.

Plaintiffs argue that several Treasury regulations – none of which apply to § 1055 – suggest there is an implicit reasonableness requirement in § 1055 because the regulations "reference using reasonable assumptions." Am. Compl. ¶ 47. However, these regulations prove that actuarial assumptions need not be "reasonable" in order to make the benefits the "actuarial equivalent."

17

Plaintiffs' primary regulation, 26 C.F.R. § 1.401(a)-11(b)(2), does not even apply to ERISA. *See* 29 U.S.C. § 1202(c) (only regulations promulgated under 26 U.S.C. §§ 410(a), 411, and 412 can be enforced under ERISA); *Drummond*, 2024 WL 4005945, at *6 (holding "this regulation is not enforceable under ERISA") (citation omitted). Even if it did apply, the regulation states that QJSAs "***must*** be at least the actuarial equivalent" of an SLA, but "[e]quivalence ***may***" – not must – "be determined, on the basis of consistently applied reasonable actuarial factors[.]" 26 C.F.R. § 1.401(a)-11(b)(2) (emphasis added). This sentence shows Congress did not believe that "actuarial factors" "must" be "reasonable" for QJSAs to be the actuarial equivalent.

Similarly, 26 C.F.R. § 1.401(a)-14(c)(2) does not apply to ERISA. *See* 29 U.S.C. § 1202(c). But even if it did, that regulation pertains to when benefits commence, and for early retirement it provides that "[f]or purposes of this section," normal retirement benefits must be reduced "in accordance with reasonable actuarial assumptions." 26 CFR § 1.401(a)-14(c)(2). Again, the fact that the Treasury mandated "reasonable" actuarial assumptions "[f]or purposes of" calculating early retirement shows that "reasonable" is not inherent in "actuarial assumptions."

Plaintiffs cite 26 C.F.R. § 1.411(d)-3(g)(1), which contains a definition of "Actuarial present value" (but no definition of "actuarial equivalent"), which only applies "for purposes of this section." Even if applicable, the regulation provides: "The term actuarial present value means actuarial present value (within the meaning of § 1.401(a)(4)-12) determined using reasonable actuarial assumptions." *Id.* If actuarial present value *always* required using "reasonable" assumptions, as Plaintiffs claim, then this definition would be nonsensical. The only thing that this definition adds to the definition in § 1.401(a)(4)-12[9] is that present value be "determined using

---

[9]   26 C.F.R. § 1.401(a)(4)-12 contains a definition of "present value" that does not use the term "reasonable" and does not specify what assumptions must be used.

18

reasonable actuarial assumptions" – proving that *reasonableness is not implicit*, as Plaintiffs claim.

Plaintiffs cite 26 U.S.C. § 430(h)(3), Compl. ¶¶ 74-75, which is in the Tax Code (not ERISA) and relates to plan funding, which ERISA treats as different than benefit payments. *See supra*, p. 14-15 & n. 6. That statute says that "the determination of any present value or other computation under this section shall be made on the basis of actuarial assumptions and methods – (A) each of which is reasonable …" *Id.* § 430(h)(1). Again, the fact that Congress chose to expand on "actuarial assumptions" by requiring them to be "reasonable" proves that reasonableness is not inherent in the definition of actuarial assumption and that it does not apply outside of "this section."

Plaintiffs also rely on regulations that relate to lump sum benefits. Am. Compl. ¶ 48 (citing 26 C.F.R. §§ 1.411(a)(13)-1(b)(3), 1.417(a)(3)-1(c)(2)(iv)(A)-(B) and (f)(ii)(2)(A)-(B)). These regulations are consistent with 29 U.S.C. § 1055(g) and 26 U.S.C. § 417(e), in which Congress requires that plans use specific mortality tables and interest rates updated by the Treasury to calculate lump sum benefits, but not annuities. *See supra,* pp. 14-15 & n. 6.  Both the Treasury and Congress treat lump sum benefits and annuities differently, whereas Plaintiffs ask the Court to treat them the same. "[T]he fact that the regulations are silent with respect to *annuities* is not an invitation to borrow freely from the regulations concerning *lump-sum benefits*; to the contrary, the omission should be presumed to be significant, not accidental." *Belknap*, 588 F. Supp. 3d at 172.

Finally, Plaintiffs cite the American Academy of Actuaries' Actuarial Standards Board's ("ASB") Actuarial Standards of Practice ("ASOPs"). Am. Compl. ¶¶ 49-51. These standards specifically by their terms do not apply to the assumptions used to calculate individual employees' benefits. ASOP 27, titled "Selection of Assumptions for Measuring Pension Obligations," states:

> This standard applies to actuaries when performing actuarial services ***that include selecting assumptions*** used in the actuary's measurement of defined benefit pension plan obligations . . . Measurements of defined benefit pension plan obligations include calculations such as funding valuations or other assignment of plan costs to

time periods, liability measurements or other actuarial present value calculations, and cash flow projections or other estimates of the magnitude of future plan obligations. ***Measurements of pension obligations do not generally include individual benefit calculations,*** individual benefit statement estimates, or nondiscrimination testing.

ASOP 27 (Dec. 2023), § 1.2 (emphasis added); ASOP 27 (Sept. 2013) (substantially the same).[10]

ASOP 27 contains detailed provisions for actuaries to follow when selecting actuarial assumptions for plans to use for obligations within the scope of ASOP 27. But when it comes to making "individual benefit calculations," *there is no ASOP. Id.* This makes sense because, when calculating individual monthly benefit payments, **actuaries *do not select* assumptions** – they use the assumptions specified in the plan. *Belknap*, 588 F. Supp. 3d at n. 7 ("[W]hat may be required when selecting actuarial assumptions is not at issue here. What is at issue here is what 'actuarial equivalent' means in terms of calculating benefits as provided within a defined benefit plan").

### D. Using the Plan's Assumptions to Calculate Plaintiffs' Benefits Furthers ERISA's Goals of Transparency, Consistency, and Predictability.

Relying upon the Plan's assumptions to calculate annuity benefits is consistent with ERISA's statutory scheme and policy goals. ERISA neither "requires employers to establish . . . plans" nor "mandate[s] what kind of benefits employers must provide if they choose to have such a plan." *Lockheed*, 517 U.S. at 887. The Supreme Court has repeatedly recognized that "ERISA represents a careful balancing between ensuring fair and prompt enforcement of rights under a plan and the encouragement of the creation of such plans." *Conkright*, 559 U.S. at 517 (quotation omitted). ERISA seeks to ensure that employees will "receive the benefits they had earned" while "induc[ing] employers to offer" those benefits in the first place by promising "a predictable set of

---

[10] ASOP 35 was repealed in June 2024. *https://www.actuarialstandardsboard.org/asops/asop-no-35-documentation-and-disclosure-in-property-and-casualty-insurance-ratemaking-loss-reserving-and-valuations-repealed/*. In Paragraph 50, Plaintiffs cite the 2013 version of ASOP 27, which was superseded in 2023. *See https://www.actuarialstandardsboard.org/asops/adopted-asop-no-27-selection-of-assumptions-for-measuring-pension-obligations/*.

liabilities, under uniform standards of primary conduct." *Id.* at 516-17 (quotation omitted).

ERISA furthers these goals by requiring employee benefits plans to "specify the basis on which payments are made." 29 U.S.C. § 1102(b)(4). ERISA's "straightforward rule of hewing to the directives of the plan documents . . . lets employers establish a uniform administrative scheme with a set of standard procedures to guide processing of claims and disbursement of benefits." *Kennedy v. Plan Adm'r for DuPont Sav. & Inv. Plan*, 555 U.S. 285, 300 (2009) (quotation omitted; cleaned up). By requiring plans to calculate annuity benefits pursuant to predetermined assumptions set forth in the plan, § 1055 promotes predictability for both employers and employees and "assur[es] a predictable set of liabilities" which helps "induc[e] employers to offer benefits[.]" *Conkright*, 559 U.S. at 517 (quotation omitted); *accord Heimeshoff*, 571 U.S. at 108.

As the court in *Belknap* recognized, it is not "by any means obvious that the result in this case is irrational or unfair," even if actuarial assumptions are "out of date." 588 F. Supp. 3d at 176. Retirement plans are "private arrangements" between employers and employees, and they are "not generally required to provide protection against various forms of economic or social change," such as cost-of-living adjustments. *Id.* Indeed, in this case, many of the appendices were negotiated for participants under collective bargaining agreements. Am. Compl., ¶ 56; Plan, p. 1-2.

Moreover, using current or updated mortality tables and interest rates could harm some plan participants. As the court in *Belknap* posited, "But what happens if life expectancy decreases – as it did in 2020, as a result of the COVID-19 pandemic? Would benefits be decreased? And what happens if there is a period of hyperinflation, and the interest rate turns out to be unduly low?" *Id.* And it is "far from clear how often adjustments to the assumptions would need to be made to make them 'reasonable[.]'" *Id.* This concern is most apparent with respect to interest rates, which can change daily – in both directions.

21

Any requirement that a plan's actuarial factors be updated risks running afoul of ERISA, which provides that "[t]he accrued benefit of a participant under a plan may not be decreased by amendment of the plan[.]" 29 U.S.C. § 1054(g)(1); *accord* 26 C.F.R. § 1.411(d)-3 (qualified plan cannot make "a plan amendment [that] decreases the accrued benefit of any plan participant"). Although Plaintiffs cast themselves as crusaders for plan members, courts have observed that substituting "current" assumptions for "outdated" ones ***would actually reduce benefits for certain beneficiaries***, making class certification inappropriate. *See Belknap*, 588 F. Supp.3d at 176 (citing cases); *Thorne v. U.S. Bancorp*, Case No. 18-3405, 2021 WL 1977126, at *2 (D. Minn. May 18, 2021) (denying class certification because each of the plaintiffs' alternative "actuarial equivalence" models "results in lower benefits for some class members"). As such, allowing individual plaintiffs to retroactively impose "current" assumptions onto benefit payments would undermine the very stability and predictability that ERISA provides.

Olin maintains that the actuarial assumptions in the Plan are reasonable, but that is not the issue on a motion to dismiss. ERISA § 1055 simply requires that annuities be actuarially equivalent based upon the factors set forth in the Plan. Plaintiffs' (disputed) allegations that the factors in the Plan are not reasonable do not state a claim under ERISA § 1055, as a matter of law.

### E. Plaintiffs' Contrary Case Law is Not Persuasive.

Plaintiffs cite certain district court cases that held that the phrase "actuarial equivalent" implicitly requires reasonable assumptions. Am. Compl. ¶ 52. The Court should not follow these opinions because, in addition to being non-binding, they ignore the plain text of § 1055 and conflate inapplicable regulations with ERISA itself. In most of the cases cited by Plaintiffs, the court expressly acknowledged that § 1055(d) and (e) do not contain a reasonableness requirement, yet nevertheless decided to read reasonableness into the statute with virtually no analysis or explanation, other than the vague notion that "it cannot possibly be the case that ERISA's actuarial

22

equivalence requirements allow the use of unreasonable mortality assumptions." *Urlaub v. CITGO Petroleum Corp.,* Case No. 21 C 4133, 2022 WL 523129, at \*6 (N.D. Ill. Feb. 22, 2022). These cases are not persuasive authority because each jump to a conclusion without performing any significant textual analysis or consideration of ERISA's terms.

Plaintiffs rely heavily on *Adams v. U.S. Bancorp*, 635 F. Supp. 3d 742 (D. Minn. 2022), a case involving early retirement benefits under 29 U.S.C. § 1054(c)(3). Am. Compl. ¶¶ 29-30. In *Adams*, the court discussed regulations which the court *acknowledged* were "not enforceable under ERISA" or only require "reasonableness in other contexts." *Id.* at 752. The court nevertheless concluded that "although no regulation on its face requires reasonableness in the Section 1054(c)(3) early-retirement context," the court would accept the plaintiffs' allegations that actuarial equivalence requires the use of reasonable assumptions. *Id.* at 753. The court's wholesale disregard of the statutory language in favor of regulations it acknowledged did not apply flouts all principles of statutory interpretation and should not be followed. Notably, that same court very recently *denied* plaintiff's motion for class certification, holding that some plan participants are worse off when using the mortality tables and interest rates specified in 26 U.S.C. § 417(e). *See* April 4, 2025 Order (unpublished order attached as **Exhibit 3**). Thus, as *Adams* recognized in the context of class certification, updating plan assumptions to include "current" assumptions would leave some participants worse off, which undermines the entire basis of Plaintiffs' claim.

Finally, though not cited by Plaintiffs, several years ago Judge Clark considered a similar issue in *Duffy v. Anheuser-Busch Companies, LLC*, 449 F. Supp. 3d 882 (E.D. Mo. 2020). In *Duffy*, however, the defendant *did not argue* that § 1055 does not require the actuarial assumptions to be reasonable; rather, the defendant proffered five arguments as to why the assumptions it used *were* reasonable. *Id.* at 887. Ironically, Judge Clark rejected several of the defendants' arguments

23

because they were based on regulations that he concluded did not apply outside their stated scope, including 26 C.F.R. § 1.401(a)(4)-12. *Id.* at 890-91. Based upon defendant's arguments (or lack thereof), the Court assumed a reasonableness requirement – the same reasonableness argument rejected by a number of recent decisions[11] – and denied the defendant's motion to dismiss, holding that "Duffy sufficiently alleges that A-B uses unreasonable actuarial factors that result in benefits that fail to meet ERISA's actuarially-equivalent requirement." *Id.* at 888.[12] Thus, that which was assumed in *Duffy* is now squarely at issue before this Court, so *Duffy* is of little assistance.

### III.    Count II Fails to State a Claim for Breach of Fiduciary Duty.

In Count II, Plaintiffs claim that Defendants violated alleged fiduciary duties under ERISA by using "outdated actuarial assumptions." Am. Compl. ¶¶ 111, 113. If the Court dismisses Count I alleging that Defendants breached 29 U.S.C. § 1055, then Count II necessarily fails as well. In addition and in the alternative, the Court should also dismiss Count II because Plaintiffs cannot establish a claim for breach of fiduciary duty against any Defendant.

#### A.  Count II Must be Dismissed Because Defendants Complied with ERISA § 1055.

Count II is based entirely on Plaintiffs' assertion that Defendants should not have used the Plan's actuarial equivalence factors, which they allege caused them to receive less than the amount of benefits to which they were entitled. Am. Compl. ¶¶ 111, 113-14, 118-19, 123. However, as set forth above, ERISA §1055(d) and (e) require Defendants to pay annuity benefits according to the actuarial equivalence factors set forth in the Plan and do not require plans to update their actuarial

---

[11]   Likely because of the lack of textual analysis in the older cases, the more recent cases analyze ERISA's text, structure, and purpose in-depth and conclude that § 1055(d) simply does not mean what Plaintiffs claim it means. *Belknap*, 588 F. Supp. 3d at 170-76; *Drummond*, 2024 WL 4005945, at *5-6; *Reichert*, 2024 WL 5410419, at *1-2; *Covic*, 2024 WL 5509315, at *3-4.

[12]   The parties in *Duffy* filed a Stipulation of Dismissal with Prejudice on November 10, 2020, before any other substantive rulings were issued. *See* Case 4:19-cv-01189-SRC, at Dkt. # 77.

assumptions. If the Court agrees and dismisses Count I, then Plaintiffs cannot show that Defendants breached any duty or that they were damaged so Count II must be dismissed as well. *See Reichert,* 2024 WL 5410419 at *3 (holding "because Plaintiffs failed to plead an ERISA violation, they cannot sustain a claim for breach of fiduciary duty based on an ERISA violation."); *Anderson v. Resol. Tr. Corp.*, 66 F.3d 956, 960 (8th Cir. 1995) ("Because we have already decided the RTC's failure to disclose the suspension of benefit accruals was lawful under the applicable ERISA notice provision, the failure to disclose cannot be a breach of fiduciary duty.").

### B. Plaintiffs Fail to State a Claim for Breach of Fiduciary Duty Against Defendant Olin Because Setting Plan Design is Not a Fiduciary Function.

Plaintiffs assert a claim against Olin, the plan sponsor, for breach of fiduciary duty. However, Olin's authority to set or amend the Plan terms is a settlor function, not a fiduciary function, and an employer is not acting as a fiduciary when it determines plan terms. "In every case charging breach of ERISA fiduciary duty, then, the threshold question is … whether that person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint." *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000). While Plaintiffs attempt to lump together Olin (the employer and plan sponsor) and the Committee (the Plan's designated administrator and named fiduciary), ERISA separates these roles.[13]

ERISA requires each plan to designate a "named fiduciary." 29 U.S.C. § 1102(a)(2). Here, the Plan designates the Committee[14] as "the Plan's named fiduciaries [which] have the fiduciary duties set forth herein" and "have been designated to carry out all fiduciary responsibilities under

---

[13]    ERISA defines the "plan sponsor" of a single employer plan as the employer. 29 U.S.C. § 1002(16)(B)(i). ERISA defines the term "administrator" to mean "(i) the person specifically so designated by the terms of the instrument under which the plan is operated" or, "(ii) if an administrator is not so designated, the plan sponsor." 29 U.S.C. § 1002(16)(A).

[14]    The Plan also designates the "Investment Committee" as a named fiduciary with respect to matters pertaining to investment of Plan assets, which is not at issue in this lawsuit. Plan, § 7.2.

the Act with respect to the Plan." *Id.* § 7.6. The Plan also designates the Committee as the Plan Administrator "to administer the Plan in accordance with its terms" and vested with "absolute authority and sole discretion to interpret the terms of the Plan," including provisions relating to benefits. *Id*, § 7.1 Olin, the plan sponsor, is ***not*** a named fiduciary. *Id.* Olin does not administer or pay benefits under the Plan – these functions are delegated solely to the Committee. *Id.*

Plaintiffs make the conclusory allegations that Olin was a Plan fiduciary responsible for paying benefits and was the Plan's administrator. Am. Compl. ¶¶ 109, 112. But conclusory legal allegations are not facts, and they must be disregarded when they contradict the plain terms of the Plan. *See Elkharwily v. Mayo Holding Co.*, 955 F. Supp. 2d 988, 996 (D. Minn. 2013), *aff'd,* 823 F.3d 462 (8th Cir. 2016) ("when a written instrument contradicts allegations in the complaint" the instrument "trumps the allegations.") (citation omitted). In *Shafer v. Zimmerman Transfer, Inc.*, Case No. 1:20-cv-00023, 2020 WL 7260034 (D. Iowa Dec. 19, 2020), the court disregarded on a motion to dismiss the plaintiff's conclusory allegation that defendant "was a Plan Administrator" and fiduciary because these allegations "are not *facts;* rather, each is 'a legal conclusion couched as a factual allegation,' which this Court is not bound to accept as true," and the plan documents contradicted this allegation. *Id.* at *4 & n. 4 (quoting *Twombly,* 550 U.S. at 555). Similarly, here, Plaintiff's conclusory allegation that Olin is a fiduciary must be disregarded when the Plan designates the Committees as the Plan Administrator and sole fiduciaries.

Nor is Olin a functional fiduciary, because setting Plan terms is not a fiduciary function. ERISA defines fiduciary duties in terms of discretionary control over the administration of the plan or its assets. 29 U.S.C. § 1002(21)(A). "'[D]ecision[s] regarding the form or structure' of a plan," on the other hand, are "settlor functions," which do not give rise to a fiduciary duty. *Beck v. PACE Int'l Union*, 551 U.S. 96, 101–02 (2007) (quoting *Hughes Aircraft Co. v. Jacobson*, 525

26

U.S. 432, 444 (1999)). "ERISA's fiduciary duty requirement simply is not implicated when [employer], acting as the Plan's settler, makes a decision regarding the form or structure of the Plan such as who is entitled to receive Plan benefits and in what amounts, or how such benefits are calculated." *Hughes*, 525 U.S. at 444. "There is a world of difference between administering a . . . plan in accordance with its terms and deciding what those terms are to be. A company acts as a fiduciary in performing the first task, but not the second." *Crouch v. Bussen Quarries, Inc.*, 124 F. Supp. 3d 947, 955 (E.D. Mo. 2015) (citations and quotation omitted). "[W]hen employers adopt, modify, or terminate plans that provide pension benefits, they do not act as fiduciaries," so "[a]n employer's decision to amend . . . an employee benefit plan is unconstrained by the fiduciary duties that ERISA imposes on plan administrators." *Schultz v. Windstream Commc'ns, Inc.*, 600 F.3d 948, 951 (8th Cir. 2010) (quotation omitted). "ERISA does not prohibit an employer from acting in accordance with its interests as employer when not administering the plan or investing its assets." *Anderson*, 66 F.3d at 960 (citations and quotation omitted).

Plaintiffs allege that Olin breached an alleged fiduciary duty in "selecting and maintaining" the formulas and actuarial assumptions used in the Plan and by failing to amend these terms. Am. Compl. ¶ 111-13. These are settlor functions concerning plan terms, not fiduciary functions.

Because Olin was not acting as a fiduciary, as a matter of law, Plaintiffs' claims that Olin breached an alleged fiduciary duty must be dismissed.

### C. The Committee Did Not Breach a Fiduciary Duty in Following the Plan Terms.

Plaintiffs contend that the Committee breached its fiduciary duty by calculating their benefits using the Plan's mortality tables and interest rates, which Plaintiffs allege were "outdated." Am. Compl. ¶¶ 111, 113, 118. In essence, Plaintiffs allege that the Committee should not have followed the Plan documents. This allegation fails to state a claim as a matter of law.

Courts consistently hold that ERISA does *not* require fiduciaries to *disobey* plan terms that

27

may not comply with ERISA. ERISA requires a fiduciary to "discharge his duties with respect to a plan ... in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with" ERISA. 29 U.S.C. § 1104(a)(1)(D). In *Cement & Concrete Workers Dist. Council Pension Fund v. Ulico Cas. Co.*, 387 F. Supp. 2d 175 (E.D.N.Y. 2005), *aff'd*, 199 F. App'x 29 (2d Cir. 2006), the court concluded that the phrase "insofar" does not require a plan fiduciary not to follow a plan which may not comply with ERISA, holding: "plaintiffs' proposed construction of this statutory provision – that a plan trustee owes a fiduciary duty to depart from any provision of the plan documents which he knows to violate ERISA and/or to amend that provision – goes significantly beyond the plain command of the statute." *Id.* at 185; *see also Sec'y of Lab. v. Macy's, Inc.*, Case No. 17-cv-541, 2022 WL 407238, at *5 (S.D. Ohio Feb. 10, 2022) (holding "the weight of that persuasive authority" holds that ERISA does not impose "a fiduciary duty *not to follow* plan documents that *are not* consistent with ERISA.").

In short, fiduciaries "do not breach their fiduciary duties under ERISA simply by presiding over a plan which fails in some respect to conform to one of ERISA's myriad provisions." *Ulico*, 387 F. Supp. 2d at 184; *see also Paul v. RBC Cap. Mkts. LLC*, Case No. 16-cv-5616, 2018 WL 3630290, at *7 (W.D. Wash. July 31, 2018) ("correctly enforcing a flawed plan does not support a breach of fiduciary duty claim as a matter of law"). The Committee did not breach a fiduciary duty by following the terms of the Plan and Count II against it must be dismissed.

### D. Defendants Did Not Engage in a Prohibited Transaction under ERISA.

Plaintiffs also allege in Count II that Olin violated 29 U.S.C. § 1106(a)(1), which provides that a fiduciary "shall not cause the plan to engage in a transaction" that constitutes a "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan." 29 U.S.C. § 1106(a)(1)(D); Am. Compl. ¶¶ 115-116. Count II fails to state a claim because Plaintiffs do not and cannot identify any "transaction." Plaintiffs contend that if the Plan had used updated actuarial

28

assumptions, then their annuity payments would have been higher, which would have increased Olin's contributions. *Id.* ¶ 113-14. In other words, Plaintiffs allege that Olin violated § 1106 "[b]y retaining funds that should have been contributed to the Plan. *Id.* ¶ 116. But an employer's retention of funds is not a "transaction." *See Lockheed,* 517 U.S. at 892-93 (holding that "the payment of benefits is in fact not a 'transaction' in the sense that Congress used that term in § 406(a)," even where the payment at issue "created a 'significant benefit' for" the employer).

Here, Plaintiffs do not allege any wrongful transfer of Plan assets but, rather, allege that if the actuarial assumptions were different, Olin's required contribution to the Plan would have been greater. This allegation does not identify *any* transaction, much less a prohibited transaction. In *Wright v. Oregon Metallurgical Corp.,* 360 F.3d 1090 (9th Cir. 2004), the Court held that plaintiff failed to identify a "transaction" that would run afoul of Section 1106(a)(1) where plaintiff alleged defendants *refrained* from selling stock, holding that the decision by the defendants "to *continue* to hold 15% of Plan assets in employer stock was not a 'transaction.'" *Id.* In *David v. Alphin*, 704 F.3d 327, 340 (4th Cir. 2013), the Court followed *Wright*, holding: "Courts have held that a decision to continue certain investments, or a defendant's failure to act, cannot constitute a 'transaction' for purposes of section 406(a) or 406(b). . . . We agree with this view. The common understanding of the word 'transaction' implies that an affirmative action is required." *Id.* at 340.

Nor have Plaintiffs stated a claim under § 1106(b)(1), which provides that a fiduciary shall not "deal with the assets of the plan in his own interest or for his own account," for the same reasons. Additionally, an employer's funds that have *not* been contributed to the Plan are not "assets of the plan," and an employer does not have a fiduciary duty with respect to those funds. "Corporate assets do not become plan assets merely because an employer has a corporate obligation to make payments to the plan." *Trs. of the Graphic Commc'ns Int'l Union Upper*

29

*Midwest Loc. 1M Health & Welfare Plan v. Bjorkedal,* 516 F.3d 719, 732 (8th Cir. 2008). An employer "who chooses to pay corporate obligations in lieu of employer contributions to an ERISA plan does not breach a fiduciary duty . . ." *Id.*

### E. Plaintiffs Cannot State a Claim Under 29 U.S.C. § 1132(a)(2).

Plaintiffs assert a claim under 29 U.S.C. § 1132(a)(2), which applies when a fiduciary's conduct causes "losses to the plan" under 29 U.S.C. § 1109. Am. Compl. ¶ 124. However, for §§ 1109 and 1132(a)(2) to apply, there must be a loss *to the Plan.* Plaintiffs' allegation that Defendants reduced *their* benefit amounts is an alleged harm to *Plaintiffs personally*, not the Plan.

"Section 1109(a) only provides relief to a plan and not to individual beneficiaries." *Stark v. Healthy Alliance Life Ins. Co.*, Case No. 4:10–CV–1141, 2010 WL 4320339 at *3 (E.D. Mo. Oct. 22, 2010); *see also Larsen v. Cigna Corp. Short-Term Disability Plan*, Case No. 05-4189, 2006 WL 1367368, at *2 (D.S.D. May 18, 2006) ("The Supreme Court has held that claims under section 1132(a)(2) to enforce a fiduciary's liability under the language of section 1109(a) which restricts a fiduciary's liability to 'making good' any 'losses to the plan,' may be brought only to seek remedies which would protect the entire plan, rather than the rights of an individual beneficiary.") (citing *Massachusetts Mut. Life Ins. Co. v. Russell,* 473 U.S. 134, 144 (1985)).

Plaintiffs' claims are for an alleged decrease in their own benefits, and they do not identify any losses allegedly incurred by the Plan. As such, the claim under § 1132(a)(2) must be dismissed.

### CONCLUSION

WHEREFORE, Defendants respectfully request that the Court dismiss Plaintiffs' Amended Complaint, with prejudice, and for such other relief as the Court deems just and proper.

Dated:  June 6, 2025

Respectfully submitted,

HUSCH BLACKWELL LLP

*/s/ Melissa Z. Baris*
David W. Sobelman, #32253 (MO)
Melissa Z. Baris, #49346 (MO)
8001 Forsyth Boulevard, Suite 1500
St. Louis, Missouri 63105
Phone – 314.480.1500
David.sobelman@huschblackwell.com
Melissa.baris@huschblackwell.com

*Attorneys for Defendants Olin Corporation and Olin Pension and CEOP Administrative Committee*

## CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of June, 2025, I filed the above document with the Clerk's Office using the CM/ECF System for filing and electronic service to all counsel of record.

*/s/   Melissa Z. Baris*

31