**Execution Version**

# OLIN CORPORATION

# EMPLOYEES PENSION PLAN

**AMENDED AND RESTATED AUGUST 1, 2020**

**TABLE OF CONTENTS**

PREAMBLE ..................................................................................................................................................1
ARTICLE I Definitions ................................................................................................................................4
    1.1    Definitions ........................................................................................................................................4
        "Accrued Benefit" ...............................................................................................................................4
        "Acquired Company" ...........................................................................................................................4
        "Act" ....................................................................................................................................................4
        "Actuarial Equivalent .........................................................................................................................4
        "Administrative Committee .................................................................................................................5
        "Affiliated Company ...........................................................................................................................5
        "Applicable Interest Rate ....................................................................................................................6
        "Applicable Life Expectancy ..............................................................................................................6
        "Applicable Mortality Table ...............................................................................................................6
        "Average Compensation .....................................................................................................................7
        "Beneficiary ........................................................................................................................................7
        "Benefit Commencement Date ...........................................................................................................7
        "Benefit Service ..................................................................................................................................7
        "Board of Directors .............................................................................................................................9
        "Break in Service ................................................................................................................................9
        "Change in Control .............................................................................................................................9
        "Code ...................................................................................................................................................9
        "Company .........................................................................................................................................10
        "Compensation .................................................................................................................................10
        "Compensation within the meaning of Section 415 of the Code" or "Code Section 415 Compensation...........11
        "Creditable Service" .........................................................................................................................12
        "Disabled" .........................................................................................................................................12
        "Distribution Calendar Year" ...........................................................................................................12
        "Domestic Partner .............................................................................................................................12
        "Domestic Partner Declaration .........................................................................................................12
        "Effective Date," ...............................................................................................................................13
        "Eligible Employee" .........................................................................................................................13
        "Employee" .......................................................................................................................................15
        "Employing Company ........................................................................................................................15
        "Fiduciary" ........................................................................................................................................15
        "Five Percent Shareholder" ...............................................................................................................15
        "Former Participant" .........................................................................................................................16
        "Hours of Service" ............................................................................................................................16
        "Investment Committee .....................................................................................................................16
        "Investment Manager" ......................................................................................................................16
        "Leased Employee" ...........................................................................................................................17
        "Life Expectancy" and "Joint and Last Survivor Expectancy" ........................................................17
        "Limitation Year" ..............................................................................................................................17
        "Military Service" .............................................................................................................................17
        "Normal Retirement Date" ................................................................................................................18
        "Parental or Medical Leave of Absence" ..........................................................................................18
        "Participant" ......................................................................................................................................18
        "Period of Creditable Service ...........................................................................................................18
        "Period of Severance" .......................................................................................................................20
        "Plan" ................................................................................................................................................20
        "Plan Year" .......................................................................................................................................20
        "Prior Plan" .......................................................................................................................................20
        "Primary Social Security Benefit" ....................................................................................................20
        "Regulations" ....................................................................................................................................21
        "Related Employer" ..........................................................................................................................21

"Required Beginning Date" ........................................................................................21
"Restatement Date" ..................................................................................................22
"Retirement Allowance" ...........................................................................................22
"Severance from Service Date" .................................................................................22
"Social Security Retirement Age" .............................................................................22
"Spouse" ..................................................................................................................22
"Totally and Permanently Disabled" .........................................................................22
"Trust Agreement" ...................................................................................................23
"Trustee" ..................................................................................................................23
"Year of Creditable Service" ....................................................................................23
"Year of Benefit Service" .........................................................................................23
1.2    Gender and Number ........................................................................................23
ARTICLE II Participation .......................................................................................................24
2.1    Participants on the Restatement Date ..............................................................24
2.2    Other Participants ...........................................................................................24
2.3    Transfers To/From the Status of an Eligible Employee ...................................24
2.4    Eligible Collectively Bargained Employees Who Become Eligible Non-Collectively Bargained Employees .................................................................................25
2.5    Terminated and Rehired Participants ...............................................................25
ARTICLE III Benefits .............................................................................................................27
3.1    Normal Retirement Allowance ........................................................................27
3.2    Early Retirement Allowance ...........................................................................27
3.3    Deferred Vested Retirement Allowance ...........................................................28
3.4    Disability Retirement Allowance .....................................................................30
3.5    Internal Revenue Code Requirements for Payment of Benefits .........................30
3.6    Limitation on Benefits ....................................................................................31
3.7    Late Retirement, Reemployment After Retirement and Suspension of Benefits ...........................35
3.8    Benefits Paid Solely from the Trust Fund ........................................................37
3.9    Missing Recipients .........................................................................................37
3.10    Social Security Benefits ................................................................................38
ARTICLE IV Payment of Retirement Benefits .........................................................................39
4.1    Normal Form of Retirement Allowance ...........................................................39
4.2    Optional Forms of Payment ............................................................................39
4.3    Waivers and Elections ....................................................................................42
4.4    Cash-Out of Small Benefits ............................................................................44
4.5    Rollover Rules ...............................................................................................45
4.6    No Retroactive Annuity Starting Dates ...........................................................47
4.7    Code Section 436 Limitations .........................................................................47
ARTICLE V Death Benefits .....................................................................................................48
5.1    Spouse or Domestic Partner Death Benefit ......................................................48
5.2    Lump-Sum Death Benefit ...............................................................................49
ARTICLE VI Contributions .....................................................................................................50
6.1    Employing Company Contributions .................................................................50
6.2    Return of Contributions ..................................................................................50
ARTICLE VII Administration ..................................................................................................51
7.1    Plan Administrator .........................................................................................51
7.2    Investment Committee ....................................................................................51
7.3    Delegation .....................................................................................................51
7.4    Action by the Company ...................................................................................51
7.5    Employment of Agents ....................................................................................52
7.6    Fiduciary Responsibilities ...............................................................................52
7.7    Compensation .................................................................................................52
7.8    Committee Liability ........................................................................................52
7.9    Evidence ........................................................................................................53
ARTICLE VIII Management of Funds .......................................................................................54

8.1    Investment of Funds ................................................................................................54
8.2    Funding of Benefits ................................................................................................54
8.3    Administrative Expenses and Disbursement of Funds ..........................................54
8.4    Limitations on Rights of Participants ....................................................................55
ARTICLE IX Amendment ................................................................................................56
9.1    Right to Amend .......................................................................................................56
9.2    Amendments Following a Change in Control .........................................................56
ARTICLE X Claim Procedures ........................................................................................57
10.1    Benefit Claim Procedures .....................................................................................57
ARTICLE XI Nonalienation of Benefits ..........................................................................61
11.1    Anti-alienation Provisions ....................................................................................61
11.2    Qualified Domestic Relations Order Procedures .................................................62
ARTICLE XII Termination of Plan ...................................................................................64
12.1    Termination ...........................................................................................................64
12.2    Allocation of Plan Assets ......................................................................................64
12.3    Termination in Connection with a Change in Control ...........................................64
12.4    Limitation on Benefits Payable to 25 Highest Paid Employees ...........................65
ARTICLE XIII Miscellaneous ..........................................................................................66
13.1    No Contract of Employment ..................................................................................66
13.2    Incompetency ........................................................................................................66
13.3    Involuntary Retirement .........................................................................................66
13.4    Mergers, Consolidations and Transfers of Plan Assets ........................................66
13.5    Withdrawal of Employing Companies ..................................................................67
13.6    Change in Control ..................................................................................................67
13.7    Cooperation of Participants ...................................................................................69
13.8    Applicable Law .....................................................................................................69
13.9    Headings ................................................................................................................69
13.10    HEART ................................................................................................................69
APPENDIX A ....................................................................................................................71
OPTION 1 ......................................................................................................................71
25% JOINT AND SURVIVOR OPTION FACTORS ..................................................71
50% JOINT AND SURVIVOR OPTION FACTORS ..................................................72
75% JOINT AND SURVIVOR OPTION FACTORS ..................................................73
100% JOINT AND SURVIVOR OPTION FACTORS ................................................74
APPENDIX B ....................................................................................................................75
5 AND 10 YEAR CERTAIN AND LIFE OPTION FACTORS ....................................75
APPENDIX C ....................................................................................................................76
APPENDIX C -- SOCIAL SECURITY LEVELING OPTION FACTORS – 2001 AGE 62 and Age 65 .............76
APPENDIX C -- SOCIAL SECURITY LEVELING OPTION FACTORS – 2000 AGE 62 and Age 65 .............77
APPENDIX C -- SOCIAL SECURITY LEVELING OPTION FACTORS – 1999 AGE 62 and Age 65 .............78
PRE-GATT SOCIAL SECURITY LEVELING OPTION FACTORS - AGE 65 .........................79
PRE-GATT SOCIAL SECURITY LEVELING OPTION FACTORS - AGE 62 .........................80
APPENDIX D ....................................................................................................................81
ACTUARIAL EQUIVALENT EARLY PAYMENT FACTORS ....................................81
APPENDIX E ....................................................................................................................82
Pre- 1991 25% JOINT AND SURVIVOR OPTION FACTORS ....................................82
Pre-1991 50% JOINT AND SURVIVOR OPTION FACTORS .....................................83
Pre-1991 75% JOINT AND SURVIVOR OPTION FACTORS .....................................84
Pre-1991 100% JOINT AND SURVIVOR OPTION FACTORS ...................................85
APPENDIX F ....................................................................................................................86
Pre-1991 5 AND 10 YEAR CERTAIN AND LIFE OPTION FACTORS ......................86
APPENDIX G ....................................................................................................................87
Pre-1991 SOCIAL SECURITY LEVELING OPTION FACTORS - AGE 62 .................87
Pre-1991 SOCIAL SECURITY LEVELING OPTION FACTORS - AGE 65 .................88
APPENDIX H ....................................................................................................................89

(iii)

Pre 1991- ACTUARIAL EQUIVALENT EARLY PAYMENT FACTORS ........................................................89
APPENDIX I-1..............................................................................................................................................90
   TOP HEAVY PROVISIONS ......................................................................................................................90
APPENDIX I-2..............................................................................................................................................94
   INTERNAL REVENUE CODE REQUIREMENTS ......................................................................................94
APPENDIX I-3..............................................................................................................................................98
APPENDIX J................................................................................................................................................102
   PARTICIPATING EMPLOYING COMPANIES OR FACILITIES AND PRIOR PLAN PROVISIONS .........102

# OLIN CORPORATION EMPLOYEES PENSION PLAN
**Amended and Restated Effective as of August 1, 2020**

PREAMBLE

Effective January 1, 1967, Olin Corporation (the "Company") established the Olin Salaried Pension Plan (the "Salaried Plan") for the benefit of certain nonbargaining employees of the Company and such other subsidiaries and affiliates of the Company as adopted the Plan with the approval of the board of directors of the Company (said Company and its participating divisions, subsidiaries and affiliates being hereinafter referred to collectively as the "Employing Companies").  The Salaried Plan was a successor to, but different from, the Employees Retirement Plan of Olin Corporation which had been applicable to specified employees of the Company prior to 1967.

The Salaried Plan was amended from time to time. Effective January 1, 1989, the Pilots Pension Plan, the Peru Works Retirement Plan, the Morgan Hill Pension Plan and the Charleston Employees Pension Plan were merged into the Salaried Plan.  Effective as of January 1, 1990, the Cuba Hourly Employees Pension Plan and the Somers Retirement Plan were merged into the Salaried Plan and the Salaried Plan was renamed the NonBargaining Employees Pension Plan of Olin Corporation (the "NonBargaining Employees Plan").  Also effective as of January 1, 1990, the Brook Park Pension Plan, a frozen plan covering certain hourly, collectively bargained employees formerly employed at the Olin facility at Brook Park, Ohio, was merged into the NonBargaining Employees Plan.  Effective January 1, 1993 the A.J. Oster Company Hourly Employees' Pension Plan and the A.J. Oster Company Salaried Employees' Pension Plan were merged into the NonBargaining Employees Plan.

Effective as of January 1, 1990 the Bargaining Employees Pension Plan of Olin Corporation (the "Bargaining Employees Pension Plan") was formed by the merger of the following plans, with Bryan Metals Retirement Plan being a component plan thereof:

| | |
|---|---|
| Olin Works East Alton Retirement Plan of Olin Corporation; | Shreveport Retirement Plan; |
| Beaumont Retirement Plan; | St. Mark's Retirement Plan; and |
| Bridgeport Brass Hourly Pension Plan; | Wadsworth Retirement Plan. |
| Doe Run Retirement Plan; | |
| Fabricated Metal Products Hourly Pension Plan; | |
| Hi-Pure Retirement Plan; | |
| Joliet Pension Plan; | |
| Lake Charles Retirement Plan; | |
| Livonia Retirement Plan; | |
| Marion Pension Plan; | |
| McIntosh Pension Plan; | |
| Niagara Falls Pension Plan; | |
| Organic Chemicals Retirement Plan; | |

-1-

Effective as of March 31, 1995, the Bargaining Employees Plan was merged into the NonBargaining Employees Pension Plan of Olin Corporation and the merged plan was re-named the Olin Corporation Employees Pension Plan (the "Plan").  Effective as of October 1, 1995, the OCG Pension Plan was merged into this resulting Plan.

Effective as of October 31, 2004, the Leavitt Tube Company Pension Plan for The Chicago Steelworkers and the Chase Brass & Copper Company Hourly Pension Plan were each merged into the Plan.

Effective on and after January 1, 2005, salaried exempt and non-exempt employees who are hired (or rehired) after such date shall not be eligible to participate in the Plan.  The foregoing eligibility exclusion shall also apply to hourly non-collectively bargained employees of the Chlor Alkali division and at the Oxford, Mississippi location of the Winchester division who are hired on and after January 1, 2005 (and to other populations as provided in Appendix J).  Additionally, the participation and benefit accrual of certain participants under the GOCO Pension Plan was frozen as of December 31, 2004, and the benefit accrual of such participants shall continue under this Plan after such date.

Effective as of October 1, 2007, the Pioneer Companies Retirement Plan, Pioneer Companies Retirement Plan for Bargaining Unit Employees, and Pioneer Companies Retirement Plan for Tacoma Union Employees were each merged into the Plan.

Effective as of December 31, 2007, salaried employees and non-bargaining hourly Chlor Alkali employees will not accrue any additional benefits under the Plan.  Benefits accrued as of December 31, 2007 will be paid to such participants at such time as they are eligible to begin to receive benefits under the Plan.  Service by such participants after December 31, 2007 will count toward meeting the vesting requirements for such pension benefits and the eligibility requirements for commencing a pension benefit (including early retirement benefits), but not toward the determination of the pension benefit amount under the Plan.  Compensation earned by such participants after 2007 will similarly not count toward the determination of the pension benefit amounts under the Plan.

Effective as of June 1, 2008, the Leavitt Tube Company Production Tube Finishing Defined Benefit Plan was merged into the Plan.

The Plan is intended to be a single plan as described in Treasury Regulation 1.414(l)-1(b)(1) and all assets held in the trust fund established to hold the assets of the Plan are available to pay benefits to all participants and their beneficiaries, and to pay applicable Plan expenses.

This Plan document amends and restates the provisions of the Plan effective as of August 1, 2020. Unless otherwise expressly stated in this Plan, the provisions of this restated Plan document shall not be applicable

with respect to any Participant who retired or died or whose employment otherwise terminated prior to August 1, 2020. All rights and benefits payable with respect to such Participants shall continue to be determined in accordance with the provisions of the Plan or Prior Plan as in effect on the Participant's termination of employment (or as subsequently amended such that the amended terms apply to such Participant), except where the context clearly shall indicate to the contrary, or as required by law; provided, however, that the administration of such benefits shall be determined under the applicable terms of this Plan.

# ARTICLE I
## Definitions

1.1     Definitions.  Wherever used in the Plan, unless the context otherwise indicates, the following terms shall have the respective meanings set forth below:

"Accrued Benefit" shall mean, as of a Participant's actual date of retirement or other termination of employment or any other date of determination, the Participant's Retirement Allowance determined under Section 3.1 and Appendix J hereof as of the date of determination.  In no event shall a Participant's Accrued Benefit under this Plan be less than the Participant's Accrued Benefit under the terms of the Plan immediately prior to the Restatement Date or under the terms of any merged Prior Plan immediately prior to its merger into this Plan.

"Acquired Company" shall mean any organization of which the Company or any other Employing Company has acquired control by purchase, merger, consolidation or otherwise.

"Act" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time. References to any section of the Act shall include any successor provision thereto and applicable Regulations thereunder.  Any term or phrase defined in the Act shall, if used herein, be given the same meaning assigned to it by the Act unless a different meaning is plainly required by the context.

"Actuarial Equivalent" shall mean, except where the Plan or Appendix J expressly provides that other factors will be used, a benefit or amount differing in time or manner of payment from another benefit or amount provided under the Plan but having equivalent value when computed using:

(a)     interest at 9-1/2 percent, compounded annually, together with the 1983 Group Annuity Mortality Table (the "1983 GAM Table") (blended 70% male/30% female) with margin and, where applicable, on the basis of the tables adopted by the Administrative Committee and contained in the Appendices of this Plan (provided, that the applicable tables contained in Appendix A of the Plan shall not be the basis for determining such factors for Plan Years beginning on or after January 1, 2011 except that Appendix A shall be utilized to the extent that the Participant's age in a particular determination is age 67 or older for such determination).

(b)     for purposes of calculating and paying lump sum distributions under the Plan (and other benefits not considered to be "non-decreasing annuities", such as a social security level income benefit):

(i)     prior to September 1, 1999 (the first day of the month following the adoption of the GATT assumptions ("GATT Factors") specified in (ii) below), the 1983 GAM Table (blended 70% male/30% female), with margin, together with the Applicable Interest Rate; and

-4-

(ii)       effective on or after September 1, 1999 but before January 1, 2008, the Applicable Mortality Table, and an interest rate equal to the annual rate of interest on 30 year-Treasury Securities for the month of November (the "look-back month") which precedes the Plan Year (the "stability period") that contains the Benefit Commencement Date (or, in the case of a lump sum, in which the lump sum distribution is to be made), provided, however, that in no event will the social security level income benefit be less than that produced by applying the "grandfathered" Social Security level option factors contained in Appendix C that were applicable to Participant's Accrued Benefits as of August 31, 1999; and

(iii)      effective on or after January 1, 2008, the Applicable Mortality Table, and an interest rate equal to the applicable interest rate determined under Code Section 417(e)(3)(C) and (D) for the month of November (the "look-back month") which precedes the Plan Year (the "stability period") that contains the Benefit Commencement Date (or, in the case of a lump sum, in which the lump sum distribution is to be made).

Effective for Plan Years after 2017, to the extent a benefit structure under Appendix J or Prior Plan provides for distributions of a present value of certain accelerated forms of benefit using a mortality table otherwise required under Code Section 417(e)(3) and to the extent required under IRS Notice 2017-60 (or any applicable future statutory or regulatory guidance), such mortality table used shall be determined in accordance with IRS Notice 2017-60 (or such applicable future statutory or regulatory guidance).

"Administrative Committee" refers to the committee described in Section 7.01.

"Affiliated Company" shall mean

(a)      the Company;

(b)      each other corporation that is a member of a controlled group of corporations (as defined in Code Section 414(b), i.e., determined in accordance with Code Section 1563(a), without regard to Code Sections 1563(a)(4) and (e)(3)(C), except that the phrase "at least 25 percent" shall be substituted for the phrase "at least 80 percent" wherever it appears in Code Section 1563(a)(1)) that includes the Company;

(c)      any trade or business under common control (as defined in Code Section 414(c)) with the Company;

(d)      any organization (whether or not incorporated) which is part of an affiliated service group that includes the Company;

(e)    any entity required to be aggregated with the Company pursuant to regulations under Code Section 414(o); and

(f)    any partnership or joint venture designated as an Affiliated Company by the Company in which an Employing Company or a subsidiary thereof is a partner or joint venturer.

"Applicable Interest Rate" shall mean, for purposes of calculating and paying lump sum distributions under the Plan prior to the adoption of the GATT Factors, the interest rate(s) which would be used (as of the first day of the Plan Year which contains the Participant's Benefit Commencement Date) by the PBGC for purposes of valuing a benefit upon termination of an insufficient trusteed single-employer plan, if the present value of such benefit (using such rates(s)) is not in excess of $25,000, or 120% of such rate, if the present value of the benefit exceeds $25,000. In no event, however, shall the present value of such benefit determined under this clause be less than $25,000. Effective on or after September 1, 1999 but before January 1, 2008, with respect to lump sum distributions (and other non-decreasing annuities) paid on or after that date, "Applicable Interest Rate" shall mean the interest rate specified in Section (b)(ii) of the definition of Actuarial Equivalence.  Effective on or after January 1, 2008, with respect to lump sum distributions (and other non-decreasing annuities) paid on or after that date, "Applicable Interest Rate" shall mean the interest rate specified in Section (b)(iii) of the definition of Actuarial Equivalence.

"Applicable Life Expectancy" shall mean the life expectancy (or joint and last survivor expectancy) calculated using the attained age of the Participant (or designated Beneficiary) as of the Participant's (or designated Beneficiary's) birthday in the applicable calendar year reduced by one for each calendar year which has elapsed since the date life expectancy was first calculated.  The applicable calendar year shall be the first Distribution Calendar Year.

"Applicable Mortality Table" shall mean the mortality table prescribed under Code Section 417(e)(3)(B) (which, as of January 1, 2008, was a mortality table, modified as appropriate by the Secretary of the Treasury, based on the mortality table for the plan year under Code Section 430(h)(3)(A) (without regard to Code Sections 430(h)(3)(C) and 430(h)(3)(D))).  With respect to distributions with Benefit Commencement Dates prior to January 1, 2003, the Applicable Mortality Table is the 1983 Group Annuity Mortality Table, based upon a fixed blend of 50% of the male mortality rate and 50% of the female mortality rates.  Effective for distributions with Benefit Commencement Dates on or after December 31, 2002, and before January 1, 2008, the mortality table used for purposes of adjusting any benefit or limitation under Code Section 415(b)(2)(B), (C), or (D), as set forth in Section 3.6, and for purposes of satisfying the requirements of Code Section 417(e) shall be based upon a fixed blend of 50% of the unloaded male mortality rates and 50% of the unloaded female mortality rates underlying the mortality

-6-

rates in the 1994 Group Annuity Reserving Table ("'94 GAR") projected to 2002, as set forth in Revenue Ruling 2001-62. The mortality table described in this preceding definition is subject to change in accordance with the Code Section referenced in this definition without the necessity of further amending the Plan.

"Average Compensation" shall mean the highest average of the Participant's Compensation for any three (3) Plan Years (whether or not consecutive) out of the last ten (10) Plan Years up to and including the year in which the Participant retires or otherwise terminates service, provided, however, that with respect to the Accrued Benefit prior to January 1, 1993 of salaried employees of A.J. Oster Company, A.J. Oster Foils, Inc. and A.J. Oster West, Inc., Average Compensation shall mean the highest average of the Participant's Compensation for any five (5) consecutive Plan Years out of the last ten (10) Plan Years up to and including the year in which the Participant retires or otherwise terminates service. If a Participant has completed fewer than three (3) years of employment (five (5) years for Oster employees with respect to pre-1993 Accrued Benefits), Average Compensation shall mean the Participant's Compensation averaged over his actual period of employment. Notwithstanding the foregoing, if the Administrative Committee so determines in a uniform and nondiscriminatory manner, Compensation paid to an Employee prior to his employment by the Company pursuant to an acquisition by the Company of a trade or business may be included in determining such Employee's Average Compensation.

"Beneficiary" shall mean such beneficiary or beneficiaries as may be designated from time to time by the Participant or Former Participant; provided, however, that on or after a Participant's Benefit Commencement Date, the designation of a Beneficiary may not be changed (excepting any certain and life optional forms of payment as may be provided under the Plan). To be effective, the designation (or change in designation) must be provided in a form or manner acceptable to the Administrative Committee. In the event that a Participant or Former Participant dies without having in effect at the time of his death a proper Beneficiary designation, his Beneficiary shall be his Spouse or, if there is no surviving Spouse, his estate. The designated Beneficiary of a Participant or an alternate payee under a qualified domestic relations order shall not be entitled to designate another Beneficiary.

"Benefit Commencement Date" shall mean the date on which the payment of benefits under the Plan to a Participant or Beneficiary commences. For purposes of Article IV, "Benefit Commencement Date" shall have the same meaning as "annuity starting date" as defined in Code Section 417(f)(2).

"Benefit Service," except as otherwise noted in Appendix J, for purposes of accruing benefits under this Plan, shall mean the sum of (a), (b) and (c) below:

> (a)    for service prior to January 1, 1976: the Participant's Period of Creditable Service as of such date; and

-7-

(b)    <u>for service after December 31, 1975</u>: an Eligible Employee shall receive credit for one year of Benefit Service for each Plan Year in which he is credited with at least 1,000 Hours of Service for an Employing Company, provided, however, that with respect to his first and last Plan Year of active employment with an Employing Company, the Eligible Employee shall receive credit for one year of Benefit Service for each such Plan Year in which he is credited with 1,950 Hours of Service for an Employing Company.  An Eligible Employee who is not credited with at least 1,000 Hours of Service for an Employing Company within a Plan Year (1,950 Hours for the first and last years of active employment) shall receive credit for a partial year of Benefit Service determined by dividing the number of Hours of Service for an Employing Company that the Eligible Employee is credited with for the Plan Year by 1,000 (1,950 Hours for the first and last years of employment).

Unless otherwise provided under the Plan or otherwise determined by the Administrative Committee, no Benefit Service shall be credited to an Eligible Employee under this Plan for any period of time in which he is covered by and accruing benefit service under another defined benefit plan of the Company or an Affiliated Company.

In the event an individual incurs a Break in Service and again becomes an Eligible Employee, his prior Benefit Service shall be restored unless (a) the individual was not vested in his Retirement Allowance and the Break in Service equaled or exceeded the greater of five years or his prior Period of Creditable Service or (b) the individual was not vested in his Retirement Allowance and the individual does not complete a one-year Period of Creditable Service after his reemployment date.  In addition, any period ending on or prior to December 31, 1984, that was disregarded as of that date under the break-in-service provisions in effect immediately prior to such date under the applicable Prior Plan shall also not be included in the Participant's Benefit Service.  Under such rules and conditions which shall be uniform in their nature and application to all Participants similarly situated, and in accordance with the provisions of any applicable collective bargaining agreement, Benefit Service may be credited by the Administrative Committee during a period of absence from service, including a period of Military Service.

Notwithstanding any provision of this Plan to the contrary, effective for re-employment commencing on or after December 12, 1994, contributions, benefits and service credit with respect to qualified Military Service will be provided in accordance with Section 414(u) of the Code. Accordingly, if an Employee in qualified Military Service returns to employment with the Company during the time that his re-employment rights are protected, then he shall receive credit for Benefit Service (and Periods of Creditable Service) for the period of his qualified Military Service. With respect to unpaid family and medical leave, contributions, benefits and service credit will be provided in accordance with 29 CFR Section 825.215, effective for leaves commencing on or after August 5, 1993. During an

unpaid medical or family leave under the FMLA, the Participant shall not incur any Break in Service, and shall receive credit for Periods of Creditable Service in accordance with that definition, but shall not receive credit for Benefit Service during such leave.

All or part of an individual's service with an Acquired Company may be counted as part of a Participant's Benefit Service if the Administrative Committee, so determines in a uniform and non-discriminatory manner.

"Board of Directors" shall mean the board of directors of the Company.

"Break in Service" shall mean (a) prior to January 1, 1976, termination of employment as determined by the Employing Company from its service records and (b) on and after January 1, 1976, a one-year Period of Severance.

"Change in Control" shall be deemed to occur if (a) a person, partnership, joint venture, corporation or other entity, or two or more of any of the foregoing acting as a group (or a "person" within the meaning of Section 13(d)(3) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")), other than the Company, a majority-owned subsidiary of the Company or an employee benefit plan of the Company or such subsidiary, become(s) the "beneficial owner" (as defined in Rule 13d-3 under the Exchange Act) of 20% or more of the then outstanding voting stock of the Company; (b) during any period of two consecutive years, individuals who at the beginning of such period constitute the Board of Directors (together with any new director whose election by the Board of Directors or whose nomination for election by the Company's stockholders, was approved by a vote of at least two-thirds of the directors then still in office who either were directors at the beginning of such period or whose election or nomination for election was previously so approved) cease for any reason to constitute a majority of the directors then in office; (c) all or substantially all of the business of the Company is disposed of pursuant to a merger, consolidation or other transaction in which the Company is not the surviving corporation (unless the shareholders of the Company immediately following such transaction beneficially own, directly or indirectly, more than 50% of the aggregate voting stock or other ownership interests of (I) the entity or entities, if any, that succeed to the business of the Company or (II) the combined company); or (d) approval by the Company's shareholders of (I) a sale of all or substantially all of the assets of the Company or (II) liquidation or dissolution of the Company.

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time. References to any section of the Code shall include any successor provision thereto and applicable Regulations thereunder. Any term or phrase defined in the Act shall, if used herein, be given the same meaning assigned to it by the Act unless a different meaning is plainly required by the context.

"Company" shall mean Olin Corporation, a Virginia corporation, and any successor thereto by merger, purchase or otherwise.

"Compensation" shall mean the total compensation paid to an Employee for services rendered to an Employing Company for the calendar year including amounts excluded from taxable income pursuant to Sections 125 (cafeteria plans), 132(f)(4) (qualified transportation fringe benefits) and 402(g) (qualified 401(k) plans) of the Code, but excluding (a) any amounts contributed to, or the value of benefits distributed under, this Plan or any other deferred compensation plan or program, (b) any benefits provided under an employee benefit or fringe benefit plan or program, or the taxable value of any fringe benefits, (c) cost of living and similar allowances, (d) amounts paid under a performance unit plan or other long-term bonus plan, (e) sign-on and similar bonuses, and (f) other extraneous income.  If an Employee's last calendar year of active employment is for only a portion of that year, the Employee's Compensation for that year shall equal the sum of (1) the Employee's Compensation actually paid during such year but specifically excluding lump sum payments of any kind, including vacation pay, sick pay, severance pay, terminal pay, or pay received as a result of any settlement with an Employing Company plus (2) an amount which is determined by multiplying the Employee's monthly base pay (i.e., stated wages or salary, disregarding shift differentials, overtime, commissions, cost of living allowances and incentive and other additional compensation) determined as of his last day of active service for that calendar year multiplied by the number of months (and fractions thereof) remaining in the calendar year that would result in a full calendar year.  For the avoidance of doubt, in no event shall Compensation for any one calendar year exceed the amount of compensation an Employee would receive during the normal course of one calendar year of employment (as determined by the Administrative Committee taking into account the inclusions and exclusions described in this definition).

The maximum amount of Compensation that may be taken into account under the Plan for any Plan Year shall not exceed $200,000, as adjusted in accordance with Code Section 401(a)(17), for Plan Years beginning prior to January 1, 1994.  For Plan Years beginning on or after January 1, 1994, the maximum amount of Compensation that may be taken into account under the Plan shall not exceed $150,000, as adjusted for increases in the cost of living in accordance with Section 401(a)(17)(B) of the Code, as amended from time to time, for Plan Years beginning on or after January 1, 1994.  Effective with respect to Plan Years commencing on or after January 1, 2002, the Compensation of each Participant taken into account in determining benefit accruals in any Plan Year shall not exceed $200,000, as adjusted for cost-of-living increases in accordance with Section 401(a)(17)(B) of the Code.  The cost-of-living adjustment in effect for a calendar year applies to any period (such as a Plan Year), not exceeding 12 months, beginning in such calendar year, over which compensation is determined (i.e., a determination

-10-

period).  If a determination period consists of fewer than 12 months, Compensation limit will be multiplied by a fraction, the numerator of which is the number of months in the determination period, and the denominator of which is 12. If Compensation for any prior determination period is taken into account in determining an Employee's benefits accruing in the current Plan Year, the Compensation for that prior determination period is subject to the applicable Compensation limit in effect for that prior determination period.  Notwithstanding the foregoing, effective in determining benefits accrued by Participants in Plan Years beginning on and after January 1, 2002 (other than those receiving nonqualified grantor trust contributions from the Company attributable to the lower Compensation limits in effect during 2000 and 2001), the $200,000 limited, as adjusted, shall apply in determining Compensation (and the Compensation limit) for periods prior to January 1, 2002.

"Compensation within the meaning of Section 415 of the Code" or "Code Section 415 Compensation" shall include the Participant's total remuneration for personal services actually rendered in the course of employment with the Employing Company or a Related Employer, but excluding (i) contributions made to a plan of deferred compensation to the extent that, before the application of the limitations contained in Code Section 415 to such plan, the contributions are not includable in the gross income of the Participant for the taxable year in which contributed; (ii) distributions from a plan of deferred compensation except to the extent such distributions are from an unfunded nonqualified plan and are includable in the Participant's gross income for the year; (iii) amounts realized from the exercise of a nonqualified stock option or when restricted stock (or property) either becomes freely transferable or is no longer subject to a substantial risk of forfeiture; (iv) amounts realized from the sale, exchange or other disposition of stock acquired under a qualified stock option; and (v) other amounts which receive special tax benefits, such as premiums for group term life insurance (but only to the extent that the premiums are not includable in the gross income of the Participant).

Notwithstanding the foregoing, for Plan Years beginning on or after January 1, 1998, Code Section 415 Compensation shall also include any elective deferral as defined in Section 402(g)(3) of the Code and any amount which is contributed or deferred by the Employer at the election of the Employee and which is not otherwise includable in the gross income of the Employee by reason of  Section 125 of the Code.  For Plan Years beginning prior to January 1, 1998, such elective deferrals are not included in Code Section 415 Compensation.  Effective for Limitation Years beginning on and after January 1, 2001, for purposes of applying the 415 limits described in Section 3.6 of the Plan, Code Section 415 Compensation shall include elective amounts that are not includable in the gross income of the employee by reason of Section 132(f)(4) (i.e., qualified transportation fringe benefits).

-11-

"Creditable Service" shall mean service taken into account for purposes of determining an Employee's eligibility to participate in the Plan, vesting and attainment of retirement dates, as determined in accordance with the definition of "Period Of Creditable Service," below.

"Disabled" shall mean, except as otherwise provided in Appendix J, disabled to the extent that the Participant is receiving disability benefits under a plan providing long-term disability benefits maintained by his Employing Company.

"Distribution Calendar Year" shall mean a calendar year for which a minimum distribution is required.  For distributions beginning before the Participant's death, the first Distribution Calendar Year is the calendar year immediately preceding the calendar year which contains the Participant's Required Beginning Date.  For distributions beginning after the Participant's death, the first Distribution calendar year is the calendar year in which distributions are required to begin pursuant to Appendix I.

"Domestic Partner" shall mean each of two people, one of whom is a Participant, who represent themselves publicly as each other's Domestic Partner and have either (a) registered as Domestic Partners or members of a civil union with a government agency or office where such registration is available, or (b) submitted a Domestic Partner Declaration to the Administrative Committee.

"Domestic Partner Declaration" shall mean a declaration signed by both the Participant and Domestic Partner, which establishes that:

(a)    each person is 18 years of age or older;

(b)    neither person is married;

(c)    neither person has had another Domestic Partner within 6 months prior to the date of the Declaration;

(d)     they have shared the same residence for at least 6 months prior to the date of the Declaration;

(e)    they are not related by blood in a manner that would bar their marriage in the jurisdiction in which they reside;

(f)    they have an exclusive mutual commitment to share the responsibility for each other's welfare and financial obligations which commitment existed for at least 6 months prior to the date of the Declaration, and such commitment is expected to last indefinitely; and

(g)    2 or more of the following exist as evidence of joint responsibility for basic financial obligations:

-12-

(1)     a joint mortgage or lease;

(2)     designation of the Domestic Partner as beneficiary for life insurance or retirement benefits;

(3)     joint wills or designation of the Domestic Partner as executor and/or primary beneficiary;

(4)     designation of the Domestic Partner as durable power of attorney or health care proxy;

(5)     ownership of a joint bank account, joint credit cards or other evidence of joint financial responsibility; or

(6)     other evidence of economic interdependence.

To be effective, the Domestic Partner Declaration must be provided in a form or manner acceptable to the Administrative Committee.

"Effective Date," as applied to this restated Plan shall mean August 1, 2020.  The original effective date of the predecessor plan was January 1, 1967.  With respect to a Prior Plan or a plan that was merged into a Prior Plan, the Effective Date of such plan shall be as provided in such plan.  Certain provisions have special effective dates and such provisions are an amendment to the Plan as in effect on such date.

"Eligible Employee" shall mean an Eligible Collectively Bargained Employee or an Eligible Non-Collectively Bargained Employee.  An Eligible Collectively Bargained Employee is an Employee who is employed by and is enrolled on the active payroll of an Employing Company and who is represented by a bargaining unit with respect to which an Employing Company has reached an agreement which provides for participation in the Plan and who receives compensation from the Employing Company other than a pension, retirement allowance, retainer or fee under contract.  An Eligible Non-Collectively Bargained Employee is an Employee who is employed by (including any officer or director who is also an Employee) and is enrolled on the active payroll of an Employing Company, and either (a) the Employee is performing services in the United States or its territories and possessions, (b) the Employee is a citizen of the United States and is performing services outside the United States or its territories and possessions at the request of an Employing Company, or (c) the Employee is a citizen of Canada and is performing services in the People's Republic of China at the request of an Employing Company.

Notwithstanding anything to the contrary in the Plan (including any appendices), effective as of January 1, 2005, an Eligible Non-Collectively Bargained Employee shall not include:

(a)     any salaried exempt or non-exempt Employee hired on and after January 1, 2005;

-13-

(b)       any former Employee rehired as a salaried exempt or non-exempt Employee on and after January 1, 2005;

(c)       any hourly non-collectively bargained Employee hired on or after January 1, 2005 at the Oxford, Mississippi location of the Winchester division;

(d)       any hourly non-collectively bargained Employee hired on or after January 1, 2005 in the Chlor Alkali division; or

(e)       any Employee at Employing Company excluded under the applicable provisions of Appendix J.

Eligible Employees shall not include (unless otherwise determined by the Company) (1) employees of a plant owned by the United States government and operated for the government by an Employing Company; (2) employees included in a collective bargaining unit with which an agreement has not been signed respecting the Plan; or (3) any other person who is not considered to be an Employee of the Company or a Related Employer.  In all cases of doubt, the Administrative Committee shall decide whether a person is an Eligible Employee as defined herein.  In no event shall an individual who is leased from an organization that is not an Affiliated Company to an Affiliated Company and is a Leased Employee within the meaning of Section 414(n)(2) of the Code be treated as an Eligible Employee for purposes of this Plan.

An Eligible Employee shall not include for any purpose of the Plan any independent contractor or Leased Employee who performs services for the Company, Affiliated Company or Employing Company, or any other individual performing services who is not treated or classified as an employee by the Company, Affiliated Company or Employing Company, even if a court, administrative agency or other entity determines that such individual is a common law employee. An Eligible Employee shall not include for any purpose of the Plan (a) any individual classified by the Company, Affiliated Company or Employing Company as an independent contractor in respect of his or her services for the Company, Affiliated Company or Employing Company; (b) any individual whose compensation for services to the Company, Affiliated Company or Employing Company is reported on IRS Form 1099 (or any replacement form); (c) any individual whose compensation for services to the Company, Affiliated Company or Employing Company is paid from a payroll or other account of another employer under contract with the Company, Affiliated Company or Employing Company; or (d) any individual who is not paid from the Company's, Affiliated Company's or Employing Company's payroll account or with respect to whom the Company, Affiliated Company or Employing Company does not issue an IRS Form W-2 (or any replacement form).  Such exclusion shall not be affected by the Company's, Affiliated Company's or Employing Company's misclassification

-14-

of the individual's employment status, or a determination by a court, government agency, arbitrator, or other authority that the individual is or was a common law employee of the Company, Affiliated Company or Employing Company, or that the Company, Affiliated Company or Employing Company is or was a common law employer, joint employer, single employer, or co-employer of the individual.  For example, this provision excludes from participation in the Plan workers commonly referred to as contract employees, job-shoppers, independent contractors, consultants, and leased employees (including "leased employees" as that term is used in Code Section 414(n) regardless of whether such leased employees have completed the 12-month waiting period described in Code Section 414(n))**.**

"Employee" shall mean an individual employed by an Affiliated Company or Employing Company.

"Employing Company" shall mean, except as otherwise provided in Appendix J, the (i) Company and (ii) any Affiliated Company which has been designated as participating in the Plan by the Company.  Such term shall include any predecessor or affiliate of an Employing Company designated as coming within such term by the Company.

An Employing Company shall be deemed to have authorized the Company, Administrative Committee and Investment Committee to act for it in all matters arising under or with respect to the Plan, including the right of the Company to amend the Plan for all Employing Companies, and shall comply with such other terms and conditions as may be imposed by such entities.  The Company may limit the application of the Plan to one or more divisions, locations or operations or to a specified group of Employees with respect to an Employing Company.

Any action by an Employing Company (not including the Company) provided for by the Plan may be taken by the board of directors of the Employing Company or such of its members, or officers or Employees of the Employing Company, as may be authorized by the board to act in its behalf with regard thereto.

"Fiduciary" shall mean any person to the extent that he (a) exercises any discretionary authority or discretionary control respecting management of the Plan or exercises any authority or control respecting management or disposition of its assets; (b) renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of the Plan, or has any authority or responsibility to do so; or (c) has any discretionary responsibility in the administration of the Plan.  Such term includes persons designated by fiduciaries named in the Plan to carry out fiduciary responsibilities under the Plan.

"Five Percent Shareholder" shall mean a person who owns (or is considered to own within the meaning of Section 318 of the Code) more than five percent of the outstanding stock or stock possessing more than five percent of the total combined voting power of all stock of an Employing Company.

-15-

"Former Participant" shall mean a Participant who is no longer employed by an Affiliated Company, or is employed by an Affiliated Company but covered under a collective bargaining agreement that does not provide for participation in the Plan, but who still has an Accrued Benefit under the Plan and is vested in such Accrued Benefit.

"Hours of Service" shall mean

(a)     each hour for which an Employee is paid or entitled to payment for the performance of duties for an Affiliated Company during the applicable computation period;

(b)     each hour for which an Employee is paid, or entitled to payment by an Affiliated Company on account of a period of time during which no duties are performed (irrespective of whether the employment relationship has terminated) due to vacation, holiday, illness, incapacity (including disability), layoff, jury duty, military duty or leave of absence; and

(c)     each hour for which back pay, irrespective of mitigation of damages, has been either awarded or agreed to by an Affiliated Company (to be credited as of the time to which the award or agreement pertains - i.e., hours of service will be allocated to applicable time period(s) for which the back pay relates).

No more than 501 Hours of Service shall be credited under (b) above for any single continuous period (whether or not in a single computation period) during which an Employee performs no duties.  Notwithstanding the foregoing, no Hours of Service shall be credited for an hour during which no duties are performed if such payment is made or due (1) under a plan maintained solely for the purpose of complying with workers' compensation, unemployment compensation or disability insurance laws or (2) solely to reimburse an Employee for medical or medically related expenses incurred by the Employee.  However, an Employee shall be entitled to credit for Hours of Service during a period of absence for which credit is to be granted pursuant to the provisions of a collective bargaining agreement or for which he is paid pursuant to a disability benefit program or under personnel policies applicable to all Employees similarly situated.  An Employee shall be credited with the number of hours determined under Labor Department Regulations Section 2530.200b-2(b) and (c), which is incorporated herein by this reference. In no event will any Hours of Service be credited if they duplicate Hours of Service previously credited.

"Investment Committee" refers to the committee described in Section 7.02.

"Investment Manager" shall mean any party which (a) is appointed by the Investment Committee (or its delegate) to manage, acquire or dispose of any assets of the Plan; (b) acknowledges in writing that it is a Fiduciary; and (c) is (1) registered as an investment advisor under the Investment Advisers Act of 1940, (2) a bank (as defined

-16-

in the Investment Advisers Act of 1940) or (3) an insurance company qualified to manage, acquire or dispose of any assets of the Plan pursuant to the laws of more than one state.

"Leased Employee" shall mean any person (other than an employee of the recipient) who pursuant to an agreement between the recipient and any other person ("leasing organization") has performed services for the recipient (or for the recipient and related persons determined in accordance with Section 414(n)(6) of the Code) under the primary direction or control of the recipient on a substantially full-time basis for a period of at least one year.

Contributions or benefits provided for a leased employee by the leasing organization which are attributable to services performed for the recipient employer shall be treated as provided by the recipient employer. A Leased Employee shall not be considered an employee of the recipient if: (i) such employee is covered by a money purchase pension plan providing: (1) a nonintegrated employer contribution rate of at least ten percent (10%) of compensation, as defined in Section 415(c)(3) of the Code, but including amounts contributed by the Employer pursuant to a salary reduction agreement which are excludable from the employee's gross income under Section 125, Section 402(a)(8), Section 402(h) or Section 403(b) of the Code, (2) immediate participation, and (3) full and immediate vesting; and (ii) leased employees do not constitute more than 20 percent (20%) of the recipient's nonhighly compensated workforce.

"Life Expectancy" and "Joint and Last Survivor Expectancy" are computed by use of the expected return multiples in Tables V and VI of Section 1.72-9 of the Income Tax Regulations. Life expectancies shall not be recalculated annually.

"Limitation Year" shall mean the calendar year.

"Military Service" shall mean a leave of absence from active employment of an Affiliated Company during which the Eligible Employee is in the armed forces of the United States of America under circumstances which entitle him to reemployment and other related rights under any applicable Federal law, provided the Eligible Employee reenters the employ of an Affiliated Company within the period during which his reemployment rights are protected by such law without any intervening employment elsewhere. In the event a person in Military Service fails to return to the employ of an Affiliated Company, as provided herein, he shall be considered as having terminated his employment as of the commencement of such Military Service. Effective on or after December 12, 1994, contributions, benefits and service credit with respect to qualified Military Service will be provided in accordance with Section 414(u) of the Internal Revenue Code.

"Normal Retirement Date" shall mean, unless otherwise provided in an applicable collective bargaining agreement or in Appendix J, the date on which a Participant attains his 65th birthday.

"Parental or Medical Leave of Absence" shall mean an Employee's absence from work beginning on or after January 1, 1985,

(a)    by reason of the Employee's pregnancy;

(b)    by reason of the birth of the Employee's child;

(c)    by reason of the placement of a child with the Employee in connection with the adoption of any such child by the Employee; or

(d)    for purposes of caring for any such child during the period immediately following such child's birth or adoption.

In addition, on or after January 1, 1993, this term shall mean an Employee's absence from work

(e)    by reason of the placement of a child with the Employee in connection with the foster care of any such child by the Employee;

(f)    for the purposes of caring for any such child during the period immediately following such child's foster care placement;

(g)    because the employee is needed to care for a family member with a serious health condition; or

(h)    because the employee's own serious health condition makes the employee unable to perform the functions of his job.

"Participant" shall mean any Eligible Employee who has become a Participant pursuant to Article II.

"Period of Creditable Service," unless otherwise provided in Appendix J, for purposes of determining eligibility to participate, vesting and attainment of retirement dates, shall mean the sum of (a) and (b):

(a)    for service prior to January 1, 1976:  the Participant's period of service credited as prior service on the records of the Prior Plan;

(b)    for service on and after January 1, 1976:  the aggregate period or periods beginning on January 1, 1976, or the date on which the Participant is first credited with an Hour of Service (or his reemployment commencement date), if later, and ending on his next following Severance from Service Date.  In addition, (1) if an individual incurs a Severance from Service Date as the result of a voluntary termination, discharge or retirement and he returns to service within 12 months of his Severance from Service Date, or (2) if during an absence from service for any reason other than a voluntary termination,

-18-

discharge or retirement, he incurs a Severance from Service Date as the result of a voluntary termination, discharge or retirement and he returns to service within 12 months of the date on which he was first absent from service, the period during which he is absent from service shall be included in his Period of Creditable Service.  Fractional periods of a year will be expressed in terms of days.

If a Participant incurs a Break in Service, his Period of Creditable Service shall include his service prior to the Break in Service unless (i) the individual was not vested in his Retirement Allowance and the Break in Service equaled or exceeded the greater of five years or his prior Period of Creditable Service or (ii) the individual was not vested in his Retirement Allowance and the individual does not complete a one-year Period of Creditable Service after his reemployment commencement date.  In addition, any period ending on or before December 31, 1984, that was disregarded as of that date under the break-in-service provisions in effect immediately prior to such date under the appropriate Prior Plan shall also not be included in the Participant's Period of Creditable Service.  Under such rules and conditions which shall be uniform in their nature and application to all Participants similarly situated, a Period of Creditable Service may be credited by the Administrative Committee during a period of absence from service including a period of Military Service.

Notwithstanding any provision of this Plan to the contrary, effective for re-employment commencing on or after December 12, 1994, contributions, benefits and service credit with respect to qualified Military Service will be provided in accordance with Section 414(u) of the Code.  Accordingly, if an Employee in qualified Military Service returns to employment with the Company during the time that his re-employment rights are protected, then he shall receive credit for Periods of Creditable Service (and Benefit Service) for the period of his qualified Military Service.  With respect to unpaid family and medical leave, contributions, benefits and service credit will be provided in accordance with 29 CFR Section 825.215, effective for leaves commencing on or after August 5, 1993.  During an unpaid medical or family leave under the FMLA, the Participant shall not incur any Break in Service, and shall receive credit for Periods of Creditable Service in accordance with that definition, but shall not receive credit for Benefit Service during such leave.

All or part of an individual's service with an Acquired Company shall be counted as part of a Participant's Period of Creditable Service if the Administrative Committee so determines.

In the event an individual who was a Leased Employee within the meaning of Section 414(n)(2) of the Code, ceases to be a Leased Employee and becomes an Eligible Employee and an Affiliated Company was the recipient of such individual's services as a Leased Employee, his prior employment as a Leased Employee shall be credited as part of his Period of Creditable Service.

-19-

"Period of Severance" shall mean the period of time commencing on an individual's Severance from Service Date and ending on the date on which he again performs an Hour of Service.

"Plan" shall mean the Olin Corporation Employees Pension Plan, including this Plan document and any other agreement or Trust Agreement forming a part hereof, together with any and all amendments or supplements thereto.

"Plan Year" shall mean the calendar year.

"Prior Plan" shall mean the Plan prior to its restatement as of August 1, 2020 and, as applicable, either the Bargaining Employees Pension Plan of Olin Corporation or the NonBargaining Employees Pension Plan of Olin Corporation, which were merged to form this Plan, provided, however, that for purposes of the applicable subsections of Appendix J, "Prior Plan" shall mean the plan referred to therein.

"Primary Social Security Benefit" shall mean the annual benefit for old age under the Federal Social Security Act to which an Employee is entitled or could be entitled at his Social Security Retirement Age if he did not willfully disqualify himself therefor, as computed from the records of the Plan (excluding any part of the year in which the Employee would have retired on a normal Retirement Allowance) on the assumptions that (a) prior to becoming an Employee he worked in covered employment and that his compensation for any year prior to the time he became an Employee was equal to his compensation on the last day of the year during which he became a Participant multiplied by a fraction, the numerator of which shall be the national average wage as determined by the Federal Social Security Administration for such prior year and the denominator of which shall be such national average wage for the year in which he became a Participant, (b) he works in covered employment until his Social Security Retirement Age at the same basic rate of compensation as in effect at the time of his retirement or termination, based on benefits under the Social Security Act as in effect on the earlier of the date (1) he ceases to accrue Benefit Service under the Plan or (2) he is determined to be Disabled or Totally and Permanently Disabled, as applicable, and (c) he begins to collect his Primary Social Security Benefit at his Social Security Retirement Age. Notwithstanding the foregoing, if benefits under the Plan commence before the Participant's Social Security Retirement Age, the Primary Social Security Benefit shall be reduced by the appropriate reduction factor determined under the Social Security Act, assuming that his benefit commences at his Normal Retirement Date.

However, the Employee may elect to have his Primary Social Security Benefit calculated using his actual compensation prior to becoming an Employee provided he supplies documentation of such compensation from the Federal Social Security Administration to the Administrative Committee within 90 days following the date he is notified of the amount of his Retirement Allowance.

-20-

"Regulations" shall mean the regulations and other interpretive guidance, procedures, notices, announcements and bulletins issued pursuant to the Act or the Code, as the case may be.

"Related Employer" shall mean a corporation or other business organization during the period it is--

(a)    a member with the Company of a controlled group of corporations (as determined pursuant to Section 414(b) of the Code),

(b)    a member with the Company of a group of trades or businesses under common control (as determined pursuant to Section 414(c) of the Code),

(c)    a member with the Company of an affiliated service group (as determined pursuant to Section 414(m) of the Code), or

(d)    any other entity required to be aggregated with the Company pursuant to regulations issued under Section 414(o) of the Code.

"Required Beginning Date" shall mean, with respect to each Participant who attains age 70-1/2 on or after January 1, 1997 and who is not a "5-percent owner", April 1st of the calendar year following the calendar year in which the Participant attains age 70-1/2 or retires, whichever is later, except as expressly provided below:

(a)    If a Participant attains age 70-1/2 on or after January 1, 1997 or before January 1, 1988 and is not a "5-percent owner", his "Required Beginning Date" shall be the later of April 1st of the calendar year following the calendar year (i) in which such Participant reaches age 70-1/2, or (ii) the date on which the Participant actually retires;

(1)    A Participant who attains age 70-1/2 prior to 1997 shall commence his Retirement Allowance no later than April 1st of the calendar year following the calendar year in which he attains age 70-1/2, regardless of whether he has continued to be employed by an Employing Company or is re-employed by an Employing Company.

(2)    A Participant who attains age 70-1/2 in 1997 or 1998 shall commence his Retirement Allowance no later than April 1 of the calendar year following the calendar year in which he attains age 70-1/2, unless he elects, in accordance with procedures established by the Administrative Committee, to defer commencement of his Retirement Allowance until he retires.

(b)    If a Participant attains age 70-1/2 during 1988, is not a "5-percent owner" (as hereinafter defined) and has not retired as of January 1, 1989, such Participant's Required Beginning Date shall be delayed to April 1, 1990;

-21-

(c)    If a Participant is a 5-percent owner during any year beginning after December 31, 1988, his Required Beginning Date is April 1st following the later of: (i) the calendar year in which he reaches age 70-1/2; or (ii) the earlier of the calendar year with or within which ends the Plan Year in which the Participant becomes a 5-percent owner, or the calendar year in which the Participant retires.

A Participant shall be treated as a 5-percent owner for purposes of this definition if such Participant is a 5-percent owner as defined in Code Section 416(i) at any time during the Plan Year ending with or within the calendar year in which such owner reaches age 66 1/2 or in any subsequent Plan Year.

"Restatement Date" shall mean August 1, 2020.

"Retirement Allowance" shall mean the annual retirement income provided to a Participant under the Plan.

"Severance from Service Date" shall mean the earlier of (a) the date the Employee quits, is discharged, retires, or dies and (b) the first anniversary of the first date of a period in which an Employee remains absent from service for any other reason. Notwithstanding the foregoing, if the Employee has been granted a leave of absence or layoff in accordance with the provisions of a collective bargaining agreement, and the date of termination of such leave or layoff occurs after the first anniversary of his absence from service under clause (b) above, such termination date will be the Severance from Service Date.

In the event an Employee is absent from service beyond the first anniversary of the first date of absence occurring as a result of a Parental or Medical Leave of Absence, a Severance from Service Date shall not occur until the second anniversary of such separation from service. The period between the first and second anniversary of the first date of such absence from service shall not count either as a Period of Creditable Service or a Period of Severance.

"Social Security Retirement Age" shall mean the age used as the retirement age for the Participant under Section 216(1) of the Social Security Act, except that solely for purposes of applying the benefit limitation adjustments described in Section 3.6 to the Participant's maximum annual benefit, such section shall be applied without regard to the age increase factor and as if the early retirement age under Section 216(1)(2) of such Act were age 62.

"Spouse" shall mean the individual to whom a Participant is validly married, as recognized under applicable state law (and as construed in accordance with applicable Department of Labor and Treasury guidance, including Internal Revenue Service Notice 2014-19).

"Totally and Permanently Disabled" shall mean, except as otherwise provided in Appendix J, disabled to the extent that the Participant is receiving permanent and total disability benefits under a plan providing long-term

-22-

disability benefits maintained by an Employing Company or, if not eligible to participate in such a plan at the time of the purported disability, is receiving disability benefits under the Social Security Act or is unable to perform or be trained for any job for which the Participant is reasonably suited or for which he is qualified by education, training or experience.  Any question as to whether a Participant is, or continues to be, Totally and Permanently Disabled shall be determined by the Administrative Committee.  Any Participant who shall refuse to submit to any physical examination properly requested shall no longer be considered Totally and Permanently Disabled.

"Trust Agreement" shall mean the agreement or agreements between the Company and the Trustee, as amended from time to time, pursuant to which the Plan is funded.

"Trustee" shall mean the trustee or trustees acting as such under the Trust Agreement in effect from time to time.

"Year of Creditable Service" shall mean any 12-month Period of Creditable Service.

"Year of Benefit Service" shall mean, except as otherwise provided in Appendix J or the definition of "Benefit Service," each Plan Year in which a Participant is Credited with at least 1,000 Hours of Service.

1.2    Gender and Number.  Wherever used herein, words in the masculine form shall be deemed to refer to females as well as to males, words in the feminine form shall be deemed to refer to males as well as females, the singular shall include the plural and the plural shall include the singular in all cases where such meanings would be appropriate.

ARTICLE II
Participation

2.1 <u>Participants on the Restatement Date</u>. Except as otherwise noted in Appendix J, any Eligible Employee who was a Participant in a Prior Plan on July 31, 2020, shall continue as a Participant in this Plan on the Restatement Date, provided he continues to be an Eligible Employee.

2.2 <u>Other Participants</u>. Unless otherwise provided in the applicable collective bargaining agreement or in the applicable Appendix J, on and after the Restatement Date, each other Eligible Employee shall become a Participant in the Plan as of the date he becomes an Eligible Employee, and shall continue as a Participant in this Plan provided he continues to be an Eligible Employee.

2.3 <u>Transfers To/From the Status of an Eligible Employee</u>. An Employee who was not an Eligible Employee, but who becomes an Eligible Collectively Bargained Employee and a Participant as a result of becoming a member of a collective bargaining unit that participates in this Plan shall be entitled to have his Benefit Service and Retirement Allowance under this Plan computed as if during his entire period of service as an Employee he was also an Eligible Collectively Bargained Employee. Likewise, unless otherwise determined by the Administrative Committee, an Employee of an Affiliated Company which is not an Employing Company who is transferred to and becomes an Eligible Non-Collectively Bargained Employee of an Employing Company under this Plan shall be entitled to have his Benefit Service and Retirement Allowance under this Plan computed as though the Affiliated Company had been an Employing Company under the Plan. In the event any such an Employee is entitled to retirement benefits under a retirement plan of an Affiliated Company (other than this Plan), benefits payable under this Plan for the same period of service shall be reduced by the actuarially adjusted benefits payable under such other retirement plan. For the purpose of computing benefits under this Plan for the period during which the individual was a participant in a retirement plan of an Affiliated Company (other than this Plan), compensation earned and service completed by such individual as recorded on the records of such plan will be considered in computing benefits under this Plan. In any event his Accrued Benefit under this Plan shall be at least equal to the sum of (i) his accrued benefit under the other plan as of the date he ceased to be eligible to participate under such other plan, plus (ii) his Accrued Benefit under this Plan based on his Benefit Service and Compensation earned after he becomes an Eligible Employee. In the event that such person shall be entitled to a pension under such other plan, the benefits to be paid to such person under this Plan shall be reduced by the actuarially adjusted amounts to be paid under such other plan.

In the event a Participant transfers to a bargaining unit with respect to which an Employing Company has not reached an agreement which provides for participation in the Plan, such individual shall cease to be a Participant as of the date he ceases to be an Eligible Collectively Bargained Employee.  Likewise, if a Participant is transferred to the employ of an Affiliated Company that is not an Employing Company, he shall cease to be a Participant as of the effective date of the transfer.  However, with respect to any such Participant (or any former Employee rehired as a salaried exempt or non-exempt Employee on and after January 1, 2005), the Plan will continue to recognize Periods of Creditable Service with Affiliated Companies in determining the Participant's vesting under this Plan and his qualification for benefits under this Plan.  Notwithstanding the foregoing, in the event there is a transfer of assets resulting in the transfer of a Participant's Accrued Benefit under this Plan to a plan of an Affiliated Company, then all service crediting shall cease under this Plan with respect to the Accrued Benefit being transferred and the individual shall no longer be considered to be a Participant or Former Participant under this Plan.

2.4     <u>Eligible Collectively Bargained Employees Who Become Eligible Non-Collectively Bargained Employees</u>.  An individual who was not an Eligible Employee solely because he was covered under a collective bargaining agreement that did not provide for participation in this Plan, but who becomes an Eligible Employee and a Participant as a result of ceasing to be a member of the collective bargaining unit, shall be entitled to have his Benefit Service and Retirement Allowance under the Plan computed as if he had always been an Eligible Employee.  In the event such an individual is entitled to retirement benefits under a retirement plan of an Affiliated Company (other than this Plan), benefits payable under this Plan for the same period of service shall be reduced by the Actuarial Equivalent of such benefits payable under such other retirement plan.  For the purpose of computing benefits under the Plan for the period during which the individual was a participant in a retirement plan of an Affiliated Company (other than this Plan), compensation earned and service completed by such individual as recorded on the records of such plan will be considered in computing benefits under this Plan.  In any event his Accrued Benefit under this Plan shall be at least equal to his accrued benefit under the other plan as of the date he ceases to be eligible to participate under such plan, plus his Accrued Benefit under this Plan based on his Benefit Service and Compensation earned after he becomes an Eligible Employee.

In the event a Participant is included in a bargaining unit with respect to which an Employing Company has reached an agreement which does not provide for participation in the Plan, such individual shall cease to be a Participant as of the effective date of such agreement.

2.5     <u>Terminated and Rehired Participants</u>.  A Participant who ceases to be an Employee but who becomes an Eligible Employee again without incurring a Break in Service shall become a Participant on the date

-25-

such Employee is credited with an Hour of Service after the Employee's rehire date.  Any other rehired Eligible Employee shall become a Participant as of the date he satisfies the eligibility requirements applicable to the employee's Employing Company, as specified in Appendix J.

## ARTICLE III
Benefits

3.1     Normal Retirement Allowance.

(a)     Any Participant who attains his Normal Retirement Date while in the employ of an Employing Company is fully vested in his total Accrued Benefit and may retire and receive a Retirement Allowance commencing as of the first day of the calendar month next following receipt by the Administrative Committee of an application therefor.  A Participant's Normal Retirement Allowance shall be determined as set forth in Appendix J.  In no event shall a Participant's Accrued Benefit be less than his Accrued Benefit under the applicable Prior Plan.

(b)     Minimum Benefit for Certain Participants.  Participants whose Average Annual Compensation determined as of December 31, 1993 is greater than One Hundred Fifty Thousand Dollars ($150,000.00) shall have their benefits under the Plan determined under the "fresh start with extended wear-away approach" permitted under Treasury Regulation 1.401(a)(4)-13, with compensation adjustments applied to the Participant's Accrued Benefit frozen as of December 31, 1993.  Accordingly, such Participant's minimum Accrued Benefit shall be equal to the sum of

(i)     the Participant's frozen Accrued Benefit determined as of December 31, 1993 under Section 3.1(a) of the Plan, adjusted for compensation increases thereafter, as permitted by Treasury Regulations, plus

(ii)     the Participant's Accrued Benefit determined under Section 3.1(a) of the Plan for Benefit Service credited after 1993, using the new compensation limits in effect on and after January 1, 1994, provided, however, that in no event shall such Participant's Accrued Benefit be less than that determined under paragraph (a) of this Section 3.1 using the new compensation limits in effect on and after January 1, 1994 and taking into account all of the Participant's Years of Benefit Service.

3.2     Early Retirement Allowance.

(a)     Any Participant who while in the employ of an Employing Company has satisfied the applicable age and service requirements for an early retirement benefit specified in Appendix J may retire on the first day of a calendar month following receipt by the Administrative Committee of an application therefor.

-27-

(b)      Any Eligible Non-Collectively Bargained Employee Participant who has completed at least seven (7) Years of Creditable Service and who is at least age fifty-two (52) and less than age fifty-five (55) on the date (without taking into account any severance period) his service as an Eligible Non-Collectively Bargained Employee of an Employing Company is terminated other than:

(i)      for cause, which shall include but not be limited to dishonesty, misconduct, insubordination or violation of, or extended deviation from, any reasonable Employing Company rules or policy, or

(ii)      as the result of a voluntary termination,

shall, solely for the purpose of permitting such Participant to satisfy the applicable age and service requirements for an early retirement benefit as specified in Appendix J, be treated as continuing as an Eligible Non-Collectively Bargained Employee for the period from the date of his involuntary termination until the later of the date he reaches age 55 or completes 10 Years of Creditable Service.  No Benefit Service shall be recognized for any purpose of the Plan with respect to such period by virtue of the preceding sentence.  No benefits shall commence until such Participant has actually satisfied both the age and Creditable Service requirement specified in this Section.

(c)      Except as otherwise provided in Appendix J, a Participant who is eligible for an Early Retirement Allowance may retire and elect to receive:

(1)      an unreduced Early Retirement Allowance based on his Accrued Benefit as of his date of actual retirement, commencing as of the first day of the month selected by the Participant which falls on or after his sixty-second (62nd) birthday but before his Normal Retirement Date; or

(2)      a reduced Early Retirement Allowance commencing as of the first day of the month selected by the Participant which falls prior to the first day of the month following his sixty-second (62nd) birthday, equal to 72% of his Accrued Benefit as of his date of actual retirement, plus 1/3rd of 1% for each full calendar month which has elapsed from the first day of the month in which the Participant attains age fifty-five (55) to the earlier of the month in which his benefits commence or age sixty-two (62).

3.3      Deferred Vested Retirement Allowance.

(a)      Any Participant who has been credited with at least five (5) Years of Creditable Service at the time he terminates service with his Employing Company or any other Affiliated Company shall be eligible for a Deferred Vested Retirement Allowance to the extent of his vested Accrued Benefit, as

specified in Appendix J, and shall receive a Deferred Vested Retirement Allowance in accordance with Section 3.3(b).

(b)     Except as otherwise provided in Appendix J, a Participant who is eligible for a Deferred Vested Allowance may elect to receive a Vested Deferred Retirement Allowance based on the vested percentage of his Accrued Benefit determined as of the date of his termination of employment, commencing as of the first day of the month immediately following his Normal Retirement Date. Alternatively, if a Participant, upon termination of service, has been credited with the applicable service requirements specified in Appendix J as necessary to qualify for an Early Retirement Allowance, upon attaining the applicable age requirements specified in Appendix J such Participant may elect to receive a reduced Vested Deferred Retirement Allowance based on his Accrued Benefit determined as of the date of his termination of employment, commencing as of the first day of any month following receipt by the Administrative Committee of an application therefor. A Participant's reduced Early Deferred Vested Retirement Allowance shall be the Actuarial Equivalent of the Deferred Vested Retirement Allowance that would otherwise be paid at Normal Retirement Date, based on the factors in Appendix D or H, as appropriate.

(c)     Notwithstanding the foregoing:

(1)     an Eligible Non-Collectively Bargained Employee Participant who has completed at least seven (7) Years of Creditable Service on the date his service as an Eligible Non-Collectively Bargained Employee is involuntarily terminated under circumstances described in Section 3.2(b) shall, solely for the purposes of permitting such Participant to satisfy the ten (10) Years of Creditable Service requirement necessary to commence an early Vested Deferred Retirement Allowance on or after attaining age fifty-five (55), be treated as continuing in service as an Eligible Non-Collectively Bargained Employee from the date of his involuntary termination until the date he would have completed ten (10) Years of Creditable Service but for the termination. No Benefit Service shall be recognized for any purpose of the Plan with respect to such period by virtue of the preceding sentence. No early Deferred Vested Retirement Allowance shall commence until such Participant has actually satisfied the Creditable Service and age requirements specified in this Section.

(2)     an Eligible Employee Participant who has completed at least four (4) Years of Creditable Service on the date his service as an Eligible Employee is involuntarily terminated

-29-

under circumstances described in Section 3.2(b) shall, solely for the purposes of permitting such Participant to satisfy the five (5) Years of Creditable Service requirement necessary to commence a Vested Deferred Retirement Allowance as of the first day of the month immediately following his Normal Retirement Date, be treated as continuing in service as an Eligible Employee from the date of his involuntary termination until the date he would have completed five (5) Years of Creditable Service but for the termination.  No Benefit Service shall be recognized for any purpose of the Plan with respect to such period by virtue of the preceding sentence.  No Deferred Vested Retirement Allowance shall commence until such Participant has actually satisfied the Creditable Service and age requirements specified in this Section.

(d)    Notwithstanding anything herein to the contrary, if the applicable vesting schedule (or service requirement) in Appendix J is amended, a Participant who has completed three (3) Years of Service as of the expiration of the election period described below may elect to be subject to the vesting schedule in effect prior to the change in the vesting schedule.  Such election must be made during the period which begins on the date on which the amendment changing the vesting schedule is adopted and which ends on the latest of the following dates:

(1)    the date which is 60 days after the date on which the Plan amendment is adopted;

(2)    the date which is 60 days after the date on which the Plan becomes effective;

(3)    the date which is 60 days after the date the Participant is issued written notice of the Plan amendment; or

(4)    such later date as may be specified by the Administrative Committee.

The election provided for in this Section 3.3(d) shall be made in writing and shall be irrevocable when made.

3.4    <u>Disability Retirement Allowance</u>.  In the event a Participant who has not attained his Normal Retirement Date becomes Disabled or Totally and Permanently Disabled, as applicable, while in the employ of an Employing Company, such Participant may be eligible for a Disability Retirement Allowance, if so provided in Appendix J.  A Participant's Disability Retirement Allowance, if any, shall be determined and shall commence in accordance with the applicable Appendix J.  Any Participant who shall refuse to submit to any physical examination properly requested shall no longer be considered Totally and Permanently Disabled for purposes of this Plan.

3.5    <u>Internal Revenue Code Requirements for Payment of Benefits</u>.

-30-

Notwithstanding anything to the contrary in the Plan, payments under this Plan shall comply with the provisions of Appendix I-2, including the Code requirements for calculation and payment of distributions, provided, however, that if a Participant has a valid election made pursuant to Section 242(b)(2) of the Tax Equity and Fiscal Responsibility Act of 1982, nothing in this Section 3.5 or in Appendix I-2 shall be deemed to require payment except in accordance with such election.

3.6     Limitation on Benefits.  The provisions of this Section 3.6 shall be effective with respect to Limitation Years ending after December 31, 2001.  Prior to that date, the limitations contained in Section 3.6 prior to this amendment (reflecting Retirement Protection Act of 1994 and Small Business Job Protection Act of 1996 changes) shall apply.  Benefit increases resulting from the EGTRRA increase in the limitations of Code Section 415(b) shall be provided only to Employees participating in the Plan who have one Hour of Service on or after the first day of the first Limitation Year ending after December 31, 2001.

(a)     With respect to Limitation Years beginning on and after January 1, 2002, a Participant's Annual Benefit, expressed in the form of a straight life annuity payable commencing on the Participant's sixty-fifth (65th) birthday and based solely upon Company contributions (including earnings thereon), payable with respect to such Participant under this Plan and all other defined benefit plans (whether terminated or not) ever maintained by the Company or by Related Employers shall not exceed the lesser of:

(1)     one hundred sixty thousand dollars ($160,000,00) as adjusted effective January 1 of each year in $5,000 increments under Section 415(d) of the Code in such manner as the Secretary of the Treasury will prescribe, with such adjustment applying to Limitation Years ending with or within the calendar year for which the adjustment applies; or

(2)     one hundred percent (100%) of the Participant's average annual Code Section 415 Compensation for a period of consecutive calendar years not exceeding three for which such average was the highest (or such larger amount as may from time to time be allowed by the Secretary of the Treasury or his delegate to reflect the statutory cost-of-living adjustment).

(b)     If the Annual Benefit is payable other than in the form of a life annuity and is not subject to Section 417(e)(3) of the Code, then, in determining whether such a benefit satisfies the Code Section 415(b) limitations, the Annual Benefit shall be converted into an equivalent Annual Benefit, as determined in Step 1 below.  The resulting Annual Benefit shall then be compared with the lesser of (I) the age-adjusted dollar limit determined in Step 2 below and (III) the Code Section 415 Compensation limitation described in Step 3 below.  The Plan will satisfy Code Section 415(b) (and this Section 3.6) only if the

-31-

Participant's equivalent Annual Benefit does not exceed the lesser of the age adjusted dollar limit determined in Step 2 below and the Code Section 415 Compensation limit in Step 3.

Step 1:  Under Section 415(b)(2)(B) of the Code, determine the Annual Benefit in the form of a straight life annuity commencing at the same Age that is Actuarially Equivalent to the Plan benefit.  The equivalent Annual Benefit is the greater of (I) the equivalent Annual Benefit computed using the Plan's interest rate and mortality table (or the tabular factor specified in the Plan for Actuarial Equivalence for the particular form of benefit payable) and (II) the equivalent Annual Benefit computed with a five percent (5%) interest rate assumption and the Applicable Mortality Table.  For purposes of making this adjustment, any ancillary benefit that is not directly related to retirement income benefits shall not be taken into account; and that portion of any joint and survivor annuity which constitutes a qualified joint and survivor annuity shall not be taken into account.  This step does not apply to a benefit that is not required to be converted to a straight life annuity pursuant to Section 415(b)(2)(B) of the Code (for example, a qualified joint and survivor annuity).

Step 2:  Determine the dollar limit (under Section 3.6(a)(1)) that applies at the Age that the benefit is payable (the "age-adjusted dollar limit").  The age-adjusted dollar limit is the Annual Benefit that is Actuarially Equivalent to an Annual Benefit equal to the Code Section 415(b) limitation for benefits commencing prior to age 62, or after age 65.  The dollar limit shall be reduced proportionately for less than ten (10) years of participation in accordance with subsection 3.6(e).

(1)    If the benefit of a Participant begins prior to age 62, the defined benefit dollar limitation applicable to the Participant at such earlier age is an Annual Benefit payable in the form of a straight life annuity beginning at the earlier age that is the actuarial equivalent of the defined benefit dollar limitation applicable to the Participant at age 62 (adjusted under 3.6(e) if required). The defined benefit dollar limitation applicable at an age prior to age 62 shall be the lesser of (A) or (B) below:

(A)    The actuarial equivalent (at such age) of the defined benefit dollar limitation computed using the Plan interest rate and Plan mortality table (or other tabular factor) specified in the Plan used for Actuarial Equivalence for early retirement benefits under the Plan; and

-32-

(B)    The actuarial equivalent (at such age) of the defined benefit dollar limitation computed using a five percent (5%) interest rate and the Applicable Mortality Table.

Any decrease in the defined benefit dollar limitation determined in accordance with this paragraph shall not reflect a mortality decrement if benefits are not forfeited upon the death of the Participant.  If any benefits are forfeited upon death, the full mortality decrement is taken into account.

(2)    If the benefit of a Participant begins after the Participant attains age 65, the defined benefit dollar limitation applicable to the Participant at the later age is the Annual Benefit payable in the form of a straight life annuity beginning at the later age that is actuarially equivalent to the defined benefit dollar limitation applicable to the Participant at age 65 (adjusted under Section 3.6(e), if required).  The Actuarial Equivalent of the defined benefit dollar limitation applicable at an age after age 65 is equal to the lesser of (A) and (B) below:

(A)    The actuarial equivalent (at such age) of the defined benefit dollar limitation computed using the interest rate and mortality table (or other tabular factor) specified in the Plan, and

(B)    The actuarial equivalent (at such age) of the defined benefit dollar limitation computed using a five percent (5%) interest rate assumption and the Applicable Mortality Table.

For these purposes, no increase in the defined benefit dollar limitation shall be assumed for mortality assumptions between age 65 and the age at which benefits commence.

Step 3:  Determine the Participant's Code Section 415 Compensation limitation as provided in Section 3.6(a)(2) above.  This limitation is equal to the Participant's Code Section 415 Compensation averaged over the consecutive three-year period producing the highest average, as provided in Section 415(b)(3) of the Code.  The Code Section 415 Compensation limit shall be reduced proportionately for less than ten (10) years of service in accordance with subsection 3.6(e).

(c)    If Code Section 417(e)(3) applies (e.g., because the Participant's benefit is payable in a lump sum or social security equalization option), then Steps 1 though Step 3 shall be followed, subject to the following.  Effective for Limitation Years beginning after 2005, the equivalent Annual Benefit is the

greatest of (I) the equivalent Annual Benefit computed using the Plan's interest rate and mortality table (or the tabular factor specified in the Plan for Actuarial Equivalence for the particular form of benefit payable), (II) the equivalent Annual Benefit computed with a 5.5% interest rate assumption and the Applicable Mortality Table, and (III) the equivalent Annual Benefit computed with the applicable interest rate for the distribution under Treasury Regulation Section 1.417(e)-1(d)(3) and the Applicable Mortality Table, divided by 1.05.   Effective for the 2004 and 2005 Limitation Years, the equivalent Annual Benefit is the greater of (I) the equivalent Annual Benefit computed using the Plan's interest rate and mortality table (or the tabular factor specified in the Plan for Actuarial Equivalence for the particular form of benefit payable), (II) the equivalent Annual Benefit computed with a 5.5% interest rate assumption and the Applicable Mortality Table.

(d)   If neither the Company nor any Related Employer has at any time maintained a defined contribution plan, a welfare benefit fund as defined in Section 419(e) of the Code, or an individual medical account as defined in Section 415(l)(2) of the Code, in which the Participant participated and if the retirement benefits payable with respect to the Participant under this Plan and all other defined benefit plans of the Company and Related Employers do not exceed ten thousand dollars ($10,000), multiplied by a fraction (not to exceed 1) the numerator of which is the Participant's Years of Service and the denominator of which is 10, for the current or any prior Plan Year, then the limitation in Section 3.6(a) above shall be deemed satisfied.

(e)   If any Participant having fewer than ten (10) years of participation in the Plan should receive a benefit hereunder, the dollar limitation described in subparagraph (a) shall be reduced by multiplying such amount by a fraction, the numerator of which is the number of years (or part thereof) of his participation in the Plan and the denominator of which is 10.  If any Participant having less than ten (10) Years of Service should receive a benefit hereunder, the 100% of compensation limitation shall be reduced by multiplying such amounts by a fraction, the numerator of which is the number of his Years of Service (or part thereof) and the denominator of which is 10.  In no event shall the application of this subparagraph (e) reduce the limitations and the $10,000 exemption to an amount less than one-tenth of the otherwise applicable limitation.

(f)   For Limitation Years beginning after December 31, 2001, a multiemployer plan in which the Company participates shall not be combined or aggregated with a non-multiemployer plan sponsored

-34-

by the Company for purposes of applying the Code Section 4l5(b)(1)(B) compensation limit to the non-multiemployer plan.

(g)      Notwithstanding anything to the contrary herein, the application of the Code Section 415 limitations and requirements for Limitation Years beginning on or after July 1, 2007 shall be made in accordance with the final Treasury regulations published in April 2007 with respect to applying such limitations and requirements.

3.7      Late Retirement, Reemployment After Retirement and Suspension of Benefits.

(a)      Late Retirement; Commencement of Benefits Before Actual Retirement.  Each Participant employed by an Employing Company beyond his Normal Retirement Date shall be fully vested in his Accrued Benefit and shall continue to accrue benefits for service rendered and compensation received (to the extent provided for in accordance with the applicable provisions of the Plan) until his actual retirement date.  Such Participant's Retirement Allowance shall commence as of the earliest of (i) his Required Beginning Date, (ii) the first day of the month on or after his actual retirement date, or (iii) any calendar month in which he ceases to work for an Employing Company at a rate of at least 40 Hours of Service, if the Participant is an Eligible Collectively Bargained Employee, or 83.33 Hours of Service, if the Participant is an Eligible Non-Collectively Bargained Employee (hereinafter referred to as "the Applicable Number of Hours of Service").  A Participant who on or after his Normal Retirement Date works no more than the Applicable Number of Hours of Service shall be deemed to be retired for purposes of this Section 3.7 and may commence his Retirement Allowance.  Notwithstanding the foregoing:

(1)      A Participant who attains age 70-1/2 prior to 1997 shall commence his Retirement Allowance no later than April 1st of the calendar year following the calendar year in which he attains age 70-1/2, regardless of whether he has continued to be employed by an Employing Company or is re-employed by an Employing Company.

(2)      A Participant who attains age 70-1/2 in 1997 or 1998 shall commence his Retirement Allowance no later than April 1 of the calendar year following the calendar year in which he attains age 70-1/2, unless he elects, in accordance with procedures established by the Administrative Committee, to defer commencement of his Retirement Allowance until he retires.

(3)      A Participant who attains age 70-1/2 in 1999 or thereafter, shall commence his Retirement Allowance no later than the April 1 of the calendar year following the calendar year in which he attains age 70-1/2 or retires, whichever is later.

-35-

If a Participant's Retirement Allowance does not commence until after he attains age 70-1/2, then his accrued benefit shall be actuarially adjusted as follows:  For the period beginning on the April 1st following the calendar year in which the Participant attains age 70-1/2 and ending on the date on which benefits commence after retirement, accrued benefits shall be actuarially increased such that the benefit distribution that commences after retirement is no less than the actuarial equivalent of the Participant's retirement benefits that would have been payable as of the April 1st following the calendar year in which the Participant attained age 70-1/2, if benefits had commenced on that date; plus the actuarial equivalent of any additional benefits accrued after that date, reduced by the actuarial equivalent of any distributions made with respect to the Participant's retirement benefits after that date

(b)     Reemployment After Normal Retirement Date; Suspension of Benefits.  If a Participant who retired or otherwise terminated employment returns to the employ of an Affiliated Company on or after his Normal Retirement Date and after his Benefit Commencement Date, he shall be considered to be retired with respect to any calendar month in which he is credited with less than the Applicable Number of Hours of Service as defined in subsection (a).  In such event, the Participant is entitled to receive a Retirement Allowance payment for such month.  Except as provided in Section 3.7(a)(1) and (2), above, concerning certain Participants whose Retirement Allowance commences prior to retirement, if after commencing benefits a Participant works at a rate of at least the applicable number of Hours of Service in a calendar month, benefit payments under this Plan shall be suspended, provided such Participant has been provided with proper notice as required by applicable law.  When re-commenced, such Retirement Allowance shall be computed, except as otherwise required by Section 3.7(a), as follows:

(1)     if the suspension of benefits notice requirement is complied with, by taking into account compensation received and service rendered (to the extent provided for in accordance with the applicable provisions of the Plan) up to the Participant's actual retirement date (subject to any maximum Years of Service that may be specified in Appendix J); or

(2)     if the suspension of benefits notice requirement is not complied with, by providing the Participant with the greater of (i) the monthly Retirement Allowance to which he would be entitled taking into account interest and changed life expectancy so that such allowance is the Actuarial Equivalent of the retirement allowance the Participant would have been entitled to receive at his Normal Retirement Date, and (ii) the Retirement Allowance to which he would be

entitled taking into account compensation received and service rendered (to the extent provided for in accordance with the applicable provisions of the Plan) up to his actual retirement date.

(c)   Reemployment Before Normal Retirement Date; Suspension of Benefits.  If a Participant who retired or otherwise terminated employment returns to the employ of an Affiliated Company prior to his Normal Retirement Date but after his Benefit Commencement Date, (i) for re-employments prior to July 1, 1998, any benefit then being paid to him shall cease, he shall again become a Participant in the Plan (if he is then employed by an Employing Company) and his prior service shall be restored; and (ii) for re-employments on or after July 1, 1998, any benefit then being paid to him shall continue to be paid if the Participant is working at a rate of fewer than the Applicable Number of Hours of Service in a calendar month, but shall be suspended if the Participant is working at a rate equal to or greater than more than the Applicable Number of Hours of Service.  In the event of a suspension under this Section 3.7(c), benefit payments shall be suspended until the Participant subsequently retires or, if earlier, reaches his Required Beginning Date.

(d)   Re-employment During Labor Dispute.  Notwithstanding paragraphs (b) and (c) of this Section 3.7, in the event of a labor/management conflict which results in a labor dispute (work stoppage or strike) any retired Participant who was an Eligible Non-Collectively Bargained Employee and who, at management's request, accepts reemployment during the period of such labor dispute will continue to receive his Retirement Allowance regardless of the number of hours he may work each month, provided that such reemployment terminates upon resolution of the labor dispute.

3.8   Benefits Paid Solely from the Trust Fund.  All benefits under the Plan are to be paid or provided for solely from the trust fund established under the Plan and the Employing Companies assume no liability or responsibility therefor.  Each Participant or retired Participant or other person who shall claim the right to any payment under the Plan shall be entitled to look only to the trust fund for such payments.

3.9   Missing Recipients.  If the Administrative Committee is unable, within three years after any benefit becomes due under the Plan to a Participant or Beneficiary, to make payment because the identity and/or whereabouts of such person cannot be ascertained notwithstanding the mailing of due notice to any last known address or addresses, the Administrative Committee shall direct that any such benefits shall be forfeited and used to reduce future Employing Company contributions; provided, however, that such benefit shall be restored (in an amount equal to the amount forfeited) upon proper claim made by such Participant or Beneficiary prior to the

-37-

termination of the Plan.  In the event a proper claim is made, benefits under this Section 3.9 shall be restored based on the following order of priority:

        (i)        from forfeitures arising under this Section 3.9; and

        (ii)        from additional Employing Company contributions made in order to restore

such benefits.

        3.10       <u>Social Security Benefits</u>.  In the case of a Participant or Beneficiary who is receiving benefits under the Plan, or in the case of a Participant who is separated from service and who has a vested right to benefits, such benefits may not be decreased by reason of any increase in the benefit levels payable under Title II of the Social Security Act or any increase in the wage base under such Title II, if such increase takes place after the earlier of the Benefit Commencement Date or the date of such separation as the case may be.

## ARTICLE IV
## Payment of Retirement Benefits

4.1     Normal Form of Retirement Allowance.

(a)     Except as otherwise provided in Appendix J, unless a Participant elects a different form of payment as provided in Section 4.2, a Participant's Accrued Benefit shall be payable in accordance with this Section 4.1.  Except as provided in Section 4.4, all Retirement Allowances shall be payable in monthly installments.

(b)     A Participant who is not married on his Benefit Commencement Date shall receive his Retirement Allowance in the form of equal monthly payments to him beginning on such date and ending with the month in which he dies.

(c)     A Participant who is married on his Benefit Commencement Date shall receive his benefit in the form of a qualified joint and 50% survivor annuity.  Such an annuity shall be an annuity for his life, with a survivor annuity for the life of his Spouse, if such Spouse survives him, in an amount equal to 50% of the amount of the annuity payable during their joint lives.  Such an annuity shall be the Actuarial Equivalent (based on the applicable Actuarial Equivalent factors) of a single life annuity for the life of the Participant.  Under such an annuity, the Participant shall receive monthly payments beginning on his Benefit Commencement Date and ending with the month in which he dies, and his Spouse shall receive monthly payments beginning on the first day of the month following his death and ending with the month in which such Spouse dies.  A married Participant may waive payment of his benefit in the form of a qualified joint and 50% survivor annuity in accordance with Section 4.3; if such a waiver is effectively made, but the Participant fails to elect an optional form of payment, his Accrued Benefit shall be paid in the form described in Section 4.1(b).

4.2     Optional Forms of Payment.

(a)     Subject to Section 3.5 and Appendix J, in lieu of the standard form of payment described in Section 4.1, a Participant may elect in accordance with Section 4.3 to receive the Actuarial Equivalent of the Retirement Allowance described in Section 4.1 in accordance with one of the optional forms described below:

Option 1.  An adjusted Retirement Allowance (based on the applicable Actuarial Equivalent factors) payable for the retired Participant's life, with the provision that after his death a percentage of his Retirement Allowance (25%, 50%, 75% or 100%) shall be continued during

-39-

the life of his Spouse (at the time of retirement), if she survives him, or, on or after September 1, 1994, any Beneficiary designated by the Participant; provided, however, that if a non-Spouse Beneficiary is less than age 25 at the Participant's Benefit Commencement Date, survivorship payments, if any, shall be paid only until the Beneficiary attains age 25.

Option 2. An adjusted Retirement Allowance (based on the applicable Actuarial Equivalent factors) payable for the retired Participant's life with the provision that in the event of the Participant's death within the shorter of ten (10) years or his life expectancy determined at his Benefit Commencement Date, payment shall be continued for the duration of such 10-year or life expectancy period to the Beneficiary designated by him. If such Beneficiary does not survive such period, the commuted value equal to the Actuarial Equivalent of any payments remaining shall be paid to the legal representatives of the last to survive of the retired Participant and the Beneficiary.

Option 3. An adjusted Retirement Allowance (based on the applicable Actuarial Equivalent factors) payable for the retired Participant's life with the provision that after his death within the shorter of five years or his life expectancy determined at his Benefit Commencement Date, payment shall be continued for the duration of such five-year or life expectancy period to the Beneficiary designated by him. If such Beneficiary does not survive such period, the commuted value equal to the Actuarial Equivalent of any payments remaining shall be paid to the legal representatives of the last to survive of the retired Participant and the Beneficiary.

Option 4. An adjusted reduced Retirement Allowance (based on Actuarial Equivalent factors) payable during the retired Participant's life, with the provision that after the Participant's death, a specified dollar amount (to be elected by the Participant provided that the amount may not exceed the amount of the Retirement Allowance paid to the Participant and that the percentage payable to the beneficiary must be set at 10% increments (e.g., 10%, 20%, 30%...)) shall be continued for the duration of the life of the Beneficiary designated by the Participant. Notwithstanding anything in the Plan to the contrary, this Option 4 shall cease to be available under the Plan on and after July 1, 2010.

Option 5. Social Security Level Option. If a Participant retires and elects to have his Retirement Allowance commence before he is entitled, solely by virtue of age, to receive primary old age insurance benefits under Title II of the Social Security Act, he may elect, in conjunction with either the normal form of Retirement Allowance (under Section 4.1, above) or one of the

-40-

optional forms of Retirement Allowance (Options 1 through 4, listed above) to receive the Actuarial Equivalent of his Retirement Allowance which has been adjusted so that, with the Participant's primary old age insurance benefits, estimated at the time of his retirement, he will receive, so far as possible, approximately the same income each year before and after such primary old age insurance benefits commence.

(b)    Any method of payment of a Participant's benefit shall be limited so that it shall be distributed either (1) over the life of the Participant and a designated Beneficiary or (2) over a period that does not extend beyond the life expectancy of the Participant or over the joint life and last survivor expectancy of the Participant and a designated Beneficiary.  Notwithstanding anything in the Plan to the contrary, distributions under this Plan shall be made in accordance with Section 401(a)(9) of the Code and any regulations issued thereunder (including regulations describing the minimum distribution incidental death benefit and the commencement of benefits where consent of the Participant (and/or Participant's spouse if applicable) is not obtained).  To the extent that any provision of the Plan is inconsistent with such section of the Code or such regulations, such Plan provision shall be disregarded.  The specific requirements of Code Section 401(a)(9) and the requirements for distribution of amounts as annuities are set forth in Appendix I-2.

(c)    Effective for Benefit Commencement Dates on or after January 1, 2017, and subject to Section 3.5 and the distribution provisions set forth in Appendix J, if a Participant elects to divide his or her Accrued Benefit by electing to receive a portion of his or her Accrued Benefit as a single sum payment or other accelerated form of benefit, and the remaining portion of his or her Accrued Benefit in an annuity form, the amount of the distribution payable with respect to each specified portion of the Accrued Benefit is determined in accordance with the method for calculating the amount of a distribution payable in the optional form elected for that portion as if that portion were the Participant's entire Accrued Benefit.

(d)    For a Participant who elects to bifurcate his or her Accrued Benefit as provided above, the distribution method described in Section 4.2(c) shall be the default method of distribution determination.  However, to the extent the default method is not permitted under applicable Treasury Regulations, then in such case, the method of distribution determination shall be as follows:

(1)    the Participant will receive a portion of his or her Accrued Benefit in the form of a single-sum payment as described above;

-41-

(2)      the remainder of the Participant's Accrued Benefit not payable in the form of a single-sum payment, expressed in the normal form of payments applicable to such Participant, commencing when the Participant attains his Normal Retirement Date (or at the current date, if later) will be equal to the excess of the Participant's total Accrued Benefit expressed in the applicable aforementioned normal form over the annuity payable in that form that is actuarially equivalent to the single-sum payment, determined using the applicable interest rate under Treasury Regulation section 1.417(e)-1(d)(2) and the applicable mortality table under Treasury Regulation section 1.417(e)-1(d)(3); and

(3)      subject to clause (2) above, the resulting amount of the distribution payable with respect to the remainder of the Participant's Accrued Benefit not payable in the form of a single-sum payment is determined in accordance with the method for calculating the amount of a distribution payable in the optional form elected for that remainder as if that remainder were the Participant's entire Accrued Benefit.

(e)      For avoidance of doubt, nothing in Sections 4.2(c)-(d) shall be construed as providing for additional optional forms of payment not otherwise provided under Appendix J or the Plan in the absence of such Sections 4.2(c)-(d).

4.3      <u>Waivers and Elections</u>.

(a)      In accordance with procedures established by the Administrative Committee, each married Participant shall be notified, no more than 90 days and no fewer than 30 days prior to his Benefit Commencement Date, that he may elect in accordance with Section 4.3(b) within the 90-day period immediately preceding his Benefit Commencement Date to waive payment of his Retirement Allowance in the form of a qualified joint and survivor annuity as described in Section 4.1(c).  Such notice shall include a written explanation of

(1)      the terms and conditions of the qualified joint and survivor annuity provided under Section 4.1(c);

(2)      the Participant's right to waive payment of his benefit under the qualified joint and survivor annuity and the effect of such waiver;

(3)      the rights of the Participant's Spouse; and

(4)      the Participant's right to revoke any prior waiver and the effect of such revocation.

-42-

All waivers and elections shall be made on a form provided for that purpose by, and filed with, the Administrative Committee.  A Participant's Benefit Commencement Date shall not occur until at least 30 days after such notice is provided to the Participant and any election made pursuant to this Section 4.3(a) may be revoked prior to the Participant's Benefit Commencement Date by filing an appropriate form with the Administrative Committee.

Notwithstanding the foregoing, for Benefit Commencement Dates in Plan Years beginning on or after January 1, 1997, a Participant may, after having received the notice, affirmatively elect to have his benefit commence sooner than 30 days following his receipt of the notice, provided all of the following requirements are met:

(i)        the Administrative Committee clearly informs the Participant that he has a period of at least 30 days after receiving the notice to decide when to have his benefits begin and, if applicable, to choose a particular optional form of payment;

(ii)       the Participant affirmatively elects a form of payment and, if applicable, the spouse consents to that form of payment in accordance with Section 4.3(b), below;

(iii)      the Participant is allowed to revoke his election until the later of his Benefit Commencement Date, or seven days following the day he received the notice;

(iv)      payment does not commence less than seven days following the day after the notice is received by the Participant.

In addition, the Administrative Committee shall also notify any unmarried Participant and any married Participant who has effectively waived payment of his benefit in the form of a qualified joint and 50% survivor annuity of his right to elect any optional form of payment described in Section 4.2.  Additionally, when a Participant is making a benefit payment election under the Plan, the Administrative Committee will provide notice to the Participant of the general description of the material features, and an explanation of the relative values of, the optional forms of benefit available to the Participant under the Plan.  Such notice will be provided in a manner that would satisfy the notice requirements of Code Section 417(a)(3) and Treas. Reg. 1.417(a)(3)-1.

(b)       Any election or revocation by a Participant which would have the effect of waiving a qualified joint and survivor annuity form of benefit that would otherwise apply, or involves designation of a Beneficiary other than his Spouse shall not be effective unless--

(1)       the Spouse of the Participant consents in writing to such election, revocation or designation during the applicable Election Period;

-43-

(2)      the election designates a specific alternate beneficiary, including any class of beneficiaries or contingent beneficiaries, and form of benefit payment, which may not be changed without spousal consent (or the Spouse expressly permits designation by the Participant without any further spousal consent); and

(3)      the Spouse's consent acknowledges the effect of the same and is witnessed by a Plan representative or a notary public; or

(4)      it is established to the satisfaction of the Administrative Committee that the consent required above may not be obtained because there is no Spouse, because the Spouse cannot be located or because of such other circumstances as may be provided in regulations under the Code.

Any consent by a Spouse or determination that such a consent may not be obtained shall be effective only with respect to such Spouse.  A consent that permits designations by the Participant without any requirement of further consent by such Spouse must acknowledge that the Spouse has the right to limit consent to a specific beneficiary, and a specific form of benefit, where applicable, and that the Spouse voluntarily elects to relinquish those rights. Any election made pursuant to this Section 4.3(b) may be revoked prior to the Participant's Benefit Commencement Date by filing an appropriate form with the Administrative Committee.

(c)      The provisions of this Section 4.3(c) shall only apply to those Participants whose election is made after his Required Beginning Date.  Notwithstanding anything contained in the Plan (including its Appendices) to the contrary, if the notice described in Section 4.3(a) is provided after the Benefit Commencement Date, the rules of Treasury Regulation Section 1.417(r)-1 concerning "retroactive annuity starting dates" shall be complied with and the interest rate used thereunder shall be the Applicable Federal Rate (Mid-term) in effect for the month of November which precedes the Plan Year that contains the Required Beginning Date.

4.4      <u>Cash-Out of Small Benefits</u>.  If the present value of a lump-sum payment which is the Actuarial Equivalent of the benefits payable to any person pursuant to this Article IV does not exceed $1,000.00, it shall be paid in the form of a lump sum.  If the present value of a lump-sum payment which is the Actuarial Equivalent of the benefits payable to any person pursuant to this Article IV exceeds $1,000.00 but is less than $5,000.00, the Participant may elect to receive such benefits in the form of a lump sum without spousal consent.  If the present value of the Actuarial Equivalent of a terminated Participant's vested Accrued Benefit is zero, the individual shall be deemed to have received a distribution of such vested Accrued Benefit.  With respect to distributions made on or

after January 1, 2002, for purposes of this Section, the value of the Participant's vested Accrued Benefit shall be determined without regard to that portion of his Accrued Benefit, if any, that is attributable to rollover contributions (and earnings thereon).

4.5     Rollover Rules.  A distributee may elect, at the time and in the manner prescribed by the Administrative Committee, to have any portion of an "eligible rollover distribution" paid directly to an "eligible retirement plan" specified by the distributee in a "direct rollover."

(a)     An "eligible rollover distribution" is any distribution of all or any portion of the accrued benefit of the distributee, except that an eligible rollover distribution does not include:

(1)     any distribution that is one of a series of substantially equal periodic payments (not less frequently than annually) made for the life (or life expectancy) of the distributee or the joint lives (or joint life expectancies) of the distributee and the distributee's designated beneficiary, or for a specified period of ten (10) years or more;

(2)     any distribution to the extent such distribution is required under Section 401(a)(9) of the Code;

(3)     for distributions made prior to January 1, 2002, the portion of any distribution that is not includable in gross income (determined without regard to the exclusion for net unrealized appreciation with respect to Company securities); and

(4)     any distribution made on or after January 1, 1999 that qualifies as a hardship distribution.

(b)     An "eligible retirement plan" is an individual retirement account described in Section 408(a) of the Code, an individual retirement annuity described in Section 408(b) of the Code (other than an endowment contract), an annuity plan described in Section 403(a) of the Code, or a qualified trust described in Section 401(a) of the Code, that accepts the distributee's eligible rollover distribution.  For distributions made on or after January 1, 2002, an "eligible retirement plan" shall also include an annuity contract described in Section 403(b) of the Code, and an eligible deferred compensation plan described in Section 457(b) of the Code that is maintained by a state, political subdivision of a state, or any agency or instrumentality of such a state or political subdivision thereof, which agrees to separately account for amounts transferred into such plan from this Plan.  For distributions made on or after January 1, 2008, and subject to any applicable rules under Code Sections 402(c) and 408A, an "eligible retirement plan" shall also include a Roth IRA as described in Code Section 408A.

Case: 4:25-cv-00096-CMS   Doc. #: 21-1   Filed: 06/06/25   Page: 51 of 278 PageID #: 895

The definition of 'eligible retirement plan' shall also apply in the case of a distribution to a surviving spouse, or a spouse or former spouse who is the alternate payee under a qualified domestic relation order, as defined in Section 414(p) of the Code.  However, in the case of an eligible rollover distribution made prior to January 1, 2002 to a surviving spouse, an "eligible retirement plan" is limited to an individual retirement account or individual retirement annuity.

For distributions made after December 31, 2001, a portion of a distribution shall not fail to be an eligible rollover distribution merely because the portion consists of after-tax employee contributions which are not includible in gross income.  Such portion, however, may be transferred only to an individual retirement account or annuity described in Section 408(a) or (b) of the Code, or is transferred to a qualified defined benefit pension plan (only for Plan Years after 2006) or a qualified defined contribution pension plan that agrees to separately account for amounts so transferred (and earnings thereon), including separately accounting for the portion of such distribution which is includible in gross income and the portion of such distribution which is not so includible.

Effective for Plan Years beginning after 2009, a direct rollover of a distribution may be made to a non-spousal beneficiary who is a designated beneficiary within the meaning of Code Section 401(a)(9)(E), provided the distributed amount satisfies all the requirements to be an eligible rollover distribution other than the requirement that the distribution be made to the participant or participant's spouse, and the direct rollover is made to an to an individual retirement account or individual retirement annuity established on behalf of the designated beneficiary that will be treated as an inherited individual retirement account or individual retirement annuity.  The preceding direct rollover provisions with respect to a non-spousal beneficiary shall be made applied in accordance with Code Section 402(c)(11).

The Administrative Committee need not obtain evidence that a retirement plan had received an IRS determination letter in order to have a reasonable belief that a retirement plan is qualified under Code Section 401(a).

(c)     A "direct rollover" is a payment by the Plan to the eligible retirement plan specified by the distributee.  For purposes of this Section, a distributee includes an Employee or former Employee.  In addition, the Employee's or former Employee's surviving Spouse and the Employee's or former Employee's Spouse or former Spouse who is an alternate payee under a qualified domestic relations order, as defined in Section 414(p) of the Code, are distributees with regard to the interest of such Spouse or former Spouse.

-46-

4.6     <u>No Retroactive Annuity Starting Dates</u>.  Notwithstanding any other provision of the Plan, retroactive annuity starting dates, as described in Treasury Regulation Section 1.417(e)-1(b)(3) are not permitted under the Plan except as may be specifically provided under Section 4.3(c).  The Administrative Committee, in its sole discretion and in a uniform and nondiscriminatory manner, shall cause appropriate actuarial adjustments to be made to a Participant's Retirement Allowance to reflect any delay in the commencement of the payment of a Participant's Retirement Allowance.

4.7     <u>Code Section 436 Limitations</u>.  Notwithstanding any other provision of the Plan, the Plan shall be operated in compliance with Code Section 436 to the extent applicable and as provided in Appendix I-3.

ARTICLE V
Death Benefits

5.1　　Spouse or Domestic Partner Death Benefit.  Except as otherwise provided in Appendix J, the following pre-retirement death benefits shall be provided to a Spouse or Domestic Partner.

(a)　　If a married Participant or Former Participant who is vested in his Accrued Benefit dies prior to his Benefit Commencement Date (1) while in the employ of an Employing Company or Affiliated Company, (2) following his termination of employment or retirement or (3) if so provided in Appendix J while his participation in the Plan is continued during a period in which he is Disabled or Totally and Permanently Disabled, as applicable, a pre-retirement survivor annuity shall be paid to his surviving Spouse or Domestic Partner provided the Participant and his Spouse have been married throughout the one-year period ending on the Participant's death, or in the case of a Domestic Partner, has been designated as the Participant's beneficiary and has met the definition of Domestic Partner under Article I for the one-year period ending on the Participant's death.  The term "Spouse" for purposes of Section 5.1(b) and 5.1(c) shall include Domestic Partners, unless otherwise prohibited by the Code or applicable law.

(b)　　If such Participant or Former Participant dies after attaining the age and after completing the Years of Service necessary to qualify for an Early Retirement Allowance as provided in the applicable Appendix J, a survivor annuity shall be payable to his Spouse in the form and amount that such Spouse would have received if the Participant or Former Participant had retired on the day before his death and had elected to receive his benefits commencing immediately in the form of a qualified joint and 50% survivor annuity described in Section 4.1(c). If such Participant or Former Participant dies before attaining the age but after completing the Years of Service necessary to qualify for an Early Retirement Allowance, a survivor annuity shall be payable to his Spouse in the form and amount that such Spouse would have received if the Participant had terminated service on his date of death (or in the case of a Former Participant on his actual termination of service), survived to the necessary age and then elected to begin receiving his benefit immediately in the form of a qualified joint and 50% survivor annuity described in Section 4.1(c). If such Participant or Former Participant dies before completing the Years of Service necessary to qualify for an Early Retirement Allowance, a survivor annuity shall be payable to his Spouse in the form and amount that such Spouse would have received if the Participant had terminated service on his date of death (or in the case of a Former Participant on his actual termination of service), survived to his Normal Retirement Date and then began to receive his Retirement Allowance in the form of a qualified joint and 50% survivor

-48-

annuity.  Solely for purposes of the qualified joint and 50% survivor annuity determined under this Section 5.1(b), with respect to Domestic Partners, the Domestic Partner shall be assumed to be the Spouse of the Participant.

(c)        Payment of a surviving Spouse's benefit shall not begin until the later of (1) the first day of the month coincident with or next following the date on which the Participant or Former Participant would have attained the necessary age to qualify for an Early Retirement Allowance, if such Participant or Former Participant had satisfied the Years of Service requirement for an Early Retirement Allowance, or the Participant or Former Participant's Normal Retirement Date, if he had not satisfied the Years of Service requirement for an Early Retirement Allowance, or (2) the first day of the month coinciding with or otherwise next following the Participant's or Former Participant's death. The Spouse may elect that payment of such benefit shall begin at a later date, but in no event later than the date on which the Participant would have attained age 65. In the event the Spouse elects to defer commencement of the survivor annuity, the amount of such annuity shall be determined as provided above except that it shall be assumed that the Participant or Former Participant had elected to begin receiving his benefits on the day before the actual Benefit Commencement Date.

5.2        Lump-Sum Death Benefit.  If so provided in Appendix J, upon the Administrative Committee's notification of a Participant's death, a lump-sum death benefit, in an amount specified in the applicable Appendix J, shall be paid to the Participant's Beneficiary, provided that the Participant died after qualifying for a Normal or Early Retirement Allowance under Section 3.1 or 3.2 hereof and the applicable Appendix J.  Solely for purposes of this Section 5.2, a Participant's Beneficiary shall be his spouse unless such spouse consents in writing on a form witnessed by a Plan representative or notary to the designation of another person as Beneficiary.

## ARTICLE VI
### Contributions

6.1     Employing Company Contributions.  All contributions to provide the benefits under the Plan shall be made by the Employing Companies and shall be payable at such intervals as may be determined by the Investment Committee.  The Investment Committee shall be responsible for establishing a funding policy so that contributions shall be made in such amounts as are recommended to the Investment Committee by its actuary to meet minimum funding standards as prescribed by applicable law.  Any forfeitures under the Plan shall be used to reduce the contributions otherwise payable by the appropriate Employing Company and shall not be applied to increase any benefits otherwise payable under the Plan.

6.2     Return of Contributions.  Except as provided in Section 12.1 and in this Section 6.2, all contributions made to the Plan by the Employing Companies shall be irrevocable, and shall be transferred to the Trustee to be used in accordance with the provisions of the Plan to provide benefits under the Plan, and to pay the expenses of the trust; and neither such contributions nor any income therefrom shall be used for, or diverted to, purposes other than for the exclusive benefit of Participants and their Beneficiaries under the Plan, prior to the satisfaction of all liabilities for benefits under the Plan.  A contribution may be returned to an Employing Company if such contribution was:

(a)     conditioned upon tax deductibility (it being presumed that all contributions are so conditioned), and the Internal Revenue Service determines that the contribution is not deductible; provided, however, that excess contributions in an amount less than $25,000 may be returned to the Employing Company without a determination of non-deductibility by the Internal Revenue Service; or

(b)     made as a result of a mistake of fact.

Such refund shall be made, if requested by an Employing Company in writing, within one year from the date a contribution was made as a result of a mistake of fact, or from the date of disallowance of a deduction (or other applicable date) as the case may be.  Any contribution refunded as provided above shall be adjusted only to reflect its proportionate share of the trust fund's loss, if any, and shall not be adjusted to reflect its share of the trust fund's gain, if any.

# ARTICLE VII
## Administration

7.1    <u>Plan Administrator</u>.  The Pension and CEOP Administrative Committee, with membership and charter as may be established by the Company from time to time, shall be one of the Plan's two named fiduciaries and shall be the administrator of the Plan within the meaning of Section 3(16)(A) of the Act.  The Administrative Committee shall administer the Plan in accordance with its terms and shall have all the powers necessary to carry out the provisions of the Plan.  The Administrative Committee, or its agent or delegate, has the absolute authority and sole discretion to interpret the terms of the Plan, including the Plan's eligibility provisions and its provisions relating to qualification for and accrual of benefits.  The Administrative Committee's decisions shall be final and binding on all persons seeking benefits.  Benefits shall only be paid under this Plan only if the Administrative Committee, in its sole discretion, determines that such person is entitled to them.  Any exercise of discretion by the Administrative Committee shall be exercised in a nondiscriminatory manner as applied to similarly situated individuals.  Unless the Company determines otherwise, the Administrative Committee shall have no fiduciary responsibility relating to the asset management matters under the Plan.

7.2    <u>Investment Committee</u>.  The Investment Committee, with membership and charter as may be established by the Company from time to time, shall be the Plan's named fiduciary with respect to the matters pertaining to the investment and management of Plan assets (including, but not limited to, appointment of Investment Managers to manage the trust assets or any part thereof, review and approval of investment and funding policies, and selection, appointment and removal of a Trustee).

7.3    <u>Delegation</u>.  Each of the Investment Committee and Administrative Committee have the authority to delegate any of their powers or duties to any other person.  Any such person may further delegate its powers or duties to another person.  Unless otherwise expressly provided, any delegation or subsequent delegation shall include the same full, final and discretionary authority that the delegating party has and any decisions, actions or interpretations made by any delegate shall have the same ultimate binding effect as if made by the delegating entity.

7.4    <u>Action by the Company</u>.  The Board of Directors, the Compensation Committee of the Board of Directors, or the Benefit Plan Review Committee (or any of their respective delegates) may act on behalf of the Company with respect to actions or matters reserved to the Company in this Plan; provided that each of these have the authority to delegate any of their powers or duties to any other person.  Any such person may further delegate its powers or duties to another person.  Any delegation or subsequent delegation shall include the same authority that the delegating party has, except as otherwise expressly provided in any delegation.

7.5     Employment of Agents.  The Administrative Committee and the Investment Committee may employ such legal, medical, insurance, accounting, actuarial or other experts as deemed necessary or desirable, in their sole discretion, in carrying out the provisions of the Plan.

7.6     Fiduciary Responsibilities.  The Administrative Committee and the Investment Committee are the Plan's named fiduciaries and have the fiduciary duties set forth herein.  The Administrative Committee and the Investment Committee, together with the Trustee, have been designated to carry out all fiduciary responsibilities under the Act with respect to the Plan, except for those responsibilities specifically delegated to another person.

The Company may allocate other fiduciary responsibilities among the fiduciaries named in the Plan or may designate persons other than named fiduciaries to carry out fiduciary responsibilities.

Any of the fiduciaries of the Plan may, by agreement among themselves, allocate specific responsibilities among themselves or delegate to other persons all or such portion of their fiduciary duties hereunder, as they, in their sole discretion, shall decide, other than those granted to the Trustee under the Trust Agreement.  The Company may purchase insurance to cover the potential liability of all persons who serve in a fiduciary capacity (as defined in the Act or the Plan) with regard to the Plan.

7.7     Compensation.  No member of the Administrative Committee or Investment Committee shall receive any compensation for his services as such.  Each member of such Committees and each other fiduciary of the Plan shall be bonded as required by the Act.

7.8     Committee Liability.  The members of the Administrative Committee and Investment Committee shall use the degree of care, skill, prudence and diligence in carrying out their duties that a prudent man, acting in a like capacity and familiar with such matters, would use in his conduct of a similar situation.

Except as provided in Act or in the Regulations, in administering the Plan neither a member of the Administrative Committee or Investment Committee, nor an Employing Company nor any director, officer or employee thereof, shall be liable for any acts of omission or commission, except for his or its own individual, willful and intentional malfeasance or misfeasance and each Employing Company, its officers, directors and employees and any member of the such Committees shall be entitled to rely conclusively on all tables, valuations, certificates, opinions and reports which shall be furnished by any actuary, accountant, Trustee, insurance company, counsel or other expert who shall be employed or engaged by the Employing Company or such Committees.

To the maximum extent permitted by law, no member of the Administrative Committee or Investment Committee or officer, employee or director of the Company or any Employing Company to whom any duty or power relating to the administration or interpretation of the Plan or to the management and control of the assets of

-52-

the Plan may be delegated or allocated shall be personally liable by reason of any contract or other instrument executed by him or on his behalf in his capacity as a fiduciary of the Plan nor for any action taken or omitted or mistake of judgment made in good faith, and the Company (or the appropriate Employing Company) shall indemnify and hold harmless, directly from its own assets (including the proceeds of any insurance policy the premiums of which are paid from its own assets) against any cost or expense (including counsel fees) or liability (including any sum paid in settlement of a claim with the approval of the Company or applicable Employing Company) arising out of any act or omission to act in connection with the Plan unless arising out of such person's own fraud or bad faith.

7.9    Evidence.  Evidence required of anyone under the Plan may be by certificate, affidavit, document or other information which the person acting on it considers pertinent and reliable, and signed, made or presented by the proper party or parties.

ARTICLE VIII
Management of Funds

8.1     Investment of Funds.  The funds of the Plan, including funds formerly held under any Prior Plan, shall be held by the Trustee under the Trust Agreement.  The Trustee may commingle for investment purposes such funds with the funds received by it with respect to other pension and retirement plans of Affiliated Companies that are and continue to be qualified plans under Section 401(a) of the Code and may hold, invest, or reinvest, control and disburse funds in accordance with the Trust Agreement.

If provided in the Trust Agreement, the Investment Committee may appoint one or more Investment Managers to manage (including the power to acquire and dispose of) all or a portion of the trust assets.

The Investment Committee may from time to time amend the Trust Agreement and may remove the Trustee and upon such removal or upon resignation of any Trustee, the Investment Committee may designate a successor Trustee.

8.2     Funding of Benefits.  Anything herein to the contrary notwithstanding, if the Investment Committee shall find that any benefit prescribed by the Plan can be provided with equal security to the Participants at the same or less cost, or at an increased cost provided the Company approves the increase in cost thereof, through the medium of a contract or contracts (including but not limited to contracts of the deposit administration type) entered into with any government agency or insurance company or companies, approved by the Investment Committee, the Investment Committee is authorized and empowered to provide for the payment of such benefits by purchase thereof from such agency or company, using the contributions and accumulations under the Plan for that purpose.

A retirement fund consisting of any assets held by the Trustee pursuant to the trust or a contract (as described above), or both shall be established to receive and hold all contributions paid, along with interest and other income (the "Retirement Fund").  All benefits to any person provided under the Plan shall be paid from the Retirement Fund, and the Employing Companies assume no liability or responsibility therefor.  Each Participant, Beneficiary or other person who shall claim the right to any payment under the Plan shall be entitled to look only to the Retirement Fund for such payments.

8.3     Administrative Expenses and Disbursement of Funds.  All administrative expenses of the Plan shall be paid by the Trustee from the assets held by it pursuant to the trust (unless prohibited by law) except to the extent that the Employing Companies, in their discretion, pay any such expenses. The Employing Companies may advance funds to the Plan for the payment of ordinary operating and administrative expenses, and shall be entitled to

be reimbursed therefor from the Plan without interest. For this purpose, administrative expenses include the expenses of amending, restating and administering the Plan and Trust, fees and expenses of the fiduciaries of the Plan for the performance of their duties under the Plan, reasonable fees and expenses of any legal counsel, accountant, actuary or agent for authorized services rendered in respect of the Plan and all other proper charges and disbursements in respect of the Plan (including settlements of claims or legal actions approved by legal counsel to the Plan).

The Administrative Committee shall determine the manner in which the funds of the Plan shall be disbursed, including the form of voucher or warrant to be used in making disbursements and the due qualification of persons authorized to approve and sign the same.

8.4     Limitations on Rights of Participants.  No Participant or Former Participant or his Beneficiary under the Plan, nor any other person, shall have any interest in or right to any part of the earnings of the trust fund established under the Plan, or any rights in, or to, or under the trust fund or any part of the assets thereof, except as, and to the extent, expressly provided for in the Plan.  The Company, Trustee or any other entity does not in any way guarantee the  trust fund established under the Plan from loss or depreciation.  The liability of the Company, Trustee or any other entity to make any payment under the Plan will be limited to the assets held by the Trustee that are available for that purpose.

## ARTICLE IX
### Amendment

9.1 <u>Right to Amend</u>.  The Company reserves the  right, at any time and from time to time to modify or amend, in whole or in part, any or all of the provisions of the Plan provided that no modification or amendment shall deprive a Participant of any portion of his vested Accrued Benefit, including any early retirement benefit, retirement-type subsidy or optional form of benefit protected by Code Section 411(d)(6), or shall make it possible for any part of the assets of the Plan to be used for, or diverted to, purposes other than for the exclusive benefit of Eligible Employees and retired Participants (or Beneficiaries of such Participants) prior to the satisfaction of all liabilities of the Plan.  The term "retirement-type subsidy" shall not be deemed to include a qualified disability benefit, a medical benefit, a Social Security supplement, a death benefit (including life insurance), or a plant shutdown benefit that does not continue after retirement age.  Any modification or amendment may be made retroactively, if necessary, to bring the Plan into conformity with the Act, the Regulations and with any other governmental regulations expressing a public policy or condition which must be conformed with in order to qualify the trust as an exempt pension trust under the Code, or to qualify the Plan as exempt under Section 401 of the Code so that all contributions to be made thereunder by an Employing Company are deductible under Section 404 of such Code.  Any such amendment shall be binding on all Employing Companies.  Notwithstanding the foregoing, the Company shall have the duty and power to revise the Plan or Appendices, as well as addenda or amendments thereto, to correct errors, including but not limited to scrivener's errors, to the extent such correction is necessary to reflect the intent of the Plan; provided that such correction shall be applied as if included in the original provisions.

9.2 <u>Amendments Following a Change in Control</u>.  Unless otherwise expressly agreed to under the terms of an applicable collective bargaining agreement, this Section 9.2 shall apply solely to Non-Collectively Bargained Participants and their Beneficiaries.  Notwithstanding any other provision of this Article IX, for a period of three years following a Change in Control, and except as may be required by applicable law, the provisions of the Plan may not be amended to adversely affect the rights, expectancies or benefits of any Participant, Former Participant or Beneficiary as in effect immediately prior to the Change in Control without the written consent of a majority in both number and interest of the aggregate of all Beneficiaries then receiving payments and all Plan Participants (including Former Participants).

## ARTICLE X
## Claim Procedures

10.1    Benefit Claim Procedures.

(a)    Claims for benefits must be in writing, signed by the Participant, or his personal representative or his Beneficiary, and presented to the Administrative Committee.  If a claim for benefits is denied in whole or in part by the Administrative Committee, the claimant shall be given written notice thereof within ninety (90) days following receipt of the claim by the Plan.  If the Administrative Committee determines that an extension is necessary, it shall notify the claimant of the reasons for the extension before the end of the initial ninety (90) day period.  The extended period may not exceed one hundred eighty (180) days after the date of the filing of the claim.

A notice of adverse benefit determination must be in written or electronic form.  Such notice shall set forth, in a manner calculated to be understood by the claimant (and, to the extent required by the regulations contained in 81 Fed. Reg. 92316 (Dec. 19, 2016) for disability claims and appeals (the "2016 Disability Regulations"), culturally and linguistically appropriate):

(i)    the reasons for denial of the claim;

(ii)    a reference to the particular provisions of the Plan on which denial of the claim is based;

(iii)    a statement as to any additional facts or information necessary to perfect the claim and an explanation as to why the same is required; and

(iv)    a description of the Plan's procedures hereinafter set forth for review of the denial of the claim, and a statement regarding the claimant's right to bring a civil action under ERISA Section 502(a) following an adverse benefit determination on appeal.

(b)    If a claim for benefits relates to benefits because of Totally and Permanently Disabled or Disabled under the Plan, and the claim is denied in whole or in part by the Administrative Committee, the claimant shall be given written notice thereof within forty-five (45) days following receipt of the claim by the Plan.  This period may be extended by the Administrative Committee for up to thirty (30) days, provided that the Administrative Committee determines that such an extension is necessary due to matters beyond the control of the Plan and notifies the claimant, prior to the expiration of the initial forty-five (45) day period, of the reasons for the extension.  If, prior to the end of the first thirty (30) day extension period, the Administrative Committee determines that, due to matters beyond the control of the Plan, a decision

-57-

cannot be rendered within that extension period, the period for making the determination may be extended for up to an additional thirty (30) days, provided that the Administrative Committee notifies the claimant, prior to the expiration of the first thirty (30) day extension period, of the reasons for the extension.  A notice of extension under this paragraph shall specifically explain the standards on which entitlement to a benefit is based, the unresolved issues that prevent a decision on the claim, and the additional information needed to resolve those issues, and the claimant shall be afforded at least forty-five (45) days within which to provide the specified information (the period for making the benefit determination shall be tolled from the date on which the notification of the extension is sent to the claimant until the date on which the claimant responds to the request for additional information).

To the extent required by the 2016 Disability Regulations, a notice of denial of a claim for benefits related to benefits because of Totally and Permanently Disabled or Disabled under the Plan shall also include: (a) a discussion of the decision, including an explanation of the basis of disagreeing with or not following (i) the views presented of health care professionals treating the claimant or vocational professionals who evaluated the claimant, (ii) the views of medical or vocational experts whose advice was obtained on behalf of the Plan, without regard to whether the advice was relied upon in making the benefit determination, and (iii) a Social Security Administration ("SSA") disability determination presented by the claimant to the Plan; (b) any internal rule, guideline, protocol, standard, or other similar criterion the Plan relied upon in making the adverse determination, or a statement that such rules, guidelines, protocols, standards, or similar criteria do not exist; and (c) if the decision was based on medical necessity or experimental treatment or similar exclusion or limit, either an explanation of the scientific or clinical judgment for the determination, applying the terms of the Plan to the claimant's medical circumstances, or a statement that such explanation will be provided free of charge upon request.

(c)     Every person whose claim for benefits under the Plan is denied in whole or in part by the Administrative Committee shall have the right to request a review of such denial.  Such review shall be granted upon written request therefor filed by the claimant with the Administrative Committee within sixty (60) days following receipt of the notice of the denial (within one hundred and eighty (180) days for disability benefit claims).  The claimant, in person or by duly authorized representative, may submit written comments, documents, records and other information related to the benefit claim on appeal.  The claimant shall be provided, upon request and free of charge, access to and copies of all documents, records and other information relevant to the benefit claim.  The review on appeal will consider all comments, documents,

-58-

records and other information submitted by the claimant without regard to whether such information was submitted or considered in the initial benefit determination.

        (d)      The Administrative Committee shall decide the matter with reasonable promptness and in any event within sixty (60) days (forty-five (45) days for disability benefit claims) after receipt of the appeal.  If the Administrative Committee determines that an extension is necessary, the Administrative Committee shall notify the claimant of the reasons for the extension before the end of such initial period.  The extended period may not exceed one hundred and twenty (120) days (ninety (90) days if the claim relates to disability benefits) following receipt of a request for review.  Its decision shall be in written or electronic form, and, in the event of an adverse benefit determination, shall set forth, in a manner calculated to be understood by the claimant, (i) the specific reasons for the decision, (ii) the provisions of the Plan on which the determination is based; (iii) a statement that the claimant is entitled to receive, upon request and free of charge, access to and copies of all documents, records and other information relevant to the benefit claim; and (iv) a statement regarding the claimant's right to bring a civil action under ERISA Section 502(a).

        The following shall be required with respect for appeals regarding a claim for benefits related to benefits because of Totally and Permanently Disabled or Disabled under the Plan, but only to the extent required by the 2016 Disability Regulations:

        (1)      a fiduciary who handled an initial claim will recuse himself from the appeal;

        (2)      claimants will be given a chance to present evidence and testimony during appeal, and on appeal, no new evidence or rational is allowed unless the claimant was given notice and a chance to respond; and

        (3)      a notice of denial on such appeal will also include:  (aa) a statement describing any additional, voluntary appeal procedures offered by the Plan and the claimant's right to obtain information about such procedures; (bb) a statement describing any applicable Plan-imposed limitations period, including the calendar date when the limitations period will expire; (cc) a discussion of the decision, including an explanation of the basis of disagreeing with or not following (i) the views presented of health care professionals treating the claimant or vocational professionals who evaluated the claimant, (ii) the views of medical or vocational experts whose advice was obtained on behalf of the Plan, without regard to whether the advice was relied upon in making the benefit determination, and (iii) a SSA disability determination presented by the

claimant to the Plan; (dd) any internal rule, guideline, protocol, standard, or other similar criterion the Plan relied upon in making the adverse determination, or a statement that such rules, guidelines, protocols, standards, or similar criteria do not exist; and (ee) if the decision was based on medical necessity or experimental treatment or similar exclusion or limit, either an explanation of the scientific or clinical judgment for the determination, applying the terms of the Plan to the claimant's medical circumstances, or a statement that such explanation will be provided free of charge upon request.

(e)     After exhausting the Plan's administrative claim and appeal provisions, an individual wishing to bring a lawsuit in either state or federal court challenging a claim denial must commence the lawsuit no later than six months after the individual receives a final denial letter indicating the individual has exhausted his or her administrative appeals and has the right to file a lawsuit.  In addition to this six month deadline that applies to filing a lawsuit after the claims and appeals procedures are exhausted, a general time limitation shall apply to all lawsuits involving all types of Plan issues.  An individual must commence any such lawsuit involving Plan claims no later than two years after the individual first receives information that constitutes a clear repudiation of the rights the individual is seeking to assert (i.e., the underlying event or issue that should have triggered the individual's awareness that his or her rights under the Plan may have been violated).  Although any period of time when an individual's claim is in the claims procedure described above (i.e., the time between when an individual files a claim for benefits with the Administrative Committee and the time the individual receives a final determination letter from the Administrative Committee) does not count against the two-year period, once the claims procedure process is completed, the two year period will continue running from the point at which it was tolled.  In order to raise an issue in any legal action related to the claim, an individual must have clearly raised such issue during the claims and appeals procedure described above.

(f)     If a legal action begun against the Trustee, the Company, an Affiliated Company or an Employing Company by or on behalf of any person results adversely to that person, or if a legal action arises because of conflicting claims to a Participant's or other person's benefits, the cost to the Trustee, the Company, an Affiliated Company or an Employing Company of defending the action will be charged to the extent permitted by law to the sums, if any, which were involved in the action or were payable to the person concerned.

## ARTICLE XI
## Nonalienation of Benefits

11.1     Anti-alienation Provisions.

(a)     The Plan is intended by the Employer to provide a system of deferred compensation for the support of Participants, Beneficiaries and their families related to the loss of earning power upon the happening of certain events.  Except as herein expressly provided or as otherwise permitted under ERISA and the Code, no benefits under the Plan shall be assigned or alienated.

(b)     A Participant's benefits under the Plan shall be paid in accordance with the applicable requirements of any "qualified domestic relations order" (as defined in ERISA and the Code) which apply to the Participant's benefits under the Plan.

(c)     A Participant's benefits may be reduced, as provided under Section 401(a)(13)(C) of the Code, as a result of an order or requirement to pay under:

(i)     A judgment of conviction for a crime against the Plan;

(ii)     A civil judgment in connection with a violation (or alleged violation) of Part 4 of Subtitle B of Title I of ERISA; or

(iii)     Pursuant to a settlement agreement between the Participant and the Secretary of Labor or the Pension Benefit Guaranty Corporation in connection with a violation (or alleged violation) of Part 4 of such Subtitle by a Fiduciary or any other person.

(d)     In the event a Participant's benefits are attached by order of any court other than in a "qualified domestic relations order" (as defined in ERISA and the Code) or by an order or requirement to pay (as described in Section 5.16(c) above), the Administrative Committee may bring an action for a declaratory judgment in a court of competent jurisdiction to determine the proper recipient of the benefits to be paid by the Plan.  During the pendency of said action, any benefits that become payable may be paid into the court as they become payable, to be distributed by the court to the recipient it deems proper at the close of said action.

If any person entitled to any benefit under the Plan shall become bankrupt or shall attempt to anticipate, alienate, sell, transfer, assign, pledge, encumber or charge such benefit, such benefit shall, in the sole discretion of the Administrative Committee, cease and terminate, and in that event the Administrative Committee shall cause such benefit, or any part thereof, to be held or applied for the benefit of such person, his Spouse, children, or other

-61-

dependents, or all or any of them, in such manner and in such proportion as the Administrative Committee shall determine proper.

If it is determined that a Participant, Beneficiary or alternate payee has received a payment of benefits that should not have been paid or should have been paid in a lesser amount, the Participant, Beneficiary or alternate payee shall promptly repay to the Plan such overpayment, and absent such repayment, the Plan may recover such overpayment from benefits that are then payable, or which may become payable, to the Participant, Beneficiary or alternate payee from the Plan. The Plan shall be considered to have established an equitable lien by agreement with the person to whom such overpayment was made. Such Participant, Beneficiary or alternate payee shall, upon request, execute and deliver such instruments and papers as may be required and shall do whatever else is necessary to secure such rights of recovery to the Plan. Such adjustments made under this Section 11.1 shall be final and binding on all persons.

11.2    Qualified Domestic Relations Order Procedures.

(a)    Following the receipt of a domestic relations order which would affect the payment of a Participant's benefits under the Plan, the Administrative Committee shall promptly notify the Participant and any alternate payee specified in the order (at the address included in the order) of the receipt of the order and the Plan's procedures for determining the qualified status of such order.

(b)    Any alternate payee specified in the order by written direction to the Administrative Committee may designate a representative for receipt of copies of notices sent to the alternate payee with respect to the order.

(c)    Within a reasonable period after receipt of the order the Administrative Committee shall determine whether such order is qualified and notify the Participant and any alternate payee involved of such determination. Such determination shall be made in accordance with provisions of ERISA and the Code and regulations thereunder. In making such determination, the Administrative Committee may obtain and rely upon the legal opinion of counsel as to the qualification of the order.

(d)    During any period during which the issue of the qualification of an order is being determined, whether by the Administrative Committee, by a court of competent jurisdiction, or otherwise, the Administrative Committee shall segregate in a separate account in the Plan or in an escrow account the amounts which would have been payable to an alternate payee during such period if the order had been determined to be qualified.

(e)      If within eighteen (18) months of receipt of the order by the Administrative Committee, the order (as it may have been modified)--

(1)      is determined to be a qualified order, the segregated amounts (plus any interest thereon) shall be paid to the person or persons entitled thereto under the order (as it may have been modified), or

(2)      is either determined not to be qualified or the issue of qualification is not resolved, the segregated amounts (plus any interest thereon) shall be disposed of in the manner which would have applied if there had been no order.

(f)      Any determination that the order (as it may have been modified) is qualified made after the close of the eighteen (18) month period shall be applied prospectively only.

## ARTICLE XII
### Termination of Plan

12.1    Termination.  The Company (for itself and the other Employing Companies) may terminate the Plan, in whole or in part, for any reason at any time.  Upon termination or partial termination of the Plan, the Accrued Benefit of the affected Participants, Former Participants and Beneficiaries accrued to the date of such termination or partial termination shall be fully vested and nonforfeitable; provided, however, that an Employee shall not have any recourse towards satisfaction of his vested and nonforfeitable benefits from other than Plan assets or the Pension Benefit Guaranty Corporation.  Any funds remaining after all liabilities of the Plan have been satisfied shall be returned to the Employing Companies, unless otherwise provided in an applicable collective bargaining agreement.

12.2    Allocation of Plan Assets.  In the event of termination or partial termination of the Plan, the assets of the Plan allocable to affected Participants, Former Participants and Beneficiaries shall be allocated to such individuals in accordance with Section 4044 of the Act, except as the Company, the Internal Revenue Service, or the Pension Benefit Guaranty Corporation may otherwise direct.  Any such allocated amounts shall be applied in the manner determined by the Administrative Committee to the payment of benefits to the persons entitled thereto.

In the event of termination or partial termination of the Plan, the rights of affected Participants and Former Participants who are considered highly compensated employees (within the meaning of Section 414(q) of the Code) shall be limited to a benefit that is nondiscriminatory under Section 401(a)(4) of the Code.

12.3    Termination in Connection with a Change in Control.  Unless otherwise expressly agreed to under the terms of an applicable collective bargaining agreement, this Section 12.3 shall apply solely to Non-Collectively Bargained Participants and their Beneficiaries.  Notwithstanding any other provision of this Article XII or any other provision of the Plan, if (a) the Plan is terminated at any time, and in contemplation thereof any corporate action or governmental filing had been taken or made within three years following a Change in Control and (b) after satisfaction of all liabilities to Participants (including Former Participants) and their Beneficiaries, there are assets remaining in the Plan, then, effective upon such termination, the Accrued Benefits under the Plan of each Beneficiary then receiving payments and each Participant (including a Former Participant) shall automatically be increased pro rata (subject to the limitations on benefits included in Section 3.6) according to each Participant's Accrued Benefit determined at the time of such Participant's retirement or other termination of employment in the case of a Former Participant or Beneficiary or at the date of termination of the Plan in the case of an active Participant, so that such remaining assets are exhausted in their entirety.  Notwithstanding the provisions of Article

-64-

IX or any other provision of the Plan, this Section 12.3 may not be amended within three years following a Change in Control, without the written consent of a majority in both number and interest of the aggregate of all Beneficiaries then receiving payments and all Plan Participants (including Former Participants).

12.4    Limitation on Benefits Payable to 25 Highest Paid Employees.

(a)    For Plan Years beginning on or after January 1, 1992, benefits distributed to any of the 25 most highly compensated active and former highly compensated Employees (as defined in Code Section 414(q)) are restricted such that the annual payments are no greater than an amount equal to the payment that would be made on behalf of the Employee under a single life annuity that is the Actuarial Equivalent of the sum of the Employee's Accrued Benefit and the Employee's other benefits under the Plan.  This paragraph shall not apply if:  (a) after payment of the benefit to an Employee described in the preceding paragraph, the value of Plan assets equals or exceeds 110% of the value of current liabilities, as defined in Code Section 412(1)(7), or (b) the value of the benefits for an Employee described above is less than 1% of the value of current liabilities.  For purposes of this paragraph, the term "benefit" includes periodic income and any death benefits not provided for by insurance on the Employee's life.

(b)    In the event that Congress should provide by statute, or the Treasury Department or the Internal Revenue Service should provide by regulation or ruling, that the provisions of this Section 12.4 are no longer necessary in order to meet the requirements for a qualified pension plan under the Code, this Section shall become void and shall no longer apply without the necessity of amendment to the Plan.

## ARTICLE XIII
Miscellaneous

13.1    No Contract of Employment.  The Plan shall not be deemed to constitute a contract between any Employing Company and any Participant or to be a consideration for, or an inducement for, the employment of any individual by any Employing Company.  Nothing contained in the Plan shall be deemed to give any individual the right to be retained in the service of any Employing Company or to interfere with the right of any Employing Company to discharge or to terminate any individual at any time without regard to the effect that such discharge or termination might have upon any rights that he might have under the Plan.

13.2    Incompetency.

In the event a duly appointed guardian, conservator, committee or other legal representative of any Participant or any other person entitled to any payment under the Plan shall be appointed by a court of competent jurisdiction, payments may be made to such person (but in the name of the Participant or such other person) provided that proper proof of appointment and continuing qualification is furnished.  Any such payment so made by the Administrative Committee shall be a complete discharge of the liabilities of the Plan therefor.

In the event that the Administrative Committee shall find that a Participant or any other person entitled to any payment under the Plan is unable to care for his affairs because of illness or accident or any other reason, any such payments due may, unless claim shall have been made therefor by a duly appointed guardian, conservator, committee or other legal representative, be paid by the Administrative Committee to the Spouse, child, parent or other blood relative or to any person deemed by the Administrative Committee to have incurred expenses for such Participant or other person entitled to payments under the Plan, and any such payment so made by the Administrative Committee shall be a complete discharge of the liabilities of the Plan therefor.

13.3    Involuntary Retirement.  No provision of the Plan shall be construed to permit the involuntary retirement of any Participant by an Employing Company in violation of any applicable law.

13.4    Mergers, Consolidations and Transfers of Plan Assets.  Unless the contrary is expressly provided in any applicable collective bargaining agreement, the Company reserves the right, at any time and from time to time, to merge or consolidate the Plan with, or to transfer any assets or liabilities to, any other plan.  In the event that the Company establishes for any of the Participants, including Former Participants, a separate retirement plan either similar in form to this Plan or in such form as may be approved by the Internal Revenue Service under Section 401(a) of the Code, the Company shall, subject to the provisions of the Act and Regulations, arrange for the allocation to such separate retirement plan of the share of such employees in the assets of the Plan as determined by

the actuary of the Plan and such allocation shall be conclusive for all purposes. The funds so allocated may, in the discretion of the Investment Committee, be retained by the Trustee under the Trust Agreement and commingled for investment purposes with the funds of the Plan and other such plans, or may be segregated or withdrawn from the funds of the Plan and transferred to a successor trust or otherwise used to provide the benefits under such separate retirement plan. In the case such separate plan is established or in the case of any merger or consolidation of the Plan with, or transfer of assets or liabilities of the Plan to, any other plan, each Participant shall (if such other plan were then to terminate) be entitled to receive a benefit immediately after such merger, consolidation or transfer that shall be at least equal to the benefit that he would have been entitled to receive immediately before such merger, consolidation or transfer (if the Plan had then terminated).

In connection with the establishment of the Plan, the accrued benefits under the Prior Plans of those individuals who became Participants in the Plan as of the Effective Date will be provided under this Plan.

13.5    Withdrawal of Employing Companies. The Company in its discretion may at any time withdraw the designation of any Affiliated Company (other than the Company) or any division or facility of the Company or Affiliated Company as an Employing Company. In either case, such entity shall cease to be an Employing Company and the Employees of such entity shall cease to be Eligible Employees under the Plan. Thereupon, assets attributable to the withdrawing Employing Company shall remain in the Plan or shall be treated as determined by the Company.

13.6    Change in Control. Unless otherwise expressly agreed to under the terms of an applicable collective bargaining agreement, this Section 13.6 shall apply solely to Non-Collectively Bargained Participants and their Beneficiaries. Notwithstanding the preceding provisions of this Article XIII or any other provision of the Plan, if any merger or consolidation with another plan or transfer of assets or liabilities involving the Plan and another plan is effected at any time, and in contemplation thereof any corporate action or governmental filing had been taken or is made within three years following a Change in Control, then, effective immediately prior to such merger, consolidation or transfer, the Accrued Benefits under the Plan of each Beneficiary who is receiving benefits and each Participant (including Former Participants) shall automatically be increased pro rata (subject to the limitations on benefits contained in Section 3.6) according to each Participant's Accrued Benefit determined at the time of such Participant's retirement or other termination of employment in the case of a Former Participant or Beneficiary or at the time of the merger, consolidation or transfer in the case of an active Participant such that any excess, determined immediately prior to the date of such merger, consolidation or transfer, of the fair market value of the assets of the Plan over the present value of the Accrued Benefits of all Plan Participants, Former Participants

-67-

and Beneficiaries (determined as if the Plan had terminated immediately prior to such transaction and annuities were purchased at then current rates) is exhausted in its entirety.

If any withdrawal of a group of employees or an Employing Company from the Plan is effected at any time, and in contemplation thereof any corporate action or governmental filing had been taken or is made within three years following a Change in Control, then, effective upon such withdrawal, the Accrued Benefits under the Plan of each Participant (including Former Participants) and Beneficiaries to be no longer covered by the Plan ("affected person") shall automatically be increased pro rata (subject to the limitations of benefits contained in Section 3.6) according to each such affected person's Accrued Benefit determined at the time of such individual's retirement or other termination of employment in the case of a Former Participant or Beneficiary or at the time of the withdrawal in the case of an active Participant such that any excess, as of the date of such withdrawal, of the fair market value of the assets of the Plan to be withdrawn over the present value of the Accrued Benefits of the affected persons (determined as if the Plan had been terminated immediately prior to such transaction and annuities were purchased at then current rates) is exhausted in its entirety.

Notwithstanding the provisions of Article XII or any other provisions of the Plan, this Section 13.6 may not be amended within three years following a Change in Control without the written consent of a majority in both number and interest of the aggregate of all Beneficiaries then receiving payments and all Plan Participants (including Former Participants).

13.7    Cooperation of Participants.  In order to receive any benefits under the Plan, a Participant or Beneficiary must furnish to the Administrative Committee such documents, evidence, data or information as it considers necessary or desirable for the purpose of administration of the Plan.  The records of the Administrative Committee (or if applicable, the records of a prior plan administrator of a Prior Plan) as to an Employee's or Participant's period of employment, service, termination and reason therefor, leave of absence, reemployment and compensation, will be conclusive on all persons unless determined to the Administrative Committee's satisfaction to be incorrect.

13.8    Applicable Law.  All questions pertaining to the construction, validity and effect of the Plan shall be determined in accordance with the laws of the Commonwealth of Virginia (without giving effect to its principles of conflicts of law), to the extent such laws are not preempted by the Act.

13.9    Headings.  The headings of Articles and Sections are included solely for convenience of reference and shall have no effect upon the meaning of the provisions hereof.

13.10    HEART.  Effective January 1, 2007, notwithstanding any provision of the Plan to the contrary, in the case of a Participant who dies while performing qualified military service (as defined in Code Section 414(u)), the surviving Spouse (or if applicable, Beneficiaries) of such Participant is entitled to any additional benefits (other than benefit accruals relating to the period of qualified military service) provided under the Plan had such Participant resumed and then terminated employment on account of death.  Effective January 1, 2009, notwithstanding any provision of the Plan to the contrary, any differential wage payments (as defined in Code Section 3401(h)(2)) received by a Participant shall be treated as Code Section 415 Compensation (but not for purposes of determining benefits under the Plan).

IN WITNESS WHEREOF, this plan document has been executed by a duly authorized officer of the Company effective as of August 1, 2020.

**OLIN CORPORATION**

By _____

Its Sr. Director, Global Compensation & Benefits

Date  August 25, 2020

APPENDIX A

OPTION 1

**25% JOINT AND SURVIVOR OPTION FACTORS**

Generally effective for benefits commencing on or after January 1, 1991and before January 1, 2011

| DIFFERENCE BETWEEN PARTICIPANT'S AGE AND BENEFICIARY'S AGE (YEARS) | PARTICIPANT'S AGE | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 44-46 | 47-49 | 50-52 | 53-55 | 56-58 | 59-61 | 62-64 | 65 and over |
| Participant Older: | | | | | | | | |
| 20 or more | .981 | .977 | .972 | .966 | .958 | .949 | .937 | .924 |
| 17-19 | .982 | .978 | .973 | .967 | .960 | .951 | .940 | .928 |
| 14-16 | .983 | .979 | .974 | .968 | .962 | .954 | .944 | .932 |
| 11-13 | .983 | .980 | .975 | .970 | .964 | .957 | .948 | .937 |
| 8-10 | .984 | .981 | .977 | .972 | .967 | .960 | .952 | .942 |
| 5-7 | .985 | .982 | .978 | .974 | .969 | .963 | .956 | .948 |
| 2-4 | .986 | .983 | .980 | .977 | .972 | .967 | .961 | .954 |
| Less than 2 | .987 | .985 | .982 | .979 | .975 | .971 | .966 | .961 |
| Participant Younger: | | | | | | | | |
| Less than 2 | .987 | .985 | .982 | .979 | .975 | .971 | .966 | .961 |
| 2-4 | .989 | .986 | .984 | .981 | .979 | .975 | .971 | .967 |
| 5-7 | .990 | .988 | .986 | .984 | .982 | .979 | .976 | .973 |
| 8-10 | .991 | .989 | .988 | .986 | .985 | .983 | .981 | .978 |
| 11-13 | .992 | .991 | .990 | .989 | .987 | .986 | .985 | .983 |
| 14-16 | .993 | .992 | .991 | .991 | .990 | .989 | .988 | .987 |
| 17-19 | .994 | .994 | .993 | .993 | .992 | .992 | .991 | .990 |
| 20 or more | .995 | .995 | .994 | .994 | .994 | .994 | .993 | .993 |

-71-

APPENDIX A

OPTION 1

**50% JOINT AND SURVIVOR OPTION FACTORS**

Generally effective for benefits commencing on or after January 1, 1991and before January 1, 2011

| DIFFERENCE BETWEEN PARTICIPANT'S AGE AND BENEFICIARY'S AGE (YEARS) | PARTICIPANT'S AGE | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 44-46 | 47-49 | 50-52 | 53-55 | 56-58 | 59-61 | 62-64 | 65 and over |
| **Participant Older:** | | | | | | | | |
| 20 or more | .963 | .955 | .945 | .933 | .920 | .903 | .882 | .858 |
| 17-19 | .964 | .956 | .947 | .936 | .923 | .907 | .888 | .865 |
| 14-16 | .966 | .958 | .949 | .939 | .927 | .912 | .894 | .873 |
| 11-13 | .967 | .960 | .952 | .942 | .931 | .917 | .900 | .881 |
| 8-10 | .969 | .962 | .955 | .946 | .935 | .923 | .908 | .891 |
| 5-7 | .971 | .965 | .958 | .950 | .941 | .929 | .916 | .901 |
| 2-4 | .973 | .967 | .961 | .954 | .946 | .937 | .925 | .913 |
| Less than 2 | .975 | .970 | .965 | .959 | .952 | .944 | .935 | .925 |
| **Participant Younger:** | | | | | | | | |
| Less than 2 | .975 | .970 | .965 | .959 | .952 | .944 | .935 | .925 |
| 2-4 | .977 | .973 | .969 | .964 | .958 | .952 | .944 | .936 |
| 5-7 | .980 | .976 | .972 | .968 | .964 | .959 | .953 | .947 |
| 8-10 | .982 | .979 | .976 | .973 | .970 | .966 | .962 | .957 |
| 11-13 | .984 | .982 | .980 | .978 | .975 | .973 | .970 | .966 |
| 14-16 | .987 | .985 | .983 | .982 | .980 | .978 | .976 | .974 |
| 17-19 | .989 | .987 | .986 | .985 | .984 | .983 | .982 | .980 |
| 20 or more | .991 | .990 | .989 | .988 | .988 | .987 | .986 | .985 |

-72-

APPENDIX A

OPTION 1

**75% JOINT AND SURVIVOR OPTION FACTORS**

Generally effective for benefits commencing on or after January 1, 1991and before January 1, 2011

| DIFFERENCE BETWEEN PARTICIPANT'S AGE AND BENEFICIARY'S AGE (YEARS) | PARTICIPANT'S AGE | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 44-46 | 47-49 | 50-52 | 53-55 | 56-58 | 59-61 | 62-64 | 65 and over |
| **Participant Older:** | | | | | | | | |
| 20 or more | .946 | .934 | .920 | .903 | .884 | .861 | .833 | .802 |
| 17-19 | .947 | .936 | .922 | .907 | .889 | .866 | .840 | .810 |
| 14-16 | .949 | .938 | .926 | .911 | .894 | .873 | .848 | .820 |
| 11-13 | .952 | .941 | .929 | .916 | .900 | .880 | .858 | .832 |
| 8-10 | .954 | .944 | .933 | .921 | .906 | .889 | .868 | .845 |
| 5-7 | .957 | .948 | .938 | .927 | .914 | .898 | .880 | .859 |
| 2-4 | .960 | .952 | .943 | .933 | .921 | .908 | .892 | .875 |
| Less than 2 | .963 | .956 | .948 | .939 | .930 | .918 | .905 | .891 |
| **Participant Younger:** | | | | | | | | |
| Less than 2 | .963 | .956 | .948 | .939 | .930 | .918 | .905 | .891 |
| 2-4 | .966 | .960 | .954 | .946 | .938 | .929 | .919 | .907 |
| 5-7 | .970 | .965 | .959 | .953 | .947 | .940 | .932 | .923 |
| 8-10 | .973 | .969 | .965 | .960 | .955 | .950 | .944 | .937 |
| 11-13 | .977 | .973 | .970 | .967 | .963 | .959 | .955 | .950 |
| 14-16 | .980 | .977 | .975 | .973 | .970 | .968 | .965 | .961 |
| 17-19 | .983 | .981 | .979 | .978 | .977 | .975 | .973 | .970 |
| 20 or more | .986 | .985 | .983 | .983 | .982 | .981 | .980 | .978 |

APPENDIX A

OPTION 1

**100% JOINT AND SURVIVOR OPTION FACTORS**

Generally effective for benefits commencing on or after January 1, 1991and before January 1, 2011

| DIFFERENCE BETWEEN PARTICIPANT'S AGE AND BENEFICIARY'S AGE (YEARS) | PARTICIPANT'S AGE | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 44-46 | 47-49 | 50-52 | 53-55 | 56-58 | 59-61 | 62-64 | 65 and over |
| Participant Older: | | | | | | | | |
| 20 or more | .929 | .914 | .896 | .875 | .851 | .823 | .789 | .752 |
| 17-19 | .931 | .916 | .899 | .880 | .857 | .830 | .798 | .762 |
| 14-16 | .934 | .919 | .903 | .885 | .863 | .838 | .808 | .774 |
| 11-13 | .936 | .923 | .908 | .891 | .870 | .847 | .819 | .788 |
| 8-10 | .940 | .927 | .913 | .897 | .879 | .857 | .831 | .803 |
| 5-7 | .943 | .932 | .919 | .905 | .888 | .868 | .846 | .821 |
| 2-4 | .947 | .937 | .925 | .912 | .898 | .881 | .861 | .840 |
| Less than 2 | .951 | .942 | .932 | .921 | .908 | .894 | .878 | .860 |
| Participant Younger: | | | | | | | | |
| Less than 2 | .951 | .942 | .932 | .921 | .908 | .894 | .878 | .860 |
| 2-4 | .956 | .948 | .939 | .930 | .919 | .908 | .894 | .880 |
| 5-7 | .960 | .953 | .946 | .939 | .931 | .921 | .911 | .900 |
| 8-10 | .965 | .959 | .953 | .948 | .941 | .935 | .927 | .918 |
| 11-13 | .969 | .965 | .960 | .956 | .952 | .947 | .941 | .935 |
| 14-16 | .973 | .970 | .967 | .964 | .961 | .958 | .954 | .949 |
| 17-19 | .978 | .975 | .973 | .971 | .969 | .967 | .964 | .961 |
| 20 or more | .981 | .980 | .978 | .977 | .976 | .975 | .973 | .971 |

APPENDIX B

5 AND 10 YEAR CERTAIN AND LIFE OPTION FACTORS

Effective for benefits commencing on or after January 1, 1991

| AGE OF PARTICIPANT | OPTION 2 10 YEARS CERTAIN AND LIFE | OPTION 3 5 YEARS CERTAIN AND LIFE |
|---|---|---|
| 45 | 0.993 | 0.998 |
| 46 | 0.992 | 0.998 |
| 47 | 0.991 | 0.998 |
| 48 | 0.990 | 0.997 |
| 49 | 0.989 | 0.997 |
| 50 | 0.988 | 0.997 |
| 51 | 0.986 | 0.996 |
| 52 | 0.985 | 0.996 |
| 53 | 0.984 | 0.995 |
| 54 | 0.982 | 0.995 |
| 55 | 0.980 | 0.994 |
| 56 | 0.978 | 0.994 |
| 57 | 0.976 | 0.993 |
| 58 | 0.973 | 0.992 |
| 59 | 0.970 | 0.992 |
| 60 | 0.966 | 0.991 |
| 61 | 0.962 | 0.989 |
| 62 | 0.957 | 0.988 |
| 63 | 0.952 | 0.986 |
| 64 | 0.946 | 0.984 |
| 65 | 0.939 | 0.982 |
| 66 | 0.931 | 0.979 |
| 67 | 0.923 | 0.977 |
| 68 | 0.913 | 0.973 |
| 69 | 0.903 | 0.970 |
| 70 | 0.892 | 0.966 |
| 71 | 0.879 | 0.961 |
| 72 | 0.866 | 0.956 |
| 73 | 0.851 | 0.950 |
| 74 | 0.835 | 0.944 |
| 75 | 0.817 | 0.936 |

# APPENDIX C

## APPENDIX C -- SOCIAL SECURITY LEVELING OPTION FACTORS – 2001 AGE 62 AND AGE 65

### Social Security Leveling Option Factors for 2001 - Level to Age 62
### GAM 83 with margin, 50/50 male/female, 5.78%

| Month | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Age | | | | | | | | | | | | |
| 55 | 0.569269 | 0.572773 | 0.576321 | 0.579916 | 0.583551 | 0.587236 | 0.590964 | 0.594742 | 0.598570 | 0.602443 | 0.606371 | 0.610352 |
| 56 | 0.614377 | 0.618221 | 0.622115 | 0.626052 | 0.630043 | 0.634086 | 0.638180 | 0.642322 | 0.646528 | 0.650775 | 0.655091 | 0.659461 |
| 57 | 0.663890 | 0.668113 | 0.672382 | 0.676713 | 0.681105 | 0.685544 | 0.690049 | 0.694607 | 0.699231 | 0.703911 | 0.708656 | 0.713472 |
| 58 | 0.718349 | 0.722993 | 0.727702 | 0.732471 | 0.737305 | 0.742204 | 0.747163 | 0.752190 | 0.757285 | 0.762462 | 0.767694 | 0.773010 |
| 59 | 0.778390 | 0.783515 | 0.788716 | 0.793979 | 0.799320 | 0.804724 | 0.810207 | 0.815771 | 0.821406 | 0.827115 | 0.832913 | 0.838787 |
| 60 | 0.844743 | 0.850419 | 0.856176 | 0.862008 | 0.867915 | 0.873906 | 0.879982 | 0.886142 | 0.892389 | 0.898723 | 0.905145 | 0.911671 |
| 61 | 0.918287 | 0.924576 | 0.930962 | 0.937435 | 0.943998 | 0.950651 | 0.957403 | 0.964246 | 0.971191 | 0.978238 | 0.985387 | 0.992641 |
| 62 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 |

### Social Security Leveling Option Factors for 2001 - Level to Age 65
### GAM 83 with margin, 50/50 male/female, 5.78%

| Month | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Age | | | | | | | | | | | | |
| 55 | 0.435507 | 0.438189 | 0.440903 | 0.443647 | 0.446434 | 0.449250 | 0.452100 | 0.454995 | 0.457919 | 0.460885 | 0.463893 | 0.466936 |
| 56 | 0.470017 | 0.472953 | 0.475934 | 0.478945 | 0.481999 | 0.485092 | 0.488224 | 0.491392 | 0.494611 | 0.497866 | 0.501162 | 0.504506 |
| 57 | 0.507895 | 0.511125 | 0.514395 | 0.517706 | 0.521058 | 0.524459 | 0.527905 | 0.531398 | 0.534929 | 0.538510 | 0.542142 | 0.545822 |
| 58 | 0.549558 | 0.553108 | 0.556718 | 0.560358 | 0.564058 | 0.567807 | 0.571603 | 0.575445 | 0.579348 | 0.583301 | 0.587304 | 0.591374 |
| 59 | 0.595487 | 0.599411 | 0.603389 | 0.607414 | 0.611501 | 0.615636 | 0.619836 | 0.624083 | 0.628396 | 0.632766 | 0.637199 | 0.641693 |
| 60 | 0.646252 | 0.650596 | 0.654994 | 0.659453 | 0.663972 | 0.668563 | 0.673209 | 0.677921 | 0.682702 | 0.687545 | 0.692459 | 0.697450 |
| 61 | 0.702513 | 0.707327 | 0.712211 | 0.717164 | 0.722183 | 0.727272 | 0.732442 | 0.737678 | 0.742988 | 0.748379 | 0.753846 | 0.759396 |
| 62 | 0.765025 | 0.770385 | 0.775820 | 0.781332 | 0.786927 | 0.792593 | 0.798344 | 0.804190 | 0.810110 | 0.816117 | 0.822222 | 0.828419 |
| 63 | 0.834699 | 0.84068 | 0.84675 | 0.852904 | 0.859149 | 0.865486 | 0.871924 | 0.878448 | 0.885068 | 0.891802 | 0.898632 | 0.90557 |
| 64 | 0.912616 | 0.919302 | 0.926095 | 0.932993 | 0.939992 | 0.947098 | 0.954307 | 0.961635 | 0.969067 | 0.976622 | 0.984292 | 0.992087 |
| 65 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 |

# APPENDIX C

## APPENDIX C -- SOCIAL SECURITY LEVELING OPTION FACTORS – 2000 AGE 62 AND AGE 65

### Social Security Leveling Option Factors for 2000 - Level to Age 62
#### GAM 83 with margin, 50/50 male/female, 6.15%

| Month | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Age | | | | | | | | | | | | |
| 55 | 0.558352 | 0.561914 | 0.565520 | 0.569167 | 0.572867 | 0.576613 | 0.580408 | 0.584257 | 0.588153 | 0.592107 | 0.596112 | 0.600170 |
| 56 | 0.604282 | 0.608197 | 0.612158 | 0.616167 | 0.620235 | 0.624352 | 0.628532 | 0.632758 | 0.637046 | 0.641395 | 0.645802 | 0.650269 |
| 57 | 0.654802 | 0.659101 | 0.663471 | 0.667887 | 0.672370 | 0.676908 | 0.681510 | 0.686177 | 0.690895 | 0.695693 | 0.700551 | 0.705482 |
| 58 | 0.710483 | 0.715233 | 0.720052 | 0.724929 | 0.729867 | 0.734879 | 0.739967 | 0.745118 | 0.750344 | 0.755643 | 0.761018 | 0.766467 |
| 59 | 0.772001 | 0.777255 | 0.782573 | 0.787971 | 0.793446 | 0.798995 | 0.804617 | 0.810329 | 0.816123 | 0.821992 | 0.827944 | 0.833990 |
| 60 | 0.840121 | 0.845943 | 0.851850 | 0.857833 | 0.863909 | 0.870071 | 0.876311 | 0.882647 | 0.889080 | 0.895609 | 0.902228 | 0.908947 |
| 61 | 0.915765 | 0.922246 | 0.928807 | 0.935467 | 0.942227 | 0.949079 | 0.956033 | 0.963097 | 0.970248 | 0.977520 | 0.984906 | 0.992391 |
| 62 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 |

### Social Security Leveling Option Factors for 2000 - Level to Age 65
#### GAM 83 with margin, 50/50 male/female, 6.15%

| Month | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Age | | | | | | | | | | | | |
| 55 | 0.423669 | 0.426376 | 0.429108 | 0.431877 | 0.434679 | 0.437530 | 0.440404 | 0.443328 | 0.446285 | 0.449281 | 0.452324 | 0.455406 |
| 56 | 0.458523 | 0.461493 | 0.464490 | 0.467546 | 0.470626 | 0.473749 | 0.476923 | 0.480130 | 0.483385 | 0.486681 | 0.490022 | 0.493417 |
| 57 | 0.496857 | 0.500117 | 0.503434 | 0.506785 | 0.510181 | 0.513627 | 0.517124 | 0.520663 | 0.524249 | 0.527883 | 0.531572 | 0.535310 |
| 58 | 0.539105 | 0.542713 | 0.546360 | 0.550068 | 0.553816 | 0.557622 | 0.561480 | 0.565380 | 0.569356 | 0.573373 | 0.577450 | 0.581586 |
| 59 | 0.585783 | 0.589770 | 0.593806 | 0.597897 | 0.602059 | 0.606263 | 0.610532 | 0.614868 | 0.619258 | 0.623710 | 0.628234 | 0.632821 |
| 60 | 0.637474 | 0.641893 | 0.646379 | 0.650919 | 0.655524 | 0.660199 | 0.664937 | 0.669742 | 0.674627 | 0.679580 | 0.684600 | 0.689698 |
| 61 | 0.694869 | 0.699790 | 0.704769 | 0.709816 | 0.714946 | 0.720150 | 0.725427 | 0.730786 | 0.736215 | 0.741726 | 0.747331 | 0.753015 |
| 62 | 0.758785 | 0.764268 | 0.769821 | 0.775458 | 0.781176 | 0.786980 | 0.792871 | 0.798853 | 0.804924 | 0.811094 | 0.817349 | 0.823712 |
| 63 | 0.830169 | 0.836284 | 0.842498 | 0.848805 | 0.855205 | 0.861708 | 0.868306 | 0.875001 | 0.881811 | 0.888727 | 0.895752 | 0.902878 |
| 64 | 0.910124 | 0.916997 | 0.923961 | 0.931043 | 0.938235 | 0.945538 | 0.952944 | 0.960483 | 0.968127 | 0.975906 | 0.983812 | 0.991836 |
| 65 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 |

| APPENDIX C |
| --- |
| APPENDIX C -- SOCIAL SECURITY LEVELING OPTION FACTORS – 1999 AGE 62 AND AGE 65 |

| Social Security Leveling Option Factors for 1999 - Level to Age 65 |
| --- |
| GAM 83 with margin, 50/50 male/female, 5.25% |

| Month | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Age | | | | | | | | | | | | |
| 55 | 0.452857 | 0.455502 | 0.458182 | 0.460890 | 0.463630 | 0.466410 | 0.469222 | 0.472060 | 0.474938 | 0.477849 | 0.480797 | 0.483787 |
| 56 | 0.486810 | 0.489705 | 0.492634 | 0.495596 | 0.498596 | 0.501633 | 0.504706 | 0.507820 | 0.510970 | 0.514159 | 0.517391 | 0.520659 |
| 57 | 0.523967 | 0.527141 | 0.530348 | 0.533595 | 0.536885 | 0.540219 | 0.543582 | 0.546994 | 0.550452 | 0.553954 | 0.557499 | 0.561091 |
| 58 | 0.564728 | 0.568208 | 0.571733 | 0.575297 | 0.578911 | 0.582569 | 0.586270 | 0.590027 | 0.593831 | 0.597680 | 0.601579 | 0.605526 |
| 59 | 0.609532 | 0.613369 | 0.617238 | 0.621172 | 0.625153 | 0.629180 | 0.633269 | 0.637401 | 0.641590 | 0.645838 | 0.650135 | 0.654501 |
| 60 | 0.658917 | 0.663143 | 0.667426 | 0.671765 | 0.676161 | 0.680608 | 0.685121 | 0.689690 | 0.694327 | 0.699016 | 0.703774 | 0.708599 |
| 61 | 0.713494 | 0.718167 | 0.722903 | 0.727705 | 0.732576 | 0.737503 | 0.742506 | 0.747568 | 0.752706 | 0.757910 | 0.763187 | 0.768544 |
| 62 | 0.773970 | 0.779163 | 0.784415 | 0.789747 | 0.795155 | 0.800630 | 0.806181 | 0.811816 | 0.817521 | 0.823311 | 0.829189 | 0.835147 |
| 63 | 0.841194 | 0.846972 | 0.852823 | 0.858761 | 0.864779 | 0.87088 | 0.87707 | 0.883351 | 0.889725 | 0.896185 | 0.902739 | 0.909396 |
| 64 | 0.91615 | 0.922595 | 0.929127 | 0.93577 | 0.942492 | 0.94932 | 0.956246 | 0.963263 | 0.970397 | 0.977625 | 0.984982 | 0.992434 |
| 65 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 |

| Social Security Leveling Option Factors  - Level to Age 62 - OLD FACTORS |
| --- |
| GAM 83 w/o margin, 70/30 male/female, 9.5% |

| Month | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Age | | | | | | | | | | | | |
| 55 | 0.455 | 0.459 | 0.464 | 0.468 | 0.472 | 0.477 | 0.481 | 0.485 | 0.490 | 0.494 | 0.498 | 0.503 |
| 56 | 0.507 | 0.512 | 0.517 | 0.522 | 0.526 | 0.531 | 0.536 | 0.541 | 0.546 | 0.551 | 0.555 | 0.560 |
| 57 | 0.565 | 0.571 | 0.576 | 0.582 | 0.587 | 0.593 | 0.598 | 0.604 | 0.609 | 0.615 | 0.620 | 0.626 |
| 58 | 0.631 | 0.637 | 0.644 | 0.650 | 0.656 | 0.662 | 0.669 | 0.675 | 0.681 | 0.687 | 0.694 | 0.700 |
| 59 | 0.706 | 0.713 | 0.720 | 0.728 | 0.735 | 0.742 | 0.749 | 0.756 | 0.763 | 0.771 | 0.778 | 0.785 |
| 60 | 0.792 | 0.800 | 0.808 | 0.816 | 0.824 | 0.832 | 0.841 | 0.849 | 0.857 | 0.865 | 0.873 | 0.881 |
| 61 | 0.889 | 0.898 | 0.908 | 0.917 | 0.926 | 0.935 | 0.945 | 0.954 | 0.963 | 0.972 | 0.982 | 0.991 |
| 62 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 |

PRE-GATT SOCIAL SECURITY LEVELING OPTION FACTORS - AGE 65

Effective for benefits commencing on or after January 1, 1991
Grandfathered Minimum Benefit after Adoption of GATT Factors

| Age | | 1 .083333 | 2 .16667 | 3 .25000 | 4 .33333 | 5 .416667 | 6 .50000 | 7 .58333 | 8 .66667 | 9 .75000 | 10 .83333 | 11 .91666 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 55 | .315 | .318 | .321 | .324 | .327 | .330 | .333 | .336 | .339 | .342 | .345 | .348 |
| 56 | .351 | .354 | .358 | .361 | .365 | .368 | .372 | .375 | .378 | .382 | .385 | .389 |
| 57 | .392 | .396 | .400 | .403 | .407 | .411 | .415 | .418 | .422 | .426 | .430 | .433 |
| 58 | .437 | .441 | .446 | .450 | .454 | .459 | .463 | .467 | .472 | .476 | .480 | .485 |
| 59 | .489 | .494 | .499 | .504 | .509 | .514 | .519 | .523 | .528 | .533 | .538 | .543 |
| 60 | .548 | .554 | .559 | .565 | .571 | .576 | .582 | .588 | .593 | .599 | .605 | .610 |
| 61 | .616 | .622 | .629 | .635 | .642 | .648 | .655 | .661 | .667 | .674 | .680 | .687 |
| 62 | .693 | .700 | .708 | .715 | .722 | .730 | .737 | .744 | .752 | .759 | .766 | .774 |
| 63 | .781 | .790 | .798 | .807 | .815 | .824 | .832 | .841 | .849 | .858 | .866 | .875 |
| 64 | .883 | .893 | .903 | .912 | .922 | .932 | .942 | .951 | .961 | .971 | .981 | .990 |
| 65 | 1.000 | | | | | | | | | | | |

APPENDIX C

PRE-GATT SOCIAL SECURITY LEVELING OPTION FACTORS - AGE 62

Effective for benefits commencing on or after January 1, 1991
Grandfathered Minimum Benefit after Adoption of GATT Factors

| Age | | 1 .083333 | 2 .16667 | 3 .25000 | 4 .33333 | 5 .416667 | 6 .50000 | 7 .58333 | 8 .66667 | 9 .75000 | 10 .83333 | 11 .91666 |
|-----|------|-------|-------|-------|-------|--------|-------|-------|-------|-------|-------|-------|
| 55 | .455 | .459 | .464 | .468 | .472 | .477 | .481 | .485 | .490 | .494 | .498 | .503 |
| 56 | .507 | .512 | .517 | .522 | .526 | .531 | .536 | .541 | .546 | .551 | .555 | .560 |
| 57 | .565 | .571 | .576 | .582 | .587 | .593 | .598 | .604 | .609 | .615 | .620 | .626 |
| 58 | .631 | .637 | .644 | .650 | .656 | .662 | .669 | .675 | .681 | .687 | .694 | .700 |
| 59 | .706 | .713 | .720 | .728 | .735 | .742 | .749 | .756 | .763 | .771 | .778 | .785 |
| 60 | .792 | .800 | .808 | .816 | .824 | .832 | .841 | .849 | .857 | .865 | .873 | .881 |
| 61 | .889 | .898 | .908 | .917 | .926 | .935 | .945 | .954 | .963 | .972 | .982 | .991 |
| 62 | 1.000 | | | | | | | | | | | |

-80-

APPENDIX D

ACTUARIAL EQUIVALENT EARLY PAYMENT FACTORS
(ASSUMING NORMAL RETIREMENT AT AGE 65)

Effective for benefits commencing on or after January 1, 1991

| PARTICIPANT'S AGE | FACTOR |
|---|---|
| 55 | .315 |
| 56 | .351 |
| 57 | .392 |
| 58 | .437 |
| 59 | .489 |
| 60 | .548 |
| 61 | .616 |
| 62 | .693 |
| 63 | .781 |
| 64 | .883 |
| 65 | 1.000 |

The above factors are interpolated for completed months when partial years are involved.

APPENDIX E

PRE- 1991 25% JOINT AND SURVIVOR OPTION FACTORS

Effective for benefits commencing prior to January 1, 1991

| DIFFERENCE BETWEEN PARTICIPANT'S AGE AND BENEFICIARY'S AGE | PARTICIPANT'S AGE | | | 65 and over |
|---|---|---|---|---|
| | 55-58 | 59-61 | 62-64 | |
| **Participant Older:** | | | | |
| 20 or more | .94 | .92 | .91 | .89 |
| 17-19 | .94 | .92 | .91 | .89 |
| 14-16 | .94 | .92 | .91 | .90 |
| 11-13 | .95 | .93 | .92 | .90 |
| 8-10 | .95 | .93 | .92 | .91 |
| 5-7 | .95 | .94 | .93 | .92 |
| 2-4 | .96 | .95 | .93 | .93 |
| Less than 2 | .96 | .96 | .94 | .93 |
| **Participant Younger:** | | | | |
| Less than 2 | .96 | .96 | .94 | .93 |
| 2-4 | .96 | .96 | .94 | .93 |
| 5-7 | .96 | .96 | .95 | .94 |
| 8-10 | .97 | .97 | .96 | .95 |
| 11-13 | .97 | .97 | .96 | .96 |
| 14-16 | .97 | .97 | .96 | .96 |
| 17-19 | .98 | .98 | .97 | .97 |
| 20 or more | .98 | .98 | .97 | .97 |

APPENDIX E

PRE-1991 50% JOINT AND SURVIVOR OPTION FACTORS

Effective for benefits commencing prior to January 1, 1991

| DIFFERENCE BETWEEN PARTICIPANT'S AGE AND BENEFICIARY'S AGE | PARTICIPANT'S AGE | | | 65 and over |
|---|---|---|---|---|
| | 55-58 | 59-61 | 62-64 | |
| **Participant Older:** | | | | |
| 20 or more | .88 | .86 | .83 | .81 |
| 17-19 | .88 | .86 | .84 | .82 |
| 14-16 | .88 | .86 | .85 | .83 |
| 11-13 | .89 | .87 | .86 | .84 |
| 8-10 | .89 | .88 | .87 | .84 |
| 5-7 | .89 | .88 | .88 | .86 |
| 2-4 | .90 | .89 | .89 | .87 |
| Less than 2 | .90 | .89 | .89 | .88 |
| **Participant Younger:** | | | | |
| Less than 2 | .90 | .89 | .89 | .88 |
| 2-4 | .90 | .90 | .90 | .90 |
| 5-7 | .92 | .92 | .92 | .91 |
| 8-10 | .94 | .93 | .93 | .92 |
| 11-13 | .95 | .95 | .95 | .95 |
| 14-16 | .95 | .95 | .95 | .95 |
| 17-19 | .96 | .96 | .96 | .96 |
| 20 or more | .96 | .96 | .96 | .96 |

APPENDIX E

PRE-1991 75% JOINT AND SURVIVOR OPTION FACTORS

Effective for benefits commencing prior to January 1, 1991

| DIFFERENCE BETWEEN PARTICIPANT'S AGE AND BENEFICIARY'S AGE | PARTICIPANT'S AGE | | | 65 and over |
|---|---|---|---|---|
| | 55-58 | 59-61 | 62-64 | |
| **Participant Older:** | | | | |
| 20 or more | .83 | .79 | .77 | .74 |
| 17-19 | .83 | .80 | .78 | .76 |
| 14-16 | .84 | .81 | .79 | .78 |
| 11-13 | .85 | .82 | .80 | .80 |
| 8-10 | .85 | .83 | .81 | .81 |
| 5-7 | .86 | .83 | .82 | .82 |
| 2-4 | .87 | .84 | .83 | .83 |
| Less than 2 | .88 | .85 | .84 | .83 |
| **Participant Younger:** | | | | |
| Less than 2 | .88 | .85 | .84 | .83 |
| 2-4 | .89 | .87 | .86 | .84 |
| 5-7 | .90 | .89 | .87 | .86 |
| 8-10 | .91 | .90 | .88 | .88 |
| 11-13 | .92 | .91 | .90 | .90 |
| 14-16 | .93 | .93 | .92 | .92 |
| 17-19 | .94 | .94 | .93 | .93 |
| 20 or more | .95 | .95 | .94 | .94 |

APPENDIX E

PRE-1991 100% JOINT AND SURVIVOR OPTION FACTORS

Effective for benefits commencing prior to January 1, 1991

| DIFFERENCE BETWEEN PARTICIPANT'S AGE AND BENEFICIARY'S AGE | PARTICIPANT'S AGE | | | 65 and over |
| --- | --- | --- | --- | --- |
| | 55-58 | 59-61 | 62-64 | |
| **Participant Older:** | | | | |
| 20 or more | .79 | .74 | .72 | .68 |
| 17-19 | .79 | .75 | .73 | .70 |
| 14-16 | .80 | .76 | .74 | .72 |
| 11-13 | .80 | .77 | .75 | .74 |
| 8-10 | .81 | .78 | .76 | .75 |
| 5-7 | .82 | .79 | .77 | .76 |
| 2-4 | .83 | .80 | .79 | .77 |
| Less than 2 | .84 | .81 | .80 | .78 |
| **Participant Younger:** | | | | |
| Less than 2 | .84 | .81 | .80 | .78 |
| 2-4 | .85 | .82 | .82 | .80 |
| 5-7 | .86 | .84 | .84 | .82 |
| 8-10 | .87 | .85 | .85 | .84 |
| 11-13 | .88 | .86 | .86 | .86 |
| 14-16 | .89 | .88 | .88 | .88 |
| 17-19 | .90 | .90 | .90 | .90 |
| 20 or more | .92 | .92 | .92 | .92 |

APPENDIX F

PRE-1991 5 AND 10 YEAR CERTAIN AND LIFE OPTION FACTORS

Effective for benefits commencing prior to January 1, 1991

| PARTICIPANT'S | 5 YEARS CERTAIN AND LIFE | 10 YEARS CERTAIN AND LIFE |
|---|---|---|
| **AGE THEREAFTER** | | |
| 55 | .971 | .936 |
| 56 | .970 | .932 |
| 57 | .969 | .928 |
| 58 | .967 | .923 |
| 59 | .965 | .918 |
| 60 | .963 | .913 |
| 61 | .961 | .907 |
| 62 | .959 | .900 |
| 63 | .956 | .893 |
| 64 | .953 | .885 |
| 65 | .950 | .877 |

APPENDIX G

PRE-1991 SOCIAL SECURITY LEVELING OPTION FACTORS - AGE 62

Effective for benefits commencing prior to January 1, 1991

| Age | | 1 .083333 | 2 .16667 | 3 .25000 | 4 .33333 | 5 .416667 | 6 .50000 | 7 .58333 | 8 .66667 | 9 .75000 | 10 .83333 | 11 .91666 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 55 | .450 | .454 | .458 | .463 | .467 | .472 | .476 | .480 | .485 | .489 | .493 | .498 |
| 56 | .502 | .507 | .512 | .517 | .521 | .526 | .531 | .536 | .540 | .546 | .550 | .555 |
| 57 | .560 | .565 | .571 | .577 | .582 | .587 | .593 | .598 | .604 | .610 | .615 | .620 |
| 58 | .626 | .632 | .639 | .645 | .651 | .658 | .664 | .670 | .677 | .683 | .689 | .696 |
| 59 | .702 | .709 | .716 | .724 | .730 | .738 | .745 | .752 | .759 | .767 | .774 | .781 |
| 60 | .788 | .796 | .804 | .813 | .821 | .829 | .838 | .846 | .854 | .862 | .870 | .879 |
| 61 | .887 | .896 | .906 | .915 | .925 | .934 | .944 | .953 | .962 | .972 | .981 | .991 |

-87-

APPENDIX G

PRE-1991 SOCIAL SECURITY LEVELING OPTION FACTORS - AGE 65

Effective prior to January 1, 1991

| Age | | 1 .083333 | 2 .16667 | 3 .25000 | 4 .33333 | 5 .416667 | 6 .50000 | 7 .58333 | 8 .66667 | 9 .75000 | 10 .83333 | 11 .91666 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 55 | .309 | .312 | .315 | .318 | .321 | .324 | .327 | .330 | .333 | .336 | .339 | .342 |
| 56 | .345 | .348 | .352 | .355 | .358 | .362 | .365 | .368 | .372 | .375 | .378 | .382 |
| 57 | .385 | .389 | .393 | .396 | .400 | .404 | .408 | .411 | .415 | .419 | .423 | .426 |
| 58 | .430 | .434 | .439 | .443 | .447 | .452 | .456 | .460 | .465 | .469 | .473 | .478 |
| 59 | .482 | .487 | .492 | .497 | .502 | .507 | .512 | .517 | .522 | .527 | .532 | .537 |
| 60 | .542 | .548 | .553 | .559 | .564 | .570 | .576 | .581 | .587 | .592 | .598 | .603 |
| 61 | .609 | .616 | .622 | .629 | .635 | .641 | .648 | .654 | .661 | .668 | .674 | .681 |
| 62 | .687 | .695 | .702 | .710 | .717 | .725 | .732 | .739 | .747 | .755 | .762 | .770 |
| 63 | .777 | .786 | .794 | .803 | .811 | .820 | .829 | .837 | .846 | .854 | .863 | .871 |
| 64 | .880 | .890 | .900 | .910 | .920 | .930 | .940 | .950 | .960 | .970 | .980 | .990 |

APPENDIX H

PRE 1991- ACTUARIAL EQUIVALENT EARLY PAYMENT FACTORS

(ASSUMING NORMAL RETIREMENT AT AGE 65)

Effective prior to January 1, 1991

| PARTICIPANT'S AGE | FACTOR |
|---|---|
| 55 | .309 |
| 56 | .345 |
| 57 | .385 |
| 58 | .430 |
| 59 | .482 |
| 60 | .542 |
| 61 | .609 |
| 62 | .687 |
| 63 | .777 |
| 64 | .880 |
| 65 | 1.000 |

The above factors are interpolated for completed months when partial years are involved.

APPENDIX I-1

TOP HEAVY PROVISIONS

Effective January 1, 1984, the following special provisions shall apply to determine if the Plan is a Top Heavy Plan in accordance with Code Section 416 and any special rules that will apply based on such status.  In the event that the provisions contained in this Appendix I are inconsistent with the terms contained in the remainder of the Plan, the provisions contained in this Appendix I shall take precedence.

ARTICLE I

Definitions

| | |
|---|---|
| Aggregation Group: | All plans maintained by an Affiliated Company that are qualified under the Code; provided that each such plan satisfies at least one of the following requirements: |
| | (a) one or more Key Employees are Participants; |
| | (b) the plan enables any plan in which a Key Employee is a Participant to comply with the coverage and nondiscrimination requirements of Sections 401(a)(4) and 410 of the Code; or |
| | (c) such plan has been designated as a part of the Aggregation Group, provided that the resulting Aggregation Group meets the coverage and non-discrimination requirements of Sections 401(a)(4) and 410 of the Code. |
| Determination Date: | The last day of the preceding Plan Year. |
| Key Employee: | Any employee or former employee (and any beneficiary of such an employee) who, at any time during the Plan Year ending on the determination date for the Plan Year in question, was: |
| | (a) an officer of the Company or of any Related Employer having annual compensation greater than $130,000 (as adjusted under Code Section 416(i)(1) for Plan Years beginning after December 31, 2002), provided that no more than fifty (50) persons (or, if lesser, the greater of three (3) persons or ten percent (10%) of the employees of the Company and the Related Employers) shall be treated as officers; |
| | (b) a person who, without application of the aggregation rules of subsections (b), (c) and (m) of Section 414(b) of the Code, owned (or was considered as owning within the meaning of Section 318 of the Code) more than five percent (5%) of the outstanding stock (or in the case of an unincorporated business, of the capital or profits interest) of the Company or Related Employer or stock possessing more than five percent (5%) of the total combined voting power of all of the stock of the Company or Related Employer; or |
| | (c) a person who had annual compensation from the Company and Related Employers of more than One Hundred Fifty Thousand Dollars ($150,000) and who, without application of the aggregation rules of subsections (b), (c) and (m) of Section 414(b) of the Code, owned (or was considered as owning within the meaning of Section 318 of the Code) more than one percent (1%) of the outstanding stock (or in the case of an unincorporated business, of the capital or profits interest) of the Company or Related Employer or stock possessing more |

-90-

than one percent (1%) of the total combined voting power of all of the stock of the Company or Related Employer.

Compensation for purposes of this definition means compensation as defined in Section 415(c)(3) of the Code, including amounts contributed by the Company pursuant to a salary reduction agreement which are excludable from the Employee's gross income under Section 125, Section 402(a)(8), Section 402(h) or Section 403(b) of the Code.

The determination of who is a Key Employee will be made in accordance with Code Section 416(i)(1) and the applicable regulations and other guidance of general applicability issued thereunder.

Non-Key Employee:

With respect to any Plan Year, an employee of the Company or a Related Employer who is not a Key Employee.

Top Heavy Average Compensation:

The average of an individual's annual Compensation within the meaning of Code Section 415 (as defined in the Glossary) received from an Employing Company over any five consecutive Plan Years that produces the highest average; provided,  however, that years beginning after the last Top Heavy Plan Year shall be disregarded.

Top Heavy Plan:

With respect to any Plan Year commencing after 1983, the Plan, if  (a) it is included in the Aggregation Group, and (b) as of the Determination Date for such Plan Year, the sum of (i) the aggregate values of the Accounts for all Key Employees under the Plan; and  (ii) the aggregate account values and the aggregate present values of accrued benefits (excluding amounts attributable to unrelated rollover contributions) for all Key Employees under all other plans in the Aggregation Group, exceeds 60 percent of all such aggregate values for all individuals under all plans in the Aggregation Group.

In determining the value of any individual's account or the present value of his accrued benefits:

(a) For Plan Years beginning after December 31, 2001, for purposes of determining the present values of accrued benefits and the amounts of account balances of Participants as of the Determination Date: (i) generally, any accrued benefit transferred or distributed in the one year period ending on a Plan's determination date (except any such accrued benefit otherwise included in the present value of accrued benefits on the determination date) shall be added back and included in the plan's present value of accrued benefits as of the determination date.  This rule shall apply to distributions under a terminated plan which, if it had not been terminated, would have been required to be included in an aggregation group.  It shall also apply to any unrelated rollover or transfer (i.e. one initiated by the employee and made to a plan maintained by another, unrelated employer under Code Section 414 (b), (c) or (m)).  In the case of a distribution made for a reason other than severance from employment, death, or disability, this provision shall be applied by substituting "five year period" for "one year period" in the first sentence hereof.  The plan accepting an unrelated rollover or transfer shall not consider the rollover or transfer as part of its present value of accrued benefits unless the rollover or transfer was accepted prior to December 31, 1983.  In the case of a related rollover or transfer (i.e. one not initiated by the employee or made to a plan maintained by the same or related employer under Code Section 414 (b), (c) or (m)), the rollover or transfer shall not be added back but shall be counted in the plan accepting the rollover or

-91-

transfer whether the rollover or transfer was accepted before or after December 31, 1983; and (ii) the accrued benefit of all participants in the Plan who have not performed any service for any employer maintaining the plan at any time during the one year period ending on the plan's determination date shall be disregarded;

(b) the present value of his accrued benefit under a defined benefit plan shall be determined by using a five percent interest rate assumption and the 1983 Group Annuity Mortality Table without margin (blended 70% male/30% female) (prior to 1991, the 1963 George B. Buck Mortality Table); and

(c) the accrued benefit of a Non-Key employee under the Plan shall be (i) determined under the method, if any, that uniformly applies for accrual purposes under all plans maintained by the Company and any Related Employer, or (ii) if there is no such method, as if such benefit accrued not more rapidly than the slowest accrual rate permitted under the fractional accrual rate of Section 411(b)(1)(C) of the Code.

The value of an individual's account or the present value of his accrued benefit shall not be considered in determining if the Plan is a Top Heavy Plan if the individual has not performed any services for the Company or a Related Employer, during the five-year period ending on the Determination Date.

Top Heavy Plan Year:                 A Plan Year in which the Plan is a Top Heavy Plan.

Valuation Date:                 For a defined contribution plan, the most recent valuation date occurring within a 12-month period ending on a Determination Date.  For a defined benefit plan, the most recent valuation date used for determining plan costs for minimum funding purposes.

## ARTICLE II

### Vesting Requirements

In any Top Heavy Plan Year, the Accrued Benefit of each Participant shall be vested in accordance with the following schedule if such schedule provides a higher vested percentage than would be applicable pursuant to Section 3.3 and Appendix J:

| Years of Service | Percentage Vested |
|---|---|
| Less than 2 years | 0% |
| 2 years | 20% |
| 3 years | 40% |
| 4 years | 60% |
| 5 years | 80% |
| 6 or more years | 100% |

In the event the Plan ceases to be a Top Heavy Plan for any Plan Year subsequent to a Top Heavy Plan Year, (a) if a Participant has completed three Years of Service on or before the last day of the most recent Plan Year for which the Plan was a Top Heavy Plan, the vesting schedule set forth in this Appendix I shall continue to be applicable; and (b) if a Participant has completed at least two, but less than three Years of Service on or before the last day of the most recent Plan Year for which the Plan is a Top Heavy Plan, the vesting provisions in Section 3.3 and Appendix J shall again be applicable; provided, however, that in no event shall the vested percentage of a Participant's Accrued Benefit be less than the percentage determined under this Appendix I as of the last day of the most recent Plan Year for which the Plan was a Top Heavy Plan.

ARTICLE III

Minimum Benefit Accrual

If a Participant is a Non-Key Employee during any Top Heavy Plan Year, he shall accrue a minimum annual benefit in the form of a single life annuity (or the Actuarial Equivalent of such annuity) commencing as of the first day of the month following his Normal Retirement Date equal to two percent of his Top Heavy Average Compensation multiplied by the number of Top Heavy Plan Years in which he completes a year of Benefit Service as a Non-Key Employee up to a maximum of 10 years.

In the event a Participant's pension payments are suspended as a result of his remaining in or returning to the employ of an Affiliated Company on or after his Normal Retirement Date, his minimum annual benefit shall be increased to the Actuarial Equivalent of such benefit at his Normal Retirement Date to reflect the nonpayment of benefits during such period.

For purposes of satisfying the minimum benefit requirements of Code Section 416(c)(1) and the Plan, in determining years of service with the Company, any service with the Company or any Related Employer shall be disregarded to the extent that such service occurs during a Plan Year when the Plan benefits (within the meaning of Code Section 410(b)) no Key Employee or former Key Employee.

APPENDIX I-2

INTERNAL REVENUE CODE REQUIREMENTS
FOR CALCULATION AND PAYMENT OF BENEFITS

The following provisions will apply for purposes of determining required minimum distributions for calendar years beginning with the 2003 calendar year, and will take precedence over any inconsistent provisions of the Plan.  All distributions required under this Section will be determined and made in accordance with the Treasury regulations under Code Section 401(a)(9).  Distributions may still be made under a designation made before January 1, 1984, in accordance with Section 242(b)(2) of TEFRA.  For purposes of the following provisions, (1) life expectancy shall be as computed by use of the Single Life Table in Section 1.401(a)(9)-9 of the Treasury regulations, (2) the term "designated Beneficiary" shall refer to the individual who is designated as the Beneficiary under the Plan and is the designated Beneficiary under Code Section 401(a)(9) and Section 1.401(a)(9)-1, Q&A-4, of the Treasury regulations, and (3) the term "distribution calendar year" shall refer to a calendar year for which a minimum distribution is required; for distributions beginning before the Participant's death, the first distribution calendar year is the calendar year immediately preceding the calendar year which contains the Participant's Required Beginning Date.  For distributions beginning after the Participant's death, the first distribution calendar year is the calendar year in which distributions are required to begin pursuant to (2) below.

(1)  Required Beginning Date.  The Participant's entire interest will be distributed, or begin to be distributed, to the Participant no later than the Participant's Required Beginning Date.

(2)  Death of Participant Before Distributions Begin.  If the Participant dies before distributions begin, the Participant's entire interest will be distributed, or begin to be distributed, no later than as follows:

> (A)  If the Participant's surviving spouse is the Participant's sole designated Beneficiary, then, except as provided in paragraph (6), distributions to the surviving spouse will begin by December 31 of the calendar year immediately following the calendar year in which the Participant died, or by December 31 of the calendar year in which the Participant would have attained age 70 1/2, if later.

> (B)  If the Participant's surviving spouse is not the Participant's sole designated Beneficiary, then, except as provided in paragraph (6), distributions to the designated Beneficiary will begin by December 31 of the calendar year immediately following the calendar year in which the Participant died.

> (C)  If there is no designated Beneficiary as of September 30 of the year following the year of the Participant's death, the Participant's entire interest will be distributed by December 31 of the calendar year containing the fifth anniversary of the Participant's death.

> (D)  If the Participant's surviving spouse is the Participant's sole designated Beneficiary and the surviving spouse dies after the Participant but before distributions to the surviving spouse begin, this paragraph (2), other than subparagraph (A), will apply as if the surviving spouse were the Participant.

For purposes of this paragraph (2) and paragraph (5), distributions are considered to begin on the Participant's Required Beginning Date (or, if subparagraph (D) of paragraph (2) applies, the date distributions are required to begin to the surviving spouse under subparagraph (A)).  If annuity payments irrevocably commence to the Participant before the Participant's Required Beginning Date (or to the Participant's surviving spouse before the date distributions are required to begin to the surviving spouse under subparagraph (A)), the date distributions are considered to begin is the date distributions actually commence.

Unless the Participant's interest is distributed in the form of an annuity purchased from an insurance company or in a single sum on or before the Required Beginning Date, as of the first distribution calendar year distributions will be

-94-

made in accordance with paragraphs 3, 4 and 5 below.  If the Participant's interest is distributed in the form of an annuity purchased from an insurance company, distributions thereunder will be made in accordance with the requirements of Code Section 401(a)(9) and the Treasury regulations.  Any part of the Participant's interest which is in the form of an individual account described in Code Section 414(k) will be distributed in a manner satisfying the requirements of Code Section 401(a)(9) and the Treasury regulations that apply to individual accounts.

(3)  Determination of Amount to be Distributed Each Year.

(A)  General Annuity Requirements.  If the Participant's interest is paid in the form of annuity distributions under the Plan, payments under the annuity will satisfy the following requirements:

(i)  the annuity distributions will be paid in periodic payments made at intervals not longer than one year;

(ii)  the distribution period will be over a life (or lives) or over a period certain not longer than the period described in paragraph 4 or 5 below;

(iii)  once payments have begun over a period certain, the period certain will not be changed even if the period certain is shorter than the maximum permitted;

(iv)  payments will either be nonincreasing or increase only as follows:

1.  by an annual percentage increase that does not exceed the annual percentage increase in a cost-of-living index that is based on prices of all items and issued by the Bureau of Labor Statistics;

1.  to the extent of the reduction in the amount of the Participant's payments to provide for a survivor benefit upon death, but only if the Beneficiary whose life was being used to determine the distribution period described in paragraph 4 dies or is no longer the Participant's Beneficiary pursuant to a qualified domestic relations order within the meaning of Code Section 414(p);

1.  to pay cash refunds of employee contributions upon the Participant's death; or

(dd)  to pay increased benefits that result from a plan amendment.

(B)  Amount Required to be Distributed by Required Beginning Date.  The amount that must be distributed on or before the Participant's Required Beginning Date (or, if the Participant dies before distributions begin, the date distributions are required to begin under paragraph 2(A) or (B) above) is the payment that is required for one payment interval.  The second payment need not be made until the end of the next payment interval even if that payment interval ends in the next calendar year.  Payment intervals are the periods for which payments are received, e.g., bi-monthly, monthly, semi-annually, or annually.  All of the Participant's benefit accruals as of the last day of the first distribution calendar year will be included in the calculation of the amount of the annuity payments for payment intervals ending on or after the Participant's Required Beginning Date.

(C)  Additional Accruals After First Distribution Calendar Year.  Any additional benefits accruing to the Participant in a calendar year after the first distribution calendar year will be

-95-

distributed beginning with the first payment interval ending in the calendar year immediately following the calendar year in which such amount accrues.

(4)  Requirements For Annuity Distributions That Commence During Participant's Lifetime.

(A)  Joint Life Annuities Where the Beneficiary Is Not the Participant's Spouse.  If the Participant's interest is being distributed in the form of a joint and survivor annuity for the joint lives of the Participant and a nonspouse Beneficiary, annuity payments to be made on or after the Participant's required beginning date to the designated Beneficiary after the Participant's death must not at any time exceed the applicable percentage of the annuity payment for such period that would have been payable to the Participant using the table set forth in Q&A-2 of Section 1.401(a)(9)-6T of the Treasury regulations, or such guidance as may replace such table.  If the form of distribution combines a joint and survivor annuity for the joint lives of the Participant and a nonspouse Beneficiary and a period certain annuity, the requirement in the preceding sentence will apply to annuity payments to be made to the designated Beneficiary after the expiration of the period certain.

(B)  Period Certain Annuities.  Unless the Participant's spouse is the sole designated Beneficiary and the form of distribution is a period certain and no life annuity, the period certain for an annuity distribution commencing during the Participant's lifetime may not exceed the applicable distribution period for the Participant under the Uniform Lifetime Table set forth in Section 1.401(a)(9)-9 of the Treasury regulations for the calendar year that contains the annuity starting date.  If the annuity starting date precedes the year in which the Participant reaches age 70, the applicable distribution period for the Participant is the distribution period for age 70 under the Uniform Lifetime Table set forth in Section 1.401(a)(9)-9 of the Treasury regulations plus the excess of 70 over the age of the Participant as of the Participant's birthday in the year that contains the annuity starting date.  If the Participant's spouse is the Participant's sole designated Beneficiary and the form of distribution is a period certain and no life annuity, the period certain may not exceed the longer of the Participant's applicable distribution period, as determined under this paragraph 4(B), or the joint life and last survivor expectancy of the Participant and the Participant's spouse as determined under the Joint and Last Survivor Table set forth in Section 1.401(a)(9)- 9 of the Treasury regulations, using the Participant's and spouse's attained ages as of the Participant's and spouse's birthdays in the calendar year that contains the annuity starting date.

(5)  Requirements For Minimum Distributions Where Participant Dies Before Date Distributions Begin.

(A)  Participant Survived by Designated Beneficiary.  If the Participant dies before the date distribution of his or her interest begins and there is a designated Beneficiary, the Participant's entire interest will be distributed, beginning no later than the time described in paragraph 2(A) or (B) above, over the life of the designated Beneficiary or over a period certain not exceeding:

(i)  unless the annuity starting date is before the first distribution calendar year, the life expectancy of the designated Beneficiary determined using the Beneficiary's age as of the Beneficiary's birthday in the calendar year immediately following the calendar year of the Participant's death; or

(ii)  if the annuity starting date is before the first distribution calendar year, the life expectancy of the designated Beneficiary determined using the Beneficiary's age as of the Beneficiary's birthday in the calendar year that contains the annuity starting date.

(B)  <u>No Designated Beneficiary</u>.  If the Participant dies before the date distributions begin and there is no designated Beneficiary as of September 30 of the year following the year of the Participant's death, distribution of the Participant's entire interest will be completed by December 31 of the calendar year containing the fifth anniversary of the Participant's death.

(C)  Death of Surviving Spouse Before Distributions to Surviving Spouse Begin.  If the Participant dies before the date distribution of his or her interest begins, the Participant's surviving spouse is the Participant's sole designated Beneficiary, and the surviving spouse dies before distributions to the surviving spouse begin, this paragraph 5 will apply as if the surviving spouse were the Participant, except that the time by which distributions must begin will be determined without regard to paragraph 2(A) above.

(6)  <u>Election as to the 5-year rule</u>.  Participants or Beneficiaries may elect on an individual basis whether the 5-year rule or the life expectancy rule in paragraphs (2) and (5) above applies to distributions after the death of a Participant who has a designated Beneficiary.  The election must be made no later than the earlier of September 30 of the calendar year in which distribution would be required to begin under paragraph (2) above, or by September 30 of the calendar year which contains the fifth anniversary of the Participant's (or, if applicable, surviving spouse's) death.  If neither the Participant nor Beneficiary makes an election under this paragraph, distributions will be made in accordance with paragraphs (2) and (5) above..

APPENDIX I-3

CODE SECTION 436 LIMITATIONS

1.      <u>Limitations Applicable If the Plan's AFTAP Is 60-80%</u>.

Notwithstanding any other provisions of the Plan, if the Plan's AFTAP for a Plan Year is less than 80 percent (or would be less than 80 percent to the extent described in Section 1(b) below) but is not less than 60 percent, then the limitations set forth in this Section 1 apply.

      (a)      <u>50 Percent Limitation on Single Sum Payments, Other Accelerated Forms of Distribution, and Other Prohibited Payments</u>.  A Participant or Beneficiary is not permitted to elect, and the Plan shall not pay, a single sum payment or other optional form of benefit that includes a prohibited payment with an annuity starting date on or after the applicable Code Section 436 measurement date, and the Plan shall not make any payment for the purchase of an irrevocable commitment from an insurer to pay benefits or any other payment or transfer that is a prohibited payment, unless the present value of the portion of the benefit that is being paid in a prohibited payment does not exceed the lesser of:

           (i)      50 percent of the present value of the benefit payable in the optional form of benefit that includes the prohibited payment; or

           (ii)      100 percent of the PBGC maximum benefit guarantee amount (as defined in §1.436-1(d)(3)(iii)(C) of the Treasury Regulations).

The limitation set forth in this Section 1(a) does not apply to any payment of a benefit which under Code Section 411(a)(11) may be immediately distributed without the consent of the Participant.  If an optional form of benefit that is otherwise available under the terms of the Plan is not available to a Participant or Beneficiary as of the annuity starting date because of the application of the requirements of this Section 1(a), the Participant or Beneficiary is permitted to elect to bifurcate the benefit into unrestricted and restricted portions (as described in §1.436-1(d)(3)(iii)(D) of the Treasury Regulations).  The Participant or Beneficiary may also elect any other optional form of benefit otherwise available under the Plan at that annuity starting date that would satisfy the limitations described above in (i) and (ii), or may elect to defer the benefit in accordance as provided under the Plan.

During a period when Section 1(a) applies to the Plan, and to the extent permitted and determined by the Administrative Committee, Participants and Beneficiaries are permitted to elect payment in any optional form of benefit otherwise available under the Plan that provides for the current payment of the unrestricted portion of the benefit (as described in § 1.436-1(d)(3)(iii)(D) of the Treasury Regulations), with a delayed commencement for the restricted portion of the benefit (subject to other applicable requirements, such as Code Sections 411(a)(11) and 401(a)(9)).

      (b)      <u>Plan Amendments Increasing Liability for Benefits</u>.  No amendment to the Plan that has the effect of increasing liabilities of the Plan by reason of increases in benefits, establishment of new benefits, changing the rate of benefit accrual, or changing the rate at which benefits become nonforfeitable shall take effect in a Plan Year if the AFTAP for the Plan Year is:

           (i)      Less than 80 percent; or

           (ii)      80 percent or more, but would be less than 80 percent if the benefits attributable to the amendment were taken into account in determining the AFTAP.

The limitation set forth in this Section 1(b) does not apply to any amendment to the Plan that provides a benefit increase under a Plan formula that is not based on compensation, provided that the rate of such increase does not exceed the contemporaneous rate of increase in the average wages of Participants covered by the amendment.

2.      <u>Limitations Applicable If the Plan's AFTAP Is Less Than 60 Percent</u>.

Notwithstanding any other provisions of the Plan, if the Plan's AFTAP for a Plan Year is less than 60 percent (or would be less than 60 percent to the extent described in Section 2(b) below), then the limitations in this Section 2 apply.

(a)      Single Sums, Other Accelerated Forms of Distribution, and Other Prohibited Payments Not Permitted.  A Participant or Beneficiary is not permitted to elect, and the Plan shall not pay, a single sum payment or other optional form of benefit that includes a prohibited payment with an annuity starting date on or after the applicable Code Section 436 measurement date, and the Plan shall not make any payment for the purchase of an irrevocable commitment from an insurer to pay benefits or any other payment or transfer that is a prohibited payment.  The limitation set forth in this Section 2(a) does not apply to any payment of a benefit which under Code Section 411(a)(11) may be immediately distributed without the consent of the Participant.

(b)      Shutdown Benefits and Other Unpredictable Contingent Event Benefits Not Permitted to Be Paid. An unpredictable contingent event benefit with respect to an unpredictable contingent event occurring during a Plan Year shall not be paid if the AFTAP for the Plan Year is:

(i)      Less than 60 percent; or

(ii)      60 percent or more, but would be less than 60 percent if the AFTAP were redetermined applying an actuarial assumption that the likelihood of occurrence of the unpredictable contingent event during the Plan Year is 100 percent.

(c)      Benefit Accruals Frozen.  Benefit accruals under the Plan shall cease as of the applicable Code Section 436 measurement date.  In addition, if the Plan is required to cease benefit accruals under this Section 2(c), then the Plan is not permitted to be amended in a manner that would increase the liabilities of the Plan by reason of an increase in benefits or establishment of new benefits.

3.      Limitations Applicable If the Company Is In Bankruptcy.  Notwithstanding any other provisions of the Plan, a Participant or Beneficiary is not permitted to elect, and the Plan shall not pay, a single sum payment or other optional form of benefit that includes a prohibited payment with an annuity starting date that occurs during any period in which the Company is a debtor in a case under title 11, United States Code, or similar Federal or State law, except for payments made within a Plan Year with an annuity starting date that occurs on or after the date on which the Plan's enrolled actuary certifies that the Plan's AFTAP for that Plan Year is not less than 100 percent.  In addition, during such period in which the Company is a debtor, the Plan shall not make any payment for the purchase of an irrevocable commitment from an insurer to pay benefits or any other payment or transfer that is a prohibited payment, except for payments that occur on a date within a Plan Year that is on or after the date on which the Plan's enrolled actuary certifies that the Plan's AFTAP for that Plan Year is not less than 100 percent.  The limitation set forth in this Section 3 does not apply to any payment of a benefit which under Code Section 411(a)(11) may be immediately distributed without the consent of the Participant.

4.      Provisions Applicable After Limitations Cease to Apply.

(a)      Resumption of Prohibited Payments.  If a limitation on prohibited payments under  the above Section 1(a), Section 2(a), or Section 3 applied to the Plan as of a Code Section 436 measurement date, but that limit no longer applies to the Plan as of a later Code Section 436 measurement date, then that limitation does not apply to benefits with annuity starting dates that are on or after that later Code Section 436 measurement date.

In addition, after the Code Section 436 measurement date on which the limitation on prohibited payments under Section 1(a) or Section 2(a) ceases to apply to the Plan, and to the extent permitted and determined by the Administrative Committee, any Participant or Beneficiary who had an annuity starting date within the period during which that limitation applied to the Plan is permitted to make a new election (within 90 days after the Code Section 436 measurement date on which the limit ceases to apply or, if later, 30 days after receiving notice of the right to make such election) under which the form of benefit previously elected is modified at a new annuity starting date to be changed to a single sum payment (if, otherwise available to such Participant or Beneficiary under the terms of the Plan) for the remaining value of the Participant or Beneficiary's benefit under the Plan, subject to the other rules in this Appendix I-3 and applicable requirements of Code Section 401(a), including spousal consent.

Case: 4:25-cv-00096-CMS    Doc. #: 21-1    Filed: 06/06/25    Page: 105 of 278 PageID #: 949

(b)      Resumption of Benefit Accruals.  If a limitation on benefit accruals under Section 2(c) applied to the Plan as of a Code Section 436 measurement date, but that limitation no longer applies to the Plan as of a later Code Section 436 measurement date, then benefit accruals shall resume prospectively and that limitation does not apply to benefit accruals that are based on service on or after that later Code Section 436 measurement date, except as otherwise provided under the Plan.  The Plan shall comply with the rules relating to partial years of participation and the prohibition on double proration under Department of Labor regulation 29 CFR § 2530.204-2(c) and (d).

In addition, benefit accruals that were not permitted to accrue because of the application of Section 2(c) shall be restored when that limitation ceases to apply if the continuous period of the limitation was 12 months or less and the Plan's enrolled actuary certifies that the AFTAP for the Plan Year would not be less than 60 percent taking into account any restored benefit accruals for the prior Plan Year.

(c)      Shutdown and Other Unpredictable Contingent Event Benefits.  If an unpredictable contingent event benefit with respect to an unpredictable contingent event that occurs during the Plan Year is not permitted to be paid after the occurrence of the event because of the limitation of Section 2(b), but is permitted to be paid later in the same Plan Year (as a result of additional contributions or pursuant to the enrolled actuary's certification of the AFTAP for the Plan Year that meets the requirements of § 1.436-1(g)(5)(ii)(B) of the Treasury Regulations), then that unpredictable contingent event benefit shall be paid, retroactive to the period that benefit would have been payable under the terms of the Plan (determined without regard to Section 2(b)).  If the unpredictable contingent event benefit does not become payable during the Plan Year in accordance with the preceding sentence, then the Plan is treated as if it does not provide for that benefit.

(d)      Treatment of Plan Amendments That Do Not Take Effect.  If a Plan amendment does not take effect as of the effective date of the amendment because of the limitation of Section 1(b) or Section 2(c), but is permitted to take effect later in the same Plan Year (as a result of additional contributions or pursuant to the enrolled actuary's certification of the AFTAP for the Plan Year that meets the requirements of § 1.436-1(g)(5)(ii)(C) of the Treasury Regulations), then the Plan amendment must automatically take effect as of the first day of the Plan Year (or, if later, the original effective date of the amendment).  If the Plan amendment cannot take effect during the same Plan Year, then it shall be treated as if it were never adopted, unless the Plan amendment provides otherwise.

5.      Notice Requirement.  If the Plan has become subject to a limitation described in Section 1(a), Section 2, or Section 3, the Administrative Committee shall provide any applicable notices required under Code Section 436 or ERISA in a timely manner.

6.      Methods to Avoid or Terminate Benefit Limitations.  In accordance with Code Section 436 and other applicable guidance, the Company may (but is not required to) take such actions to avoid or terminate the application of the limitations set forth in Sections 1 through 3 for a Plan Year.

7.      Special Rules.

(a)      Rules of Operation for Periods Prior to and After Certification of Plan's AFTAP.  To the extent determined by the Company, for any period during which a presumption under Code Section 436(h) and § 1.436-1(h) of the Treasury Regulations applies to the Plan, the limitations under Sections 1 through 3 are applied to the Plan as if the AFTAP for the Plan Year were the presumed AFTAP determined under the rules of Code Section 436(h) and § 1.436-1(h)(1), (2), or (3) of the Treasury Regulations.

(b)      Plan Termination and Other Special Rules.

(i)      Plan Termination.  The limitations on prohibited payments in Section 1(a), Section 2(a), and Section 3 do not apply to prohibited payments that are made to carry out the termination of the Plan in accordance with applicable law.  Any other limitations under such sections do not cease to apply as a result of termination of the Plan.

(ii)      Special Rules Relating to Unpredictable Contingent Event Benefits and Plan Amendments Increasing Benefit Liability.  During any period in which none of the presumptions referenced under Section 7(a) apply to the Plan and the Plan's enrolled actuary has not yet issued a certification of the Plan's AFTAP for the Plan Year, the limitations under Section 1(b) and Section

-100-

2(b) shall be based on the inclusive presumed AFTAP for the Plan, calculated in accordance with the rules of § 1.436-1(g)(2)(iii) of the Treasury Regulations.

(c)        <u>Special Rules Under PRA 2010</u>.

(i)        Payments Under Social Security Leveling Options.  For purposes of determining whether the limitations under Section 1(a) or 2(a) apply to payments under a social security leveling option, within the meaning of Code Section 436(j)(3)(C)(i), the AFTAP for a Plan Year shall be determined in accordance with the "Special Rule for Certain Years" under Code Section 436(j)(3).

(ii)        Limitation on Benefit Accruals.  For purposes of determining whether the accrual limitation under Section 2(c) applies to the Plan, the AFTAP for a Plan Year shall be determined in accordance with the "Special Rule for Certain Years" under Code Section 436(j)(3) (except as provided under section 203(b) of the Preservation of Access to Care for Medicare Beneficiaries and Pension Relief Act of 2010, if applicable).

(d)        <u>Interpretation of Provisions</u>.  The limitations imposed by this Appendix I-3 shall be interpreted and administered in accordance with Code Section 436 and any other applicable guidance.  This  Appendix I-3 is intended to impose restrictions only to the extent required under Code Section 436 and any other applicable guidance, and shall be applied and interpreted accordingly.

8.        <u>Definitions</u>.  The definitions in the following Treasury Regulations apply for purposes of Sections 1 through 7:

(a)        § 1.436-1(j)(1) defining "AFTAP";

(b)        § 1.436-1(j)(2) defining "annuity starting date";

(c)        § 1.436-1(j)(6) defining "prohibited payment";

(d)        § 1.436-1(j)(8) defining "Code Section 436 measurement date"; and

(e)        § 1.436-1(j)(9) defining an "unpredictable contingent event" and an "unpredictable contingent event benefit".

9.        <u>Effective Date</u>.  Appendix I-3 is effective for Plan Years beginning after December 31, 2007.

APPENDIX J

PARTICIPATING EMPLOYING COMPANIES OR FACILITIES AND PRIOR PLAN PROVISIONS

**AMENDED AND RESTATED AS OF AUGUST 1, 2020**

This Appendix J lists all participating Employing Companies or facilities and (1) the Prior Plan, if any, applicable to each facility or Employing Company; and (2) the benefits and special provisions applicable to Participants employed at each facility or Employing Company.

In the event that the provisions of this Appendix J are inconsistent with the terms contained in the rest of the Plan, the provisions contained in this Appendix J shall control.  In addition, notwithstanding anything contained in the Plan to the contrary, to the extent the Board of Directors adopts any special provisions relating to an Employing Company, including, but not limited to, the crediting of service under the Plan for employment with an Employing Company (or other predecessor employer) prior to the time the Employing Company becomes an Affiliated Company, such provisions shall take precedence over the provisions of the Plan.

In the event that an Eligible Employee transfers employment from one Employing Company to another Employing Company, and participation in the applicable benefit structures for such Employing Companies are frozen, the Eligible Employee's benefit (if any) under the Plan shall be determined under the applicable provisions of the benefit structure for the original Employing Company.

Notwithstanding anything in the Plan to the contrary, to the extent that a Participant is eligible to receive benefits under more than one benefit structure under this Plan or Appendix J (or any benefit structure contained in the Prior Plan not otherwise in this Plan, or in any other qualified defined benefit pension plan of an Employing Company) due to any transfer, the Participant shall not be eligible to receive benefits from more than one benefit structure for the same period of service with the Employing Company.  Similarly, nothing in the Plan or in any Appendix shall result in the double counting of service (whether Benefit Service, Creditable Service or any other type of service) for the same time period in determining the period of service of a Participant.

*Execution Version*

**OLIN CORPORATION EMPLOYEES
PENSION PLAN**

**APPENDIX J
AMENDED AND RESTATED AUGUST 1, 2020**

**PARTICIPATING EMPLOYING COMPANIES OR FACILITIES
AND PRIOR PLAN PROVISIONS**

TABLE OF CONTENTS

|  | Page |
|---|---|
| J-1 Beaumont | 1 |
| J-2 Bloomington/FMP | 3 |
| J-3 Brandenburg/Doe Run | 6 |
| J-4 Bridgeport Brass | 8 |
| J-5 Brook Park | 10 |
| J-6 Bryan Metals | 13 |
| J-7 Certain Defense Operations Non-Bargaining Unit Employees | 16 |
| J-8 Chase Brass & Copper (Hourly) | 20 |
| J-9 Cuba | 28 |
| J-10 East Alton | 30 |
| J-11 GOCO | 37 |
| J-12 Joliet | 38 |
| J-13 Lake Charles | 40 |
| J-14 Leavitt Tube (Chicago Steelworkers) | 44 |
| J-15 Leavitt Tube (Production Tube Finishing) | 48 |
| J-16 Livonia | 51 |
| J-17 Manteca | 53 |
| J-18 Marion | 54 |
| J-19 McIntosh | 56 |
| J-20 Nazareth/Hi-Pure | 58 |
| J-21 Niagara Falls | 61 |
| J-22 Niagara Falls/Niachlor | 62 |
| J-23 OCG/OMM | 71 |
| J-24 Olin Corporate Group | 75 |
| J-25 Oster Caribe/Puerto Rico | 91 |
| J-26 Historically Oster Employees (Hourly) | 94 |
| J-27 Historically Oster Employees (Salaried) | 97 |
| J-28 Pioneer (Henderson) | 104 |
| J-29 Pioneer (Tacoma) | 111 |
| J-30 Pioneer (Non-Bargaining) | 118 |
| J-31 St. Marks | 126 |
| J-32 Shreveport | 128 |
| J-33 Wadsworth | 130 |
| J-34 Warwick | 131 |
| J-35 Waterbury(Somers) | 134 |
| J-36 Waterbury Rolling Mills(Non-Bargained) | 136 |
| J-37 Waterbury Rolling Mills(Bargained) | 139 |
| J-38 Dow (DEPP PPA Component Transferees) | 143 |
| J-39 Dow (UCEPP PPA Component Transferees) | 149 |
| J-40 Dow (DEPP PEP Component Transferees) | 155 |

*J-41 Dow (UCEPP PEP Component Transferees)*                                    161
*J-42 Dow (Rom & Haas Transferees)*                                            167
***closed or currently inactive locations, or frozen appendices, are in italics***

**APPENDIX J**

APPENDIX J-1

### *J-1 Beaumont*

This Appendix J-1 shall apply to all Eligible Employees working at the Beaumont, Texas facility who are covered by a collective bargaining agreement between the Company (or an Affiliated Employer) and Oil, Chemical & Atomic Workers' International Union, AFL-CIO, Local 4-243.  With respect to these employees, the Beaumont facility shall be deemed to be the Employing Company.

(a)     **Prior Plans**. Prior to March 31, 1995, the Bargaining Employees Pension Plan of Olin Corporation.  Prior to January 1, 1990, the Beaumont Retirement Plan (originally effective January 1, 1973) as in effect through December 31, 1988 and as restated in the Bargaining Employees Pension Plan of Olin Corporation through December 31, 1989.

(b)     **Eligibility**.  An individual shall become a Participant as of the date he becomes an Eligible Collectively Bargained Employee of the Employing Company.

(c)     **Normal Retirement Allowance.**  A Participant's annual normal Retirement Allowance commencing on or after his Normal Retirement Date shall be equal to the appropriate flat benefit rate, based on the group in which he was classified immediately preceding his termination as indicated in the table below, multiplied by his years of Benefit Service.

| Termination Effective Date | Flat Benefit Rate | | |
|---|---|---|---|
| | Group A | Group B | Group C |
| On or after January 1,1989, but before January 1, 1990 | $234 | $222 | $210 |
| On or after January 1, 1990, but before January 1,1991 | $246 | $234 | $222 |
| On or after January 1, 1991, but before January 1, 1994 | $282 | $270 | $258 |
| On or after January 1, 1994, but before January 1, 1997 | $360 | $348 | $336 |
| On or after January 1, 1997 | $408 | $396 | $384 |

Group A shall include all employees in the following job classifications:  Regenerator Operator, Assistant Regenerator Operator, Instrument Man, and Repairman-Welder.  Group B shall include all employees in the following job classifications:  Utility Mechanic, Pumper, and Assistant Instrument Man.  Group C shall include all employees in the following job classifications:  Laborer and Janitor.

(d)     **Early Retirement Allowance.**  A Participant who while in the employ of the Employing Company attains age 55 and is credited with at least 20 Years of Creditable Service may elect to retire and receive Early Retirement benefits in accordance with Section 3.2(c) of the Plan.

(e)     **Vested Deferred Retirement Allowance**.  A Participant whose employment has terminated may elect to receive Vested Deferred Retirement benefits in accordance with Section 3.3(b) of the Plan.

(f)     **Disability Retirement Allowance.**  Not Available.

(g)     **Lump-Sum Death Benefit.**  None.

**APPENDIX J-1, BEAUMONT**

J-1

(h)   **Special Rules for Crediting Service and Computing Retirement Allowances**.

Participants who transfer to and become employees of Arch Chemicals, Inc. (or a subsidiary thereof) (collectively, "Arch") on or before February 8, 2000, and who are defined as Arch Employees (see below) in the Employee Benefits Allocation Agreement between Olin Corporation and Arch Chemicals, Inc. (the "Agreement") shall cease to accrue benefits under this Plan as the date they terminate employment with Olin and transfer to Arch. As soon as administratively feasible on or after the spin-off of Arch from Olin and as provided in the Agreement, assets and liabilities relating to such Participants' Accrued Benefits under this Plan shall be transferred to and assumed by a qualified defined benefit plan sponsored by Arch. Thereafter, no benefits shall be payable to or on account of any Arch Employee under this Plan, and neither the Plan nor any Employing Company shall have any further liability with respect to the Accrued Benefit of any Arch Employee.

The Agreement defines an Arch Employee as any individual who, as of the Distribution Date or at any time thereafter but on or before February 8, 2000, is identified on the records of Arch as being an employee of any member of the Arch Group of businesses, including individuals then receiving any long-term disability benefits whose most recent employment was with a line of business that became a part of the Arch Group, but excluding any individual who received a notice of lay-off from Olin or a Related Employer prior to the Distribution Date.

Any Arch Employee whose Accrued Benefit under this Plan was transferred to the defined benefit plan established by Arch, and who is subsequently employed by Olin or another Employing Company shall have their past Creditable Service with Olin and its Related Employers re-credited for purposes of determining such Arch Employee's eligibility to participate, vesting and attainment of retirement dates, provided that such Creditable Service would be re-credited under the normal operation of the Plan's Break-in-Service rules; however, such Arch Employee shall not receive credit for past Benefit Service with respect to benefit accrual, and their Compensation and Average Compensation shall be determined based upon Compensation received from Olin on and after their re-employment by Olin. No service credit shall be given with respect to their period of employment with Arch, and no compensation paid by Arch shall be counted for purposes of determining such Arch Employee's Accrued Benefit under the Plan.

**APPENDIX J-1, BEAUMONT**

J-2

APPENDIX J-2

### *J-2 Bloomington/FMP*

This Appendix J-2 shall apply to all Eligible Employees working at the Bloomington, Illinois facility who are covered by a collective bargaining agreement between the Company (or an Affiliated Employer) and the International Association of Machinists & Aerospace Workers, AFL-CIO (DeWitt Lodge No. 852).  With respect to these employees, the Bloomington facility shall be deemed to be the Employing Company.

(a)     **Prior Plans**.  Prior to March 31, 1995, the Bargaining Employees Pension Plan of Olin Corporation.  Prior to January 1, 1990, the Fabricated Metal Products Hourly Pension Plan (originally effective January 1, 1987) as in effect through December 31, 1988 and as restated in the Bargaining Employees Pension Plan of Olin Corporation through December 31, 1989.

(b)     **Eligibility**.  An individual shall become a Participant as of the date he becomes an Eligible Collectively Bargained Employee of the Employing Company.

(c)     **Normal Retirement Allowance.**  A Participant's annual normal Retirement Allowance commencing on or after his Normal Retirement Date shall be equal to the sum of the following:

(1)     For terminations commencing prior to January 1, 1992:

(i)     $159 multiplied by his Years of Benefit Service, up to a maximum of 15 years;

(ii)     $183 multiplied by his Years of Benefit Service in excess of 15 up to a maximum of 30 years;

(iii)     $207 multiplied by his Years of Benefit Service in excess of 30;

(2)     For terminations commencing on or after January 1, 1992 but before January 1, 1993:

(i)     $165 multiplied by his Years of Benefit Service, up to a maximum of 15 years;

(ii)     $189 multiplied by his Years of Benefit Service in excess of 15 up to a maximum of 30 years;

(iii)     $213 multiplied by his Years of Benefit Service in excess of 30;

(3)     For terminations commencing on or after January 1, 1993 but before January 1, 1994:

(i)     $171 multiplied by his Years of Benefit Service, up to a maximum of 15 years;

(ii)     $195 multiplied by his Years of Benefit Service in excess of 15 up to a maximum of 30 years;

(iii)     $219 multiplied by his Years of Benefit Service in excess of 30;

(4)     For terminations commencing on or after January 1, 1994:

(i)     $177 multiplied by his Years of Benefit Service, up to a maximum of 15 years;

(ii)     $201 multiplied by his Years of Service in excess of 15 up to a maximum of 30 years;

**APPENDIX J-2, BLOOMINGTON/FMP**

(iii)      $225 multiplied by his Years of Service in excess of 30;

provided, however, in all cases, that if such Participant was a Participant in the Prior Plan, his benefits under this Plan shall be reduced by the offset described in the Prior Plan.

(d)    **Early Retirement Allowance.**

(1)    A Participant who while in the employ of the Employing Company attains age 55 and has at least 10 Years of Creditable Service may elect to retire and receive Early Retirement benefits in accordance with Section 3.2(c) of the Plan, provided, however, that if such Allowance commences prior to the first day of the month immediately following the Participant's 65th birthday, the Allowance shall be reduced by 1/3 of 1% for each full calendar month by which his Benefit Commencement Date precedes the first day of the month immediately following his 65th birthday until and including the month in which he attains age 60 and further reduced by 1/4 of 1% for each full calendar month by which his Benefit Commencement Date precedes the first day of the month in which he attains age 60.

(2)    <u>Special Early Retirement Allowance</u>.  Any Participant who while in the employ of an Employing Company

(i)      has completed 30 Years of Creditable Service and attained age 60, or

(ii)      is on lay-off for a period of at least six months or as a result of a permanent shut-down of a plant or facility and has either (A) attained age 55 and the sum of his attained age and years of Benefit Service equals at least 75, or (B) the sum of his attained age and years of Benefit Service equals at least 80,

may elect to retire and receive a special early Retirement Allowance commencing as of the first day of the month coincident or next following his actual retirement.  Such Allowance shall equal his Accrued Benefit determined as of his date of retirement, unreduced for commencement prior to age 65, plus $275 per month for each month from his date of retirement until the first day of the calendar month in which he attains age 62.

(e)    **Vested Deferred Retirement Allowance**.  A Participant whose employment has terminated may elect to receive Vested Deferred Retirement benefits in accordance with Section 3.3(b) of the Plan, provided, however, that such Allowance shall be reduced by 5/9ths of one percent for each month by which such Allowance commences prior to age 65 but before age 60 and shall be reduced to the percentage shown in the following table if such Allowance commences after the Participant attains age 55 but before he attains age 60.

| Attained Age | Percentage Payable |
|---|---|
| 55 | 41.5% |
| 56 | 44.9% |
| 57 | 48.6% |
| 58 | 52.8% |
| 59 | 57.4% |

(f)    **Disability Retirement Allowance.**  A Participant who has been credited with at least 10 Years of Creditable Service and who thereafter becomes Totally and Permanently Disabled while in the employ of the Employing Company shall receive an Disability Retirement Allowance equal to his Accrued Benefit as of his date of Total and Permanent Disability unreduced for commencement prior to age 65 and commencing as of the first day of the month coincident with or following his date of disability, provided, however, that if the Totally and Permanently Disabled Participant is not eligible for disability benefits under

**APPENDIX J-2, BLOOMINGTON/FMP**

the Social Security Act, his Disability Retirement Allowance under this Plan shall be 200% of the amount determined under the preceding sentence.

(g)      **Lump-Sum Death Benefit.**  None.

**APPENDIX J-2, BLOOMINGTON/FMP**

J-5

APPENDIX J-3

### *J-3 Brandenburg/Doe Run*

This Appendix J-3 shall apply to all Eligible Employees working at the Brandenburg, Kentucky facility who are covered by a collective bargaining agreement between the Company (or an Affiliated Employer) and the International Brotherhood of Electrical Workers, Local 369, the International Guards Union of America, Local 15, AFL-CIO, the International Brotherhood of Firemen & Oilers, Local 320, and the United Association of Journeymen & Apprentices of the Plumbing and Pipefitting Industry, Local 522.  With respect to these employees, the Brandenburg facility shall be deemed to be the Employing Company.

(a)    **Prior Plans**. Prior to March 31, 1995, the Bargaining Employees Pension Plan of Olin Corporation.  Prior to January 1, 1990, the Doe Run Retirement Plan (originally effective February 1, 1969) as in effect through December 31, 1988 and as restated in the Bargaining Employees Pension Plan of Olin Corporation through December 31, 1989.

(b)    **Eligibility**.  An individual shall become a Participant as of the date he becomes an Eligible Collectively Bargained Employee of the Employing Company.

(c)    **Normal Retirement Allowance.**  A Participant's annual normal Retirement Allowance commencing on or after his Normal Retirement Date shall be equal to:

(1)    For terminations occurring on or after February 1, 1989 and prior to September 1, 1992, $264 multiplied by his Years of Benefit Service;

(2)    As of April 1, 1993 for terminations commencing on or after September 1, 1992 and before January 1, 1997, $360 multiplied by his Years of Benefit Service;

(3)    For terminations occurring on or after January 1, 1997, $456 multiplied by his Years of Benefit Service.

(d)    **Early Retirement Allowance.**  A Participant who while in the employ of the Employing Company attains age 55 and is credited with at least 10 Years of Creditable Service may elect to retire and receive Early Retirement benefits in accordance with Section 3.2(c) of the Plan.

(e)    **Vested Deferred Retirement Allowance**.  A Participant whose employment has terminated may elect to receive Vested Deferred Retirement benefits in accordance with Section 3.3(b) of the Plan.

(f)    **Disability Retirement Allowance.**  Not Available.

(g)    **Lump-Sum Death Benefit.**  The Beneficiary of a Participant shall be eligible for a lump-sum death benefit as described in Section 5.2 of the Plan in the amount of $4,000 prior to January 1, 1997 and $5,000 on or after January 1, 1997.

(h)    **Special Rules for Crediting Service and Computing Retirement Allowances**.

Participants who transfer to and become employees of Arch Chemicals, Inc. (or a subsidiary thereof) (collectively, "Arch") on or before February 8, 2000, and who are defined as Arch Employees (see below) in the Employee Benefits Allocation Agreement between Olin Corporation and Arch Chemicals, Inc. (the "Agreement"), shall cease to accrue benefits under this Plan as the date they terminate employment with Olin and transfer to Arch.  As soon as administratively feasible on or after the spin-off of Arch from Olin

and as provided in the Agreement, assets and liabilities relating to such Participants' Accrued Benefits under this Plan shall be transferred to and assumed by a qualified defined benefit plan sponsored by Arch. Thereafter, no benefits shall be payable to or on account of any Arch Employee under this Plan, and neither the Plan nor any Employing Company shall have any further liability with respect to the Accrued Benefit of any Arch Employee.

The Agreement defines an Arch Employee as any individual who, as of the Distribution Date or at any time thereafter but on or before February 8, 2000, is identified on the records of Arch as being an employee of any member of the Arch Group of businesses, including individuals then receiving any long-term disability benefits whose most recent employment was with a line of business that became a part of the Arch Group, but excluding any individual who received a notice of lay-off from Olin or a Related Employer prior to the Distribution Date.

Any Arch Employee whose Accrued Benefit under this Plan was transferred to the defined benefit plan established by Arch, and who is subsequently employed by Olin or another Employing Company shall have their past Creditable Service with Olin and its Related Employers re-credited for purposes of determining such Arch Employee's eligibility to participate, vesting and attainment of retirement dates, provided that such Creditable Service would be re-credited under the normal operation of the Plan's Break-in-Service rules; however, such Arch Employee shall not receive credit for past Benefit Service with respect to benefit accrual, and their Compensation and Average Compensation shall be determined based upon Compensation received from Olin on and after their re-employment by Olin.  No service credit shall be given with respect to their period of employment with Arch, and no compensation paid by Arch shall be counted for purposes of determining such Arch Employee's Accrued Benefit under the Plan.

**APPENDIX J-3, BRANDENBURG/DOE RUN**

J-7

APPENDIX J-4

### J-4 *Bridgeport Brass*

This Appendix J-4 shall apply to all Eligible Employees working at the Indianapolis, Indiana facility who are covered by a collective bargaining agreement between the Bridgeport Brass, Inc. (or an Affiliated Employer) and the United Steelworkers of America on behalf of its Local 1999-14.  With respect to these employees, the Bridgeport Brass Company shall be deemed to be the Employing Company.  The Indianapolis, Indiana facility was closed as of March 31, 2003, and thereafter no employee covered by this Appendix J-4 accrued any additional benefits.

(a)  **Prior Plans**. Prior to March 31, 1995, the Bargaining Employees Pension Plan of Olin Corporation.  Prior to January 1, 1990, Bridgeport Brass Hourly Pension Plan (a.k.a., Pension Plan for Indianapolis Hourly Employees of Bridgeport Brass Company) (originally effective January 1, 1969) as in effect through December 31, 1988 and as restated in the Bargaining Employees Pension Plan of Olin Corporation through December 31, 1989.

(b)  **Eligibility**.  An individual shall become a Participant as of the date he becomes an Eligible Collectively Bargained Employee of the Employing Company.

(c)  **Normal Retirement Allowance.**  A Participant's annual normal Retirement Allowance commencing on or after his Normal Retirement Date shall be equal to the appropriate flat benefit rate specified in the table below multiplied by his Years of Benefit Service.

| Termination Effective Date | Flat Benefit Rate |
|---|---|
| On or after January 1, 1989, but before January 1, 1990 | $210 |
| On or after January 1, 1990, but before January 1, 1991 | $216 |
| On or after January 1, 1991, but before January 1, 1994 | $222 |
| On or after January 1, 1994, but before January 1, 1995 | $240 |
| On or after January 1, 1995, but before January 1, 1996 | $258 |
| On or after January 1, 1996, but before January 1, 1997 | $264 |
| On or after January 1, 1997, but before January 1, 1998 | $288 |
| On or after January 1, 1998, but before January 1, 1999 | $300 |
| On or after January 1, 1999, but before January 1, 2000 | $312 |
| On or after January 1, 2000, but before January 1, 2001 | $330 |
| On or after January 1, 2001, but before January 1, 2002 | $348 |
| On or after January 1, 2002, but before January 1, 2003 | $384 |
| On or after January 1, 2003, but before January 1, 2004 | $402 |
| On or after January 1, 2004, but before January 1, 2005 | $420 |
| On or after January 1, 2005, but before January 1, 2006 | $432 |
| On or after January 1, 2006 | $444 |

(d)  **Early Retirement Allowance.**  A Participant who while employed by the Employing Company (i) attains age 55 and is credited with at least 20 Years of Creditable Service, or (ii) attains age 62 and is credited with at least 15 Years of Service, may elect to retire and receive Early Retirement benefits in accordance with Section 3.2(c) of the Plan.

(e)  **Vested Deferred Retirement Allowance**.  A Participant whose employment has terminated may elect to receive Vested Deferred Retirement benefits in accordance with Section 3.3(b) of the Plan.

(f)  **Disability Retirement Allowance.**  A Participant who has been credited with at least 10 Years of Creditable Service and who thereafter becomes Totally and Permanently Disabled while in the employ of

**APPENDIX J-4, BRIDGEPORT BRASS**

J-8

the Employing Company may retire and receive a Disability Retirement Allowance equal to his Accrued Benefit as of his date of Total and Permanent Disability (unreduced for early commencement).  Such Allowance shall be payable as of the Participant's Disability Retirement Date, which shall be the first of the month following the later of the date the Employee has been Totally and Permanently Disabled for five months or the date the Employee's Totally and Permanently Disabled is established.

(g)    **Lump-Sum Death Benefit.**  None.

(h)    **Special Rules Concerning Crediting of Service.**

(1)    For purposes of determining Periods of Creditable Service, Years of Benefit Service and Breaks in Service, service shall be credited for periods prior to September 1, 1989 in accordance with the provisions of the May 5, 1984 Pension Agreement between Bridgeport Brass Company and the United Steelworkers of America on behalf of Local 4266, except that any full calendar month spent on strike during the period May 7, 1989 through August 18, 1989 is not credited.

(2)    An Employee's Severance from Service Date shall be the earlier of (i) the date the Employee quits, is discharged, retired or dies, and (ii) the second anniversary of the date of the Employee's layoff or authorized leave of absence.

(3)    For service on or after September 1, 1989, each Employee shall be credited with one-twelfth of a Year of Creditable Service and one-twelfth of a Year of Benefit Service for each calendar month in which the Employee is credited with an Hour of Service for the Company, including authorized periods of personal leave of absence and up to two years for periods of layoff or sick leave.

**APPENDIX J-4, BRIDGEPORT BRASS**

J-9

APPENDIX J-5

### J-5 *Brook Park*

This Appendix J-5 shall apply to Eligible Employees working at the Brook Park, Ohio facility who are covered by a collective bargaining agreement between the Company (or an Affiliated Employer) and the Teamsters Union Local 415.  With respect to these employees, the Brook Park facility shall be deemed to be the Employing Company.

The Brook Park facility was closed by Olin in 1990, and thereafter no employee covered by this Appendix J-5 accrued any additional benefits.  The Brook Park Pension Plan was merged into this Plan effective January 1, 1990.  Although the Brook Park facility did not become an Employing Company under this Plan until January 1, 1990, this plan document incorporates and restates the applicable provisions of the Prior Plan effective as of January 1, 1989.

(a) **Prior Plan**. Prior to March 31, 1995, the Non-Bargaining Employees Pension Plan of Olin Corporation. Prior to January 1, 1990, the Brook Park Pension Plan (originally effective January 1, 1978) as in effect through December 31, 1988 and as restated in the Non-Bargaining Employees Pension Plan of Olin Corporation through December 31, 1989.

(b) **Eligibility**.  An individual who (1) is included in the bargaining unit represented by Teamsters Union Local 415 at the Brook Park facility; (2) receives compensation other than a pension, retirement allowance, retainer of fee under contract; and (3) is not a leased employee shall become a Participant as of the date he becomes an Eligible Collectively Bargained Employee of the Employing Company.

(c) **Normal Retirement Allowance**.  A Participant's annual normal Retirement Allowance commencing on or after his Normal Retirement Date shall be equal to the appropriate flat benefit rate multiplied by his years of Benefit Service.

   (1) If a Participant's termination is effective on or after August 1, 1988 but prior to August 1, 1989, the flat benefit rate shall be $132.

   (2) If a Participant's termination is effective on or after August 1, 1989 but prior to August 1, 1990, the flat benefit rate shall be $138 per month.

   (3) If a Participant's termination is effective on or after August 1, 1990, the flat benefit rate shall be $156.

(d) **Early Retirement Allowance**.  A participant who while in the employ of the Employing Company attains age 55 and is credited with at least 20 Years of Creditable Service may elect to retire and receive Early Retirement benefits in accordance with Section 3.2(c) of the Plan, provided, however, that

   (1) if the Participant elects a Benefit Commence Date prior to his 65th birthday, such Retirement Allowance shall be equal to 60% of his Accrued Benefit as of his date of retirement plus 1/3 of 1% for each full calendar month which has elapsed from the first day of the month following the month in which the Participant attains age 55 to the month in which his first Early Retirement Allowance payment is due; and

   (2) The special service crediting rule of Section 3.2(a) for employees who are at least age 52 shall not apply to these Participants.

(e) **Vested Deferred Retirement Allowance**.  A Participant whose employment has terminated may elect to receive Vested Deferred Retirement benefits in accordance with Section 3.3(b) of the Plan, provided,

**APPENDIX J-5, BROOK PARK**

however, that any election to receive an Early Vested Deferred Retirement Allowance must be made within 90 days after the Participant attains age 55.

(f)     **Disability Retirement Allowance**.  A Participant who has attained age 40 (but not age 65) and been credited with at least 10 Years of Creditable Service who becomes Totally and Permanently Disabled while in the employ of the Employing Company may apply for a Disability Retirement Allowance.  Such Allowance shall be paid on the first day of a calendar month not less than thirty nor more than 90 days following such application if the Administrative Committee finds that the Participant is Totally and Permanently Disabled.

(1)     The Participant may elect one of the following annual Disability Retirement Allowances:

(i)(A)     prior to the time the Participant attains age 65, a percentage of the Participant's basic annual rate of compensation in effect at the time the Participant becomes Totally and Permanently Disabled, which percentage shall equal 20% plus an additional one-half of one percent for each Year of Benefit Service in excess of 10 but not in excess of thirty, provided, however, that such allowance shall not be less than $720 per year; and

(B)     upon attainment of age 65, a deferred vested retirement allowance as provided in paragraph (e), above, computed by treating the date that the Participant is deemed to be Totally and Permanently Disabled as though it were the Participant's date of termination of service; or

(ii)     the Actuarial Equivalent (based on the factors contained in Appendix D or H, as appropriate) of the vested deferred Retirement Allowance described in paragraph (e), above, commencing immediately.

(2)     Notwithstanding the foregoing, the Disability Retirement Allowance described in paragraph (f)(1), above, shall be reduced by an amount equal to the "maximum offset percentage" of any permanent and total disability or similar benefits payable to the Participant under any disability program of the United States or any state thereof or any foreign government; provided, however, that payments due under Workers' Compensation laws or as Veterans Disability Pensions shall not be included in the computation of such reduction.  For purposes of the preceding sentence, "Maximum Offset Percentage" means an amount equal to:

(i)     64% (or the maximum percentage which subsequently may be permitted under administrative rules or regulations promulgated by the Internal Revenue Service) of permanent and total disability or similar benefits payable to the Participant under any disability program of the United States; and

(ii)     100% (or the maximum percentage which subsequently may be permitted under administrative rules or regulations promulgated by the Internal Revenue Service) of any permanent or total disability or similar benefits payable to the Participant under any disability program of one of the United States or any foreign government, subject to prior approval of the Internal Revenue Service.

(3)     For purposes of this paragraph (f), Totally and Permanently Disabled shall mean disabled from bodily injury or disease (other than injury or disease which (i) resulted from or consists of habitual drunkenness or addition to narcotics, or (ii) was incurred, suffered or occurred while the employee was engaged in, or resulted from his having engaged in, a criminal enterprise, or (iii) was intentionally self-inflicted, or (iv) arose out of service in the Armed Forces of any country) by reason of which the employee is totally incapacitated, mentally or physically, for the further performance of duty, which incapacity is likely to be permanent.

**APPENDIX J-5, BROOK PARK**

J-11

(4)  Any question as to whether a Participant applying for or receiving a Disability Retirement Allowance is Totally and Permanently Disabled shall be determined by the Administrative Committee, taking into account the medical opinion of one or more physicians designated by the Corporation.  Any Participant receiving a Disability Retirement Allowance shall be required to submit to a physical examination by one or more physicians designated by the Corporation at any time, but not more often than semi-annually, whenever such examination shall be requested by the Administrative Committee.  If any Participant shall refuse to submit to any physical examination properly requested in accordance with this paragraph (f), his Disability Retirement Allowance shall not be granted by the Administrative Committee, or if previously granted, shall be discontinued.  If it appears from such medical examination that a Participant receiving a Disability Retirement Allowance who has not attained age 65 has regained his earning capacity, his allowance may be discontinued by the Administrative Committee, or if such disability has been partly removed and his earning capacity regained in part, his allowance may be reduced proportionately by the Administrative Committee.  If the allowance of any such Participant is discontinued or reduced, and if he again suffers disability and again loses his earning capacity, he shall be entitled to apply to the Administrative Committee to have his original allowance restored, and the Administrative Committee may, in its discretion, restore all or part thereof.  If any such Participant shall be restored to active service as an employee, he shall be treated as if he had been re-employed after retirement as set forth in Section 3.7 of the Plan.

(g)  **Lump-Sum Death Benefit**.  Not applicable.

(h)  **Special Rules for Crediting Service and computing Retirement Allowances**.

(1)  For service prior to January 1, 1989, a Participant's period of Benefit and Creditable Service shall include all service (including special prior service credit) credited on the records of the Prior Plan.

(2)  A Participant shall be credited with a Year of Benefit Service for each Plan Year in which the Participant is credited with 1,950 Hours of Service.  A Participant shall be credited with a fractional Year of Benefit Service for each Plan Year in which the Participant is credited with less than 1,950 Hours of Service; such fraction shall equal the Participant's actual Hours of Service for such Plan Year divided by 1,950.

**APPENDIX J-5, BROOK PARK**

APPENDIX J-6

### *J-6 Bryan Metals*

This Appendix J-6 shall apply to all Eligible Employees working at the Bryan, Ohio facility who are covered by a collective bargaining agreement between Bryan Metals, Inc. (or an Affiliated Employer) and the United Steelworkers of America, AFL-CIO-CLC.  With respect to these employees, Bryan Metals, Inc. shall be deemed to be the Employing Company.  Bryan Metals became an Employing Company, and these provisions shall be effective, as of January 1, 1990.  Notwithstanding anything in the Plan to the contrary, effective as of December 31, 2006, participation and benefit accruals under this Appendix J-6 shall be frozen, and Participants shall not accrue any additional benefits hereunder after such date.  However, the Plan will continue to recognize Periods of Creditable Service in determining the Participant's vesting and attainment of retirement dates hereunder.

(a)     **Prior Plans**. Prior to March 31, 1995, the Bargaining Employees Pension Plan of Olin Corporation.

(b)     **Eligibility**.  An individual shall become a Participant as of the date he becomes an Eligible Collectively Bargained Employee of the Employing Company; provided, however, that no individual shall become a Participant hereunder on or after January 1, 2007.

(c)     **Normal Retirement Allowance.**  A Participant's annual normal Retirement Allowance commencing on or after his Normal Retirement Date shall be equal to the appropriate flat benefit rate specified in the table below multiplied by his Years of Benefit Service credited for periods of service after January 1, 1990. Years of Benefit Service shall be frozen as of December 31, 2006, and no additional Years of Benefit Service shall accrue thereafter for any Participant.

| Termination Effective Date | Flat Benefit Rate |
|---|---|
| On or after January 1, 1990 and prior to January 1, 1994 | $192 |
| On or after January 1, 1994 and prior to January 1, 1995 | $204 |
| On or after January 1, 1995 and prior to January 1, 1996 | $210 |
| On or after January 1, 1996 and prior to January 1, 1997 | $216 |
| On or after January 1, 1997 and prior to January 1, 1998 | $240 |
| On or after January 1, 1998 and prior to January 1, 1999 | $252 |
| On or after January 1, 1999 and prior to January 1, 2000 | $264 |
| On or after January 1, 2000 and prior to January 1, 2001 | $282 |
| On or after January 1, 2001 and prior to January 1, 2002 | $300 |
| On or after January 1, 2002 and prior to January 1, 2003 | $336 |
| On or after January 1, 2003 and prior to January 1, 2004 | $360 |
| On or after January 1, 2004 and prior to January 1, 2005 | $372 |
| On or after January 1, 2005 and prior to January 1, 2006 | $384 |
| On or after January 1, 2006 | $408 |

(d)     **Early Retirement Allowance.**  A Participant who while in the employ of the Employing Company attains age 55 and is credited with at least 20 Years of Creditable Service or attains age 62 and is credited with at least 15 Years of Creditable Service may elect to retire and receive Early Retirement benefits in accordance with Section 3.2(c) of the Plan.

(e)     **Vested Deferred Retirement Allowance**.  A Participant whose employment has terminated may elect to receive Vested Deferred Retirement benefits in accordance with Section 3.3(b) of the Plan.

(f)     **Disability Retirement Allowance.**

APPENDIX J-6, BRYAN METALS

J-13

(1)     If a Participant who has been credited with at least 10 Years of Creditable Service but has not yet attained his Normal Retirement Date becomes Totally and Permanently Disabled while in the employ of the Employing Company and is receiving disability benefits from the Social Security Administration, he may elect to receive a Disability Retirement Allowance commencing as of his Disability Retirement Date.  A Participant's Disability Retirement Date shall be the first day of the month following the later of the completion of five months of disability or the date the disability is established.

(2)     A Participant's Disability Retirement Allowance shall equal the Participant's Accrued Benefit as of his Disability Retirement Date unreduced for the period of time by which such allowance commences prior to the Participant's Normal Retirement Date.

(3)     If the Administrative Committee determines that a Participant is no longer Totally and Permanently Disabled, his Disability Retirement Allowance shall be discontinued and the Participant shall either return to active employment or shall be considered to have terminated service with the Company as of his Disability Retirement Date.  If such Participant fails to return to work for the Employing Company his right to, and amount of, future benefits under the Plan (*e.g.*, an Early Retirement Allowance or a Vested Deferred Retirement Allowance), shall be based on his Years of Benefit Service as of his Disability Retirement Date and the benefit rate in effect at the time of his Disability Retirement Date, but for purposes of calculating any reduction in such Allowance for the period of time by which it commences prior to the Participant's Normal Retirement Date, the Participant's age at the time such allowance commences shall be the applicable age.

(g)     **Lump-Sum Death Benefit.**  None.

(h)     **Special Rules for Crediting Service.**

(1)     For employees who retire prior to January 1, 1994, Years of Benefit Service and Periods of Creditable Service shall be measured from the later of the Participant's date of hire with the Employing Company or January 1, 1990 through to the Participant's next following Severance from Service Date, provided, however, that for Participants hired prior to January 1, 1990 (i) for purposes of qualifying for a Deferred Vested Retirement Allowance, Periods of Creditable Service shall include service from the Participant's date of hire, and (ii) for purposes of qualifying for an Early Retirement Allowance, Periods of Creditable Service shall include service from January 1, 1990.

(2)     For employees who retire on or after January 1, 1994, Years of Benefit Service and Periods of Creditable Service shall be measured from the later of the Participant's date of hire (or rehire) with the Employing Company through to the Participant's next following Severance from Service Date.

(3)     Each Eligible Employee will be credited with one-twelfth of a year of Benefit Service for each calendar month in which he is credited with an Hour of Service for the Employing Company.  Benefit Service will also be credited for authorized periods of personal leave-of-absence and for up to two years for periods of layoff or sick leave.

(4)     For employees who retire on or after January 1, 2002, Years of Benefit Service and Periods of Creditable Service shall be measured from September, 1988.  Such Service will apply to reduced early retirement, unreduced early retirement and disability retirement.  Notwithstanding the foregoing, Years of Benefit Service shall be frozen as of December 31, 2006, and no additional Years of Benefit Service shall accrue thereafter for any Participant.

**APPENDIX J-6, BRYAN METALS**

(5) This provision shall apply solely to the Participants who transfer directly to, and become employees of, Global Brass and Copper Acquisition Co. and its affiliates ("Global"), and who are defined as Transferred Employees under Article V of the Purchase Agreement between Global Brass and Copper Acquisition Co. and Olin Corporation dated as of October 15, 2007 (such Participants referred to in this Appendix J-6 as "Global Sale Bryan Metals Participants").  Global Sale Bryan Metals Participants shall continue to receive credit for service with Global in determining their Period of Creditable Service for purposes of vesting and eligibility to retire early under the terms of the Plan; provided, however, that (i) such service with Global shall not be credited for purposes of benefit accrual or Years of Benefit Service under the terms of the Plan, and (ii) no benefit shall be payable from this Plan until a Global Sale Bryan Metals Participant terminates service with Global (or if earlier, such Global Sale Bryan Metals Participant reaches age 65).

**APPENDIX J-6, BRYAN METALS**

APPENDIX J-7

### *J-7 Certain Defense Operations Non-Bargaining Unit Employees*

Effective as of December 31, 1996, this Appendix J-7 shall apply to all salaried and hourly non-collectively bargained employees of the following Employing Companies, except as otherwise provided below:

- **Olin Corporation**, but only with respect to the employees of the Aerospace Division (including former employees of Aerojet, Inc. and employees at Redmond, Washington and San Leandro, California);
- **Olin Aerospace Company** (including former employees of Rocket Research Company, Inc. and Pacific Electro Dynamics, Inc.); and
- **Physics International, Inc.**

(a)   **Prior Plan**.  Pension Plan for Certain Defense Operations Non-Bargaining Unit Employees (originally effective January 1, 1989), as in effect prior to its merger into this Plan (as of December 31, 1996).

(b)   **Eligibility**.  An individual shall become a Participant as of the date he both is an Eligible Non-Collectively Bargained Employee of the Employing Company and has completed one Year of Creditable Service.

(c)   **Normal Retirement Allowance**.  A Participant's annual normal Retirement Allowance commencing on or after his Normal Retirement Date shall be equal to the greater of (1) and (2) below:

(1)   an amount equal to the greater of (i) or (ii) below, reduced in the case of former Aerojet employees by such employee's Aerojet Plan Offset:

(i)   1.5% of the Participant's Average Compensation multiplied by the years (and fractions thereof) of his Benefit Service, minus the lesser of (x) 1/70th of the Participant's Primary Social Security Benefit multiplied by the years (and fractions thereof) of his Benefit Service (up to a maximum of 35 years) or (y) 50% of the Participant's Primary Social Security Benefit multiplied by a fraction, the numerator of which is his actual number of years of Benefit Service, and the denominator of which the total number of years of Benefit Service, that he would have if he remained in the employ of an Employing Company until his Normal Retirement Date; or

(ii)   1% of the Participant's Average Compensation multiplied by the years (and fractions thereof) of his Benefit Service; or

(2)   an amount equal to the sum of:

(i)   the Participant's Olin Salaried Plan Benefit or Aerojet Service Benefit, if any; plus

(ii)   an amount equal to the greater of:  (A) 1.5% of the Participant's Average Compensation multiplied by the years (and fractions thereof) of his Benefit Service after December 31, 1988 (April 29, 1994, in the case of former Aerojet employees), minus the lesser of (x) 1/70th of the Participant's Primary Social Security Benefit multiplied by the years (and fractions thereof) of his Benefit Service after December 31, 1988 (April 29, 1994, in the case of former Aerojet employees), (up to

**APPENDIX J-7, CERTAIN DEFENSE**

J-16

a maximum of 35 years including years of benefit service credited under the Olin Salaried Plan) or (y) 50% of the Participant's Primary Social Security Benefit multiplied by a fraction, the numerator of which is his actual number of years of Benefit Service after December 31, 1988 (April 29, 1994, in the case of former Aerojet employees), and the denominator of which the total number of years of Benefit Service after December 31, 1988 (April 29, 1994, in the case of former Aerojet employees), that he would have if he remained in the employ of an Employing Company until his Normal Retirement Date; or (B) 1% of the Participant's Average Compensation multiplied by the years (and fractions thereof) of his Benefit Service after December 31, 1988 (April 29, 1994, in the case of former Aerojet employees).

Notwithstanding the foregoing, Participants whose Average Compensation determined as of December 31, 1993 is greater than One Hundred Fifty Thousand Dollars ($150,000.00) shall have their benefits under the Plan determined under the "fresh start with extended wear-away approach" permitted under Treasury Regulation 1.401(a)(4)-13, with compensation adjustments applied to the Participant's Accrued Benefit frozen as of December 31, 1993.  Accordingly, such Participant's minimum Accrued Benefit shall be equal to the sum of:

(A)  the Participant's frozen Accrued Benefit determined as of December 31, 1993 under this paragraph (c), adjusted for compensation increases thereafter, as permitted by Treasury Regulations, plus

(B)  the Participant's Accrued Benefit determined under this paragraph (c) for Benefit Service credited after 1993, using the new compensation limits in effect on and after January 1, 1994,

provided, however, that in no event shall such Participant's Accrued Benefit be less than that determined under this paragraph (c) using the new compensation limits in effect on and after January 1, 1994 and taking into account all of the Participant's Years of Benefit Service.

(d)  **Early Retirement Allowance**.  A Participant who while in the employ of the Company attains age 55 and is credited with at least 10 Years of Creditable Service may elect to retire and receive Early Retirement benefits in accordance with Section 3.2(c) of the Plan.

(e)  **Vested Deferred Retirement Allowance**.  A Participant whose employment has terminated may elect to receive Vested Deferred Retirement Benefits in accordance with Section 3.3(b) of the Plan.

(f)  **Disability Retirement Allowance**.  In the event a Participant who has not attained his Normal Retirement Date becomes Disabled while in the employ of an Employing Company, he shall continue to participate in the Plan and to accrue Benefit Service while he is Disabled and such period of disability shall be included in his Period of Creditable Service.  For the purposes of computing his Retirement Allowance, such Employee shall be considered as having continued to receive throughout the period during which he was Disabled the basic annual rate of salary he was receiving on the date he became Disabled.  Any question as to whether a Participant is, or continues to be, Disabled shall be determined by the Administrative Committee.  Any Participant who shall refuse to submit to any physical examination properly requested shall no longer be considered to be Disabled for purposes of this Plan.  At the time when the Administrative Committee determines that a Participant is no longer Disabled (or when such Participant reaches his Normal Retirement Date), the individual's participation in the Plan shall be terminated (unless he returns to active employment) and his right to a Retirement Allowance under the Plan shall be determined as of that date.  For purposes of determining such Participant's right to, and amount of, future benefits under the Plan, the Participant shall be credited with Benefit Service for the period of time he was Disabled and shall be deemed to have received throughout the period during which he was Disabled the regularly stated salary or wages he was

**APPENDIX J-7, CERTAIN DEFENSE**

J-17

receiving at the time he became Disabled.  If a Disabled Participant dies before attaining age sixty-five (65), his surviving spouse, if any, shall be entitled to a pre-retirement survivor annuity in accordance with Section 5.1 of the Plan.  Notwithstanding the foregoing, no Participant shall qualify for a Disability Retirement Allowance following his separation from service with the Company and all other Employing Companies, or during a period in which he is not actively employed by the Company or other Employing Companies.

(g)  **Lump-Sum Death Benefit**.  The Beneficiary of a Participant shall be eligible for a lump-sum death benefit of $5,000 as described in Section 5.2 of the Plan.  Notwithstanding the foregoing, Participants who transfer to, and become employees of, Primex Technologies, Inc. or its affiliates are not eligible for a lump-sum death benefit under this Section 5.2 on or after the date such Participant is no longer actively employed by the Company or any of its subsidiaries.

(h)  **Special Rules for Crediting Service and Computing Retirement Allowances.**

(1)  "Benefit Service" under this Plan shall include the Participant's Benefit Service as shown on the records of the Prior Plan, provided, however, that a Participant who was credited with Benefit Service under the terms of the Prior Plan for periods of time during which he was a participant in the Olin Salaried Plan and with respect to whom pension assets were transferred from the Olin Salaried Plan to the Prior Plan, shall not also be credited with such service under the terms of this Plan (as successor plan to the Olin Salaried Plan) for the same period of time.

(2)  "Period of Creditable Service" under this Plan shall include the Participant's Period of Creditable Service as shown on the records of the Prior Plan, provided, however, that a Participant who was credited with Creditable Service under the terms of the Prior Plan for periods of time during which he was a participant in the Olin Salaried Plan and with respect to whom pension assets were transferred from the Olin Salaried Plan to the Prior Plan, shall not also be credited with such service under the terms of this Plan (as successor plan to the Olin Salaried Plan) for the same period of time.

(3)  Refund of Accumulated Contributions.  Any Participant who made employee contributions under the Rockcor Plan may elect to receive a refund of his Accumulated Contributions (together with Compound Interest) upon his termination of employment with all Affiliated Companies in accordance with the terms of the Prior Plan.

(4)  "Aerojet Plan Offset" shall mean the Participant's accrued benefit under the Aerojet-General Corporation Consolidated Pension Plan (the "Aerojet Plan") in effect as of April 29, 1994, based on the terms of the Aerojet Plan as it existed on such date and the Participant's compensation and benefit service as of such date, reduced by using the applicable early payment factors in effect in the Aerojet Plan on April 29, 1994 (attached as Exhibits to the Prior Plan), with the amount of such reduction to be based on the age of the former Aerojet employee on the date he ultimately commences benefits under this Plan.  The amount of the Aerojet Plan Offset shall be determined without regard to when the Former Aerojet Employee actually commences benefits under the Aerojet Plan.

(5)  "Aerojet Service Benefit" shall mean the benefit accrued by a former Aerojet employee under the Aerojet Plan as of April 29, 1994 based on the terms of the Aerojet Plan as it existed on that date and the Employee's compensation and service as of that date, provided, however, that in determining whether an Employee is entitled to the subsidized early retirement factors, the Employee's age and service as of April 29, 1994 shall not be determinative, but rather, service with Olin and its affiliates shall be treated as service with

**APPENDIX J-7, CERTAIN DEFENSE**

J-18

Aerojet, and the amount of the reduction shall be based on the age of the former Aerojet employee as of the date he commences benefits under this Plan.

(6)     "Olin Salaried Plan" shall mean the Olin Salaried Pension Plan as in effect on December 31, 1988.

(7)     "Olin Salaried Plan Benefit" shall mean the Participant's accrued benefit under the Olin Salaried Plan as of December 31, 1988, based on the terms of the Olin Salaried Plan as it existed on such date and his compensation and benefit service determined on such date.

(8)     Salaried and hourly, non-bargained Participants who transfer directly to, and become employees of, Primex Technologies, Inc. and its affiliates ("Primex") in connection with Olin's divestment of its ordnance and aerospace divisions (or who transfer directly within five years following such divestment), shall continue to receive credit for their service with Primex in determining their Period of Creditable Service for purposes of vesting and eligibility to retire early under the terms of the Plan, expressly provided, however that (i) such service shall not be credited for purposes of benefit accrual under the terms of the Plan, (ii) such Participants' Compensation and Average Compensation for purposes of calculating their Retirement Allowance under the Plan shall take into account compensation paid by Primex and shall be determined as of their termination of service or retirement from Primex, and (iii) no benefit shall be payable from this Plan until the Participant terminates service with Primex. For purposes applying the service and compensation credit, and limitation on distribution provided by this paragraph, "Primex" shall be read to refer also to General Dynamics Ordnance and Tactical Systems, Inc. on and after January 25, 2001.

**APPENDIX J-7, CERTAIN DEFENSE**

J-19

APPENDIX J-8

### J-8 *Chase Brass & Copper (Hourly)*

This Appendix J-8 shall apply to all Eligible Employees who are hourly Employees of Chase Brass & Copper Company, Incorporated ("Chase Brass & Copper") covered by the collective bargaining agreement between Chase Brass & Copper (or an Affiliated Employer) and The United Steelworkers of America, Local No. 7248 (the "Union"). With respect to these Employees, Chase Brass & Copper shall be deemed to be the Employing Company.

Notwithstanding anything in the Plan to the contrary, effective as of August 31, 2007, participation and benefit accruals under this Appendix J-8 shall be frozen, and Chase Brass Participants shall not accrue any additional benefits hereunder after such date. However, the Plan will continue to recognize service in determining a Chase Brass Participant's vesting and attainment of retirement dates and death benefit eligibility hereunder.

(a)     **Prior Plan**. Chase Brass & Copper Company Hourly Pension Plan (originally adopted effective August 24, 1990), which was merged into the Olin Corporation Employees Pension Plan as of October 31, 2004.

(b)     **Eligibility**. An individual who was a participant in the Prior Plan as of October 31, 2004 shall become a Participant in the Plan on October 31, 2004. Any other individual shall become a Participant as of the later of (i) the date he becomes an Eligible Collectively Bargained Employee of the Employing Company covered under the collective bargaining agreement with the Union, or (ii) the date he has completed one Year of Creditable Service; provided, however, that no individual hired (or transferred into the employment status under item (i)) shall become a Participant hereunder on or after September 1, 2007. A Participant covered under this Appendix J-8 shall be referred to herein as a "Chase Brass Participant".

(c)     **Normal Retirement Allowance**. A Chase Brass Participant's monthly normal Retirement Allowance commencing on his Normal Retirement Date shall be equal to the flat Normal Retirement Rate in effect when he terminates service with the Employing Company (as indicated in the table below), multiplied by his years of Benefit Service. For purposes of determining the amount of a Chase Brass Participant's retirement benefit, years of Benefit Service shall be frozen as of August 31, 2007, and no years of Benefit Service shall accrue for such purposes thereafter for any Chase Brass Participant.

| Termination Date | Normal Retirement Rate |
|---|---|
| **Prior to June 27, 1993** | **$18.00** |
| **From June 27, 1993 to June 26, 1999** | **$20.00** |
| **From June 27, 1999 to June 24, 2000** | **$21.00** |
| **From June 25, 2000 to June 23, 2001** | **$22.00** |
| **From June 24, 2001 to June 22, 2002** | **$23.00** |
| **From June 23, 2002 to June 21, 2003** | **$24.00** |
| **From June 22, 2003 to May 31, 2004** | **$25.00** |
| **From June 1, 2004 to June 27, 2004** | **$26.00** |
| **From June 28, 2004 to June 26, 2005** | **$28.00** |
| **From June 27, 2005 to June 25, 2006** | **$29.00** |
| **On and after June 26, 2006** | **$30.00** |

For purposes of this Appendix, a Chase Brass Participant's Normal Retirement Date shall mean the later of (i) the date the Chase Brass Participant attains age 65 or (ii) the earlier of the fifth anniversary of the date on which he commences participation in the Prior Plan or the Plan.

Notwithstanding the preceding, to an extent a Chase Brass Participant transferred into employment resulting in such Chase Brass Participant not meeting the eligibility criteria described in (b) above, such Chase Brass Participant shall continue to accrue Creditable Service after such transfer, but shall not continue to accrue

Benefit Service after such transfer, and such Chase Brass Participant's normal Retirement Allowance shall be calculated with the benefit provisions at time of the transfer (and not at termination).

(d) **Early Retirement Allowance**. A Chase Brass Participant who while in the employ of the Employing Company attains age 60 and is credited with at least ten years of Benefit Service, may elect to retire early and receive a monthly early Retirement Allowance equal to the normal Retirement Allowance determined in Section (c) above), reduced by 1/180th for each month that his early retirement date precedes the month following his 65th birthday.

(e) **Vested Deferred Retirement Allowance**. A Chase Brass Participant who (i) terminates employment with the Employing Company or any Affiliated Company prior to being eligible to commence his early Retirement Allowance pursuant to Section (d) hereof, and (ii) after completing at least five years of Creditable Service, shall be eligible to receive a vested deferred Retirement Allowance as set forth below.

A Chase Brass Participant's monthly vested deferred Retirement Allowance shall commence as of the first day of the calendar month that follows the month in which the Chase Brass Participant attains his Normal Retirement Date and shall be determined pursuant to Section (c) above. In the case of a Chase Brass Participant who had at least ten years of Benefit Service, such Chase Brass Participant may elect to commence payment of his monthly vested deferred Retirement Allowance as of the first day of any calendar month on or after his attainment of age 60 and prior to his attainment of his Normal Retirement Date. If a Chase Brass Participant makes the election described in the immediately preceding sentence, his monthly vested deferred Retirement Allowance shall equal the normal Retirement Allowance determined in Section (c) above), actuarially reduced to reflect the commencement date occurring prior to Normal Retirement Date.

(f) **Disability Retirement Allowance**. A Chase Brass Participant, who, as of November 19, 2008, had retired under the Plan on account of his Permanent and Total Disability, shall continue to receive a disability Retirement Allowance under the Plan as provided herein. A disability Retirement Allowance is not available under the Plan to any other Chase Brass Participant.

The amount of a Chase Brass Participant's disability Retirement Allowance shall be determined as follows:

(i) With respect to any month for which a Chase Brass Participant, eligible for a disability Retirement Allowance hereunder, is not eligible for a Social Security Benefit, his disability Retirement Allowance shall be a monthly amount equal to two times the applicable Normal Retirement Rate (as indicated in the table in Section (c) hereof) in effect on the date his disability occurred, multiplied by his years of Benefit Service.

(ii) With respect to any month for which a Chase Brass Participant, eligible for a disability Retirement Allowance hereunder, is also eligible for a Social Security Benefit, his disability Retirement Allowance shall be a monthly benefit equal to one-half of the monthly benefit determined pursuant to Section (f)(i) hereof.

(iii) The disability Retirement Allowance, otherwise payable to any Chase Brass Participant hereunder, shall be reduced by the amount of any disability pension or benefit (other than a Social Security Benefit and other workmen's compensation benefits) which may hereafter be paid, or be payable upon application, to any such Chase Brass Participant under any law of the United States or any political subdivision thereof providing for the payment of benefits to individuals who are disabled to the extent that such benefits have been provided for by premiums, taxes, contributions or other payments paid by, or at the expense of, the Employing Company or any Affiliated Company.

**APPENDIX J-8 CHASE BRASS & COPPER (HOURLY)**

J-21

The disability Retirement Allowance described herein shall be first payable to any Chase Brass Participant eligible for a disability Retirement Allowance hereunder with respect to the month in which the Chase Brass Participant's Permanent and Total Disability has been established, provided that proper application has been made therefor.  Once such payments commence, they shall be paid monthly thereafter as of the first day of each succeeding month during his lifetime until the earlier of (1) the date his Permanent and Total Disability ceases, or (2) his Normal Retirement Date.

A Chase Brass Participant's disability Retirement Allowance shall be terminated:

(1) If the Chase Brass Participant engages in any gainful occupation or employment (except for purposes of rehabilitation or under circumstances determined to be compatible with the finding of Permanent and Total Disability); or

(2) When the Chase Brass Participant attains age 65, at which time a redetermination shall be made, and the monthly benefit payable for months thereafter shall be a normal Retirement Allowance, calculated in accordance with Section (c) hereof and based upon his disability retirement date and his Benefit Service as of such disability retirement date.

For purposes of this Appendix, Permanent and Total Disability shall mean a physical or mental condition resulting from bodily injury or disease, either occupational or non-occupational in cause, which the Administrative Committee finds, on the basis of competent medical advice as provided hereunder, will wholly and permanently prevent the Chase Brass Participant from engaging in any occupation or employment for wage or profit.  The term shall exclude, however, any such disability that, in the opinion of the medical authority as provided hereunder, (1) consists of chronic alcoholism or addiction to narcotics, (2) was the result of an intentionally self-inflicted injury, (3) was contracted or incurred while the Chase Brass Participant was engaged in, or resulted from his having engaged in, a felonious criminal enterprise, or (4) was the result of service in the armed forces of the United States or any country for which a military pension is payable.

The determination of Permanent and Total Disability or its nonexistence shall be made by a qualified physician retained or approved by the Administrative Committee, as shall also the determination of whether a Chase Brass Participant continues to be Permanently and Totally Disabled, and any such determination, unless disputed as hereinafter provided, shall be conclusive.  Any Chase Brass Participant receiving a disability Retirement Allowance shall be required to submit to a medical examination at any time during such retirement for the purpose of determining his condition whenever such examination is requested by the Administrative Committee but not more often than semi-annually.

If any determination with respect to Permanent and Total Disability shall be questioned by the Chase Brass Participant involved or by the Company or an Affiliated Company, the matter shall be resolved as follows: The Chase Brass Participant shall be examined by a physician appointed for this purpose by the Administrative Committee and by a physician appointed for the purpose by a duly authorized representative of the Union.  If the two physicians disagree as to whether the Chase Brass Participant is Permanently and Totally Disabled, the question shall be submitted to a third physician selected by the two physicians.  Before rendering his medical opinion, the third physician shall examine the Chase Brass Participant and consult with the other two physicians.  The medical opinion of the third physician shall conclusively resolve the question of Permanent and Total Disability.  The fees and expenses of the Administrative Committee's physician and the Union's physician shall be paid by Employing Company and the Union, respectively, and the fees and expenses of the third physician shall be shared equally by the Employing Company and the Union.

Notwithstanding the foregoing procedures for determining Permanent and Total Disability, the Administrative Committee may rely on a determination by the Social Security Administration that the Chase

**APPENDIX J-8 CHASE BRASS & COPPER (HOURLY)**

J-22

Brass Participant is disabled and is eligible for, and receiving benefits under, the Social Security Act for a cause other than as specified herein.

For purposes of this Appendix, Disability Retirement Age shall mean (1) the date on which a Chase Brass Participant who was Permanently and Totally Disabled prior to December 5, 1976, is credited with 15 or more years of Creditable Service, or (2) the date on which a Chase Brass Participant who was, or is, Permanently and Totally Disabled on or after December 5, 1976, is credited with ten or more years of Creditable Service.  Notwithstanding the preceding sentence, a Chase Brass Participant shall only reach Disability Retirement Age if he has not attained age 65.

For Purposes of this Appendix, Social Security Benefit shall mean an amount payable because of age or disability to an individual, based on his own account under the Federal Social Security Act as now in effect, or as hereafter amended, supplemented or superseded.

(g)     **Spouse's Death Benefit**.

(i) The provisions of Section 5.1 of the Plan shall be applicable to Chase Brass Participants.

(ii) Notwithstanding any provision of the Plan or this Appendix to the contrary, upon receipt of proof, satisfactory to the Administrative Committee, of the death of a Chase Brass Participant in active service after he has (1) attained age 45, but not age 55, and has completed at least 15 years of Benefit Service, or (2) has attained age 55 and completed at least ten years of Benefit Service, whichever is earlier, the death benefit payable to the Chase Brass Participant's spouse shall be the greater of (x) the benefit determined pursuant to Section 5.1 of the Plan, or (y) a monthly benefit equal to one-half the normal Retirement Allowance payable under Section (c) hereof, based upon the Chase Brass Participant's Benefit Service completed to the date of his death, payable in the form of a single life annuity for the life of the Chase Brass Participant's surviving spouse and commencing as of the first of the month next following the date of the Chase Brass Participant's death.

(h)     **Normal Form of Retirement Allowance**.  The provisions of Section 4.1 of the Plan shall apply to Chase Brass Participants with the following modifications:

(i) In lieu of the Actuarially Equivalent factors determined under Section 1.1 of the Plan, the actuarial reduction factors that shall be applied to the Chase Brass Participant's Normal Retirement Allowance to determine the Actuarially Equivalent value of a qualified joint and 50% survivor annuity shall be 14.80%, plus or minus 0.07% for each of the first 180 months by which the Chase Brass Participant's age is greater or less than, respectively, the age of his spouse.

(ii) In lieu of the qualified joint and 50% survivor annuity provided under Section 4.1 of the Plan, a Chase Brass Participant may also elect that his Retirement Allowance will be paid in the form of a qualified joint and 100% survivor annuity.  Such election shall be made in accordance with such procedures as may be established by the Administrative Committee from time to time and shall not require spousal consent.  The actuarial reduction for the qualified joint and 100% survivor annuity option shall be 25.80%, plus or minus 0.10% for each of the first 180 months by which the Chase Brass Participant's age is greater or less than, respectively, the age of his spouse.

(iii) A Chase Brass Participant who is receiving a disability Retirement Allowance pursuant to Section (f) hereof who is not entitled to a Social Security Benefit will receive a larger Retirement Allowance before age 65 than after age 65, as described in Section (f) hereof.  The excess of such larger Retirement Allowance over the Retirement Allowance which such Chase Brass Participant will receive for life is a supplemental pension which will not be reduced in accordance with section (h)(i) or (ii) hereof, and no part of which will be payable to a spouse.

**APPENDIX J-8 CHASE BRASS & COPPER (HOURLY)**

J-23

(i)      **Lump-Sum Death Benefit**.  None.

(j)      **Optional Forms of Payment**.  In lieu of the standard form of payment described in Section 4.1 of the Plan as modified by Section (h) hereof, a Chase Brass Participant may elect, in accordance with Section 4.3 of the Plan, to receive his Retirement Allowance in one of the following optional forms (with the below Option 4 effective for Plan Years after 2007):

> "Option 1 – 100% Contingent Annuitant Option."  A Retirement Allowance, reduced to an Actuarially Equivalent amount in accordance with Table A (as set forth in Section (l) hereof) that is payable during the Chase Brass Participant's life with the provision that, after his death, the same amount shall be paid during the life of, and to, the contingent annuitant designated by him in writing, duly acknowledged and filed with the Administrative Committee when he filed the option.

> "Option 2 – 50% Contingent Annuitant Option."  A Retirement Allowance, reduced to an Actuarially Equivalent amount in accordance with Table A (as set forth in Section (l) hereof) that is payable during the Chase Brass Participant's life with the provision that, after his death, a benefit of one-half the rate of his reduced benefit shall be paid during the life of, and to, the contingent annuitant designated by him in writing, duly acknowledged and filed with the Administrative Committee when he filed the option.

> "Option 3 – Straight Life Annuity Options."  A Retirement Allowance which provides the Chase Brass Participant with a monthly retirement income benefit for his lifetime in an amount determined under Section (c), (d), (e) or (f) hereof, whichever is applicable.

> "Option 4 – 75% Contingent Annuitant Option."  A Retirement Allowance, reduced to an Actuarially Equivalent amount in accordance with Table A (as set forth in Section (l) hereof) that is payable during the Chase Brass Participant's life with the provision that, after his death, a benefit of three-fourths the rate of his reduced benefit shall be paid during the life of, and to, the contingent annuitant designated by him in writing, duly acknowledged and filed with the Administrative Committee when he filed the option.

(k)      **Special Rules for Crediting Service and Computing Retirement Allowances**.

> (i) For service prior to October 31, 2004, a Chase Brass Participant's service shall include all service credited on the records of the Prior Plan.

> (ii) For purposes of this Appendix, a Chase Brass Participant's years of Benefit Service shall be expressed in years and computed in accordance with the following:

>> (1) Computations shall be made to the nearest one-twelfth (1/12th) year;

>> (2) Benefit Service shall be computed at the rate of one full year for each calendar year during which the Chase Brass Participant shall have been compensated by the Employing Company as an Eligible Collectively Bargained Employee for 1,700 or more hours (any overtime or premium-paid hours for this purpose being treated as straight-time hours).  If compensated hours shall be less than 1,700 in any calendar year, Benefit Service with respect to such year shall be reduced proportionately, except as may be provided in any applicable strike settlement agreement, and provided that, in no event, shall his Benefit Service be less than one-twelfth (1/12th) of a year for each calendar month during which the Chase Brass Participant shall have been compensated as an Eligible Collectively Bargained Employee by the Employing Company for at least one hour.

**APPENDIX J-8 CHASE BRASS & COPPER (HOURLY)**

J-24

(3) In computing compensated "hours" for the foregoing purposes:

(A) Time paid a Chase Brass Participant for holidays not worked shall be computed at the rate of eight hours per day;

(B) Non-worked vacation time shall be computed at the rate of eight hours per day;

(C) A Chase Brass Participant, absent from work because of, either (i) an injury or disease sustained in the course of his employment and with respect to which he receives workmen's compensation, or (ii) an injury or disease not sustained in the course of his employment and for which he receives disability benefits from a plan or policy maintained by the Company or any Affiliated Company, shall receive Benefit Service at the rate of eight hours per day but not to exceed forty hours per week (or such lesser number of hours as would have been his normally scheduled hours per week) for the period with respect to which such workmen's compensation or disability benefits, as applicable, were paid to him;

(D) A Chase Brass Participant who is absent from work because of Union business shall, upon written request from the Union filed with the Employing Company at least once each month, receive Benefit Service for such hours or absence from work at the rate of eight hours a day but not to exceed forty hours a week;

(E) An hour for which a Chase Brass Participant was entitled to Compensation shall be treated as a compensated hour whether or not Compensation was actually paid; and

(F) An hour for which back pay is awarded, or agreed to, by the Company or any Affiliated Company, irrespective of mitigation of damages, shall be treated as a compensated hour during the period to which the award or agreement pertains rather than during the period in which it is paid. In the case of payment which is not calculated on the basis of units of time, the number of compensated hours shall be equal to the amount of the payment divided by the Chase Brass Participant's most recent hourly rate of Compensation before the period to which the payment pertains. In the case of a Chase Brass Participant whose Compensation is determined on the basis of a fixed rate for a specified period of time other than hourly, the Chase Brass Participant's hourly rate of Compensation shall be the Chase Brass Participant's rate of Compensation for the specified period of time divided by the number of hours regularly scheduled for the performance of duties during such period of time. In the case of an Chase Brass Participant whose Compensation is not determined on the basis of a fixed rate for a specified period of time, the Chase Brass Participant's hourly rate or Compensation shall be the lowest hourly rate of Compensation paid to employees in the same job classification as that of the Chase Brass Participant or, if no employees in the same job classification have an hourly rate, the minimum wage, as established from time to time under section 6(a)(1) of the Fair Labor Standards Act of 1938, as amended.

(4) Except as otherwise required by the Uniformed Services Employment and Reemployment Rights Act of 1994, a Chase Brass Participant who enters, or entered, the active armed forces of the United States, Coast Guard or Merchant Marine Service

**APPENDIX J-8 CHASE BRASS & COPPER (HOURLY)**

J-25

of the United States and who has, or had, reemployment rights under applicable law and complies, or complied, with the requirements of such law as to reemployment and is, or was, reemployed, shall be deemed to be, or have been, on military leave and shall receive Benefit Service at the rate of 40 hours per week for the period of such military leave.

(5) A Chase Brass Participant's Benefit Service shall include his Benefit Service credited under the BP America Inc. Master Hourly Plan for Represented Employees or any earlier plan that was merged into such plan by BP America, Inc. that covered individuals who are now Chase Brass Participants in this Plan.

(6) Notwithstanding anything in the Plan to the contrary, for purposes of determining the amount of a Chase Brass Participant's retirement benefit (including the benefit amounts determined in the above sections (c), (d), (e), (f), and (g) of this Appendix J-8), years of Benefit Service shall be frozen as of August 31, 2007, and no years of Benefit Service shall accrue for such purposes thereafter for any Chase Brass Participant.

(7) This paragraph shall apply solely to the Chase Brass Participants who transfer directly to, and become employees of, Global Brass and Copper Acquisition Co. and its affiliates ("Global"), and who are defined as Transferred Employees under Article V of the Purchase Agreement between Global Brass and Copper Acquisition Co. and Olin Corporation dated as of October 15, 2007 (such Chase Brass Participants referred to herein as "Global Sale Chase Brass Participants"). Global Sale Chase Brass Participants shall continue to receive credit for service with Global in determining service solely for purposes of determining the Global Sale Chase Brass Participant's vesting and attainment of retirement dates and death benefit eligibility; provided, however, that (i) such service with Global shall not be credited for purposes of benefit accrual or determining the amount of a Global Sale Chase Brass Participant's retirement benefit under the Plan, and (ii) no benefit shall be payable from this Plan until a Global Sale Chase Brass Participant terminates service with Global (or if earlier, such Global Sale Chase Brass Participant reaches age 65).

(l)     **Actuarial Equivalence**.  For purposes of the determination of Actuarially Equivalent forms of benefit under this Appendix, where the conversion to an Actuarially Equivalent form is described herein by reference to Table A of this Section, the basis for determining a benefit of Actuarially Equivalent form shall be five percent interest and the mortality table of Table A below.

## TABLE A

*Unisex Mortality Rates (qx)*

| Age | qx | Age | qx | Age | qx |
|-----|-----|-----|-----|-----|-----|
| 15 | .000437 | 46 | .003476 | 77 | .067281 |
| 16 | .000449 | 47 | .003912 | 78 | .073594 |
| 17 | .000462 | 48 | .004388 | 79 | .080381 |
| 18 | .000476 | 49 | .004899 | 80 | .087379 |
| 19 | .000492 | 50 | .005447 | 81 | .094620 |
| 20 | .000510 | 51 | .006028 | 82 | .102291 |
| 21 | .000530 | 52 | .006643 | 83 | .110217 |
| 22 | .000551 | 53 | .007292 | 84 | .118300 |
| 23 | .000574 | 54 | .007974 | 85 | .126636 |
| 24 | .000600 | 55 | .008686 | 86 | .135112 |
| 25 | .000630 | 56 | .009433 | 87 | .143853 |
| 26 | .000661 | 57 | .010246 | 88 | .152939 |
| 27 | .000697 | 58 | .011222 | 89 | .162360 |

**APPENDIX J-8 CHASE BRASS & COPPER (HOURLY)**

J-26

| | | | | | |
|---|---|---|---|---|---|
| 28 | .000735 | 59 | .012339 | 90 | .171925 |
| 29 | .000779 | 60 | .013566 | 91 | .181540 |
| 30 | .000826 | 61 | .014884 | 92 | .191159 |
| 31 | .000879 | 62 | .016313 | 93 | .202213 |
| 32 | .000937 | 63 | .017940 | 94. | .213847 |
| 33 | .001001 | 64 | .019848 | 95 | .225606 |
| 34 | .001072 | 65 | .022039 | 96 | .237845 |
| 35 | .001149 | 66 | .024489 | 97 | .250464 |
| 36 | .001234 | 67 | .027117 | 98 | .263183 |
| 37 | .001330 | 68 | .030073 | 99 | .277103 |
| 38 | .001434 | 69 | .033411 | 100 | .291676 |
| 39 | .001551 | 70 | .036978 | 101 | .306416 |
| 40 | .001695 | 71 | .040512 | 102 | .322302 |
| 41 | .001888 | 72 | .043950 | 103 | .339564 |
| 42 | .002124 | 73 | .047471 | 104 | .357727 |
| 43 | .002404 | 74 | .051328 | 105 | .376187 |
| 44 | .002723 | 75 | .055828 | 106 | .487097 |
| 45 | .003080 | 76 | .061243 | 107 | .609135 |
| | | | | 108 | .737310 |
| | | | | 109 | .876941 |
| | | | | 110 | 1.000000 |

**APPENDIX J-8 CHASE BRASS & COPPER (HOURLY)**

J-27

APPENDIX J-9

## J-9 *Cuba*

This Appendix J-9 shall apply to all Eligible Employees working at the Cuba, Missouri facility who are hourly, non-collectively bargained employees.  With respect to these employees, the Cuba facility shall be deemed to be the Employing Company.  Notwithstanding anything in the Plan to the contrary, with respect to participation under this Appendix J-9, employees hired on or after January 1, 2007 shall not be eligible to participate in the Plan.

(a)     **Prior Plans**.  Prior to March 31, 1995, the Non-Bargaining Employees Pension Plan of Olin Corporation.  On or after January 1, 1989 but before January 1, 1990, the Olin Salaried Pension Plan as restated in the Non-Bargaining Employees Pension Plan of Olin Corporation through December 31, 1989.  Prior to January 1, 1989, the Cuba Hourly Pension Plan (originally effective October 1, 1988).

(b)     **Eligibility**.  An individual shall become a Participant as of the date he both is an Eligible Non-Collectively Bargained Employee of an Employing Company and has completed one Year of Creditable Service; provided, however, that no individual that is hired on or after January 1, 2007 shall become a Participant hereunder.

(c)     **Normal Retirement Allowance**.  A Participant's annual normal Retirement Allowance commencing on or after his Normal Retirement Date shall be equal to the appropriate flat benefit rate, based on the group in which he was classified immediately preceding his termination as indicated in the table below, multiplied by his Years of Benefit Service.

| Termination Effective Date | Group 1 | Group 2 |
|---|---|---|
| Terminations Effective 10/1/1988 through 12/31/1993 | $108 | $144 |
| Terminations Effective 1/1/1994 through 5/31/1997 | $132 | $168 |
| Terminations Effective 6/1/1997 through 12/31/1998 | $156 | $192 |
| Terminations Effective 1/1/1999 through 12/31/1999 | $168 | $204 |
| Terminations Effective 1/1/2000 through 12/31/2000 | $180 | $216 |
| Terminations Effective 1/1/2001 through 5/31/2001 | $192 | $228 |
| Terminations Effective 6/1/2001 through 12/31/2002 | $204 | $240 |
| Terminations Effective 1/1/2003 through 12/31/2003 | $228 | $264 |
| Terminations Effective 1/1/2004 through 12/31/2004 | $240 | $276 |
| Terminations Effective 1/1/2005 through 12/31/2005 | $258 | $294 |
| Terminations Effective 1/1/2006 through 12/31/2006 | $270 | $306 |
| Terminations Effective on or after 1/1/2007 | $282 | $318 |

Group 1 shall include all employees in Operators Class 1 and 2.  Group 2 shall include all employees in the Maintenance Craft classes.  A Participant's job classification for this purposes shall be the job classification in which the employee was classed for the majority of time in the 12 months immediately preceding the Participant's retirement, based on Personnel Department records.

(d)     **Early Retirement Allowance**.  A participant who while in the employ of the Employing Company attains age 55 and is credited with (i) prior to January 1, 1995, at least 15 Years of Creditable Service, and (ii) after December 31, 1994, at least 10 Years of Creditable Service, may elect to retire and receive Early Retirement benefits in accordance with Section 3.2(c).

APPENDIX J-9, CUBA

J-28

(e)    **Vested Deferred Retirement Allowance**.  A Participant whose employment has terminated may elect to receive Vested Deferred Retirement benefits in accordance with Section 3.3(b) of the Plan.

(f)    **Disability Retirement Allowance**.  Effective as of November 1, 1992, Participants may be eligible for a Disability Retirement Allowance as described in paragraph (f)(2) of Appendix J-24, provided, however, that all references therein to a Normal, Early or Deferred Vested Retirement Allowance shall mean such Allowance as determined under this Appendix J-9.

(g)    **Lump-Sum Death Benefit**.  The Beneficiary of a Participant shall be eligible for a lump-sum death benefit of $5,000 as described in Section 5.2 of the Plan.

(h)    **Special Rules for Crediting Service and Computing Retirement Allowances**.

(1)    For service prior to January 1, 1989, a Participant's period of Benefit and Creditable Service shall include all service (including special prior service credit) credited on the records of the Prior Plan.

(2)    For service prior to January 1, 1989, a Participant who completed 1,000 or more Hours of Service in a Plan Year shall be credited with one Year of Benefit Service, and a Participant who completed less than 1,000 Hours of Service in a Plan Year shall be credited with a fractional Year of Benefit Service of which the numerator shall be the number of Hours of Service the Participant completes in the Plan Year and the denominator shall be 1,000.

(3)    This provision shall apply solely to the Participants who transfer directly to, and become employees of, Global Brass and Copper Acquisition Co. and its affiliates ("Global"), and who are defined as Transferred Employees under Article V of the Purchase Agreement between Global Brass and Copper Acquisition Co. and Olin Corporation dated as of October 15, 2007 (such Participants referred to in this Appendix J-9 as "Global Sale Cuba Participants").  Global Sale Cuba Participants shall continue to receive credit for service with Global in determining their Period of Creditable Service for purposes of vesting and eligibility to retire early under the terms of the Plan; provided, however, that (i) such service with Global shall not be credited for purposes of benefit accrual or Years of Benefit Service under the terms of the Plan, and (ii) no benefit shall be payable from this Plan until a Global Sale Cuba Participant terminates service with Global (or if earlier, such Global Sale Cuba Participant reaches age 65).  Solely for purposes of determining whether a Global Sale Cuba Participant is eligible for the special service crediting rule provided under Sections 3.2(b) and 3.3(c) of the Plan, the term "Employing Company" as utilized in such Section 3.2(b) shall include Global.

**APPENDIX J-9, CUBA**

J-29

APPENDIX J-10

**J-10 East Alton**

This Appendix J-10 shall apply to all Eligible Employees working at the East Alton, Illinois facility who are covered by a collective bargaining agreement between the Company (or an Affiliated Employer) and the District No. 9, International Association of Machinists and Aerospace Workers, AFL-CIO; the International Brotherhood of Electrical Workers, AFL-CIO & CLC, Local Union 649; the International Chemical Workers Union, Local No. 6; the United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, Local No. 555, AFL-CIO; the United Steelworkers of America, AFL-CIO, Local 12650; and the Western Employees' Trades Council, AFL-CIO.  With respect to these employees, the East Alton facility shall be deemed to be the Employing Company.

Notwithstanding anything in the Plan to the contrary, with respect to participation under this Appendix J-10, employees hired on or after December 5, 2005 (or rehired after such date) shall not be eligible to participate in the Plan; provided, however, that any employee involuntarily terminated by the Employing Company prior to December 5, 2005 who is rehired within one year of such termination shall be eligible to participate in the Plan (even if such rehire date is after December 5, 2005).

Further, active Participants under this Appendix J-10 shall have the opportunity during 2006 (in the form and manner determined by the Administrative Committee or its designee) to elect, effective as of December 31, 2006 to (i) continue accruing benefits under this Plan in accordance with the terms of this Appendix J-10 (as amended from time to time), or (ii) cease accruing benefits under this Plan and instead be eligible to receive a certain retirement contribution under the Olin Corporation Contributing Employee Ownership Plan in accordance with the terms (as amended from time to time) thereunder.  Active Participants electing option (ii) of the preceding sentence shall be known herein as "Electing Frozen Participants".  Notwithstanding anything in the Plan to the contrary, effective as of December 31, 2006, participation and benefit accruals under this Appendix J-10 shall be frozen for Electing Frozen Participants, and Electing Frozen Participants shall not accrue any additional benefits hereunder after such date.  However, the Plan will continue to recognize Periods of Creditable Service in determining an Electing Frozen Participant's vesting and attainment of retirement dates hereunder.

Notwithstanding anything in the Plan to the contrary, effective as of January 31, 2009, participation and benefit accruals under this Appendix J-10 shall be frozen for active Participants who are less than 45 years old as of such date (the "January 2009 Freeze Participants"), and such January 2009 Freeze Participants shall not accrue any additional benefits hereunder after such date.  However, the Plan will continue to recognize Years of Creditable Service in determining a January 2009 Freeze Participant's vesting and attainment of retirement dates hereunder.

Effective January 1, 2012, the normal retirement allowance formula under this Appendix J-10 was further modified as described below for participants accruing benefits hereunder on or after such date.

(a)      **Prior Plans**.  Prior to March 31, 1995, the Bargaining Employees Pension Plan of Olin Corporation.  Prior to January 1, 1990, the Olin Works East Alton Retirement Plan of Olin Corporation (originally effective January 1, 1969)  as in effect through December 31, 1988 and as restated in the Bargaining Employees Pension Plan of Olin Corporation through December 31, 1989.

(b)      **Eligibility**.  An individual shall become a Participant as of the date he becomes an Eligible Collectively Bargained Employee of the Employing Company; provided, however, that no individual shall become a Participant hereunder on or after December 5, 2005 (subject to the proviso contained in the second paragraph of the introduction above).

(c)      **Normal Retirement Allowance.**  A Participant's annual normal Retirement Allowance commencing on or after his Normal Retirement Date shall be equal to the greater of (1) or (2), subject to the requirements of (3) and (4):

**APPENDIX J-10, EAST ALTON**

J-30

(1)      (A)  For terminations effective before January 1, 2012, a flat benefit rate, based on his highest job classification (shown as Participant's Base Wage Rate) during the majority of the 12 months preceding his termination as indicated in the table below, multiplied by his years of Benefit Service:

(i)      For terminations effective before January 1, 1990

| Wage Rate | Flat Benefit Amount |
|---|---|
| Less than $10.15 | $192.00 |
| $10.15 to $11.48 | $216.00 |
| $11.49 to $12.83 | $240.00 |
| $12.84 or higher | $264.00 |

(ii)     For terminations effective on and after January 1, 1990 but before January 1, 1992

| Wage Rate | Flat Benefit Amount |
|---|---|
| Less than $11.04 | $201.60 |
| $11.04 to $12.45 | $226.80 |
| $12.46 to $13.88 | $252.20 |
| $13.89 or higher | $277.20 |

(iii)    For terminations effective on and after January 1, 1992 but before January 1, 1993

| Wage Rate | Flat Benefit Amount |
|---|---|
| Less than $11.04 | $209.40 |
| $11.04 to $12.45 | $235.80 |
| $12.46 to $13.88 | $262.20 |
| $13.89 or higher | $288.60 |

(iv)     For terminations effective on and after January 1, 1993 but before January 1, 1994

| Wage Rate | Flat Benefit Amount |
|---|---|
| Less than $12.68 | $231.00 |
| $12.68 to $14.28 | $258.00 |
| $14.29 to $15.93 | $288.00 |
| $15.94 or higher | $318.00 |

(v)      For terminations effective on and after January 1, 1994 but before January 1, 1995

| Wage Rate | Flat Benefit Amount |
|---|---|
| Less than $13.06 | $255.00 |
| $13.06 to $14.71 | $285.00 |
| $14.72 to $16.41 | $318.00 |
| $16.42 or higher | $351.00 |

(vi)     For terminations effective on and after January 1, 1995 but before January 1, 1996

| Wage Rate | Flat Benefit Amount |
|---|---|
| Less than $13.45 | $267.00 |
| $13.45 to $15.15 | $300.00 |
| $15.16 to $16.90 | $333.00 |
| $16.91 or higher | $369.00 |

(vii)    For terminations effective on and after January 1, 1996 but before January 1, 1997

**APPENDIX J-10, EAST ALTON**

J-31

| Wage Rate | Flat Benefit Amount |
|---|---|
| Less than $13.92 | $294.00 |
| $13.92 to $15.68 | $330.00 |
| $15.69 to $17.49 | $366.00 |
| $17.50 or higher | $405.00 |

(viii)    For terminations effective on and after January 1, 1997 but before January 1, 1998

| Wage Rate | Flat Benefit Amount |
|---|---|
| Less than $14.34 | $309.00 |
| $14.34 to $16.15 | $348.00 |
| $16.16 to $18.01 | $384.00 |
| $18.02 or higher | $426.00 |

(ix)    For terminations effective on and after January 1, 1998 but before January 1, 1999

| Wage Rate | Flat Benefit Amount |
|---|---|
| Less than $14.77 | $324.00 |
| $14.77 to $16.63 | $366.00 |
| $16.64 to $18.55 | $402.00 |
| $18.56 or higher | $447.00 |

(x)    For terminations effective on and after January 1, 1999 but before January 1, 2000

| Wage Rate | Flat Benefit Amount |
|---|---|
| Less than $15.29 | $339.00 |
| $15.29 to $17.21 | $384.00 |
| $17.22 to $19.20 | $423.00 |
| $19.21 or higher | $468.00 |

(xi)    For terminations effective on and after January 1, 2000 but before January 1, 2001

| Wage Rate | Flat Benefit Amount |
|---|---|
| Less than $15.83 | $357.00 |
| $15.83 to $17.81 | $402.00 |
| $17.82 to $19.87 | $444.00 |
| $19.88 or higher | $492.00 |

(xii)    For terminations effective on and after January 1, 2001 but before January 1, 2002

| Wage Rate | Flat Benefit Amount |
|---|---|
| Less than $16.46 | $396.00 |
| $16.46 to $18.52 | $447.00 |
| $18.53 to $20.66 | $492.00 |
| $20.67 or higher | $546.00 |

(xiii)    For terminations effective on and after January 1, 2002 but before January 1, 2003

| Wage Rate | Flat Benefit Amount |
|---|---|
| Less than $17.04 | $417.00 |
| $17.04 to $19.17 | $468.00 |
| $19.18 to $21.38 | $516.00 |
| $21.39 or higher | $573.00 |

**APPENDIX J-10, EAST ALTON**

J-32

(xiv)   For terminations effective on and after January 1, 2003 but before January 1, 2004

| Wage Rate | Flat Benefit Amount |
|---|---|
| Less than $17.55 | $438.00 |
| $17.55 to $19.75 | $492.00 |
| $19.76 to $22.02 | $543.00 |
| $22.03 or higher | $603.00 |

(xv)   For terminations effective on and after January 1, 2004 but before January 1, 2005

| Wage Rate | Flat Benefit Amount |
|---|---|
| Less than $18.16 | $459.00 |
| $18.16 to $20.44 | $516.00 |
| $20.45 to $22.79 | $570.00 |
| $22.80 or higher | $633.00 |

(xvi)   For terminations effective on and after January 1, 2005 but before January 1, 2006

| Wage Rate | Flat Benefit Amount |
|---|---|
| Less than $18.80 | $477.00 |
| $18.80 to $21.16 | $537.00 |
| $21.17 to $23.59 | $594.00 |
| $23.60 or higher | $657.00 |

(xvii)   For terminations effective on and after January 1, 2006 but before January 1, 2007

| Wage Rate | Flat Benefit Amount |
|---|---|
| Less than $19.46 | $501.00 |
| $19.46 to $21.90 | $561.00 |
| $21.91 to $24.92 | $618.00 |
| $24.93 or higher | $681.00 |

(xviii)   For terminations effective on and after January 1, 2007 but before January 1, 2008

| Wage Rate | Flat Benefit Amount |
|---|---|
| Less than $20.04 | $513.00 |
| $20.04 to $22.56 | $573.00 |
| $22.57 to $25.15 | $630.00 |
| $25.16 or higher | $693.00 |

(xix)   For terminations effective on and after January 1, 2008 but before January 1, 2012

| Wage Rate | Flat Benefit Amount |
|---|---|
| Less than $20.64 | $513.00 |
| $20.64 to $23.24 | $573.00 |
| $23.25 to $25.90 | $630.00 |
| $25.91 or higher | $693.00 |

(B)  For terminations effective on and after January 1, 2012, the sum of

(x) a flat benefit rate, based on his highest job classification (shown as Participant's Base Wage Rate) during the majority of the 12 months in the 2011 calendar year as indicated in the table described in (A)(xvi) above, multiplied by his years of Benefit Service earned prior to January 1, 2012, plus

**APPENDIX J-10, EAST ALTON**

J-33

(y) a flat benefit rate, based on his highest job classification (shown as Participant's Base Wage Rate) during the majority of the 12 months preceding his termination (or, if termination occurs in the 2012 calendar year, during the majority of months in 2012) as indicated in the table below, multiplied by his years of Benefit Service earned on or after January 1, 2012:

(i)    For terminations effective on and after January 1, 2012, but before November 26, 2012

| Wage Rate | Flat Benefit Amount |
|---|---|
| Less than $23.24 | $513.00 |
| $23.24 to $26.16 | $573.00 |
| $26.17 to $29.15 | $630.00 |
| $29.16 or higher | $693.00 |

(ii)    For terminations effective on and after November 26, 2012, but before December 2, 2013

| Wage Rate | Flat Benefit Amount |
|---|---|
| Less than $23.94 | $513.00 |
| $23.94 to $26.94 | $573.00 |
| $26.95 to $30.02 | $630.00 |
| $30.03 or higher | $693.00 |

(iii)    For terminations effective on and after December 2, 2013, but before December 2, 2014

| Wage Rate | Flat Benefit Amount |
|---|---|
| Less than $24.66 | $513.00 |
| $24.66 to $27.75 | $573.00 |
| $27.76 to $30.92 | $630.00 |
| $30.93 or higher | $693.00 |

(iv)    For terminations effective on and after December 2, 2014, but before November 30, 2015

| Wage Rate | Flat Benefit Amount |
|---|---|
| Less than $25.40 | $513.00 |
| $25.40 to $28.58 | $573.00 |
| $28.59 to $31.85 | $630.00 |
| $31.86 or higher | $693.00 |

(v)    For terminations effective on and after November 30, 2015, and before January 1, 2018

| Wage Rate | Flat Benefit Amount |
|---|---|
| Less than $26.16 | $513.00 |
| $26.16 to $29.44 | $573.00 |
| $29.45 to $32.81 | $630.00 |
| $32.82 or higher | $693.00 |

**APPENDIX J-10, EAST ALTON**

J-34

(vi)    For terminations effective on and after January 1, 2018, and before December 2, 2019

| Wage Rate | Flat Benefit Amount |
|---|---|
| Less than $26.94 | $513.00 |
| $26.94 to $30.32 | $573.00 |
| $30.33 to $33.79 | $630.00 |
| $33.80 or higher | $693.00 |

(vii)   For terminations effective on and after December 2, 2019

| Wage Rate | Flat Benefit Amount |
|---|---|
| Less than $27.75 | $513.00 |
| $27.75 to $31.23 | $573.00 |
| $31.24 to $34.80 | $630.00 |
| $34.81 or higher | $693.00 |

(2)    .85% of the Participant's highest average annual compensation during any five consecutive calendar years (any five calendar years with respect to Employees in the collective bargaining units represented by the International Brotherhood of Electrical Workers) out of the ten calendar years prior to 1984 multiplied by the number of years (and fractions of years) of his Benefit Service.

(3)    With regard to Elected Frozen Participants, Years of Benefit Service shall be frozen as of December 31, 2006, and no additional Years of Benefit Service shall accrue thereafter for any Elected Frozen Participant.  For Elected Frozen Participants, the annual normal Retirement Allowance determined above shall be based on Years of Benefit Service as of December 31, 2006, and the flat benefit rate  that would have been applicable to the Elected Frozen Participant had he retired on December 31, 2006.

(4)    With regard to January 2009 Freeze Participants, Years of Benefit Service shall be frozen as of January 31, 2009, and no additional Years of Benefit Service shall accrue thereafter for any January 2009 Freeze Participant.  For a January 2009 Freeze Participant, the annual normal Retirement Allowance determined above shall be based on Years of Benefit Service as of January 31, 2009, and the flat benefit rate that would have been applicable to the January 2009 Freeze Participant had he retired on January 31, 2009.  Notwithstanding anything in the Plan to the contrary, for a January 2009 Freeze Participant, the amount of Benefit Service for 2009 shall be determined by dividing their actual hours of service in January 2009 by 1,950.

(d)    **Early Retirement Allowance.**  A Participant who while in the employ of the Employing Company (i) attains age 55 and is credited with at least 20 Years of Creditable Service, or (ii) attains age 62 and is credited with at least 15 Years of Creditable Service, may elect to retire and receive Early Retirement benefits in accordance with Section 3.2(c) of the Plan.  On and after January 1, 2001, a Participant who attains age 60 and is credited with at least 15 Years of Creditable Service, may elect to retire and receive an Early Retirement Benefit that is unreduced for early commencement.  On and after that date, the Early Retirement Benefit of any Participant commencing an Early Retirement Allowance shall be reduced by 1/3rd of 1% by each full calendar month (4% per year) by which his Benefit Commencement Date precedes his 60th birthday.

(e)    **Vested Deferred Retirement Allowance**.  A Participant whose employment has terminated may elect to receive Vested Deferred Retirement benefits in one accordance with Section 3.3(b) of the Plan.

(f)    **Disability Retirement Allowance.**  Not available.

**APPENDIX J-10, EAST ALTON**

J-35

(g)     **Lump-Sum Death Benefit.**  For Participants who terminated prior to January 1, 2006 and otherwise meet the eligibility requirements of Section 5.2 of the Plan, the lump-sum death benefit payable in accordance with Section 5.2 of the Plan shall be $3,000.

(h)     **Pop-Up Benefit.**  For Participants (i) who retire on or after January 1, 2006, (ii) who receive an adjusted Retirement Allowance described under Section 4.1(c) or elected under Option 1 of Section 4.2(a) with his or her Spouse as the Beneficiary, and (iii) whose Spouse predeceases the Participant within 10 years of the Participant's Benefit Commencement Date, then upon such death of the Spouse, the benefit amount the Participant shall receive thereafter shall be the single life annuity amount determined under Section 4.1(b).

(i)     **Global Sale.**  This provision shall apply solely to the Participants (including Electing Frozen Participants) who transfer directly to, and become employees of, Global Brass and Copper Acquisition Co. and its affiliates ("Global"), and who are defined as Transferred Employees under Article V of the Purchase Agreement between Global Brass and Copper Acquisition Co. and Olin Corporation dated as of October 15, 2007 (such Participants referred to in this Appendix J-10 as "Global Sale East Alton Participants"). Global Sale East Alton Participants shall continue to receive credit for service with Global in determining their Period of Creditable Service for purposes of vesting and eligibility to retire early under the terms of the Plan; provided, however, that (i) such service with Global shall not be credited for purposes of benefit accrual or Benefit Service under the terms of the Plan, and (ii) no benefit shall be payable from this Plan until a Global Sale East Alton Participant terminates service with Global (or if earlier, such Global Sale East Alton Participant reaches age 65).

**APPENDIX J-10, EAST ALTON**

APPENDIX J-11

### *J-11 <u>GOCO</u>*

This Appendix J-11 shall apply to participants of the GOCO Pension Plan ("GOCO Plan") whose participation and benefit accruals were frozen as of December 31, 2004 due to Section 2.6 of the GOCO Plan.  Such GOCO Plan participants who, absent Section 2.6 of the GOCO Plan, would have continued to participate and accrue additional benefits under the GOCO Plan after December 31, 2004 shall be eligible to participate in the Plan under this Appendix J-11.  A Participant covered under this Appendix J-11 shall be referred to herein as a "GOCO Transferee".

The Retirement Allowance payable to a GOCO Transferee under this Plan shall be payable at such times and in such form as is provided under the GOCO Plan with respect to such GOCO Transferee, and the amount of such Retirement Allowance payable under this Plan at such time and in such form shall equal:

> (1) the amount that would have been payable under the GOCO Plan to the GOCO Transferee assuming that the participation and benefit accrual freeze provided under Section 2.6 of the GOCO Plan is not taken into consideration; minus
>
> (2) the amount actually payable under the GOCO Plan to the GOCO Transferee taking into consideration the participation and benefit accrual freeze provided under Section 2.6 of the GOCO Plan.

**APPENDIX J-11 GOCO**

APPENDIX J-12

### *J-12 Joliet*

This Appendix J-12 shall apply to all Eligible Employees working at the Joliet, Illinois facility who are covered by a collective bargaining agreement between the Company (or an Affiliated Employer) and the International Chemical Workers Union Council/United Food & Commercial Workers Local 763-C.  With respect to these employees, the Joliet facility shall be deemed to be the Employing Company.  Notwithstanding anything in the Plan to the contrary, effective as of December 31, 2007, participation and benefit accruals under this Appendix J-12 shall be frozen, and Participants shall not accrue any additional benefits hereunder after such date.  However, the Plan will continue to recognize Years of Creditable Service in determining the Participant's vesting and attainment of retirement dates hereunder.

(a)     **Prior Plans**.  Prior to March 31, 1995, the Bargaining Employees Pension Plan of Olin Corporation.  Prior to January 1, 1990, the Joliet Pension Plan (originally effective January 1, 1973) as in effect through December 31, 1988 and as restated in the Bargaining Employees Pension Plan of Olin Corporation through December 31, 1989.

(b)     **Eligibility**.  An individual shall become a Participant as of the date he becomes an Eligible Collectively Bargained Employee of the Employing Company; provided, however, that no individual shall become a Participant hereunder on or after January 1, 2008.

(c)     **Normal Retirement Allowance**.  A Participant's annual normal Retirement Allowance commencing on or after his Normal Retirement Date shall be equal to the appropriate flat benefit rate specified in the table below multiplied by his Years of Benefit Service.  Years of Benefit Service shall be frozen as of December 31, 2007, and no additional Years of Benefit Service shall accrue thereafter for any Participant.

| Termination Effective Date | Flat Benefit Rate |
| --- | --- |
| On or after November 16, 1988, and prior to November 16, 1990 | $246 |
| On or after November 16, 1990, and prior to January 1, 1993 | $270 |
| On or after January 1, 1993, and prior to January 1, 1994 | $292 |
| On or after January 1, 1994, and prior to January 1, 1995 | $312 |
| On or after January 1, 1995, and prior to January 1, 1996 | $336 |
| On or after January 1, 1996, and prior to January 1, 1999 | $384 |
| On and after January 1, 1999 and prior to November 16, 2001 | $432 |
| On and after November 16, 2001 and prior to November 16, 2003 | $456 |
| On and after November 16, 2003 and prior to November 16, 2004 | $480 |
| On and after November 16, 2004 and prior to November 16, 2007 | $516 |
| On and after November 16, 2007 | $540 |

Provided, however, that if a Participant was hired before January 1, 1966 and participated in the Blockson Retirement Income Plan, his benefits under this Plan shall be reduced by the amount of the payment he is entitled to under the Group Annuity Contract No. GA 272 (Blockson).

(d)     **Early Retirement Allowance.**  A Participant who while in the employ of the Employing Company attains age 55 and is credited with at least 15 Years of Creditable Service may elect to retire and receive Early Retirement benefits in accordance with Section 3.2(c) of the Plan.

**APPENDIX J-12, JOLIET**

J-38

(e)      **Vested Deferred Retirement Allowance**.  A Participant whose employment has terminated may elect to receive Vested Deferred Retirement benefits in accordance with Section 3.3(b) of the Plan.

(f)      **Disability Retirement Allowance.**  Not Available.

(g)      **Lump-Sum Death Benefit.** The Beneficiary of a Participant shall be eligible for a lump-sum death benefit as described in Section 5.2 of the Plan in the amount of $1,500 prior to January 1, 1996 and $5,000 on or after January 1, 1996.

**APPENDIX J-12, JOLIET**

J-39

APPENDIX J-13

### *J-13 Lake Charles*

This Appendix J-13 shall apply to all Eligible Employees working at the Lake Charles, Louisiana facility who are covered by a collective bargaining agreement between the Company (or an Affiliated Employer) and the Lake Charles Metal Trades Council, AFL-CIO, the International Association of Machinists & Aerospace Workers, AFL-CIO Local Lodge 1317 (affiliated with District Lodge 161) and the Office & Professional Employees International Union, Local 87, AFL-CIO.  With respect to these employees, the Lake Charles facility shall be deemed to be the Employing Company.

(a)     **Prior Plans**.  Prior to March 31, 1995, the Bargaining Employees Pension Plan of Olin Corporation.  Prior to January 1, 1990, the Lake Charles Retirement Plan (originally effective February 1, 1969) as in effect through December 31, 1988 and as restated in the Bargaining Employees Pension Plan of Olin Corporation through December 31, 1989.

(b)     **Eligibility**.  An individual shall become a Participant as of the date he becomes an Eligible Collectively Bargained Employee of the Employing Company.

(c)     **Normal Retirement Allowance**.  A Participant's annual normal Retirement Allowance commencing on or after his Normal Retirement Date shall be equal to the appropriate flat benefit rate, based on the group in which he was classified immediately preceding his termination as indicated in the table below, multiplied by his years of Benefit Service:

| Termination Effective Date | Flat Benefit Rate for Each Group | | | | | |
|---|---|---|---|---|---|---|
| | **1** | **2** | **3** | **4** | **5** | **6** |
| On or after January 1, 1989, but before July 1, 1989 | $246 | $252 | $258 | $264 | $270 | $276 |
| On or after July 1, 1989, but before July 1, 1990 | $252 | $258 | $264 | $270 | $276 | $282 |
| On or after July 1, 1990, but before July 1, 1993 | $288 | $294 | $300 | $306 | $312 | $318 |
| On or after July 1, 1993, but before July 1, 1996 | $336 | $342 | $348 | $354 | $360 | $366 |
| On or after July 1, 1996, but before July 1, 1997 | $348 | $354 | $360 | $366 | $372 | $378 |
| On or after July 1, 1997, but before July 1, 1998 | $360 | $366 | $372 | $378 | $384 | $390 |
| On or after July 1, 1998, but before July 1, 1999 | $372 | $378 | $384 | $390 | $396 | $402 |
| On or after July 1, 1999 | $396 | $402 | $408 | $414 | $420 | $426 |

Group 1 shall include all employees in the Office & Professional Union with a job classification of Wage Group A In-Hire Rate and Wage Group A One-Year Rate.  Group 2 shall include all employees in the Metal Trades Union with a job classification of Utility (Utility Pool).  Group 3 shall include all employees in the Office & Professional Union with a job classification of Wage Group A Three-Year Rate.  Group 4 has no current members.  Group 5 shall include all employees in the Office & Professional Union with a job classification of Wage Group A Five-Year Rate; all employees in the Metal Trades Union with a job classification of Acid Plant Operator, Assistant Acid Plant Operator, Assistant Waste Treatment Operator, B Operator, Brine Well Operator, C Operator, D Operator, Disbursement Clerk, E Operator, F Operator, Helpers (In General), Hydrazine Operator, Maintenance Trainee Steps 1-6, Oiler, Railroad Switch Operator, Routine Analyst A, Routine Analyst B, Routine Analyst C, Sampler, Shipper/Packer (TCCA),

**APPENDIX J-13, LAKE CHARLES**

J-40

Switch Helper, Truck Driver, and Winch Truck Driver; and all employees in the Machinists Union with a job classification of Inside Machinist Helper.  Group 6 shall include all employees in the Metal Trades Union with a job classification of A Operator, A/Lead Operator (Utilities), Acid Plant Lead Operator, Boilermaker, Carpenter, Caustic Adjuster, Electrician, Garage Mechanic, Heavy Equipment Operator, Instrument Person, Insulator, Lead (Maintenance), Locomotive Engineer, Millwright, Painter, Pipefitter, Waste Treatment Lead Operator and Welder; and all employees in the Machinists Union with a job classification of Inside Machinist and Lead.

(d)    **Early Retirement Allowance.**  A Participant who while in the employ of the Employing Company attains age 55 and is credited with at least 15 Years of Creditable Service may elect to retire and receive Early Retirement benefits in accordance with Section 3.2(c) of the Plan.

(e)    **Vested Deferred Retirement Allowance**.  A Participant whose employment has terminated may elect to receive Vested Deferred Retirement benefits in accordance with Section 3.3(b) of the Plan

(f)    **Disability Retirement Allowance.**  Not Available.

(g)    **Lump-Sum Death Benefit**.

(1)    On or before April 30, 1996:  The lump-sum death benefit payable in accordance with Section 5.2 of the Plan is $3,000; provided, however, that such death benefit shall only be paid as a result of the death of a Participant who was actively employed by an employing company under the Lake Charles Retirement Plan on June 30, 1984.

(2)    On or after May 1, 1996:  The lump-sum death benefit payable in accordance with Section 5.2 of the Plan is $5,000.

(h)    **Special Provisions Applicable Solely to Employees Transferred to Bio-Lab, Inc.**  The following special provisions shall apply solely to individuals ("Bio-Lab Transferees") who were employees of the Employing Company on December 16, 1994 and who became employees of Bio-Lab, Inc. as provided in the Asset Purchase Agreement between Olin Corporation and Bio-Lab, Inc., dated December 20, 1994.

(1)    For purposes of determining a Participant's Benefit Service under this Plan, all hours of service for the Employing Company or for Bio-Lab on or before December 31, 1994 will be taken into account.

(2)    For purposes of determining a Participant's Years of Creditable Service under this Plan, all hours of service for the Employing Company and for Bio-Lab will be taken into account.

(3)    A Bio-Lab Transferee will not be eligible for a retirement allowance under this Plan until the earlier of the date he (i) retires or otherwise terminates service with Bio-Lab, or (ii) attains age 65.  At such time the Participant's Retirement Allowance shall be determined based on his Years of Benefit Service, the group of employees he was classified in as of December 16, 1994, and the benefit multipliers in effect as of December 16, 1994.

(i)    **1996 Early Retirement Incentive Program**.  Each Participant terminating service with the Company between May 1, 1996 and July 1, 1996 in connection with the Special Early Retirement Incentive Program agreed to between the Company and the Unions shall be entitled to (1) a retirement benefit calculated as a normal retirement benefit, based on years of Benefit Service, pension group and benefit rate as of the Participant's termination, without reduction for commencement prior to the Participant's Normal Retirement Date; and (2) an enhanced benefit rate as shown below.

| Group 1 | $396 | Group 4 | $414 |
|---------|------|---------|------|

**APPENDIX J-13, LAKE CHARLES**

J-41

| | | | |
|---|---|---|---|
| Group 2 | $402 | Group 5 | $420 |
| Group 3 | $408 | Group 6 | $426 |

(j) **Special Provisions Applicable Solely to Employees Transferred to Arco Chemical Company.**
Effective as of December 2, 1996, or, if later, the Closing Date specified in the Asset Purchase Agreement by and between Olin Corporation and the Arco Chemical Company, dated as of October 9, 1996 (the "Agreement"), any Participant who transfers to and becomes an employee of Arco Chemical Company or its affiliates ("Arco"), and who is defined as a Transferred Employee under Article IX of the Agreement, shall

(1) be fully vested in such Participant's Accrued Benefit under the Plan as of the Closing Date specified in the Agreement, as amended;

(2) continue to receive credit for service with Arco for purposes of determining such Participant's eligibility to retire early under the terms of the Agreement (but not for purposes of benefit accrual);

(3) not be entitled to commence benefits under the Plan until such Participant has terminated service from Arco or its affiliates;

(4) not qualify for a Disability Retirement Allowance following a separation from service with the Company and all other Employing Companies, or during a period in which such Participant is not actively employed by the Company; and

(5) have the benefit payable from this Plan calculated based upon such Participant's Years of Benefit Service and employee group classification, and the benefit multipliers in effect as of the Closing Date specified in the Agreement, as amended.

In the event that such Participant's employment is subsequently transferred from Arco to Lyondell Industries ("Lyondell"), Olin shall continue to credit service with Lyondell, as well as Arco, for purposes of determining such Participant's eligibility for early retirement (but not for purposes of benefit accrual), and no benefits shall be payable until such Participant terminates service from Lyondell and its affiliates.  In the event that such Participant's employment is subsequently transferred from Lyondell to Chemtura Corporation ("Chemtura"), Olin shall continue to credit service with Chemtura, as well as Arco and Lyondell, for purposes of determining such Participant's eligibility for early retirement (but not for purposes of benefit accrual), and no benefits shall be payable until such Participant terminates service from Chemtura and its affiliates.  In the event that such Participant's service is terminated with Lyondell (or Chemtura) and he or she is subsequently employed by Arch Chemicals, Inc. ("Arch"), assets and liabilities attributable to such Participant's Accrued Benefit under this Plan shall be transferred to and assumed by a qualified defined benefit plan sponsored by Arch.  Thereafter, no benefits shall be payable to or on account of any such Participant under this Plan, and neither the Plan nor any Employing Company shall have any further liability with respect to the Accrued Benefit of any such Participant.

(k) **Special Rules for Crediting Service and Computing Retirement Allowances.**

Participants who transfer to and become employees of Arch Chemicals, Inc. (or a subsidiary thereof) (collectively, "Arch") on or before February 8, 2000, and who are defined as Arch Employees (see below) in the Employee Benefits Allocation Agreement between Olin Corporation and Arch Chemicals, Inc. (the "Agreement"), shall cease to accrue benefits under this Plan as the date they terminate employment with Olin and transfer to Arch.  As soon as administratively feasible on or after the spin-off of Arch from Olin and as provided in the Agreement, assets and liabilities relating to such Participants' Accrued Benefit under this Plan shall be transferred to and assumed by a qualified defined benefit plan sponsored by Arch. Thereafter, no benefits shall be payable to or on account of any Arch Employee under this Plan, and neither

**APPENDIX J-13, LAKE CHARLES**

J-42

the Plan nor any Employing Company shall have any further liability with respect to the Accrued Benefit of any Arch Employee.

The Agreement defines an Arch Employee as any individual who, as of the Distribution Date or at any time thereafter but on or before February 8, 2000, is identified on the records of Arch as being an employee of any member of the Arch Group of businesses, including individuals then receiving any long-term disability benefits whose most recent employment was with a line of business that became a part of the Arch Group, but excluding any individual who received a notice of lay-off from Olin or a Related Employer prior to the Distribution Date.

Any Arch Employee whose Accrued Benefit under this Plan was transferred to the defined benefit plan established by Arch, and who is subsequently employed by Olin or another Employing Company shall have their past Creditable Service with Olin and its Related Employers re-credited for purposes of determining such Arch Employee's eligibility to participate, vesting and attainment of retirement dates, provided that such Creditable Service would be re-credited under the normal operation of the Plan's Break-in-Service rules; however, such Arch Employee shall not receive credit for past Benefit Service with respect to benefit accrual, and their Compensation and Average Compensation shall be determined based upon Compensation received from Olin on and after their re-employment by Olin.  No service credit shall be given with respect to their period of employment with Arch, and no compensation paid by Arch shall be counted for purposes of determining such Arch Employee's Accrued Benefit under the Plan.

**APPENDIX J-13, LAKE CHARLES**

J-43

APPENDIX J-14

### *J-14 Leavitt Tube (Chicago Steelworkers)*

This Appendix J-14 shall apply to all individuals who, as of October 31, 2004, had an undistributed accrued benefit under the terms of the frozen Leavitt Tube Company Pension Plan for The Chicago Steelworkers (as amended and restated effective November 1, 2002) (each being referred to herein as a "Leavitt Tube Steelworker Participant"), which plan was merged into this Plan as of that date.

(a)     **Prior Plan**.  The Leavitt Tube Company Pension Plan for The Chicago Steelworkers (as amended and restated effective November 1, 2002), which was frozen as of March 30, 2001, and merged into the Olin Corporation Employees Pension Plan as of October 31, 2004.  The Prior Plan was originally adopted by UNR Industries, Inc. ("UNR") effective November 1, 1962 (then known as the Pension Plan for Employees of UNR, Inc. - Leavitt Division).  As of August 30, 1996, Leavitt Tube Company purchased the business of the Leavitt Division of UNR, assumed the Prior Plan, and renamed the Prior Plan the Leavitt Tube Company Pension Plan for The Chicago Steelworkers.

(b)     **Eligibility**.  There are no new entrants under this Appendix after March 30, 2001 due to the sale of the Leavitt Tube Company business to Pinkert Industrial Group LLC by Chase Brass and Copper, and the termination of all employees connected to such business.  Prior to that date, each employee of Leavitt Tube Company, subsequently referred to as LTC Reserve Corp. ("LTC"), who was either (i) a member of Local No. 5544 of the United Steelworkers of America (the "Union"), (ii) an hourly paid plant employee in a job classification covered by the labor agreement between LTC and the Union, effective June 28, 1998, through June 27, 2004 (the "Union Agreement"), or (iii) a salaried plant foreman, whose position is covered by the Union Agreement, became a participant in the Prior Plan on the first day of his employment with LTC.

(c)     **Normal Retirement Allowance**.  A Leavitt Tube Steelworker Participant's monthly normal Retirement Allowance, commencing on or after his Normal Retirement Date and calculated in the form of a single life annuity, shall be equal to the flat benefit rate in effect as of termination, multiplied by his years (and fractions of years) of continuous service (or, if applicable as determined under the Prior Plan by the prior plan administrator of the Prior Plan, benefit service) determined by the plan administrator of the Prior Plan as of March 30, 2001 for purposes of the Prior Plan, up to a maximum of 35 years.

| Effective Date of Termination | Amount |
|---|---|
| On or after November 12, 1980 but prior to June 1, 1984 | $14.00 |
| On or after June 1, 1984 but prior to June 1, 1985 | $14.50 |
| On or after June 1, 1985 but prior to February 1, 1994 | $15.50 |
| On or after February 1, 1994 but prior to August 1, 1995 | $17.00 |
| On or after August 1, 1995 but prior to August 1, 1996 | $20.00 |
| On or after August 1, 1996 but prior to August 1, 1997 | $21.00 |
| On or after August 1, 1997 but prior to August 1, 1998 | $22.00 |
| On or after August 1, 1998 but prior to October 1, 1999 | $23.00 |
| On or after October 1, 1999 but prior to December 1, 2001 | $23.00 |
| On or after December 1, 2001 but prior to December 1, 2002 | $26.00 |
| On or after December 1, 2002 but prior to December 1, 2003 | $27.50 |
| On or after December 1, 2003 | $29.00 |

As of March 30, 2001, each Leavitt Tube Steelworker Participant became fully vested in his Accrued Benefit under the Prior Plan.  A Leavitt Tube Steelworker Participant's normal Retirement Allowance shall not be greater than his Accrued Benefit as of March 30, 2001, the date benefit accruals ceased under the Prior Plan.

**APPENDIX J-14, LEAVITT TUBE (CHICAGO STEELWORKERS)**

The Normal Retirement Date for a Leavitt Tube Steelworker Participant shall be the later of (a) the Leavitt Tube Steelworker Participant's completion of 5 years of continuous service or vesting service or attainment of his 5th anniversary of participation in the Plan, and (b) Leavitt Tube Steelworker Participant's attainment of age 65.

(d)  **Early Retirement Allowance**.  Any Leavitt Tube Steelworker Participant who had attained age 60 and completed at least five years of continuous service or benefit service as of March 30, 2001 shall be entitled to apply for early retirement benefits, which shall be calculated as follows: his normal Retirement Allowance as determined above shall be reduced by 0.5% for each month by which the Leavitt Tube Steelworker Participant's Benefit Commencement Date is prior to his Normal Retirement Date.

(e)  **Vested Deferred Retirement Allowance**.  A Leavitt Tube Steelworker Participant, who has attained age 60, may elect to commence payment of his Retirement Allowance as of the first day of any month prior to his Normal Retirement Date.  If a Leavitt Tube Steelworker Participant elects a Benefit Commencement Date prior to his Normal Retirement Date, his normal Retirement Allowance shall be reduced by 0.5% for each month by which the Participant's Benefit Commencement Date is prior to his Normal Retirement Date.

(f)  **Special Pension Payment**.  The first three monthly installments of any normal or early Retirement Allowance shall be a special pension payment; provided, however, that no special pension payment shall be provided in the case of a vested deferred Retirement Allowance, and a pension payable to any other Employee who shall have previously received a special pension payment with respect to a prior retirement. The special pension payment shall be in the amount of $3,000, and shall be made in a lump sum within the first full calendar month of retirement, if application for a pension is made not later than the close of such month; otherwise, the special pension payment shall be made within any subsequent calendar month in which application is made.

Beginning with the fourth calendar month following retirement the monthly pension installments as hereinbefore provided in this Plan shall be payable.

(g)  **Disability Retirement Allowance**.  A Leavitt Tube Steelworker Participant, who, as of March 30, 2001, had retired under the Prior Plan on account of his Total and Permanent Disability, shall continue to receive a Disability Retirement Allowance under the Plan for so long as he continues to be Totally and Permanently Disabled (but no later than his age 65).  Such incapacity may be verified by medical examination prior to the Leavitt Tube Steelworker Participant's attainment of age 65 at any reasonable time.  A Disability Retirement Allowance is not available under the Plan to any other Leavitt Tube Steelworker Participant.

The monthly amount of a Disability Retirement Allowance shall, until the Leavitt Tube Steelworker Participant's attainment of age 65, be an amount computed pursuant to Section (c) above but based only on the Leavitt Tube Steelworker Participant's continuous service to the date of his retirement due to Total and Permanent Disability (as determined by the plan administrator of the Prior Plan for purposes of the Prior Plan).  At age 65, the Leavitt Tube Steelworker Participant is eligible to apply for a Normal Retirement Allowance.

For purposes of this Section, a Leavitt Tube Steelworker Participant shall be considered to be Totally and Permanently Disabled if (a) he became totally and permanently disabled by injury or disease so as to be prevented thereby from engaging in any occupation or employment for remuneration or profit, and (b) such total disability has continued for a period of six consecutive months and, in the opinion of a qualified physician, will be permanent and continuous for the remainder of his life.  A Leavitt Tube Steelworker Participant will not be entitled to a Disability Retirement Allowance, however, if his incapacity (i) was contracted, suffered or incurred while the Leavitt Tube Steelworker Participant was engaged in, or resulted from his having engaged in, a criminal enterprise, (ii) resulted from his habitual drunkenness or addiction to narcotics, or (iii) resulted from an intentionally self-inflicted injury.

**APPENDIX J-14, LEAVITT TUBE (CHICAGO STEELWORKERS)**

J-45

If any dispute shall arise between the Administrative Committee and any Leavitt Tube Steelworker Participant who was receiving a Disability Retirement Allowance as of March 30, 2001, as to whether such Leavitt Tube Steelworker Participant continues to be Totally and Permanently Disabled, such dispute shall be resolved as follows:

(i) If such Leavitt Tube Steelworker Participant was covered by the Union Agreement as of the date payment of his Disability Retirement Allowance commenced, the Leavitt Tube Steelworker Participant shall be examined by a physician appointed for that purpose by the Administrative Committee and by a physician appointed for that purpose by a duly authorized representative of the Union.  If the two physicians disagree concerning whether the Leavitt Tube Steelworker Participant continues to be totally and permanently incapacitated, the question shall be submitted to a third physician selected by the two physicians who shall decide the issue.  The fees and expenses of the third physician shall be shared equally by the Administrative Committee and the Union.

(ii) Any other Leavitt Tube Steelworker Participant shall be examined by a physician appointed for the purpose by the Administrative Committee.

(h)      **Spouse's Pre-retirement Death Benefit**.  If a vested Leavitt Tube Steelworker Participant dies prior to his Benefit Commencement Date and he has been married to his Spouse throughout the one year period ending on the date of his death, his surviving Spouse shall be entitled to the surviving Spouse's benefit described below.

The benefit payable to the Leavitt Tube Steelworker Participant's surviving Spouse pursuant to this Section shall be equal to the greater of:

(i)  A surviving Spouse's benefit payable for the life of the eligible surviving Spouse equal to:

(1) For each month until the surviving Spouse attains age 62, $100 or, if higher, 50% of the Leavitt Tube Steelworker Participant's regular pension; or

(2) For each month after the surviving Spouse attains age 62, $50 or, if higher, 50% of the Leavitt Tube Steelworker Participant's regular pension, less 50% of the amount of the surviving Spouse's Social Security benefit.

For purposes of this Section, the Leavitt Tube Steelworker Participant's "regular pension" means his normal Retirement Allowance (determined in accordance with Section (c) above without any reductions) as if he retired on his date of death and had then been age 65; or

(ii) The amount payable in the form of a preretirement survivor annuity determined in accordance with Section 5.1(b) of the Plan.

In the case of a Leavitt Tube Steelworker Participant who dies on or after his Normal Retirement Date, payment of the surviving Spouse benefit under this Section shall commence on the first day of the month following the Participant's death.  In the case of a Leavitt Tube Steelworker Participant who dies prior to his Normal Retirement Date, payment of the surviving Spouse benefit under this Section shall commence upon the earlier of: (A) the first day of the month following the month in which the Participant would have attained his Normal Retirement Date; or (B) if elected by the Participant's surviving Spouse, the first day of the month elected by the surviving Spouse on or after the month the Participant would have attained age 60 (but no earlier than the month following the month of the Participant's death).

(i)      **Normal Forms of Retirement Allowance**.

**APPENDIX J-14, LEAVITT TUBE (CHICAGO STEELWORKERS)**

J-46

(i) The normal form of payment of benefits to an unmarried Leavitt Tube Steelworker Participant shall be a straight life annuity for the life of the Participant only.

(ii) The normal form of payment of benefits to a married Leavitt Tube Steelworker Participant shall be a qualified joint and 50% survivor annuity (with the Participant's Spouse as beneficiary) that is Actuarially Equivalent to the straight life annuity described in Section (h)(i) hereof.

(j)     **Lump-Sum Pre-Retirement Death Benefit**.  None.

(k)     **Optional Forms of Payment**.  In lieu of the standard form of payment described in Section (h) hereof, a Leavitt Tube Steelworker Participant may elect, in accordance with Section 4.3 of the Plan, to receive the Actuarial Equivalent of the Retirement Allowance described in Section (h)(i) hereof in one of the following optional forms:

"Option 1 – Joint and Survivor Annuity."  A life annuity to the Leavitt Tube Steelworker Participant with the provision that, if a joint annuitant survives the Participant, payments are continued in the same amount or a reduced amount for the joint annuitant's lifetime.

"Option 2 – Life Annuity with Stipulated Payments."  A life annuity to the Leavitt Tube Steelworker Participant with the provision that, if the Participant dies before receiving 120 stipulated monthly payments, either payments will be continued to a beneficiary until the balance of the stipulated monthly payments has been paid, or the computed value of the balance of the stipulated monthly payments will be paid to a beneficiary.

"Option 3 – Temporary Annuity."  An annuity payable from the Leavitt Tube Steelworker Participant's Early Retirement Date to a specified date, or death, if earlier, that will provide an approximately level amount of benefit inclusive of Social Security and any annuity not converted to a Temporary Annuity before and after receipt of Social Security.

Notwithstanding any provision in the Plan or this Appendix to the contrary, a Leavitt Tube Steelworker Participant may not elect an optional form, except a Joint and Survivor Annuity with his Spouse as the joint annuitant, under which the monthly payment to the Participant would be less than 51% of the monthly amount that would be payable to him under the straight life annuity form described in Section (h)(i) hereof.

(l)     **Special Rules for Crediting Service and Computing Retirement Allowances**.  For service prior to March 30, 2001, a Leavitt Tube Steelworker Participant's service shall include all service credited on the records of the Prior Plan.  No additional service shall be earned by any Leavitt Tube Steelworker Participant following March 30, 2001, and a Participant shall not be credited with any additional service following the merger of the Prior Plan into this Plan.

(m)     **Actuarial Equivalence**.  In calculating Actuarially Equivalent forms of benefit (other than de minimis lump sums), Actuarial Equivalent means a benefit having the same value as the benefit which it replaces as determined by, or with the advice of, an actuary using generally accepted actuarial methods and the following assumptions:

Interest Rate: 6%

Mortality Table: 1951 Group Annuity Table, male rates, projected to 1970 by Scale C, using no age setback for joint annuitant or 5-year age setback for the Leavitt Tube Steelworker Participant, whichever results in a greater benefit.

**APPENDIX J-14, LEAVITT TUBE (CHICAGO STEELWORKERS)**

J-47

APPENDIX J-15

### *J-15 Leavitt Tube (Production Tube Finishing)*

This Appendix J-15 shall apply to all individuals who, as of June 1, 2008, had an undistributed accrued benefit under the terms of the frozen Leavitt Tube Company Production Tube Finishing Defined Benefit Plan (as amended and restated effective January 1, 1997 and as subsequently amended) (each being referred to herein as a "Leavitt Tube Production Participant"), which plan was merged into this Plan as of that date.

(a) **Prior Plan**. The Leavitt Tube Company Production Tube Finishing Defined Benefit Plan (as amended and restated effective January 1, 1997 and as subsequently amended), which was frozen as of March 30, 2001, and merged into the Olin Corporation Employees Pension Plan as of June 1, 2008. The Prior Plan was originally established January 31, 1979.

(b) **Eligibility**. There are no new entrants under this Appendix after March 30, 2001 due to the sale of the Leavitt Tube Company business to Pinkert Industrial Group LLC by Chase Brass and Copper, and the termination of all employees connected to such business. Prior to that date, each employee of Leavitt Tube Company, subsequently referred to as LTC Reserve Corp. ("LTC"), who was (i) employed in the Lincoln Tube Division, (ii) an hourly paid employee, and (iii) represented for collectively bargaining purposes by Miscellaneous Warehousemen Airline Automotive Parts Service, Tire and Rental, Chemical and Petroleum, Ice, Paper, and Related Clerical and Production Employees' Union Local 781, became a participant in the Prior Plan on the first day of meeting the preceding requirements.

(c) **Normal Retirement Allowance**. A Leavitt Tube Production Participant's monthly normal Retirement Allowance, commencing on or after his Normal Retirement Date and calculated in the form of a single life annuity, shall, subject to the modifications as provided herein, be equal to the sum of the following:

(i) $5.50 multiplied by his Accrual Service prior to February 1, 1998;

(ii) $7.50 multiplied by his Accrual Service on and after February 1, 1998, and prior to February 1, 1999;

(iii) $9.50 multiplied by his Accrual Service on and after February 1, 1999, and prior to February 1, 2000;

(iv) $11.50 multiplied by his Accrual Service on and after February 1, 2000, and prior to February 1, 2001;

(v) $13.50 multiplied by his Accrual Service on and after February 1, 2001, and prior to February 1, 2002;

(vi) $15.50 multiplied by his Accrual Service on and after February 1, 2002, and prior to February 1, 2003; and

(vii) $17.50 multiplied by his Accrual Service on and after February 1, 2003.

However, Accrual Service shall not exceed 25 years. In computing such maximum, a Participant's earliest years of Accrual Service shall be disregarded first.

In any calendar year ending on or after December 31, 1999, in which a change in the dollar amount occurs, Accrual Service shall be credited at the lower dollar amount if employment terminates within the first month of such period, or at the higher dollar amount if employment terminates after the first month of such period

**APPENDIX J-16, LIVONIA**

J-48

As of March 30, 2001, each Leavitt Tube Production Participant became fully vested in his Accrued Benefit under the Prior Plan. A Leavitt Tube Production Participant's normal Retirement Allowance shall not be greater than his accrued benefit as of March 30, 2001, the date benefit accruals ceased under the Prior Plan.

A Leavitt Tube Production Participant's Normal Retirement Date is the older of age 65 or his age on the date 5 years after the first day of the Plan Year in which his participation in the Prior Plan occurred. To the extent that a Leavitt Tube Production Participant commences benefits after his Normal Retirement Date, the normal Retirement Allowance determined above shall be adjusted in accordance with the late retirement provisions of the Prior Plan (subject to applicable law).

(d)     **Early Retirement Allowance**. Any Leavitt Tube Production Participant who had attained age 60 and completed at least five years of service as of March 30, 2001 shall be entitled to apply for early retirement benefits, which shall be calculated in the same manner as his normal Retirement Allowance, provided that such amount shall be reduced by multiplying the factor shown below corresponding to the number of years his early retirement date precedes his Normal Retirement Date.

| NUMBER OF YEARS EARLY RETIREMENT DATE PRECEDES NORMAL RETIREMENT DATE | FACTOR |
|---|---|
| 1 | .94 |
| 2 | .88 |
| 3 | .82 |
| 4 | .76 |
| 5 | .70 |

The above factors shall be prorated for a partial year (counting a partial month as a complete month).

(e)     **Vested Deferred Retirement Allowance**. A Leavitt Tube Production Participant, who has attained age 60, may elect to commence payment of his Retirement Allowance as of the first day of any month prior to his Normal Retirement Date. If a Leavitt Tube Production Participant elects a Benefit Commencement Date prior to his Normal Retirement Date, his normal Retirement Allowance shall be reduced in the same manner as provided in Section (d) above.

(f)     **Disability Retirement Allowance**. A Leavitt Tube Production Participant, who, as of March 30, 2001, had retired under the Prior Plan on account of his Total and Permanent Disability, shall continue to receive a Disability Retirement Allowance under the Plan for so long as he continues to be Totally and Permanently Disabled (but no later than his Normal Retirement Date). Such incapacity may be verified by medical examination prior to the Leavitt Tube Production Participant's Normal Retirement Date at any reasonable time. A Disability Retirement Allowance is not available under the Plan to any other Leavitt Tube Production Participant.

The monthly amount of a Disability Retirement Allowance shall be an amount computed pursuant to Section (c) above but based only on the Leavitt Tube Production Participant's service to the date of his retirement due to Total and Permanent Disability (as determined by the plan administrator of the Prior Plan for purposes of the Prior Plan). On or after cessation of the Disability Retirement Allowance, the participant shall be eligible to apply for benefits in accordance with the terms above.

For purposes of this Section, a Leavitt Tube Production Participant shall be considered to be Totally and Permanently Disabled if he is disabled, as a result of sickness or injury, to the extent that he is prevented from engaging in any substantial gainful activity, and is eligible for and receives a disability benefit under Title II of the Federal Social Security Act.

**APPENDIX J-16, LIVONIA**

(g) **Spouse's Pre-retirement Death Benefit**.  If a vested Leavitt Tube Production Participant dies prior to his Benefit Commencement Date and he has been married to his Spouse throughout the one year period ending on the date of his death, his surviving Spouse shall be entitled the amount payable in the form of a preretirement survivor annuity determined in accordance with Section 5.1 of the Plan.

Notwithstanding the preceding, if a Leavitt Tube Production Participant dies on or after his Normal Retirement Date and before his annuity starting date and such Leavitt Tube Production Participant is not survived by a spouse to whom he was continuously married throughout the one-year period ending on the date of his death, the above provisions shall not apply.  Instead, the death benefit shall be the preservation of retirement option death benefit.  This death benefit is the death benefit which would have been payable to the Leavitt Tube Production Participant's beneficiary or contingent annuitant if the Leavitt Tube Production Participant's Benefit Commencement Date had occurred on the date he died.  The optional form of distribution elected according to the provisions of the Plan before the Leavitt Tube Production Participant's death is the form in effect for determining the death benefit.  For purposes of this death benefit only, an election of an optional form of distribution shall be a qualified election even if it is not made within 90 days of the date retirement benefits would have begun if it meets all of the other requirements for a qualified election.  The normal form of distribution for retirement benefits provided below shall be in effect if an election has not been made or an election is revoked without a subsequent election according to the provisions of the Plan.

(h) **Normal Forms of Retirement Allowance**.

   (i) The normal form of payment of benefits to a Leavitt Tube Production Participant who is unmarried shall be a straight life annuity for the life of the Participant only.

   (ii) The normal form of payment of benefits to a Leavitt Tube Production Participant who is married shall be the form of a qualified joint and 50% survivor annuity that is Actuarially Equivalent to the straight life annuity described in Section (h)(i) hereof.

(i) **Lump-Sum Pre-Retirement Death Benefit**.  None.

(j) **Optional Forms of Payment**.  In lieu of the standard form of payment described in Section (h) hereof, a Leavitt Tube Production Participant may elect, in accordance with Section 4.3 of the Plan, to receive the Actuarial Equivalent (as determined in accordance with the applicable provisions of the Prior Plan) of the Retirement Allowance described in Section (h)(i) hereof in one of the following optional forms: single life annuity; single life annuity with certain periods of 5, 10, or 15 years; and survivorship life annuities with survivorship percentages of 50, 66 2/3, 75 or 100.

(k) **Special Rules for Crediting Service and Computing Retirement Allowances**.  For service prior to March 30, 2001, a Leavitt Tube Production Participant's service shall include all service credited on the records of the Prior Plan.  No additional service shall be earned by any Leavitt Tube Production Participant following March 30, 2001, and a Leavitt Tube Production Participant shall not be credited with any additional service following the merger of the Prior Plan into this Plan.

**APPENDIX J-16, LIVONIA**

J-50

APPENDIX J-16

### *J-16 Livonia*

This Appendix J-16 shall apply to all Eligible Employees working at the Livonia, Michigan facility who are covered by a collective bargaining agreement between the Company (or its Affiliated Employers) and the Cylinder, Gas, Chemicals, Petroleum Distillery, Auto Service and Accessory Drivers, Mechanics, Helpers and Inside Employees, Local Union No. 283, affiliated with the International Brotherhood of Teamsters, Automobile Drivers, Demonstrators, Auto Service Department and Industrial Employees, Maintenance, Chauffeurs, Warehousemen and Helpers of America.  For these employees the Livonia facility shall be deemed to be the Employing Company.

(a)     **Prior Plans**.  Prior to March 31, 1995, the Bargaining Employees Pension Plan of Olin Corporation.  Prior to January 1, 1990, the Livonia Retirement Plan (originally effective January 1, 1988) as in effect through December 31, 1988 and as restated in the Bargaining Employees Pension Plan of Olin Corporation through December 31, 1989.

(b)     **Eligibility**.  An individual shall become a Participant as of the date he becomes an Eligible Collectively Bargained Employee of the Employing Company.

(c)     **Normal Retirement Allowance**.  A Participant's annual normal Retirement Allowance commencing on or after his Normal Retirement Date shall be equal to the appropriate flat benefit rate, multiplied by his years of Benefit Service:

| Termination Effective Date | Flat Benefit Rate |
|---|---|
| On or after December 1, 1988, but before December 1, 1989 | $258 |
| On and after December 1, 1989, but before January 1, 1992 | $264 |
| On and after January 1, 1992, but before January 1, 1995 | $312 |
| On or after January 1, 1995 | $360 |

Provided, however, that if a Participant was a Participant in the "Teamsters Plan" (as described in the Prior Plan) and is eligible for benefits from the Central States, Southeast and Southwest Area Pension Fund, the amount of the Participant's Normal Retirement Allowance payable under this Plan will be reduced by the amount payable under the Teamsters Plan.

(d)     **Early Retirement Allowance.**  A Participant who while in the employ of the Employing Company attains age 55 and is credited with at least 10 Years of Creditable Service may elect to retire and receive Early Retirement benefits in accordance with Section 3.2(c) of the Plan.

(e)     **Vested Deferred Retirement Allowance**.  A Participant whose employment has terminated may elect to receive Vested Deferred Retirement benefits in accordance with Section 3.3(b).

(f)     **Disability Retirement Allowance.**  Not available.

(g)     **Lump-Sum Death Benefit.**  None.

(h)     **Special Rules Concerning Crediting of Service.**

(1)     Periods of Creditable Service shall include service from a Participant's date of hire by FMC, its predecessors or the Company, whichever is earliest.  If a Participant was a participant in the "Teamsters Plan" or the Central States, Southeast and Southwest Area Pension Fund, Periods of Creditable Service shall include service from the Participant's original date of hire at the Livonia facility through December 31, 1987.

**APPENDIX J-16, LIVONIA**

(2)      A Participant's Years of Benefit Service shall include all service with FMC and Olin prior to January 1, 1988.

**APPENDIX J-16, LIVONIA**

J-52

APPENDIX J-17

*J-17 <u>Manteca</u>*

This Appendix J-17 shall apply to all Eligible Employees who are hourly employees working at the Manteca, California facility.  With respect to these employees, the Manteca facility shall be deemed to have been a Participating Employer and the Employing Company since September 1, 1995.

(a)    **Prior Plans**.  None.

(b)    **Eligibility**.  An individual shall become a Participant as of the later of the date he is both an Eligible Non-Collectively Bargained Employee of the Employing Company and has completed one Year of Creditable Service, or September 1, 1995.

(c)    **Normal Retirement Allowance**.  A Participant's annual normal Retirement Allowance commencing on or after his Normal Retirement Date shall be equal to the appropriate flat benefit rate multiplied by his years (and fractions of years) of Benefit Service.  If a Participant's termination is effective on or after January 1, 1996, the flat benefit rate shall be $156.00.

(d)    **Early Retirement Allowance**.  A participant who while in the employ of the Employing Company attains age 55 and is credited with at least 10 Years of Creditable Service, may elect to retire and receive Early Retirement benefits in accordance with Section 3.2(c) of the Plan.

(e)    **Vested Deferred Retirement Allowance**.  A Participant whose employment has terminated may elect to receive Vested Deferred Retirement benefits in accordance with Section 3.3(b) of the Plan.

(f)    **Disability Retirement Allowance**.  Not available.

(g)    **Lump-Sum Death Benefit**.  The Beneficiary of a Participant shall be eligible for a lump-sum death benefit of $5,000 as described in Section 5.2 of the Plan.

(h)    **Special Rules for Crediting Service and Computing Retirement Allowances.**

(1)    For purposes of eligibility for early retirement and benefit accrual, only service for the Company on or after September 1, 1995 shall be taken into account.

**APPENDIX J-17, MANTECA**

J-53

APPENDIX J-18

*J-18 **Marion***


       This Appendix J-18 shall apply to Eligible Employees working at the Marion, Illinois facility who are covered by a collective bargaining agreement between the Company (or an Affiliated Employer) and the United Steelworkers of America, Local 15009.  With respect to these employees, the Marion facility shall be deemed to be the Employing Company.

(a)    **Prior Plans**.  Prior to March 31, 1995, the Bargaining Employees Pension Plan of Olin Corporation.  Prior to January 1, 1990, the Marion Pension Plan (originally effective December 13, 1972) as in effect through December 31, 1988 and as restated in the Bargaining Employees Pension Plan of Olin Corporation through December 31, 1989.

(b)    **Eligibility**.  An individual shall become a Participant as of the date he becomes an Eligible Collectively Bargained Employee of the Employing Company.

(c)    **Normal Retirement Allowance**.  A Participant's annual normal Retirement Allowance commencing on or after his Normal Retirement Date shall be equal to the appropriate flat benefit rate, multiplied by his years of Benefit Service:

| Termination Effective Date | Flat Benefit Rate |
|---|---|
| On or after December 7, 1987, but before January 1, 1990 | $216 |
| On and after January 1, 1990, but before January 1, 1991 | $222 |
| On and after January 1, 1991, but prior to January 1, 1992 | $228 |
| On or after January 1, 1992, but before January 1, 1994 | $234 |
| On and after January 1, 1994, but before January 1, 1995 | $258 |
| On and after January 1, 1995, but prior to January 1, 1996 | $276 |
| On and after January 1, 1996 | $288 |

(d)    **Early Retirement Allowance.**  A Participant who while in the employ of the Employing Company attains age 55 and is credited with at least 15 Years of Creditable Service may elect to retire and receive Early Retirement benefits in accordance with Section 3.2(c) of the Plan.

(e)    **Vested Deferred Retirement Allowance**.  A Participant whose employment has terminated may elect to receive Vested Deferred Retirement benefits in accordance with Section 3.3(b) of the Plan.

(f)    **Disability Retirement Allowance.**  Not available.

(g)    **Lump-Sum Death Benefit.**  The lump-sum death benefit payable in accordance with Section 5.2 of the Plan shall be $2,000 prior to January 1, 1991;  $3,000 on or after January 1, 1991 but before January 1, 1995; and $4,000 on or after January 1, 1995.

(h)    **Special Rules for Lump Sum Death Benefits with respect to Employees being employed by Primex Technologies, Inc.**  Notwithstanding the foregoing, effective as of December 31, 1996, Participants employed at the facility, who transfer to, and become employees of, Primex Technologies, Inc. or its affiliates are not eligible for a lump-sum death benefit under Section 5.2 of the Plan on or after the date such Participant is no longer actively employed by the Company or any of its subsidiaries.


**APPENDIX J-18, MARION**

J-54

(i)　　**Special Rules for Crediting Service with respect to Employees being employed by Primex Technologies, Inc.**  Effective as of December 31, 1996, Participants employed at the Marion facility, who transfer directly to, and become employees of, Primex Technologies, Inc. or its affiliates ("Primex") in connection with Olin's divestment of its ordnance and aerospace divisions (or who transfer directly within five years following such divestment), shall continue to receive credit for service with Primex in determining their Period of Creditable Service for purposes of vesting and eligibility to retire early under the terms of the Plan, expressly provided, however that (i) such service shall not be credited for purposes of benefit accrual under the terms of the Plan, and (ii) except as required under Code Section 401(a)(9), no benefit shall be payable from this Plan until the Participant terminates service with Primex. For purposes of applying the service credit, and limitation on distribution, provided by this paragraph, "Primex" shall be read to refer also to General Dynamics Ordnance and Tactical Systems, Inc. on and after January 25, 2001.

**APPENDIX J-18, MARION**

APPENDIX J-19

### *J-19 McIntosh*

This Appendix J-19 shall apply to all Eligible Employees working at the McIntosh, Alabama facility who are covered by a collective bargaining agreement between the Company (or its Affiliated Employers) and the International Association of Machinists and Aerospace Workers, AFL-CIO and Lodge 2452. With respect to these employees, the McIntosh facility shall be deemed to be the Employing Company. Notwithstanding anything in the Plan to the contrary, effective as of May 25, 2008, participation and benefit accruals under this Appendix J-19 shall be frozen, and Participants shall not accrue any additional benefits hereunder after such date. However, the Plan will continue to recognize Years of Creditable Service in determining a Participant's vesting and attainment of retirement dates hereunder.

(a)     **Prior Plans**. Prior to March 31, 1995, the Bargaining Employees Pension Plan of Olin Corporation. Prior to January 1, 1990, the McIntosh Pension Plan (originally effective May 1, 1968) as in effect through December 31, 1988 and as restated in the Bargaining Employees Pension Plan of Olin Corporation through December 31, 1989.

(b)     **Eligibility**. An individual shall become a Participant as of the date he becomes an Eligible Collectively Bargained Employee of the Employing Company; provided, however, that no individual shall become a Participant hereunder on or after May 25, 2008.

(c)     **Normal Retirement Allowance**.

(1)     For Retirements effective prior to July 1, 1991. A Participant's annual normal Retirement Allowance commencing on or after his Normal Retirement Date shall be equal to the appropriate flat benefit rate, based on the group in which he was classified immediately preceding his termination as indicated in the appropriate table below, multiplied by his years of Benefit Service:

| Group | Terminations Effective 7/1/89-6/30/91 | Terminations Effective 7/1/88-6/30/89 |
|---|---|---|
| 1 | $279 | $249 |
| 2 | $282 | $252 |
| 3 | $285 | $255 |
| 4 | $288 | $258 |

(2)     For Retirements effective on or after July 1, 1991. A Participant's annual normal Retirement Allowance commencing on or after his Normal Retirement Date shall be equal to the appropriate flat benefit rate specified in the table below multiplied by his Years of Benefit Service. Years of Benefit Service shall be frozen as of May 25, 2008, and no additional Years of Benefit Service shall accrue thereafter for any Participant.

| Termination Effective Date | Flat Benefit Rate |
|---|---|
| On or after July 1, 1991, but before May 1, 1994 | $336 |
| On or after May 1, 1994, but before May 1, 1995 | $360 |
| On or after May 1, 1995, but before May 1, 1996 | $372 |
| On or after May 1, 1996, but before May 1, 1997 | $384 |
| On or after May 1, 1997, but before May 1, 1998 | $396 |
| On or after May 1, 1998, but before May 1, 2004 | $480 |
| On or after May 1, 2004 | $540 |

**APPENDIX J-19, MCINTOSH**

J-56

(d)    **Early Retirement Allowance.**  A Participant who while in the employ of the Employing Company attains age 55 and is credited with at least 15 Years of Creditable Service may elect to retire and receive Early Retirement benefits in accordance with Section 3.2(c) of the Plan, provided, however, that if such Allowance commences prior to the first day of the month immediately following the Participant's 62nd birthday, the Allowance shall be equal to 79% of his Accrued Benefit plus 1/4 of 1% for each full calendar month which has elapsed from the first day of the month in which the Participant attains his 55th birthday to the month in which his first Retirement Allowance payment is due.

(e)    **Vested Deferred Retirement Allowance**.  A Participant whose employment has terminated may elect to receive Vested Deferred Retirement benefits in accordance with Section 3.3(b) of the Plan.

(f)    **Disability Retirement Allowance.**  Not available.

(g)    **Lump-Sum Death Benefit.**  The lump-sum death benefit payable in accordance with Section 5.2 of the Plan shall be: $1,500 with respect to Participants who terminate prior to July 1, 1991; $3,000 with respect to Participants who terminate on or after July 1, 1991, but before May 1, 1998; $5,000 with respect to Participants who terminate on or after May 1, 1998 but before May 1, 2004; and $6,500 with respect to Participants who terminate on or after May 1, 2004.

(h)    **Special Retirement Incentive Benefit Program**.

> (1)    Eligibility.  Any Participant who while in the employ of the Employing Company attains age 55 and is credited with at least 15 Years of Creditable Service (a "pension-eligible employee") may participate in the Special Retirement Incentive Benefit Program by applying therefor in writing during the fifteen (15) day "window" period, March 18, 1994 through April 1, 1994.  If such application is approved, the applicant must elect to retire no later than June 1, 1994.

> (2)    Retirement Incentive Benefits.  Pension-eligible employees whose applications to participate in the Special Retirement Incentive Benefit Program are approved by the Employing Company shall be eligible for

>> (i)    a Retirement Allowance commencing on or after his retirement date equal to $33.00 per month ($396 per year), multiplied by his years of Benefit Service;

>> (ii)    a one-time lump-sum retirement bonus payment equal to $125 per month for each month between the employee's retirement date and the date the employee will attain age 65, provided, however, that any such employee who is age 64 or older shall receive a minimum retirement bonus payment of $1,500; and

>> (iii)    credit for sufficient hours worked in 1994 so as to qualify for pro rata 1995 vacation pay, as described in Article XI, Section of the Labor Agreement.

> (3)    The terms of the Special Retirement Incentive Benefit Program are described more fully in a Memorandum of Agreement between Olin and the International Association of Machinists and Aerospace Workers, AFL-CIO and Lodge 2452, which agreement is incorporated herein by reference.

(i)    Notwithstanding paragraph (c) above, any Participant who went on a union leave of absence during 2002 shall utilize a $540 flat benefit rate in determining his annual normal Retirement Allowance commencing on or after his Normal Retirement Date.

**APPENDIX J-19, MCINTOSH**

J-57

APPENDIX J-20

### *J-20 Nazareth/Hi-Pure*

This Appendix J-20 shall apply to all Eligible Employees working at the Nazareth, Pennsylvania facility who are covered by a collective bargaining agreement between the Company (or an Affiliated Employer) and the Teamsters, Chauffeurs, Warehousemen & Helpers Union.  With respect to these employees, the Nazareth facility shall be deemed to be the Employing Company.

(a)    **Prior Plans**.  Prior to March 31, 1995, the Bargaining Employees Pension Plan of Olin Corporation.  Prior to January 1, 1990, the Hi-Pure Retirement Plan (originally effective October 29, 1984) as in effect through December 31, 1988 and as restated in the Bargaining Employees Pension Plan of Olin Corporation through December 31, 1989.

(b)    **Eligibility**.  An individual shall become a Participant as of the date he becomes an Eligible Collectively Bargained Employee of the Employing Company.

(c)    **Normal Retirement Allowance.**  A Participant's annual normal Retirement Allowance commencing on or after his Normal Retirement Date shall be equal to the sum of the following:

(1)    For periods of service on or after October 1, 1986, the applicable flat rate multiplied by the Participant's Years of Benefit Service credited for periods after October 1, 1986:

| Termination Effective Date | Flat Benefit Rate |
|---|---|
| On or after October 1, 1986, but before October 1, 1989 | $180 |
| on or after October 1, 1989, but before October 1, 1993 | $204 |
| On or after October 1, 1993 | $264 |

(2)    For periods of service prior to October 1, 1986, for each Year of Participation credited for periods prior to October 1, 1986, 1.1% of your calendar year earnings up to $7,800, plus 2% of your calendar year earnings over $7,800, as credited on the records of the Prior Plan.

(d)    **Early Retirement Allowance.**  A Participant who while in the employ of the Employing Company attains age 55 and is credited with at least 10 Years of Creditable Service may elect to retire and receive Early Retirement benefits in accordance with Section 3.2(c) of the Plan, provided, however, that if such Allowance commences prior to the first day of the month immediately following the Participant's 65th birthday, the Allowance shall be reduced to 60% plus 1/3 of 1% for each full calendar month by which his Benefit Commencement Date is after the first day of the month immediately following his 55th birthday.

(e)    **Vested Deferred Retirement Allowance**.  A Participant whose employment has terminated may elect to receive Vested Deferred Retirement benefits in accordance with Section 3.3(b) of the Plan.

(f)    **Disability Retirement Allowance.**  Not available.

(g)    **Lump-Sum Death Benefit.**  None.

(h)    **Special Rules Concerning Employee Contributions and Accrued Benefits under the Prior Plan.**

(1)    Effective October 1, 1986, no further employee contributions were required or permitted under the Hi-Pure Retirement Plan.

**APPENDIX J-20, NAZARETH/HI-PURE**

(2)    <u>Definitions</u>.  For purposes of this Appendix J-20, the following definitions shall apply:

(i)    "<u>Accrued Benefit Derived from Employee Contributions</u>" shall mean, as of any applicable date, the Participant's Accumulated Contributions expressed as a Retirement Allowance commencing at the Participant's Normal Retirement Date based on the interest rate which would be used by the Pension Benefit Guaranty Corporation for purposes of determining the present value of a lump-sum distribution from a plan that was terminated on the first day of the Plan Year in which the date of determination occurs.

(ii)    "<u>Accrued Benefit Derived from Employer Contributions</u>" means an annual Retirement Allowance in an amount equal to the excess, if any, of:

(A)    the Participant's total Accrued Benefit as of the date of determination, over

(B)    his Accrued Benefit Derived from Employee Contributions.

(iii)    "<u>Accumulated Contributions</u>" shall mean the aggregate of a Participant's contributions under the Hi-Pure Retirement Plan, plus Compound Interest, reduced by any refund of such contributions (including accrued interest) to the Participant.

(iv)    "<u>Compound Interest</u>" shall mean (A) with respect to the period prior to December 31, 1987, 5% per annum, compounded annually and (B) with respect to Plan Years commencing on and after January 1, 1988, (1) a rate equal to 120% of the Federal mid-term rate as in effect on the first day of each Plan Year, compounded annually, until the date of determination which shall be the earlier of the date on which a Participant's Accumulated Contributions are withdrawn or his Benefit Commencement Date, plus (2) the interest rate which would be used by the Pension Benefit Guaranty Corporation for purposes of determining the present value of a lump-sum distribution from a plan that was terminated on the first day of each Plan Year, compounded annually, from the date of determination to the Participant's Normal Retirement Date.

(3)    <u>Vesting</u>.  A Participant is always fully vested in his Accrued Benefit Derived from Employee Contributions.

(4)    <u>Refund of Accumulated Contributions</u>.

(i)    Any Participant or Former Participant who has made employee contributions under the Prior Plan may elect to receive a refund of his Accumulated Contributions at any time. If such a Participant withdraws his Accumulated Contributions, he shall be entitled to receive a Retirement Allowance based only on his Accrued Benefit Derived from Employer Contributions and all references to his Accrued Benefit in the Plan shall be deemed to refer to his Accrued Benefit Derived from Employer Contributions.  In the event such a Former Participant is reemployed by an Affiliated Company prior to incurring a five-year Period of Severance, he may repay the amount of his Accumulated Contributions (including Compound Interest from the date of the withdrawal to the date of repayment) to the Plan within five years of his date of reemployment, and his Accrued Benefit Derived from Employee Contributions shall be restored.

(ii)    Any Participant who is not vested in any portion of his Accrued Benefit Derived from Employer Contributions will receive a refund of his Accumulated Contributions upon his termination of employment with all Affiliated Companies; <u>provided</u>, <u>however</u>, that no distribution of such Accumulated Contributions will be made prior to the Participant's attainment of his Normal Retirement Date without the Participant's consent

**APPENDIX J-20, NAZARETH/HI-PURE**

J-59

if such amount exceeds $5,000 ($3500 prior to January 1, 1998).  If such Participant does not consent to the distribution of his Accumulated Contributions, he will be entitled to a Retirement Allowance based on his Accrued Benefit Derived from Employee Contributions upon attaining his Normal Retirement Date.  In the event of the death of such Participant who is not vested in any portion of his Accrued Benefit Derived from Employer Contributions prior to his Normal Retirement Date, a pre-retirement annuity shall be paid to his surviving spouse, if any, in accordance with Section 5.1(b) of the Plan based on his Accrued Benefit Derived from Employee Contributions.

If a Participant who is not vested in his Accrued Benefit Derived from Employer Contributions receives a refund of his Accumulated Contributions, he will not be entitled to any further benefit from the Plan; provided, however, that in the event such Participant is reemployed by an Affiliated Company prior to incurring a five year Period of Severance, he may repay the amount of his Accumulated Contributions (including Compound Interest from the date of the withdrawal to the date of repayment) to the Plan, within five years of his date of reemployment, and his Accrued Benefit Derived from Employee Contributions shall be restored.

(iii)    In any event, the aggregate amount paid under the Plan as a result of a Participant's or Former Participant's death, together with any amount paid to the Participant during his lifetime, shall be at least equal to the amount of his Accumulated Contributions.  Any death benefit payable pursuant to this subparagraph shall be paid to the Participant's Beneficiary.

**APPENDIX J-20, NAZARETH/HI-PURE**

J-60

APPENDIX J-21

### *J-21 Niagara Falls*

This Appendix J-21 shall apply to all Eligible Employees working at the Niagara Falls, New York facility, the portion of which was operated solely by the Company, during such time as they are covered by a collective bargaining agreement between the Company (or an Affiliated Employer) and the Oil, Chemical and Atomic Workers International Union, Local 8-77. With respect to these employees, the Niagara Falls facility shall be deemed to be the Employing Company. Effective as of the decertification of the Union on March 1, 1996, those employees covered under this Appendix shall cease benefit accruals under this Appendix J-21 and commence accruing benefits under Appendix J-24. Reference should be made to the special service crediting provisions of paragraph (j)(14) of Appendix J-24 for guidance in calculating the benefits payable to such employees following the Union decertification which occurred on March 1, 1996.

(a) **Prior Plans**. Prior to March 31, 1995, the Bargaining Employees Pension Plan of Olin Corporation. Prior to January 1, 1990, the Niagara Falls Pension Plan (originally effective November 1, 1976) as in effect through December 31, 1988 and as restated in the Bargaining Employees Pension Plan of Olin Corporation through December 31, 1989.

(b) **Eligibility**. An individual shall become a Participant as of the date he becomes an Eligible Collectively Bargained Employee of the Employing Company.

(c) **Normal Retirement Allowance.** A Participant's annual normal Retirement Allowance commencing on or after his Normal Retirement Date shall be equal to the appropriate flat benefit rate, multiplied by his years of Benefit Service:

| Termination Effective Date | Flat Benefit Rate |
|---|---|
| On or after April 1, 1986, but before April 1, 1989 | $222 |
| On and after April 1, 1989, but before April 1, 1992 | $252 |
| On and after April 1, 1992 | $300 |

Effective as of March 1, 1996, those employees covered under this Appendix shall cease benefit accruals under this Appendix J-21 and commence accruing benefits under Appendix J-24.

(d) **Early Retirement Allowance.** A Participant who while in the employ of the Employing Company attains age 55 and is credited with (i) prior to April 1, 1992, at least 20 Years of Creditable Service, and (ii) on or after April 1, 1992, at least 15 Years of Creditable Service, may elect to retire and receive Early Retirement benefits in accordance with Section 3.2(c) of the Plan.

(e) **Vested Deferred Retirement Allowance**. A Participant whose employment has terminated may elect to receive Vested Deferred Retirement benefits in accordance with Section 3.3(b) of the Plan.

(f) **Disability Retirement Allowance.** Not available.

(g) **Lump-Sum Death Benefit.** The lump-sum death benefit payable in accordance with Section 5.2 of the Plan shall be $2,000.

**APPENDIX J-21, NIAGARA FALLS**

APPENDIX J-22

### J-22 Niagara/<u>Niachlor</u>

This Appendix J-22 shall apply to all salaried and hourly non-bargaining employees of the Company employed at the facility previously operated as a joint venture with E.I. du Pont de Nemours and Company, at Niagara Falls, New York (hereinafter referred to as "Niagara Falls/Niachlor") and all collectively bargained employees working at Niagara Falls/Niachlor covered by a collective bargaining agreement between the Company (or an Affiliated Employer) and United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO (USW) 4-598.

Such employees, whether salaried or collectively bargained, who were an employee of Du Pont at the Niagara Falls/Niachlor facility immediately prior to March 1, 1997 and who became an Olin employee on or about March 1, 1997 in connection with the acquisition by Olin of the Niagara Falls/Niachlor business are referred to as the "Dupont Transferred Employees". All other employees, whether salaried, hourly or collectively bargained, covered by this Appendix J-22 who are not Dupont Transferred Employees are referred to as the "Niagara Employees". (For avoidance of doubt, there were no hourly non-bargaining employees of Du Pont at the Niagara Falls/Niachlor facility immediately prior to March 1, 1997 who became an Olin employee on or about March 1, 1997 in connection with the its acquisition.)

For avoidance of doubt, Niagara Employees includes those employees who were hired at the Niagara Falls, New York facility, the portion of which was operated solely by the Company, after the decertification of the union referenced in Appendix J-21 in March 1996, but shall not include such decertified employees covered by Appendix J-21. This Appendix J-22 shall not cover the employees covered by Appendix J-21.

With respect to the Dupont Transferred Employees and Niagara Employees, the Niagara Falls/Niachlor business shall be deemed to have been the "Employing Company" since March 1, 1996. Notwithstanding anything in the Plan to the contrary, with respect to participation under this Appendix J-22, employees hired on or after March 15, 2006 shall not be eligible to participate in the Plan.

Notwithstanding anything in the Plan to the contrary, effective as of December 31, 2007, participation and benefit accruals with regard to all Participants, except collectively-bargained Dupont Transferred Employees, under this Appendix J-22 shall be frozen, and such Participants shall not accrue any additional benefits hereunder after such date (the "Frozen Participants"). However, the Plan will continue to recognize Years of Creditable Service in determining a Frozen Participant's vesting and attainment of retirement dates hereunder. For avoidance of doubt, Frozen Participants (i) includes all Niagara Employees (whether salaried, hourly or collectively bargained) and salaried Dupont Transferred Employees, and (ii) does not include collectively bargained Dupont Transferred Employees.

(a)    <u>Prior Plans</u>. None sponsored by the Company. Prior to March 1, 1997, the Dupont Transferred Employees participated in the E.I. du Pont de Nemours and Company Pension and Retirement Plan (the "Du Pont Plan"). In connection with the acquisition of the Niagara Falls/Niachlor business, assets of the Du Pont Plan were transferred to this Plan.

(b)    <u>Eligibility</u>. An individual, other than a Dupont Transferred Employee who was a Participant in the Du Pont Plan as of February 28, 1997, shall become a Participant in this Plan as of the date he both is an Eligible Employee of the Employing Company and has completed one Year of Service; provided, however, that no individual that is hired on or after March 15, 2006 shall become a Participant hereunder. A Dupont Transferred Employee who was a Participant in the Du Pont Plan as of February 28, 1997 shall become a Participant in this Plan as of March 1, 1997.

(c)    <u>Normal Retirement Allowance</u>.

**APPENDIX J-22, NIAGARA FALLS/NIACHLOR**

J-62

(1)     for Dupont Transferred Employees who did not commence retirement benefits under the Du Pont Plan prior to becoming Participants in this Plan (a "Du Pont Formula Transferred Employee").  A Du Pont Formula Transferred Employee's annual normal Retirement Allowance commencing on or after his Normal Retirement Date shall be equal to the greatest of:

FORMULA A:  1.2% of the Participant's Average Compensation multiplied by the sum of his years (and fractions thereof) of service credited on the records of the Du Pont Plan for purposes of benefit accrual and his Years of Benefit Service credited on the records of this Plan; or

FORMULA B:  1.5% of the Participant's Average Compensation multiplied by the sum of his years (and fractions thereof) of service credited on the records of the Du Pont Plan for purposes of benefit accrual and his Years of Benefit Service credited on the records of this Plan, minus 50% of the Participant's Primary Social Security Benefit; provided, however, that for purposes of this FORMULA B, a Participant's Primary Social Security Benefit shall mean the Participant's Social Security benefit based on his Du Pont and Olin earnings and service only (rather than on the Participant's total employment history) and the Social Security law in effect on January 1 of the year in which the Participant retires or terminates service with Olin; or

FORMULA C:  $108 multiplied by the sum of his years (and fractions thereof) of service credited on the records of the Du Pont Plan for purposes of benefit accrual and his Years of Benefit Service credited on the records of this Plan, plus 2/3% of 1% of the Participant's Average Compensation multiplied by the sum of his years (and fractions thereof) of service credited on the records of the Du Pont Plan for purposes of benefit accrual and his Years of Benefit Service credited on the records of this Plan, up to a maximum of fifteen (15) years (i.e., up to a maximum of 10% of Average Compensation).

(2)     Normal Retirement Allowance for Dupont Transferred Employees who commenced retirement benefits under the Du Pont Plan prior to becoming Participants in this Plan (an "Olin Formula Transferred Employee").  The annual Normal Retirement Allowance of an Olin Formula Transferred Employee, commencing on or after his Normal Retirement Date, shall be computed as provided in paragraph (c) of Appendix J-24, Olin Corporate Group, taking into account only such Participant's Years of Benefit Service for Olin (and disregarding any years of service for purposes of benefit accrual credited under the Du Pont Plan).

(3)     Normal Retirement Allowance for Participants who are Niagara Employees.  The annual Normal Retirement Allowance of a Participant who is a Niagara Employee, commencing on or after his Normal Retirement Date, shall be computed as provided in paragraph (c)(1) of Appendix J-24, Olin Corporate Group.

(4)     December 31, 2007 Freeze for Frozen Participants. The benefit accrual of Frozen Participants under this Appendix J-22, whether under paragraphs (1), (2), and (3) above, shall be frozen as of December 31, 2007, and any benefit payable to a Frozen Participant shall be based on the Frozen Participant's Accrued Benefit as of December 31, 2007.  Frozen Participants shall continue to receive credit for service after December 31, 2007 in determining their Years of Creditable Service for purposes of vesting and eligibility to retire early hereunder; provided, however, (and subject to the following paragraph) that (i) such service after December 31, 2007 shall not be credited for purposes of benefit accrual or Benefit Service under the terms of the Plan, and (ii) Compensation earned after December 31, 2007 shall not count toward the determination of benefits under the Plan.  The freeze on benefit accrual service or Benefit Service indicated in clause (i) of the preceding service applies to any service after December 31, 2007, whether it be service that is attributable to employment service, severance benefits or job transition benefits.

Notwithstanding the preceding paragraph, for any Frozen Participant who is being credited with benefit accrual service or Benefit Service as of December 31, 2007 due to being Disabled, such

**APPENDIX J-22, NIAGARA FALLS/NIACHLOR**

J-63

Frozen Participant shall continue to be credited after December 31, 2007 with benefit accrual service or Benefit Service in the same manner and subject to the same terms as before (or as may be subsequently amended).

Except as provided in the above paragraph, for the avoidance of doubt, the only Participants under this Appendix J-22 accruing benefits hereunder after December 31, 2007 are the collectively bargained Dupont Transferred Employees.

(d) Early Retirement Allowance.

(1) Early Retirement Allowance for Du Pont Formula Transferred Employees. A Du Pont Formula Transferred Employee who has completed fifteen (15) Years of Creditable Service and who attains his fiftieth (50th) birthday while in the employ of the Company may elect to receive an Early Retirement Allowance commencing as of the first day of any month coincident with or following his actual date of retirement but not later than the first day of the month immediately following his sixty-fifth (65th) birthday. Such benefit shall be equal to his Accrued Benefit, determined in accordance with paragraph (c)(1) of this Appendix J-22, multiplied by the applicable percentage factor from the Early Retirement Table below:

Early Retirement Table

| Age at Benefit Commencement Date | YEARS OF SERVICE | | | | | | | | Age at Benefit Commencement Date |
|---|---|---|---|---|---|---|---|---|---|
| | 15 through 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 and over | |
| 65 | 100% | | | | | | | | 65 |
| 64 | 95 | 100% | | | Unreduced Pension | | | | 64 |
| 63 | 90 | 95 | 100% | | 100% | | | | 63 |
| 62 | 85 | 90 | 95 | 100% | | | | | 62 |
| 61 | 80 | 85 | 90 | 95 | 100% | | | | 61 |
| 60 | 75 | 80 | 85 | 90 | 95 | 100% | | | 60 |
| 59 | 70 | 75 | 80 | 85 | 90 | 95 | 100% | | 59 |
| 58 | 65 | 70 | 75 | 80 | 85 | 90 | 95 | 100% | 58 |
| 57 | 60 | 65 | 70 | 75 | 80 | 85 | 90 | 95 | 57 |
| 56 | 55 | 60 | 65 | 70 | 75 | 80 | 85 | 90 | 56 |
| 55 | 50 | 55 | 60 | 65 | 70 | 75 | 80 | 85 | 55 |
| 54 | 50 | 50 | 55 | 60 | 65 | 70 | 75 | 80 | 54 |
| 53 | 50 | 50 | 50 | 55 | 60 | 65 | 70 | 75 | 53 |
| 52 | 50 | 50 | 50 | 50 | 55 | 60 | 65 | 70 | 52 |
| 51 | 50 | 50 | 50 | 50 | 50 | 55 | 60 | 65 | 51 |
| 50 | 50 | 50 | 50 | 50 | 50 | 50 | 55 | 60 | 50 |

(2) Special Optional Retirement Allowance for Du Pont Formula Transferred Employees. A Du Pont Formula Transferred Employee who (i) has twenty-five (25) Years of Creditable Service, (ii) has attained age forty-five (45) while in the employ of the Company and (iii) is involuntarily terminated by the Company due to lack of work shall be entitled to receive an optional Retirement Allowance in accordance with this paragraph (d)(2). The number of Years of Service required to receive an Optional Retirement Allowance shall be reduced by two months for each month which has elapsed since the Employee attained age forty-five (45) as of his date of termination of employment, provided the Employee is credited with at least fifteen (15) Years of Creditable Service. Alternatively, a Transferred Employee who (i) has fifteen (15) Years of Creditable Service, (ii) has attained age 50 while in the employ of the Company and (iii) is involuntarily

**APPENDIX J-22, NIAGARA FALLS/NIACHLOR**

J-64

terminated by the Company for reasons other than dishonesty, insubordination or other misconduct shall also be entitled to receive an Optional Retirement Allowance in accordance with this paragraph (d)(2).  The Optional Retirement Allowance shall be calculated as a Normal Retirement Allowance under paragraph (c)(1) of this Appendix J-22, but shall be reduced by 5/12ths of 1% for each month by which the Participant's Benefit Commencement Date precedes the earliest month in which with continued employment he would have become eligible for an unreduced pension as provided in paragraph (d)(1).

(3)     Early Retirement Allowance for Olin Formula Transferred Employees.  An Olin Formula Transferred Employee who while in the employ of the Company attains age 55 and is credited with at least 10 Years of Creditable Service may elect to retire and receive Early Retirement benefits in accordance with Section 3.2(c) of the Plan and paragraph (c)(2) of this Appendix J-22 (i.e., taking into account only such Participant's Years of Benefit Service for Olin, and disregarding any years of service for purposes of benefit accrual credited under the Du Pont Plan).

(4)     Early Retirement Allowance for Participants who are Niagara Employees.  A Participant who is a Niagara Employee who while in the employ of the Company attains age 55 and is credited with at least 10 Years of Creditable Service may elect to retire and receive Early Retirement benefits in accordance with Section 3.2(c) of the Plan and paragraph (c)(3) of this Appendix J-22.

(e)     Vested Deferred Retirement Allowance.

(1)     Vested Deferred Retirement Allowance for Du Pont Formula Transferred Employees.  A Du Pont Formula Transferred Employee who has completed five (5) Years of Creditable Service prior to terminating service with the Company is entitled to a Vested Deferred Retirement Allowance equal to his Accrued Benefit determined as of his date of termination of employment in accordance with paragraph (c)(1) of this Appendix J-22.  Such Vested Deferred Retirement Allowance shall commence as of the Participant's Normal Retirement Date, or, if such Participant is credited with at least thirty (30) years of Creditable Service, as of the first day of the month of any month on or after such Participant attains age 60, following receipt by the Administrative Committee of an application therefor.  Alternatively, if a Du Pont Formula Transferred Employee, upon termination of service, has been credited with at least ten (10) Years of Creditable Service, upon attaining the applicable age specified below such Participant may elect to receive a reduced Vested Deferred Retirement Allowance based on his Accrued Benefit determined as of his date of termination of employment in accordance with paragraph (c)(1) of this Appendix J-22.  Such Vested Deferred Retirement Allowance shall commence as of the first day of the month of any month following receipt by the Administrative Committee of an application therefor.  Such a Participant's early Vested Deferred Retirement Allowance shall be reduced by 5/12ths of 1% for each month before the month such Participant would otherwise be entitled to an unreduced Vested Deferred Retirement Allowance.

| Years of Service at Termination | Age at which Benefits May Commence – Reduced | Age at which Benefits May Commence – Unreduced |
| --- | --- | --- |
| Less than 10 | Not Available | 65 and over |
| 10 to 14 | 60 to 64 | 65 and over |
| 15 to 29 | 50 to 64 | 65 and over |
| 30 or more | 50 to 59 | 60 and over |

(2)     Vested Deferred Retirement Allowance for Olin Formula Transferred Employees.  An Olin Formula Transferred Employee who is credited with at least five (5) Years of Creditable Service and whose employment has terminated may elect to receive Vested Deferred Retirement benefits in accordance with Section 3.3(b) of the Plan and paragraph (c)(3) of this Appendix J-22 (i.e., taking

**APPENDIX J-22, NIAGARA FALLS/NIACHLOR**

J-65

into account only such Participant's Years of Benefit Service for Olin, and disregarding any years of service for purposes of benefit accrual credited under the Du Pont Plan).

(3)    Vested Deferred Retirement Allowance for Participants who is a Niagara Employee.  A Participant who is a Niagara Employee, who is credited with at least five (5) Years of Creditable Service and whose employment has terminated may elect to receive Vested Deferred  Retirement benefits in accordance with Section 3.3(b) of the Plan and paragraph (c)(3) of this Appendix J-22.

(f)    Disability Retirement Allowance.

(1)    Du Pont Incapability Retirement Allowance.  In the event a Du Pont Formula Transferred Employee becomes Disabled while in the employ of the Company after completing fifteen (15) Years of Service, he shall be entitled to an Incapability Retirement Allowance.  Such Retirement Allowance shall commence as of the first day of any month following receipt by the Administrative Committee of an application therefor provided that the Administrative Committee finds that such Employee has been Disabled for six months.  The annual Incapability Retirement Allowance payable pursuant to this paragraph (f)(1) shall consist of an allowance calculated in accordance with the provisions of paragraph (c)(1) of this Appendix J-22, without reduction for early commencement, plus an incapability supplement equal to the greater of 50% of the Participant's Primary Social Security Benefit or $90 a month, such amount to be paid until the earlier of the date such Employee attains age 62 or becomes eligible for a disability benefit under the Social Security Act.  For purposes of the Incapability Retirement Allowance, a Participant's Primary Social Security Benefit shall mean the Participant's Social Security benefit based on his Du Pont and Olin earnings and service only (rather than on the Participant's total employment history) and the Social Security law in effect on January 1 of the year in which the Participant becomes eligible for such Retirement Allowance.

(2)    Olin Disability Retirement Allowance.  In the event an Olin Formula Transferred Employee or other Participant who has not attained his Normal Retirement Date becomes Disabled while in the employ of the Company, he shall continue to participate in the Plan and to accrue Benefit Service while he is Disabled and such period of disability shall be included in his Period of Creditable Service.  For the purposes of computing his Retirement Allowance, such Employee shall be considered as having continued to receive throughout the period during which he was Disabled the basic annual rate of salary he was receiving on the date he became Disabled.  At the time when the Administrative Committee determines that a Participant is no longer Disabled (or when such Participant reaches his Normal Retirement Date), the individual's participation in the Plan shall be terminated (unless he returns to active employment) and his right to a Retirement Allowance under the Plan shall be determined as of that date.  For purposes of determining such Participant's right to, and amount of, future benefits under the Plan, the Participant shall be credited with Benefit Service for the period of time he was Disabled and shall be deemed to have received throughout the period during which he was Disabled the regularly stated salary or wages he was receiving at the time he became Disabled.  If a Disabled Participant dies before attaining age sixty-five (65), his surviving spouse, if any, shall be entitled to a pre-retirement survivor annuity in accordance with Section 5.1 of the Plan.  Notwithstanding the foregoing, no Participant shall qualify for a Disability Retirement Allowance following his separation from service with the Company and all other Employing Companies, or during a period in which he is not actively employed by the Company or other Employing Companies.

(g)    Lump-Sum Death Benefit.  The Beneficiary of a Participant shall be eligible for a lump-sum death benefit of $5,000 as described in Section 5.2 of the Plan.

(h)    Definitions and Special Rules for Crediting Service and Computing Retirement Allowances.

The following definitions and special rules apply for purposes of this Appendix J-22 only.

**APPENDIX J-22, NIAGARA FALLS/NIACHLOR**

J-66

(1)    [Reserved]

(2)    "Normal Retirement Date" for a Dupont Transferred Employee who did not elect to commence retirement benefits under the Du Pont Plan prior to March 1, 1997 shall mean the first of the month on or after the Participant attains age 65 and has been credited with at least five (5) Years of Creditable Service.

(3)    "Creditable Service" of a Dupont Transferred Employee includes service credited on the records of the Du Pont Plan for purposes of eligibility, participation and vesting, plus such Participant's Creditable Service for Olin as defined in Section 1.1 of this Plan.

(4)    "Average Compensation" of a Dupont Transferred Employee shall mean the greater of such Participant's Average Pay calculated under the Du Pont Plan as of March 1, 1997 or his Average Compensation as defined in Section 1.1 of this Plan taking into account compensation earned while employed by Du Pont (prior to March 1, 1997) and while employed by Olin (on and after March 1, 1997).

(5)    "Disabled" shall mean disabled to the extent that the Participant is receiving disability benefits under a plan providing long-term disability benefits maintained by the Company. Notwithstanding the foregoing, for purposes of becoming entitled to an Incapability Retirement Allowance, "Disabled" shall mean that the Du Pont Formula Transferred Employee is determined by the Administrative Committee to be permanently incapable, by virtue of a physical or mental infirmity which is expected to be of an indefinite duration, of performing the duties of his regular position with the required degree of efficiency. In making this determination, the Administrative Committee may rely in its discretion on the opinion of the Company physician, on evidence of the Participant's entitlement to long-term disability benefits and/or Social Security disability benefits, and on such other evidence as it deems relevant. Any question as to whether a Participant is, or continues to be, Disabled shall be determined by the Administrative Committee. A Participant shall not be deemed Disabled if, upon request of the Administrative Committee, he fails to provide evidence of disability satisfactory to the Administrative Committee or fails to complete any other documents required by the Administrative Committee pertaining to his disability. Any Participant who shall refuse to submit to any physical examination properly requested shall no longer be considered to be Disabled for purposes of this Plan.

(6)    For purposes of determining a collectively bargained Dupont Transferred Employee's benefits, Compensation shall include the one-time $1,250 payments to be made in July 2014, October 2014, July 2016 and October 2016.

(i)    <u>Special Retirement Allowance and Death Benefit Rules for Du Pont Formula Transferred Employees</u>.

The following special rules, which apply solely to the retirement and death benefits payable to or on account of Du Pont Formula Transferred Employees, modify the provisions of Section 4.1 of the Plan, Normal Form of Retirement Allowance, Section 4.2 of the Plan, Optional Forms of Payment, and Section 5.1 of the Plan, Spouse's Death Benefit.

(1)    <u>Company Paid Survivor Benefits</u>. Company Paid Survivor Benefits shall be paid with respect to each Du Pont Formula Transferred Employee with at least fifteen (15) Years of Service who dies while in the employ of the Company or after electing to retire with a Normal Retirement Allowance under paragraph (c)(1), an Early Retirement Allowance under paragraph (d)(1), an Optional Early Retirement Allowance under paragraph (d)(2) or an Incapability Retirement Allowance under paragraph (f)(1).

Company Paid Survivor Benefits shall be paid, as elected by the Participant, to

**APPENDIX J-22, NIAGARA FALLS/NIACHLOR**

J-67

(i)  the Participant's Spouse for life, provided that if the surviving Spouse dies at a time when there is a child or children of the Participant under age 21, a survivor benefit will continue to be paid until such time as each such child attains age 21.  The amount paid to each such child shall be determined by dividing the Company Paid Survivor Benefit into equal shares based on the number of such children.  Each child's separate share will be paid until that child attains age 21;

(ii)  the Participant's minor children, in equal shares.  Each child's separate share will be paid until that child attains age 21; or

(iii)  one of the Participant's parents or step-parents for life;

provided, however, that any survivor designation in favor of a non-Spouse beneficiary must be consented to by the Participant's Spouse in accordance with Section 4.3 of the Plan.

The monthly Company Paid Survivor Benefit shall equal the greater of

(A)  0.5% of the Participant's Average Compensation multiplied by the sum of his years (and fractions thereof) of service credited on the records of the Du Pont Plan for purposes of benefit accrual and his Years of Benefit Service credited on the records of this Plan; or

(B)  4% of the Participant's Average Compensation, plus $4.00 multiplied by the sum of his years (and fractions thereof) of service credited on the records of the Du Pont Plan for purposes of benefit accrual and his Years of Benefit Service credited on the records of this Plan;

provided, however, that (a) if the Company Paid Survivor Benefit is payable to a beneficiary, other than the Participant's minor child, who is more than five (5) years younger than the Participant, the benefit is actuarially reduced to reflect the age difference, and (b) if the Participant elected to receive an early retirement or optional retirement allowance that was subject to a reduction (as provided in paragraphs (d)(1) and (d)(2), above), the benefit is reduced by the same factor as was applied to the retirement allowance.

(2)  Pre-Retirement Spouse Benefit Option.  Each Du Pont Formula Transferred Employee with at least fifteen (15) Years of Service who is at least age 55 and married is deemed to have automatically elected to receive the Pre-Retirement Spouse Benefit Option, unless such benefit is waived by the Participant with the consent of his Spouse in accordance with the provisions of Section 4.3 of the Plan.  In the event of the Participant's death while still in the employ of the Company or prior to commencing a retirement allowance, such benefit shall be paid in addition to the Company Paid Survivor Benefit (described in paragraph (i)(1), above).  The Pre-Retirement Spouse Benefit, equal to ten percent (10%) of the retirement allowance the Participant would have been entitled to if he had retired as of his date of death, shall be paid monthly to the Participant's Spouse for life.

(3)  Post-Retirement Spouse Benefit Option.  Each Du Pont Formula Transferred Employee with at least fifteen (15) Years of Service who is at least age 55 and married at the time he retires, having elected to retire with a Normal Retirement Allowance under paragraph (c)(1), an Early Retirement Allowance under paragraph (d)(1), an Optional Early Retirement Allowance under paragraph (d)(2) or an Incapability Retirement Allowance under paragraph (f)(1), is deemed to have automatically elected to receive the Post-Retirement Spouse Benefit Option, unless such benefit is waived by the Participant with the consent of his Spouse in accordance with the provisions of Section 4.3 of the Plan.  The Participant's election with respect to this benefit at the time of retirement is irrevocable.  In the event of the Participant's death after commencing a retirement allowance, such benefit shall be paid in addition to the Company Paid Survivor Benefit (described

**APPENDIX J-22, NIAGARA FALLS/NIACHLOR**

J-68

in paragraph (i)(1), above), and is calculated so as to generate an amount which when added to the Company Paid Survivor Benefit, is equal to at least the minimum survivor annuity amount required to be paid to a under Code Sections 401(a)(11) and 417, or if elected as provided under Section 4.3 of the Plan, the survivor annuity amount with a survivor percentage of 75%, based on the age of the Participant and the Participant's spouse as of the date the retirement allowance commences. The retirement allowance of the Participant shall be actuarially adjusted to provide for the Post-Retirement Spouse Benefit.  The Post-Retirement Spouse Benefit shall be paid monthly to the Participant's Spouse for life.

(4)     Post-Retirement Joint & Survivor Option.  Each Du Pont Formula Transferred Employee who upon retirement is eligible for an unreduced retirement allowance or who has at least twenty-five (25) Years of Service and is at least age 50 at the time of retirement may elect to receive a Post-Retirement Joint & Survivor Option.

| Employee's Age | Years of Service for Unreduced Retirement Allowance |
|---|---|
| 61 | 24 |
| 62 | 23 |
| 63 | 22 |
| 64 | 21 |
| 65 or older | 5 or more |

A Participant electing the Post-Retirement Joint & Survivor Option may choose to provide his beneficiary with any multiple of 10% of such Participant's retirement allowance (or 75% of such Participant's retirement allowance) in the event the Participant predeceases the beneficiary, provided, however, that the sum of all survivor benefits payable under the Plan on account of the Participant's death shall not exceed the amount of the Participant's retirement allowance (as adjusted to provide such benefits).  The Participant's election with respect to this option at the time of retirement is subject to Section 4.3 and is irrevocable.  In the event of the Participant's death after commencing retirement, such benefit shall be paid in addition to the Company Paid Survivor Benefit (described in paragraph (i)(1), above), and in addition to the Post-Retirement Spouse Benefit (described in paragraph (i)(3), above)(unless such benefit was waived by the Participant with the consent of the Participant's Spouse).  If the Post-Retirement Joint and Survivor Option is elected, the retirement allowance of the Participant shall be actuarially adjusted, based on the age of the Participant and the Participant's beneficiary as of the date the retirement allowance commences to provide for this benefit.  The survivor benefit available under the Post-Retirement Joint and Survivor Option shall be paid monthly to the Participant's beneficiary for life.

(5)     Pre-Payment Spouse Benefit Coverage for Vested Deferred Participants.  Each Du Pont Formula Transferred Employee with at least five (5) but less than fifteen (15) Years of Service who is married is deemed to have automatically elected to receive the Pre-Payment Spouse Benefit Coverage, unless such benefit is waived by the Participant with the consent of his Spouse in accordance with the provisions of Section 4.3 of the Plan.  If the Employee was eligible for a vested deferred retirement allowance to be paid as of his date of death, the Pre-Retirement Spouse Benefit shall consist of a survivor annuity payable to the Participant's Spouse in the form and amount that such Spouse would have received if the Participant had retired on the day before his death and had elected to receive his benefits commencing immediately in the form of a qualified

**APPENDIX J-22, NIAGARA FALLS/NIACHLOR**

J-69

joint and 50% survivor annuity described in Section 4.1(c) of the Plan.  If the Employee was not eligible for a vested deferred retirement allowance to be paid as of his date of death, the Pre-Payment Spouse Benefit shall consist of a survivor annuity payable to the Participant's Spouse in the form and amount that such Spouse would have received if the Participant had terminated employment on his date of death (or in the case of a former employee, on his actual termination of service date) and had elected to receive his benefits commencing as of the earliest date he would have become eligible for such payments in the form of a qualified joint and 50% survivor annuity described in Section 4.1(c) of the Plan.

(6)     Post-Payment Spouse Benefit for Vested Deferred Participants.  Each Du Pont Formula Transferred Employee with at least five (5) but less than fifteen (15) Years of Service who is married at his benefit commencement date is deemed to have automatically elected to receive his vested deferred retirement allowance in the form of the Post-Payment Spouse Benefit, unless such benefit is waived by the Participant with the consent of his Spouse in accordance with the provisions of Section 4.3 of the Plan.  The Post-Payment Spouse Benefit shall consist of a qualified joint and 50% survivor annuity described in Section 4.1(c) of the Plan, or if elected as provided under Section 4.3 of the Plan, the 75% joint and survivor annuity option under Option 1 of Section 4.2 of the Plan.

**APPENDIX J-22, NIAGARA FALLS/NIACHLOR**

J-70

APPENDIX J-23

### *J-23 OCG/OMM*

This Appendix J-23 shall apply to all Eligible Employees who are salaried and hourly non-collectively bargained employees who were credited with an hour of service for service to OCG Microelectronic Materials, Inc. prior to October 1, 1995. With respect to these employees, OCG Microelectronic Materials has been a Participating Employer and Employing Company since October 1, 1995. Employees of OCG Microelectronic Materials or Olin Microelectronic Materials or Olin Microelectronic Chemicals who do not have any service credited for service to OCG Microelectronic Materials prior to October 1, 1995 are covered under the Olin Corporate Group, Appendix J-24.

(a)    **Prior Plan**. OCG Pension Plan (originally effective January 1, 1992), as in effect prior to its merger into this Plan effective October 1, 1995.

(b)    **Eligibility**. An individual shall become a Participant as of the date he both is an Eligible Non-Collectively Bargained Employee of the Employing Company and has completed one Year of Creditable Service.

(c)    **Normal Retirement Allowance**. A Participant's annual normal Retirement Allowance commencing on or after his Normal Retirement Date shall be equal to the greatest of

   (1)    1.5% of the Participant's Average Compensation multiplied by the years (and fractions thereof) of his Benefit Service, minus the lesser of *(i)* 1/70th of the Participant's Primary Social Security Benefit multiplied by the years (and fractions thereof) of his Benefit Service (up to a maximum of 35 years) or *(ii)* 50% of the Participant's Primary Social Security Benefit multiplied by a fraction, the numerator of which is his actual number of years of Benefit Service and the denominator of which is the total number of years of Benefit Service that he would have if he remained in the employ of the Company until his Normal Retirement Date;

   (2)    1% of the Participant's Average Compensation multiplied by the years (and fractions thereof) of his Benefit Service; or

   (3)    in the case of a CG Participant for whom pension assets were transferred from the CG Plan to the OCG Pension Plan, an amount equal to the sum of:

>      (i) the Participant's Accrued Benefit determined under the terms of the CG Plan as in effect on December 31, 1991, based on his Benefit Service on the date immediately preceding the date such Participant became a Participant in the OCG Pension Plan and his actual Average Compensation determined on his date of retirement; and

>      (ii) the greater of the Participant's Accrued Benefit determined in accordance with paragraph (c)(1) or paragraph (c)(2), above, based on the Participant's Benefit Service accrued after he became a Participant in the OCG Pension Plan and his Actual Average Compensation determined on his date of retirement.

(d) **Early Retirement Allowance**.

(1)    A Participant who while in the employ of the Company attains age 55 and is credited with at least 10 Years of Creditable Service may elect to retire and receive Early Retirement benefits in accordance with Section 3.2(c) of the Plan.

(2)    In lieu of paragraph (d)(1), above, a CG Participant may retire and commence receiving a benefit as provided in the CG Plan as in effect on December 31, 1991, based on the Participant's benefit service as of that date and his Average Compensation at his retirement, provided the Participant satisfies the applicable provisions of Section 3.2(a)(2) and Appendix F of the Prior Plan, which is incorporated herein by reference, and subject to the calculation rules (including the reduction factors for early commencement) of Section 3.2(c) of the Prior Plan, which is incorporated herein by reference. That portion of the Participant's Accrued Benefit that is attributable to service with the Employing Company after December 31, 1991 shall be paid as a deferred vested benefit in accordance with paragraph (e), below.

(e) **Vested Deferred Retirement Allowance**.

(1)    A Participant whose employment has terminated may elect to receive Vested Deferred Retirement Benefits in accordance with Section 3.3(b) of the Plan.

(2)    In lieu of paragraph (e)(1), above, a CG Participant who terminates service may commence receiving a benefit as provided in the CG Plan as in effect on December 31, 1991, based on the Participant's Benefit Service as of that date and his Average Compensation as of his date of termination of employment, provided the Participant satisfies the applicable provisions of Section 3.3(c) and Appendix F of the Prior Plan, which is incorporated herein by reference, and subject to the calculation rules (including the reduction factors for early commencement) of Section 3.3(c) of the Prior Plan, which is incorporated herein by reference. That portion of the Participant's Accrued Benefit that is attributable to service with the Employing Company after December 31, 1991 shall be paid as a deferred vested benefit in accordance with paragraph (e)(1), above.

(f) **Disability Retirement Allowance**.

(1)    With respect to Participants who are determined to be Disabled prior to October 1, 1995, a Participant who is Disabled may elect to receive a Disability Retirement Allowance as described in paragraph (f)(1) of Appendix J-24, provided, however, that the November 1, 1992 date restriction shall be disregarded.

(2)    With respect to Participants who are determined to be Disabled on or after October 1, 1995, a Participant who is Disabled may elect to receive a Disability Retirement Allowance as described in paragraph (f)(2) of Appendix J-24, provided, however, that the November 1, 1992 date restriction shall be disregarded.

(g) **Lump-Sum Death Benefit**. The Beneficiary of a Participant shall be eligible for a lump-sum death benefit of $5,000 as described in Section 5.2 of the Plan.

(h) **Special Rules for Crediting Service and Computing Retirement Allowances.**

(1)    A "CG Participant" is an individual who immediately prior to becoming an Eligible Employee under the terms of the Prior Plan was a participant in the CG Plan. The "CG

**APPENDIX J-23,**
**OCG MICROELECTRONIC MATERIALS**

Plan" means the Pension Plan for Salaried Employees of CIBA-GEIGY Corporation and Certain Affiliated Corporations, as in effect on December 31, 1991.

(2)     "Benefit Service" under this Plan shall include the Participant's Benefit Service as shown on the records of the Prior Plan, provided, however, that a Participant who was credited with Benefit Service under the terms of the Prior Plan for periods of time during which he was a participant in the Non-Bargaining Employees Pension Plan of Olin Corporation and with respect to whom pension assets were transferred from the Non-Bargaining Employees Pension Plan to the Prior Plan, shall not also be credited with such service under the terms of this Plan (as successor plan to the Non-Bargaining Employees Pension Plan) for the same period of time.

(3)     "Period of Creditable Service" under this Plan shall include the Participant's Period of Creditable Service as shown on the records of the Prior Plan, provided, however, that a Participant who was credited with Creditable Service under the terms of the Prior Plan for periods of time during which he was a participant in the Non-Bargaining Employees Pension Plan of Olin Corporation and with respect to whom pension assets were transferred from the Non-Bargaining Employees Pension Plan to the Prior Plan, shall not also be credited with such service under the terms of this Plan (as successor plan to the Non-Bargaining Plan) for the same period of time.

(4)     Participants in the Prior Plan who received past service credit under the Prior Plan in an amount equal to their vesting service and benefit service under the CG Plan shall have their benefits payable under this Plan reduced by the Actuarial Equivalent of benefits payable under the CG Plan, unless assets attributable to such Participant's vested accrued benefit under the CG Plan were transferred to the Prior Plan.

(5)     Individuals who became Employees of the Employing Company as a result of the Employing Company's acquisition of KTI (a division of Union Carbide) shall receive past service credit for their service with KTI for purposes of determining their eligibility to participate in this Plan, their Period of Creditable Service and their eligibility to retire, but not for purposes of determining their Benefit Service.

(i)     **Special Optional Forms of Benefit**.  Solely with respect to CG Participants for whom pension assets were transferred from the CG Plan to the Prior Plan, the following optional forms of benefit shall also be available with respect to the Participant's Accrued Benefit prior to October 1, 1995. That portion of the Participant's Accrued Benefit that is attributable to service with the Employing Company on or after October 1, 1995 shall be paid in accordance with Sections 4.1 and 4.2 of the Plan.

(1)     "Option 5."  An adjusted reduced Retirement Allowance during the retired Participant's life, with a provision that after his death 100% of his Retirement Allowance will be continued during the life of his Beneficiary (other than such Participant's Spouse) if she survives him.  The amount of such reduced Retirement Allowance shall be 80% of the amount of the Normal Retirement Allowance and such reduced amount shall be further reduced, or increased, as applicable, by one percent (1%) for each year by which the Participant's beneficiary is more than five years younger, or older, than the Participant.

(2)     "Option 6."  An adjusted reduced Retirement Allowance during the retired Participant's life, with a provision that after his death 50% of his Retirement Allowance will be continued during the life of his Beneficiary (other than such Participant's Spouse) if she survives him.  The amount of such reduced Retirement Allowance shall be 90% of the amount of the Normal Retirement Allowance and such reduced amount shall be further

APPENDIX J-23,<br>OCG MICROELECTRONIC MATERIALS

reduced, or increased, as applicable, by five ninths (5/9) of one percent (1%) for each year by which the Participant's beneficiary is more than five years younger, or older, than the Participant.

(3)    "Option 7."  An adjusted reduced Retirement Allowance during the retired Participant's life, but in the event of his death prior to receiving 180 monthly payments, the same amount of retirement benefit shall be continued to his Beneficiary until a combined total of 180 monthly payments have been made.  The amount of such reduced Retirement Allowance payable to the Participant shall be 87-1/2% of the amount of the Normal Retirement Allowance.

(4)    "Option 8."  "Former Geigy Participants," as defined in the CG Plan, may elect to receive benefits under the lump sum distribution provisions of Appendix A to the CG Plan, but only with respect to and to the extent of the pension benefits previously subject to such Appendix A.  Notwithstanding anything herein to the contrary, a Participant electing this Option 8 may also elect any of the other options for which he is eligible with respect to his remaining pension benefits not subject to this Option 8.

(j)    **Special Rules for Crediting Service and Computing Retirement Allowances.**

Participants who transfer to and become employees of Arch Chemicals, Inc. (or a subsidiary thereof) (collectively, "Arch") on or before February 8, 2000, and who are defined as Arch Employees (see below) in the Employee Benefits Allocation Agreement between Olin Corporation and Arch Chemicals, Inc. (the "Agreement"), shall cease to accrue benefits under this Plan as the date they terminate employment with Olin or a Related Employer and transfer to Arch.  As soon as administratively feasible on or after the spin-off of Arch from Olin and as provided in the Agreement, assets and liabilities relating to such Participants' Accrued Benefit under this Plan shall be transferred to and assumed by a qualified defined benefit plan sponsored by Arch.  Thereafter, no benefits shall be payable to or on account of any Arch Employee under this Plan, and neither the Plan nor any Employing Company shall have any further liability with respect to the Accrued Benefit of any Arch Employee.

The Agreement defines an Arch Employee as any individual who, as of the Distribution Date or at any time thereafter but on or before February 8, 2000, is identified on the records of Arch as being an employee of any member of the Arch Group of businesses, including individuals then receiving any long-term disability benefits whose most recent employment was with a line of business that became a part of the Arch Group, but excluding any individual who received a notice of lay-off from Olin or a Related Employer prior to the Distribution Date.

Any Arch Employee whose Accrued Benefit under this Plan was transferred to the defined benefit plan established by Arch, and who is subsequently employed by Olin or another Employing Company shall have their past Creditable Service with Olin and its Related Employers re-credited for purposes of determining such Arch Employee's eligibility to participate, vesting and attainment of retirement dates, provided that such Creditable Service would be re-credited under the normal operation of the Plan's Break-in-Service rules; however, such Arch Employee shall not receive credit for past Benefit Service with respect to benefit accrual, and their Compensation and Average Compensation shall be determined based upon Compensation received from Olin on and after their re-employment by Olin.  No service credit shall be given with respect to their period of employment with Arch, and no compensation paid by Arch shall be counted for purposes of determining such Arch Employee's Accrued Benefit under the Plan.

**APPENDIX J-23,**
**OCG MICROELECTRONIC MATERIALS**

APPENDIX J-24

## J-24 Olin Corporate Group

This Appendix J-24 shall apply to all **salaried and hourly, non-collectively bargained** employees of the following Employing Companies, except as otherwise provided below:

- **Olin Corporation**, which has been an Employing Company since January 1, 1967, provided, however, that as of January 1, 1989 the employees of the Aerospace Division of Olin Corporation were no longer covered by this Plan and Appendix, but instead covered by the Olin Pension Plan for Certain Defense Operations Non-Bargaining Unit Employees ("the Certain Defense Plan"), but further provided that, as of December 31, 1996, the Certain Defense Plan was merged into this Plan and the employees formerly covered under the Certain Defense Plan became eligible for benefits under this Plan in accordance with Appendix J-7, hereof;
- **Hi-Pure Chemicals, Inc.**, which, with respect to these employees, has been an Employing Company since October 29, 1984;
- **Advanced Products, Inc.**, which, with respect to these employees, has been an Employing Company since October 31, 1984;
- **Olin Hunt Specialty Products, Inc.**, which, with respect to these employees, has been an Employing Company since January 1, 1985;
- **Image Technology, Inc.**, which, with respect to these employees, has been an Employing Company since January 1, 1988;
- **Bridgeport Brass, Inc.**, which, with respect to these employees, has been an Employing Company since September 8, 1988;
- **Bryan Metals, Inc.**, which, with respect to these employees, has been an Employing Company since September 8, 1988;
- **General Defense, Inc.**, which, with respect to these employees, has been an Employing Company since January 1, 1990;
- **Olin Microelectronic Materials, Inc.,** which, with respect to these employees, has been an Employing Company since October 1, 1995; provided, however, that employees who were employees of OCG Microelectronic Materials on or before October 1, 1995 shall be eligible for benefits under this Plan in accordance with Appendix J-23, hereof.
- **Olin Brass & Winchester, Inc.**, which, with respect to these employees, has been an Employing Company since October 3, 1997; provided, however, that employees who were employees of one of the Oster Companies* on or before January 1, 1993 shall be eligible for benefits under this Plan in accordance with Appendix J-25, J-26 or J-27, hereof as applicable.
- **Olin Brass & Winchester, Management, Inc.**, which, with respect to these employees, has been an Employing Company since October 3, 1997; provided, however, that employees who were employees of one of the Oster Companies* on or before January 1, 1993 shall be eligible for benefits under this Plan in accordance with Appendix J-25, J-26 or Appendix J-27, hereof as applicable.
- **Olin Chemicals & Chlor Alkali, Inc.**, which, with respect to these employees, has been an Employing Company since October 3, 1997.
- **Monarch Brass & Copper Corporation, including Monarch Brass & Copper of New England Corporation, Waterbury Rolling Mills, Inc. and New Haven Copper Company**, which with respect to their salaried and hourly, nonbargained employees have been Employing Companies since June 6, 2001.
- **Winchester Ammunitions Inc.**, which, with respect to these employees, has been an Employing Company since its establishment.
- **Chlor Alkali Logistics, Inc.**, which, with respect to these employees, has been an Employing Company since January 1, 2013.

*  References to the "Oster Companies" in this Appendix J-24 mean A.J. Oster Company, Inc., A.J. Oster Foils, Inc., A.J. Oster West, Inc. and/or A.J. Oster Caribe, Inc.

**APPENDIX J-24, OLIN CORPORATE GROUP**

This Appendix J-24 shall not apply to hourly, noncollectively bargained employees of Olin Corporation or an Affiliated Employer who are employed at the following Company facilities:

- **Allentown, Pennsylvania;**
- **Alliance, Ohio;**
- **Carol Stream, Illinois;**
- **Cuba, Missouri;**
- **Manteca, California;**
- **Warwick, Rhode Island;**
- **Waterbury, Connecticut;**
- **Watertown, Connecticut;**
- **Waukesha, Wisconsin;**
- **Yorba Linda, California**

Except as otherwise noted in Appendix J-21 or Appendix J-22 (relating to Niagra Falls), this Appendix J-24 shall not apply to salaried or hourly employees of Olin Corporation who are employed at Niagra Falls/Niachlor.

Except as otherwise explicitly noted in another Appendix or this Appendix J-24, this Appendix J-24 shall not apply to salaried or hourly employees who are covered under another Appendix.

(a)     **Prior Plan**.  Prior to March 31, 1995, the Non-Bargaining Employees Pension Plan of Olin Corporation. Prior to January 1, 1990, the Olin Salaried Pension Plan, provided, however, that

    (1)     for the hourly non-collectively bargained employees at Charleston, prior to January 1, 1989 the prior plan was the Charleston Pension Plan of Olin Corporation;

    (2)     for Olin pilots, prior to January 1, 1989 the prior plan was the Pilots Pension Plan of Olin Corporation;

    (3)     for the hourly non-collectively bargained employees at the Peru Works facility, prior to January 1, 1989 the prior plan was the Peru Works Retirement Plan of Olin Corporation; and

    (4)     for the hourly non-collectively bargained employees at Morgan Hill, prior to January 1, 1989 the prior plan was the Morgan Hill Pension Plan of Olin Corporation.

(b)     **Eligibility**.  An individual shall become a Participant as of the date he both is an Eligible Non-Collectively Bargained Employee of an Employing Company and has completed one Year of Creditable Service.

(c)     **Normal Retirement Allowance**.  A Participant's annual normal Retirement Allowance commencing on or after his Normal Retirement Date shall be equal to the greater of

    (1)     an amount equal to the greater of:

        (i)     1.5% of the Participant's Average Compensation multiplied by the years (and fractions thereof) of his Benefit Service, minus the lesser of *(A)* 1/70th of the Participant's Primary Social Security Benefit multiplied by the years (and fractions thereof) of his Benefit Service (up to a maximum of 35 years) or *(B)* 50% of the Participant's Primary Social Security Benefit multiplied by a fraction, the numerator of which is his actual number of years of Benefit Service and the denominator of which is the total number of years of Benefit Service that he would have if he remained in the employ of an Employing Company until his Normal Retirement Date; or

**APPENDIX J-24, OLIN CORPORATE GROUP**

J-76

(ii)        1% of the Participant's Average Compensation multiplied by the years (and fractions thereof) of his Benefit Service; or

(2)        an amount equal to the sum of:

      (i)      the Participant's accrued benefit under the Prior Plan as of December 31, 1988, based on the terms of that Plan as it existed on such date and his Compensation (determined without regard to the dollar limitation imposed by Section 401(a)(17) of the Code) and Benefit Service determined on such date; plus

      (ii)      an amount equal to the greater of

          *(A)*      1.5% of the Participant's Average Compensation multiplied by the years (and fractions thereof) of his Benefit Service after December 31, 1988, minus the lesser of (A) 1/70th of the Participant's Primary Social Security Benefit multiplied by the years (and fractions thereof) of his Benefit Service after December 31, 1988 (up to a maximum of 35 years), or (B) 50% of the Participant's Primary Social Security Benefit multiplied by a fraction, the numerator of which is his actual number of years of Benefit Service after December 31, 1988, and the denominator of which is the total number of years of Benefit Service after December 31, 1988, that he would have if he remained in the employ of an Employing Company until his Normal Retirement Date; or

          *(B)*      1% of the Participant's Average Compensation multiplied by the years (and fractions thereof) of his Benefit Service after December 31, 1988.

(d)      **Early Retirement Allowance**.  A participant who while in the employ of the Company attains age 55 and is credited with at least 10 Years of Creditable Service may elect to retire and receive Early Retirement benefits in accordance with Section 3.2(c) of the Plan.

(e)      **Vested Deferred Retirement Allowance**.  A Participant whose employment has terminated may elect to receive Vested Deferred Retirement benefits in accordance with Section 3.3(b) of the Plan.

(f)      **Disability Retirement Allowance**.

(1)        With respect to Participants who are determined to be Disabled **prior to November 1, 1992**, the following provisions shall apply:

      (i)      A Participant who has not attained his Normal Retirement Date who becomes Disabled while in the employ of Employing Company shall continue to participate in the Plan and to accrue Benefit Service while he is Disabled and such period of disability shall be included in his Benefit Service.  For the purposes of computing his Retirement Allowance, such Participant shall be considered as having continued to receive throughout the period during which he was Disabled the Base Monthly Pay he was receiving on the date he became Disabled.

      (ii)      For purposes of this subsection (f)(1), "Disabled" shall mean disabled to the extent that the Participant is receiving disability benefits under a plan providing long-term disability benefits maintained by an Employing Company or, if not eligible to participate in such a plan at the time the disability commences, is receiving disability benefits under the Social Security Act; and "Base Monthly Pay" shall mean the Participant's monthly base pay, excluding shift differential, overtime pay, commissions,

**APPENDIX J-24, OLIN CORPORATE GROUP**

cost of living allowances, incentive compensation and other additional compensation; Base Monthly Pay in excess of 1/12th of the maximum amount of Compensation that may be taken into account under the Plan for the Plan Year, as adjusted in accordance with Code Section 401(a)(17), for any given month shall be disregarded for purposes of this paragraph (f).

(iii)     At the time when the Administrative Committee determines that the Participant is no longer Disabled or when such Participant reaches his Normal Retirement Date, for purposes of calculating benefits under this Plan the Participant's employment shall be deemed to be terminated and his right to a Retirement Allowance under the Plan shall be determined as of that date, unless the Participant returns to active employment (in which case he may accrue additional benefits and service, assuming he otherwise meets the requirements for participation this Plan).

(2)     With respect to Participants who are determined to be Disabled **on or after November 1, 1992**, the following provisions shall apply:

(i)     In the event a Participant who has not attained his Normal Retirement Date becomes Disabled while in the employ of an Employing Company, such Participant may elect to receive a Disability Retirement Allowance commencing as of the first day of the month coinciding with or following the date the Participant is determined to be Disabled.  A Participant's monthly Disability Retirement Allowance shall be equal to the lesser of the following determined on an on-going, month-to-month basis:

*(A)*     1/12th of the Participant's Normal Retirement Allowance, computed in accordance with paragraph (c), above, except that the Participant shall be credited with Years of Benefit Service up to the Participant's Normal Retirement Date; or

*(B)*     60% of the Participant's Base Monthly Pay, reduced by all of the following paid to the Participant:

- Wages, salary or other earned income from employment (including income from employment by Olin Corporation or any of its Affiliates) paid to the Participant for services provided during his disability.

- Defined benefit plan retirement benefits payable with respect to the Participant (other than disability retirement) if Olin Corporation or any of its Affiliates has at any time paid all or part of the cost or made payroll deductions for these benefits.

- Social Security retirement benefits (except to the extent they consist of cost-of-living increases effective after the Participant's initial determination of eligibility) the Participant is entitled to receive himself or through a Spouse, provided, however, that if a Spouse receives a retirement benefit based on his own earnings, such benefit shall not reduce the Participant's disability benefit.

- Social Security Disability benefits (except to the extent they consist of cost-of-living increases effective after the Participant's initial determination of eligibility) or disability benefits under any state or local government-sponsored (provided or mandated) program (such as, e.g., Workers' Compensation) if payable because of the Participant's disability (1) which the Participant,

**APPENDIX J-24, OLIN CORPORATE GROUP**

J-78

individually or through a Spouse, is entitled to receive, or (2) which the Participant's Dependents who reside with him are entitled to receive.

- All other sources where payment is made to compensate the Participant for a loss of income, such as the wage-loss portion of a Workers' Compensation award or a settlement with a third party (or insurer) for negligent injury to the Participant.  If there is a settlement of a claim (including a Workers' Compensation claim) or a court verdict or judgment which does not state a separate amount for loss of income and a separate amount for physical injury, one-third of the award or settlement (including one-third of any periodic payments from a structured award or settlement) will be treated as disability income for purposes of calculating the reduction in the Participant's monthly benefit.  Notwithstanding the above, benefits payable under any disability income insurance that the Participant obtained privately shall not reduce the Participant's benefits under this Plan.

If a Participant fails to notify the Administrative Committee of a potential or actual claim, recovery or payment from one of the sources listed, above, and the Administrative Committee later determines that the Participant, in fact, was not entitled to receive all or part of the Disability Retirement Allowance described herein because of such claim, recovery or payment, the Participant shall repay the Plan the benefits the Participant was not entitled to, plus interest at the Applicable Interest Rate (as defined in the Glossary).

(ii)    For purposes of this subsection (f)(2)

(A)    "Disabled" shall mean approved for disability benefits under the terms of the Long-Term Disability Plan maintained by the Employing Company, provided, however, that a Participant shall not be deemed to be Disabled for purposes of this Section if, upon request of the Administrative Committee, he fails to provide evidence of disability satisfactory to the Administrative Committee or fails to complete any application, authorization or reimbursement agreement pertaining to his disability benefits; and

(B)    "Base Monthly Pay" shall mean the Participant's monthly base pay, excluding shift differential, overtime pay, commissions, cost of living allowances, incentive compensation and other additional compensation;  Base Monthly Pay in excess of 1/12th of the maximum amount of Compensation that may be taken into account under the Plan for the Plan Year, as adjusted in accordance with Code Section 401(a)(17), for any given month shall be disregarded for purposes of this Section (f)(2).

(iii)    If the Administrative Committee determines that a Participant is no longer Disabled, the Participant shall either return to active employment or shall be deemed to be absent from service, for a reason other than a quit, discharge, retirement or death, as of the date he is no longer Disabled.  For purposes of determining such Participant's right to, and amount of, future benefits under the Plan, the Participant shall be credited with Benefit Service for the period of time he was Disabled and shall be deemed to have received throughout the period during which he was Disabled the Base Monthly Pay he was receiving at the time he became Disabled.

(iv)    If a Disabled Participant attains Normal Retirement Age, his right to a Disability Retirement Allowance shall cease, and his right to a Normal Retirement Allowance under paragraph (c), above, shall be determined as of that date, provided, however, that

**APPENDIX J-24, OLIN CORPORATE GROUP**

J-79

for purposes of determining the amount of such Participant's Normal Retirement Allowance, the Participant shall be credited with Benefit Service for the period of time he was Disabled and shall be deemed to have received throughout the period during which he was Disabled the Base Monthly Pay he was receiving at the time he became Disabled.

(v)     If a Disabled Participant dies before attaining his Normal Retirement Age, his surviving spouse, if any, shall be entitled to a pre-retirement survivor annuity in accordance with Section 5.1 of the Plan.

(vi)    Effective as of June 1, 1996, no Participant shall qualify for a Disability Retirement Allowance following his separation from service with the Company and all other Employing Companies, or during a period in which he is not actively employed by the Company or other Employing Companies.

(g)     **Lump-Sum Death Benefit**.  The Beneficiary of a Participant shall be eligible for a lump-sum death benefit of $5,000 as described in Section 5.2 of the Plan.  Effective as of December 31, 1996, notwithstanding the foregoing, Participants who transfer to, and become employees of, Primex Technologies, Inc. or its affiliates are not eligible for a lump-sum death benefit under Section 5.2 of the Plan on or after the date such Participant is no longer actively employed by the Company or any of its subsidiaries.  Notwithstanding the foregoing, for Participants who became employees of Ecusta Corporation ("Ecusta", which includes any applicable successor) when Ecusta separated from the Company in 1985, the death benefit payable hereunder  to such Participants shall be pro-rated based on the Participant's service with Olin compared to the Participant's total service with Olin and Ecusta.

(h)     **Special Rules for Crediting Service and Computing Retirement Allowances**.

(1)     For service prior to the Restatement Date, a Participant's Benefit Service and Creditable Service shall include all such service (including special prior service credit) credited on the records of the Prior Plan.

(2)     Participants who were employees of General Defense, Inc. prior to January 1, 1990 (when General Defense became an Employing Company hereunder) shall be credited with Benefit Service and Credited Service under this Plan for periods of service for General Defense from their date of participation in the General Defense plan.  Such Participants shall be entitled to the greater of (a) a retirement allowance determined under the Olin formula for all credited service, or (b) the sum of a retirement allowance determined under the General Defense plan formula for service prior to January 1, 1990 and a retirement allowance determined under the Olin formula for service on or after January 1, 1990.  Such Participants may also elect to receive a lump-sum distribution with respect to benefits accrued under the General Defense plan.

(3)     A Participant who transfers to Aegis, Inc. and thereafter transfers back to an Employing Company, shall be credited with Benefit Service and Creditable Service under this Plan for all such service for Aegis.  A Participant who transfers to Aegis but does not transfer back to an Employing Company shall be credited with Creditable Service under this Plan for all such service for Aegis and with Benefit Service under this Plan for all such service for Aegis prior to June 1, 1994 (or the effective date of the Aegis, Inc. Employees Retirement Plan, if later).

(4)     Prior service credit and special credit for transferred employees granted as a result of corporate transactions prior to January 1, 1989 shall be credited as provided in Appendix K of the Non-Bargaining Employees Pension Plan of Olin Corporation.

(5)     Participants who were employees of Olin Corporation on December 16, 1994 and who as of December 17, 1994 became employees of Bio-Lab, Inc., as provided in the Asset Purchase

**APPENDIX J-24, OLIN CORPORATE GROUP**

J-80

Agreement between Olin Corporation and Bio-Lab, Inc., dated December 20, 1994, shall be credited with service for Bio-Lab for purposes of vesting and eligibility for early retirement under this Plan.

(6)    Individuals who became Employees of the Employing Company as a result of the Employing Company's acquisition of the South Charleston, West Virginia and Livonia, Michigan facilities of FMC Corporation shall receive past service credit for their service with FMC for purposes of determining their eligibility to participate in this Plan, their Period of Creditable Service and their eligibility to retire, but not for purposes of determining their Benefit Service.

(7)    Participants employed at the Employing Company's South Charleston, West Virginia and Livonia, Michigan chemical plant facilities who transferred to and became employees of Clearon, Inc. in connection with the divestment of the South Charleston and Livonia facilities on or about October 11, 1995 will receive eligibility service credit for service with Clearon for purposes of vesting and early retirement under this Plan, and such Participant's Average Compensation for purposes of calculating a Retirement Allowance under this Plan will take into account Compensation earned from Clearon.  In addition, such Participants who were also employees of FMC at the South Charleston or Livonia facility prior to the acquisition of those facilities by the Company and who were credited with eligibility service credit under the FMC Plan for service with the Employing Company at the South Charleston or Livonia facilities shall be entitled to a special allowance under this Plan equal to the difference between the Accrued Benefit of the Participant under the FMC Plan determined as of the date the Participant retires from Clearon, Inc. and the amount that would have been the Participant's Accrued Benefit under the FMC Plan if the FMC Plan had taken into account the Participant's service with Clearon, Inc.

(8)    The following provisions are effective as of September 1, 1995 and apply solely to salaried employees working at the Manteca, California facility who did not transfer to Manteca from prior Olin employment.

    (i)    An individual shall become a Participant as of the later of the date he is both an Eligible Non-Collectively Bargained Employee of the Employing Company and has completed one Year of Creditable Service, or September 1, 1995.

    (ii)    For purposes of vesting, eligibility for early retirement and benefit accrual, only service for the Company on or after September 1, 1995 shall be taken into account.

    (iii)    A Disability Retirement Allowance, as described in Section 3.4 of the Plan and paragraph (f) of this Appendix J-24, is not available.

(9)    Participants who were working at the Berea, Ohio facility on or about March 18, 1996 and who as of that date became employees of Hunt Imaging, LLC will be credited with service for Hunt Imaging for purposes of eligibility for early retirement under this Plan, but no retirement allowance under this Plan shall be paid to a former Berea Participant until such Participant terminates service with Hunt Imaging (or attains age 70 1/2, if earlier), provided, however, that if such Participant had satisfied or was within three years of satisfying the requirements for early retirement under this Plan as of March 18, 1996, such Participant may elect to receive an early retirement allowance under this Plan at any time after satisfying the early retirement eligibility requirements regardless of whether such Participant is then employed by Hunt Imaging.

**APPENDIX J-24, OLIN CORPORATE GROUP**

J-81

(10)    Effective as of December 2, 1996, or if later, the Closing Date specified in the Asset Purchase Agreement by and between Olin Corporation and the Arco Chemical Company, dated as of October 9, 1996 (the "Agreement"), any Participant who transfers to and becomes an employee of Arco Chemical Company or its affiliates ("Arco"), and who is defined as a Transferred Employee under Article IX of the Agreement, shall

(i) be fully vested in such Participant's Accrued Benefit under the Plan as of the Closing Date specified in the Agreement, as amended;

(ii) continue to receive credit for service with Arco for purposes of determining such Participant's eligibility to retire early under the terms of the Agreement (but not for purposes of benefit accrual);

(iii) receive an increase in such Participant's Accrued Benefit, determined as of the Closing Date specified in the Agreement, as amended, equal to three percent (3%) for each twelve-month period (.25% for each full month, not compounded) during which the Transferred Employee remains continuously employed with Arco;

(iv) not be entitled to commence benefits under the Plan until such Participant has terminated service from Arco or its affiliates;

(v) not qualify for a Disability Retirement Allowance following a separation from service with the Company and all other Employing Companies, or during a period in which such Participant is not actively employed by the Company.

In the event that such Participant's employment is subsequently transferred from Arco to Lyondell Industries ("Lyondell"), Olin shall continue to credit service with Lyondell, as well as Arco, for purposes of determining such Participant's eligibility for early retirement (but not for purposes of benefit accrual), Olin shall continue to increase such Participant's Accrued Benefit, determined as of the Closing Date, in accordance with (iii) above during his employment with Lyondell, and no benefits shall be payable until such Participant terminates service from Lyondell and its affiliates. In the event that such Participant's employment is subsequently transferred from Lyondell to Chemtura Corporation ("Chemtura"), Olin shall continue to credit service with Chemtura, as well as Arco and Lyondell, for purposes of determining such Participant's eligibility for early retirement (but not for purposes of benefit accrual), Olin shall continue to increase such Participant's Accrued Benefit, determined as of the Closing Date, in accordance with (iii) above during his employment with Chemtura, and no benefits shall be payable until such Participant terminates service from Chemtura and its affiliates. In the event that such Participant's service is terminated with Lyondell (or Chemtura) and he or she is subsequently employed by Arch Chemicals, Inc. ("Arch"), assets and liabilities attributable to such Participant's Accrued Benefit under this Plan shall be transferred to and assumed by a qualified defined benefit plan sponsored by Arch. Thereafter, no benefits shall be payable to or on account of any such Participant under this Plan, and neither the Plan nor any Employing Company shall have any further liability with respect to the Accrued Benefit of any such Participant.

(11)    Effective as of December 31, 1996, salaried and hourly, non-bargained Participants who transfer directly to, and become employees of, Primex Technologies, Inc. and its affiliates ("Primex") in connection with Olin's divestment of its ordnance and aerospace divisions (or who transfer directly within five years following such divestment), shall continue to receive credit for service with Primex in determining their Period of Creditable Service for purposes of vesting and eligibility to retire early under the terms of the Plan, expressly provided, however that (i) such service shall not be credited for purposes of benefit accrual under the terms of the Plan, (ii) such Participants' Average Compensation for purposes of calculating their Retirement Allowance under the Plan shall take into account compensation paid by Primex and shall be determined as of their termination of service or retirement from Primex,

**APPENDIX J-24, OLIN CORPORATE GROUP**

and (iii) no benefit shall be payable from this Plan until the Participant terminates service with Primex. For purposes applying the service and compensation credit, and limitation on distribution provided by this paragraph, "Primex" shall be read to refer also to General Dynamics Ordnance and Tactical Systems, Inc. on and after January 25, 2001.

(12)   Salaried and hourly, non-bargained Participants who transfer to and become employees of Arch Chemicals, Inc. (or a subsidiary thereof) (collectively, "Arch") on or before February 8, 2000, and who are defined as Arch Employees (see below) in the Employee Benefits Allocation Agreement between Olin Corporation and Arch Chemicals, Inc. (the "Agreement"), shall cease to accrue benefits under this Plan as the date they terminate employment with Olin or a Related Employer and transfer to Arch.  As soon as administratively feasible on or after the spin-off of Arch from Olin and as provided in the Agreement, assets and liabilities relating to such Participants' Accrued Benefits under this Plan shall be transferred to and assumed by a qualified defined benefit plan sponsored by Arch.  Thereafter, no benefits shall be payable to or on account of any Arch Employee under this Plan, and neither the Plan nor any Employing Company shall have any further liability with respect to the Accrued Benefit of any Arch Employee.

The Agreement defines an Arch Employee as any individual who, as of the Distribution Date or at any time thereafter but on or before February 8, 2000, is identified on the records of Arch as being an employee of any member of the Arch Group of businesses, including individuals then receiving any long-term disability benefits whose most recent employment was with a line of business that became a part of the Arch Group, but excluding any individual who received a notice of lay-off from Olin or a Related Employer prior to the Distribution Date.

Any Arch Employee whose Accrued Benefit under this Plan was transferred to the defined benefit plan established by Arch, and who is subsequently employed by Olin or another Employing Company shall have their past Creditable Service with Olin and its Related Employers re-credited for purposes of determining such Arch Employee's eligibility to participate, vesting and attainment of retirement dates, provided that such Creditable Service would be re-credited under the normal operation of the Plan's Break-in-Service rules; however, such Arch Employee shall not receive credit for past Benefit Service with respect to benefit accrual, and their Compensation and Average Compensation shall be determined based upon Compensation received from Olin on and after their re-employment by Olin.  No service credit shall be given with respect to their period of employment with Arch, and no compensation paid by Arch shall be counted for purposes of determining such Arch Employee's Accrued Benefit under the Plan.

(13)   Salaried and hourly nonbargained employees who became Employees of an Employing Company as a result of Olin Corporation's acquisition Monarch Brass & Copper Corporation, including Monarch Brass & Copper of New England Corporation, Waterbury Rolling Mills, Inc. and New Haven Copper Company (collectively "Monarch and its affiliates"), shall receive past service credit for their service with Monarch and its affiliates for purposes of determining their eligibility to participate in this Plan under this appendix, their Period of Creditable Service and their eligibility to retire, but not for purposes of determining their Benefit Service. Such Employees' Average Compensation for purposes of calculating a Retirement Allowance under this Plan will take into account Compensation earned from Monarch and its affiliates.  Certain such employees may have a frozen benefit under the terms of the Retirement Plan for the Benefit of Employees of Waterbury Rolling Mills, Inc., which plan has been merged with and into the Olin Corporation Employees Pension Plan at Appendix J-36.

(14)   Hourly employees previously covered by Appendix J-21 at the time that the Union referred to therein was decertified shall, immediately following such decertification, become covered under this Appendix J-24, and shall receive past service credit under this Appendix J-24 for their past service under Appendix J-21 for purposes of determining their eligibility to participate under this

**APPENDIX J-24, OLIN CORPORATE GROUP**

J-83

Appendix J-24, their Period of Creditable Service, their eligibility to retire and for purposes of determining Benefit Service hereunder. Any benefits payable under this Appendix J-24 shall be reduced by the Actuarially Equivalent value of benefits payable under Appendix J-21, so that no duplication of benefits for the same period of service shall occur. In no event, however, shall such Participant's benefit from this Plan be less than his accrued benefit as of the date such Union was decertified.

(15)     This provision shall apply solely to the salaried and hourly non-collectively bargained Participants who transfer directly to, and become employees of, Global Brass and Copper Acquisition Co. and its affiliates ("Global"), and who are defined as Transferred Employees under Article V of the Purchase Agreement between Global Brass and Copper Acquisition Co. and Olin Corporation dated as of October 15, 2007 (such Participants referred to in this Appendix J-24 as "Global Sale Participants"). Global Sale Participants shall continue to receive credit for service with Global in determining their Period of Creditable Service for purposes of vesting and eligibility to retire early under the terms of the Plan; provided, however, that (i) such service with Global shall not be credited for purposes of benefit accrual or Benefit Service under the terms of the Plan, and (ii) no benefit shall be payable from this Plan until a Global Sale Participant terminates service with Global (or if earlier, such Global Sale Participant reaches age 65). Solely for purposes of determining whether a Global Sale Participant is eligible for the special service crediting rule provided under Sections 3.2(b) and 3.3(c) of the Plan, the term "Employing Company" as utilized in such Section 3.2(b) shall include Global.

(16)     This provision shall apply solely to the salaried Participants and hourly non-collectively bargained Chlor Alkali Participants (such Participants collectively referred to in this Appendix J-24 as "Freeze Participants"). The benefit accrual of Freeze Participants shall be frozen as of December 31, 2007, and any benefit payable to a Freeze Participant shall be based on the Freeze Participant's Accrued Benefit as of December 31, 2007. Freeze Participants shall continue to receive credit for service after December 31, 2007 in determining their Period of Creditable Service for purposes of vesting and eligibility to retire early under the terms of the Plan; provided, however, (and subject to the following paragraph) that (i) such service after December 31, 2007 shall not be credited for purposes of benefit accrual or Benefit Service under the terms of the Plan, and (ii) Compensation earned after December 31, 2007 shall not count toward the determination of benefits under the Plan. The freeze on benefit accrual service or Benefit Service indicated in clause (i) of the preceding service applies to any service after December 31, 2007, whether it be service that is attributable to employment service, severance benefits or job transition benefits.

Notwithstanding the preceding paragraph, for any Freeze Participant who is being credited with benefit accrual service or Benefit Service as of December 31, 2007 due to being Disabled, such Freeze Participant shall continue to be credited after December 31, 2007 with benefit accrual service or Benefit Service in the same manner and subject to the same terms as before (or as may be subsequently amended). Notwithstanding the preceding paragraph, Compensation required to be taken into consideration under the above sub-paragraphs (7) (regarding Compensation paid by Clearon) and (11) (regarding Compensation paid by Primex) shall continue to be taken into consideration in determining benefits under the Plan for applicable Participants even if earned after 2007. Notwithstanding the preceding paragraph, the 3% adjustment required to be taken into consideration under the above sub-paragraphs (10)(iii) (regarding Arco Transferred Employees) shall continue to be taken into consideration in determining benefits under the Plan for applicable Participants even after 2007.

(i)     **1991 Early Retirement Incentive Program**. Eligible employees of an Employing Company at any location, function or department designated as subject to the provisions of this 1991 Early Retirement Incentive Program ("1991 Program") by the Chief Executive Officer of the Company who (i) are actively at work on March 15, 1991 (it being understood that individuals who have left Employing Company but who continue to receive pay, including vacation, severance or sick pay, shall not be deemed actively at work),

**APPENDIX J-24, OLIN CORPORATE GROUP**

J-84

(ii) have less than 1,700 Hay points or its equivalent under the compensation system of Employing Company and (iii) are at least age 55 by the date of retirement and have at least five Years of Service, may voluntarily elect, by filing a written election with the Administrative Committee by June 1, 1992 (or such earlier date or dates as shall be selected by the Chief Executive Officer of the Company), to retire under the "1991 Program"; provided,  however, that such Program shall not be available to any Employee who, prior to the date of retirement, commits any act which, if discovered, would have been grounds for dismissal for cause ("cause" being defined as dishonesty, misconduct or any violation of any reasonable Company rule or policy) or to any Employee who is a highly compensated employee as defined in Section 414(q) of the Code if the inclusion of such individual in the 1991 Program would cause the 1991 Program to fail to satisfy any applicable nondiscrimination requirement imposed by the Code or any regulations issued thereunder.

Eligible Employees who elect to retire under the 1991 Program in a timely manner, meet all the qualifications described above, elect to receive retirement benefits hereunder and retire no later than June 1, 1992 (or such earlier date or dates as shall be selected by the Chief Executive Officer of the Company) shall have their early Retirement Allowance modified as follows:

(1)     Each such Employee will be paid monthly a special Social Security supplement in an amount equal to 20% of his or her monthly Compensation (but not more than $50,000 of the Employee's Compensation shall be taken into account for such purpose in any 12-month period) until he or she reaches age 62 or for 30 months, whichever period is longer.  If the Employee dies before such period ends, the remaining installments will be paid monthly for the balance of the period described above, as though the Employee had not died, to his Beneficiary.

(2)     The reduction described in Section 3.2(c) of the Plan with respect to an early Retirement Allowance which would otherwise be applicable for retirement prior to age 62 shall be waived.

(j)     **1993 Early Retirement Incentive Program for Certain Salaried Employees**.  An Early Retirement Incentive Program (the "Program") is hereby adopted in accordance with the following terms and conditions:

(1)     Eligibility.  A Participant who meets all of the following requirements shall be eligible for benefits under this Program:

(i)       the Participant is employed by Olin or an Employing Company as a salaried Employee in the Winchester or Brass divisions or is a salaried employee of the Corporate division employed at East Alton, Illinois;

(ii)      the Participant is not currently covered by a collective bargaining agreement between the Company and a union;

(iii)     the Participant is actively at work as of December 16, 1993, it being understood that individuals who have left Olin or the Employing Company, including those who continue to receive severance or long-term disability pay (other than short term sick pay), shall not be deemed actively at work;

(iv)     the Participant has attained the following age and Years of Creditable Service by the dates specified below:

| Age | Service | Date | Classification |
|-----|---------|------|----------------|
| 55 | 5 | 12/31/93 | Winchester Division or Corporate Division (at East Alton) |

**APPENDIX J-24, OLIN CORPORATE GROUP**

J-85

| 55 | 5 | 05/01/94 | Brass Division, except at Indianapolis or Bryan |
| 60 | 5 | 12/31/93 | Brass Division at Indianapolis or Bryan |

(v)    the Participant has 1450 or fewer Hay Points;

(vi)    the Participant executes and performs upon a covenant not to compete; and

(vii)    the Participant elects to retire pursuant to this program on or after December 16, 1993 and on or before January 14, 1994.  The Participant's actual retirement date will be determined by the Participant's department manager and approved by the division president, consistent with the business needs of the Company, but will in no event be later than June 1, 1994.

At the option of the Chairman of the Board of the Company, the Program may be made available on a uniform and nondiscriminatory basis to any Participant who satisfies the criteria for eligibility specified by this Section and who retires for any reason on or before June 1, 1994.

(2)    Excluded Employees.  Notwithstanding the foregoing, the Program shall not be available to any Employee who

(i)    prior to the date of retirement, commits any act which, if discovered, would have been grounds for dismissal for cause ("cause" being defined as dishonesty, misconduct or any violation of any reasonable Company rule or policy); or

(ii)    is a Highly Compensated Employee as defined in Section 414(q) of the Code, if the inclusion of such individual in the Program would cause the Program to fail to satisfy any applicable nondiscrimination requirement imposed by the Code or any regulations issued thereunder; or

(iii)    violates the terms and conditions of the covenant not to compete which he is requested to execute in connection with this special retirement incentive.

(3)    Benefits.  Eligible Participants who elect to retire under the Program in a timely manner and who meet all of the qualifications for eligibility described above, shall be entitled to receive from the Plan a special Retirement Allowance under which

(i)    the Participant's early retirement benefit will not be reduced by four percent (4%) for each year by which such benefit commences before age sixty-two (62), and

(ii)    the Participant shall be paid a special monthly Social Security supplement in an amount equal to twenty percent (20%) of the Participant's base monthly compensation, limited as hereinafter provided, until he reaches age sixty-two (62) or for thirty (30) months, whichever period is longer.  In no event shall the amount of a Participant's Social Security Supplement exceed Ten Thousand Dollars ($10,000.00) in any twelve (12) month period.

(4)    Violation of Covenant.  Any Participant who elects to participate in this Program and who, in the sole determination of the Company, is found to have breached the covenant not to compete which he was requested to execute as a condition of being eligible for this benefit, shall be deemed to have never satisfied the requirements for eligibility for this Program, and shall lose all entitlement to any special benefit or enhancement provided by this Program.  All benefits previously paid

**APPENDIX J-24, OLIN CORPORATE GROUP**

J-86

under the Program shall be actuarially determined and applied to offset any subsequent payment of Plan benefits to the Participant.

    (5)    <u>Limitation on Accrued Benefit</u>.  The Accrued benefit of a Participant shall not, by virtue of this Program, exceed the permissible annual benefit payable in accordance with Section 415 of the Internal Revenue Code or any benefit payable under Section 401(a)(4) of the Code and regulations issued thereunder.

    (k)    <u>1999 Voluntary Early Separation Incentive</u>.  An Voluntary Early Separation Incentive Program is hereby adopted in accordance with the following terms and conditions:

    (1)    <u>Eligibility</u>.  All non-bargaining Employees actively employed at the Company's Charleston, Tennessee, Chlor Alkali facility who have reached age 55 and been credited with at least 10 years of Creditable Service by December 31, 1999, shall be eligible to elect to retire between November 15 and November 30, 1999 and receive the benefits of this Program.  The Participant's actual termination date will be determined by the Participant's department manager and approved by the vice president of human resources for the Chlor Alkali division, consistent with the business needs of the division and the Company.

    (2)    <u>Excluded Employees</u>.  Notwithstanding the foregoing, the benefits of this Program shall not be available to any Employee who

    (i) prior to the date of termination, commits any act which would be grounds for dismissal for cause ("cause" being defined as dishonesty, misconduct or any violation of any reasonable Company rule or policy); or

    (ii) is a Highly Compensated Employee as defined in Section 414(q) of the Code, if the inclusion of such individual in the Program would cause the Program to fail to satisfy any applicable nondiscrimination requirement imposed by the Code regulations issued thereunder.

    (iii) is entitled to unreduced early retirement benefits under Section 3.2(c)(1) of the Plan.

    (3)    <u>Benefits</u>.  Each eligible Employee who elects to retire, and in fact retires as provided in (1) above shall receive the following benefits in addition to any Retirement Allowance otherwise payable under this Appendix:

    (i) <u>Basic Benefits</u>.  One Hundred Percent (100%) of Base Weekly Pay (as hereinafter defined) for each year, or fraction thereof, of employment with the Company, up to a maximum of 30 weeks of pay; plus

    (ii) <u>Extended Benefits</u>.  if the Participant remains unemployed after exhausting the benefits provided in (i) above, Seventy Five Percent (75%) of Base weekly Pay, multiplied by one and one-half (1½) times each year, or fraction thereof, of employment with the Company, up to a maximum of forty-five (45) weeks of pay.

In calculating the Basic and Extended Benefits to which a Participant is entitled under this Paragraph (3), fractional numbers shall be rounded to the next highest number. Benefits under this Paragraph (3) shall cease once a Participant qualifies for unreduced early retirement benefits in accordance with Section 3.2(c) of the Plan.

For purposes of this section "Base Weekly Pay" means an Employee's then current basic compensation paid by the Company (or other Participating Employer) excluding additional compensation, such as shift differentials, overtime, bonuses and other extraordinary items of compensation.  Base Weekly Pay for an Employee whose regular salary is stated in terms of

**APPENDIX J-24, OLIN CORPORATE GROUP**

months will be equal to the then current monthly salary divided by 4.33.  Base Weekly Pay for an hourly paid Employee will be equal to the then current hourly rate of pay times the Employee's regularly scheduled number of work hours for a week.

(4)    Form of Benefit Payment.  Unless the Participant elects otherwise with his or her Spouse's consent as provided in (5) below, if the Participant is married, the benefits provided under this Subsection (k) shall be converted into, expressed and paid in the form of an Actuarially Equivalent qualified joint and 100% survivor annuity commencing as of the first day of the month following his retirement.  If the Participant dies after electing to retire pursuant to this subsection (k), but before actually retiring, his or her Spouse shall be entitled to receive the Actuarial Equivalent of the benefits provided in a qualified pre-retirement survivor annuity.  If the Participant is unmarried, the benefits provided by this subsection (k) shall be converted into, expressed and paid in the Actuarially Equivalent form of a life annuity unless the Participant elects otherwise below.

(5)    Election of Optional Form of Payment.  In accordance with Section 4.3(a) of the Plan, and subject to the requirements for spousal consent contained in Section 4.3(b) of the Plan,  a Participant may elect to receive the benefits payable under (3) above in the form of monthly installment payments.  If a Participant elects monthly installment payments in accordance with this Paragraph (5), and dies prior to having received all of the monthly installment payments to which he is entitled, the remainder of any such payments shall be paid to the Participant's Beneficiary.

(k)    2001 Early Retirement Incentive Program for Certain Salaried Employees of the Brass and Winchester Divisions("2001 ERIP").  An Early Retirement Incentive Program (the "Enriched Pension Option") is hereby adopted in accordance with the following terms and conditions:

(a) Eligibility.  A Participant who meets all of the following requirements shall be  eligible to retire and receive the following Enriched Pension Option:

(i) the Participant is employed by Olin or another Employing Company as a full-time salaried Employee (other than as a corporate officer)  in the Winchester or Brass Divisions working at a rate of 2,080 hours per calendar year;

(ii) the Participant is not currently covered by any collective bargaining agreement between the Company and a union;

(iii) as of June 30, 2001, the Participant is actively-at-work, it being understood that those Participants who, as of that date, are receiving long-term disability benefits, or severance benefits, shall not be considered actively at work, and those receiving short-term disability or sick pay shall be deemed actively at work;

(iv) the Participant is at least age 55 with ten (10) Years of Creditable Service as of August 31, 2001

(v) the Participant executes and performs on a covenant not to compete, and executes all other documents required as a condition of receipt of benefits hereunder;

(vi) the Participant  does not elect to receive the Special Transition Pay benefit being offered contemporaneously with the Enriched Pension Option;

(vii) if the Participant is eligible to participate in an incentive compensation plan which includes an EVA Bonus Bank component, the Participant's entitlement to receive any payment from the EVA Bonus Bank will be determined in accordance with the existing rules of the incentive compensation

**APPENDIX J-24, OLIN CORPORATE GROUP**

J-88

plan.  Specifically, Participants who retire on or after July 1 of a year continue participation in the incentive compensation plan for the balance of that year, with their Target Bonus pro-rated for the number of months of active employment during the year in which they retire.  Payments from the incentive compensation plan to Participants electing to retire under the ERIP, will be determined in the same fashion as for all other employees who participate in an EVA incentive compensation plan and if such Participant's EVA Bonus Bank balance is positive, it shall be paid out to the Participant; and

(viii) the Participant elects to retire pursuant to this program on or before August 3, 2001, and actually retires during the period from September 1, 2001 through December 31, 2001.  The Participant's actual retirement date will be determined by the Participant's department manager and approved by the division president, consistent with the business needs of the Company.

(b) Excluded Employees.  Notwithstanding the foregoing, the Program shall not be available to any Employee who:

(i) is not a salaried full-time Employee of the Brass and Winchester Division;

(ii) is a Corporate officer;

(iii) is employed at Monarch Brass and Copper Company, Waterbury Rolling Mills, New Haven Copper Company, Aegis or the Government Owned Company Operated operations at Baraboo, WI or Independence, MO. ;

(iv) is a Highly Compensated Employee, as defined in Section 414(q) of the Code, if the inclusion of such individual in the Program would cause the Program to fail to satisfy any applicable nondiscrimination requirements imposed by the Code or regulations issued thereunder; or

(v) violates the terms and conditions of the covenant not to compete that the Participant is requested to execute as a condition of receiving either the Enriched Pension Option or the Special Transition Pay benefit.

(c)  Enriched Pension Benefit.  Eligible Participants who meet all of the eligibility requirements provided in (a) above, and who elect to retire and receive the Enriched Pension Option, shall be entitled to receive a special Retirement Allowance under which

(i) the Participant's early retirement benefit will not be reduced by the normal four percent (4%) for each year by which such benefit commences before age sixty-two (62); and

(ii) the Participant shall be paid a special nonforfeitable monthly Social Security supplement in an amount equal to twenty percent (20%) of the Participant's base monthly compensation until he reaches age sixty-two (62) or for thirty (30) months, whichever period is longer; provided, however, that (x) the amount of such supplement shall not exceed the Participant's estimated old age insurance benefit unreduced on account of age (" Social Security Benefit"), and (y) in the case of  Highly Compensated Employees receiving the supplement, such supplement shall not exceed the dollar amount of the Social Security offset accrued under the Plan for the Participant, if that amount is less than the estimated unreduced Social Security Benefit.  In the event that the Company determines in good faith that application of the foregoing requirement (or any other applicable plan qualification requirements) would be violated by the payment of this supplement, or any portion thereof, to any eligible Highly Compensated Employee from the Plan, such supplement shall, to the extent necessary, be paid from the general assets of the Company and not under the terms of this Plan.

**APPENDIX J-24, OLIN CORPORATE GROUP**

J-89

(d) <u>Violation of Covenant.</u>   Any Participant who elects to participate in this Program and who, in the sole determination of the Company, is found to have breached the covenant not to compete that he was requested execute as a condition of being eligible to receive the Enriched Pension Option shall be deemed to have failed to satisfy the eligibility requirements of this Program and shall lose all entitlement to any Enriched Pension benefits.  All Enriched Pension Benefits previously paid shall be actuarially quantified and applied to reduce any future payment of unenhanced pension benefits under this Plan.

(e) <u>Limitation on Benefits.</u>  The benefits payable under this Program shall not exceed the permissible annual benefit payable in accordance with Sections 415 and 401(a)(4) of the Code.

(f) <u>Death of Participant.</u>  In the event that a Participant elects to retire and receive the Enriched Pension Option, and then dies either prior to actually retiring, or after retirement, any qualified survivor annuity or pre-retirement survivor annuity (and any other form of death benefits) shall include the value of the Enriched Pension Option and the Enriched Pension Option shall be payable in the same form as the death benefit payable to the Participant's Beneficiary.  The balance of any of the Social Security supplemental payments shall be paid to the Participant's Beneficiary in the same amount as would have been paid to the Participant, but in no event for a period longer than the period for which the Social Security supplement would have been paid to the Participant had the Participant not died.

**APPENDIX J-24, OLIN CORPORATE GROUP**

APPENDIX J-25

### *J-25 Oster Caribe/Puerto Rico*

This Appendix J-25 shall apply to all Eligible Employees working at the Puerto Rico facility who are hourly and salaried non-collectively bargained employees.  With respect to these employees, the Puerto Rico facility will be deemed to be Employing Company as of January 1, 1994.

(a)      **Prior Plans**.  Prior to March 31, 1995, the Non-Bargaining Employees Pension Plan of Olin Corporation. Prior to January 1, 1993, the A.J. Oster Company Hourly Employees' Pension Plan (originally effective January 1, 1983), as in effect through December 31, 1988, and as restated in the Non-Bargaining Employees Pension Plan of Olin Corporation through December 31, 1992.

(b)      **Hourly Employees**.  This section shall apply to all hourly employees working at the Puerto Rico facility.

(1)      **Eligibility**.  Eligibility shall be determined under Appendix J-26(b).

(2)      **Normal Retirement Allowance**.  A Participant's annual normal Retirement Allowance commencing on or after his Normal Retirement Date shall be equal to the appropriate flat benefit rate multiplied by his Years (and fractions of years) of Benefit Service (up to a maximum of 30). If a Participant's termination is effective on or after January 1, 1994, the flat benefit rate shall be $180.

(3)      **Early Retirement Allowance**.  A participant who while in the employ of the Employing Company attains age 55 and is credited with at least 10 years of Vesting Service may elect to retire and receive an Early Retirement Allowance in accordance with Section 3.2(c) of the Plan, provided, however, that (i) prior to January 1, 1995, such allowance shall be reduced by 0.05% for each month by which the payment of benefits precedes the Participant's Normal Retirement Date.

The special service crediting rule of Section 3.2(b) for employees who are at least age 52 shall not apply prior to January 1, 1993.

(4)      **Vested Deferred Retirement Allowance**.  A Participant whose employment has terminated may elect to receive Vested Deferred Retirement benefits in accordance with Section 3.3(b) of the Plan, provided, however, that the Early Vested Deferred Retirement Allowance shall only be available to Participants whose Benefit Commencement Date is on or after January 1, 1993.

The special service crediting rule of Section 3.3(c) for employees with at least seven (7) Years of Creditable Service shall not apply prior to January 1, 1993.

(5)      **Lump-Sum Death Benefit**.  Effective as of January 1, 1994, the Beneficiary of a Participant shall be eligible for a lump-sum death benefit of $5,000 as described in Section 5.2 of the Plan.

(6)      **Special Rules for Crediting Service and Paying Retirement Allowances**.  The rules set forth in Appendix J-26(h) shall apply.

(c)      **Salaried Employees.**  This section shall apply to all Eligible employees who are salaried employees working at the Puerto Rico facility.  With respect to these employees, the Puerto Rico facility will be deemed to be Employing Company as of January 1, 1994.

(1)      **Eligibility**.  Eligibility shall be determined according to the provisions of Appendix J-27(b).

**APPENDIX J-25, OSTER CARIBE/PUERTO RICO**

J-91

(2)     **Normal Retirement Allowance**.  The Normal Retirement Allowance shall be calculated according to the provisions of Appendix J-27(c).

(3)     **Early Retirement Allowance**. The Early Retirement Allowance shall be calculated according to the provisions of Appendix J-27(d).

(4)     **Vested Deferred Retirement Allowance**.  The Vested Deferred Retirement Allowance shall be calculated according to the provisions of Appendix J-27(e).

(5)     **Disability Retirement Allowance**.  None.

(6)     **Lump-Sum Death Benefit**.  Effective as of January 1, 1994, a Beneficiary of a Participants shall be eligible for a lump-sum death benefit of $5,000 as described in Section 5.2 of the Plan.

(7)     **Special Rules for Crediting Service prior to January 1, 1993**.  The provisions of Appendix J-27(h) shall apply.

(8)     **Other Special Provisions**

    (i)     The Social Security Level Option form of benefit described in Section 4.2(a) of the Plan shall only be available to Participants whose Benefit Commencement Date is on or after January 1, 1993.

    (ii)     Employees working at the Puerto Rico facility shall be credited with service as provided under the terms of this Plan and the Non-Bargaining Employees Pension Plan of Olin Corporation from the later of such Employee's date of hire or May 1, 1986.

    (iii)     This provision shall apply solely to the salaried and hourly non-collectively bargained Participants who transfer directly to, and become employees of, Global Brass and Copper Acquisition Co. and its affiliates ("Global"), and who are defined as Transferred Employees under Article V of the Purchase Agreement between Global Brass and Copper Acquisition Co. and Olin Corporation dated as of October 15, 2007 (such Participants referred to in this Appendix J-25 as "Global Sale Participants").  Global Sale Participants shall continue to receive credit for service with Global in determining their Period of Creditable Service for purposes of vesting and eligibility to retire early under the terms of the Plan; provided, however, that (i) such service with Global shall not be credited for purposes of benefit accrual or Benefit Service under the terms of the Plan, and (ii) no benefit shall be payable from this Plan until a Global Sale Participant terminates service with Global (or if earlier, such Global Sale Participant reaches age 65).  Solely for purposes of determining whether a Global Sale Participant is eligible for the special service crediting rule provided under Sections 3.2(b) and 3.3(c) of the Plan, the term "Employing Company" as utilized in such Section 3.2(b) shall include Global.

(d)     **Definitions** - The following definitions are applicable solely to employees working at the Puerto Rico facility.

(1)     "Code" shall have the same meaning as provided in Article 1.1 of the Plan.  Certain references to the "Code" contained in the Plan are neither contained nor are contrary to the ITA.  To the extent these references to the Code provide complementary definitions or provisions throughout this Plan, those definitions or provisions shall apply.  In the event, however, that any Code provision or definition contained in this Plan is or may be contrary to the ITA, the provision or definition of the ITA shall prevail.

**APPENDIX J-25, OSTER CARIBE/PUERTO RICO**

J-92

(2)      "Compensation" shall mean remuneration for services rendered by the employees working at the Puerto Rico facility who are subject to withholding pursuant to ITA Section 141 or reportable pursuant to ITA Section 147 or its successor, unless specifically exempt under ITA Sections 141(a)(1) or (f).

(3)      "ITA" shall mean the Puerto Rico Income Tax Act of 1954, as amended from time to time, or its successor the Puerto Rico Internal Revenue Code of 1994, or any successor thereto.

(4)      Maximum Deductible Contributions.  In no event shall the Puerto Rico facility make a contribution to the Plan with respect to its employees in Puerto Rico in excess of the maximum amount deductible under ITA Section 23(p) or its successor.

**APPENDIX J-25, OSTER CARIBE/PUERTO RICO**

APPENDIX J-26

### *J-26 Historically Oster Employees (Hourly)*

This Appendix J-26 shall apply to all Eligible Employees who are hourly, non-collectively bargained employees working at one of the facilities indicated below.  With respect to these employees, the facility at which they work shall be deemed to be the Employing Company as of January 1, 1993.  Notwithstanding anything in the Plan to the contrary, effective as of December 31, 2005, participation and benefit accruals under this Appendix J-26 shall be frozen, and Participants shall not accrue any additional benefits hereunder after such date.  However, the Plan will continue to recognize Periods of Creditable Service in determining the Participant's vesting and attainment of retirement dates hereunder.

- **Allentown, Pennsylvania** (f/k/a A.J. Oster Co.)    - **Carol Stream, Illinois** (f/k/a A.J. Oster Co.)
- **Warwick, Rhode Island** (f/k/a A.J. Oster Co.)    - **Watertown, Connecticut** (f/k/a A.J. Oster Co.
- **Waukesha, Wisconsin** (f/k/a A.J. Oster Co.)    - **Alliance Ohio** (f/k/a A.J. Oster Foils)
- **Yorba Linda, California** (f/k/a A.J. Oster West)

(a)    **Prior Plans**.  Prior to March 31, 1995, the Non-Bargaining Employees Pension Plan of Olin Corporation.  Prior to January 1, 1993, the A.J. Oster Company Hourly Employees' Pension Plan (originally effective January 1, 1983), as in effect through December 31, 1988, and as restated in the Non-Bargaining Employees Pension Plan of Olin Corporation through December 31, 1992.

(b)    **Eligibility**.

 (1)    Prior to January 1, 1993.  An Eligible Employee (other than a salaried employee) shall become a Participant as of the first day of the month on or after the date the employee attains age 21 and (1) completes 500 Hours of Service within the six month period beginning on the Employee's Employment Date; or (2) completes one Year of Eligibility Service, whichever occurs first.  For this purpose, an Employee's Employment Date is the first date as of which the Employee is credited with an Hour of Service, provided that if the Employee (who is not yet a Participant) incurs a Break in Service, the Employee's Employment Date is the first date thereafter as of which the Employee is again credited with an Hour of Service.  A Year of Eligibility Service shall mean a 12 month period beginning on the Employee's Employment Date during which the Employee is credited with at least 1,000 Hours of Service, provided, however, that if the Employee does not complete 1,000 Hours of Service during this initial computation period, a Year of Eligibility Service shall mean a 12 month calendar year during which the Employee is credited with at least 1,000 Hours of Service.

 (2)    On or after to January 1, 1993, but prior to January 1, 2006.  Any Eligible Non-Collectively Bargained Employee of an Employing Company whose Compensation is computed on an hourly, daily, piecework or other comparable basis shall become a Participant as of the date he both is an Eligible Non-Collectively Bargained Employee of an Employing Company and has completed one Year of Service.

 (3)    On or after to January 1, 2006.  No person shall become a Participant hereunder on or after January 1, 2006.

(c)    **Normal Retirement Allowance**.  A Participant's annual normal Retirement Allowance commencing on or after his Normal Retirement Date shall be equal to the appropriate flat benefit rate multiplied by his Years (and  fraction of years) of Benefit Service (up to a maximum of 30).  The preceding 30 year maximum on Years of Benefit Service taken into consideration for Retirement Allowance determinations is eliminated effective for Participants whose termination is effective on and after December 31, 2005.  Years of Benefit

Service shall be frozen as of December 31, 2005, and no additional Years of Benefit Service shall accrue thereafter for any Participant.

    (1)    If a Participant's termination is effective on or after January 1, 1988 but prior to January 1, 1991, the flat benefit rate shall be $240.

    (2)    If a Participant's termination is effective on or after January 1, 1991 but prior to January 1, 1999, the flat benefit rate shall be $300.

    (3)    If a Participant's termination is effective on or after January 1, 1999, the flat benefit rate shall be $312.

(d)    **Early Retirement Allowance**.  A participant who while in the employ of the Employing Company attains age 55 and is credited with at least 10 years of Vesting Service may elect to retire and receive an Early Retirement Allowance in accordance with Section 3.2(c) of the Plan, provided, however, that (i) prior to January 1, 1995, such allowance shall be reduced by 0.05% for each month by which the payment of benefits precedes the Participant's Normal Retirement Date.

The special service crediting rule of Section 3.2(b) for employees who are at least age 52 shall not apply prior to January 1, 1993.

(e)    **Vested Deferred Retirement Allowance**.  A Participant whose employment has terminated may elect to receive Vested Deferred Retirement benefits in accordance with Section 3.3(b) of the Plan, provided, however, that the Early Vested Deferred Retirement Allowance shall only be available to Participants whose Benefit Commencement Date is on or after January 1, 1993.

The special service crediting rule of Section 3.3(c) for employees with at least seven (7) Years of Creditable Service shall not apply prior to January 1, 1993.

(f)    **Disability Retirement Allowance**.  Effective as of January 1, 1995, Participants may be eligible for a Disability Retirement Allowance as described in paragraph (f)(2) of Appendix J-24, provided, however, that

    (1)    all references therein to a Normal, Early or Deferred Vested Retirement Allowance shall mean such Allowance as determined under this Appendix J-26; and

    (2)    if there is no Long-term Disability Plan in effect covering the Employees subject to this Appendix J-26, then an Participant shall be deemed to be Disabled if such Participant is eligible for Social Security disability benefits;  such Participant's Disability Retirement Allowance shall equal (A) the Participant's Normal Retirement Allowance compute in accordance with paragraph (c), above, except that the Participant shall be credited with Age and Benefit Service (up to a maximum of 30 years) to the Participant's Normal Retirement Age.  Notwithstanding the foregoing, for Participants whose Disability Retirement is effective on and after December 31, 2005, the preceding 30 year maximum on Years of Benefit Service taken into consideration for Retirement Allowance determinations is eliminated and Years of Benefit Service taken into consideration for Retirement Allowance determinations shall be frozen as of December 31, 2005, and no additional Years of Benefit Service shall be credited for periods thereafter.

(g)    **Lump-Sum Death Benefit**.  Effective as of January 1, 1993, the Beneficiary of a Participant shall be eligible for a lump-sum death benefit of $5,000 as described in Section 5.2 of the Plan.

(h)    **Special Rules for Crediting Service and Paying Retirement Allowances**.  For purposes of computing Retirement Allowances, the following definitions and other rules shall apply:

(1) For service prior to January 1, 1989, a Participant's period of service shall include all service (including special prior service credit) credited on the records of the Prior Plan, selected provisions of which are included in Appendix K of the Non-Bargaining Employees Pension Plan of Olin Corporation.

(2) For service prior to January 1, 1993,

    (i) a "Year of Vesting Service" means a 12-month period from January 1 to December 31 for which an Employee is credited with 1,000 or more Hours of Service.

    (ii) "Benefit Service" shall be expressed in years and completed months. One year of Benefit Service shall be credited if the Employee completes 1,800 or more Hours of Service in a calendar year. If the Employee completes more than 1,000 but less than 1,800 Hours of Service, a partial year of Benefit Service shall be credited in the ratio of his completed Hours of Service to 2,000. Such ratio shall be converted into its equivalent in months by multiplying by 12 and rounding to the nearest full month.

(3) The Social Security Level Option form of benefit described in Section 4.2(a) of the Plan shall only be available to Participants whose Benefit Commencement Date is on or after January 1, 1993.

(4) This provision shall apply solely to the Participants who transfer directly to, and become employees of, Global Brass and Copper Acquisition Co. and its affiliates ("Global"), and who are defined as Transferred Employees under Article V of the Purchase Agreement between Global Brass and Copper Acquisition Co. and Olin Corporation dated as of October 15, 2007 (such Participants referred to in this Appendix J-26 as "Global Sale Oster Participants"). Global Sale Oster Participants shall continue to receive credit for service with Global in determining their Period of Creditable Service for purposes of vesting and eligibility to retire early under the terms of the Plan; provided, however, that (i) such service with Global shall not be credited for purposes of benefit accrual or Benefit Service under the terms of the Plan, and (ii) no benefit shall be payable from this Plan until a Global Sale Oster Participant terminates service with Global (or if earlier, such Global Sale Oster Participant reaches age 65). Solely for purposes of determining whether a Global Sale Oster Participant is eligible for the special service crediting rule provided under Sections 3.2(b) and 3.3(c) of the Plan, the term "Employing Company" as utilized in such Section 3.2(b) shall include Global.

**APPENDIX J-26,**
**HISTORICALLY OSTER EMPLOYEES (Hourly)**

APPENDIX J-27

### *J-27 Historically Oster Employees (Salaried)*

This Appendix J-27 shall apply to all Eligible Employees who are salaried employees working at the following locations, provided, however, that such employees with no hours of service credited for service with the A.J. Oster Company, A.J. Oster Foils or A.J. Oster West before January 1, 1993 shall be covered under Appendix J-24.  With respect to the employees described in this Appendix J-27, the facility at which they work shall be deemed to be the Employing Company since January 1, 1993.

- **Allentown, Pennsylvania** (f/k/a A.J. Oster Co.)    - **Carol Stream, Illinois** (f/k/a A.J. Oster Co.)
- **Warwick, Rhode Island** (f/k/a A.J. Oster Co.)    - **Watertown, Connecticut** (f/k/a A.J. Oster Co.
- **Waukesha, Wisconsin** (f/k/a A.J. Oster Co.)    - **Alliance Ohio** (f/k/a A.J. Oster Foils)
- **Yorba Linda, California** (f/k/a A.J. Oster West)

(a)    **Prior Plans**.  Prior to March 31, 1995, the Non-Bargaining Employees Pension Plan of Olin Corporation.  Prior to January 1, 1993, the A.J. Oster Company Salaried Employees' Pension Plan (originally effective January 1, 1983), as in effect through December 31, 1988 and as restated in the Non-Bargaining Employees Pension Plan of Olin Corporation through December 31, 1992.

(b)    **Eligibility**.

(1)    Prior to January 1, 1993.  Any Eligible Employee of an Employing Company other than an Employee whose Compensation is computed on an hourly, daily, piecework or other comparable basis shall become a Participant as of the first day of the month following the later of the date such Employee attains age 21 or completes 5 Months of Service within any 12 month period.

(2)    On or after to January 1, 1993.  Any Eligible Non-Collectively Bargained Employee of an Employing Company other than an Employee whose Compensation is computed on an hourly, daily, piecework or other comparable basis shall become a Participant as of the date he both is an Eligible Non-Collectively Bargained Employee of an Employing Company and has completed one Year of Service.

(c)    **Normal Retirement Allowance**.

(1)    Prior to January 1, 1993.  A Participant who while in the employ of an Employing Company (A) attains his Normal Retirement Date, or (B) attains age 60 and is credited with at least 30 Years of Vesting Service (his "60/30 Retirement Date"), may elect to retire and receive Normal Retirement benefits commencing as of the first day of the month immediately following the Participant's actual retirement date.  A Participant's Normal Retirement benefits shall be equal to the lesser of:

(i)    the Participant's Years of Benefit Service (up to a maximum of 35), multiplied by the sum of (A) 1% of the Participant's Average Compensation, plus (B) 0.6% of the Participant's Average Compensation in excess of the Average Wage Base; or

(ii)    70% of the Participant's Average Compensation, minus 50% of the Participant's Social Security Benefit.

(2)    On or after January 1, 1993.  A Participant who while in the employ of an Employing Company attains his Normal Retirement Date may elect to retire and receive Normal Retirement benefits commencing as of the first day of the month immediately following the Participant's actual retirement date.  A Participant's Normal Retirement benefits shall be equal to the sum of the following:

       (i)      the Participant's Normal Retirement Allowance as computed under paragraph (c)(1), above, provided, however, that (A) Benefit Service credited for periods prior to January 1, 1993 only shall be taken into account, but (B) Average Compensation shall be determined taking into account Compensation before and after January 1, 1993; and

       (ii)     the Participant's Normal Retirement Allowance as computed under the Olin Corporate provisions, Appendix J-24, paragraph (c), provided, however, that Benefit Service credited for periods on or after January 1, 1993 only shall be taken in account.

Solely with respect to a Participant's Accrued Benefit as of January 1, 1993, a Participant who attains age 60 and is credited with at least 30 Years of Vesting Service (his "60/30 Retirement Date") may elect to retire and receive Normal Retirement benefits as described in paragraph (c)(1), above, to the extent of the Participant's Accrued Benefit as of January 1, 1993 commencing as of the first day of the month immediately following the Participant's actual retirement date.

(d)     **Early Retirement Allowance**.

   (1)    <u>Prior to January 1, 1993</u>.  A Participant who while in the employ of an Employing Company attains age 55 and is credited with at least 10 Years of Vesting Service may elect to retire and receive Early Retirement benefits in accordance with Section 3.2(c) of the Plan, provided, however, that (i) the unreduced Early Retirement Allowance may commence as of the first day of the month immediately following the Participant's Normal Retirement Date or 60/30 Retirement Date; and (ii) the reduced Early Retirement Allowance will be reduced by 0.5% for each month by which the Benefit Commencement Date precedes the Participant's Normal Retirement Date or, if the Participant has at least 30 Years of Vesting Service, his 60/30 Retirement Date, if earlier.

      The special service crediting rule of Section 3.2(b) for employees who are at least age 52 shall not apply prior to January 1, 1993.

   (2)    <u>On or After January 1, 1993</u>.  A Participant who while in the employ of an Employing Company attains age 55 and is credited with at least a total of 10 years of (A) Years of Vesting Service (for service prior to 1993) and/or (B) Years of Creditable Service (for service after 1992), may elect to retire and receive Early Retirement benefits in accordance with Section 3.2(c) of the Plan, provided, however, that

       (i)      the Participant's Accrued Benefit shall be calculated under paragraph (c)(2), above;

       (ii)     such allowance may commence as of the first day of the month immediately following the Participant's Normal Retirement Date or 60/30 Retirement Date;

       (iii)    if the Participant elected to receive a reduced Early Retirement Allowance, then (A) with respect to the Participant's Accrued Benefit under paragraph (c)(2)(i) his Retirement Allowance will be reduced by 0.5% for each month by which his benefit commencement date precedes his Normal Retirement Date or, if the Participant has at least 30 Years of Vesting Service, his 60/30 Retirement Date, if earlier, and (B) with respect to the Participant's Accrued Benefit under paragraph (c)(2)(ii), the early reduction factors in Section 3.2(b) shall apply.

(e)     **Vested Deferred Retirement Allowance**.

   (1)    <u>Prior to January 1, 1993</u>.  A Participant whose employment has terminated may elect to receive Vested Deferred Retirement benefits in accordance with Section 3.3(b) of the Plan, provided,

<b>APPENDIX J-27,<br>HISTORICALLY OSTER EMPLOYEES (Salaried)</b>

J-98

however, that if the Participant elects to receive an Early Vested Deferred Retirement Allowance such Participant's Accrued Benefit shall be calculated in accordance with paragraph (c)(1), above.

The special service crediting rule of Section 3.3(c) for employees with at least seven (7) Years of Creditable Service shall not apply prior to January 1, 1993.

(2)     <u>On or After January 1, 1993</u>.  A Participant who at the time he terminates service with an Employing Company has been credited with at least a total of 5 years of (A) Years of Vesting Service (for service prior to January 1, 1993) and/or (B) Years of Creditable Service (for service after 1992) may elect to receive Vested Deferred Retirement benefits in accordance with Section 3.3(b) of the Plan, provided, however, that if the Participant elects to receive an Early Vested Deferred Retirement Allowance such Participant's Accrued Benefit shall be calculated in accordance with paragraph (c)(2), above.

(f)     **Disability Retirement Allowance**.  Participants are eligible for a Disability Retirement Allowance as follows:

(1)     <u>Prior to January 1, 1993</u>.

(i)     A "Disabled Participant" is a Participant whose active employment has terminated, and who qualifies for disability benefits under the Oster "Long Term Disability Plan" and the Social Security Act.  A Participant who becomes a Disabled Participant while in the employ of an Employing Company and prior to his Normal Retirement Date or 60/30 Retirement Date shall continue to participate in the Plan and to be credited with Vesting Service and Benefit Service until the Participant dies, reaches his Normal Retirement Date, or ceases to be a Disabled Participant.  If a Participant ceases to be a Disabled Participant but does not return to active employment with an Employing Company, he shall be deemed to have terminated employment as of the date he ceased to be a Disabled Participant and his entitlement to benefits under the Plan shall be determined as of that date in accordance with the provisions of paragraphs (c), (d) or (e), above, as applicable.

(ii)     A Disabled Participant shall be entitled to a Disability Retirement Allowance commencing at his Normal Retirement Date or 60/30 Retirement Date equal to the greater of:

(A)     the Disabled Participant's Normal Retirement Allowance, calculated under paragraph (c)(1) hereof; or

(B)     1.125% of the Disabled Participant's Average Compensation (as determined on the date of the Participant becomes a Disabled Participant) multiplied by his Years of Benefit Service.

(iii)     The Administrative Committee, in its sole discretion, may determine that, even though a Participant fails to qualify for disability benefits under either the Oster "Long Term Disability Plan" or the Social Security Act, the Participant is eligible for a Disability Retirement Allowance if the Administrative Committee finds that the Participant (A) is permanently incapable of rendering satisfactory service to an Employing Company due to physical or mental disability, and (B) has attained at least age 55 and has been credited with at least 15 Years of Benefit Service.  A Participant found to be eligible for a Disability Retirement Allowance under this paragraph (f)(1)(iii) shall be entitled to a

**APPENDIX J-27,**
**HISTORICALLY OSTER EMPLOYEES (Salaried)**

Disability Retirement Allowance, commencing on the first day of any month on or after the date the Administrative Committee determines such eligibility, equal to the greater of:

(A)     the Participant's Normal Retirement Allowance, calculated under paragraph (c)(1) hereof; or

(B)     1.125% of the Participant's Average Compensation (as determined on the date of the Participant becomes a Disabled Participant) multiplied by his Years of Benefit Service.

(2)     On or After January 1, 1993.

Participants shall be eligible for a Disability Retirement Allowance as described in paragraph (f)(2) of Appendix J-24, provided, however, that

(i)     all references in Appendix J-24 to a Normal, Early or Deferred Vested Retirement Allowance shall mean such Allowance as determined under this Appendix J-27;

(ii)    the Participant's Disability Retirement Allowance shall equal the lesser of *(A)* the Participant's Normal Retirement Allowance, crediting the Participant for age and benefit service to the Participant's Normal Retirement Age (as described in paragraph (f)(2)(i)(A) of Appendix J-24), or *(B)* 12 times 60% of the Participant's monthly salary that is not in excess of $12,500 per month reduced by the other income and benefits listed in paragraph (f)(2)(i)(B) of Appendix J-24.

(g)   **Lump-Sum Death Benefit**.  Effective as of January 1, 1993, a Beneficiary of a Participants shall be eligible for a lump-sum death benefit of $5,000 as described in Section 5.2 of the Plan.

(h)   **Special Rules for Crediting Service prior to January 1, 1993**.  All service on or after January 1, 1993 shall be credited in accordance with the provisions of this Plan and the Non-Bargaining Employees Pension Plan of Olin Corporation.  Service prior to January 1, 1989 (including any special prior service credit) shall be credited as on the records of the A.J. Oster Company Salaried Employees' Pension Plan, selected provisions of which are included in Appendix K of the Non-Bargaining Employees Pension Plan of Olin Corporation.  Service on or after January 1, 1989, but prior to January 1, 1993 shall be credited in accordance with the provisions of the A.J. Oster Company Salaried Employees' Pension Plan, as restated in the Non-Bargaining Employees Pension Plan of Olin Corporation, including the following special definitions and other rules:

(1)     A Month of Service shall mean a calendar month during which the Employee is entitled to credit for at least one Hour of Service with an Employing Company.

(2)     Vesting Service will credited as follows:

(i)     An Employee will be credited with one Year of Vesting Service for each calendar year during which the Employee was at least age 18 and was credited with at least 5 Months of Service with the Employing Company, with an Oster-Affiliated Company, or under an NL Industries, Inc. Defined Benefit Plan;

(ii)    An Employee will be credited with one Year of Vesting Service for each year of service with which the Participant would have been credited under subparagraph (i) above, up to a maximum of 5 years or such longer period required by law, had he not been absent from work because of any period of obligatory military service with the United States

**APPENDIX J-27,**
**HISTORICALLY OSTER EMPLOYEES (Salaried)**

J-100

armed forces or voluntary service, provided and only to the extent that the Participant is re-employed within the period during which his re-employment rights are guaranteed under federal law;

(iii)    An Employee will be credited with one Year of Vesting Service for each complete year that a Participant is or has been a Disabled Participant.

(3)    Benefit Service will be credited as follows:

(i)    12 Months of Benefit Service shall equal One Year of Benefit Service.

(ii)    A Participant will be credited with one Year of Benefit Service for each complete year that the Participant is or has been a Disabled Participant.

(iii)    A Participant will be credited with all benefit service credited under an Oster-Affiliated Company's defined benefit plan or under an NL Industries, Inc. Defined Benefit Plan.

(4)    An Oster-Affiliated Company is any company included in the control group of corporations or unincorporated businesses under common control (as determined under section 414 of the Code) with A.J. Oster Company prior to its acquisition by Olin Corporation on August 31, 1991.  An NL Industries, Inc. Defined Benefit Plan is a defined benefit pension plan maintained prior to October 1, 1979 for employees of the Associated Lead, Inc., Tam Ceramics, Inc. or Fry's Metals, Inc., subsidiaries of NL Industries, Inc.

(5)    Average Wage Base shall be determined under the table listed below:

| Calendar Year Of 65th Birthday | Average Wage Base |
|---|---|
| 1980 | 9,600 |
| 1981 | 10,200 |
| 1982 | 10,800 |
| 1983 | 11,400 |
| 1984 | 12,000 |
| 1985 | 12,600 |
| 1986 | 13,200 |

| Calendar Year Of 65th Birthday | Average Wage Base |
|---|---|
| 1987-1988 | 13,800 |
| 1989 | 14,400 |
| 1990-1991 | 15,000 |
| 1992-1993 | 15,600 |
| 1994 | 16,200 |
| 1995 | 16,800 |
| 1996 | 17,400 |
| 1997 | 18,000 |
| 1998 | 18,600 |
| 1999 | 19,200 |
| 2000 | 19,800 |
| 2001 | 20,400 |

**APPENDIX J-27,**
**HISTORICALLY OSTER EMPLOYEES (Salaried)**

| | |
|---|---|
| 2002 | 21,000 |
| 2003-2004 | 21,600 |
| 2005 | 22,200 |
| 2006 | 22,800 |
| 2007 | 23,400 |
| 2008 | 24,000 |
| 2009-2010 | 24,600 |
| 2011-2012 | 25,200 |
| 2013-2014 | 25,800 |
| 2015-2021 | 25,896 |

(6)   Social Security Benefit shall mean the annual Primary Social Security benefit which would be payable to a Participant under the following assumptions:

(i)   In the case of a Participant who terminates prior to Normal Retirement Date, it shall be assumed that he continues to earn Compensation at the level in effect at the time of his termination until his 65th birthday.

(ii)   Subsequent changes in the level of payment of Social Security benefits after a Participant's separation from service (whether due to changes in the law or adjustments mandated by it) shall neither increase nor decrease his vested benefits under the Plan.

(iii)   The Participant is unmarried.

(iv)   For purposes of use of estimated earnings in determining the maximum offset under this Plan (A) the pre-separation or pre-retirement or pre-hire salary history will be estimated by applying a salary scale, projected backwards, to the employee's compensation at the time of separation, retirement or hire and the salary scale is either:  *(1)* the actual changes in the average wages from year to year as determined by the Social Security Administration, or *(2)* a level percentage per year not less than six percent (6%); (B) a Participant's benefit will be adjusted to the offset based on an actual salary history for years previously estimated before separation from service, where such documentation is supplied by the Participant no later than a reasonable period of time following the later of *(1)* the Participant's date of separation from service and *(2)* the time the Participant is notified of his benefit entitlement: (C) Notice of a Participant's right to supply actual salary history, as provided for in (B) above, and the financial consequences of failing to supply such history, will be provided each Participant each time a Summary Plan Description is provided and at the time of a Participant's separation from service.

(i)   **Other Special Provisions**

(1)   The Social Security Level Option form of benefit described in Section 4.2(a) of the Plan shall only be available to Participants whose Benefit Commencement Date is on or after January 1, 1993.

(2)   This provision shall apply solely to the salaried Participants who transfer directly to, and become employees of, Global Brass and Copper Acquisition Co. and its affiliates ("Global"), and who are defined as Transferred Employees under Article V of the Purchase Agreement between Global Brass and Copper Acquisition Co. and Olin Corporation dated as of October 15, 2007 (such Participants referred to in this Appendix J-27 as "Global Sale Participants").  Global Sale Participants shall continue to receive credit for service with Global in determining their Period of Creditable Service for

**APPENDIX J-27,**
**HISTORICALLY OSTER EMPLOYEES (Salaried)**

purposes of vesting and eligibility to retire early under the terms of the Plan; provided, however, that (i) such service with Global shall not be credited for purposes of benefit accrual or Benefit Service under the terms of the Plan, and (ii) no benefit shall be payable from this Plan until a Global Sale Participant terminates service with Global (or if earlier, such Global Sale Participant reaches age 65).  Solely for purposes of determining whether a Global Sale Participant is eligible for the special service crediting rule provided under Sections 3.2(b) and 3.3(c) of the Plan, the term "Employing Company" as utilized in such Section 3.2(b) shall include Global.

**APPENDIX J-27,**
**HISTORICALLY OSTER EMPLOYEES (Salaried)**

APPENDIX J-28

### *J-28 Pioneer (Henderson)*

This Appendix J-28 shall apply to all individuals who, as of October 1, 2007, had an undistributed accrued benefit under the terms of the frozen Pioneer Companies Retirement Plan for Bargaining Unit Employees (as amended and restated effective January 1, 2001 and as subsequently amended) (each being referred to herein as a "Pioneer Henderson Participant"), which plan was merged into this Plan as of that date. With respect to these Pioneer Henderson Participants, Pioneer Companies, Inc. (collectively referred to herein as "Pioneer") shall be deemed to be the Employing Company.

(a)    **Prior Plan**. The Pioneer Companies Retirement Plan for Bargaining Unit Employees (as amended and restated effective January 1, 2001 and as subsequently amended), which was frozen as of February 29, 2004, and merged into the Olin Corporation Employees Pension Plan as of October 1, 2007. The Prior Plan was originally adopted effective as of October 25, 1998, and former known as the Pioneer Americas, LLC Retirement Plan for Bargaining Unit Employees (and before that, known as Pioneer Chlor Alkali Company, Inc. Retirement Plan for Bargaining Unit Employees).

(b)    **Eligibility**. There are no new entrants under this Appendix after February 29, 2004 due to the freeze of the Prior Plan as of such date. Prior to that date, each employee of Pioneer who was covered by a collective bargaining agreement that provided for coverage under the Prior Plan, became a participant in the Prior Plan on the later of the (i) first day of meeting the preceding coverage requirement or (ii) the last day of the Service Computation Period in which he first completed one year of Eligibility Service.

(c)    **Normal Retirement Allowance**. A Pioneer Henderson Participant's monthly normal Retirement Allowance, commencing on or after his Normal Retirement Date and calculated in the form of a single life annuity, and subject to the remaining provisions herein, shall be equal to 1/12th of the sum of the following: (a) 1 ¼ percent of the Pioneer Henderson Participant's Average Annual Earnings up to Covered Compensation multiplied by his number of years of Credited Service at retirement; plus (b) 1 ½ percent of the Pioneer Henderson Participant's Average Annual Earnings in excess of Covered Compensation multiplied by his number of years of Credited Service at retirement. As of February 29, 2004, the Prior Plan was frozen and benefit accruals ceased at such time.

A Pioneer Henderson Participant shall not earn Credited Service after February 29, 2004 and compensation after such date will not be considered in determining Average Annual Earnings or benefits under this Appendix. A Pioneer Henderson Participant's normal Retirement Allowance shall not be greater than his accrued benefit as of February 29, 2004 under the Prior Plan.

In no event will a reduction in a Pioneer Henderson Participant's Average Annual Earnings reduce the normal Retirement Allowance payable to him below the amount that would have been payable to him under the same form of payment had he retired prior to his Normal Retirement Date when eligible for an early Retirement Allowance.

Notwithstanding the preceding, in no event will the monthly normal Retirement Allowance payable to a Pioneer Henderson Participant be less than the greater of (a) his benefit accrued as of December 31, 1988 under the terms of the Prior Plan in effect on that date or (b) his benefit accrued as of February 28, 1991 under the terms of the Prior Plan in effect on that date, including the $30.00 minimum benefit formula.

Notwithstanding the preceding, if a benefit is payable with respect to a Pioneer Henderson Participant under the provisions of any other tax-qualified defined benefit or defined contribution plan to which Pioneer made contributions with respect to such Pioneer Henderson Participant (other than any such plan to which the Pioneer Henderson Participant has made employee contributions), the benefit payable to the Pioneer Henderson Participant under the Plan shall be reduced by an amount equal to the portion of the benefit

**APPENDIX J-28, PIONEER (HENDERSON)**

J-104

payable, or paid, under such other plan with respect to the Pioneer Henderson Participant which is based upon any period of service for which the Pioneer Henderson Participant received Credited Service under the Prior Plan; provided, however, that in no event shall such Pioneer Henderson Participant received a benefit under the Plan that is less than the Actuarial Equivalent of his accrued benefit under the Prior Plan as of February 29, 2004 attributable to the Pioneer Henderson Participant's years of Credited Service under the Plan other than such years upon which the benefit payable, or paid, under such other plan is based; and provided, further, that no reduction shall be made if such other plan provides that the benefit payable under such other plan will be offset by benefits provided under the Prior Plan.

A Pioneer Henderson Participant's Normal Retirement Date is age 65.

(d)       **Early Retirement Allowance**.

A Pioneer Henderson Participant who retires from employment with his Employing Company and all Affiliated Companies under any of the following criteria and who is not eligible for or does not elect to receive a disability Retirement Allowance shall be eligible for an early Retirement Allowance.

(i)  The Pioneer Henderson Participant retires directly from active employment with his Employing Company and all Affiliated Companies within the ten-year period preceding his Normal Retirement Date and has at least ten years of Service.

(ii)  The Pioneer Henderson Participant retires directly from active employment with his Employing Company and all Affiliated Companies and has an accrued benefit under the Prior Plan as of December 31, 1993 that is not subsequently forfeited and retires within the three-year period preceding his Normal Retirement Date.

(iii)  The Pioneer Henderson Participant retires directly from active employment with his Employing Company and all Affiliated Companies and has an accrued benefit under the Prior Plan as of March 1, 1991 that is not subsequently forfeited and retires within the ten-year period preceding his Normal Retirement Date.

An eligible Pioneer Henderson Participant's monthly early Retirement Allowance shall be equal to his normal Retirement Allowance on the date of his early retirement; provided, however, that the amount of such benefit shall be reduced as follows:

(i) If the Pioneer Henderson Participant retires at or after age 62 and has at least ten years of Service, his benefit shall be not reduced.

(ii) If the Pioneer Henderson Participant retires under conditions other than those described in (i) above and has benefits accrued under the Prior Plan prior to 1994, his benefit shall be adjusted as follows:

(1) If the Pioneer Henderson Participant retires directly from active employment with his Employing Company and all Affiliated Companies at or after "age 60" and has at least 25 years of Service, his benefit shall not be reduced.

(2) If the Pioneer Henderson Participant retires directly from active employment with his Employing Company and all Affiliated Companies at or after "age 62" and has at least one year of Service, his benefit shall not be reduced.

(3) If the Pioneer Henderson Participant retires directly from active employment with his Employing Company and all Affiliated Companies at or after "age 55," but prior to "age 60" and has at least 25 years of Service, his benefit shall be reduced by 1/3rd of

**APPENDIX J-28, PIONEER (HENDERSON)**

J-105

one percent for each full calendar month by which his Benefit Commencement Date precedes his attainment of "age 60."

(4) If the Pioneer Henderson Participant retires directly from active employment with his Employing Company and all Affiliated Companies at or after "age 55" but prior to age "62" and has at least ten, but fewer than 25 years of Service, his benefit shall be reduced by 5/12ths of one percent for each full calendar month by which his Benefit Commencement Date precedes his attainment of "age 62".

(iii) If the Pioneer Henderson Participant retires under conditions other than those described in (i) above and does not have benefits accrued under the Prior Plan prior to 1994, his benefit shall be reduced by 5/12ths of one percent for each full calendar month by which his Benefit Commencement Date precedes his attainment of "age 65".

For these purposes, "age 55", "age 62", and "age 65" mean the first day of the calendar month coinciding with or next following the date the Pioneer Henderson Participant attains such age.

(e)     **Vested Deferred Retirement Allowance**.

A Pioneer Henderson Participant's vested interest in his accrued benefit shall be determined in accordance with the following schedule, based upon the number of full years of Service credited to him; provided, however, that a Pioneer Henderson Participant's vested interest in his accrued benefit shall be 100 percent if he is employed by his Employing Company or an Affiliated Company on his Normal Retirement Date or the date he becomes eligible for an early Retirement Allowance in accordance with Section (d)(iii) above, regardless of whether he has completed the number of years of Service required under the schedule for 100 percent vesting.

| Years of Service | Vested Interest |
|---|---|
| less than five | 0% |
| five or more | 100% |

Notwithstanding the foregoing, if an individual became a Pioneer Henderson Participant on October 25, 1988 upon the transfer of assets and liabilities from the Amended Retirement Plan for Employees of Stauffer Chemical Corporation to the Prior Plan, his vested interest in the portion of his accrued benefit transferred from such plan shall be 100 percent.

Each Pioneer Henderson Participant who terminates employment with his Employing Company and all Affiliated Companies, who has a vested interest in his accrued benefit, and who is not eligible for a normal, early or disability Retirement Allowance shall be eligible for a deferred vested Retirement Allowance.

A monthly deferred vested Retirement Allowance shall be paid to an eligible Pioneer Henderson Participant commencing as of his Normal Retirement Date; provided, however, that a Pioneer Henderson Participant who has satisfied any applicable service requirement for an early Retirement Allowance at the time of his termination of employment may elect to begin benefit payments as of the first day of any month following the month in which he would have been eligible for an early Retirement Allowance if he had continued in employment.

An eligible Pioneer Henderson Participant's monthly deferred vested Retirement Allowance shall be equal to his vested accrued benefit on the date of his termination of employment with his Employing Company and all Affiliated Companies; provided, however, that the amount of such benefit shall be reduced by 5/12 of 1 percent for each full calendar month by which commencement of payment of the benefit precedes his Normal Retirement Date.

**APPENDIX J-28, PIONEER (HENDERSON)**

J-106

(f)     **Disability Retirement Allowance**.

Each Pioneer Henderson Participant who retires from employment with his Employing Company and all Affiliated Companies prior to his Normal Retirement Date due to being Totally and Permanently Disabled and who has at least five years of Service shall be eligible for a disability Retirement Allowance as provided herein.

Pre-1994 Disability

A Pioneer Henderson Participant who is Totally and Permanently Disabled prior to January 1, 1994 shall be entitled to either:

(i)  a monthly disability retirement benefit shall be paid to an eligible Pioneer Henderson Participant commencing as of the first day of the month following the later of:

(1)  the last calendar month in which sickness and accident benefits under any employer-sponsored group insurance plan are payable; or

(2)  the month in which he makes written application for the benefit, but no later than his Normal Retirement Date.

(ii)     or if such Pioneer Henderson Participant elects continued disability accrual , he shall be treated as having continued in employment as an employee until the earliest of:

(1) the date he ceases to be Totally and Permanently Disabled;

(2) the date on which he elects to retire and commence disability retirement benefits, provided he satisfies the requirements for such retirement benefit as in effect on the date he elects to retire;

(3) the date he refuses to undergo a medical examination requested by the Administrative Committee; or

(4) his Normal Retirement Date.

Post-1993 Disability

A Pioneer Henderson Participant who is Totally and Permanently Disabled on or after January 1, 1994 shall be treated as having continued in employment as an employee until the earliest of:

(1)     the date he ceases to be Totally and Permanently Disabled;

(2)     the date he refuses to undergo a medical examination requested by the Administrative Committee; or

(3)     his Normal Retirement Date.

Continued Disability Accruals

A Totally and Permanently Disabled Pioneer Henderson Participant who is treated as continuing in employment as provided above shall be credited with Service and Credited Service during such time; provided that no Credited Service shall be provided on or after February 29, 2004.  Such Pioneer

**APPENDIX J-28, PIONEER (HENDERSON)**

J-107

Henderson Participant shall be considered (1) to continue in the same employment class applicable to the Pioneer Henderson Participant on the date he became Totally and Permanently Disabled and (2) to receive Earnings throughout the period (but not after February 29, 2004) he is treated as continuing in employment at the same base rate he earned immediately prior to the expiration of any sick leave benefits payable to him or, if no sick leave benefits are payable to the Pioneer Henderson Participant, at the same base rate in effect for the most recent calendar year preceding the date he became Totally and Permanently Disabled.

A Pioneer Henderson Participant who continues to be Totally and Permanently Disabled to his Normal Retirement Date shall be treated as having retired on that date and shall be eligible for a normal Retirement Allowance as provided above based on his Average Annual Earnings and Credited Service on his Normal Retirement Date (or if earlier, February 29, 2004).  Such benefit shall be determined under the provisions of the Plan in effect on the Participant's Normal Retirement Date.

Effect of Recovery on Continued Disability Accrual

If a Pioneer Henderson Participant who is receiving continued disability accrual ceases to be Totally and Permanently Disabled prior to his Normal Retirement Date (or if he became Totally and Permanently Disabled prior to January 1, 1994, the date he elects to receive his disability retirement benefit), his employment will not be considered to have been interrupted if he returns to employment with the Employing Company or an Affiliated Company as an employee within 60 days of the date he ceased being Totally and Permanently Disabled.  If the Pioneer Henderson Participant does not return to employment within 60 days, he shall be treated as having terminated employment on the date he ceased being Totally and Permanently Disabled.  Such Pioneer Henderson Participant shall be entitled to a benefit under the Plan based on his Credited Service and Average Annual Earnings on the date he ceased being Totally and Permanently Disabled (or if earlier, February 29, 2004); provided, however, that his eligibility for and the amount of such benefit shall be determined in accordance with the provisions of the Plan in effect on the date he became Totally and Permanently Disabled.

Medical Examination

In any case where the Administrative Committee deems it necessary or advisable, it may require a Pioneer Henderson Participant applying for a disability retirement benefit to submit to such medical examinations and reexaminations as may be reasonably necessary.

In determining whether or not a Pioneer Henderson Participant who is receiving continued disability accruals is or continues to be Totally and Permanently Disabled, the Administrative Committee may require the Pioneer Henderson Participant to submit to a medical examination by a physician acceptable to it.  The Administrative Committee may not require a Pioneer Henderson Participant to submit to such an examination more than two times during a 12-month period.  If the Pioneer Henderson Participant refuses to submit to such a medical examination, he shall be deemed to have ceased to be Totally and Permanently Disabled hereunder.

(g)    **Spouse's Pre-retirement Death Benefit**.  Subject to the following, if a vested Pioneer Henderson Participant dies prior to his Benefit Commencement Date and he has been married to his Spouse throughout the one year period ending on the date of his death, his surviving Spouse shall be entitled the amount payable in the form of a preretirement survivor annuity determined in accordance with Section 5.1 of the Plan.

(i) The Spouse is not required to be married throughout the one-year period immediate preceding the Pioneer Henderson Participant's date of death if the Pioneer Henderson Participant dies after retiring directly from active employment with his Employing Company and all Affiliated Companies and after being eligible for early retirement but elects to defer payment of his early Retirement Allowance.

**APPENDIX J-28, PIONEER (HENDERSON)**

J-108

(ii) If prior to a Pioneer Henderson Participant's death the Pioneer Henderson Participant elected an optional form of payment that is a qualified joint and survivor annuity, for purposes of determining the amount of the qualified preretirement survivor annuity, the optional form of payment elected by the Pioneer Henderson Participant shall be substituted for the qualified joint and 50% survivor annuity in Section 5.1 of the Plan.

(iii) If a Pioneer Henderson Participant dies while employed with his Employing Company and an Affiliated Company, the monthly amount of the qualified preretirement survivor annuity payable to his surviving Spouse shall be the greater of the amount determined above or 50 percent of the Pioneer Henderson Participant's accrued benefit on his date of death, reduced as provided under the terms of the Plan if the Spouse elects to commence payment of the qualified preretirement survivor annuity prior to the Pioneer Henderson Participant's Normal Retirement Date; provided, however, that if the Pioneer Henderson Participant's surviving Spouse elects to commence payment prior to the date the Pioneer Henderson Participant would have attained age 55, the amount of the Pioneer Henderson Participant's accrued benefit shall be reduced by 35 percent for the period from the date the Pioneer Henderson Participant would have attained age 55 to his Normal Retirement Date and shall be further reduced by 1/3rd of one percent for each full calendar month by which the Spouse's Benefit Commencement Date precedes the date the Pioneer Henderson Participant would have attained age 55.

(iv)  Payment of a qualified preretirement survivor annuity to a Pioneer Henderson Participant's surviving Spouse shall commence as of the first day of the month following the later of (1) the month in which the Pioneer Henderson Participant dies or (2) the month in which the Pioneer Henderson Participant would have attained earliest retirement age (as defined herein) under the Plan; provided, however, that the surviving Spouse of a Pioneer Henderson Participant who is entitled to the enhanced qualified preretirement survivor annuity described in (iii) above may elect to commence payment as of the first day of the month following the month in which the Pioneer Henderson Participant dies, regardless of whether the Pioneer Henderson Participant would have attained earliest retirement age as of such date.  Notwithstanding the foregoing, a Participant's surviving Spouse may elect to defer commencement of payment of the qualified preretirement survivor annuity to a date no later than the Pioneer Henderson Participant's Normal Retirement Date.  If a Pioneer Henderson Participant's surviving Spouse dies before the date as of which payment of the qualified preretirement survivor annuity is to commence to such Spouse, no qualified preretirement survivor annuity shall be payable hereunder.  Payment of a qualified preretirement survivor annuity shall continue to a Pioneer Henderson Participant's surviving Spouse for such Spouse's lifetime, the last monthly payment being for the month in which the Spouse's death occurs.  For purposes of this Article, a Pioneer Henderson Participant's "earliest retirement age" means the earliest age at which the Pioneer Henderson Participant could have elected to commence retirement benefits under the Plan if he had survived, but based on his years of Service on his date of death.

(h)     **Forms of Payment**.  A Pioneer Henderson Participant shall be paid in the form and manner provided under Article IV of the Plan, subject to the following:

(i) A married Pioneer Henderson Participant may elect to increase the survivor benefit payable to his Spouse under the qualified joint and survivor annuity to 100 percent or 75 percent of the reduced amount payable during the Pioneer Henderson Participant's lifetime, without need for written consent from the Spouse.

(ii) If the Pioneer Henderson Participant's Beneficiary under an optional form of payment dies prior to the Pioneer Henderson Participant's Benefit Commencement Date, the election shall become inoperative and ineffective, and benefit payments, if any, shall be made under the normal

**APPENDIX J-28, PIONEER (HENDERSON)**

J-109

form of payment provided under Article IV of the Plan, unless the Pioneer Henderson Participant elects another optional form of payment provided under the Plan prior to his Benefit Commencement Date.

(iii) With respect to option 1 under Section 4.2(a) of the Plan, the 25% survivorship percentage shall not be available to a Pioneer Henderson Participant, and the provision regarding less than age-25 non-Spousal Beneficiaries shall be inapplicable to a Pioneer Henderson Participant.

(iv) Options 3 and 4 under Section 4.2(a) of the Plan shall not be available to a Pioneer Henderson Participant.

(v)  Option 5 under Section 4.2(a) of the Plan is not available to a Pioneer Henderson Participant who is entitled to a deferred vested Retirement Allowance or a disability Retirement Allowance.

(vi) Notwithstanding anything in the Plan, and subject to applicable law, Actuarial Equivalent for purposes of purposes of converting a single life annuity to another form of payment under this Appendix shall be based on the 1979 George B. Buck Unisex Mortality Table assuming 80 percent males and 20 percent females and an interest rate of eight percent.  In no event shall the Actuarial Equivalent of a Pioneer Henderson Participant's accrued benefit as of his Benefit Commencement Date be reduced below the Actuarial Equivalent of his benefit accrued as of February 28, 1991 under the terms of the Prior Plan determined as of such Benefit Commencement Date using the factors in effect on that date.

(i)      **Lump-Sum Pre-Retirement Death Benefit**.  None.

(j)      **Special Rules for Crediting Service and Earnings**.

A Pioneer Henderson Participant's Credited Service, Average Annual Earnings and accrued benefit as of February 29, 2004 (or earlier date if applicable) shall be as credited and determined on the records and terms of the Prior Plan.

An individual's Eligibility Service and Service Computation Period as of February 29, 2004 (or earlier date if applicable) shall be as credited and determined on the records and terms of the Prior Plan.

A Pioneer Henderson Participant's Service as of October 1, 2007 (or earlier date if applicable) shall be as credited and determined on the records and terms of the Prior Plan.  On and after such date, it shall be credited and determined in accordance with the applicable provisions of the Plan (and Prior Plan to the extent applicable).

**APPENDIX J-28, PIONEER (HENDERSON)**

J-110

APPENDIX J-29

### *J-29 Pioneer (Tacoma)*

This Appendix J-29 shall apply to all individuals who, as of October 1, 2007, had an undistributed accrued benefit under the terms of the frozen Pioneer Companies Retirement Plan for Tacoma Union Employees (as amended and restated effective January 1, 2001 and as subsequently amended) (each being referred to herein as a "Pioneer Tacoma Participant"), which plan was merged into this Plan as of that date. With respect to these Pioneer Tacoma Participants, Pioneer Companies, Inc. (collectively referred to herein as "Pioneer") shall be deemed to be the Employing Company.

(a)  **Prior Plan**. The Pioneer Companies Retirement Plan for Tacoma Union Employees (as amended and restated effective January 1, 2001 and as subsequently amended), which was frozen as of February 29, 2004, and merged into the Olin Corporation Employees Pension Plan as of October 1, 2007.

The Prior Plan was originally adopted effective as of June 30, 1997 by the Occidental Chemical Corporation ("Onyx"), which established the Occidental Chemical Corporation Retirement Plan for Tacoma Union Employees to provide benefits for eligible employees at operations to be purchased by Pioneer America, LLC (formerly known as Pioneer Chlor Alkali Company, Inc.). Assets and liabilities were transferred to the Prior Plan from the Occidental Chemical Corporation Retirement Plan for Union (Hourly and Salaried) Employees (the "Oxy Plan"). Sponsorship of the Prior Plan was transferred to Pioneer Chlor Alkali Company, Inc. on August 29, 1997 and the name of the Prior Plan was changed to the Pioneer Chlor Alkali Company, Inc. Retirement Plan for Tacoma Union Employees. Effective January 1, 2000, the Prior Plan name was changed to the Pioneer Americas, LLC Retirement Plan for Tacoma Union Employees. Effective September 30, 2003, the Prior Plan name was changed to the Pioneer Companies Retirement Plan for Tacoma Union Employees.

(b)  **Eligibility**. There are no new entrants under this Appendix after February 29, 2004 due to the freeze of the Prior Plan as of such date. Prior to that date, each employee of Pioneer who (i) was covered by a collective bargaining agreement with (1) the International Chemical Workers Union (Local 110) at Tacoma, Washington or (2) the International Union of Operating Engineers (Local 286) at Tacoma, Washington, and (ii) was not accruing benefits under another defined benefit pension plan maintained by Pioneer (other than a frozen defined benefit plan), became a participant in the Prior Plan on the first day of the calendar month following the month in which he met the preceding coverage requirement.

(c)  **Normal Retirement Allowance**. A Pioneer Tacoma Participant's monthly normal Retirement Allowance, commencing on or after his Normal Retirement Date and calculated in the form of a single life annuity, and subject to the remaining provisions herein, shall be equal to 1/12th of the sum of the following:

(i) ¾ percent of the Pioneer Tacoma Participant's Past Service Earnings multiplied by his number of full years of Past Credited Service; plus

(ii) 1 percent of the Pioneer Tacoma Participant's Earnings for each year of Future Credited Service; plus

(iii) one percent of the Pioneer Tacoma Participant's Earnings determined as of the date that the Pioneer Tacoma Participant commenced participation in the Prior Plan (provided that in no event shall such Earnings be less than $11,000) multiplied by each year (or fraction thereof) beginning with the first day of the month coinciding with or next following the Pioneer Tacoma Participant's date of hire and ending with the date the Pioneer Tacoma Participant commenced participation in the Prior Plan; plus

**APPENDIX J-29, PIONEER (TACOMA)**

J-111

(iv) the dollar amount determined from the chart below based on the Pioneer Tacoma Participant's Average Annual Earnings at retirement multiplied by a fraction, not to exceed one, the numerator of which is the number of the Pioneer Tacoma Participant's years of Credited Service at retirement and the denominator of which is 15; provided, however, that if the Pioneer Tacoma Participant terminates employment prior to his Normal Retirement Date, the denominator of the fraction shall be the greater of 15 or the number of years of Credited Service the Pioneer Tacoma Participant would have completed if he had continued in employment as an Employee to age 62; and provided, further, that in no event shall the dollar amount determined under this item (iv) be less than $132.

| Participant's Average Annual Earnings | Applicable Dollar Amount |
| --- | --- |
| $3,000.01 to $3,600 | $132 |
| 3,600.01 to 4,200 | 264 |
| 4,200.01 to 4,800 | 396 |
| 4,800.01 to 5,400 | 528 |
| 5,400.01 to 6,000 | 660 |
| 6,000.01 to 6,600 | 792 |
| 6,600.01 to 7,200 | 924 |
| 7,200.01 to 7,800 | 1,056 |
| 7,800.01 to 8,400 | 1,188 |
| 8,400.01 to 9,000 | 1,320 |
| 9,000.01 to 9,600 | 1,450 |
| 9,600.01 to 10,200 | 1,584 |
| 10,200.01 to 10,800 | 1,716 |
| 10,800.01 to 11,400 | 1,848 |
| 11,400.01 to 12,000 | 1,980 |
| Etc. in steps of $600 | Etc. in steps of $132 |

As of February 29, 2004, the Prior Plan was frozen and benefit accruals ceased at such time.

A Pioneer Tacoma Participant shall not earn Credited Service, Past Credited Service, or Future Credited Service after February 29, 2004 and compensation after such date will not be considered in determining Earnings, Average Annual Earnings, Past Service Earnings or benefits under this Appendix.  A Pioneer Tacoma Participant's normal Retirement Allowance shall not be greater than his accrued benefit as of February 29, 2004 under the Prior Plan.

**APPENDIX J-29, PIONEER (TACOMA)**

J-112

In no event will a reduction in a Pioneer Tacoma Participant's Average Annual Earnings reduce the normal Retirement Allowance payable to him below the amount that would have been payable to him under the same form of payment had he retired prior to his Normal Retirement Date when eligible for an early Retirement Allowance.

A Pioneer Tacoma Participant's Normal Retirement Date is age 65.

(d) **Early Retirement Allowance**.

A Pioneer Tacoma Participant who retires from active employment with his Employing Company and all Affiliated Companies at or after age 55, but prior to his Normal Retirement Date, and who has at least five years of Service, shall be eligible for an early Retirement Allowance.

An eligible Pioneer Tacoma Participant's monthly early Retirement Allowance shall be equal to his vested accrued benefit on the date of his early retirement; provided, however, that if the Pioneer Tacoma Participant elects to commence payment of such benefit prior to his Normal Retirement Date, the following shall apply:

(i) If the Pioneer Tacoma Participant retires at or after age 60, but prior to his Normal Retirement Date, and has at least 30 years of Service, the amount of his early Retirement Allowance shall not be reduced for early commencement.

(ii) If the Pioneer Tacoma Participant retires either (1) prior to age 60 and is credited with at least ten years of Service or (2) at or after age 60 and is credited with at least ten, but fewer than 30 years of Service, the amount of his early Retirement Allowance shall be reduced by .25 percent for each full calendar month by which his Benefit Commencement Date precedes the first day of the month coinciding with or immediately following the date he attains age 62.

(iii) If the Pioneer Tacoma Participant retires under conditions other than those described in (i) and (ii) above, the amount of his early Retirement Allowance shall be reduced by .25 percent for each full calendar month by which his Benefit Commencement Date precedes his Normal Retirement Date.

Notwithstanding the foregoing, the amount of early Retirement Allowance payable to a Pioneer Tacoma Participant who (i) was laid off on March 15, 2002, (ii) had at least 25 years of Service on March 1, 2002, (iii) would have had at least 30 years of Service if he had continued in employment with the Employing Company or an Affiliated Company to age 60, and (iv) elects a Benefit Commencement Date on or after the first day of the month coinciding with or immediately following the date he attains age 60 shall not be reduced for early commencement.

Notwithstanding the foregoing, the amount of early Retirement Allowance payable to a Pioneer Tacoma Participant who was laid off on March 1, 2005, and elects a Benefit Commencement Date on or after the first day of the month coinciding with or immediately following the date he attains age 60 shall not be reduced for early commencement.

(e) **Vested Deferred Retirement Allowance**.

A Pioneer Tacoma Participant's vested interest in his accrued benefit shall be determined in accordance with the following schedule, based upon the number of full years of Service credited to him; provided, however, that a Pioneer Tacoma Participant's vested interest in his accrued benefit shall be 100 percent if he is employed by his Employing Company or an Affiliated Company on his Normal Retirement Date,

**APPENDIX J-29, PIONEER (TACOMA)**

J-113

regardless of whether he has completed the number of years of Service required under the schedule for 100 percent vesting.

| Years of Service | Vested Interest |
|---|---|
| less than five | 0% |
| five or more | 100% |

Each Pioneer Tacoma Participant who terminates employment with his Employing Company and all Affiliated Companies, who has a vested interest in his accrued benefit, and who is not eligible for a normal or early Retirement Allowance shall be eligible for a deferred vested Retirement Allowance.

A monthly deferred vested Retirement Allowance shall be paid to an eligible Pioneer Tacoma Participant commencing as of his Normal Retirement Date; provided, however, that a Pioneer Tacoma Participant who has five years of Service may elect to begin benefit payments as of the first day of any month following the month in which he attains age 55.

An eligible Pioneer Tacoma Participant's monthly deferred vested Retirement Allowance shall be equal to his vested accrued benefit on the date of his termination of employment with his Employing Company and all Affiliated Companies; provided, however, that the amount of such benefit shall be reduced for early commencement in the same way as provided in section (d) above for an early Retirement Allowance.

(f)     **Disability Retirement Allowance**.

Each Pioneer Tacoma Participant who suffers Totally and Permanently Disability while actively employed by his Employing Company or an Affiliated Company, but prior to his Normal Retirement Date and who has at least 15 years of Service shall be eligible for an ancillary disability Retirement Allowance.  For purposes of this Article, "Totally and Permanently Disability" means any physical or mental condition that continues for a period of at least six months, will be permanent and which prevents the Pioneer Tacoma Participant from engaging in employment with his Employing Company, as determined by the Administrative Committee, in its discretion, on the basis of medical evidence satisfactory to the Administrative Committee.  A Pioneer Tacoma Participant shall not be deemed to have suffered Totally and Permanently Disability if he is not entitled to disability benefits under Title II of the Social Security Act.

An eligible Pioneer Tacoma Participant's monthly ancillary disability Retirement Allowance shall be equal to his accrued benefit on the date his Totally and Permanently Disability commenced.

A monthly ancillary disability Retirement Allowance shall be paid to an eligible Pioneer Tacoma Participant commencing as of the first day of the month following the latest of:

> (i) the expiration of six months from the date on which his Totally and Permanently Disability commenced;

> (ii) the date as of which he qualifies for Social Security disability insurance benefits; or

> (iii) the month in which he makes written application for the benefit.

A Pioneer Tacoma Participant's Benefit Commencement Date will not be deemed to have occurred simply because payment of ancillary disability Retirement Allowance have commenced to him hereunder.

Payment of a monthly ancillary disability Retirement Allowance shall continue to a Pioneer Tacoma Participant until his Normal Retirement Date, or until otherwise terminated as hereinafter provided.  Any Pioneer Tacoma Participant who continuously up to his Normal Retirement Date receives an ancillary disability Retirement Allowance under the Plan shall be deemed for all Plan purposes to have retired upon

the occurrence of his Normal Retirement Date and shall be eligible for a normal Retirement Allowance in an amount determined as provided above in section (c), but based on his years of Credited Service and the provisions of the Plan in effect on the date his Totally and Permanently Disability commenced. Ancillary disability Retirement Allowance shall terminate if, prior to the Pioneer Tacoma Participant's Normal Retirement Date, the Pioneer Tacoma Participant:

> (i) ceases to be Totally and Permanently Disabled;

> (ii) dies; or

> (iii) refuses to undergo a medical examination requested by the Administrative Committee.

If a Pioneer Tacoma Participant's ancillary disability Retirement Allowance ceases prior to his Normal Retirement Date, and if he does not return promptly to work with the Employing Company or an Affiliated Company, his employment thereupon shall be deemed terminated for all Plan purposes, and he shall be eligible for an early Retirement Allowance in an amount determined in the same manner as specified in section (d) above, or a deferred vested Retirement Allowance in an amount determined in the same manner as specified in section (e) above but based on his years of Credited Service and the provisions of the Plan in effect on the date his Totally and Permanently Disability commenced, and only if he meets the eligibility requirements for such benefit as in effect on the date his Totally and Permanently Disability commenced.  If such Participant's ancillary disability Retirement Allowance ceases prior to his Normal Retirement Date, and if he returns promptly to work with the Employing Company or an Affiliated Company, he shall not be entitled to any benefits under this section (f) on account of his prior Totally and Permanently Disability (or on account of the cessation of his ancillary disability Retirement Allowance), and he thereupon shall continue as a participant in accordance with and subject to the remaining provisions of the Plan.

In any case where the Administrative Committee deems it necessary or advisable, it may require a Pioneer Tacoma Participant applying for an ancillary disability Retirement Allowance to submit to such medical examinations and reexaminations as may be reasonably necessary.

In determining whether or not a Pioneer Tacoma Participant who is receiving an ancillary disability Retirement Allowance is or continues to be Totally and Permanently Disabled, the Administrative Committee may require the Pioneer Tacoma Participant to submit to a medical examination by a physician acceptable to it.  The Administrative Committee may not require a Pioneer Tacoma Participant to submit to such an examination more than two times during a 12-month period.  If the Pioneer Tacoma Participant refuses to submit to such a medical examination, he shall be deemed to have ceased to be Totally and Permanently Disabled hereunder.

(g)    **Spouse's Pre-retirement Death Benefit**.  Subject to the following, if a vested Pioneer Tacoma Participant dies prior to his Benefit Commencement Date and has a Spouse on the date of his death, his surviving Spouse shall be entitled the amount payable in the form of a preretirement survivor annuity determined in accordance with Section 5.1 of the Plan.

> (i) If prior to a Pioneer Tacoma Participant's death the Pioneer Tacoma Participant elected an optional form of payment that is a qualified joint and survivor annuity, for purposes of determining the amount of the qualified preretirement survivor annuity, the optional form of payment elected by the Pioneer Tacoma Participant shall be substituted for the qualified joint and 50% survivor annuity in Section 5.1 of the Plan.

> (ii) If a Pioneer Tacoma Participant dies at or after age 55 while employed with his Employing Company and an Affiliated Company, and after completing 15 years of Service, the monthly amount of the qualified preretirement survivor annuity payable to his surviving Spouse shall be the greater of the amount determined above or 50 percent of the Pioneer Tacoma Participant's accrued

benefit on his date of death, reduced as provided under the terms of the Plan if the Spouse elects to commence payment of the qualified preretirement survivor annuity prior to the Pioneer Tacoma Participant's Normal Retirement Date; provided, however, that such benefit shall be further reduced by two percent for each full year in excess of five by which the Spouse is younger than the Pioneer Tacoma Participant, but not below the Actuarial Equivalent (as defined in section (h) below) of the benefit payable to a Spouse who is exactly five years younger than the Pioneer Tacoma Participant.

(iii)  Payment of a qualified preretirement survivor annuity to a Pioneer Tacoma Participant's surviving Spouse shall commence as of the first day of the month following the later of (1) the month in which the Pioneer Tacoma Participant dies or (2) the month in which the Pioneer Tacoma Participant would have attained earliest retirement age (as defined herein) under the Plan; provided, however, that the surviving Spouse of a Pioneer Tacoma Participant who is entitled to the enhanced qualified preretirement survivor annuity described in (ii) above may elect to commence payment as of the first day of the month following the month in which the Pioneer Tacoma Participant dies, regardless of whether the Pioneer Tacoma Participant would have attained earliest retirement age as of such date.  Notwithstanding the foregoing, a Participant's surviving Spouse may elect to defer commencement of payment of the qualified preretirement survivor annuity to a date no later than the Pioneer Tacoma Participant's Normal Retirement Date. If a Pioneer Tacoma Participant's surviving Spouse dies before the date as of which payment of the qualified preretirement survivor annuity is to commence to such Spouse, no qualified preretirement survivor annuity shall be payable hereunder.  Payment of a qualified preretirement survivor annuity shall continue to a Pioneer Tacoma Participant's surviving Spouse for such Spouse's lifetime, the last monthly payment being for the month in which the Spouse's death occurs.  For purposes of this Article, a Pioneer Tacoma Participant's "earliest retirement age" means the earliest age at which the Pioneer Tacoma Participant could have elected to commence retirement benefits under the Plan if he had survived, but based on his years of Service on his date of death.

(h)      **Forms of Payment**.  A Pioneer Tacoma Participant shall be paid in the form and manner provided under Article IV of the Plan, subject to the following:

(i) A married Pioneer Tacoma Participant may elect to increase the survivor benefit payable to his Spouse under the qualified joint and survivor annuity to 100 percent, 75 percent or 66 2/3 percent of the reduced amount payable during the Pioneer Tacoma Participant's lifetime, without need for written consent from the Spouse.

(ii) If the Pioneer Tacoma Participant's Beneficiary under an optional form of payment dies prior to the Pioneer Tacoma Participant's Benefit Commencement Date, the election shall become inoperative and ineffective, and benefit payments, if any, shall be made under the normal form of payment provided under Article IV of the Plan, unless the Pioneer Tacoma Participant elects another optional form of payment provided under the Plan prior to his Benefit Commencement Date.

(iii) With respect to option 1 under Section 4.2(a) of the Plan, the 25% survivorship percentage shall be replaced with a 66 2/3% survivorship percentage, and the provision regarding less than age-25 non-Spousal Beneficiaries shall be inapplicable to a Pioneer Tacoma Participant.

(iv) Options 2, 3 and 4 under Section 4.2(a) of the Plan shall not be available to a Pioneer Tacoma Participant.

(v)  Notwithstanding anything in the Plan, and subject to applicable law, Actuarial Equivalent for purposes of purposes of converting a single life annuity to another form of payment under this

**APPENDIX J-29, PIONEER (TACOMA)**

J-116

Appendix shall be based on the UP-1984 Mortality Table, using 87 percent male and 13 percent female, and an interest rate of seven percent.

(i)     **Lump-Sum Pre-Retirement Death Benefit**.  None.

(j)     **Special Rules for Crediting Service and Earnings**.

A Pioneer Tacoma Participant's Credited Service, Past Credited Service, Future Credited Service, Earnings, Average Annual Earnings and accrued benefit as of February 29, 2004 (or earlier date if applicable) shall be as credited and determined on the records and terms of the Prior Plan.

A Pioneer Tacoma Participant's Service as of October 1, 2007 (or earlier date if applicable) shall be as credited and determined on the records and terms of the Prior Plan.

A Pioneer Tacoma Participant shall be credited with a year of Service for each calendar year for which he is credited with at least 1,000 Hours of Service; provided, however, that if the Pioneer Tacoma Participant is credited with fewer than 1,000 Hours of Service for the calendar year in which he is first hired, he shall be credited with a year of Service for such calendar year if he is actively employed on the first day of the immediately following calendar year.

**APPENDIX J-29, PIONEER (TACOMA)**

APPENDIX J-30

### *J-30 Pioneer (Non-Bargaining)*

This Appendix J-30 shall apply to all individuals who, as of October 1, 2007, had an undistributed accrued benefit under the terms of the frozen Pioneer Companies Retirement Plan (as amended and restated effective January 1, 2001 and as subsequently amended) (each being referred to herein as a "Pioneer Non-Bargaining Participant"), which plan was merged into this Plan as of that date. With respect to these Pioneer Non-Bargaining Participants, Pioneer Companies, Inc. (collectively referred to herein as "Pioneer") shall be deemed to be the Employing Company.

(a)     **Prior Plan**. The Pioneer Companies Retirement Plan (as amended and restated effective January 1, 2001 and as subsequently amended), which was frozen as of February 29, 2004, and merged into the Olin Corporation Employees Pension Plan as of October 1, 2007. The Prior Plan was originally adopted effective as of October 25, 1998, and was formerly known as the Pioneer Americas, LLC Retirement Plan.

(b)     **Eligibility**. There are no new entrants under this Appendix after February 29, 2004 due to the freeze of the Prior Plan as of such date. Prior to that date, each employee of Pioneer, excepting those who were covered by a collective bargaining agreement that did not provide for coverage under the Prior Plan, became a participant in the Prior Plan on the later of the (i) first day of meeting the preceding coverage requirement or (ii) the last day of the Service Computation Period in which he first completed one year of Eligibility Service.

(c)     **Normal Retirement Allowance**. A Pioneer Non-Bargaining Participant's monthly normal Retirement Allowance, commencing on or after his Normal Retirement Date and calculated in the form of a single life annuity, and subject to the remaining provisions herein, shall be equal to 1/12th of the sum of the following: (a) 1 ¼ percent of the Pioneer Non-Bargaining Participant's Average Annual Earnings up to Covered Compensation multiplied by his number of years of Credited Service at retirement; plus (b) 1 ½ percent of the Pioneer Non-Bargaining Participant's Average Annual Earnings in excess of Covered Compensation multiplied by his number of years of Credited Service at retirement. As of February 29, 2004, the Prior Plan was frozen and benefit accruals ceased at such time.

A Pioneer Non-Bargaining Participant shall not earn Credited Service after February 29, 2004 and compensation after such date will not be considered in determining Average Annual Earnings or benefits under this Appendix. A Pioneer Non-Bargaining Participant's normal Retirement Allowance shall not be greater than his accrued benefit as of February 29, 2004 under the Prior Plan.

In no event will a reduction in a Pioneer Non-Bargaining Participant's Average Annual Earnings reduce the normal Retirement Allowance payable to him below the amount that would have been payable to him under the same form of payment had he retired prior to his Normal Retirement Date when eligible for an early Retirement Allowance.

The monthly normal Retirement Allowance payable to a transferred employee as defined in the U.S. Pension Transfer Employee Benefits and Leased Employee Agreement between ICI America, Inc. and PCI Carolina, Inc. dated October 31, 1997 ("Transferred Employee") shall be based on the greater of the benefit determined under the formula provided above (the "Pioneer formula") or under the special benefit formula provided in Addendum A (the "ICI formula") of the Prior Plan. If the Pioneer formula provides the greater benefit and the Transferred Employee elects to receive the MRB Lump Sum Benefit under such Addendum A, his accrued benefit payable under the Pioneer formula shall be reduced by the Minimum Retirement Benefit as provided under Addendum A. A Transferred Employee's accrued benefit shall not be less than his accrued benefit spun off to the Prior Plan from the ICI Americas Pension Plan, and nothing in the Plan or Addendum A shall operate or be construed to reduce or eliminate a "protected benefit," within the meaning of Code Section 411, with respect to a benefit spun off to the Prior Plan from the ICI Americas Pension Plan.

**APPENDIX J-30, PIONEER (NON-BARGAINING)**

Notwithstanding the foregoing, in no event will the monthly normal Retirement Allowance payable to a Pioneer Non-Bargaining Participant whose benefit was spun off from the Predecessor Plan or Stauffer Plan #2 be less than the Pioneer Non-Bargaining Participant's accrued benefit under such plan immediately prior to the spin off date.  For purposes of this Appendix, "Predecessor Plan" means (i) the Stauffer Retirement Plan and/or (ii) the Amended Retirement Plan for Employees of Stauffer Chemical Company, as appropriate under the context in which used herein, without regard to any offset under that plan or plans for benefits secured by an insurance contract or contracts.  For purposes of this Appendix, "Stauffer Plan #2" means the Retirement Plan for Salaried Employees of Stauffer Chemical Company.

A Pioneer Non-Bargaining Participant's Normal Retirement Date is age 65.

(d)     **Early Retirement Allowance**.

A Pioneer Non-Bargaining Participant who retires from employment with his Employing Company and all Affiliated Companies under any of the following criteria and who is not eligible for or does not elect to receive a disability Retirement Allowance shall be eligible for an early Retirement Allowance.

(i)  The Pioneer Non-Bargaining Participant retires directly from active employment with his Employing Company and all Affiliated Companies within the ten-year period preceding his Normal Retirement Date and has at least ten years of Service.

(ii)  The Pioneer Non-Bargaining Participant retires directly from active employment with his Employing Company and all Affiliated Companies and meets the following requirements:

(1) was first eligible to participate in the Prior Plan on October 25, 1988;

(2) was a participant in Stauffer Plan #2 on July 31, 1985 and was credited with at least one year of vesting service under Stauffer Plan #2 on that date;

(3) was on the Stauffer Chemical Company payroll on July 31, 1985; and

(4) was age 55 or older on July 31, 1985.

(iii)  The Pioneer Non-Bargaining Participant retires directly from active employment with his Employing Company and all Affiliated Companies within the three-year period preceding his Normal Retirement Date, has an accrued benefit under the Prior Plan as of December 31, 1993 that is not subsequently forfeited, and has at least one year of Service.

An eligible Pioneer Non-Bargaining Participant's monthly early Retirement Allowance shall be equal to his normal Retirement Allowance on the date of his early retirement; provided, however, that the amount of such benefit shall be reduced as follows:

(i) If the Pioneer Non-Bargaining Participant retires at or after age 62 and has at least ten years of Service, his benefit shall be not reduced.

(ii) If the Pioneer Non-Bargaining Participant retires under conditions other than those described in (i) above and has benefits accrued under the Prior Plan prior to 1994, his benefit shall be adjusted as follows:

(1) If the Pioneer Non-Bargaining Participant retires directly from active employment with his Employing Company and all Affiliated Companies at or after "age 60" and has at least 25 years of Service, his benefit shall not be reduced.

**APPENDIX J-30, PIONEER (NON-BARGAINING)**

J-119

(2) If the Pioneer Non-Bargaining Participant retires directly from active employment with his Employing Company and all Affiliated Companies at or after "age 62" and has at least one year of Service, his benefit shall not be reduced.

(3) If the Pioneer Non-Bargaining Participant retires directly from active employment with his Employing Company and all Affiliated Companies at or after "age 55," but prior to "age 60" and has at least 25 years of Service, his benefit shall be reduced by 1/3rd of one percent for each full calendar month by which his Benefit Commencement Date precedes his attainment of "age 60."

(4) If the Pioneer Non-Bargaining Participant retires directly from active employment with his Employing Company and all Affiliated Companies at or after "age 55" but prior to age "62" and has at least ten, but fewer than 25 years of Service, his benefit shall be reduced by 5/12ths of one percent for each full calendar month by which his Benefit Commencement Date precedes his attainment of "age 62".

(iii) If the Pioneer Non-Bargaining Participant retires under conditions other than those described in (i) above and does not have benefits accrued under the Prior Plan prior to 1994, his benefits shall be reduced by 5/12ths of one percent for each full calendar month by which his Benefit Commencement Date precedes his attainment of "age 65".

For these purposes, "age 55", "age 62", and "age 65" mean the first day of the calendar month coinciding with or next following the date the Pioneer Non-Bargaining Participant attains such age.

(e)     **Vested Deferred Retirement Allowance**.

A Pioneer Non-Bargaining Participant's vested interest in his accrued benefit shall be determined in accordance with the following schedule, based upon the number of full years of Service credited to him; provided, however, that a Pioneer Non-Bargaining Participant's vested interest in his accrued benefit shall be 100 percent if he is employed by his Employing Company or an Affiliated Company on his Normal Retirement Date, regardless of whether he has completed the number of years of Service required under the schedule for 100 percent vesting.

| Years of Service | Vested Interest |
|---|---|
| less than five | 0% |
| five or more | 100% |

Notwithstanding the foregoing, if an individual became a Pioneer Non-Bargaining Participant on October 25, 1988 upon the transfer of assets and liabilities from the Predecessor Plan to the Prior Plan, his vested interest in the portion of his accrued benefit transferred from such plan shall be 100 percent.

Each Pioneer Non-Bargaining Participant who terminates employment with his Employing Company and all Affiliated Companies, who has a vested interest in his accrued benefit, and who is not eligible for a normal, early or disability Retirement Allowance shall be eligible for a deferred vested Retirement Allowance.

A monthly deferred vested Retirement Allowance shall be paid to an eligible Pioneer Non-Bargaining Participant commencing as of his Normal Retirement Date; provided, however, that a Pioneer Non-Bargaining Participant who has satisfied any applicable service requirement for an early Retirement Allowance at the time of his termination of employment may elect to begin benefit payments as of the first day of any month following the month in which he would have been eligible for an early Retirement Allowance if he had continued in employment.

An eligible Pioneer Non-Bargaining Participant's monthly deferred vested Retirement Allowance shall be equal to his vested accrued benefit on the date of his termination of employment with his Employing

**APPENDIX J-30, PIONEER (NON-BARGAINING)**

J-120

Company and all Affiliated Companies; provided, however, that the amount of such benefit shall be reduced by 5/12 of 1 percent for each full calendar month by which commencement of payment of the benefit precedes his Normal Retirement Date.

(f)      **Disability Retirement Allowance**.

Each Pioneer Non-Bargaining Participant who retires from employment with his Employing Company and all Affiliated Companies prior to his Normal Retirement Date due to being Totally and Permanently Disabled and who has at least five years of Service shall be eligible for a disability Retirement Allowance as provided herein.

Pre-1994 Disability

A Pioneer Non-Bargaining Participant who is Totally and Permanently Disabled prior to January 1, 1994 shall be entitled to either:

(i)  a monthly disability retirement benefit shall be paid to an eligible Pioneer Non-Bargaining Participant commencing as of the first day of the month following the later of:

(1)  the last calendar month in which sickness and accident benefits under any employer-sponsored group insurance plan are payable; or

(2)  the month in which he makes written application for the benefit, but no later than his Normal Retirement Date.

(ii)      or if such Pioneer Non-Bargaining Participant elects continued disability accrual , he shall be treated as having continued in employment as an employee until the earliest of:

(1) the date he ceases to be Totally and Permanently Disabled;

(2) the date on which he elects to retire and commence disability retirement benefits, provided he satisfies the requirements for such retirement benefit as in effect on the date he elects to retire;

(3) the date he refuses to undergo a medical examination requested by the Administrative Committee; or

(4) his Normal Retirement Date.

Post-1993 Disability

A Pioneer Non-Bargaining Participant who is Totally and Permanently Disabled on or after January 1, 1994 shall be treated as having continued in employment as an employee until the earliest of:

(1)      the date he ceases to be Totally and Permanently Disabled;

(2)      the date he refuses to undergo a medical examination requested by the Administrative Committee; or

(3)      his Normal Retirement Date.

Continued Disability Accruals

**APPENDIX J-30, PIONEER (NON-BARGAINING)**

J-121

A Totally and Permanently Disabled Pioneer Non-Bargaining Participant who is treated as continuing in employment as provided above shall be credited with Service and Credited Service during such time; provided that no Credited Service shall be provided on or after February 29, 2004.  Such Pioneer Non-Bargaining Participant shall be considered (1) to continue in the same employment class applicable to the Pioneer Non-Bargaining Participant on the date he became Totally and Permanently Disabled and (2) to receive Earnings throughout the period (but not after February 29, 2004) he is treated as continuing in employment at the same base rate he earned immediately prior to the expiration of any sick leave benefits payable to him or, if no sick leave benefits are payable to the Pioneer Non-Bargaining Participant, at the same base rate in effect for the most recent calendar year preceding the date he became Totally and Permanently Disabled.

A Pioneer Non-Bargaining Participant who continues to be Totally and Permanently Disabled to his Normal Retirement Date shall be treated as having retired on that date and shall be eligible for a normal Retirement Allowance as provided above based on his Average Annual Earnings and Credited Service on his Normal Retirement Date (or if earlier, February 29, 2004).  Such benefit shall be determined under the provisions of the Plan in effect on the Participant's Normal Retirement Date.

<u>Effect of Recovery on Continued Disability Accrual</u>

If a Pioneer Non-Bargaining Participant who is receiving continued disability accrual ceases to be Totally and Permanently Disabled prior to his Normal Retirement Date (or if he became Totally and Permanently Disabled prior to January 1, 1994, the date he elects to receive his disability retirement benefit), his employment will not be considered to have been interrupted if he returns to employment with the Employing Company or an Affiliated Company as an employee within 60 days of the date he ceased being Totally and Permanently Disabled.  If the Pioneer Non-Bargaining Participant does not return to employment within 60 days, he shall be treated as having terminated employment on the date he ceased being Totally and Permanently Disabled.  Such Pioneer Non-Bargaining Participant shall be entitled to a benefit under the Plan based on his Credited Service and Average Annual Earnings on the date he ceased being Totally and Permanently Disabled (or if earlier, February 29, 2004); provided, however, that his eligibility for and the amount of such benefit shall be determined in accordance with the provisions of the Plan in effect on the date he became Totally and Permanently Disabled.

<u>Medical Examination</u>

In any case where the Administrative Committee deems it necessary or advisable, it may require a Pioneer Non-Bargaining Participant applying for a disability retirement benefit to submit to such medical examinations and reexaminations as may be reasonably necessary.

In determining whether or not a Pioneer Non-Bargaining Participant who is receiving continued disability accruals is or continues to be Totally and Permanently Disabled, the Administrative Committee may require the Pioneer Non-Bargaining Participant to submit to a medical examination by a physician acceptable to it. The Administrative Committee may not require a Pioneer Non-Bargaining Participant to submit to such an examination more than two times during a 12-month period.  If the Pioneer Non-Bargaining Participant refuses to submit to such a medical examination, he shall be deemed to have ceased to be Totally and Permanently Disabled hereunder.

(g)   **Spouse's Pre-retirement Death Benefit**.  Subject to the following, if a vested Pioneer Non-Bargaining Participant dies prior to his Benefit Commencement Date and he has been married to his Spouse throughout the one year period ending on the date of his death, his surviving Spouse shall be entitled the amount payable in the form of a preretirement survivor annuity determined in accordance with Section 5.1 of the Plan.

**APPENDIX J-30, PIONEER (NON-BARGAINING)**

J-122

(i) The Spouse is not required to be married throughout the one-year period immediate preceding the Pioneer Non-Bargaining Participant's date of death if the Pioneer Non-Bargaining Participant dies after retiring directly from active employment with his Employing Company and all Affiliated Companies and after being eligible for early retirement but elects to defer payment of his early Retirement Allowance.

(ii) If prior to a Pioneer Non-Bargaining Participant's death the Pioneer Non-Bargaining Participant elected an optional form of payment that is a qualified joint and survivor annuity, for purposes of determining the amount of the qualified preretirement survivor annuity, the optional form of payment elected by the Pioneer Non-Bargaining Participant shall be substituted for the qualified joint and 50% survivor annuity in Section 5.1 of the Plan.

(iii) If a Pioneer Non-Bargaining Participant dies while employed with his Employing Company and an Affiliated Company, the monthly amount of the qualified preretirement survivor annuity payable to his surviving Spouse shall be the greater of the amount determined above or 50 percent of the Pioneer Non-Bargaining Participant's accrued benefit on his date of death, reduced as provided under the terms of the Plan if the Spouse elects to commence payment of the qualified preretirement survivor annuity prior to the Pioneer Non-Bargaining Participant's Normal Retirement Date; provided, however, that if the Pioneer Non-Bargaining Participant's surviving Spouse elects to commence payment prior to the date the Pioneer Non-Bargaining Participant would have attained age 55, the amount of the Pioneer Non-Bargaining Participant's accrued benefit shall be reduced by 35 percent for the period from the date the Pioneer Non-Bargaining Participant would have attained age 55 to his Normal Retirement Date and shall be further reduced by 1/3rd of one percent for each full calendar month by which the Spouse's Benefit Commencement Date precedes the date the Pioneer Non-Bargaining Participant would have attained age 55.

(iv)  Payment of a qualified preretirement survivor annuity to a Pioneer Non-Bargaining Participant's surviving Spouse shall commence as of the first day of the month following the later of (1) the month in which the Pioneer Non-Bargaining Participant dies or (2) the month in which the Pioneer Non-Bargaining Participant would have attained earliest retirement age (as defined herein) under the Plan; provided, however, that the surviving Spouse of a Pioneer Non-Bargaining Participant who is entitled to the enhanced qualified preretirement survivor annuity described in (iii) above may elect to commence payment as of the first day of the month following the month in which the Pioneer Non-Bargaining Participant dies, regardless of whether the Pioneer Non-Bargaining Participant would have attained earliest retirement age as of such date. Notwithstanding the foregoing, a Participant's surviving Spouse may elect to defer commencement of payment of the qualified preretirement survivor annuity to a date no later than the Pioneer Non-Bargaining Participant's Normal Retirement Date.  If a Pioneer Non-Bargaining Participant's surviving Spouse dies before the date as of which payment of the qualified preretirement survivor annuity is to commence to such Spouse, no qualified preretirement survivor annuity shall be payable hereunder.  Payment of a qualified preretirement survivor annuity shall continue to a Pioneer Non-Bargaining Participant's surviving Spouse for such Spouse's lifetime, the last monthly payment being for the month in which the Spouse's death occurs.  For purposes of this Article, a Pioneer Non-Bargaining Participant's "earliest retirement age" means the earliest age at which the Pioneer Non-Bargaining Participant could have elected to commence retirement benefits under the Plan if he had survived, but based on his years of Service on his date of death.

(h)     **Forms of Payment**.  A Pioneer Non-Bargaining Participant shall be paid in the form and manner provided under Article IV of the Plan, subject to the following:

(i) A married Pioneer Non-Bargaining Participant may elect to increase the survivor benefit payable to his Spouse under the qualified joint and survivor annuity to 100 percent or 75 percent of

**APPENDIX J-30, PIONEER (NON-BARGAINING)**

J-123

the reduced amount payable during the Pioneer Non-Bargaining Participant's lifetime, without need for written consent from the Spouse.

(ii) If the Pioneer Non-Bargaining Participant's Beneficiary under an optional form of payment dies prior to the Pioneer Non-Bargaining Participant's Benefit Commencement Date, the election shall become inoperative and ineffective, and benefit payments, if any, shall be made under the normal form of payment provided under Article IV of the Plan, unless the Pioneer Non-Bargaining Participant elects another optional form of payment provided under the Plan prior to his Benefit Commencement Date.

(iii) With respect to option 1 under Section 4.2(a) of the Plan, the 25% survivorship percentage shall not be available to a Pioneer Non-Bargaining Participant, and the provision regarding less than age-25 non-Spousal Beneficiaries shall be inapplicable to a Pioneer Non-Bargaining Participant.

(iv) Options 3 and 4 under Section 4.2(a) of the Plan shall not be available to a Pioneer Non-Bargaining Participant.

(v)  Option 5 under Section 4.2(a) of the Plan is not available to a Pioneer Non-Bargaining Participant who is entitled to a deferred vested Retirement Allowance or a disability Retirement Allowance.

(vi) Notwithstanding anything in the Plan, and subject to applicable law, Actuarial Equivalent for purposes of purposes of converting a single life annuity to another form of payment under this Appendix shall be based on the 1979 George B. Buck Unisex Mortality Table assuming 80 percent males and 20 percent females and an interest rate of eight percent.

(i)     **Lump-Sum Pre-Retirement Death Benefit**.  None.

(j)     **Special Rules for Crediting Service and Earnings**.

A Pioneer Non-Bargaining Participant's Credited Service, Average Annual Earnings and accrued benefit as of February 29, 2004 (or earlier date if applicable) shall be as credited and determined on the records and terms of the Prior Plan.

An individual's Eligibility Service and Service Computation Period as of February 29, 2004 (or earlier date if applicable) shall be as credited and determined on the records and terms of the Prior Plan.

A Pioneer Non-Bargaining Participant's Service as of October 1, 2007 (or earlier date if applicable) shall be as credited and determined on the records and terms of the Prior Plan.  On and after such date, it shall be credited and determined in accordance with the applicable provisions of the Plan (and Prior Plan to the extent applicable).

A Transferred Employee's Service and Credited Service includes his service and credited service under the ICI Americas Pension Plan (as credited and determined on the records of the Prior Plan).  The Service of a Pioneer Non-Bargaining Participant who was previously a participant in Stauffer Plan #2, was a participant in the Prior Plan on October 25, 1988, had fewer than ten years of service under Stauffer Plan #2 as of July 31, 1985, shall be determined in accordance with the provisions of Section 3.1 of Stauffer Plan #2 as in effect on July 31, 1985 (all as credited and determined on the records of the Prior Plan).

For a Pioneer Non-Bargaining Participant who transferred employment for Canada to the United States, and whose Credited Service as of February 29, 2004 included service credit provided under a Canadian pension plan, a Pioneer Non-Bargaining Participant's Retirement Allowance shall be reduced for the benefit payable from the Canadian pension plan.

**APPENDIX J-30, PIONEER (NON-BARGAINING)**

**APPENDIX J-30, PIONEER (NON-BARGAINING)**

J-125

APPENDIX J-31

### *J-31 St. Marks*

This Appendix J-31 shall apply to all Eligible Employees working at the St. Marks, Florida facility who are covered by a collective bargaining agreement between the Company (or an Affiliated Employer) and the United Steelworkers of America, AFL-CIO-CLC, Local 8018.  With respect to these employees, the St. Marks facility shall be deemed to be the Employing Company.

(a)    **Prior Plans**.  Prior to March 31, 1995, the Bargaining Employees Pension Plan of Olin Corporation.  Prior to January 1, 1990, the St. Marks Retirement Plan (originally effective August 2, 1972) as in effect through December 31, 1988 and as restated in the Bargaining Employees Pension Plan of Olin Corporation through December 31, 1989.

(b)    **Eligibility**.  An individual shall become a Participant as of the date he becomes an Eligible Collectively Bargained Employee of the Employing Company.

(c)    **Normal Retirement Allowance**.  A Participant's annual normal Retirement Allowance commencing on or after his Normal Retirement Date shall be equal to the appropriate flat benefit rate, based on the group in which he was classified for the majority of the twelve months immediately preceding his termination as indicated in the table below, multiplied by his years of Benefit Service.

| Termination Effective Date | Flat Benefit Rate | | |
|---|---|---|---|
| | Group 1 | Group 2 | Group 3 |
| On or after January 1, 1989, but before January 1, 1990 | $120 | $132 | $144 |
| On or after January 1, 1990, but before January 1, 1991 | $126 | $141 | $153 |
| On or after January 1, 1991, but before January 1, 1992 | $132 | $150 | $162 |
| On or after January 1, 1992, but before January 1, 1993 | $141 | $162 | $174 |
| On or after January 1, 1993, but before January 1, 1994 | $150 | $168 | $183 |
| On or after January 1, 1994, but before January 1, 1995 | $156 | $180 | $192 |
| On or after January 1, 1995, but before January 1, 1996 | $186 | $195 | $204 |
| On or after January 1, 1996 | $198 | $207 | $216 |

Group 1 shall include job grades 1 through 6.  Group 2 shall include job grades 7 through 10.  Group 3 shall include job grades 11 through 13.

(d)    **Early Retirement Allowance.**

(1)    A Participant who while in the employ of the Employing Company attains age 55 and is credited with at least 20 Years of Creditable Service may elect to retire and receive Early Retirement benefits in accordance with Section 3.2(c) of the Plan, provided, however, that if such Allowance commences prior to the first day of the month immediately following the Participant's 65th birthday, the Allowance shall be equal to 60% of his Accrued Benefit plus 1/3 of 1% for each full

**APPENDIX J-31, ST. MARKS**

J-126

calendar month which has elapsed from the first day of the month in which the Participant attains his 55th birthday to the month in which his first Retirement Allowance payment is due.

(2)    On or after January 1, 1990, a Participant who while in the employ of the Employing Company attains age 62 and is credited with at least 15 Years of Creditable Service may elect to retire and receive an Early Retirement Allowance, as described in Section 3.2(c) of the Plan.

(e)    **Vested Deferred Retirement Allowance**.  A Participant whose employment has terminated may elect to receive Vested Deferred Retirement benefits in accordance with Section 3.3(b) of the Plan.

(f)    **Disability Retirement Allowance.**  Not available.

(g)    **Lump-Sum Death Benefit.**  None.

(h)    **Special Rules for Crediting Service with respect to Employees being employed by Primex Technologies, Inc.**  Effective as of December 31, 1996, Participants employed at the St. Marks facility, who transfer directly to, and become employees, of Primex Technologies, Inc. or its affiliates ("Primex") in connection with Olin's divestment of its ordnance and aerospace divisions (or who transfer directly within five years following such divestment), shall continue to receive credit for service with Primex in determining their Period of Creditable Service for purposes of vesting and eligibility to retire early under the terms of the Plan, expressly provided, however that (i) such service shall not be credited for purposes of benefit accrual under the terms of the Plan, and (ii) no benefit shall be payable from this Plan until the Participant terminates service with Primex. For purposes of applying the service credit, and limitation on distribution, provided by this paragraph, "Primex" shall be read to refer also to General Dynamics Ordnance and Tactical Systems, Inc. on and after January 25, 2001.

**APPENDIX J-31, ST. MARKS**

J-127

APPENDIX J-32

*J-32* *Shreveport*

This Appendix J-32 shall apply to all Eligible Employees working at the Shreveport, Louisiana facility who are covered by a collective bargaining agreement between the Company (or an Affiliated Employer) and the Oil, Chemical and Atomic Workers International Union, AFL-CIO and Local 4-245. With respect to these employees, the Shreveport facility shall be deemed to be the Employing Company.

(a)　　**Prior Plans**. Prior to March 31, 1995, the Bargaining Employees Pension Plan of Olin Corporation. Prior to January 1, 1990, the Shreveport Retirement Plan (originally effective January 1, 1970) as in effect through December 31, 1988 and as restated in the Bargaining Employees Pension Plan of Olin Corporation through December 31, 1989.

(b)　　**Eligibility**. An individual shall become a Participant as of the date he becomes an Eligible Collectively Bargained Employee of the Employing Company.

(c)　　**Normal Retirement Allowance.**:

(1)　　For terminations effective on or after January 1, 1989 but before January 1, 1998, a Participant's annual normal Retirement Allowance commencing on or after his Normal Retirement Date shall be equal to the appropriate flat benefit rate, based on the group in which he was classified immediately preceding his termination as indicated in the table below, multiplied by his years of Benefit Service.

| Termination Effective Date | Flat Benefit Rate | | |
|---|---|---|---|
| | Group A | Group B | Group C |
| On or after January 1, 1989, but before January 1, 1990 | $210 | $204 | $162 |
| On or after January 1, 1990, but before January 1, 1992 | $252 | $252 | $186 |
| On or after January 1, 1992, but before January 1, 1995 | $300 | $300 | $234 |
| On or after January 1, 1995, but before January 1, 1998 | $360 | $360 | $234 |

Group A shall consist of all employees classified as Operators, Assistant Operators and Welders. Group B shall consist of all employees classified as Pumpers and Utility Mechanics. Group C shall consist of all employees classified as Labor, six months and Labor, new.

(2)　　For terminations effective on or after January 1, 1998, a Participant's annual normal Retirement Allowance commencing on or after his Normal Retirement Date shall be equal to $420 multiplied by his years of Benefit Service.

(d)　　**Early Retirement Allowance.** A Participant who while in the employ of the Employing Company attains age 55 and is credited with at least 20 Years of Creditable Service, may elect to retire and receive Early Retirement benefits in accordance with Section 3.2(c) of the Plan.

(e)　　**Vested Deferred Retirement Allowance**. A Participant whose employment has terminated may elect to receive Vested Deferred Retirement benefits in accordance with Section 3.3(b) of the Plan.

**APPENDIX J-32, SHREVEPORT**

J-128

(f)     **Disability Retirement Allowance.**  Not available.

(g)     **Lump-Sum Death Benefit.**  Effective as of January 1, 1998, the Beneficiary of a Participant shall be eligible for a lump-sum death benefit of $3,000 as described in Section 5.2 of the Plan.

(h)     **Special Rules for Crediting Service and Computing Retirement Allowances**.

Participants who transfer to and become employees of Arch Chemicals, Inc. (or a subsidiary thereof) (collectively, "Arch") on or before February 8, 2000, and who are defined as Arch Employees (see below) in the Employee Benefits Allocation Agreement between Olin Corporation and Arch Chemicals, Inc. (the "Agreement"), shall cease to accrue benefits under this Plan as the date they terminate employment with Olin and transfer to Arch.  As soon as administratively feasible on or after the spin-off of Arch from Olin and as provided in the Agreement, assets and liabilities relating to such Participants' Accrued Benefit under this Plan shall be transferred to and assumed by a qualified defined benefit plan sponsored by Arch. Thereafter, no benefits shall be payable to or on account of any Arch Employee under this Plan, and neither the Plan nor any Employing Company shall have any further liability with respect to the Accrued Benefit of any Arch Employee.

The Agreement defines an Arch Employee as any individual who, as of the Distribution Date or at any time thereafter but on or before February 8, 2000, is identified on the records of Arch as being an employee of any member of the Arch Group of businesses, including individuals then receiving any long-term disability benefits whose most recent employment was with a line of business that became a part of the Arch Group, but excluding any individual who received a notice of lay-off from Olin or a Related Employer prior to the Distribution Date.

Any Arch Employee whose Accrued Benefit under this Plan was transferred to the defined benefit plan established by Arch, and who is subsequently employed by Olin or another Employing Company shall have their past Creditable Service with Olin and its Related Employers re-credited for purposes of determining such Arch Employee's eligibility to participate, vesting and attainment of retirement dates, provided that such Creditable Service would be re-credited under the normal operation of the Plan's Break-in-Service rules; however, such Arch Employee shall not receive credit for past Benefit Service with respect to benefit accrual, and their Compensation and Average Compensation shall be determined based upon Compensation received from Olin on and after their re-employment by Olin.  No service credit shall be given with respect to their period of employment with Arch, and no compensation paid by Arch shall be counted for purposes of determining such Arch Employee's Accrued Benefit under the Plan.

**APPENDIX J-32, SHREVEPORT**

APPENDIX J-33

*J-33 Wadsworth*

This Appendix J-33 shall apply to all Eligible Employees working at the Wadsworth, Ohio facility who are covered by a collective bargaining agreement between the Company (or an Affiliated Employer) and the United Rubber Workers' Union.  With respect to these employees, the Wadsworth facility shall be deemed to be the Employing Company.

(a)     **Prior Plans**.  Prior to March 31, 1995, the Bargaining Employees Pension Plan of Olin Corporation.  Prior to January 1, 1990, the Wadsworth Retirement Plan (originally effective August 1, 1987) as in effect through December 31, 1988 and as restated in the Bargaining Employees Pension Plan of Olin Corporation through December 31, 1989.

(b)     **Eligibility**.  An individual shall become a Participant as of the date he becomes an Eligible Collectively Bargained Employee of the Employing Company.

(c)     **Normal Retirement Allowance.**  A Participant's annual normal Retirement Allowance commencing on or after his Normal Retirement Date shall be equal to the appropriate flat benefit rate, multiplied by his years of Benefit Service:

| Termination Effective Date | Flat Benefit Rate |
|---|---|
| On or after August 1, 1988, but before September 1, 1989 | $120 |
| On or after September 1, 1989, but before September 1, 1990 | $126 |
| On or after September 1, 1990, but before September 1, 1991 | $132 |
| On or after September 1, 1991 | $138 |

(d)     **Early Retirement Allowance.**  A Participant who while in the employ of the Employing Company attains age 55 and is credited with at least 20 Years of Creditable Service may elect to retire and receive Early Retirement benefits in accordance with Section 3.2(c) of the Plan, provided, however, that if such Allowance commences prior to the first day of the month immediately following the Participant's 65th birthday, the Allowance shall be reduced to 60% plus 1/3 of 1% for each full calendar month by which his Benefit Commencement Date is after the first day of the month immediately following his 55th birthday.

(e)     **Vested Deferred Retirement Allowance**.  A Participant whose employment has terminated may elect to receive Vested Deferred Retirement benefits in accordance with Section 3.3(b) of the Plan.

(f)     **Disability Retirement Allowance.**  Not available.

(g)     **Lump-Sum Death Benefit.**  None.

(h)     **Special Rules Concerning Crediting of Service**.  Periods of Creditable Service and Years of Benefit Service shall take into account service from an Employee's date of hire by Physics International, Olin or any of its subsidiaries.

**APPENDIX J-33, WADSWORTH**

APPENDIX J-34

### *J-34 Warwick*

This Appendix J-34 shall apply to all Eligible Employees working at the Warwick, Rhode Island facility who are covered by a collective bargaining agreement between the Company (or an Affiliated Employer) and the International Brotherhood of Teamsters, Local 251.  With respect to these employees, the Warwick facility shall be deemed to be the Employing Company.  The Warwick facility was closed in December 1990.

(a)    **Prior Plans**.  Prior to March 31, 1995, the Bargaining Employees Pension Plan of Olin Corporation.  Prior to January 1, 1990, the Organic Chemicals Division Retirement Plan (originally effective September 30, 1985) as in effect through December 31, 1988 and as restated in the Bargaining Employees Pension Plan of Olin Corporation through December 31, 1989.

(b)    **Eligibility**.  An individual shall become a Participant as of the date he becomes an Eligible Collectively Bargained Employee of the Employing Company.

(c)    **Normal Retirement Allowance.**  A Participant's annual normal Retirement Allowance commencing on or after his Normal Retirement Date shall be equal to the appropriate flat benefit rate, multiplied by his Years of Benefit Service:

| Terminations Effective | Flat Benefit Rate |
|---|---|
| on or after July 1, 1988, but before July 1, 1989 | $276 |
| on or after July 1, 1989 | $288 |

provided, however, that if a Participant was hired before September 30, 1985 and participated in the New England Teamsters and Trucking Industry Pension Plan ("Teamsters' Plan"), his benefits under this Plan shall be reduced by the amount of the payment he is entitled to under the Teamsters' Plan.

(d)    **Early Retirement Allowance.**

(1)    A Participant who while in the employ of the Employing Company attains age 52 and is credited with at least 15 Years of Creditable Service may elect to retire and receive Early Retirement benefits in accordance with Section 3.2(c) of the Plan, provided, however, that such Allowance may commence as of the later of the first day of the month following his retirement or the first day of the month following his 60th birthday, provided, however, that if such Allowance commences prior to the first day of the month immediately following the Participant's 60th birthday, the Allowance shall be equal to his Accrued Benefit multiplied by the appropriate factor from the following table based on the Participant's age at his Benefit Commencement Date:

| Age of Participant at Benefit Commencement Date | Percent of Allowance Payable |
|---|---|
| 59 | 89% |
| 58 | 80% |
| 57 | 72% |
| 56 | 65% |
| 55 | 58% |
| 54 | 53% |
| 53 | 48% |
| 52 | 43% |

**APPENDIX J-34, WARWICK/ORGANIC CHEMICALS**

(2)    Minimum 30-Year Service Retirement Allowance.  A Participant who while in the employ of the Employing Company is credited with at least 30 Years of Service may elect to retire at any time and receive Early Retirement benefits in accordance Section 3.2(c) of the Plan, provided, however, that if such Allowance commences prior to the first day of the month immediately following the Participant's 60th birthday, the Allowance shall be equal to 75% of his Accrued Benefit.

(e)    **Vested Deferred Retirement Allowance**.  A Participant whose employment has terminated may elect to receive Vested Deferred Retirement benefits in accordance with Section 3.3(b) of the Plan, provided, however, that the Early Vested Retirement Allowance shall be equal to the Participant's Accrued Benefit multiplied by the appropriate factor from the following table based on the Participant's age at his Benefit Commencement Date:

| Age of Participant at Benefit Commencement Date | Percent of Allowance Payable |
|---|---|
| 64 | 94% |
| 63 | 88% |
| 62 | 78% |
| 61 | 69% |
| 60 | 62% |
| 59 | 55% |
| 58 | 49% |
| 57 | 44% |
| 56 | 40% |
| 55 | 36% |
| 54 | 32% |
| 53 | 29% |
| 52 | 27% |

(f)    **Disability Retirement Allowance.**

(1)    A Participant who has been credited with at least 15 Years of Creditable Service and who thereafter becomes Totally and Permanently Disabled while in the employ of an Employing Company may receive an Disability Retirement Allowance equal to his Accrued Benefit as of his date of Total and Permanent Disability, commencing as of the first day of the month coincident with or next following the later of the date the Participant has been disabled for at least six months or the date of his application for a Disability Retirement Allowance, provided, however, that such Participant's maximum Disability Retirement Allowance shall not exceed $400 a month ($4,800 per year).

(2)    A Participant who has been credited with at least 10 but less than 15 Years of Creditable Service and who thereafter becomes Totally and Permanently Disabled while in the employ of an Employing Company may receive an Disability Retirement Allowance equal to his Accrued Benefit as of his date of Total and Permanent Disability, commencing as of the first day of the month coincident with or next following the later of the date the Participant has been disabled for at least six months or the date of his application for a Disability Retirement Allowance, provided, however, that such Participant's maximum Disability Retirement Allowance shall not exceed $75 a month ($900 per year).

(g)    **Lump-Sum Pre-Retirement Death Benefit.**  The post-retirement lump-sum benefit described in Section 5.2 of the Plan is not available.  However, if a Participant who has been credited with at least 10 Years of

**APPENDIX J-34, WARWICK/ORGANIC CHEMICALS**

J-132

Creditable Service dies while in the employ of an Employing Company or Affiliated Company, his Beneficiary shall be entitled to receive a lump-sum death benefit equal to $100 multiplied by his years of Benefit Service, up to a maximum benefit of $2,500. For this purpose, a Participant's Beneficiary shall be his spouse unless such spouse consents in writing on a form witnessed by a Plan representative or notary to the designation of another person as Beneficiary.

(h)  **Special "Christmas Benefit."**  A Participant who retired after becoming eligible for a Normal or Early Retirement Allowance shall be eligible to receive a Christmas Benefit of $400 paid annually in November of each year, provided, the Participant has received his Retirement Allowance for at least 60 months and the Participant is eligible for a Retirement Allowance payment on the December 1 of such year. The Christmas Benefit shall be paid for the lifetime of the Participant only.

(i)  **Special Rules for Crediting Service**.  If an employee was hired before September 30, 1985 and was a participant in the Teamsters' Plan, Creditable and Benefit Service under this Plan shall include such service as credited on the records of the Teamsters' Plan.

(j)  **Special Rules Concerning Optional Forms of Payments.**  In lieu of the standard joint and survivor benefit described in Section 4.1(c), the standard joint and survivor annuity shall be an annuity for the Participant's life equal to 85% of his Retirement Allowance with a survivor annuity for the life of the spouse equal to 50% of the amount of the annuity payable during their joint lives.

**APPENDIX J-34, WARWICK/ORGANIC CHEMICALS**

J-133

APPENDIX J-35

### *J-35 Waterbury(Somers)*

This Appendix J-35 shall apply to all Eligible Employees who hourly employees working at the Waterbury, Connecticut (Somers) facility.  With respect to these employees, the Waterbury facility shall be deemed the Employing Company.  Notwithstanding anything in the Plan to the contrary, with respect to participation under this Appendix J-35, employees hired on or after January 1, 2006 shall not be eligible to participate in the Plan.

(a)     **Prior Plans**.  Prior to March 31, 1995, the Non-Bargaining Employees Pension Plan of Olin Corporation.  On or after January 1, 1989 but before January 1, 1990, the Olin Salaried Pension Plan as restated in the Non-Bargaining Employees Pension Plan of Olin Corporation through December 31, 1989.  Prior to January 1, 1989, the Somers Brass Company Retirement Plan, also known as Somers Thin Strip Retirement Plan of Olin Corporation (originally effective January 1, 1956).

(b)     **Eligibility**.  An individual shall become a Participant as of the date he is both an Eligible Non-Collectively Bargained Employee of the Employing Company and has completed one Year of Creditable Service; provided, however, that no individual that is hired on or after January 1, 2006 shall become a Participant hereunder.

(c)     **Normal Retirement Allowance**.  A Participant's annual normal Retirement Allowance commencing on or after his Normal Retirement Date shall be equal to the appropriate flat benefit rate multiplied by his years (and fractions of years) of Benefit Service.

| Termination Effective Date | Flat Benefit Rate |
| --- | --- |
| On or after January 1, 1989 but prior to January 1, 1990 | $198 |
| On or after January 1, 1990 but prior to January 1, 1991 | $204 |
| On or after January 1, 1991 but prior to January 1, 1992 | $216 |
| On or after January 1, 1992, but prior to January 1, 1993 | $240 |
| On or after January 1, 1993, but prior to January 1, 1994 | $264 |
| On or after January 1, 1994, but prior to January 1, 1995 | $300 |
| On or after January 1, 1995, but prior to January 1, 1996 | $324 |
| On or after January 1, 1996, but prior to January 1, 1997 | $348 |
| On or after January 1, 1997, but prior to January 1, 1998 | $366 |
| On or after January 1, 1998, but prior to January 1, 1999 | $390 |
| On or after January 1, 1999, but prior to January 1, 2000 | $408 |
| On or after January 1, 2000, but prior to January 1, 2001 | $420 |
| On or after January 1, 2001, but prior to January 1, 2002 | $462 |
| On or after January 1, 2002, but prior to January 1, 2003 | $480 |
| On or after January 1, 2003, but prior to January 1, 2004 | $504 |
| On or after January 1, 2004, but prior to January 1, 2005 | $516 |
| On or after January 1, 2005, but prior to January 1, 2006 | $540 |
| On or after January 1, 2006 | $552 |

(d)     **Early Retirement Allowance**.

(1)     Prior to January 1, 1994.  A participant who while in the employ of the Employing Company (i) attains age 55 and is credited with at least 15 Years of Creditable Service, or (ii) attains age 60 and is credited with at least 10 Years of Creditable Service may elect to retire and receive Early Retirement benefits in accordance with Section 3.2(c) of the Plan, provided, however, that if the Participant elects a Benefit Commencement Date prior to his 62nd birthday, such Retirement

**APPENDIX J-35, WATERBURY (SOMERS)**

J-134

Allowance shall be reduced by 6/10ths if 1% for each full calendar month up to a maximum of 36 months, plus 3/10ths of 1% for each additional full calendar month by which the Benefit Commencement Date precedes the first day of the month after the Participant's 62nd birthday.

(2)    <u>After December 31, 1994</u>.  A participant who while in the employ of the Employing Company attains age 55 and is credited with at least 10 Years of Creditable Service, may elect to retire and receive Early Retirement benefits in accordance with Section 3.2(c) of the Plan.

(e)    **<u>Vested Deferred Retirement Allowance</u>**.  A Participant whose employment has terminated may elect to receive Vested Deferred Retirement benefits in accordance with Section 3.3(b) of the Plan.

(f)    **<u>Disability Retirement Allowance</u>**.  Effective as of January 1, 1994, Participants shall be eligible for a Disability Retirement Allowance as described in paragraph (f)(2) of Appendix J-24, provided, however, that all references therein to a Normal, Early or Deferred Vested Retirement Allowance shall mean such Allowance as determined under this Appendix J-35.

(g)    **<u>Lump-Sum Death Benefit</u>**.  The Beneficiary of a Participant shall be eligible for a lump-sum death benefit of $5,000 as described in Section 5.2 of the Plan.

(h)    **<u>Special Rules for Crediting Service and Computing Retirement Allowances.</u>**

(1)    For service prior to January 1, 1989, a Participant's Creditable and Benefit Service shall include all service (including special prior service credit) credited on the records of the Prior Plan.

(2)    For service prior to January 1, 1989, a Participant who completed 1,950 or more Hours of Service in a Plan Year shall be credited with one Year of Benefit Service, and a Participant who completed less than 1,950 Hours of Service in a Plan Year shall be credited with a fractional Year of Benefit Service of which the numerator shall be the number of Hours of Service the Participant completes in the Plan Year and the denominator shall be 1,950.

(3)    The Retirement Allowance of any Waterbury Rolling Mills, Inc. Employee who was formerly employed by Olin Corporation at the Waterbury Somers facility, who has a deferred vested benefit hereunder, and who subsequently is re-employed as a result of the acquisition of Monarch Brass & Copper Corporation and its affiliates, shall be based upon the Benefit Service that such Employee was credited with, and the flat dollar rate in effect, as of the Employee's initial termination of service with Olin Corporation and its affiliates.

(4)    This provision shall apply solely to the Participants who transfer directly to, and become employees of, Global Brass and Copper Acquisition Co. and its affiliates ("Global"), and who are defined as Transferred Employees under Article V of the Purchase Agreement between Global Brass and Copper Acquisition Co. and Olin Corporation dated as of October 15, 2007 (such Participants referred to in this Appendix J-35 as "Global Sale Somers Participants").  Global Sale Somers Participants shall continue to receive credit for service with Global in determining their Period of Creditable Service for purposes of vesting and eligibility to retire early under the terms of the Plan; provided, however, that (i) such service with Global shall not be credited for purposes of benefit accrual or Benefit Service under the terms of the Plan, and (ii) no benefit shall be payable from this Plan until a Global Sale Somers Participant terminates service with Global (or if earlier, such Global Sale Somers Participant reaches age 65).  Solely for purposes of determining whether a Global Sale Somers Participant is eligible for the special service crediting rule provided under Sections 3.2(b) and 3.3(c) of the Plan, the term "Employing Company" as utilized in such Section 3.2(b) shall include Global.

**APPENDIX J-35, WATERBURY (SOMERS)**

J-135

APPENDIX J-36

### *J-36 Waterbury Rolling Mills (Non-Bargained)*

This Appendix J-36 shall apply to all nonbargained individuals who, as of October 1, 2001 had an undistributed accrued benefit under the terms of the frozen Retirement Plan for the Benefit of Waterbury Rolling Mills, Incorporated, which plan was merged into this Plan as of that date.

(a)     **Prior Plan**. Retirement Plan for the Benefit of Waterbury Rolling Mills, Incorporated, which was frozen as of December 31, 1976, and merged into the Olin Corporation Employees Pension Plan as of October 1, 2001.

(b)     **Eligibility**. There are no new entrants under this appendix after January 1, 1977.  For the period after July 1, 1976 and before January 1, 1977, each Employee became a Participant as of July 1, 1976, if he was compensated for 1000 Hours of Service from July 1, 1975 through June 30, 1976, and had attained age 25. Prior to July 1, 1976, each Employee became a Participant in the Prior Plan as of the July 1 following the date on which he had completed 5 Years of Credited Service, attained age 30, and had not reached age 80.

(c)     **Normal Retirement Allowance**.

(i) Normal Retirement Date Defined.  A Participant's Normal Retirement Date under this Appendix shall be the first day of the month coinciding with or immediately following the later of: (a) a Participant's 65th birthday, or (b) either: (I) for Employees becoming Participants in the Prior Plan prior to January 1, 1988, the sooner of the 10th anniversary of the Participant's entry date into the Prior Plan, or January 1, 1993 (i.e., the 5th anniversary of 1988 Plan Year); and (II) for Participants joining the Plan on or after January 1, 1988, the 5th anniversary of the Participant's entry date.

(ii) Amount of Normal Retirement Benefits.  A Participant's monthly Normal Retirement Allowance commencing on or after his Normal Retirement Date shall be equal to the sum of:  (A) $2.70 plus (B) one and three-eighths percent (1-3/8%) of the Participant's Average Monthly Compensation in excess of $400 per month, all multiplied by the Participant's Years of Credited Service under the Prior Plan earned prior to January 1, 1977.  A minimum benefit of Ten dollars ($10.00) per month shall be paid to all Participants eligible for benefits under the provisions of (c)(ii)(B) above, with such benefit being in addition to the benefit produced by the application of (c)(ii)(A) above.

(a) **Minimum Normal Retirement Allowance.** In no event shall an eligible Participant covered by this Appendix receive a monthly Normal Retirement Allowance less than (I) $2.25, multiplied by his Years of Credited Service earned prior to January 1, 1977 (computed to the nearest 1/10th year; plus (II) one and one-sixth percent (1-1/6%) of the Participant's Average Monthly Compensation multiplied by his Years of Credited Service earned prior to January 1, 1977 (computed to the nearest 1/10th year) not in excess of thirty (30) times the Average Monthly Compensation in excess of $350.00 reported for the five anniversaries immediately preceding the Participant's 60th birthday (or during his first 5 years of participation if the Employee first became a participant the Prior Plan at age 56 or older).

(b) **Average Monthly Compensation Defined**. For purposes of determining the Participant's Normal Retirement Allowance hereunder, "Average Monthly Compensation" means 1/12th of the Participant's average annual Compensation for the five (5) highest paid consecutive years out of the ten (10) years immediately preceding the Participant's retirement, but not taking into account any compensation reported or paid after December 31, 1976.

(c)**Definition of Accrued Benefit.**  At any determination point, a Participant's Accrued Benefit is the benefit to which he would be entitled at his Normal Retirement Date, determined as

though he were continuing in the service of an Employing Company until his Normal Retirement Date, without increased Compensation from the date of such determination until his Normal Retirement Date, multiplied by a fraction, the numerator of which is his actual number of Years of Credited Service, and the denominator of which is the number of Years of Credited Service he would have if he had continued to be employed by an Employing Company until his Normal Retirement Date.  In no event shall a Participant's Accrued Benefit be less than such Accrued Benefit as of the Merger Date.

(d)    **Early Retirement Allowance**.  A participant who while in the employ of the Employing Company (i) attains age 55 and is credited with at least 10 Years of Credited Service, may elect to retire and receive Early Retirement. If the Participant elects a Benefit Commencement Date prior to his Normal Retirement Date, such Retirement Allowance shall be reduced by 5/9th if 1% for each full calendar month by which the Benefit Commencement Date precedes age 65.

(e)    **Vested Deferred Retirement Allowance**.  A Participant who terminates employment with a vested benefit having been credited with at least ten (10) Years of Vesting Service may elect to receive Vested Deferred Retirement benefits commencing as of the first day of any month following his 55th birthday, and before his Normal Retirement Date. A Vested Deferred Retirement Allowance shall be calculated in the same manner as for early retirement.  A Participant covered by this Appendix will be vested in his frozen accrued benefit hereunder if he (I) has completed one Hour of Service on or after January 1, 1989, and is credited with at least five (5) Years of Service, or (II) if he has not completed one Hour of Service on or after January 1, 1989, and he is credited with at least ten (10) Years of Service.  Years of Service shall be determined based upon the records of Years of Service maintained by Waterbury Rolling Mills, Inc. under the Prior Plan.

(f)    **Disability Retirement Allowance**.

(i) A Participant shall be deemed to be Totally and Permanently Disabled if the Administrative Committee determines, upon written application of the Participant made within sixty (60) days of his termination of employment, that he has a physical and/or mental condition that totally and permanently prevents the Participant from engaging in any or performing the principal duties of his customary employment with the Company, or in any other regular gainful occupation or employment which he may be capable of performing (except for rehabilitative employment not incompatible with the finding of Total and Permanent Disability).  Such term shall exclude any disability consisting of chronic alcoholism or addition to narcotics, or which resulted from being engaged in a felonious criminal enterprise, or from an intentionally self-inflicted injury, or from services in the armed forces for which a service connected pension is payable.

(ii) Participants shall be eligible to retire and receive a Disability Retirement Allowance if they (I) have completed ten (10) Years of Credited Service, (II) upon written application to the Administrative Committee, are found to have suffered a Total and Permanent Disability while in active service with an Employing Company or Affiliated Company, and (III) are eligible to receive Social Security Disability Benefits.  Such monthly Disability Retirement Allowance shall commence as of the effective date of the commencement of Social Security Disability Benefits, and shall equal the greater of (I) $12.00 multiplied by Years of Credited Service as of December 31, 1976, or (II) the Actuarial Equivalent of his Normal Retirement Benefit, based on Years of Credited Service and Average Monthly Compensation as of December 31, 1976. Disability retirement benefits shall be reduced by the amount of any workers' compensation benefits (except fixed statutory payments for the loss of any bodily member) payable with respect to the Participant.  In the case of a lump sum settlement under workers' compensation, the lump sum shall be divided by the weekly payment to which the Participant was entitled under workers' compensation in order to determine the period with respect to which workers' compensation benefits are payable for purposes of this offset.

Disability Benefits shall be paid each month during the continuance of said Disability prior to the Participant's Normal Retirement Date, and thereafter as a Normal Retirement Benefit. No disability benefits

**APPENDIX J-36, WATERBURY ROLLING MILLS (Non-Bargained)**

J-137

shall be paid for any month during which the Participant is receiving temporary disability benefits under any group sickness and accident insurance plan to which the Company or any Employing Company contributes. Disability retirement benefits shall terminate if (a) the Participant engages in any regular gainful occupation or employment for remuneration (except for rehabilitative employment approved by the Administrative Committee); (b) the Administrative Committee determines on the basis of a medical examination that the Participant has sufficiently recovered to return to regular work for the Company and the Participant refuses an offer of employment; or (c) the Participant refuses to undergo a medical examination order by the Administrative Committee.

The Administrative Committee has the right to require any Participant receiving Disability Retirement Benefits prior to his Normal Retirement Date to undergo a medical examination by a physician or clinic designated by the Administrative Committee, but not more often than semi-annually.  If any Member refuses to submit to a medical exam, his Disability Retirement Benefits shall be discontinued until his withdrawal of such refusal.  If his refusal continues for six or more months, the Participant's right to Disability Retirement Benefits shall permanently terminate.

(g)     **Lump-Sum Death Benefit**.  The Beneficiary of a Participant shall NOT be eligible for a lump-sum death benefit of $5,000 as described in Section 5.2 of the Plan.

(h)     **Special Rules for Crediting Service and Computing Retirement Allowances.**

For service prior to January 1, 1977, a Participant's Credited Service and Years of Service shall include all service credited on the records of the Prior Plan (based on service computed at a rate of one year for each calendar year in which the Participant has completed 1,000 or more Hours of Service).  A Participant shall not be credited with any additional Years of Service or Years of Credited Service following December 31, 1976, the date that the Prior Plan was frozen, and shall not accrue any additional benefits or Credited Service following the merger of the Prior Plan into this Plan.

(i)     **Actuarial Equivalence.**

(i) In calculating Actuarially Equivalent forms of benefits (other than de minimis lump sums), which shall be determined in accordance with (ii) below, the benefit paid shall be no less than the benefit would be if it were calculated using the 1984 Unisex Pension Table, set back two years, and a seven percent (7%) interest rate.

(ii) Subject to applicable law, lump sum distributions shall be determined in accordance with the definition of Actuarial Equivalence specified in Section 2.2(a)-(d) of the Prior Plan, the terms of which are incorporated herein by reference.

**APPENDIX J-36, WATERBURY ROLLING MILLS (Non-Bargained)**

J-138

APPENDIX J-37

### *J-37 Waterbury Rolling Mills (Bargained)*

This Appendix J-37 shall apply to all individuals who, as of October 1, 2001 had an undistributed accrued benefit under the terms of the frozen Waterbury Rolling Mills, Inc. UAW Local 1251 Pension Plan, which plan was merged into this Plan as of that date.

(a)   **Prior Plan**. Waterbury Rolling Mills, Inc. UAW Local 1251 Pension Plan, which was frozen as of August 31, 1989, and merged into the Olin Corporation Employees Pension Plan as of October 1, 2001.

(b)   **Eligibility**. There are no new entrants under this appendix after August 31, 1989.  Prior to that date, each Employee of Waterbury Rolling Mills, Inc., who was a member of the International Union, United Automobile, Aircraft and Agricultural Implement Workers of America and Amalgamated Union, Local 1251 (the "Union") became a Participant in the Prior Plan as of the sixtieth (60th) day following employment.

(c)   **Normal Retirement Allowance**.

(i)  Normal Retirement Date Defined.  A Participant's Normal Retirement Date under this Appendix shall be the first day of the month coinciding with or immediately following the later of: (a) a Participant's 62nd birthday, or (b) either: (I) for Employees becoming Participants in the Prior Plan prior to January 1, 1988, the sooner of the 10th anniversary of the Participant's entry date into the Prior Plan, or January 1, 1993 (i.e., the 5th anniversary of 1988 Plan Year); and (II) for Participants joining the Plan on or after January 1, 1988, the 5th anniversary of the Participant's entry date.

(ii)  Amount of Normal Retirement Benefit.  A Participant's annual Normal Retirement Allowance commencing on or after his Normal Retirement Date shall be equal to the flat benefit rate in effect as of his termination of service multiplied by his years (and fractions of years) of Credited Service, calculated in the form of a single life annuity:

| Termination Effective Date | Flat Benefit Rate |
| --- | --- |
| On or after June 1, 1976 but prior to June 1, 1977 | $108 |
| On or after June 1, 1977 but prior to June 1, 1978 | $120 |
| On or after June 1, 1978 but prior to June 1, 1979 | $132 |
| On or after June 1, 1979 but prior to April 15, 1988 | $144 |
| On or after April 15, 1988 | $156 |

A Participant's Normal Retirement Benefit shall not be greater than his Accrued Benefit as of August 31, 1989, the date benefit accruals ceased under the Prior Plan.

(d)   **Early Retirement Allowance**.  A participant who while in the employ of the Employing Company (i) attains age 60 and is credited with at least 10 Years of Credited Service, may elect to retire and receive Early Retirement. If the Participant elects a Benefit Commencement Date prior to his Normal Retirement Date, such Retirement Allowance shall be reduced by 5/9th if 1% for each full calendar month by which the Benefit Commencement Date precedes the first day of the month after the Participant's Normal Retirement Date.

(e)   **Vested Deferred Retirement Allowance**.  A Participant who terminates employment with a vested benefit having been credited with at least ten (10) Years of Vesting Service may elect to receive Vested Deferred Retirement benefits commencing as of the first day of any month following his 60th birthday, and before age 62. A Vested Deferred Retirement Allowance shall be calculated in the same manner as for early

**APPENDIX J-37, LEAVITT TUBE (PRODUCTION TUBE FINISHING)**

retirement.  A Participant covered by this Appendix will be vested in his frozen accrued benefit hereunder if he (I) has completed one Hour of Service on or after January 1, 1989, and is credited with at least five (5) Years of Service, or (II) if he has not completed one Hour of Service on or after January 1, 1989, and he is credited with at least ten (10) Years of Service.  Years of Service shall be determined based upon the records of Years of Service maintained by Waterbury Rolling Mills, Inc. under the Prior Plan.

(f)     **Disability Retirement Allowance**.

(i) <u>Eligibility for disability Retirement Benefit.</u>  A Participant who (A) has completed ten (10) or more Years of Service and (B) is in active service shall be deemed to be Totally and Permanently Disabled if the Administrative Committee determines, upon written application of the Participant, that he has a physical and/or mental condition that totally and permanently prevents the Participant from engaging in any or performing the principal duties of his customary employment with the Company, or in any other regular gainful occupation or employment which he may be capable of performing (except for rehabilitative employment not incompatible with the finding of Total and Permanent Disability).  Such term shall exclude any disability consisting of chronic alcoholism or addiction to narcotics, or which resulted from being engaged in a felonious criminal enterprise, or from an intentionally self-inflicted injury, or from services in the armed forces for which a service connected pension is payable.

(ii) Eligible Participants who have been determined to suffered a Total and Permanent Disability (as defined in (i) above) while in active service with an Employing Company or Affiliated Company shall be entitled to receive a monthly Disability Retirement Allowance commencing  as of the first day of the month following the date on which the Administrative Committee determines the Participant to be Totally and Permanently Disabled, equal to the greater of:

(a) $100.00 per month or

(b) the disability benefit rate set forth below in effect as of the date the Participant is determined to be Totally and Permanently Disabled, multiplied by his years of Credited Service, calculated in the form of a single life annuity:

| Disability Retirement Effective Date | Monthly Flat Benefit Rate |
|---|---|
| On or after June 1, 1974 but prior to June 1, 1977 | $12 |
| On or after June 1, 1977 but prior to June 1, 1978 | $13 |
| On or after June 1, 1978 but prior to June 1, 1979 | $14 |
| On or after June 1, 1979 | $15 |

(iii) Disability retirement benefits shall be reduced by the amount of any workers' compensation benefits (except fixed statutory payments for the loss of any bodily member) payable with respect to the Participant. In the case of a  lump sum settlement under workers' compensation, the lump sum shall be divided by the weekly payment to which the Participant was entitled under workers' compensation in order to determine the period with respect to which workers' compensation benefits are payable for purposes of this offset.

Disability Benefits shall be paid each month during the continuance of said Disability until the Participant reaches age 65 or begins to receive an unreduced Social Security pension (whichever occurs first).  As of the first day of the month following such date, the Participant's Disability Retirement Benefits shall cease, and the Participant shall commence to receive Normal retirement benefits based upon his Years of Credited Service and the benefit unit in effect at the time his disability retirement benefits commenced. No disability benefits shall be paid for any month during which the Participant is receiving temporary disability benefits under any group sickness and accident insurance plan to which the Company or any Employing Company contributes.  Disability retirement benefits shall terminate if (a) the Participant engages in any regular

**APPENDIX J-37, LEAVITT TUBE (PRODUCTION TUBE FINISHING)**

J-140

gainful occupation or employment for remuneration (except for rehabilitative employment approved by the Administrative Committee); (b) the Administrative Committee determines on the basis of a medical examination that the Participant has sufficiently recovered to return to regular work for the Company and the Participant refuses an offer of employment; or (c) the Participant refuses to undergo a medical examination order by the Administrative Committee.

The Administrative Committee has the right to require any Participant receiving Disability Retirement Benefits prior to his Normal Retirement Date to undergo a medical examination by a physician or clinic designated by the Administrative Committee, but not more often than semi-annually.  If any Member refuses to submit to a medical exam, his Disability Retirement Benefits shall be discontinued until his withdrawal of such refusal.  The Administrative Committee shall rely on evidence that the Participant is continuing to receive Social Security Disability benefits as evidence in making a determination of continued disability under this Appendix.

(g)     **Lump-Sum Death Benefit**.  The Beneficiary of a Participant shall NOT be eligible for a lump-sum death benefit of $5,000 as described in Section 5.2 of the Plan.

(h)     **Special Rules for Crediting Service and Computing Retirement Allowances.**

For service prior to August 31, 1989, a Participant's Credited Service and Years of Service shall include all service credited on the records of the Prior Plan. No additional Years of Service or Credited Service shall be earned following August 31, 1989 and a Participant shall not be credited with any additional Years of Service or Years of Credited Service following the merger of the Prior Plan into this Plan.

(i) "Credited Service" under this appendix shall equal the sum of the Participant's Years of Past Benefit Service credited to him as of July 1, 1976, plus each Plan Year thereafter through August 31, 1989 in which the Participant was credited with at least 1,700 or more Hours of Service (a "Year of Future Benefit Service").  If the Participant had fewer than 1,700 Hours of Service credited during a Plan Year subsequent to July 1, 1976, the Participant was credited with a fractional Year of  Future Benefit Service (calculated to the nearest $1/10^{th}$ of a year) equal to the ratio which the number of Hours of Service completed by the Participant bore to 1,700.

(ii) "Vesting  Service" under this appendix shall equal the sum of the Participant's Years of Past Vesting Service credited to him as of July 1, 1976, plus each Plan Year thereafter through August 31, 1989 in which the Participant was credited with at least 1,000  or more Hours of Service (a "Year of Future Benefit Service").  If the Participant had fewer than 10700 Hours of Service credited during a Plan Year subsequent to July 1, 1976, the Participant was credited with a fractional Year of  Future Vesting Service at a rate of $1/10^{th}$ for each 100 Hours of Service credited to him  In addition, a Participant who completed at least 85 Hours of Service in a Plan Year had at least $1/10^{th}$ of a Year of Future Vesting Service Credited to him..  A Participant was credited with Vesting Service, but not Credited Service while he was in the employ of an Affiliated Company but not a member of the Union.

The calculation of Vesting Service and Credited Service under this Appendix shall be subject to all of the applicable rules contained in the Prior Plan, including the rules concerning Breaks in Service.

(i)     **Actuarial Equivalence.**

(i) In calculating Actuarially Equivalent forms of benefits (other than de minimis lump sums), which shall be determined in accordance with (ii) below, the benefit paid shall be no less than the benefit would be if it were calculated using the 1984 Unisex Pension Table, set back two years, and a seven percent (7%) interest rate.

**APPENDIX J-37, LEAVITT TUBE (PRODUCTION TUBE FINISHING)**

J-141

(ii) Subject to applicable law, lump sum distributions shall be determined in accordance with the definition of Actuarial Equivalence specified in Section 2.2(a)-(d) of the Prior Plan, the terms of which are incorporated herein by reference.

APPENDIX J-38

### *J-38 Dow (DEPP PPA Component Transferees)*

This Appendix J-38 shall apply to all individuals (i) who, as of October 5, 2015 ("Transfer Date"), transferred employment from The Dow Chemical Company ("Dow") to Blue Cube Operations, LLC ("Blue Cube"), a subsidiary of the Company, due to the spinoff of Dow's chlorine-related business to the Company as of such Transfer Date (the "Dow Transaction"), (ii) who, prior to the Dow Transaction, participated in the Personal Pension Account Component of the Dow Employees' Pension Plan ("Dow Plan"), and (iii) whose accrued benefit under the Personal Pension Account Component of the Dow Plan was hereby transferred to this Plan under this Appendix J-38 effective as of the Transfer Date in accordance with the transaction documents of the Dow Transaction. Such individuals are referred to herein as the "DEPP PPA Active Transferee Participants."

This Appendix J-38 shall also apply to all individuals (i) who, prior to the Dow Transaction, participated in the Personal Pension Account Component of the Dow Plan as a terminated vested participant as of the Transfer Date, and (ii) whose accrued benefit under the Personal Pension Account Component of the Dow Plan was hereby transferred to this Plan under this Appendix J-38 effective as of the Transfer Date in accordance with the transaction documents of the Dow Transaction. Such individuals are referred to herein as the "DEPP PPA TV Transferee Participants."

Collectively, the DEPP PPA Active Transferee Participants and DEPP PPA TV Transferee Participants are referred to as the "DEPP PPA Transferee Participants."

For avoidance of doubt, DEPP PPA Transferee Participants generally were hired by Dow on or after January 1, 2008. With respect to DEPP PPA Active Transferee Participants, Blue Cube shall be deemed to be the Employing Company as of the Transfer Date. For avoidance of doubt, there are no further accrual of benefits under this Appendix J-38 after the Transfer Date; provided, however, the preceding shall not be interpreted as limiting the crediting of Interest Credits as provided below.

(a)     **Prior Plan**. The Dow Plan, as sponsored by Dow, as in effect as of the Transfer Date. For avoidance of doubt, (i) any changes to the Dow Plan adopted or effective after the Transfer Date shall have no effect under the Plan or this Appendix and (ii) for reference herein to the applicable rules of the Prior Plan, references to Dow under such rules shall be substituted with references to the Company where context requires.

(b)     **Eligibility**. Except for the DEPP PPA Transferee Participants, there are no new entrants permitted under this Appendix after the Transfer Date.

(c)     **Personal Pension Account as of Transfer Date**. Personal Pension Account refers to a form of the notational account record maintained under the Plan on behalf of each DEPP PPA Transferee Participant. Under the Prior Plan, such Personal Pension Account equaled the sum of "Pay Credits" and "Interest Credits" that were credited to that account in accordance with the terms of the Prior Plan. A DEPP PPA Transferee Participant's Personal Pension Account under the Plan as of the Transfer Date shall be equal to such individual's Personal Pension Account under the Prior Plan as of the Transfer Date (reflecting "Pay Credits" and "Interest Credits" provided under the Prior Plan through such Transfer Date), as reflected on the Prior Plan records and as transferred to this Plan as described in paragraph (l) below.

(d)     **Interest Credits to Personal Pension Account after Transfer Date.**

(1)     A DEPP PPA Transferee Participant's Personal Pension Account under the Plan shall be credited with Interest Credits after the Transfer Date as provided herein. Interest Credits are added to a DEPP PPA Transferee Participant's Personal Pension Account only for the

**APPENDIX J-38, Dow (DEPP PPA Component Transferees)**

J-143

DEPP PPA Transferee Participants who have not begun to receive payments under the Plan pursuant to this Appendix.

(2)     "Interest Credit" shall mean, for each Plan Year after the 2015 Plan Year, an amount equal to the Interest Credit Rate multiplied by a DEPP PPA Transferee Participant's Personal Pension Account as of the last day of the immediately preceding Plan Year. Such amount shall be credited to a DEPP PPA Transferee Participant's Personal Pension Account on the last day of each Plan Year. In the Plan Year in which a benefit payment is scheduled to begin under the Plan for a DEPP PPA Transferee Participant, the Interest Credit shall be credited to the DEPP PPA Transferee Participant's Personal Pension Account on the last day of the month immediately preceding the month for which the first benefit payment is scheduled to begin, based on completed months from the beginning of the Plan Year to the date the Interest Credit is credited.

(3)     Notwithstanding clause (2) above, for the 2015 Plan Year, the Plan shall provide an Interest Credit as of the last day of the 2015 Plan Year equal to (i) the Interest Credit that the Prior Plan would have provided the DEPP PPA Transferee Participant assuming such individual had worked at Dow for the complete 2015 Plan Year, less (ii) the Interest Credit that the Prior Plan provided such individual for the period from January 1, 2015 to the Transfer Date. If a DEPP PPA Transferee Participant were to commence benefits under the Plan prior to the end of the 2015 Plan Year, the Plan shall provide an Interest Credit as of the last day of the month immediately preceding the month for which the first benefit payment is scheduled to begin, equal to (i) the Interest Credit that the Prior Plan would have provided the DEPP PPA Transferee Participant assuming such individual had worked at Dow to his Benefit Commencement Date, less (ii) the Interest Credit that the Prior Plan provided such individual for the period from January 1, 2015 to the Transfer Date.

(4)     For these purposes, "Interest Credit Rate" shall mean 150 basis points plus the discount rate on six-month Treasury Bills, determined (in accordance with applicable guidance) as of the September immediately preceding the applicable Plan Year. The Interest Credit Rate, so determined, is the annual percentage yield for the applicable Plan Year.

(5)     For avoidance of doubt, a DEPP PPA Transferee Participant's Personal Pension Account shall not be credited with any "Pay Credits" or such other similar term under this Appendix on and after the Transfer Date.

(e)     **Accrued Benefit**. A DEPP PPA Transferee Participant's Personal Pension Account "Accrued Benefit" is the benefit that is equal to the DEPP PPA Transferee Participant's Life Only Annuity commencing at Normal Retirement Age that is the Actuarial Equivalent of the DEPP PPA Transferee Participant's Personal Pension Account balance as of the Benefit Commencement Date. For a Participant whose Benefit Commencement Date is before Normal Retirement Age, Interest Credits shall be projected to the DEPP PPA Transferee Participant's Personal Pension Account from the Benefit Commencement Date to Normal Retirement Age using the Interest Credit Rate in effect at the Benefit Commencement Date.

Subject to other applicable provisions of the Plan, a vested DEPP PPA Transferee Participant's Personal Pension Account shall equal: (a) if the DEPP PPA Transferee Participant elects an annuity, an annuity that is the Actuarial Equivalent of his Personal Pension Account as of the date benefit payments begin; or (b) if the Participant elects a Lump Sum Benefit, the DEPP PPA Transferee Participant's Personal Pension Account balance as of the date benefit payments begin.

Because this is a defined benefit pension plan, the DEPP PPA Transferee Participant shall have no actual individual account, no claim to any particular assets and no share of any actual contributions to the Plan, any expenses, gains or losses of the assets of the Plan or any forfeitures of the Plan.

**APPENDIX J-38, Dow (DEPP PPA Component Transferees)**

J-144

(f)     **Vesting**.  A DEPP PPA Transferee Participant shall be fully vested in his Personal Pension Account "Accrued Benefit" as of the Transfer Date.

(g)     **Time and Forms of Payment**.  Subject to other applicable provisions of the Plan, including Section 3.7 (regarding "required beginning date"), a DEPP PPA Active Transferee Participant may commence payment under the Plan at any time after termination of employment with the Company and a DEPP PPA TV Transferee Participant may commence payment under the Plan at any time after the Transfer Date (subject to such DEPP PPA TV Transferee Participant not being employed by the Company at such time).  A DEPP PPA Transferee Participant shall be paid in the form and manner provided under Article IV of the Plan, subject to the following:

(1) The only optional forms of payment available under this Appendix shall be (i) Life Only Annuity, (ii) 50% Survivor Benefit, (iii) 100% Survivor Benefit, and (iv) Lump Sum Benefit, each as described under the Prior Plan with respect to the  Personal Pension Account benefit determinations.  There is no "Pension Purchase Option" (as described under the Prior Plan) under the Plan.

(2) The normal form of payment for a vested married DEPP PPA Transferee Participant is the 100% Survivor Benefit, provided that a DEPP PPA Transferee Participant may elect the 50% Survivor Benefit (with Spouse as beneficiary), without need for written consent from the Spouse. The normal form of payment for a vested unmarried DEPP PPA Transferee Participant (including a Participant with a Domestic Partner) is the Life Only Annuity.

(3) The first three optional forms of benefit described in clause (1) above shall be calculated as the Actuarial Equivalent of the vested DEPP PPA Transferee Participant's Personal Pension Account Accrued Benefit (as determined under paragraph (e) above) as of the last day of the month immediately preceding the month for which the first benefit payment is scheduled to be made.

(4) The Lump Sum Benefit described in clause (1) above shall be equal to the Personal Pension Account balance as of the last day of the month immediately preceding the month the Lump Sum Benefit is paid and shall be payable in any amount.

(5) The Lump Sum Benefit shall not be automatically distributed, even if the amount is $1,000 or less.

(6) For the a Lump Sum Benefit, a specific named Beneficiary other than his Spouse may be elected by a vested Married Participant, but only if the Spouse consents in writing to such election as provided under Article IV of the Plan.

(7) The 50% Survivor Benefit and 100% Survivor Benefit are only available to a vested Married Participant (with Spouse as beneficiary) or a vested Participant with a Domestic Partner (with such Domestic Partner as the beneficiary).  No person other than a Spouse or Domestic Partner may be a beneficiary under the 50% Survivor Benefit and 100% Survivor Benefit.

(8) Payment of the 50% Survivor Benefit and 100% Survivor Benefit shall end with the last to die of the vested Participant and the vested Participant's Spouse or Domestic Partner, as applicable.

(h)     **Pre-retirement Death Benefit**.  If a DEPP PPA Transferee Participant with a vested Personal Pension Account dies before his benefit under this Appendix has commenced, a death benefit shall be payable on such DEPP PPA Transferee Participant's behalf in an amount equal in value to such DEPP PPA Transferee Participant's Personal Pension Account. Such death benefit shall be paid as follows:

**APPENDIX J-38, Dow (DEPP PPA Component Transferees)**

J-145

(1) Unmarried Participants.  If such DEPP PPA Transferee Participant is not married on the date of his death, and there is no surviving Beneficiary or the Beneficiary dies before a distribution is made, the Personal Pension Account shall be paid as a Lump Sum Benefit as soon as administratively feasible in the following order:

> (A) to the surviving Child(ren) of the DEPP PPA Transferee Participant, if any, in equal shares;

> (B) to the beneficiary of any Company-sponsored life insurance policy for which the Company pays all or part of the premium of the DEPP PPA Transferee Participant, if any; or

> (C) to the estate of the DEPP PPA Transferee Participant.

(2) Married Participants.  If such DEPP PPA Transferee Participant is married on the date of his death, the Personal Pension Account shall be payable to such DEPP PPA Transferee Participant's Spouse commencing on the last day of the month following the month in which such DEPP PPA Transferee Participant died or at such later date as such Spouse may elect, up to and including the date that would have been the DEPP PPA Transferee Participant's Normal Retirement Date if such DEPP PPA Transferee Participant had survived.  The Spouse may elect to receive a Lump Sum Benefit, which shall be paid as soon as administratively feasible, or have the death benefit paid as a Life Only Annuity payable for the Spouse's lifetime.

If such Spouse is not living on the date of the DEPP PPA Transferee Participant's death or dies before the pre-retirement death benefits commence, such Personal Pension Account shall be paid as a Lump Sum Benefit as soon as administratively feasible in the following order:

> (A) to the Beneficiary designated by the DEPP PPA Transferee Participant, if any;

> (B) to the surviving Child(ren) of the DEPP PPA Transferee Participant, if any, in equal shares; or

> (C) to the beneficiary of any Company-sponsored life insurance policy for which the Company pays all or part of the premium of the DEPP PPA Transferee Participant, if any; or

> (D) to the estate of the DEPP PPA Transferee Participant.

For these purposes, the Beneficiary of a DEPP PPA Transferee Participant with a Domestic Partner shall be the DEPP PPA Transferee Participant's Domestic Partner, unless such DEPP PPA Transferee Participant has designated a different Beneficiary in writing in accordance with rules prescribed by the Committee.

(i) **Miscellaneous Definitions**.

(1)   "Actuarial Equivalent" means an equivalent value benefit computed on the basis of a specific mortality table and a specific interest rate, which for purposes of this Appendix, shall be the Interest Credit Rate for the Plan Year of distribution and the applicable mortality table set forth in Code section 417(e)(3).

(2)   "Vesting Service" means the sum of a DEPP PPA Active Transferee Participant's Vesting Service under the Prior Plan as of the Transfer Date (as credited and determined on the records and terms of the Prior Plan), plus for each Plan Year thereafter, a DEPP PPA Active Transferee Participant shall be credited with one year of Vesting Service for each

**APPENDIX J-38, Dow (DEPP PPA Component Transferees)**

J-146

Plan Year in which 1,000 or more Hours of Service are credited to such DEPP PPA Active Transferee Participant and shall be credited with no Vesting Service for any Plan Year in which fewer than 1,000 Hours of Service are credited to such DEPP PPA Active Transferee Participant.

Notwithstanding the foregoing, to the extent a DEPP PPA Active Transferee Participant did not earn one year of Vesting Service for the period from January 1, 2015 to the Transfer Date under the Prior Plan, such DEPP PPA Active Transferee Participant shall earn a year of Vesting Service for the 2015 Plan Year if his combined Hours of Service with Dow and the Company for the 2015 Plan Year is equal to or more than 1,000 Hours of Service. There shall be no duplication of Vesting Service for any Plan Year.

On and after the Transfer Date, the calculation of Vesting Service under this Appendix shall be subject to all of the applicable rules contained in the Prior Plan, including the rules concerning breaks in service. For avoidance of doubt, any Vesting Service (or or any other service) reflected under this Appendix for periods of service recognized under the Prior Plan shall not count toward the service requirements under any other Appendix.

(3)     "Normal Retirement Age" shall mean the attainment of age 65.

(4)     "Normal Retirement Date" shall mean the first day of the month following the DEPP PPA Transferee Participant's attainment of Normal Retirement Age.

(5)     "Child" or "Children" shall mean: (a) the living natural or legally adopted child of a DEPP PPA Transferee Participant; or (b) the living natural or legally adopted child of the DEPP PPA Transferee Participant's Spouse, and, if adopted, whose adoption was final on the date of the DEPP PPA Transferee Participant's termination of employment with the Company, and which child of the Spouse is living in a family relationship in the household of such DEPP PPA Transferee Participant on the date of death of such DEPP PPA Transferee Participant.

(6)     Notwithstanding Article I of the Plan, "Domestic Partner" shall have the meaning provided under the Prior Plan.

(7)     Notwithstanding Article I of the Plan, the "or retires, whichever is later," clause in the definition of "Required Beginning Date" shall not apply to a DEPP PPA Active Transferee Participant to the extent such clause would not have applied to such DEPP PPA Active Transferee Participant under the Prior Plan.

(j)     **Minimum Benefits under Prior Plan**. Notwithstanding the foregoing, to the extent that a DEPP PPA Transferee Participant participated in a benefit structure other than the Personal Pension Account Component benefit structure under the Prior Plan as of the Transfer Date, and such alternative benefit structure provided a minimum benefit under the Prior Plan to the DEPP PPA Transferee Participant (referred to herein as a "Minimum Benefit Structure"), the DEPP PPA Transferee Participant shall receive the greater of the benefit under the Personal Pension Account Component benefit structure or Minimum Benefit Structures (as determined in a manner comparable to that under the Prior Plan). To the extent a DEPP PPA Transferee Participant's benefit under this Appendix is payable under a Minimum Benefit Structure, such benefit shall be payable under the applicable benefit payment rules of the Minimum Benefit Structure as set forth in the Prior Plan (including, without limitation, such retirement eligibility provisions, available optional forms of payment, beneficiary designations, pre-retirement death benefits, and actuarial or other adjustments required based on the chosen benefit commencement date and optional form of payment), and no benefit shall be payable under the Personal Pension Account Component benefit structure described herein.

**APPENDIX J-38, Dow (DEPP PPA Component Transferees)**

J-147

(k)     **Other Applicable Provisions**.  Nothing herein shall be construed as increasing the benefit that would have otherwise been payable to a DEPP PPA Transferee Participant under the terms of the Prior Plan assuming (i) no transfer of the DEPP PPA Transferee Participant's benefit under the Prior Plan to this Plan, and (ii) DEPP PPA Transferee Participant's termination of employment from Dow as of the Transfer Date (or such earlier date as may have been applicable for a DEPP PPA TV Transferee Participant).  Nothing in this Appendix shall be construed as limiting the Company's ability to amend the provisions applicable to a Minimum Benefit Structure or the Personal Pension Account Component benefit structure  as provided pursuant to the Plan under this Appendix.

(l)     **Effective Date; Transfer of Assets and Liabilities from Prior Plan**.  Subject to the following, the effective date of this Appendix shall be as of the Transfer Date.  Pursuant to the terms of the Dow Transaction, and in connection with the transfer of the DEPP PPA Transferee Participant's Personal Pension Account "Accrued Benefit" (and, as applicable, an accrued benefit under a Minimum Benefit Structure) from the Prior Plan to this Plan, there shall be a transfer of assets and liabilities from the Prior Plan to this Plan.  Such transfer of assets and liabilities is expected to occur in April 2016, and the effectiveness of this Appendix is subject to such transfer; provided, further, the effect of any particular provision herein is subject to the transfer of a DEPP PPA Transferee Participant's Personal Pension Account "Accrued Benefit" (and, as applicable, an accrued benefit under a Minimum Benefit Structure) from the Prior Plan, and related assets and liabilities, occurring in the manner contemplated herein.  To the extent such transfer of assets and liabilities does not occur, this Appendix shall be of no effect and shall be null and void.

(m)     For avoidance of doubt, any beneficiary designation made by a DEPP PPA Transferee Participant (or other applicable individual) under the Prior Plan shall not transfer to this Plan and shall have no effect hereunder.

**APPENDIX J-38, Dow (DEPP PPA Component Transferees)**

J-148

APPENDIX J-39

### *J-39 Dow (UCEPP PPA Component Transferees)*

This Appendix J-39 shall apply to all individuals (i) who, as of October 5, 2015 ("Transfer Date"), transferred employment from The Dow Chemical Company ("Dow") to Blue Cube Operations, LLC ("Blue Cube"), a subsidiary of the Company, due to the spinoff of Dow's chlorine-related business to the Company as of such Transfer Date (the "Dow Transaction"), (ii) who, prior to the Dow Transaction, participated in the Personal Pension Account Component of the Union Carbide Employees' Pension Plan ("UCEPP Plan"), and (iii) whose accrued benefit under the Personal Pension Account Component of the UCEPP Plan was hereby transferred to this Plan under this Appendix J-39 effective as of the Transfer Date in accordance with the transaction documents of the Dow Transaction. Such individuals are referred to herein as the "UCEPP PPA Active Transferee Participants."

This Appendix J-39 shall also apply to all individuals (i) who, prior to the Dow Transaction, participated in the Personal Pension Account Component of the UCEPP Plan as a terminated vested participant as of the Transfer Date, and (ii) whose accrued benefit under the Personal Pension Account Component of the UCEPP Plan was hereby transferred to this Plan under this Appendix J-39 effective as of the Transfer Date in accordance with the transaction documents of the Dow Transaction. Such individuals are referred to herein as the "UCEPP PPA TV Transferee Participants."

Collectively, the UCEPP PPA Active Transferee Participants and UCEPP PPA TV Transferee Participants are referred to as the "UCEPP PPA Transferee Participants."

For avoidance of doubt, UCEPP PPA Transferee Participants generally were hired by Dow on or after January 1, 2008. With respect to UCEPP PPA Active Transferee Participants, Blue Cube shall be deemed to be the Employing Company as of the Transfer Date. For avoidance of doubt, there are no further accrual of benefits under this Appendix J-39 after the Transfer Date; provided, however, the preceding shall not be interpreted as limiting the crediting of Interest Credits as provided below.

(a)     **Prior Plan**. The UCEPP Plan, as sponsored by Dow or its affiliate, as in effect as of the Transfer Date. For avoidance of doubt, (i) any changes to the UCEPP Plan adopted or effective after the Transfer Date shall have no effect under the Plan or this Appendix and (ii) for reference herein to the applicable rules of the Prior Plan, references to Dow under such rules shall be substituted with references to the Company where context requires.

(b)     **Eligibility**. Except for the UCEPP PPA Transferee Participants, there are no new entrants permitted under this Appendix after the Transfer Date.

(c)     **Personal Pension Account as of Transfer Date**. Personal Pension Account refers to a form of the notational account record maintained under the Plan on behalf of each UCEPP PPA Transferee Participant. Under the Prior Plan, such Personal Pension Account equaled the sum of "Pay Credits" and "Interest Credits" that were credited to that account in accordance with the terms of the Prior Plan. A UCEPP PPA Transferee Participant's Personal Pension Account under the Plan as of the Transfer Date shall be equal to such individual's Personal Pension Account under the Prior Plan as of the Transfer Date (reflecting "Pay Credits" and "Interest Credits" provided under the Prior Plan through such Transfer Date), as reflected on the Prior Plan records and as transferred to this Plan as described in paragraph (l) below.

(d)     **Interest Credits to Personal Pension Account after Transfer Date.**

(1)     A UCEPP PPA Transferee Participant's Personal Pension Account under the Plan shall be credited with Interest Credits after the Transfer Date as provided herein. Interest Credits are added to a UCEPP PPA Transferee Participant's Personal Pension Account

**APPENDIX J-39, Dow (UCEPP PPA Component Transferees)**

J-149

only for the UCEPP PPA Transferee Participants who have not begun to receive payments under the Plan pursuant to this Appendix.

(2)     "Interest Credit" shall mean, for each Plan Year after the 2015 Plan Year, an amount equal to the Interest Credit Rate multiplied by a UCEPP PPA Transferee Participant's Personal Pension Account as of the last day of the immediately preceding Plan Year. Such amount shall be credited to a UCEPP PPA Transferee Participant's Personal Pension Account on the last day of each Plan Year.  In the Plan Year in which a benefit payment is scheduled to begin under the Plan for a UCEPP PPA Transferee Participant, the Interest Credit shall be credited to the UCEPP PPA Transferee Participant's Personal Pension Account on the last day of the month immediately preceding the month for which the first benefit payment is scheduled to begin, based on completed months from the beginning of the Plan Year to the date the Interest Credit is credited.

(3)     Notwithstanding clause (2) above, for the 2015 Plan Year, the Plan shall provide an Interest Credit as of the last day of the 2015 Plan Year equal to (i) the Interest Credit that the Prior Plan would have provided the UCEPP PPA Transferee Participant assuming such individual had worked at Dow for the complete 2015 Plan Year, less (ii) the Interest Credit that the Prior Plan provided such individual for the period from January 1, 2015 to the Transfer Date.  If a UCEPP PPA Transferee Participant were to commence benefits under the Plan prior to the end of the 2015 Plan Year, the Plan shall provide an Interest Credit as of the last day of the month immediately preceding the month for which the first benefit payment is scheduled to begin, equal to (i) the Interest Credit that the Prior Plan would have provided the UCEPP PPA Transferee Participant assuming such individual had worked at Dow to his Benefit Commencement Date, less (ii) the Interest Credit that the Prior Plan provided such individual for the period from January 1, 2015 to the Transfer Date.

(4)     For these purposes, "Interest Credit Rate" shall mean 150 basis points plus the discount rate on six-month Treasury Bills, determined (in accordance with applicable guidance) as of the September immediately preceding the applicable Plan Year.  The Interest Credit Rate, so determined, is the annual percentage yield for the applicable Plan Year.

(5)     For avoidance of doubt, a UCEPP PPA Transferee Participant's Personal Pension Account shall not be credited with any "Pay Credits" or such other similar term under this Appendix on and after the Transfer Date.

(e)     **Accrued Benefit**.  A UCEPP PPA Transferee Participant's Personal Pension Account "Accrued Benefit" is the benefit that is equal to the UCEPP PPA Transferee Participant's Life Only Annuity commencing at Normal Retirement Age that is the Actuarial Equivalent of the UCEPP PPA Transferee Participant's Personal Pension Account balance as of the Benefit Commencement Date.  For a Participant whose Benefit Commencement Date is before Normal Retirement Age, Interest Credits shall be projected to the UCEPP PPA Transferee Participant's Personal Pension Account from the Benefit Commencement Date to Normal Retirement Age using the Interest Credit Rate in effect at the Benefit Commencement Date.

Subject to other applicable provisions of the Plan, a vested UCEPP PPA Transferee Participant's Personal Pension Account shall equal: (a) if the UCEPP PPA Transferee Participant elects an annuity, an annuity that is the Actuarial Equivalent of his Personal Pension Account as of the date benefit payments begin; or (b) if the Participant elects a Lump Sum Benefit, the UCEPP PPA Transferee Participant's Personal Pension Account balance as of the date benefit payments begin.

**APPENDIX J-39, Dow (UCEPP PPA Component Transferees)**

J-150

Because this is a defined benefit pension plan, the UCEPP PPA Transferee Participant shall have no actual individual account, no claim to any particular assets and no share of any actual contributions to the Plan, any expenses, gains or losses of the assets of the Plan or any forfeitures of the Plan.

(f)     **Vesting**.  A UCEPP PPA Transferee Participant shall be fully vested in his Personal Pension Account "Accrued Benefit" as of the Transfer Date.

(g)     **Time and Forms of Payment**.  Subject to other applicable provisions of the Plan, including Section 3.7 (regarding "required beginning date"), a UCEPP PPA Active Transferee Participant may commence payment under the Plan at any time after termination of employment with the Company and a UCEPP PPA TV Transferee Participant may commence payment under the Plan at any time after the Transfer Date (subject to such UCEPP PPA TV Transferee Participant not being employed by the Company at such time). A UCEPP PPA Transferee Participant shall be paid in the form and manner provided under Article IV of the Plan, subject to the following:

> (1) The only optional forms of payment available under this Appendix shall be (i) Life Only Annuity, (ii) 50% Survivor Benefit, (iii) 100% Survivor Benefit, and (iv) Lump Sum Benefit, each as described under the Prior Plan with respect to the  Personal Pension Account benefit determinations.  There is no "Pension Purchase Option" (as described under the Prior Plan) under the Plan.

> (2) The normal form of payment for a vested married UCEPP PPA Transferee Participant is the 100% Survivor Benefit, provided that a UCEPP PPA Transferee Participant may elect the 50% Survivor Benefit (with Spouse as beneficiary), without need for written consent from the Spouse. The normal form of payment for a vested unmarried UCEPP PPA Transferee Participant (including a Participant with a Domestic Partner) is the Life Only Annuity.

> (3) The first three optional forms of benefit described in clause (1) above shall be calculated as the Actuarial Equivalent of the vested UCEPP PPA Transferee Participant's Personal Pension Account Accrued Benefit (as determined under paragraph (e) above) as of the last day of the month immediately preceding the month for which the first benefit payment is scheduled to be made.

> (4) The Lump Sum Benefit described in clause (1) above shall be equal to the Personal Pension Account balance as of the last day of the month immediately preceding the month the Lump Sum Benefit is paid and shall be payable in any amount.

> (5) The Lump Sum Benefit shall not be automatically distributed, even if the amount is $1,000 or less.

> (6) For the a Lump Sum Benefit, a specific named Beneficiary other than his Spouse may be elected by a vested Married Participant, but only if the Spouse consents in writing to such election as provided under Article IV of the Plan.

> (7) The 50% Survivor Benefit and 100% Survivor Benefit are only available to a vested Married Participant (with Spouse as beneficiary) or a vested Participant with a Domestic Partner (with such Domestic Partner as the beneficiary).  No person other than a Spouse or Domestic Partner may be a beneficiary under the 50% Survivor Benefit and 100% Survivor Benefit.

> (8) Payment of the 50% Survivor Benefit and 100% Survivor Benefit shall end with the last to die of the vested Participant and the vested Participant's Spouse or Domestic Partner, as applicable.

(h)     **Pre-retirement Death Benefit**.  If a UCEPP PPA Transferee Participant with a vested Personal Pension Account dies before his benefit under this Appendix has commenced, a death benefit shall be payable on

**APPENDIX J-39, Dow (UCEPP PPA Component Transferees)**

J-151

such UCEPP PPA Transferee Participant's behalf in an amount equal in value to such UCEPP PPA Transferee Participant's Personal Pension Account. Such death benefit shall be paid as follows:

(1) Unmarried Participants. If such UCEPP PPA Transferee Participant is not married on the date of his death, and there is no surviving Beneficiary or the Beneficiary dies before a distribution is made, the Personal Pension Account shall be paid as a Lump Sum Benefit as soon as administratively feasible in the following order:

(A) to the surviving Child(ren) of the UCEPP PPA Transferee Participant, if any, in equal shares;

(B) to the beneficiary of any Company-sponsored life insurance policy for which the Company pays all or part of the premium of the UCEPP PPA Transferee Participant, if any; or

(C) to the estate of the UCEPP PPA Transferee Participant.

(2) Married Participants. If such UCEPP PPA Transferee Participant is married on the date of his death, the Personal Pension Account shall be payable to such UCEPP PPA Transferee Participant's Spouse commencing on the last day of the month following the month in which such UCEPP PPA Transferee Participant died or at such later date as such Spouse may elect, up to and including the date that would have been the UCEPP PPA Transferee Participant's Normal Retirement Date if such UCEPP PPA Transferee Participant had survived. The Spouse may elect to receive a Lump Sum Benefit, which shall be paid as soon as administratively feasible, or have the death benefit paid as a Life Only Annuity payable for the Spouse's lifetime.

If such Spouse is not living on the date of the UCEPP PPA Transferee Participant's death or dies before the pre-retirement death benefits commence, such Personal Pension Account shall be paid as a Lump Sum Benefit as soon as administratively feasible in the following order:

(A) to the Beneficiary designated by the UCEPP PPA Transferee Participant, if any;

(B) to the surviving Child(ren) of the UCEPP PPA Transferee Participant, if any, in equal shares; or

(C) to the beneficiary of any Company-sponsored life insurance policy for which the Company pays all or part of the premium of the UCEPP PPA Transferee Participant, if any; or

(D) to the estate of the UCEPP PPA Transferee Participant.

For these purposes, the Beneficiary of a UCEPP PPA Transferee Participant with a Domestic Partner shall be the UCEPP PPA Transferee Participant's Domestic Partner, unless such UCEPP PPA Transferee Participant has designated a different Beneficiary in writing in accordance with rules prescribed by the Committee.

(i) **Miscellaneous Definitions**.

(1) "Actuarial Equivalent" means an equivalent value benefit computed on the basis of a specific mortality table and a specific interest rate, which for purposes of this Appendix, shall be the Interest Credit Rate for the Plan Year of distribution and the applicable mortality table set forth in Code section 417(e)(3).

**APPENDIX J-39, Dow (UCEPP PPA Component Transferees)**

J-152

(2)     "Vesting Service" means the sum of a UCEPP PPA Active Transferee Participant's Vesting Service under the Prior Plan (as credited and determined on the records and terms of the Prior Plan), plus for each Plan Year thereafter, a UCEPP PPA Active Transferee Participant shall be credited with one year of Vesting Service for each Plan Year in which 1,000 or more Hours of Service are credited to such UCEPP PPA Active Transferee Participant and shall be credited with no Vesting Service for any Plan Year in which fewer than 1,000 Hours of Service are credited to such UCEPP PPA Active Transferee Participant.

Notwithstanding the foregoing, to the extent a UCEPP PPA Active Transferee Participant did not earn one year of Vesting Service for the period from January 1, 2015 to the Transfer Date under the Prior Plan, such UCEPP PPA Active Transferee Participant shall earn a year of Vesting Service for the 2015 Plan Year if his combined Hours of Service with Dow and the Company for the 2015 Plan Year is equal to or more than 1,000 Hours of Service.  There shall be no duplication of Vesting Service for any Plan Year.

On and after the Transfer Date, the calculation of Vesting Service under this Appendix shall be subject to all of the applicable rules contained in the Prior Plan, including the rules concerning breaks in service.   For avoidance of doubt, any Vesting Service (or any other service) reflected under this Appendix for periods of service recognized under the Prior Plan shall not count toward the service requirements under any other Appendix.

(3)     "Normal Retirement Age" shall mean the attainment of age 65.

(4)     "Normal Retirement Date"  shall mean the first day of the month following the UCEPP PPA Transferee Participant's attainment of Normal Retirement Age.

(5)     "Child" or "Children" shall mean: (a) the living natural or legally adopted child of a UCEPP PPA Transferee Participant; or (b) the living natural or legally adopted child of the UCEPP PPA Transferee Participant's Spouse, and, if adopted, whose adoption was final on the date of the UCEPP PPA Transferee Participant's termination of employment with the Company, and which child of the Spouse is living in a family relationship in the household of such UCEPP PPA Transferee Participant on the date of death of such UCEPP PPA Transferee Participant.

(6)     Notwithstanding Article I of the Plan, "Domestic Partner" shall have the meaning provided under the Prior Plan.

(7)     Notwithstanding Article I of the Plan, the "or retires, whichever is later," clause in the definition of "Required Beginning Date" shall not apply to a UCEPP PPA Active Transferee Participant to the extent such clause would not have applied to such UCEPP PPA Active Transferee Participant under the Prior Plan.

(j)     **Minimum Benefits under Prior Plan**.  Notwithstanding the foregoing, to the extent that a UCEPP PPA Transferee Participant participated in a benefit structure other than the Personal Pension Account Component benefit structure under the Prior Plan as of the Transfer Date, and such alternative benefit structure provided a minimum benefit under the Prior Plan to the UCEPP PPA Transferee Participant (referred to herein as a "Minimum Benefit Structure"), the UCEPP PPA Transferee Participant shall receive the greater of the benefit under the Personal Pension Account Component benefit structure or Minimum Benefit Structures (as determined in a manner comparable to that under the Prior Plan).  To the extent a UCEPP PPA Transferee Participant's benefit under this Appendix is payable under a Minimum Benefit Structure, such benefit shall be payable under the applicable benefit payment rules of the Minimum Benefit Structure as set forth in the Prior Plan (including, without limitation, such retirement eligibility provisions,

**APPENDIX J-39, Dow (UCEPP PPA Component Transferees)**

J-153

available optional forms of payment, beneficiary designations, pre-retirement death benefits, and actuarial or other adjustments required based on the chosen benefit commencement date and optional form of payment), and no benefit shall be payable under the Personal Pension Account Component benefit structure described herein.

(k)     **Other Applicable Provisions**.  Nothing herein shall be construed as increasing the benefit that would have otherwise been payable to a UCEPP PPA Transferee Participant under the terms of the Prior Plan assuming (i) no transfer of the UCEPP PPA Transferee Participant's benefit under the Prior Plan to this Plan, and (ii) UCEPP PPA Transferee Participant's termination of employment from Dow as of the Transfer Date (or such earlier date as may have been applicable for a UCEPP PPA TV Transferee Participant).  Nothing in this Appendix shall be construed as limiting the Company's ability to amend the provisions applicable to a Minimum Benefit Structure or the Personal Pension Account Component benefit structure  as provided pursuant to the Plan under this Appendix.

(l)     **Effective Date; Transfer of Assets and Liabilities from Prior Plan**.  Subject to the following, the effective date of this Appendix shall be as of the Transfer Date. Pursuant to the terms of the Dow Transaction, and in connection with the transfer of the UCEPP PPA Transferee Participant's Personal Pension Account "Accrued Benefit" (and, as applicable, an accrued benefit under a Minimum Benefit Structure) from the Prior Plan to this Plan, there shall be a transfer of assets and liabilities from the Prior Plan to this Plan.  Such transfer of assets and liabilities is expected to occur in April 2016, and the effectiveness of this Appendix is subject to such transfer; provided, further, the effect of any particular provision herein is subject to the transfer of a UCEPP PPA Transferee Participant's Personal Pension Account "Accrued Benefit" (and, as applicable, an accrued benefit under a Minimum Benefit Structure) from the Prior Plan, and related assets and liabilities, occurring in the manner contemplated herein.  To the extent such transfer of assets and liabilities does not occur, this Appendix shall be of no effect and shall be null and void.

(m)     For avoidance of doubt, any beneficiary designation made by a UCEPP PPA Transferee Participant (or other applicable individual) under the Prior Plan shall not transfer to this Plan and shall have no effect hereunder.

**APPENDIX J-39, Dow (UCEPP PPA Component Transferees)**

J-154

APPENDIX J-40

### *J-40 Dow (DEPP PEP Component Transferees)*

This Appendix J-40 shall apply to all individuals (i) who, as of October 5, 2015 ("Transfer Date"), transferred employment from The Dow Chemical Company ("Dow") to Blue Cube Operations, LLC ("Blue Cube"), a subsidiary of the Company, due to the spinoff of Dow's chlorine-related business to the Company as of such Transfer Date (the "Dow Transaction"), (ii) who, prior to the Dow Transaction, participated in the DEPP Component (i.e., the "pension equity plan" component) of the Dow Employees' Pension Plan ("Dow Plan"), and (iii) whose accrued benefit under the DEPP Component of the Dow Plan was hereby transferred to this Plan under this Appendix J-40 effective as of the Transfer Date in accordance with the transaction documents of the Dow Transaction. Such individuals are referred to herein as the "DEPP PEP Active Transferee Participants."

This Appendix J-40 shall also apply to all individuals (i) who, prior to the Dow Transaction, participated in the DEPP Component of the Dow Plan as a terminated vested participant as of the Transfer Date, and (ii) whose accrued benefit under the DEPP Component of the Dow Plan was hereby transferred to this Plan under this Appendix J-40 effective as of the Transfer Date in accordance with the transaction documents of the Dow Transaction. Such individuals are referred to herein as the "DEPP PEP TV Transferee Participants."

Collectively, the DEPP PEP Active Transferee Participants and DEPP PEP TV Transferee Participants are referred to as the "DEPP PEP Transferee Participants."

For avoidance of doubt, DEPP PEP Transferee Participants generally were hired by Dow on or after January 1, 1996 and before January 1, 2008. For a DEPP PEP Transferee Participant, the "Account Balance" under the Prior Plan referred to the "Current Benefit Formula" determined under the Prior Plan before application of the "Benefit Conversion Factor", and such "Account Balance" grew based on an individual's "Accruals" and "Average Annual Compensation"/"HC3A" while employed with Dow (and, as applicable, with interest after termination of employment with Dow for DEPP PEP TV Transferee Participants) in accordance with the terms of the Prior Plan through the Transfer Date. The preceding sentence is provided for purposes of description only.

With respect to DEPP PEP Active Transferee Participants, Blue Cube shall be deemed to be the Employing Company as of the Transfer Date. For avoidance of doubt, there are no further accrual of benefits under this Appendix J-40 after the Transfer Date; provided, however, the preceding shall not be interpreted as limiting the crediting of interest as provided below.

(a)     **Prior Plan**. The Dow Plan, as sponsored by Dow, as in effect as of the Transfer Date. For avoidance of doubt, (i) any changes to the Dow Plan adopted or effective after the Transfer Date shall have no effect under the Plan or this Appendix and (ii) for reference herein to the applicable rules of the Prior Plan, references to Dow under such rules shall be substituted with references to the Company where context requires.

(b)     **Eligibility**. Except for the DEPP PEP Transferee Participants, there are no new entrants permitted under this Appendix after the Transfer Date.

(c)     **Account Balance as of Transfer Date**. A DEPP PEP Transferee Participant's Account Balance under the Plan as of the Transfer Date shall be equal to such individual's Account Balance under the Prior Plan as of the Transfer Date (reflecting, for DEPP PEP Active Transferee Participants, "Accruals" and compensation under the Prior Plan through such Transfer Date, and reflecting, for DEPP PEP TV Transferee Participants, interest from termination of employment with Dow through such Transfer Date), as reflected on the Prior Plan records and as transferred to this Plan as described in paragraph (l) below.

(d)     **Interest to Account Balance after Transfer Date.**

**APPENDIX J-40, Dow (DEPP PEP Component Transferees)**

J-155

(1)     A DEPP PEP Transferee Participant's Account Balance under the Plan shall increase at 8% interest from the Transfer Date to May 31, 2016 (with interest prorated for any partial year), and shall thereafter increase at 6% interest (with interest prorated for any partial year).  Notwithstanding the preceding, a DEPP PEP Transferee Participant's Account Balance under the Plan shall not increase with interest once a DEPP PEP Transferee Participant commences benefits under this Appendix.

(2)     For avoidance of doubt, a DEPP PEP Transferee Participant's Account Balance shall not increase for any other reason (including, without limitation, to reflect compensation earned or service with the Company) on and after the Transfer Date.  There shall be no further "Accruals", "Credited Service" or "Eligibility Service" under the Plan on and after the Transfer Date, and an individual's compensation with the Company on and after the Transfer Date shall not affect "Average Annual Compensation"/"HC3A" (as such terms are used in the Prior Plan).

(e)     **Accrued Benefit**.  A DEPP PEP Transferee Participant's DEPP Component "Accrued Benefit" is the benefit that is equal to the DEPP PEP Transferee Participant's actual Account Balance increased with interest (8% until May 31, 2016, and 6% thereafter) until Normal Retirement Age, with interest prorated for partial years, and divided by the Benefit Conversion Factor for Normal Retirement Age.

Because this is a defined benefit pension plan, the DEPP PEP Transferee Participant shall have no actual individual account, no claim to any particular assets and no share of any actual contributions to the Plan, any expenses, gains or losses of the assets of the Plan or any forfeitures of the Plan.

(f)     **Vesting**.  A DEPP PEP Transferee Participant shall be fully vested in his DEPP Component "Accrued Benefit" as of the Transfer Date.

(g)     **Time and Forms of Payment**.  Subject to other applicable provisions of the Plan, including Section 3.7 (regarding "required beginning date"), a DEPP PEP Active Transferee Participant may commence payment under the Plan at any time after termination of employment with the Company and a DEPP PEP TV Transferee Participant may commence payment under the Plan at any time after the Transfer Date (subject to such DEPP PEP TV Transferee Participant not being employed by the Company at such time).  A DEPP PEP Transferee Participant shall be paid in the form and manner provided under Article IV of the Plan, subject to the following:

(1) The only optional forms of payment available under this Appendix shall be (i) Life Only Annuity, (ii) 50% Survivor Benefit, (iii) 100% Survivor Benefit, (iv) Early Retirement Level Income Option, and (v) Lump Sum Benefit, each as described and subject to the same adjustments as provided under the Prior Plan with respect to the DEPP Component benefit determinations.

(2) The normal form of payment for a vested married DEPP PEP Transferee Participant is the 100% Survivor Benefit, provided that a DEPP PEP Transferee Participant may elect the 50% Survivor Benefit (with Spouse as beneficiary), without need for written consent from the Spouse. The normal form of payment for a vested unmarried DEPP PEP Transferee Participant (including a Participant with a Domestic Partner) is the Life Only Annuity.

(3) The Lump Sum Benefit shall only be available if a DEPP PEP Transferee Participant's Account Balance is less than $15,000.

(4) The 50% Survivor Benefit and 100% Survivor Benefit are only available to a vested Married Participant (with Spouse as beneficiary) or a vested Participant with a Domestic Partner (with such Domestic Partner as the beneficiary).  No person other than a Spouse or Domestic Partner may be a beneficiary under the 50% Survivor Benefit and 100% Survivor Benefit.

**APPENDIX J-40, Dow (DEPP PEP Component Transferees)**

J-156

(5) The Early Retirement Level Income Option is only available to (i) a DEPP PEP Transferee Participant who commences prior to age 62, (ii) who terminates employment with the Company after age 50 with five years of Eligibility Service, and (iii) whose benefit after age 62 would be greater than $15 under the option.

(6) For the first four payment options described in clause (1) above, the Guaranteed Payout Option as described in the Prior Plan is an additional option that may be elected by a DEPP PEP Transferee Participant, and if so elected, the payment of benefits shall be subject to the same adjustments as provided under the Prior Plan. There is no "Pension Purchase Option" (as described under the Prior Plan) under the Plan.

(h)     **Pre-retirement Death Benefit**.  If a DEPP PEP Transferee Participant with a vested DEPP Component "Accrued Benefit" dies before his benefit under this Appendix has commenced, a death benefit shall be payable. Such death benefit shall be paid as follows:

(1) Unmarried Participants.  If such DEPP PEP Transferee Participant is not married on the date of his death, a death benefit shall be payable to the DEPP PEP Transferee Participant's Beneficiary in the form of a lump sum payment equal to the DEPP PEP Transferee Participant's Account Balance.  If the DEPP PEP Transferee Participant has a Domestic Partner, such Beneficiary shall be the Domestic Partner unless otherwise designated by the DEPP PEP Transferee Participant.  If there is no surviving Beneficiary or the Beneficiary dies before a distribution is made, the Account Balance shall be paid as a lump sum payment as soon as administratively feasible in the following order:

(A) to the surviving Child(ren) of the DEPP PEP Transferee Participant, if any, in equal shares;

(B) to the beneficiary of any Company-sponsored life insurance policy for which the Company pays all or part of the premium of the DEPP PEP Transferee Participant, if any; or

(C) to the estate of the DEPP PEP Transferee Participant.

Upon the divorce of a DEPP PEP Transferee Participant, a prior designation of a Spouse as a Beneficiary shall be null and void except to the extent required by a QDRO.

(2) Married Participants.  If such DEPP PEP Transferee Participant is married on the date of his death, the death benefit shall be payable to such DEPP PEP Transferee Participant's Spouse commencing on the last day of the month following the month in which such DEPP PEP Transferee Participant died or at such later date as such Spouse may elect, up to and including the date that would have been the DEPP PEP Transferee Participant's Normal Retirement Date if such DEPP PEP Transferee Participant had survived.  Until such benefit commencement, the  Account Balance shall continue to increase with interest (8% until May 31, 2016, and 6% thereafter) until the Spouse's benefit commencement, with interest prorated for partial years, and divided by the Benefit Conversion Factor based on the Spouse's age at benefit commencement.

The Spouse shall receive the death benefit as a Life Only Annuity payable for the Spouse's lifetime, provided that the Spouse may elect the Guaranteed Payment Option, and if so elected, the payment of such death benefits shall be subject to the same adjustments as provided under the Prior Plan.  Additionally, the Spouse may elect to receive such monthly benefit as a Lump Sum Benefit, as described and as determined under the Prior Plan, if (i) the present value of such

**APPENDIX J-40, Dow (DEPP PEP Component Transferees)**

J-157

monthly benefit is greater than $1,000 but the Account Balance attributable to such benefit is less than or equal to $15,000, or (ii) the monthly benefit equals $15 or less.

If such Spouse dies before the pre-retirement death benefits commence, the Spouse's Account Balance shall be paid as a lump sum payment as soon as administratively feasible to the Spouse's Beneficiary, and if there is no surviving Beneficiary or the Beneficiary dies before a distribution is made, such Account Balance shall be paid  in a lump sum in the following order:

(A) to the spouse of such Spouse, if any;

(B) to the surviving Child(ren) of the DEPP PEP Transferee Participant, if any, in equal shares; or

(C) to the beneficiary of any Company-sponsored life insurance policy for which the Company pays all or part of the premium of the DEPP PEP Transferee Participant, if any; or

(D) to the estate of the Spouse.

(i)    **Miscellaneous Definitions**.

(1)    "Vesting Service" means the sum of a DEPP PEP Active Transferee Participant's Vesting Service under the Prior Plan as of the Transfer Date (as credited and determined on the records and terms of the Prior Plan), plus for each Plan Year thereafter, a DEPP PEP Active Transferee Participant shall be credited with one year of Vesting Service for each Plan Year in which 1,000 or more Hours of Service are credited to such DEPP PEP Active Transferee Participant and shall be credited with no Vesting Service for any Plan Year in which fewer than 1,000 Hours of Service are credited to such DEPP PEP Active Transferee Participant.

Notwithstanding the foregoing, to the extent a DEPP PEP Active Transferee Participant did not earn one year of Vesting Service for the period from January 1, 2015 to the Transfer Date under the Prior Plan, such DEPP PEP Active Transferee Participant shall earn a year of Vesting Service for the 2015 Plan Year if his combined Hours of Service with Dow and the Company for the 2015 Plan Year is equal to or more than 1,000 Hours of Service.  There shall be no duplication of Vesting Service for any Plan Year.

On and after the Transfer Date, the calculation of Vesting Service under this Appendix shall be subject to all of the applicable rules contained in the Prior Plan, including the rules concerning breaks in service.  For avoidance of doubt, any Vesting Service (or or any other service) reflected under this Appendix for periods of service recognized under the Prior Plan shall not count toward the service requirements under any other Appendix.

(2)    "Normal Retirement Age" shall mean the attainment of age 65.

(3)    "Normal Retirement Date"  shall mean the first day of the month following the DEPP PEP Transferee Participant's attainment of Normal Retirement Age.

(4)    "Child" or "Children" shall mean: (a) the living natural or legally adopted child of a DEPP PEP Transferee Participant; or (b) the living natural or legally adopted child of the DEPP PEP Transferee Participant's Spouse, and, if adopted, whose adoption was final on the date of the DEPP PEP Transferee Participant's termination of employment with the Company, and which child of the Spouse is living in a family relationship in the

**APPENDIX J-40, Dow (DEPP PEP Component Transferees)**

J-158

household of such DEPP PEP Transferee Participant on the date of death of such DEPP PEP Transferee Participant.

(5)     Notwithstanding Article I of the Plan, "Domestic Partner" shall have the meaning provided under the Prior Plan.

(6)     "Benefit Conversion Factor" shall mean the factor used to convert the Account Balance to a Life Only Annuity payable to the DEPP PEP Transferee Participant (or, if applicable, the surviving Spouse), determined at the time of benefit commencement according to the following schedule.  For these purposes, "Age at Commencement" shall mean the age of the DEPP PEP Transferee Participant (or, if applicable, the surviving Spouse) on his birthday nearest to the date the benefits commence.

| Age at Commencement | Benefit Conversion | | Age at Commencement | Benefit Conversion |
|---|---|---|---|---|
| 18 | 14.6 | | 42 | 12.2 |
| 19 | 14.5 | | 43 | 12.1 |
| 20 | 14.4 | | 44 | 12.0 |
| 21 | 14.3 | | 45 | 11.9 |
| 22 | 14.2 | | 46 | 11.8 |
| 23 | 14.1 | | 47 | 11.7 |
| 24 | 14.0 | | 48 | 11.6 |
| 25 | 13 9 | | 49 | 11.5 |
| 26 | 13.8 | | 50 | 11.4 |
| 27 | 13.7 | | 51 | 11.3 |
| 28 | 13.6 | | 52 | 11.2 |
| 29 | 13.5 | | 53 | 11.1 |
| 30 | 13.4 | | 54 | 10.9 |
| 31 | 13.3 | | 55 | 10.8 |
| 32 | 13.2 | | 56 | 10.7 |
| 33 | 13.1 | | 57 | 10.6 |
| 34 | 13.0 | | 58 | 10.4 |
| 35 | 12.9 | | 59 | 10.3 |
| 36 | 12.8 | | 60 | 10.1 |
| 37 | 12.7 | | 61 | 9.9 |
| 38 | 12.6 | | 62 | 9.8 |
| 39 | 12.5 | | 63 | 9.6 |
| 40 | 12.4 | | 64 | 9.4 |
| 41 | 12.3 | | >65 | 9.2 |

(7)     Notwithstanding Article I of the Plan, the "or retires, whichever is later," clause in the definition of "Required Beginning Date" shall not apply to a DEPP PEP Active Transferee Participant to the extent such clause would not have applied to such DEPP PEP Active Transferee Participant under the Prior Plan.

(j)     **Minimum Benefits under Prior Plan**.  Notwithstanding the foregoing, to the extent that a DEPP PEP Transferee Participant participated in a benefit structure other than the DEPP Component benefit structure under the Prior Plan as of the Transfer Date, and such alternative benefit structure provided a minimum benefit under the Prior Plan to the DEPP PEP Transferee Participant (referred to herein as a "Minimum Benefit Structure"), the DEPP PEP Transferee Participant shall receive the greater of the benefit under the

**APPENDIX J-40, Dow (DEPP PEP Component Transferees)**

J-159

DEPP Component benefit structure or Minimum Benefit Structures (as determined in a manner comparable to that under the Prior Plan).  To the extent a DEPP PEP Transferee Participant's benefit under this Appendix is payable under a Minimum Benefit Structure, such benefit shall be payable under the applicable benefit payment rules of the Minimum Benefit Structure as set forth in the Prior Plan (including, without limitation, such retirement eligibility provisions, available optional forms of payment, beneficiary designations, pre-retirement death benefits, and actuarial or other adjustments required based on the chosen benefit commencement date and optional form of payment), and no benefit shall be payable under the DEPP Component benefit structure described herein.

(k)  **Other Applicable Provisions**.  Nothing herein shall be construed as increasing the benefit that would have otherwise been payable to a DEPP PEP Transferee Participant under the terms of the Prior Plan assuming (i) no transfer of the DEPP PEP Transferee Participant's benefit under the Prior Plan to this Plan, (ii) DEPP PEP Transferee Participant's termination of employment from Dow as of the Transfer Date (or such earlier date as may have been applicable for a DEPP PEP TV Transferee Participant), and (iii) that interest payable on the DEPP PEP Transferee Participant's Account balance after such termination through benefit commencement would be at 8% through May 31, 2016 and 6% thereafter.  Nothing in this Appendix shall be construed as limiting the Company's ability to amend the provisions applicable to a Minimum Benefit Structure or the DEPP Component benefit structure  as provided pursuant to the Plan under this Appendix.

(l)  **Effective Date; Transfer of Assets and Liabilities from Prior Plan**.  Subject to the following, the effective date of this Appendix shall be as of the Transfer Date.  Pursuant to the terms of the Dow Transaction, and in connection with the transfer of the DEPP PEP Transferee Participant's DEPP Component "Accrued Benefit" (and, as applicable, an accrued benefit under a Minimum Benefit Structure) from the Prior Plan to this Plan, there shall be a transfer of assets and liabilities from the Prior Plan to this Plan.  Such transfer of assets and liabilities is expected to occur in April 2016, and the effectiveness of this Appendix is subject to such transfer; provided, further, the effect of any particular provision herein is subject to the transfer of a DEPP PEP Transferee Participant's DEPP Component "Accrued Benefit" (and, as applicable, an accrued benefit under a Minimum Benefit Structure) from the Prior Plan, and related assets and liabilities, occurring in the manner contemplated herein.  To the extent such transfer of assets and liabilities does not occur, this Appendix shall be of no effect and shall be null and void.

(m)  For avoidance of doubt, any beneficiary designation made by a DEPP PEP Transferee Participant (or other applicable individual) under the Prior Plan shall not transfer to this Plan and shall have no effect hereunder.

**APPENDIX J-40, Dow (DEPP PEP Component Transferees)**

J-160

APPENDIX J-41

### *J-41 Dow (UCEPP PEP Component Transferees)*

This Appendix J-41 shall apply to all individuals (i) who, as of October 5, 2015 ("Transfer Date"), transferred employment from The Dow Chemical Company ("Dow") to Blue Cube Operations, LLC ("Blue Cube"), a subsidiary of the Company, due to the spinoff of Dow's chlorine-related business to the Company as of such Transfer Date (the "Dow Transaction"), (ii) who, prior to the Dow Transaction, participated in the UCEPP Component (i.e., the "pension equity plan" component) of the Union Carbide Employees' Pension Plan ("UCEPP Plan"), and (iii) whose accrued benefit under the UCEPP Component of the UCEPP Plan was hereby transferred to this Plan under this Appendix J-41 effective as of the Transfer Date in accordance with the transaction documents of the Dow Transaction. Such individuals are referred to herein as the "UCEPP PEP Active Transferee Participants."

This Appendix J-41 shall also apply to all individuals (i) who, prior to the Dow Transaction, participated in the UCEPP Component of the UCEPP Plan as a terminated vested participant as of the Transfer Date, and (ii) whose accrued benefit under the UCEPP Component of the UCEPP Plan was hereby transferred to this Plan under this Appendix J-41 effective as of the Transfer Date in accordance with the transaction documents of the Dow Transaction. Such individuals are referred to herein as the "UCEPP PEP TV Transferee Participants."

Collectively, the UCEPP PEP Active Transferee Participants and UCEPP PEP TV Transferee Participants are referred to as the "UCEPP PEP Transferee Participants."

For avoidance of doubt, UCEPP PEP Transferee Participants generally were hired by Dow on or after February 7, 2003 and before January 1, 2008. For a UCEPP PEP Transferee Participant, the "Account Balance" under the Prior Plan referred to the "Current Benefit Formula" determined under the Prior Plan before application of the "Benefit Conversion Factor", and such "Account Balance" grew based on an individual's "Accruals" and "Average Annual Compensation"/"HC3A" while employed with Dow (and, as applicable, with interest after termination of employment with Dow for UCEPP PEP TV Transferee Participants) in accordance with the terms of the Prior Plan through the Transfer Date. The preceding sentence is provided for purposes of description only.

With respect to UCEPP PEP Active Transferee Participants, Blue Cube shall be deemed to be the Employing Company as of the Transfer Date. For avoidance of doubt, there are no further accrual of benefits under this Appendix J-41 after the Transfer Date; provided, however, the preceding shall not be interpreted as limiting the crediting of interest as provided below.

(a) **Prior Plan**. The UCEPP Plan, as sponsored by Dow or its affiliate, as in effect as of the Transfer Date. For avoidance of doubt, (i) any changes to the UCEPP Plan adopted or effective after the Transfer Date shall have no effect under the Plan or this Appendix and (ii) for reference herein to the applicable rules of the Prior Plan, references to Dow under such rules shall be substituted with references to the Company where context requires.

(b) **Eligibility**. Except for the UCEPP PEP Transferee Participants, there are no new entrants permitted under this Appendix after the Transfer Date.

(c) **Account Balance as of Transfer Date**. A UCEPP PEP Transferee Participant's Account Balance under the Plan as of the Transfer Date shall be equal to such individual's Account Balance under the Prior Plan as of the Transfer Date (reflecting, for UCEPP PEP Active Transferee Participants, "Accruals" and compensation under the Prior Plan through such Transfer Date, and reflecting, for UCEPP PEP TV Transferee Participants, interest from termination of employment with Dow through such Transfer Date), as reflected on the Prior Plan records and as transferred to this Plan as described in paragraph (l) below.

(d) **Interest to Account Balance after Transfer Date.**

**APPENDIX J-41, Dow (UCEPP PEP Component Transferees)**

(1)    A UCEPP PEP Transferee Participant's Account Balance under the Plan shall increase at 8% interest from the Transfer Date to May 31, 2016 (with interest prorated for any partial year), and shall thereafter increase at 6% interest (with interest prorated for any partial year). Notwithstanding the preceding, a UCEPP PEP Transferee Participant's Account Balance under the Plan shall not increase with interest once a UCEPP PEP Transferee Participant commences benefits under this Appendix.

(2)    For avoidance of doubt, a UCEPP PEP Transferee Participant's Account Balance shall not increase for any other reason (including, without limitation, to reflect compensation earned or service with the Company) on and after the Transfer Date. There shall be no further "Accruals", "Credited Service" or "Eligibility Service" under the Plan on and after the Transfer Date, and an individual's compensation with the Company on and after the Transfer Date shall not affect "Average Annual Compensation"/"HC3A" (as such terms are used in the Prior Plan).

(e)    **Accrued Benefit**. A UCEPP PEP Transferee Participant's UCEPP Component "Accrued Benefit" is the benefit that is equal to the UCEPP PEP Transferee Participant's actual Account Balance increased with interest (8% until May 31, 2016, and 6% thereafter) until Normal Retirement Age, with interest prorated for partial years, and divided by the Benefit Conversion Factor for Normal Retirement Age.

Because this is a defined benefit pension plan, the UCEPP PEP Transferee Participant shall have no actual individual account, no claim to any particular assets and no share of any actual contributions to the Plan, any expenses, gains or losses of the assets of the Plan or any forfeitures of the Plan.

(f)    **Vesting**. A UCEPP PEP Transferee Participant shall be fully vested in his UCEPP Component "Accrued Benefit" as of the Transfer Date.

(g)    **Time and Forms of Payment**. Subject to other applicable provisions of the Plan, including Section 3.7 (regarding "required beginning date"), a UCEPP PEP Active Transferee Participant may commence payment under the Plan at any time after termination of employment with the Company and a UCEPP PEP TV Transferee Participant may commence payment under the Plan at any time after the Transfer Date (subject to such UCEPP PEP TV Transferee Participant not being employed by the Company at such time). A UCEPP PEP Transferee Participant shall be paid in the form and manner provided under Article IV of the Plan, subject to the following:

(1) The only optional forms of payment available under this Appendix shall be (i) Life Only Annuity, (ii) 50% Survivor Benefit, (iii) 100% Survivor Benefit, (iv) Early Retirement Level Income Option, and (v) Lump Sum Benefit, each as described and subject to the same adjustments as provided under the Prior Plan with respect to the UCEPP Component benefit determinations.

(2) The normal form of payment for a vested married UCEPP PEP Transferee Participant is the 100% Survivor Benefit, provided that a UCEPP PEP Transferee Participant may elect the 50% Survivor Benefit (with Spouse as beneficiary), without need for written consent from the Spouse. The normal form of payment for a vested unmarried UCEPP PEP Transferee Participant (including a Participant with a Domestic Partner) is the Life Only Annuity.

(3) The Lump Sum Benefit shall only be available if a UCEPP PEP Transferee Participant's Account Balance is less than $15,000.

(4) The 50% Survivor Benefit and 100% Survivor Benefit are only available to a vested Married Participant (with Spouse as beneficiary) or a vested Participant with a Domestic Partner (with such Domestic Partner as the beneficiary). No person other than a Spouse or Domestic Partner may be a beneficiary under the 50% Survivor Benefit and 100% Survivor Benefit.

**APPENDIX J-41, Dow (UCEPP PEP Component Transferees)**

J-162

(5) The Early Retirement Level Income Option is only available to (i) a UCEPP PEP Transferee Participant who commences prior to age 62, (ii) who terminates employment with the Company after age 50 with five years of Eligibility Service, and (iii) whose benefit after age 62 would be greater than $15 under the option.

(6) For the first four payment options described in clause (1) above, the Guaranteed Payout Option as described in the Prior Plan is an additional option that may be elected by a UCEPP PEP Transferee Participant, and if so elected, the payment of benefits shall be subject to the same adjustments as provided under the Prior Plan. There is no "Pension Purchase Option" (as described under the Prior Plan) under the Plan.

(h)      **Pre-retirement Death Benefit**.  If a UCEPP PEP Transferee Participant with a vested UCEPP Component "Accrued Benefit" dies before his benefit under this Appendix has commenced, a death benefit shall be payable. Such death benefit shall be paid as follows:

(1) Unmarried Participants.  If such UCEPP PEP Transferee Participant is not married on the date of his death, a death benefit shall be payable to the UCEPP PEP Transferee Participant's Beneficiary in the form of a lump sum payment equal to the UCEPP PEP Transferee Participant's Account Balance.  If the UCEPP PEP Transferee Participant has a Domestic Partner, such Beneficiary shall be the Domestic Partner unless otherwise designated by the UCEPP PEP Transferee Participant.  If there is no surviving Beneficiary or the Beneficiary dies before a distribution is made, the Account Balance shall be paid as a lump sum payment as soon as administratively feasible in the following order:

(A) to the surviving Child(ren) of the UCEPP PEP Transferee Participant, if any, in equal shares;

(B) to the beneficiary of any Company-sponsored life insurance policy for which the Company pays all or part of the premium of the UCEPP PEP Transferee Participant, if any; or

(C) to the estate of the UCEPP PEP Transferee Participant.

Upon the divorce of a UCEPP PEP Transferee Participant, a prior designation of a Spouse as a Beneficiary shall be null and void except to the extent required by a QDRO.

(2) Married Participants.  If such UCEPP PEP Transferee Participant is married on the date of his death, the death benefit shall be payable to such UCEPP PEP Transferee Participant's Spouse commencing on the last day of the month following the month in which such UCEPP PEP Transferee Participant died or at such later date as such Spouse may elect, up to and including the date that would have been the UCEPP PEP Transferee Participant's Normal Retirement Date if such UCEPP PEP Transferee Participant had survived.  Until such benefit commencement, the Account Balance shall continue to increase with interest (8% until May 31, 2016, and 6% thereafter) until the Spouse's benefit commencement, with interest prorated for partial years, and divided by the Benefit Conversion Factor based on the Spouse's age at benefit commencement.

The Spouse shall receive the death benefit as a Life Only Annuity payable for the Spouse's lifetime, provided that the Spouse may elect the Guaranteed Payment Option, and if so elected, the payment of such death benefits shall be subject to the same adjustments as provided under the Prior Plan.  Additionally, the Spouse may elect to receive such monthly benefit as a Lump Sum Benefit, as described and as determined under the Prior Plan, if (i) the present value of such

**APPENDIX J-41, Dow (UCEPP PEP Component Transferees)**

J-163

monthly benefit is greater than $1,000 but the Account Balance attributable to such benefit is less than or equal to $15,000, or (ii) the monthly benefit equals $15 or less.

If such Spouse dies before the pre-retirement death benefits commence, the Spouse's Account Balance shall be paid as a lump sum payment as soon as administratively feasible to the Spouse's Beneficiary, and if there is no surviving Beneficiary or the Beneficiary dies before a distribution is made, such Account Balance shall be paid  in a lump sum in the following order:

> (A) to the spouse of such Spouse, if any;
>
> (B) to the surviving Child(ren) of the UCEPP PEP Transferee Participant, if any, in equal shares; or
>
> (C) to the beneficiary of any Company-sponsored life insurance policy for which the Company pays all or part of the premium of the UCEPP PEP Transferee Participant, if any; or
>
> (D) to the estate of the Spouse.

(i)     **Miscellaneous Definitions**.

(1)     "Vesting Service" means the sum of a UCEPP PEP Active Transferee Participant's Vesting Service under the Prior Plan as of the Transfer Date (as credited and determined on the records and terms of the Prior Plan), plus for each Plan Year thereafter, a UCEPP PEP Active Transferee Participant shall be credited with one year of Vesting Service for each Plan Year in which 1,000 or more Hours of Service are credited to such UCEPP PEP Active Transferee Participant and shall be credited with no Vesting Service for any Plan Year in which fewer than 1,000 Hours of Service are credited to such UCEPP PEP Active Transferee Participant.

Notwithstanding the foregoing, to the extent a UCEPP PEP Active Transferee Participant did not earn one year of Vesting Service for the period from January 1, 2015 to the Transfer Date under the Prior Plan, such UCEPP PEP Active Transferee Participant shall earn a year of Vesting Service for the 2015 Plan Year if his combined Hours of Service with Dow and the Company for the 2015 Plan Year is equal to or more than 1,000 Hours of Service.  There shall be no duplication of Vesting Service for any Plan Year.

On and after the Transfer Date, the calculation of Vesting Service under this Appendix shall be subject to all of the applicable rules contained in the Prior Plan, including the rules concerning breaks in service.  For avoidance of doubt, any Vesting Service (or or any other service) reflected under this Appendix for periods of service recognized under the Prior Plan shall not count toward the service requirements under any other Appendix.

(2)     "Normal Retirement Age" shall mean the attainment of age 65.

(3)     "Normal Retirement Date" shall mean the first day of the month following the UCEPP PEP Transferee Participant's attainment of Normal Retirement Age.

(4)     "Child" or "Children" shall mean: (a) the living natural or legally adopted child of a UCEPP PEP Transferee Participant; or (b) the living natural or legally adopted child of the UCEPP PEP Transferee Participant's Spouse, and, if adopted, whose adoption was final on the date of the UCEPP PEP Transferee Participant's termination of employment with the Company, and which child of the Spouse is living in a family relationship in the

**APPENDIX J-41, Dow (UCEPP PEP Component Transferees)**

J-164

household of such UCEPP PEP Transferee Participant on the date of death of such UCEPP PEP Transferee Participant.

(5)     Notwithstanding Article I of the Plan, "Domestic Partner" shall have the meaning provided under the Prior Plan.

(6)     "Benefit Conversion Factor" shall mean the factor used to convert the Account Balance to a Life Only Annuity payable to the UCEPP PEP Transferee Participant (or, if applicable, the surviving Spouse), determined at the time of benefit commencement according to the following schedule.  For these purposes, "Age at Commencement" shall mean the age of the UCEPP PEP Transferee Participant (or, if applicable, the surviving Spouse) on his birthday nearest to the date the benefits commence.

| Age at Commencement | Benefit Conversion | | Age at Commencement | Benefit Conversion |
|---|---|---|---|---|
| 18 | 14.6 | | 42 | 12.2 |
| 19 | 14.5 | | 43 | 12.1 |
| 20 | 14.4 | | 44 | 12.0 |
| 21 | 14.3 | | 45 | 11.9 |
| 22 | 14.2 | | 46 | 11.8 |
| 23 | 14.1 | | 47 | 11.7 |
| 24 | 14.0 | | 48 | 11.6 |
| 25 | 13 9 | | 49 | 11.5 |
| 26 | 13.8 | | 50 | 11.4 |
| 27 | 13.7 | | 51 | 11.3 |
| 28 | 13.6 | | 52 | 11.2 |
| 29 | 13.5 | | 53 | 11.1 |
| 30 | 13.4 | | 54 | 10.9 |
| 31 | 13.3 | | 55 | 10.8 |
| 32 | 13.2 | | 56 | 10.7 |
| 33 | 13.1 | | 57 | 10.6 |
| 34 | 13.0 | | 58 | 10.4 |
| 35 | 12.9 | | 59 | 10.3 |
| 36 | 12.8 | | 60 | 10.1 |
| 37 | 12.7 | | 61 | 9.9 |
| 38 | 12.6 | | 62 | 9.8 |
| 39 | 12.5 | | 63 | 9.6 |
| 40 | 12.4 | | 64 | 9.4 |
| 41 | 12.3 | | >65 | 9.2 |

(7)     Notwithstanding Article I of the Plan, the "or retires, whichever is later," clause in the definition of "Required Beginning Date" shall not apply to a UCEPP PEP Active Transferee Participant to the extent such clause would not have applied to such UCEPP PEP Active Transferee Participant under the Prior Plan.

(j)     **Minimum Benefits under Prior Plan**.  Notwithstanding the foregoing, to the extent that a UCEPP PEP Transferee Participant participated in a benefit structure other than the UCEPP Component benefit structure under the Prior Plan as of the Transfer Date, and such alternative benefit structure provided a minimum benefit under the Prior Plan to the UCEPP PEP Transferee Participant (referred to herein as a "Minimum Benefit Structure"), the UCEPP PEP Transferee Participant shall receive the greater of the benefit under the

**APPENDIX J-41, Dow (UCEPP PEP Component Transferees)**

J-165

UCEPP Component benefit structure or Minimum Benefit Structures (as determined in a manner comparable to that under the Prior Plan).  To the extent a UCEPP PEP Transferee Participant's benefit under this Appendix is payable under a Minimum Benefit Structure, such benefit shall be payable under the applicable benefit payment rules of the Minimum Benefit Structure as set forth in the Prior Plan (including, without limitation, such retirement eligibility provisions, available optional forms of payment, beneficiary designations, pre-retirement death benefits, and actuarial or other adjustments required based on the chosen benefit commencement date and optional form of payment), and no benefit shall be payable under the UCEPP Component benefit structure described herein.

(k)     **Other Applicable Provisions**.  Nothing herein shall be construed as increasing the benefit that would have otherwise been payable to a UCEPP PEP Transferee Participant under the terms of the Prior Plan assuming (i) no transfer of the UCEPP PEP Transferee Participant's benefit under the Prior Plan to this Plan, (ii) UCEPP PEP Transferee Participant's termination of employment from Dow as of the Transfer Date (or such earlier date as may have been applicable for a UCEPP PEP TV Transferee Participant), and (iii) that interest payable on the UCEPP PEP Transferee Participant's Account balance after such termination through benefit commencement would be at 8% through May 31, 2016 and 6% thereafter.  Nothing in this Appendix shall be construed as limiting the Company's ability to amend the provisions applicable to a Minimum Benefit Structure or the UCEPP Component benefit structure  as provided pursuant to the Plan under this Appendix.

(l)     **Effective Date; Transfer of Assets and Liabilities from Prior Plan**.  Subject to the following, the effective date of this Appendix shall be as of the Transfer Date.  Pursuant to the terms of the Dow Transaction, and in connection with the transfer of the UCEPP PEP Transferee Participant's UCEPP Component "Accrued Benefit" (and, as applicable, an accrued benefit under a Minimum Benefit Structure) from the Prior Plan to this Plan, there shall be a transfer of assets and liabilities from the Prior Plan to this Plan.  Such transfer of assets and liabilities is expected to occur in April 2016, and the effectiveness of this Appendix is subject to such transfer; provided, further, the effect of any particular provision herein is subject to the transfer of a UCEPP PEP Transferee Participant's UCEPP Component "Accrued Benefit" (and, as applicable, an accrued benefit under a Minimum Benefit Structure) from the Prior Plan, and related assets and liabilities, occurring in the manner contemplated herein.  To the extent such transfer of assets and liabilities does not occur, this Appendix shall be of no effect and shall be null and void.

(m)     For avoidance of doubt, any beneficiary designation made by a UCEPP PEP Transferee Participant (or other applicable individual) under the Prior Plan shall not transfer to this Plan and shall have no effect hereunder.

**APPENDIX J-41, Dow (UCEPP PEP Component Transferees)**

J-166

APPENDIX J-42

### *J-42 Dow (Rohm & Haas Transferees)*

This Appendix J-42 shall apply to all individuals (i) who, as of October 5, 2015 ("Transfer Date"), transferred employment from The Dow Chemical Company ("Dow") to Blue Cube Operations, LLC ("Blue Cube"), a subsidiary of the Company, due to the spinoff of Dow's chlorine-related business to the Company as of such Transfer Date (the "Dow Transaction"), (ii) who, prior to the Dow Transaction, participated in the Rohm and Haas Company Retirement Plan ("R&S Plan"), and (iii) whose accrued benefit under the Applicable R&S Component (defined below) of the R&S Plan was hereby transferred to this Plan under this Appendix J-42 effective as of the Transfer Date in accordance with the transaction documents of the Dow Transaction.  Such individuals are referred to herein as the "R&S Active Transferee Participants."

This Appendix J-42 shall also apply to all individuals (i) who, prior to the Dow Transaction, participated in the R&S Plan as a terminated vested participant as of the Transfer Date, and (ii) whose accrued benefit under the Applicable R&S Component of the R&S Plan was hereby transferred to this Plan under this Appendix J-42 effective as of the Transfer Date in accordance with the transaction documents of the Dow Transaction.  Such individuals are referred to herein as the "R&S TV Transferee Participants."

Collectively, the R&S Active Transferee Participants and R&S TV Transferee Participants are referred to as the "R&S Transferee Participants."

For purposes of this Appendix, "Applicable R&S Component" refers to the benefit structure under the R&S Plan applicable to the R&S Transferee Participant, whether it be the "Standard", "Rider 1", "Rider 2", "Rider 3" or "Rider 4" benefit structure as applied (including, as applicable, any "Switcher" rules) to the R&S Transferee Participant under the R&S Plan.

With respect to R&S Active Transferee Participants, Blue Cube shall be deemed to be the Employing Company as of the Transfer Date.  For avoidance of doubt, there are no further accrual of benefits under this Appendix J-42 after the Transfer Date.

(a)     **Prior Plan**.  The R&S Plan, as sponsored by Dow or its affiliate, as in effect as of the Transfer Date.  For avoidance of doubt, (i) any changes to the R&S Plan adopted or effective after the Transfer Date shall have no effect under the Plan or this Appendix and (ii) for reference herein to the applicable rules of the Prior Plan, references to Dow under such rules shall be substituted with references to the Company where context requires.

(b)     **Eligibility**.  Except for the R&S Transferee Participants, there are no new entrants permitted under this Appendix after  the Transfer Date.

(c)     **Accrued Benefit as of Transfer Date**.  A R&S Transferee Participant's Accrued Benefit under the Plan as of the Transfer Date shall be equal to such individual's "accrued benefit" payable at Normal Retirement Age under the Applicable R&S Component of the Prior Plan as of the Transfer Date, as reflected on the Prior Plan records and as transferred to this Plan as described in paragraph (h) below.  There shall be no further accruals under this Appendix for a R&S Transferee Participant after the Transfer Date, and compensation and service with the Company shall not affect a R&S Transferee Participant's Accrued Benefit under this Appendix; provided, however, that a R&S Active Transferee Participant's  service with Company shall be taken into consideration for purposes of determining vesting and retirement eligibility under this Appendix.

(d)     **Vesting**.  A R&S Transferee Participant shall be fully vested in his Applicable R&S Component "Accrued Benefit" as of the Transfer Date.

**APPENDIX J-42, Dow (Rohm & Haas Transferees)**

J-167

(e)     **Time and Form of Payments**.  An R&S Transferee Participant's benefit under this Appendix shall be payable under the applicable benefit payment rules of the Applicable R&S Component as set forth in the Prior Plan (including, without limitation, such retirement eligibility provisions, available optional forms of payment, beneficiary designations, pre-retirement death benefits, and actuarial or other adjustments required based on the chosen benefit commencement date and optional form of payment).

(f)     **Miscellaneous Definitions**.

(1)     "Vesting Service" means the sum of a R&S Active Transferee Participant's Vesting Service under the Prior Plan as of the Transfer Date (as credited and determined on the records and terms of the Prior Plan), plus for each Plan Year thereafter, a R&S Active Transferee Participant shall be credited with one year of Vesting Service for each Plan Year in which 1,000 or more Hours of Service are credited to such R&S Active Transferee Participant and shall be credited with no Vesting Service for any Plan Year in which fewer than 1,000 Hours of Service are credited to such R&S Active Transferee Participant; provided, however, that Vesting Service shall be determined under the elapsed time method if the R&S Active Transferee Participant's Applicable R&S Component used such method.

Notwithstanding the foregoing, to the extent a R&S Active Transferee Participant did not earn one year of Vesting Service for the period from January 1, 2015 to the Transfer Date under the Prior Plan, such R&S Active Transferee Participant shall earn a year of Vesting Service for the 2015 Plan Year if his combined Hours of Service with Dow and the Company for the 2015 Plan Year is equal to or more than 1,000 Hours of Service; provided, however, that Vesting Service shall be determined under the elapsed time method if the R&S Active Transferee Participant's Applicable R&S Component used such method.  There shall be no duplication of Vesting Service for any Plan Year.

On and after the Transfer Date, the calculation of Vesting Service under this Appendix shall be subject to all of the applicable rules contained in the Prior Plan, including the rules concerning breaks in service.  For avoidance of doubt, any Vesting Service (or or any other service) reflected under this Appendix for periods of service recognized under the Prior Plan shall not count toward the service requirements under any other Appendix.

(2)     "Normal Retirement Age" shall mean the attainment of age 65.

(3)     Notwithstanding Article I of the Plan, the "or retires, whichever is later," clause in the definition of "Required Beginning Date" shall not apply to a R&S Active Transferee Participant to the extent such clause would not have applied to such R&S Active Transferee Participant under the Prior Plan.

(g)     **Other Applicable Provisions**.  Nothing herein shall be construed as increasing the benefit that would have otherwise been payable to a R&S Transferee Participant under the terms of the Prior Plan assuming (i) no transfer of the R&S Transferee Participant's benefit under the Prior Plan to this Plan, and (ii) R&S Transferee Participant's termination of employment from Dow as of the Transfer Date (or such earlier date as may have been applicable for a R&S TV Transferee Participant).  Nothing in this Appendix shall be construed as limiting the Company's ability to amend the provisions applicable to an Applicable R&S Component benefit structure  as provided pursuant to the Plan under this Appendix.

(h)     **Effective Date; Transfer of Assets and Liabilities from Prior Plan**.  Subject to the following, the effective date of this Appendix shall be as of the Transfer Date.  Pursuant to the terms of the Dow Transaction, and in connection with the transfer of the R&S Transferee Participant's Applicable R&S Component "Accrued Benefit" from the Prior Plan to this Plan, there shall be a transfer of assets and

**APPENDIX J-42, Dow (Rohm & Haas Transferees)**

liabilities from the Prior Plan to this Plan.  Such transfer of assets and liabilities is expected to occur in April 2016, and the effectiveness of this Appendix is subject to such transfer; provided, further, the effect of any particular provision herein is subject to the transfer of a R&S Transferee Participant's Applicable R&S Component "Accrued Benefit" from the Prior Plan, and related assets and liabilities, occurring in the manner contemplated herein.  To the extent such transfer of assets and liabilities does not occur, this Appendix shall be of no effect and shall be null and void.

(i)     For avoidance of doubt, any beneficiary designation made by a R&S Transferee Participant (or other applicable individual) under the Prior Plan shall not transfer to this Plan and shall have no effect hereunder.

**APPENDIX J-42, Dow (Rohm & Haas Transferees)**

J-169