**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI**

| | |
|---|---|
| LOU ANN LANDEL and ALVIN L. LEWIS JR., on behalf of themselves and all other similarly situated,<br><br><br>Plaintiffs,<br><br>v.<br><br>OLIN CORPORATION, THE PENSION AND CEOP ADMINISTRATIVE COMMITTEE; and JOHN/JANE DOES 1–10,<br><br>Defendants. | Civil Action No.: 4:25-cv-00096-JAR |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

**POSPISIL SWIFT, LLC**
Michael D. Pospisil #49139MO
1600 Genessee Street, Suite 340
Kansas City, MO 64102
Tel: (816) 895-6440
Fax: (816) 895-9161
Email: mdp@pslawke.com

**SIRI & GLIMSTAD LLP**
Oren Faircloth
Kimberly Dodson
745 Fifth Avenue, Suite 500
New York, NY 10151
Tel: (212) 532-1091
Fax: (646) 417-5967
Email: ofaircloth@sirillp.com
Email: kdodson@sirillp.com

*Attorneys for Plaintiff and Proposed Class*

Dated: June 30, 2025

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES..................................................................................................iii

I.      INTRODUCTION ................................................................................................... 1

II.     BACKGROUND ..................................................................................................... 4

        A.      ERISA'S Actuarial Equivalence Requirements Are Meant to
                Protect Participants and Spouses ............................................................... 4

        B.      The Plan and Its Outdated Actuarial Formulas Negatively
                Impact Plaintiffs and Retirees ................................................................... 6

        C.      Plaintiffs Allege Violations of § 1055(d) and for Breach of
                Fiduciary Duties......................................................................................... 7

III.    ARGUMENT ........................................................................................................... 9

        A.      Legal Standard ........................................................................................... 9

        B.      Defendants' Statute of Limitations Argument Requires a "Clear
                Repudiation" of Rights, Which Never Occurred, and Ignores the
                Realities of Pension Plan Complexity....................................................... 9

        C.      Plaintiffs State a Claim Under 29 U.S.C. § 1055................................... 12

                1.      Plans Cannot Use Decades-Old Data to Calculate the Present
                        Value of an "Actuarially Equivalent" Benefit Today..................... 13

                2.      Most Courts Have Allowed These Claims to Proceed................... 14

                3.      Treasury Regulations Support a Reasonableness Requirement...... 17

                4.      Defendants' Remaining Arguments Are Unsupported and
                        Unpersuasive.................................................................................. 18

                5.      Plaintiffs' Case Law Is Persuasive and Directly on Point............. 19

        D.      Plaintiffs Allege a Breach of Fiduciary Duty......................................... 22

                1.      Defendants' Cited Cases Are Inapposite and Do Not Justify
                        Immunity......................................................................................... 23

                2.      Olin Is Liable as a Functional Fiduciary for Failing to
                        Monitor Its Appointed Fiduciaries ................................................ 24

3.      Plaintiffs Allege a Prohibited Transaction Under ERISA .............................. 25

4.      Plaintiffs Allege Plan Losses and Profits Recoverable Under § 1132(a)(2) ................................................................................................ 27

IV.      CONCLUSION .................................................................................................. 29

CERTIFICATE OF SERVICE ..................................................................................... 31

## **TABLE OF AUTHORITIES**

<u>**Cases**</u>

*Adams v. U.S. Bancorp*,
  635 F. Supp. 3d 742 (D. Minn. 2022) ........................................................... 5, 15, 17, 21

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).................................................................................................... 9

*Belknap v. Partners Healthcare Sys.*,
  No. 19-cv-11437, 2020 U.S. Dist. LEXIS 139187, at *4 (D. Mass. Aug. 5, 2020)....... 15, 20,21

*Blankenship v. Chamberlain*,
  695 F. Supp. 2d 966 (E.D. Mo. 2010)........................................................................ 11

*Boeckman v. A.G. Edwards, Inc.*,
  461 F. Supp. 2d 801 (S.D. Ill. 2006) ......................................................................... 12

*Boggs v. Boggs*,
  520 U.S. 833 (1997)............................................................................................ 5, 12, 17

*Braden v. Wal-Mart Stores, Inc.*,
  588 F.3d 585 (8th Cir. 2009) ..................................................................................... 26

*Cement & Concrete Workers District Council Pension Fund v. Ulico Casualty Co.*,
  387 F. Supp. 2d 175 (E.D.N.Y. 2005) ....................................................................... 23

*Coyne & Delany Co. v. Selman*,
  98 F.3d 1457 (4th Cir. 1996)...................................................................................... 25

*Covic v. FedEx Corp.*,
  No. 23-cv-02593, 2024 U.S. Dist. LEXIS 242143 (W.D. Tenn. Sep. 18, 2024) ...................... 15

*Cruz v. Raytheon Co.*,
  435 F. Supp. 3d 350 (D. Mass. 2020) ........................................................................ 15

*Delker v. Mastercard Int'l, Inc.*,
  21 F.4th 1019 (8th Cir. 2022)..................................................................................... 24

*Drummond v. S. Co. Servs., Inc.*,
  No. 22-cv-0174, 2023 U.S. Dist. LEXIS 236565 (N.D. Ga. Sep. 8, 2023).............................. 15

*Duncan v. Walker*,
  533 U.S. 164 (2001)................................................................................................... 12

*Duffy v. Anheuser-Busch Cos., LLC*,
    449 F. Supp. 3d 882 (E.D. Mo. 2020) ................................................................... 1, 14, 15, 19

*Duke v. Luxottica U.S. Holdings Corp.*,
    No. 2:21-cv-6072, 2024 U.S. Dist. LEXIS 216345, at *3 (E.D.N.Y. Nov. 27, 2024) ........ 15, 28

*Esden v. Bank of Bos.*,
    229 F.3d 154 (2d Cir. 2000) ...................................................................................... 13

*Feinberg v. T. Rowe Price Group, Inc.*,
    No. MJG-17-0427, 2018 U.S. Dist. LEXIS 140709, at *16 (D. Md. Aug. 20, 2018) .............. 23

*Fifth Third Bancorp v. Dudenhoeffer*,
    573 U.S. 409 (2014) ................................................................................................. 22

*Franklin v. Duke Univ.*,
    No. 1:23-cv-833, 2024 U.S. Dist. LEXIS 73345, at *7 (M.D.N.C. Apr. 23, 2024) ........... 15, 20

*Geiger v. Kawaauhau* (*In re Geiger*),
    113 F.3d 848 (8th Cir. 1997) ................................................................................. 14, 18

*Hamrick v. E.I. DU Pont de Nemours & Co.*,
    No. 23-238-JLH, 2024 U.S. Dist. LEXIS 17497, at *10 (D. Del. Jan. 31, 2024) .................... 15

*Harris Trust & Sav. Bank v. Salomon Smith Barney Inc.*,
    530 U.S. 238 (2000) .................................................................................................. 26

*Herndon v. Huntington Ingalls Industries*,
    No. 4:19-cv-52, 2020 U.S. Dist. LEXIS 102338, at *5 (E.D. Va. Feb. 20, 2020) .............. 15, 17

*Huggins v. FedEx Ground Package Sys., Inc.*,
    592 F.3d 853 (8th Cir. 2010) ..................................................................................... 9

*Hughes v. Nw. Univ.*,
    595 U.S. 170 (2022) ............................................................................................... 23, 24

*Larsen v. Cigna Corp.*,
    2006 U.S. Dist. LEXIS 33134 (D.S.D. May 18, 2006) ............................................... 28, 29

*Leigh v. Engle*,
    727 F.2d 113 (7th Cir. 1984) .................................................................................... 25

*Lockheed Corp. v. Spink*,
    517 U.S. 882 (1996) ............................................................................................... 26, 27

iv

*Loudner v. United States*,
   108 F.3d 896 (8th Cir. 1997)...................................................................................... 9

*King Cnty. Emps.' Ass'n v. State Emps.' Ret. Bd.*,
   336 P.2d 387 (Wash. 1959) ...................................................................................... 13

*Martin v. Consultants & Admin., Inc.*,
   966 F.2d 1078 (7th Cir. 1992)................................................................................... 12

*Masten v. Metro. Life Ins. Co. Emple. Bens. Comm.*,
   543 F. Supp. 3d 25 (S.D.N.Y. 2021) .................................................................... 5, 15

*Osberg v. Foot Locker*,
   862 F.3d 198 (2d Cir. 2017) ...................................................................................... 10

*Pizza Pro Equip. Leasing v. Comm'r*,
   147 TC 394 (2016)....................................................................................................... 5

*Reichert v. Bakery*,
   No. 23-cv-12343, 2024 U.S. Dist. LEXIS 113803 (E.D. Mich. Apr. 17, 2024)................. 15, 20

*Romero v. Allstate Corp.*,
   404 F.3d 212 (3d Cir. 2005) ...................................................................................... 10

*Scalia v. WPN Corp.*,
   417 F. Supp. 3d 658 (W.D. Pa. 2019) ....................................................................... 25

*Scott v. AT&T Inc.*,
   No. 20-cv-07094, 2022 U.S. Dist. LEXIS 115123 (N.D. Cal. June 29, 2022)........................ 15

*Secretary of Labor v. Macy's, Inc.*,
   No. 17-cv-541, 2021 U.S. Dist. LEXIS 221603 (S.D. Ohio Feb. 10, 2022) ........................... 23

*Silva v. Evonik Corp.*,
   No. 20-cv-2202, 2020 U.S. Dist. LEXIS 250206, at *21 (D.N.J. Dec. 30, 2020).................... 25

*Sisseton-Wahpeton Sioux Tribe v. United States*,
   895 F.2d 588 (9th Cir.)................................................................................................ 9

*Skrtich v. Pinnacle W. Capital Corp.*,
   No. 22-cv-01753, 2023 U.S. Dist. LEXIS 136862, at *8 (D. Ariz. Aug. 7, 2023) .................. 15

*Smith v. Rockwell Automation*, Inc.,
   438 F. Sup. 3d 912 (E.D. Wis. 2020) ........................................................ 15, 17, 18, 19

v

*Smith v. U.S. Bancorp,*
  No. 18-cv-3405, 2019 U.S. Dist. LEXIS 107481 (D. Minn. June 26, 2019) ..................... 15, 24

*Stark v. Healthy All. Life Ins. Co.,*
  No. 10-cv-1141, 2010 U.S. Dist. LEXIS 112742 (E.D. Mo. Oct. 22, 2010) ..................... 28, 29

*Stephens v. US Airways Group, Inc.,*
  644 F.3d 437 (D.C. Cir. 2011) ................................................................................... 5, 13

*Stodghill v. Wellston School Dist.,*
  512 F.3d 472 (8th Cir. 2008) ......................................................................................... 9

*Tibble v. Edison Int'l,*
  575 U.S. 523 (2015) ......................................................................................... 12, 23, 24

*Torres v. Am. Airlines, Inc.,*
  416 F. Supp. 3d 640 (N.D. Tex. 2019) ...................................................................... 15, 17

*TRW Inc. v. Andrews,*
  534 U.S. 19 (2001) ....................................................................................................... 16

*Union Pac. R.R. Co. v. Beckham,*
  138 F.3d 325 (8th Cir. 1998) ......................................................................................... 10

*Urlaub v. CITGO Petro. Corp.,*
  750 F. Supp. 3d 863 (N.D. Ill. 2024) ..................................................................... *passim*

*Whetstone v. Howard Univ.,*
  No. 23-cv-2409, 2024 U.S. Dist. LEXIS 164095, at *15 (D.D.C. Sep. 12, 2024) ....... 11, 15, 23

*Wildman v. Am. Century Servs., LLC,*
  237 F. Supp. 3d 918 (W.D. Mo. 2017) ........................................................................... 12

*Wright v. Oregon Metallurgical Corp.,*
  360 F.3d 1090 (9th Cir. 2004) .................................................................................. 26, 27

*Young v. Verizon's Bell Atlantic Cash Balance Plan,*
  615 F.3d 808 (7th Cir. 2010) ......................................................................................... 10

**Statutes**

29 U.S.C. § 1002(b) ............................................................................................................ 12

29 U.S.C. § 1002(21)(A) ..................................................................................................... 24

29 U.S.C. § 1022(b) ............................................................................................................ 14

29 U.S.C. § 1054(c)(3) ............................................................................................ 20

29 U.S.C. § 1054(g) ................................................................................................. 18

29 U.S.C § 1055 ................................................................................................ *passim*

29 U.S.C § 1055(d) ........................................................................................... *passim*

29 U.S.C § 1055(d)(1) ............................................................................................... 4

29 U.S.C § 1055(d)(1)(B) .................................................................................... 5, 15

29 U.S.C § 1055(e) ............................................................................................. 5, 6, 8

29 U.S.C § 1055(g) ........................................................................................... 12, 19

29 U.S.C § 1082(a) ................................................................................................. 14

29 U.S.C § 1102(a)(2) ............................................................................................. 24

29 U.S.C. § 1106(a)(1) ............................................................................................ 25

29 U.S.C. § 1106(a)(1)(C) ....................................................................................... 26

29 U.S.C. § 1106(a)(1)(D) ....................................................................................... 26

29 U.S.C. § 1106(b)(1) ............................................................................................ 26

29 U.S.C. § 1109 ....................................................................................................... 4

29 U.S.C. § 1109(a) ................................................................................................. 28

29 U.S.C. § 1132(a)(1)(B) ....................................................................................... 14

29 U.S.C. § 1132(a)(2) .................................................................................... 3, 4, 27

29 U.S.C § 1391(a) ................................................................................................. 14

Reorganization Plan No. 4 of 1978
 43 Fed. Reg. 47713 (Aug. 10, 1978) ..................................................................... 17

Retirement Equity Act of 1984
 53 Fed. Reg. 31837 (Aug. 22, 1988) ..................................................................... 17

## **Regulations**

26 C.F.R. § 1.401(a)-11(b)(2) ............................................................................................... 17, 20

26 C.F.R. § 1.401(a)-14(c)(2) .................................................................................................. 17

26 C.F.R. § 1.411(d)-3(g)(1) .................................................................................................... 17

## **Rules**

Fed. R. Civ. P. (12)(b)(6)...................................................................................................... 8, 11

## **Other Authorities**

Actuarial Standards Board, Actuarial Standard of Practice ........................................................... 13

*Schwartzmann* & Garfield, Education & Examination Comm. of the Society of Actuaries, Actuarially Equivalent Benefits 1, EA1-24-91 (1991) .......................................................... 5, 13

## I.    **INTRODUCTION**

Defendants[1] ask this Court to adopt an interpretation of ERISA that would read the phrase "actuarial equivalent" out of the statute entirely. Under their view, so long as a plan labels its assumptions as "actuarial," they need not be reasonable, a position that defies the plain text, the structure, and the purpose of ERISA, and would strip participants and beneficiaries of a core protection Congress specifically sought to safeguard. This Court should reject such a reading, just as it did in *Duffy v. Anheuser-Busch Cos.*, LLC, 449 F. Supp. 3d 882 (E.D. Mo. 2020), where the Hon. Stephen R. Clark found that nearly identical allegations—that a plan's use of decades-old mortality tables and fixed interest rates violated ERISA's actuarial equivalence requirement—were sufficient to state a claim under ERISA § 205(d), 29 U.S.C. § 1055(d). The reasoning in *Duffy* squarely applies here, and the vast majority of courts across the country have reached a similar conclusion. This Court should do the same.

Like the plaintiff in *Duffy*, Plaintiffs Lou Ann Landel and Alvin Lewis allege that the Olin Corporation Employees' Pension Plan ("Plan") violates ERISA's actuarial equivalence mandate by using conversion formulas based on mortality data from the 1960s and 70s, which, when coupled with a 5% interest rate, results in fewer monthly benefits than if contemporary mortality were used. ERISA requires that qualified joint and survivor annuities ("JSAs") be the actuarial equivalent of the single life annuity ("SLA") the participant was offered. *See* 29 U.S.C. § 1055(d). That way, married participants get the same value of benefits as single retirees and are not penalized for choosing a benefit form that is meant to protect their spouse after they pass away. To ensure accuracy, the equivalence between a qualified JSA and SLA must be calculated based on up-to-date actuarial assumptions that reflect the experience of the actual population for whom the

---

[1] "Defendants" includes Olin Corporation ("Olin") and the Pension and CEOP Administrative Committee (the "Committee").

calculations are performed. By understating the present value of JSA benefits through the use of outdated mortality data, and by failing to review those formulas to ensure they resulted in benefits that were actuarially equivalent, Defendants violated ERISA.

The concept of actuarial equivalence is imbued with an inherent standard of reasonableness because actuaries are expected to base their projections on future conditions using the most accurate data available at the time the calculation is performed. The regulations discussing actuarial assumptions support this by repeatedly referencing actuarial assumptions that are "reasonable." If, as Defendants suggest, ERISA imposed no constraints on the formulas used to calculate "equivalence," a plan could use mortality data from the 1600s or an interest rate of 99% and still claim compliance. And if all that was required to satisfy § 1055(d)'s requirements was to list the assumptions in the plan document, as Defendants argue, then plan sponsors would have unfettered discretion to use any assumptions they fancy. Reading § 1055(d) that way would not only defy common sense but also make ERISA's "definitely determinable" requirement surplusage, which would defy basic principles of statutory interpretation. Plaintiffs are not suggesting that benefit formulas change with every fluctuation in the interest rate. In fact, ERISA does not allow that. But that does not mean employers have a lifetime pass to ignore benefit formulas, even when they are 50 years old and shortchanging married participants on their monthly payments. It simply cannot be that plans *never* need to update outdated mortality data.

Olin's statute of limitations argument fails because the Plan's two-year limitation period does not begin until a participant receives information that clearly repudiates the rights they seek to assert, and Plaintiffs never received such notice. Their benefit statements disclosed the payment amounts, not the formulas (or the underlying outdated mortality table) used. The plan document did not disclose the underlying mortality data, meaning no reasonable participant, or even an expert

2

actuary, could reverse-engineer those assumptions without access to internal Plan data. Nor did Plaintiffs know (nor could they have known) that Defendants were shirking their fiduciary duties to review and update the Plan's assumptions each year. Those breaches occurred annually, and the limitations period did not begin to run until Plaintiffs first consulted counsel. At a minimum, these fact-intensive questions cannot be resolved on a motion to dismiss. Further, the Plan's limitations provision applies to "claims for benefits under the Plan," and Plaintiffs bring no such claim. They challenge the legality of the Plan's terms under ERISA, not their application in determining benefits.

Plaintiffs' claims under ERISA § 502(a)(2) and (a)(3) for fiduciary breaches are also well-pled. They are not just challenging how the Plan was designed but how it was administered. A fiduciary's duty to administer a plan in compliance with ERISA overrides any obligation to follow unlawful plan terms. Defendants' claim that they simply followed the Plan is no defense where the Plan's terms themselves violate ERISA. Otherwise, fiduciaries could insulate themselves from claims simply by arguing "the plan made me do it." Courts have rejected such an outcome. Further, Olin cannot escape liability by claiming it did not administer the Plan. ERISA also imposes a proactive duty on plan sponsors to monitor named fiduciaries and ensure ongoing ERISA compliance. Plaintiffs allege that Defendants repeatedly failed to review the formulas used to determine benefits, resulting in 50-year-old mortality data being used to shortchange married retirees and their spouses. Worse, by underpaying survivor benefits, Defendants diverted value into Olin's own coffers, reducing its own contributions, and pocketing interest on the money it never had to deposit into the Plan. That kind of diversion is a classic equitable restoration claim under ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2).

Finally, Defendants argue that Plaintiffs allege no loss to the Plan, but that argument misses the mark. ERISA § 409, 29 U.S.C. § 1109, permits recovery of not only losses, but "any profits" the fiduciary gained through use of plan assets. Plaintiffs allege both. Olin did not contribute as much money to the Plan, and it benefited from keeping money that should have been paid to the Plan. Accordingly, Plaintiffs' claims under §§ 1109 and 1132(a)(2) can proceed. Defendants' motion to dismiss should be denied in full.

## II.    BACKGROUND

### A. ERISA's Actuarial Equivalence Requirements Are Meant to Protect Participants and Spouses

Congress enacted ERISA to protect workers and their families. *See Boggs v. Boggs*, 520 U.S. 833, 845 (1997) ("The principal object of the statute is to protect plan participants and beneficiaries."). Before ERISA, many widows (and their dependents) were left without income after their spouse died because pension payments typically stopped at the worker's death. To address this, ERISA requires that defined benefit pension plans offer qualified JSAs[2]: a form of benefit that continues to pay after the participant's death to the surviving spouse. *See Boggs,* 520 U.S. at 845 ("The statutory object of the qualified joint and survivor annuity provisions, along with the rest of [29 U.S.C.] § 1055, is to ensure a stream of income to surviving spouses."). 29 U.S.C. § 1055. Critically, plans must not simply offer the JSA, but the JSA must be the default payment for married participants unless both the participant and the spouse explicitly opt to take the benefit in a different form.

A central requirement under ERISA is that when pension plans offer JSA benefits, those optional benefits must be the "actuarial equivalent" to the value of the SLA that the participant

---

[2] A "qualified" JSA is any JSA with a survivor portion that is "not less than 50 percent of (and [] not greater than 100 percent of) the amount of the annuity" payable during the joint lives of the participant and spouse. *See* 29 U.S.C. § 1055(d)(1).

would have received if he or she were single. In other words, ERISA ensures that the value of a married employee's earned pension is not diminished by the choice to protect his or her surviving spouse. Section 1055(d) requires that qualified JSAs be "the actuarial equivalent of a single annuity for the life of the participant." 29 U.S.C. § 1055(d)(1)(B); *see also id.*, § 1055(e) (mandating that qualified preretirement survivor annuities ("QPSAs") have at least the same actuarial value as the amount that would be payable as a survivor annuity under the qualified JSA).

"Actuarial equivalence" is a term of art with an established meaning (*Stephens v. US Airways Group, Inc.*, 644 F.3d 437, 440 (D.C. Cir. 2011)) and "special attention must be paid to the actuarial assumptions underlying the computations." *Pizza Pro Equip. Leasing v. Comm'r*, 147 TC 394, 412 (2016), *aff'd*, 719 F. App'x 540 (8th Cir. 2018). Simply put, actuarial equivalence means that two different forms of benefit have the same present economic value when calculated using reasonable assumptions about longevity (mortality rates) and the time value of money (interest rates).[3]

By using the phrase "actuarial equivalent," Congress imposed a requirement to analyze the value of each form of benefit under the expected standards of the profession, not just any mathematical equation. If plans were free to choose any combination of assumptions, they could, for example, choose a mortality table from the 1600's or a 99% discount rate.[4] The phrase

---

[3] *See Stephens*, 644 F.3d, at 440 (citing *Schwartzmann & Garfield*, at 11 ("The interest and mortality assumptions play a key role in determining the magnitude of the actuarial equivalence factor. Periodically, the assumptions used must be reviewed and modified so as to ensure that they continue to fairly assess the cost of the optional basis of payment.").

[4] *See Masten v. Metro. Life Ins. Co. Emple. Bens. Comm.*, 543 F. Supp. 3d 25, 34 (S.D.N.Y. 2021) (finding that "a definition so 'unmoored from any concept of reasonableness ... could conceivably produce absurdly unfair results,' such as the use of a mortality table from 1693"); *Adams v. U.S. Bancorp*, 635 F. Supp. 3d 742, 749 (D. Minn. 2022) ("plans could apply extreme [early retirement factors], such as a 99% benefit reduction if a participant retires one year early.").

"actuarial equivalent" in § 1055 would be unnecessary surplusage. Treasury regulations further clarify the requirement that reasonable assumptions be used, repeatedly emphasizing that actuarial assumptions used to calculate benefits must be reasonable and regularly updated to reflect current demographic and economic realities. *See* First Amended Complaint, ECF 17 ("FAC"), ¶ 47. Thus, using outdated or unrealistic mortality tables or interest rates undermines ERISA's protective purpose, unlawfully reduces retirement benefits, and violates clear statutory and regulatory requirements. *Id.*, ¶ 86.

**B. The Plan and Its Outdated Actuarial Formulas Negatively Impact Plaintiffs and Retirees**

The Olin Corporation Employees' Pension Plan (the "Plan") is a defined benefit Plan that promises to pay retirees a monthly pension benefit throughout their lifetime. *See* FAC, ¶ 57. Participants are entitled to receive their pension benefits as an SLA, qualified JSA, or another form. *Id.*, ¶¶ 7, 58. If a participant passes away before retirement, their spouse can receive a "Death Benefit" (i.e., a QPSA). *Id.*, ¶ 8. To determine the monthly amount of participant's JSA or QPSA, Defendants use formulas based on mortality tables and interest rates. *Id.*, ¶ 15. However, the formulas Defendants use are based on outdated, unreasonable assumptions. *Id.* Specifically, the Plan uses formulas based on mortality data from the 1960s and 1970s, known as the 1971 Group Annuity Mortality Table ("71GAM") and the Uninsured Pensioners 1984 table ("UP-84"). *Id.*, ¶ 61. These tables were created many decades ago when people had shorter life expectancies due to less advanced healthcare and lifestyle differences. *Id.*, ¶ 71.

As alleged, if the Plan used updated information from modern mortality tables and reasonable current interest rates, retirees would receive higher monthly payments than they currently do using the outdated formulas. *Id.*, ¶¶ 82–84. Modern mortality tables, such as those regularly updated by the Society of Actuaries ("SOA") and recommended by the Department of

Treasury, show that people today generally live significantly longer than predicted by tables from the 1960s and 1970s. Because a retiree today generally lives nearly five years longer than a retiree from the 1970s, using outdated assumptions to determine survivor benefits causes the Plan to underestimate how long retirees and their spouses will likely live, resulting in fewer monthly benefits. *See id.*, ¶¶ 12, 15, 85. By continuing to use formulas based on decades-old data, Defendants systematically undervalue the retirement benefits of married retirees, meaning participants and their spouses receive smaller monthly pension payments than they would if the Plan used updated, reasonable assumptions. *Id.*, ¶ 62.

The Plan documents, including Appendix J, do not identify the specific actuarial assumptions or mortality tables used to calculate the pension benefits for Plaintiffs. Instead, the Plan's definition of "Actuarial Equivalent" references Appendix J, which sets forth generalized conversion factors without stating the underlying mortality tables used to determine benefits. *See* Plan Document, ECF 21-1, PageID 853; *see also* Appendix J, PageID 952–1122. Appendix J does ***not*** explicitly disclose the actuarial assumptions or mortality tables used to calculate pension benefits for Plaintiffs and, instead, provides conversion factors without detailing the underlying actuarial data. Thus, the precise actuarial assumptions underlying Plaintiffs' benefit calculations are not disclosed in Appendix J.

### C.  Plaintiffs Allege Violations of § 1055(d) and for Breach of Fiduciary Duties

Defendants' outdated assumptions harmed Plaintiffs by significantly reducing the monthly pension benefits they receive. *See* FAC, ¶¶ 83–84. For Plaintiff Landel, who is receiving a Death Benefit or QPSA (which uses the same formulas as a 50% qualified JSA), she was entitled to receive an SLA of $46.49 each month. *Id.*, ¶ 83. However, if her benefits were calculated using updated and reasonable assumptions such as the Treasury assumptions that were applicable at the time her benefits would be $48.63 or 4.16% more each month. *Id.* Similarly, Plaintiff Lewis was

entitled to receive an SLA of $1,300 and opted to ensure his spouse was fully protected by selecting a 100% JSA that pays him $1,058.78 each month. If his benefits were determined using updated and reasonable assumptions such as the Treasury assumptions that were applicable at the time he began collecting benefits, his monthly benefit payment would be roughly $1,126.41 or 6.68% higher per month. *Id.*, ¶ 84. This systematic undervaluation of Plaintiffs' retirement benefits directly impacts their financial well-being, resulting in reduced monthly income, and, over time, these reductions accumulate to substantial financial losses.

Defendants also breached their fiduciary duties by continuing to administer a Plan that violates ERISA's actuarial equivalence requirements and by failing to periodically review the terms of the Plan to ensure compliance with ERISA. *See* FAC, ¶¶ 118, 121. As a result, Defendants retained additional monies by reducing the minimum amount contributed to the Plan, causing Plaintiffs and the Class to receive less than the full value of their protected benefits under ERISA. *Id.*, ¶¶ 121–23.

Plaintiffs bring claims on behalf of themselves and similarly situated participants. FAC, ¶¶ 125–26. They bring two causes of action pursuant to ERISA §§ 502(a)(3). First, they bring claims under ERISA § 205(d) and (e), 29 U.S.C. § 1055(d) and (e), for failing to pay benefits in an amount actuarially equivalent to the SLA to which they were entitled. Second, they bring claims under ERISA §§ 404 and 406 for breaches of fiduciary duty. Plaintiffs seek all available and appropriate remedies, including but not limited to: declaratory and injunctive relief, accounting, disgorgement, restitution, surcharge, and relief to the Plan from the Plan's fiduciaries for their violations of ERISA. *Id.*, Prayer for Relief, ¶¶ B–N.

III.   **ARGUMENT**

   **A.  Legal Standard**

   Plaintiffs' allegations as outlined above clearly meet the threshold to survive Defendants'

motion to dismiss. In ruling on a motion to dismiss under Rule 12(b)(6), the Court "must accept

as true all of the complaint's factual allegations and view them in the light most favorable to the

Plaintiff." *Stodghill v. Wellston School Dist.*, 512 F.3d 472, 476 (8th Cir. 2008) (cleaned up). When

ruling on a motion to dismiss, a court "must liberally construe a complaint in favor of the

plaintiff[.]" *Huggins v. FedEx Ground Package Sys., Inc.*, 592 F.3d 853, 862 (8th Cir. 2010). "A

claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw

the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*,

556 U.S. 662, 678 (2009). Plaintiffs need not demonstrate that their claims are probable, only that

they are more than just possible. *Id*.

   **B.  Defendants' Statute of Limitations Argument Requires a "Clear Repudiation"
        of Rights, Which Never Occurred, and Ignores the Realities of Pension Plan
        Complexity**

   Starting the clock on Plaintiffs' first payment contradicts the Plan's own terms. Defendants

ask the Court to start the two-year clock when Plaintiffs received their first pension check in 2019,

regardless of whether they had any inkling that those payments were unlawfully reduced. Def. Br.,

8–10. But the Plan's unambiguous text says otherwise: the limitations period begins on the date

the participant "receives information that constitutes ***a clear repudiation of the rights*** the

individual is seeking to assert." Plan § 10.1(e), PageID 909 (emphasis added)). There was no such

repudiation here. Plaintiffs received benefit amounts fully consistent with the Plan's face-value

formulas. Neither the pre-retirement calculation sheets nor the summary benefit statements

disclosed the underlying 1960s–70s mortality tables or the fixed 5% interest rate. Receiving a

9

check that "looks right" under the Plan's stated terms is not a denial of benefits, much less a "clear repudiation" of any legal right.[5]

Even under the federal "discovery rule," Plaintiffs' claims did not accrue until they "discover[ed], or with due diligence should have discovered, the injury that forms the basis of the litigation." *Union Pac. R.R. Co. v. Beckham*, 138 F.3d 325, 330 (8th Cir. 1998). Courts applying this rule refuse to force "participants and beneficiaries likely unfamiliar with the intricacies of pension plan formulas and the technical requirements of ERISA to become watchdogs over potential plan errors and abuses." *Romero v. Allstate Corp*., 404 F.3d 212, 224 (3d Cir. 2005). Plaintiffs, here, could not have discovered that Olin was using archaic tables and stale interest rates simply by reading their benefit statements. Even an actuary would face insurmountable reverse-engineering hurdles without access to internal Plan data. Until Plaintiffs consulted counsel and obtained Plan documents showing the outdated assumptions, no inquiry would have put them on notice.

Courts confirm that the clock does not start at first payment. In *Osberg v. Foot Locker*, 862 F.3d 198, 206–08 (2d Cir. 2017), the Second Circuit squarely rejected the notion that receipt of a benefit check alone triggers the limitations period. There, the court explained that participants would "have had to make a sophisticated chain of deductions about the meaning of the information on their statements and the mechanics underlying their benefits, with the opaque guidance contained in the SPD as their guide." *Id.*, 207. Requiring retirees to engage in what the court called "a heroic chain of deductions[,]" (*id.*, 208), simply to detect an actuarial-equivalence violation is

---

[5] *See Loudner v. United States*, 108 F.3d 896, 901 n.2 (8th Cir. 1997) ("the cause of action does not accrue until the beneficiary 'has knowledge of the repudiation.'" (citing *Sisseton-Wahpeton Sioux Tribe v. United States*, 895 F.2d 588, 593 (9th Cir.), *cert. denied*, 498 U.S. 824 (1990)); *see also Young v. Verizon's Bell Atlantic Cash Balance Plan*, 615 F.3d 808, 816 (7th Cir. 2010) (no repudiation when the benefit calculation was consistent with plan's terms).

incompatible with ERISA's protective scheme. Here, the Plan's assumptions, based on 1960s–70s mortality tables and a fixed 5% rate, were no more "apparent" to Plaintiffs than those in *Osberg*.

Similarly, district courts across the country have held that, absent disclosure of the underlying data, the limitations clock remains tolled. In *Whetstone v. Howard Univ.*, No. 23-cv-2409, 2024 U.S. Dist. LEXIS 164095, at *15 (D.D.C. Sep. 12, 2024), Judge Alikhan rejected the defendant's argument that the plaintiff's claim was barred by the statute of limitations, concluding that "plan participants are often the people 'least likely to have a clear understanding of the terms of the pension plan and their application to [the] case,' " and that a claim does not accrue when the Plan document itself omits the formula used for SLA-to-JSA conversions. Likewise, in *Urlaub v. CITGO Petro. Corp.*, 750 F. Supp. 3d 863, 871 (N.D. Ill. 2024), the court denied summary judgment because benefit packets alone were insufficient to inform the plaintiffs that their benefits were not actuarially equivalent. The same reasoning compels refusal to start the clock here: Plaintiffs could not have suspected a violation until they obtained Plan documents showing the outdated mortality data.

Even if actuaries review the Plan, its assumptions can only be *inferred*, not plainly known, and, tellingly, Defendants themselves cannot consistently identify them. They claim that Plaintiff could have simply reviewed the Plan to determine their benefits are "based on" the 1983 GAM Table and a 9.5% rate (*see* Def. Br., 9), even though the Plan uses neither in its conversion formula for Plaintiffs' benefits. FAC, ¶¶ 56–59. If Defendants are uncertain as to which assumptions were used to determine benefits, how could untrained participants without access to the underlying assumptions have discerned any discrepancy years before consulting counsel? Whether and when Plaintiffs knew (or should have known) of the actuarial equivalence violation turns on fact-intensive issues of notice, disclosure, and expertise that cannot be resolved on a Rule 12(b)(6)

11

motion. *See Blankenship v. Chamberlain*, 695 F. Supp. 2d 966, 971 (E.D. Mo. 2010) ("an affirmative defense based on a statute of limitations that requires a factual inquiry is not amenable to resolution on a motion to dismiss").

Independently, Plaintiffs' claims remain timely because ERISA fiduciaries owe a *continuing duty* to act prudently, so each failure to review or update unlawful assumptions constitutes a *new* breach. *See Wildman v. Am. Century Servs., LLC*, 237 F. Supp. 3d 918, 922–24 (W.D. Mo. 2017) (quoting *Boeckman v. A.G. Edwards, Inc.*, 461 F. Supp. 2d 801, 814–15 (S.D. Ill. 2006)). Under this doctrine, every year Olin neglected to correct its antiquated mortality tables and fixed-rate formula gave rise to a fresh ERISA violation. *See Tibble v. Edison Int'l*, 575 U.S. 523, 529 (2015) (fiduciary duties are ongoing); *Martin v. Consultants & Admin., Inc.*, 966 F.2d 1078, 1087–88 (7th Cir. 1992) ("The continuing nature of a trustee's duty under ERISA" triggers new claims for recurrent failures). Thus, even if Plaintiffs' original claims had accrued upon first payment, each subsequent breach revives their right to challenge the Plan's unlawful terms.

### C.  Plaintiffs State a Claim Under 29 U.S.C. § 1055

ERISA § 1055(d) mandates that qualified JSAs and QPSAs be "the actuarial equivalent" of the single-life annuity a participant earns. That phrase is not mere decoration; it embodies Congress's intent that benefit valuations rest on *reasonable* actuarial assumptions, not arbitrary or antiquated formulas. If any plan-listed assumption, however outdated, automatically sufficed—as Defendants argue—then "actuarial equivalent" would be surplusage and § 1055(d) and (g) would be meaningless. Such a reading violates basic canons of statutory construction: courts must "give effect…to every clause and word of a statute." *Duncan v. Walker*, 533 U.S. 167, 174 (2001). It also undermines ERISA's protective purpose of guarding participants and beneficiaries against arbitrary benefit calculations. *See* 29 U.S.C. § 1002(b); *Boggs*, 520 U.S. at 845.

Here, Plaintiffs allege that the Plan uses formulas based on mortality data from the 1960s–70s and a stale, fixed interest rate to value 2019 retiree benefits, assumptions that bear no relationship to contemporary demographic or economic conditions at the time Plaintiffs' benefits began. That conduct is exactly what § 1055(d) was meant to prevent. Courts and professional standards confirm that actuarial assumptions must be *reasonable* and periodically reviewed.[6] Defendants' plea to ignore reasonableness, and their request that the Court bless any formula so long as it's "in the plan," would allow plan sponsors to circumvent ERISA's protections.[7] This Court should reject that interpretation and hold that Plaintiffs have plausibly alleged a § 1055(d) violation.

> **1.**     **Plans Cannot Use Decades-Old Data to Calculate the Present Value of an "Actuarially Equivalent" Benefit Today**

Contrary to Defendants' argument, the term "actuarial equivalent" must mean something; it imposes a substantive constraint on the value of the two benefit forms. The adjective "actuarial" invokes the professional discipline of actuarial science, which depends on current, evidence-based

---

[6] *See* Actuarial Standards Board., Actuarial Standard of Practice No. 1, § 2.10 ("In many instances, the ASOPs call for the actuary to take 'reasonable' steps, make 'reasonable' inquiries, select 'reasonable' assumptions or methods, or otherwise exercise professional judgment to produce a 'reasonable' result when rendering actuarial services. The intent is to call upon the actuary to exercise the level of care and diligence that, in the actuary's professional judgment, is necessary to complete the assignment in an appropriate manner."); Actuarial Standards Bd., Actuarial Standard of Practice No. 35, § 3.2.5 ("The actuary should select reasonable demographic assumptions."); *Stephens*, 644 F.3d at 440 (citing Schwartzmann & Garfield, Education & Examination Comm. of the Society of Actuaries, Actuarially Equivalent Benefits 1, EA1-24-91 (1991), 11 ("The interest and mortality assumptions play a key role in determining the magnitude of the actuarial equivalence factor. Periodically, the assumptions used must be reviewed and modified so as to insure that they continue to fairly assess the cost of the optional basis of payment.")). In other words, when Congress specified an "actuarial equivalent," it required an analysis under the reasonable standards of the profession, not just any mathematical equation a plan could concoct. *See Urlaub v. CITGO Petrol. Corp.*, No. 21-cv-4133, 2022 U.S. Dist. LEXIS 30616, at *19 (N.D. Ill. Feb. 22, 2022) ("[I]t cannot possibly be the case that ERISA's actuarial equivalence requirements allow the use of unreasonable mortality assumptions.").

[7] *See Esden v. Bank of Bos.*, 229 F.3d 154, 164 (2d Cir. 2000) ("If plans were free to determine their own assumptions and methodology, they could effectively eviscerate the protections provided by ERISA's requirement of "actuarial equivalence.").

assumptions to forecast life expectancy and economic conditions.[8] Plaintiffs agree with Defendants that the concept of actuarial equivalence rests on the principle of "present value" (Def. Br., 13), which is the value of a stream of future payments today. But Olin cannot calculate the present value of a *current* retiree's SLA or JSA using *outdated* mortality data because the present value would not be accurate, and the retiree would get fewer benefits than he or she is entitled to. That is precisely the opposite of ERISA's protective purpose. If employers were free to use any assumptions they wish, they could manipulate the formulas to reduce benefits, thereby stripping § 1055 of its protectionist purpose.

Nor does Congress's use of the word "reasonable" in other ERISA contexts suggest that § 1055's actuarial-equivalence standard is unconstrained. When Congress required "reasonable" assumptions in the funding (29 U.S.C. § 1082(a)) or withdrawal-liability (§ 1391(a)) provisions, it was addressing distinct statutory schemes that do *not* even employ the term "actuarial equivalent." Here, Congress deliberately invoked a technical term of art in actuarial practice, leaving courts to import its established professional meaning, which demands periodic review and reasonableness. *Geiger v. Kawaauhau* (*In re Geiger*), 113 F.3d 848, 852 (8th Cir. 1997) ("We presume that when Congress uses a word that has a fixed, technical meaning, it has used it as a term of art."). Just as ERISA's summary plan description requirements must contain up-to-date information without redundantly including the modifying word "accurate" (§ 1022(b)), and § 1132(a)(1)(B) permits enforcement of plan-specified benefit rights without spelling out "correct," so too § 1055(d) need not append "reasonable" to "actuarial equivalent." The phrase itself subsumes a validity and accuracy standard drawn from actuarial norms.

---

[8] As the Washington Supreme Court held in a 1959 decision, an "actuarial equivalent" calculation "reasonably requires the most accurate tables available." *King Cnty. Emps.' Ass'n v. State Emps.' Ret. Bd.*, 336 P.2d 387, 391 (Wash. 1959) (*en banc*).

14

### 2.    Most Courts Have Allowed These Claims to Proceed

The weight of authority favors permitting Plaintiffs' claims to proceed. Courts around the country—including this Court in *Duffy*—have found that allegations of undervaluing benefits based on the use of outdated mortality data suffice to state a § 1055(d) claim. Over a dozen courts have refused to dismiss such complaints, recognizing that actuarial assumptions must be grounded in reasonable, current data.[9] By contrast, the handful of outlier decisions that Defendants cite rest on erroneous rationales and are already under review on appeal.[10] Even in *Belknap v. Partners Healthcare Sys.*, No. 19-cv-11437, 2020 U.S. Dist. LEXIS 139187, at *4 (D. Mass. Aug. 5, 2020), where the court ultimately adopted the same flawed argument that Defendants advance here, the court denied dismissal finding that "actuarial equivalent" "must mean something." This Court should follow the overwhelming majority view rejecting the notion that actuarial equivalence is satisfied simply by listing assumptions in the plan document.

---

[9] *See Duffy*, 449 F. Supp. 3d at 891; *Masten v. Metro. Life Ins. Co.*, 543 F. Supp. 3d 25, 34-37 (S.D.N.Y. 2021); *Urlaub v. CITGO Petro. Corp.*, No. 21-cv-4133, 2022 U.S. Dist. LEXIS 30616, at *17 (N.D. Ill. Feb. 22, 2022); *Scott v. AT&T Inc.*, No. 20-cv-07094, 2022 U.S. Dist. LEXIS 115123 (N.D. Cal. June 29, 2022); *Herndon v. Huntington Ingalls Industries*, No. 4:19-cv-52, 2020 U.S. Dist. LEXIS 102338, at *5 (E.D. Va. Feb. 20, 2020); *Cruz v. Raytheon Co.*, 435 F. Supp. 3d 350 (D. Mass. 2020); *Torres v. Am. Airlines, Inc.*, 416 F. Supp. 3d 640 (N.D. Tex. 2019); *Smith v. Rockwell Automation*, Inc., 438 F. Sup. 3d 912 (E.D. Wis. 2020); *Smith v. U.S. Bancorp,* No. 18-cv-3405, 2019 U.S. Dist. LEXIS 107481 (D. Minn. June 26, 2019); *Adams v. U.S. Bancorp*, 635 F. Sup. 3d 742 (D. Minn. 2022); *Franklin v. Duke Univ.,* No. 1:23-cv-833, 2024 U.S. Dist. LEXIS 73345, at *7 (M.D.N.C. Apr. 23, 2024); *Whetstone v. Howard Univ.*, Civil Action No. 23-2409 (LLA), 2024 U.S. Dist. LEXIS 164095, at *23 (D.D.C. Sep. 12, 2024); *Hamrick v. E.I. DU Pont de Nemours & Co.*, No. 23-238-JLH, 2024 U.S. Dist. LEXIS 17497, at *10 (D. Del. Jan. 31, 2024); *Duke v. Luxottica U.S. Holdings Corp.*, No. 2:21-cv-6072, 2024 U.S. Dist. LEXIS 216345, at *3 (E.D.N.Y. Nov. 27, 2024); *Skrtich v. Pinnacle W. Capital Corp.*, No. 22-cv-01753, 2023 U.S. Dist. LEXIS 136862, at *8 (D. Ariz. Aug. 7, 2023).

[10] Defendants cite to *Belknap v. Partners Healthcare Sys., Inc.*, 588 F. Supp. 3d 161 (D. Mass. 2022); *Drummond v. S. Co. Servs., Inc.*, No. 22-cv-0174, 2023 U.S. Dist. LEXIS 236565 (N.D. Ga. Sep. 8, 2023); *Reichert v. Bakery*, No. 23-cv-12343, 2024 U.S. Dist. LEXIS 113803 (E.D. Mich. Apr. 17, 2024); *Covic v. FedEx Corp.*, No. 23-cv-02593, 2024 U.S. Dist. LEXIS 242143 (W.D. Tenn. Sep. 18, 2024). The court in *Covic* simply adopted the reasoning of *Reichert*, which, in turn, relied heavily on *Belknap*'s flawed and misguided interpretation of actuarial equivalence, rendering all three decisions equally unpersuasive. Not only was *Belknap* appealed but the remaining three outlier decisions are all on appeal.

15

The Department of Labor ("DOL"), charged with enforcing ERISA, echoes this common-sense conclusion. In its amicus brief in *Drummond*, the DOL explained:

> [A] QJSA must be actuarially "equal in ... value" to the SLA "for the life of the participant." 29 U.S.C. §1055(d)(1)(B). In other words, the expected value of the QJSA must be equivalent to the expected value of the SLA the participant would have received over their lifetime. And determining what a participant would have received as an SLA over their lifetime requires assumptions about mortality. If unreasonable assumptions are made as to the participant's lifespan, then the expected value of the QJSA will not equal the expected value of what the participant would have received as an SLA over their lifetime (and therefore the former would not be the "actuarial equivalent" of the latter).

Br. for Acting U.S. Sec'y of Labor as *Amicus Curiae*, 11. The DOL's position confirms that "actuarial equivalence" requires the use of reasonable, not arbitrary, assumptions.

Defendants also argue that because ERISA requires that actuarial assumptions be stated in the plan (i.e., that benefits be "definitely determinable") this necessarily means that any assumptions listed in the plan, no matter how outdated or unreasonable, satisfy ERISA's actuarial equivalence requirement. Def. Br., 16–17. But ERISA and the Treasury Code's "definitely determinable" rule cannot swallow § 1055(d). If simply listing assumptions sufficed, the "actuarial equivalent" requirement would be redundant and devoid of substance upon which to enforce the protections it is meant to afford, which is contrary to the rule against surplusage. *See TRW Inc. v. Andrews*, 534 U.S. 19, 29 (2001) (rejecting interpretation that "would in practical effect render [provision] entirely superfluous in all but the most unusual circumstances"). ERISA's definitely determinable requirement and its actuarial-equivalence standard serve distinct purposes: one ensures benefit formulas are ascertainable; the other ensures those formulas are *reasonable.*

Moreover, Defendants' concern that requiring reasonable assumptions would force plans to exercise discretion and re-evaluate assumptions each year is misplaced. But nothing prevents a plan from locking in a methodology that ensures continued compliance with ERISA's requirements

16

while also preserving administrative consistency. Indeed, many plans satisfy § 1055 by referencing the Treasury's annually revised mortality tables and interest rates that automatically update each year. These are known as "variable" assumptions, which eliminate employer discretion and ensure assumptions remain up to date. That approach preserves both actuarial soundness and administrative consistency, and demonstrates that reasonable, contemporary assumptions are entirely compatible with ERISA's actuarial equivalence requirement.

### 3.     Treasury Regulations Support a Reasonableness Requirement

Defendants' claim that Treasury's annuity-equivalence regulation, 26 C.F.R. § 1.401(a)-11(b)(2), "does not apply" to § 1055 (Def. Br., 17) is incorrect.[11] Also, courts routinely look to regulations like § 1.401(a)-11 for guidance on what "actuarial equivalence" entails.[12] That regulation expressly provides: "Equivalence may be determined, on the basis of consistently applied ***reasonable actuarial factors***, for each participant or for all participants or reasonable groupings of participants." 26 C.F.R. § 1.401(a)-11(b)(2) (emphasis added). Defendants' argument that the regulation's use of the word "may" suggests that reasonableness is optional (Def. Br., 18) misses the mark. Far from making reasonableness optional, the phrasing "reasonable actuarial

---

[11] Under the Reorganization Plan No. 4 of 1978, the Treasury Department was granted authority to issue regulations interpreting Part 2 of Subtitle B of ERISA, which includes § 1055. *See* 43 Fed. Reg. 47713, 47714–16 (Aug. 10, 1978), §§ 101(a), 104, and 109, 92 Stat. 3790. Following the Retirement Equity Act of 1984, which "enlarged ERISA's protection of surviving spouses in significant respects," (*Boggs*, 520 U.S. at 843), Treasury updated § 1.401(a)-11 and issued § 1.401(a)-20. It did so specifically noting that these rules "also apply to employee benefit plans subject to Title I of ERISA." 53 Fed. Reg. 31837, 31838–39 (Aug. 22, 1988).

[12] *See Urlaub*, 2022 U.S. Dist. LEXIS 30616, at **11–16 (relying heavily on the Tax Code to explain an ambiguity in interpreting § 1055(d) and ERISA); *Herndon*, 2020 U.S. Dist. LEXIS 102338, at *4 (same); *Smith v. Rockwell Automation, Inc.*, 438 F. Sup. 3d 912, 924 (E.D. Wis. 2020) (same); *Torres v. Am. Airlines, Inc.*, 416 F. Supp. 3d 640, 647–48 (N.D. Tex. 2019) (same); *see also Adams*, 635 F. Supp. 3d at 752 (affirming the notion that the Treasury regulations mandate reasonableness in determining actuarial equivalence, reflecting the industry's own understanding of this crucial term).

factors" reflects the regulatory expectation that assumptions must meet professional standards of validity and accuracy.

Defendants point to 26 C.F.R. § 1.401(a)-14(c)(2) and § 1.411(d)-3(g)(1) to argue that reasonableness is not inherent in actuarial terms (Def. Br., 17–19). But those provisions implement distinct Treasury Code sections that do not directly address the annuity-equivalence mandate of § 1055(d). Further, as discussed, those regulations do not employ the phrase "actuarial equivalent," and they do not undermine the general expectation that actuarial equivalence requires *reasonable* factors.

Actuarial standards of practice also reflect a consensus, within the actuarial community, that assumptions used for these determinations be reasonable. Even setting aside the Treasury regulations, the Actuarial Standards of Practice ("ASOPs") confirm that actuarial assumptions must rest on current, credible data. *See* FAC, ¶¶ 49–50 (citing the ASOPs); *supra* n.6. The ASOPs similarly require demographic assumptions be "reasonable" and periodically reviewed. Even if actuaries are not selecting assumptions for each individual benefit payment, those professional norms represent the consensus in the field that assumptions be reasonable, and courts routinely import such norms when interpreting ERISA's use of technical terms. *In re Geiger*, 113 F.3d at 852.

### 4. Defendants' Remaining Arguments are Unsupported and Unpersuasive

First, Defendants contend that enforcing a reasonableness standard would destabilize retirement plans and run afoul of ERISA's anti-cutback rule, 29 U.S.C. § 1054(g). Def. Br., 20–22. But protecting actuarial accuracy need not, and would not, reduce accrued benefits. Plans can maintain nonforfeiture protections simply by adopting a "greater of" formula: participants receive the higher of the benefit calculated under the legacy assumptions or the benefit calculated under updated, reasonable assumptions. That mechanism preserves both the accrued value under the old

18

formula and compliance with ERISA's substantive standards.[13] Far from threatening plan stability, this approach enhances participant protections without sacrificing predictability or consistency. The idea that enforcing a reasonableness standard would necessarily lead to impermissible benefit reductions is not just overstated, it is demonstrably false.

Second, Defendants warn that judicial review of actuarial assumptions would undermine ERISA's goals of transparency and predictability. Def. Br., 20–21. In reality, as discussed, many plans already integrate *variable assumptions* tied to the Treasury Department's annually published mortality tables and interest rates, automatically updating year to year.[14] Those mechanisms deliver clear, consistent benefit calculations. Participants know in advance how assumptions will shift, and sponsors avoid *ad hoc* amendments, while ensuring assumptions remain grounded in current demographic and economic data. Reasonableness and consistency are complementary, not conflicting, objectives under ERISA.

### 5.    Plaintiffs' Case Law is Persuasive and Directly on Point

Defendants dismiss Plaintiffs' authorities as "non-binding" or lacking analysis (Def. Br. 22–23), but every one of the cited decisions addresses *precisely* the same question under ERISA § 1055(d): whether outdated or arbitrary actuarial assumptions can satisfy the "actuarial equivalent"

---

[13] *See Smith v. Rockwell Automation, Inc.*, 438 F. Supp. 3d 912, 918-19 (E.D. Wis. 2020) ("One method is for the plan to provide that the actuarial equivalent of the accrued benefit on or after the date of the change will be the greater of (1) the actuarial equivalent of the accrued benefit as of the date of change calculated under the old actuarial assumptions or (2) the actuarial equivalent of the total accrued benefit calculated under the new assumptions.").

[14] *Smith*, 438 F. Supp. 3d at 917 ("Alternatively, the plan could adopt a variable standard that is self-updating, such as one of the variable standards identified in Revenue Ruling 79-90. Accordingly, § 401(a)(25) does not support the defendants' interpretation of 'actuarial equivalent.'").

requirement. In *Duffy*, the plaintiff argued that using the UP-84, "a grossly outdated, unreasonable mortality table" resulted in benefits "much lower than they should be" *Duffy*, 449 F. Supp. 3d at 890. He argued that updating from the UP-84 to the 2014 SOA table would increase pension liabilities by 7% and extend a 65-year-old's life expectancy from 16.8 to 19.1 years, an additional 28 months of payments. *Id.*, 886. Judge Clark denied Anheuser-Busch's motion to dismiss, finding that the plaintiff "sufficiently alleges that A-B uses unreasonable actuarial factors that result in benefits that fail to meet ERISA's actuarially-equivalent requirement. *Id.*, 888. The *Duffy* decision demonstrates that using obsolete actuarial assumptions, like those alleged here, can violate ERISA's mandate of actuarial equivalence under § 1055(d) and (g). The court in *Urlaub* reached the same conclusion, squarely rejecting the argument that mere adherence to plan terms insulates fiduciaries from scrutiny when those terms produce unlawfully reduced benefits.

In *Urlaub*, the court permitted the plaintiffs' claims—that CITGO's use of the outdated 71 GAM table "resulted in illegally reduced pension benefits"—to proceed and denied the defendant's motion to dismiss. *Urlaub*, 2022 U.S. Dist. LEXIS 30616, at *30. The court leaned heavily on the Treasury regulations finding they "lend greater support to the plaintiffs' contention that actuarial equivalence under section 1055 requires a comparison between their JSAs at their actual (here, early) retirement date and the SLAs they would have received at that retirement date." *Id.*, *13 (discussing 26 C.F.R. § 1.401(a)-20 Q&A-16). Coupled with ERISA's purpose "to ensure a stream of income to surviving spouses," the court found "[i]f, as the plaintiffs allege, the GAMT's mortality assumptions are no longer accurate, resulting in an inaccurate conversion of the plaintiffs' benefits from an SLA to a JSA and shorting them on benefits, then use of the GAMT would violate ERISA's actuarial equivalence requirement."). *Id.*, *20. That is exactly what Plaintiffs allege here.

20

The court in *Franklin* specifically rejected the same argument that Defendants advance here, making clear that it "respectfully disagree[d] with the conclusion in *Reichert*, which, as that court and others have recognized, would make the statutorily-imposed actuarial equivalence requirement meaningless." *Franklin*, 2024 U.S. Dist. LEXIS 73345, at *6. The *Franklin* court noted that "even the *Belknap* court denied an earlier-filed motion to dismiss, noting that 'Congress intended the 'actuarial equivalence' requirement of § 1054(c)(3) to provide some degree of protection to beneficiaries, and not to permit employers to use any assumptions they chose, no matter how outmoded or inapt.'" *Id.*, *6–7 (citing *Belknap*, 2020 U.S. Dist. LEXIS 139187, at *2. While these cases may be non-binding, they reflect a *consensus* that § 1055(d) imposes a substantive constraint on plan assumptions. Defendants' effort to distinguish these by quibbling over "applicability" of Treasury regulations misses the point: courts routinely look to those regulations to interpret technical terms in ERISA. At minimum, these decisions confirm that "actuarial equivalent" contemplates assumptions grounded in *current* demographic and economic conditions, not relics from a half-century ago.

Also, in *Adams*, the court did not disregard the statutory language in favor of the regulations (*see* Def. Br., 23); it found that the issue was not whether ERISA's text contained a "reasonable" requirement but the meaning of "actuarial equivalent" finding that it is a technical word that requires reference to the actuarial industry. *Adams*, 635 F. Supp. 3d at 751. Further, the court in *Adams* denied class certification not because using updated assumptions was legally impermissible, but because plaintiffs' expert applied those assumptions inconsistently, converting some benefits using plan-prescribed factors while critiquing those same factors as outdated.[15]

---

[15] *See Adams*, 22-cv-509, Doc. 173, Order Denying Class Certification, 14–17 (finding that the plaintiffs' expert first converted a portion of the participant's benefit using the accrued benefit, a

21

*Adams* made clear that Plaintiffs' § 1055(d) claim should proceed and scrutinized only the plaintiffs' class definition and expert methodology. Plaintiffs have alleged precisely the same claims regarding the use of unreasonable, outdated assumptions that every one of these courts has found sufficient to state a claim.

### D.  Plaintiffs Allege a Breach of Fiduciary Duty

Defendants are not passive recordkeepers, they are fiduciaries of the Plan, and ERISA requires more than blind compliance with plan terms. Plaintiffs allege that Defendants breached their fiduciary duties by failing to review the terms of a plan that employs decades-old formulas that leaves married participants with benefits that are not "actuarially equivalent" to what they would have received as an SLA, as required by ERISA § 205, 29 U.S.C. § 1055. FAC, ¶ 118. Year after year, these fiduciaries failed to review the terms of the Plan, specifically the formulas used to determine survivor benefits, ensure those formulas comply with ERISA, and, if not, update them. *See* FAC, ¶¶ 118–121. Put simply, Plaintiffs' allegations indicate the Plan's fiduciaries were either intentionally paying benefits that were not actuarially equivalent, or they were asleep at the wheel when it came to the Plan's benefit formulas.

In response, Defendants argue they cannot be liable because they were simply following the Plan's written terms. But ERISA's fiduciary duties foreclose that excuse.[16] Fiduciaries are required to ensure that the plan's operation complies with ERISA's substantive requirements, including the duty to pay actuarially equivalent benefits under § 1055. They are not free to blindly

---

10-year certain and life annuity, into an SLA using the plan's unreasonable formulas, which was improper.).

[16] *See Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 420 (2014) (on the duty to administer plans only "***insofar as such documents and instruments are consistent with***" ERISA citing ERISA § 404(a)(1)) and holding that ERISA "makes clear that the duty of prudence trumps the instructions of a plan document . . . . This rule would make little sense if . . . the duty of prudence is defined by the aims of the particular plan as set out in the plan documents, since in that case the duty of prudence could never conflict with a plan document").

22

adhere to formulas based on decades-old data that penalize married participants for selecting a benefit that will continue to their spouse when they pass.

The duty of loyalty and prudence under ERISA § 404 requires fiduciaries to act solely in the interest of participants and beneficiaries, not to rubber-stamp noncompliant plan terms. *See Feinberg v. T. Rowe Price Group, Inc.*, No. MJG-17-0427, 2018 U.S. Dist. LEXIS 140709, at *16 (D. Md. Aug. 20, 2018) (finding that adherence to the plan document "does not provide a blanket defense for the Plan Trustees."). As one court put it, "the fact that the Committee and its members were abiding by the Plan's text does not necessarily defeat a claim for breach of fiduciary duty." *Whetstone*, 2024 U.S. Dist. LEXIS 164095, at *25. Fiduciary duties include a continuing obligation to monitor plan terms and ensure they remain compliant with ERISA, not a one-and-done duty.[17] Defendants cannot escape liability by claiming "the plan made me do it." ERISA imposes substantive obligations, and fiduciaries are bound to follow the law, not unlawful plan provisions.

### 1.    Defendants' Cited Cases Are Inapposite and Do Not Justify Immunity

Defendants invoke a pair of cases in an effort to shield themselves from fiduciary liability, but neither supports their sweeping claim of immunity. In C*ement & Concrete Workers District Council Pension Fund v. Ulico Casualty Co.*, 387 F. Supp. 2d 175 (E.D.N.Y. 2005), *aff'd*, 199 F. App'x 29 (2d Cir. 2006), and *Secretary of Labor v. Macy's, Inc*., No. 17-cv-541, 2021 U.S. Dist. LEXIS 221603 (S.D. Ohio Feb. 10, 2022), the courts confronted vastly different allegations. There were no claims that fiduciaries failed to monitor plan compliance over time, no evidence that they

---

[17] *See Tibble v. Edison Int'l*, 575 U.S. 523, 530 (2015) (reiterating fiduciaries' "continuing duty to monitor" and ensure compliance with ERISA's requirements); *Hughes v. Nw. Univ.*, 595 U.S. 170, 175-76, 142 S. Ct. 737, 741 (2022) (explaining that fiduciaries have a "continuing duty to monitor [which] is a subset of the duty of prudence") (citing *Tibble v. Edison Int'l*, 575 U.S. 523, 530 (2015) (reiterating fiduciaries' "continuing duty to monitor" and ensure compliance with ERISA's requirements)).

23

ignored widespread or systemic underpayments, and no assertion that the plan sponsor or fiduciaries profited from employing flawed actuarial assumptions. The courts reached the conclusions they did because they rejected the notion that fiduciaries could be held liable strictly for administering the Plan in accordance with the terms, which the plaintiffs alleged were unlawful.

This case is different. Plaintiffs allege that Defendants not only administered a Plan with flawed, outdated formulas, but also failed to re-evaluate or update those assumptions for decades, despite the release of half a dozen more contemporary mortality tables. *See* FAC ¶¶ 118–121. Plaintiffs further allege that Olin, as plan sponsor, had a duty to monitor the activities of the Committee and, it too, failed to ensure the Plan was kept in accordance with ERISA. That is not passive conduct, it is willful disregard, and it violates fiduciary duties under ERISA, which require ongoing diligence, loyalty, and prudence. *See Tibble*, 575 U.S. at 530; *Hughes*, 595 U.S. at 175–76. Simply put, Defendants did not merely inherit a flawed Plan, but allowed that Plan to fester, year after year, through deliberate inaction and in violation of their fiduciary responsibilities. *See Smith v. U.S. Bancorp*, No. 18-cv-3405, 2019 U.S. Dist. LEXIS 107481, at *10 (D. Minn. June 26, 2019) (denying a motion to dismiss fiduciary duty claims based on a failure to monitor by the plan sponsor over the committee where plaintiffs alleged use of outdated actuarial assumptions rendered benefits not actuarially equivalent).

### 2. Olin Is Liable as a Functional Fiduciary for Failing to Monitor Its Appointed Fiduciaries

Olin attempts to distance itself from fiduciary liability by claiming it is merely the plan sponsor, not a named fiduciary. But under ERISA, fiduciary status turns on *function*, not *form*. *Delker v. Mastercard Int'l, Inc.*, 21 F.4th 1019, 1025 (8th Cir. 2022) (citing 29 U.S.C. §§ 1102(a)(2), 1002(21)(A)). A party is a fiduciary "to the extent" it exercises discretionary authority or control over plan management or administration. 29 U.S.C. § 1002(21)(A). Here, Plaintiffs

allege that Olin retained discretionary authority to appoint, monitor, and oversee the Committee responsible for administering the Plan. FAC, ¶ 121. That authority comes with a corresponding fiduciary duty to monitor those appointees and ensure that they act in compliance with ERISA. Plaintiffs allege that Olin failed to do so, year after year, despite its oversight obligations.

Defendants attempt to sidestep this claim by invoking cases involving so-called "settlor" functions like adopting, amending, or terminating a plan. *See* Def. Br., 25–27. But the cases Defendants cite are beside the point because Plaintiffs do not challenge Olin's decision to create or amend the Plan; they challenge its failure to supervise the Committee in its *ongoing administration* of the Plan. That is not a settlor act, it is fiduciary neglect. Courts have held that an entity with the power to appoint and remove plan fiduciaries has a corresponding duty to monitor their performance and take corrective action when necessary.[18] Olin's failure to supervise its appointed fiduciaries, and to ensure the Plan was administered in compliance with ERISA's actuarial equivalence requirements, states a valid claim for breach of fiduciary duty. It cannot hide behind the label of "plan sponsor" when its own conduct fits squarely within the statutory definition of a fiduciary.

### 3.    Plaintiffs Allege a Prohibited Transaction Under ERISA

Defendants argue that Count II fails because Plaintiffs have not identified a "transaction" within the meaning of ERISA § 406(a), 29 U.S.C. § 1106(a)(1), and because Olin's retention of funds does not constitute the use of "plan assets." Def. Br., 28–29. These arguments

---

[18] *See, e.g., Silva v. Evonik Corp.*, No. 20-cv-2202, 2020 U.S. Dist. LEXIS 250206, at *21 (D.N.J. Dec. 30, 2020) ("Persons with authority to appoint and remove plan fiduciaries have an ERISA-imposed duty to monitor those fiduciaries"); *Scalia v. WPN Corp.*, 417 F. Supp. 3d 658, 669 (W.D. Pa. 2019) ("The power to appoint and dismiss an investment fiduciary carries with it a duty to monitor appropriately those subject to removal. (internal quotations omitted) (citing *Coyne & Delany Co. v. Selman*, 98 F.3d 1457, 1465 (4th Cir. 1996) and *Leigh v. Engle*, 727 F.2d 113, 135 (7th Cir. 1984)).

mischaracterize both the statute and Plaintiffs' allegations. ERISA § 406(a)(1)(D) bars any "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan." And § 406(b)(1) forbids fiduciaries from "deal[ing] with the assets of the plan in his own interest or for his own account." 29 U.S.C. §§ 1106(a)(1)(D) and 1106(b)(1).

Here, Plaintiffs allege that Defendants used outdated and unreasonable actuarial assumptions to systematically undervalue annuity benefits. FAC, ¶¶ 111, 118. The resulting underpayments allowed Olin—a party in interest under ERISA by virtue of its status as the plan sponsor—to avoid making the contributions that would have been required to fund full, lawful benefits. The plan was deprived of assets it should have held to meet its obligations, assets that were retained by Olin, which benefited it financially. FAC, ¶ 111. That is no mere "retention of funds;" it is an ongoing "transaction" each time the Plan pays out too little, transferring value away from participants and into the employer's pocket. Olin allowed actuarial assumptions to remain outdated for decades when it knew (or should have known) that doing so suppressed benefits paid and reduced the company's funding obligations to the Plan. That is precisely the kind of conflicted dealing ERISA was enacted to prevent. As the Eighth Circuit noted, ERISA prohibits transactions that cause even an "indirect benefit" to a party in interest.[19]

Defendants attempt to reframe these allegations as akin to passive investment decisions or routine disbursements under Plan terms. But the cases they cite—*Lockheed Corp. v. Spink*, 517 U.S. 882 (1996) and *Wright v. Oregon Metallurgical Corp.*, 360 F.3d 1090 (9th Cir. 2004)—are

---

[19] *See Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 600 (8th Cir. 2009) ("Section 406(a)(1). . . 'supplements the fiduciary's general duty of loyalty to the plan's beneficiaries . . . by categorically barring certain transactions deemed 'likely to injure the pension plan.' *Harris Trust & Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238, 241–42 (2000) . . . . Among the transactions barred by § 1106(a)(1) are those that "constitute[] a direct or indirect . . . (C) furnishing of goods, services, or facilities between the plan and a party in interest; [or] (D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan.' 29 U.S.C. § 1106(a)(1)(C), (D)").

inapposite. *Lockheed* held that a plan sponsor's decision to amend a plan to offer early retirement benefits in exchange for a release of claims was not a prohibited transaction, because plan design decisions like amendments are settlor functions, not fiduciary acts. 517 U.S. 882, 890–91. That's not what Plaintiffs allege here.

Similarly, *Wright* held that because the plan's express terms *permitted* the fiduciaries to maintain up to 85% investment in employer stock, and because there was no evidence of financial distress or insider self-dealing, the fiduciaries simply declined to deviate from plan terms in response to short-term market fluctuations, a choice the Ninth Circuit deemed reasonable and legally protected. This case involves a continuing fiduciary failure to act, despite a clear duty to monitor, and despite incentives not to act because the employer was benefiting financially from suppressing survivor benefits. Unlike in *Lockheed*, this case is not about employees getting extra benefits, and unlike in *Wright* where the court found no "transaction" or asset transfer, here, each underpayment of benefits functions as an ongoing diversion of plan value for Olin's benefit. This case involves fiduciaries abdicating their monitoring duties and allowing flawed methodologies to persist, while the plan sponsor reaps the financial upside from reduced funding obligations. Defendants cannot shoehorn these facts into *Wright*. Defendants' reliance on *Lockheed* and *Wright* is misplaced, and their attempt to analogize this case to routine benefit administration and discretion exercised in good faith under the terms of a plan misses the mark entirely.

### 4. Plaintiffs Allege Plan Losses and Profits Recoverable Under § 1132(a)(2)

Defendants argue that Plaintiffs' claims under ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), must fail because the harm is allegedly "personal" rather than a "loss to the plan." Def. Br., 30. That framing is wrong because Plaintiffs allege a classic plan-level loss. Specifically, they allege that the Plan's use of outdated and unreasonable actuarial assumptions caused Olin to contribute

27

less money than it would have if those assumptions were accurate and compliant with ERISA. FAC, ¶ 111. That funding shortfall is an example of a loss to the Plan.[20] Even if the Plan's books "balance" on paper, the Plan was deprived of assets it should have received, assets that were instead retained by Olin. That is a real economic loss to the Plan. *See* 29 U.S.C. § 1109(a). The fact that the Plan met its payout obligations by paying participants less than they were owed does not cure the harm; it confirms it. ERISA does not permit employers to manipulate the formulas used to pay benefits, shortchange its contributions to the Plan, and then claim no harm.

Furthermore, § 1109(a) expressly provides for the recovery of not only "losses to the plan" but also "any profits" gained through the use of plan assets. 29 U.S.C. § 1109(a). Plaintiffs allege that Olin profited by avoiding lawful contributions and retaining those funds for its own use resulting in it receiving a windfall. FAC, ¶ 114. That unjust enrichment is independently actionable under § 1109(a), even if Defendants dispute whether a traditional "loss" occurred.

Additionally, Defendants' citation to *Stark v. Healthy All. Life Ins. Co.,* No. 10-cv-1141, 2010 U.S. Dist. LEXIS 112742 (E.D. Mo. Oct. 22, 2010) and *Larsen v. Cigna Corp.*, 2006 U.S. Dist. LEXIS 33134 (D.S.D. May 18, 2006) misses the mark. *Stark* involved a narrow, participant-level challenge to a denial of health insurance coverage for one individual's son, and the court dismissed the § 1132(a)(2) claim because the plaintiffs sought only individualized relief, and did not allege any harm to the plan as a whole or any misuse of plan assets. *Id.*, *7–8. The plaintiffs never alleged a pattern or practice of fiduciary misconduct, nor did they claim that plan assets had

---

[20] *See, e.g., Duke v. Luxottica U.S. Holdings Corp.*, No. 2:21-cv-6072, 2024 U.S. Dist. LEXIS 216345, at *37 (E.D.N.Y. Nov. 27, 2024) (finding that "[l]oss restoration and the recalculation and payment of amounts owed to [the plaintiff] and members of the putative class work together to redress both [the plaintiff]'s alleged injury of receiving past annuity payments that are lower than what she is legally entitled to and the Plan's related injury of sustaining underfunding and related losses due to the Plan Committee's use of outdated actuarial assumptions to calculate joint and survivor annuity payments for hundreds, if not thousands of recipients").

been diverted or misused. In fact, the court dismissed the fiduciary duty claim specifically because there was no allegation of a plan-wide breach, no requested relief on behalf of the plan, and no claim of unjust enrichment by the employer. *Id.*, *8. This case is the opposite. Plaintiffs allege fiduciary conduct that systematically harmed the Plan's funding structure and unjustly enriched the sponsor.

*Larsen* similarly did not involve any plan-level remedy. There, the plaintiff challenged the denial of her individual short- and long-term disability benefits and attempted to reframe that denial as a breach of fiduciary duty. The court dismissed the fiduciary claim under § 1132(a)(2), holding that the plaintiff had not alleged any harm to the plan itself, only that she had personally been denied benefits. 2006 U.S. Dist. LEXIS 33134, *5–6. *Stark* and *Larsen* were about one person's denied claim. This case is about years of fiduciary indifference, systemic underfunding that impacted the Plan as a whole, and unlawful enrichment of a party in interest. That is precisely the kind of conduct § 1109(a) and § 1132(a)(2) were enacted to remedy. *Stark* and *Larsen* simply affirm the unremarkable point that § 1132(a)(2) protects the Plan as an entity and not personal grievances over individual benefits.

In short, Plaintiffs allege both (1) a loss to the Plan in the form of underfunding, and (2) profits retained by Olin as a result of that underfunding. Both are recoverable under § 1132(a)(2). Dismissal is therefore unwarranted.

## IV.    CONCLUSION

Plaintiffs have plausibly alleged that Defendants violated ERISA by using outdated and unreasonable actuarial assumptions that resulted in the systematic underpayment of qualified JSAs, benefits Congress intended to protect. These allegations state valid claims under ERISA, as recognized by the vast majority of courts across the country, including this one in *Duffy*. Defendants' attempt to reframe the claims as mere challenges to plan design or procedural

29

technicalities ignores both the substance of Plaintiffs' allegations and ERISA's protective purpose. Accepting the well-pleaded facts as true, Plaintiffs have more than met their burden to proceed beyond the pleading stage. For the foregoing reasons, the Court should deny Defendants' motion to dismiss in its entirety.

Respectfully submitted,

**POSPISIL SWIFT, LLC**

*/s/ Michael D. Pospisil*
Michael D. Pospisil #49139MO
1600 Genessee Street, Suite 340
Kansas City, MO 64102
Tel: (816) 895-6440
Fax: (816) 895-9161
Email: mdp@pslawke.com

**SIRI & GLIMSTAD LLP**
Oren Faircloth
Kimberly Dodson
745 Fifth Avenue, Suite 500
New York, NY 10151
Tel: (212) 532-1091
Fax: (646) 417-5967
Email: ofaircloth@sirillp.com
Email: kdodson@sirillp.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 30th day of June 2025, I filed the above document with the

Clerk's Office using the CM/ECF System for filing and electronic service to all counsel of

record.

/s/ Michael D. Pospisil
Michael D. Pospisil