UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| LOU ANN LANDEL, et al., | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| v. | ) | No. 4:25-cv-00096-CMS |
| | ) | |
| OLIN CORPORATION, et al., | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORDANDUM AND ORDER

Before the Court is the Motion to Dismiss for Failure to State a Claim of Defendants Olin Corporation ("Olin Corp.") and Olin Pension and CEOP Administrative Committee ("Committee"). (Doc. 20). For the reasons set forth below, Defendants' motion is GRANTED.

## BACKGROUND

### *The Plan*

According to Plaintiffs' Amended Complaint, Defendant Olin Corp. established the Olin Corporation Employees' Pension Plan ("the Plan") in 1967. The Plan is an "employee pension benefit plan" and a "defined benefit plan" within the meaning of ERISA. (Doc. 17 at 19); 29 U.S.C. §§ 1002(2)(A), (35). All participants in the Plan are current or former employees of Olin Corp. and their spouses. (Doc. 17 at 20, 29).

Defendant Committee is an unincorporated association in Clayton, Missouri, which exercises discretionary authority and control in managing the Plan. (Doc. 17 at 9,

1

37). Defendants John/Jane Does 1–10 are individual members of Defendant Committee during the relevant time period. *Id.* at 9. Defendant Committee also controls the disposition of the Plan's assets. *Id.* at 37.

There are two default types of pension benefits offered by the Plan: single life annuities ("SLAs"), which are the default for single employees; and joint and survivor annuities ("JSAs"), which are the default for married employees. (Doc. 17 at 2–3).

SLAs are a monthly benefit for the life of the Participant. (Doc. 17 at 2). JSAs are a monthly benefit for the life of the Participant and then, when the Participant dies, a monthly benefit for the life of the Participant's spouse. *Id.* at 3. The benefit for the Participant's spouse is identified by the percentage of the benefit paid to the Participant during his or her life. *Id.* For example, a 50% JSA pays the spouse half the amount received by the Participant and a 100% JSA pays the spouse the same amount received by the Participant. *Id.* The default JSA for Participants who already are married when their benefits begin is a 50% JSA. *Id.*

JSAs that are between 50% and 100% of the value of an SLA are called Qualified Joint and Survivor Annuities ("QJSAs"). *Id.*; *see also* 29 U.S.C. § 1055(d). ERISA governs the calculation of QJSAs and specifically requires them to be "the actuarial equivalent of a single annuity for the life of the participant." 29 U.S.C. § 1055(d)(1)(B).

Similar conversions take place when a vested Participant in the Plan dies before benefits commence with a surviving spouse. (Doc. 17 at 3). The default benefit in these circumstances is called a Qualified Preretirement Survivor Annuity ("QPSA"), which the

2

Plan provides to the surviving spouse. *Id.* The QPSA benefit is calculated by identifying the Participant's SLA and converting it into a 50% JSA. *Id.* at 3 n.1.

*Actuarial Assumptions*

Determining a JSA benefit requires a pension plan to convert an SLA, which is meant to cover the life of one person, the Participant, to a benefit meant to cover the lives of two people, the Participant and the beneficiary. *Id.* at 11. To account for this, plans use actuarial assumptions to convert SLAs into JSAs. *Id.* at 11–12. ERISA requires the JSA to be "the actuarial equivalent" of the resulting SLA. *Id.* at 12; 29 U.S.C. § 1055(d)(1)(A). This requirement similarly applies to the conversion of an SLA to a QPSA. (Doc. 17 at 13–14); 29 U.S.C. § 1055(e)(1)(A).

The Plan offered by Olin Corp. calculates "actuarial equivalence" by taking the value of the SLA and first discounting it with an interest rate of 9.2% compounded annually before applying a mortality table. (Doc. 21, Ex. 2 at 9). Mortality tables predict the rate at which retirees will die at a given age, expressed as a decimal, which is then multiplied by the value of the SLA after the application of the interest rate. (Doc. 17 at 4); *see also*, *e.g.*, (Doc. 21, Ex. 2 at 136).

The Plan generally uses the 1983 Group Annuity Mortality Table created by the Society of Actuaries, except for workers who worked at certain facilities identified in

3

Appendix J. (Doc. 21, Ex. 2 at 9).[1] Some of these facilities identified in Appendix J use a different actuarial table, the Unisex Pensioner-1984 ("UP-84") Table.[2]

*The Plaintiffs*

Plaintiff Lou Ann Landel, a resident of Michigan, is a participant in the Plan through her late husband, Jerold Landel. (Doc. 17 at 8). Her husband worked for Olin Corp. for 20 years before his death in 2019. *Id.* She began receiving QPSA benefits in November 2019 in the form of a 50% JSA. *Id.*

Jerold Landel, if he had survived, would have received a monthly SLA payment of $106.34. *Id.* at 29. Plaintiff Landel, as his widow, receives a $46.49 monthly payment from a 50% JSA. *Id.* If the Plan were to use November 2018 Treasury Assumptions to convert the SLA into Plaintiff's JSA, she alleges that she would be receiving $48.63, or $2.14 more, per month. *Id.* This means that, by the time the Amended Complaint was filed in May 2025, Plaintiff Landel would have received a total of $312.11 more in benefits if the Plan used 2018 Mortality Tables rather than 1983 Mortality Tables. *Id.*

---

[1] Society of Actuaries, Mortality and Other Rate Tables, https://mort.soa.org/ViewTable.aspx?TableIdentity=828 (last visited Mar. 13, 2026).

[2] The Amended Complaint speculates that the Plan uses either an older mortality table, the 71GAM, or the UP-84 combined with a five percent interest rate. (Doc. 17 at 27). The five percent interest rate does not appear in the versions of the Plan in effect when either Plaintiff began to receive benefits. *See* (Doc. 21, Ex. 1); (Doc. 21, Ex. 2). Additionally, the Amended Complaint identifies neither the location where Plaintiff Landel's husband worked nor where Plaintiff Lewis worked. (Doc. 17 at 8). Because the Court "need not accept as true factual assertions that are contradicted by documents upon which the pleadings rely," the Court will rely on the default assumptions found in the Plan. *See Winston v. City of St. Louis*, No. 4:24-CV-1390-ZMB, 2026 WL 497057, at *6 n.3 (E.D. Mo. Feb. 23, 2026) (internal quotation omitted).

4

Plaintiff Alvin L. Lewis, a resident of Louisiana, is a participant in the Plan. (Doc. 17 at 8). He began receiving his benefits in April 2020. *Id.* He receives a 100% JSA with a $1,058.78 monthly payment. *Id.* at 29. Plaintiff Lewis claims that if the Plan used 2018 Mortality Tables, he would receive $1,126.41 per month instead. *Id.* His total claimed lost benefits, then, at the time of the Amended Complaint are $11,598.62 over the course of approximately five years.

Plaintiffs bring claims against Defendants in two counts: Count I alleges Defendants violated 29 U.S.C. § 1055's "actuarial equivalence" requirement by failing to apply updated actuarial assumptions; Count II alleges that Defendants violated their fiduciary duties to Plaintiffs and the Plan under 29 U.S.C. §§ 1104 and 1106 by using outdated actuarial figures to enrich themselves. (Doc. 17 at 33–36).

**ANALYSIS**

Defendants collectively filed a Motion to Dismiss for Failure to State a Claim seeking dismissal of both counts against them. (Doc. 20). For a complaint to survive a motion to dismiss, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 555, 570, 127 S.Ct. 1955 (2007)); *Lustgraaf v. Behrens*, 619 F.3d 867, 873 (8th Cir. 2010). The facts in the complaint must "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "'Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'" *Usenko v. MEMC LLC*, 926 F.3d 468, 472 (8th Cir. 2019) (quoting *Iqbal*, 556 U.S. at 678). "'A claim has facial plausibility when

5

the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505, 512 (8th Cir. 2018) (quoting *Whitney v. Guys, Inc.*, 700 F.3d 1118, 1128 (8th Cir. 2012)).

On a motion to dismiss, the Court "'must accept as true all of the complaint's factual allegations and view them in the light most favorable to the Plaintiffs.'" *Stodghill v. Wellston Sch. Dist.*, 512 F.3d 472, 476 (8th Cir. 2008) (quoting *Gunter v. Morrison*, 497 F.3d 868, 873–74 (8th Cir. 2007)). The Court may also consider documents attached to the complaint and materials necessarily embraced by the pleadings. *Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505, 512 (8th Cir. 2018).

### Contractual Limitation

Before the Court addresses the merits of Plaintiff's Complaint, it must first address Defendant's claim that the Plan's two-year limitations period applies, and that it bars Plaintiffs from bringing this suit. (Doc. 21 at 8).

The Plan limits the time in which an individual may commence a lawsuit involving Plan claims. (Doc. 21 at 8–9). A plaintiff must commence the "lawsuit involving Plan claims no later than two years after the individual receives information that constitutes a clear repudiation of the rights the individual is seeking to assert . . . ." *Id.* The Plan then further clarifies that a clear repudiation is "the underlying event or issue that should have triggered the individual's awareness that his or her rights under the Plan may have been violated . . . ." *Id.* at 9.

Defendant argues "the underlying event or issue" in this case "that should have triggered" Plaintiffs' awareness that their rights under the Plan had been violated was their first receipt of payments. *Id.* at 16. But this is an inaccurate interpretation of the Plan's limitations period. Plaintiffs never experienced an "event or issue that should have triggered [their] awareness that [their] rights *under the Plan* may have been violated" because they do not claim that their rights under the Plan have been violated. Rather, Plaintiffs claim that the Plan as written violates the guarantees of ERISA, specifically those of "actuarial equivalence" under 29 U.S.C. §1055. Thus, the Plan's two-year limitations period does not apply here.

### Count I

Plaintiffs' first count alleges that Defendants violated 29 U.S.C. § 1055 by using "unreasonable" actuarial assumptions to calculate QPSA benefits. (Doc. 1 at 32–33). Plaintiffs seek "all available and appropriate remedies to redress" the alleged violations of the "actuarial equivalence" requirement of 29 U.S.C. § 1055, including restitution of the amount withheld from the Plan participants and injunctive relief. (Doc. 1 at 39–40).

Plaintiffs ground this Count in their theory that, since Defendants used "formulas based on antiquated, unreasonable actuarial assumptions to calculate JSA benefits," they violated 29 U.S.C. § 1055's requirement that QPSAs be "actuarially equivalent" to SLAs offered by the Plan. (Doc. 1 at 32–33). Plaintiffs specifically allege that Defendants use outdated and unreasonable mortality rates, *id.* at 33, and an outdated interest rate, *id.* at 28.

Title 19 U.S.C. § 1055(d)(1)(A) requires QJSAs, like the benefit received by Plaintiff Lewis, to be "the actuarial equivalent of a single life annuity [SLA] for the life of the participant." Likewise, Section 1055(e) requires QPSAs, like the benefit received by Plaintiff Landel, to be "not less than the amounts which would be payable as a survivor annuity under the qualified joint and survivor annuity [QJSA] under the plan (or the actuarial equivalent thereof) . . . ."

Plaintiffs allege that Defendants, by using older mortality tables and a five percent interest rate, have violated the "actuarial equivalent" requirement of Section 1055. This allegation is founded on Plaintiffs' understanding that "actuarial equivalence" contains implicit substantive requirements, rather than mere equivalence, for plans to use "reasonable" actuarial assumptions, including requirements that Plaintiffs use up-to-date mortality tables and interest rates, though Plaintiffs demur in specifying how up-to-date or how often the mortality tables and interest rates much change as they fluctuate. (Doc. 17 at 18–19, 29–30). Plaintiffs claim they are damaged by the Plan's application of outdated mortality tables, which calculate shorter lifespans, and outdated interest rates, which are higher than "reasonable current interest rates." *Id.* at 36.

Plaintiffs' interpretation is not supported by a plain reading of the text of 29 U.S.C. § 1055. ERISA does not define the term "actuarial equivalent." Accordingly, this Court "assume[s] Congress intended that term of art to have its established meaning." *Stephens v. U.S. Airways Grp., Inc.*, 644 F.3d 437, 440 (D.C. Cir. 2011) (citing *McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 342 (1991)). Though there is neither an agreed definition between the parties, nor an agreed definition among the courts, this Court finds

persuasive the definition applied by the D.C. Circuit in *Stephens*, 644 F.3d at 440 (citing Jeff L. Schwartzmann & Ralph Garfield, *Education & Examination Comm. of the Society of Actuaries, Actuarially Equivalent Benefits* 1, EA1–24–91 (1991), https://www.soa.org/globalassets/assets/files/edu/edu-2009-fall-ea1-02-sn.pdf): "Two modes of payment are actuarially equivalent when their present values are equal under a given set of actuarial assumptions." "Present Value" is defined by ERISA, "with respect to liability, [as] the value adjusted to reflect anticipated events." 29 U.S.C. § 1002(27).[3] The Society of Actuaries provides a similar description when defining the "present value" of a cash flow as the "value of a future cash flow given by a present value model under a particular set of assumptions about future economic or other conditions . . . ." Society of Actuaries, *Glossary* 53 (2022).

The Plan meets that definition of actuarial equivalence. The Plan explicitly states which actuarial assumptions it uses, namely a default interest rate of 9.2% and the 1983 Group Annuity Mortality Table. (Doc. 21, Ex. 2 at 9). These are a "given set of actuarial assumptions" to adjust the value of its SLAs "to reflect anticipated events" (such as the time value of money and the mortality rate of its participants) in order to make the present value of its SLAs equivalent to those of its QJSAs and QPSAs. Importantly, Plaintiffs do not contend that the Plan's interest rate and mortality table are not "actuarial

---

[3] Though this definition refers to liabilities, not benefits, it is found in ERISA, and this Court finds it informative as to Congress's intended definition of actuarial equivalence, even if this Court does not think it therefore requires benefits under 29 U.S.C. §§ 1055(d) and (e) to "conform to such regulations as the Secretary of the Treasury may prescribe." 29 U.S.C. § 1002(27).

assumptions"; they contend only that the Plan's chosen interest rate and mortality table are "unreasonable." (Doc. 17 at 34).

ERISA, however, does not impose a substantive standard beyond actuarial equivalence. ERISA is a carefully worded statute, and every omission is given force. *See Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504, 510 (1981); *see also Mertens v. Hewitt Assocs.*, 508 U.S. 248, 254 (1993). Notably, in other subsections of ERISA, Congress set a substantive standard for calculating lump-sum benefits, 29 U.S.C. § 1055(g), and a reasonableness requirement for plan funding purposes, Section 1085a(c)(3)(A), of the sort Plaintiffs would have the Court apply here. Congress knew how to add substantive requirements to ERISA, including a reasonableness requirement, and it did not do so in Sections 1055(d) and 1055(e).

Plaintiffs also attempt to buttress their interpretation of Section 1055 with citations to tax regulations, namely 26 C.F.R. §§ 1.401(a)-11 and 1.401(a)-20. (Doc. 1 at 13, 16–17); (Doc. 24 at 17). But 29 U.S.C. § 1202(c) extends the application of regulations related to 26 U.S.C. §§ 410(a), 411, and 412 only "to the minimum participation, vesting, and funding standards" of Subchapter I of Chapter 18 of Title 29, not to the *benefit* standards at issue in 29 U.S.C. §§ 1055(d) and (e). The Court will not, then, use these regulations as an interpretive tool, particularly when they are not consistent with the plain text of Section 1055.

Finally, Plaintiffs raise *Duffy v. Anheuser-Busch Cos., LLC*, 449 F.Supp.3d 882 (E.D. Mo. 2020), a case from this District. (Doc. 24 at 1). In that case, the court concluded that Anheuser-Busch's use of a mortality table from 1984 was "unreasonable"

and therefore not "actuarially equivalent." *Duffy*, 449 F.Supp.3d at 891. The problem with *Duffy* is that the court was not presented with the very issue on which Defendant's motion turns here. There, no one disputed a "reasonableness" requirement in 29 U.S.C. § 1055, *id.* at 890, despite that the word "reasonable" does not appear anywhere in the applicable sections, sections 1055(d) and (e) and section 1054(c)(3). The court therefore was never afforded the opportunity to consider whether the text of either 29 U.S.C. §§ 1055(d) and (e) or the similarly worded 29 U.S.C. § 1054(c)(3) supported such a substantive reasonableness requirement, *see generally id.*

Accordingly, this Court does not interpret 29 U.S.C. §§ 1055(d) and (e) to contain specific substantive standards beyond its requirement of "actuarial equivalence." Likewise, this Court finds that the Plan, as currently written, offers QJSAs and QPSAs that are "actuarially equivalent" to SLAs, as required by 29 U.S.C. §§ 1055(d) and (e).

The motion to dismiss Count I is GRANTED.

## Count II- Breach of Fiduciary Duty

Plaintiffs' second count alleges that Defendants Olin Corp. and Committee were fiduciaries of the Plan and breached their statutory fiduciary duties under ERISA. (Doc. 17 at 35–39). Plaintiffs specifically allege that Olin Corp. did not act loyally and prudently in allowing the Committee to administer the plan by using outdated actuarial assumptions and interest rates to reduce the participants' benefits to Defendants' own enrichment. *Id.* at 38.

The two sections Plaintiffs cite in support of this claim are 29 U.S.C. § 1104(a)(1) and 29 U.S.C. § 1106(b)(1). Section 1104(a)(1) sets a standard of care for administering a

plan under ERISA, including a duty of loyalty that the fiduciary "shall discharge his duties . . . solely in the interest of the participants and beneficiaries . . . ." Section 1106(b)(1) prohibits fiduciaries from transacting with the Plan in a way that is in their own interest.

As a threshold issue, Olin Corp. does not have fiduciary duties as alleged in Count II. *See Pegram v. Herdrich*, 530 U.S. 211, 226 (2000) ("In every case charging breach of ERISA fiduciary duty . . . the threshold question is . . . whether that person was acting as a fiduciary . . . when taking the action subject to complaint."). The named fiduciary of the Plan is not Olin Corp. but the Committee, *see* (Doc. 21, Ex. 2 at 56) ("The Administrative Committee and the Investment Committee, together with the Trustee, have been designated to carry out all fiduciary responsibilities under the Act with respect to the Plan except for those responsibilities specifically delegated to another person.").

Plaintiff's nevertheless allege that Olin Corp. had a "responsibility to oversee the Committee and evaluate its actions with respect to the Plan." (Doc. 17 at 39). This is a fiduciary duty recognized by the Eighth Circuit. *See Barrett v. O'Reilly Automotive, Inc.*, 112 F.4th 1135, 1140 (8th Cir. 2024). That said, such a duty is derivative only and requires a sufficiently pleaded theory of an underlying breach. *See id.*; *see also Brown v. Medtronic, Inc.*, 628 F.3d 451, 461 (8th Cir. 2010) ("These derivative claims allege a breach of the duty of loyalty and a breach of the duty to properly appoint, monitor and inform the plan committee, respectively. We hold that neither of these claims can survive without a sufficiently pled theory of an underlying breach."). For reasons largely already

12

explained, Plaintiffs did not adequately allege a derivative breach of fiduciary duty by Olin Corp. and an underlying breach by the Committee.

Plaintiffs rest their allegations that Olin Corp. breached its fiduciary duty to Plaintiffs exclusively on their contention that the Committee violated its duties by administering the assets of the Plan using outdated actuarial assumptions that did not meet Section 1055(d) or (e)'s actuarial equivalence requirements. (Doc. 17 at 37–38). As this Court already has concluded, the Plan's actuarial assumptions do not contravene ERISA's actuarial equivalence requirement. Therefore, neither Olin Corp. nor the Committee violated its fiduciary duties under ERISA.

The motion to dismiss Count II is GRANTED.

## CONCLUSION

Accordingly, **IT IS HEREBY ORDERED** that Defendants' Motion to Dismiss for Failure to State a Claim, (Doc. 22), is **GRANTED**. Plaintiff's Amended Complaint is **DISMISSED** with prejudice.

Dated this 20th day of March 2026.

_____
CRISTIAN M. STEVENS
UNITED STATES DISTRICT JUDGE

13